1     DISTRICT COURT, COUNTY OF DENVER,
       STATE OF COLORADO

2

3     Court Address:
       1437 Bannock Street

4     Denver, CO 80202               ^ COURT USE ONLY ^
       _____

5

6     ERIC COOMER, Ph.D.,          Case No. 20CV34319

7          Plaintiff,         Courtroom 409

8     vs.

9     DONALD J. TRUMP FOR PRESIDENT, INC.,
       SIDNEY POWELL, SIDNEY POWELL, P.C.

10    RUDOLPH GIULIANI, JOSEPH OLTMANN,
       FEC UNITED, SHUFFLING MADNESS

11    MEDIA, INC., d/b/a CONSERVATIVE DAILY,
       JAMES HOFT, TGP COMMUNICATIONS LLC

12    d/b/a THE GATEWAY PUNDIT, MICHELLE
       MALKIN, ERIC METAXAS, CHANEL RION,

13    HERRING NETWORKS, INC.,
       d/b/a ONE AMERICA NEWS NETWORK,

14    and NEWSMAX MEDIA, INC.,

15        Defendants.
       _____

16

       VIDEO VIDEOCONFERENCED DEPOSITION OF JOSEPH OLTMANN

17              September 8, 2021
       _____

18

19

20

21

22

23

24

25

                           Page 1

```
 1      VIDEOCONFERENCED APPEARANCES:
 2     ON BEHALF OF THE PLAINTIFF:
               CHARLES J. CAIN, ESQ.
 3             BRAD KLOEWER, ESQ.
               STEVE SKARNULIS, ESQ.
 4             ZACH BOWMAN, ESQ.
               Cain & Skarnulis PLLC
 5             P.O. Box 1064
               Salida, California  81201
 6             Phone:  719-530-3011
               Email:  ccain@cstrial.com
 7             Email:  bkloewer@cstrial.com
               Email:  skarnulis@cstrial.com
 8             Email:  zbowman@cstrial.com
 9     ON BEHALF OF THE PLAINTIFF:
               THOMAS M. ROGERS III (TREY), ESQ.
10             Recht Kornfeld PC
               1600 Stout Street, Suite 1400
11             Denver, Colorado  80202
               Phone:  303-573-1900
12             Email:  trey@rklawpc.com
13     ON BEHALF OF THE DEFENDANT DONALD J. TRUMP
       FOR PRESIDENT, INC.:
14             ERIC R. HOLWAY, ESQ.
               BETH CHAMBERS, ESQ.
15             Jackson Kelly PLLC
               1099 18th Street, Suite 2150
16             Denver, Colorado  80202
               Phone:  303-390-0016
17             Email:  eric.holway@jacksonkelly.com
               Email:  beth.chambers@jacksonkelly.com
18
       ON BEHALF OF THE DEFENDANT DEFENDING THE REPUBLIC:
19             CHRISTOPHER SEERVELD, ESQ.
               Dymond • Reagor, PLLC
20             8400 East Prentice Avenue, Suite 1040
               Greenwood Village, Colorado  80111
21             Phone:  303-734-3400
               Email:  cseerveld@drc-law.com
22
23
24
25
                                        Page  2
```

```
 1      VIDEOCONFERENCED APPEARANCES (Cont'd):
 2     ON BEHALF OF THE DEFENDANT SIDNEY POWELL AND
       SIDNEY POWELL PC:
 3             BARRY ARRINGTON, ESQ.
               Arrington Law Firm
 4             3801 East Florida Avenue, Suite 830
               Denver, Colorado  80210
 5             Phone:  303-205-7870
               Email:  barry@arringtonpc.com
 6
       ON BEHALF OF THE DEFENDANTS JOSEPH OLTMANN, FEC UNITED,
 7     and SHUFFLING MADNESS MEDIA, INC., d/b/a CONSERVATIVE DAILY:
               ANDREA M. HALL, ESQ.
 8             The Hall Law Office, LLC
               P.O. Box 2251
 9             Loveland, Colorado  80539
               Phone:  970-419-8234
10             Email:  andrea@thehalllawoffice.com
11     ON BEHALF OF THE DEFENDANTS JOSEPH OLTMANN, FEC UNITED,
       and SHUFFLING MADNESS MEDIA, INC., d/b/a CONSERVATIVE DAILY:
12             INGRID J. DEFRANCO, ESQ.
               The Law Office of Ingrid J. Defranco
13             P.O. Box 128
               Brighton, Colorado  80601
14             Phone:  303-443-1749
               Email:  defrancoi@yahoo.com
15
       ON BEHALF OF THE DEFENDANTS JAMES HOFT AND
16     TGP COMMUNICATIONS, LLC d/b/a THE GATEWAY PUNDIT:
               JONATHAN BURNS, ESQ.
17             The Burns Law Firm
               P.O. Box 191250
18             St. Louis, Missouri  63119
               Phone:  314-329-5040
19             Email:  tblf@pm.me
20     ON BEHALF OF THE DEFENDANTS JAMES HOFT AND
       TGP COMMUNICATIONS, LLC d/b/a THE GATEWAY PUNDIT:
21             RANDY CORPORON, ESQ.
               Law Offices of Randy B. Corporon, PC
22             2821 South Parker Road, Suite 555
               Aurora, Colorado  80014
23             Phone:  303-749-0062
               Email:  rbc@corporonlaw.com
24
25
```

Page  3

```
 1        VIDEOCONFERENCED APPEARANCES (Cont'd):
 2      ON BEHALF OF THE DEFENDANT MICHELLE MALKIN:
                GORDON QUEENAN, ESQ.
 3              Patterson & Ripplinger, PC
                5613 DTC Parkway, Suite 400
 4              Greenwood Village, Colorado  80111
                Phone:  303-741-4539
 5              Email:  gqueenan@prpclegal.com
 6      ON BEHALF OF THE DEFENDANT ERIC METAXAS:
                MARGARET BOEHMER, ESQ.
 7              Gordon & Rees
                555 17th Street, Suite 3400
 8              Denver, Colorado  80202
                Phone:  303-534-5160
 9              Email:  mboehmer@grsm.com
10      ON BEHALF OF THE DEFENDANT CHANEL RION And ONE AMERICA
        NEWS NETWORK:
11              BLAINE KIMREY, ESQ.
                BRYAN CLARK, ESQ.
12              Vedder Price
                222 North LaSalle Street
13              Chicago, Illinois  60601
                Phone:  312-609-7865
14              Email:  bkimrey@vedderprice.com
                Email:  bclark@vedderprice.com
15
        ON BEHALF OF THE DEFENDANTS CHANEL RION and ONE AMERICA
16      NEWS NETWORK:
                STEPHEN DEXTER, ESQ.
17              Lathrop GPM LLP
                1515 Wynkoop Street, Suite 600
18              Denver, Colorado  80202
                Phone:  720-931-3200
19              Email:  stephen.dexter@lathropgpm.com
20      ON BEHALF OF THE DEFENDANTS CHANEL RION and HERRING
        NETWORKS, INC. d/b/a ONE AMERICA NEWS NETWORK:
21              PETER SCOTT, ESQ.
                JEREMY GRAY, ESQ.
22              Early Sullivan Wright Gizer & McRae LLP
                6420 Wilshire Boulevard, 17th Floor
23              Los Angeles, California  90048
                Phone:  970-419-8234
24              Email:  pscott@earlysullivan.com
                Email:  jgray@earlysullivan.com
25
```

Page 4

```
 1                    PURSUANT TO WRITTEN NOTICE and the

 2     appropriate rules of civil procedure, the video

 3     videoconferenced deposition of JOSEPH OLTMANN, called for

 4     examination by the Plaintiff, was taken remotely,

 5     commencing at 10:04 a.m. on September 8, 2021, before

 6     Laurel S. Tubbs, a Registered Professional Reporter,

 7     Certified Realtime Reporter and Notary Public in and for

 8     the State of Colorado.
```

```
 9                              INDEX

10     EXAMINATION:                                       PAGE

11     By Mr. Cain                                           7

       By Ms. Hall                                         146

12     By Mr. Arrington                                    148

13     EXHIBITS:                                          PAGE

14     Exhibit 2   Affidavit of Mr. Oltmann               117

15     Exhibit 29  Notes of Mr. Oltmann                    12

16     Exhibit 46  Document Entitled "Parley"              96

17     Exhibit 103 Email Stream                           137

18     Exhibit 104 IOS IMESSAGE/SMS/MMS                    93

19     Exhibit 131 Post by Mr. Camp                        80
```

```
20

21

22

23

24

25

                                                    Page 5
```

```
 1                  P R O C E E D I N G S
 2                  THE VIDEOGRAPHER:  Here begins the
 3      deposition of Joseph Oltmann.  Today's date is
 4      September 8th, 2021.  The time on the video is 10:04.
 5                  Counsel, please identify yourselves for
 6      the record and state whom you represent.
 7                  MR. CAIN:  Charlie Cain for the Plaintiff.
 8                  MS. DEFRANCO:  Ingrid DeFranco and Andrea
 9      Hall for Mr. Oltmann.
10                  THE VIDEOGRAPHER:  Will the court reporter
11      please swear in the witness after her read.
12                  THE REPORTER:  The attorneys participating
13      in this deposition acknowledge that I am not physically
14      present in the deposition room and that I will be
15      reporting this deposition remotely.  They further
16      acknowledge that in lieu of an oath administered in
17      person, the witness will verbally declare his testimony
18      in this matter is under penalty of perjury.  The parties
19      and their counsel consent to this arrangement and waive
20      any objections to this manner of reporting.  Please
21      indicate your agreement by stating your name and your
22      agreement on the record, beginning with the taking
23      attorney.
24                  MR. CAIN:  Charlie Cain.  I agree.
25                  MS. HALL:  Andrea Hall and Ingrid
```

Page 6

 1    DeFranco.  We agree.

 2                    JOSEPH OLTMANN,

 3    having been first duly sworn or affirmed, was examined and

 4    testified as follows:

 5                    EXAMINATION

 6    BY MR. CAIN:

 7            Q.   State your full name, please.

 8            A.   Joseph Oltmann.

 9            Q.   Mr. Oltmann, you understand you're here to

10    give testimony as a result of a court order issued by

11    Judge Moses in this case, correct?

12            A.   I do.

13            Q.   Part of what she asked us to do is to

14    provide exhibits to you via your counsel.  We did so last

15    night.  Those exhibits were to be printed out and put in a

16    binder.

17                    Do you have a binder of exhibits in front

18    of you?

19            A.   I do not.  I have a computer screen with

20    those up, though.

21            Q.   Mr. Oltmann, instead of being in person, we

22    are obviously conducting this deposition via Zoom, so I'm

23    not there to -- to look at what you're looking at or

24    perceive any information that you're getting outside of

25    the context of my questions and your answers.  So let me

                                              Page 7

1     explain a couple of things to you.

2                 First of all, you are to not have any

3     recording devices in your office.  You are in your office,

4     are you not?

5                 A.   It doesn't matter where I am.  It's not

6     relevant.

7                 Q.   You are in your office?

8                 A.   It's not relevant.

9                 Q.   Let me explain to you, sir, how this is

10    going to go.  I'm going to ask the questions.  You're

11    going to answer my questions.  It's up to your counsel to

12    advise you if they perceive that there's a privilege issue

13    or some other reason that you shouldn't answer my

14    questions.

15                Are you in your office or not?

16                A.   (No Response.)

17                MS. HALL:  Objection, Charlie.  It's not

18    relevant.  Move on.

19                MR. CAIN:  Are you instructing your client

20    not to answer the questions where he's physically

21    located?

22                MS. HALL:  Move on.

23                MR. CAIN:  Yes or no.

24                MS. HALL:  I said, Yes.  Move on, Charlie.

25    It's not relevant.

Page 8

```
 1                    MR. CAIN:  Don't talk over me.
 2             Q.   (By Mr. Cain)  It's important, Mr. Oltmann,
 3      that you and I understand each other.  If there's some
 4      reason that you don't understand my questions, will you
 5      stop me, ask me to rephrase the question, so that I can be
 6      sure that you understand what I'm asking you and you're
 7      answering the question that I'm asking?
 8             A.   Yes.
 9             Q.   Are you recording -- do you have a
10      recording device with you where you're sitted -- or
11      seating now currently?  Are you recording this?
12             A.   No.  This is being recorded.
13             Q.   No, I understand that.
14                  My question is:  Are you recording it
15      separately?
16             A.   No.
17             Q.   Mr. Oltmann, you are to not communicate
18      outside the parties during the course of this deposition.
19      That would include getting instructions on how to answer
20      questions from your counsel.
21                  Do you understand that?
22             A.   Yes.
23             Q.   I want only your testimony and your
24      testimony alone.  Who else is with you physically right
25      now?
```

Veritext Legal Solutions
800-336-4000

```
 1                     MR. CAIN:  Charlie, I'm going to object to

 2      this line of questioning.  How is this relevant?  You've

 3      not done this with one other person that you've done a

 4      deposition over Zoom with.  So I suggest you start asking

 5      questions because your time is running.

 6              Q.   (By Mr. Cain)  Who else is with you

 7      physically present --

 8                     MR. CAIN:  And I'm not going to allow

 9      speaking objections, and I will ask for more time if you

10      keep it up.

11              Q.   (By Mr. Cain)  Who else is with you,

12      Mr. Oltmann?

13              A.   My attorneys.

14              Q.   Anyone else?

15              A.   No.

16              Q.   Mr. Oltmann, have you reviewed the

17      protective order that Judge Moses entered in this case?

18              A.   No.

19              Q.   Are you aware that there's a protective

20      order that would prohibit the disclosure of individuals

21      that were on the antifa call or your conduit to that call,

22      disclosure outside of these proceedings?  Are you aware of

23      that?

24              A.   Yes.

25              Q.   Are you prepared to testify today regarding
```

Page 10

1    the identity of your conduit to the antifa call?

2         A.    Can you repeat that question again?

3         Q.    Are you prepared to testify today

4    concerning the identity of the individual or individuals

5    who gave you access to the antifa call?

6         A.    To a certain extent.

7         Q.    To what extent?

8         A.    To the extent that I give you what

9    information is readily available.

10        Q.    Who provided you access -- what's the

11   identity of the individual or individuals who provided you

12   access to the antifa call?

13        A.    I made a commitment not to disclose the

14   name of that person.  Unfortunately, that person who is

15   known to me is actually in my notes.

16        Q.    In the notes of the call?

17        A.    Yes.

18        Q.    Okay.  Who is it?

19        A.    That's all I'm going to say.

20        Q.    You understand the Court has ordered you to

21   provide us that information.  You understand that?

22        A.    I'm not going to provide that information.

23        Q.    I'm sorry?

24        A.    Mr. Coomer is on this call.  Mr. Coomer is

25   the one that presented the antifa manifesto in his social

                                           Page 11

**Court File Page No. 14765**

1   media.  Mr. Coomer was the one that was on that call.  So

2   as a result of that, no protection order would protect

3   this individual.

4           Q.   Who is the -- who is the person that was

5   your conduit?  Give me the identity of that person.

6                Are you refusing to answer my question?

7           A.   I answered your question already.  You

8   just didn't like the answer.

9           Q.   No.  I didn't get the answer to the

10  question.  The question was:  Who is the person or persons

11  who served as the conduit for you to be on the antifa

12  call?  Give me the name.

13          A.   I gave you the information as it relates

14  to the information that's in my notes, and you have my

15  notes.  So therefore you have that name.

16          Q.   Joey Camp?

17          A.   No.

18          Q.   All right.  Who?

19          A.   The information as to who gave me access

20  to that call is inside of the notes.

21          Q.   All right.  One of the documents that I

22  identified for you was Plaintiff's Exhibit 29, which I

23  understand to be your notes.

24               Do you have that?

25          A.   Hold on one second.

```
 1              MR. KIMREY:  Mr. Cain, this is Blaine
 2   Kimrey.  Have these exhibits been provided to the other
 3   counsel of record in this case?
 4              MR. CAIN:  Yes.
 5              MR. KIMREY:  I will note for the record
 6   that I did not receive copies of these exhibits.  I am
 7   counsel for OANN and Chanel Rion.  Can you have your
 8   office forward to me a file of the exhibits right now?
 9              MR. CAIN:  No.  I think, Blaine -- and
10   welcome to the case -- you should have the Exhibit Share
11   function and you can -- you can view them on that through
12   Veritext.  But I don't want to waste time on the record
13   with this right now.
14              MR. KIMREY:  Okay.  Fair enough.
15              MR. CAIN:  We can talk about it off-line.
16         Q.   (By Mr. Cain)  Do you have Exhibit 29 up,
17   Mr. Oltmann?
18         A.   I'm actually not seeing Exhibit 29.
19         Q.   It's a copy of your notes.
20         A.   Okay.  I'm looking at it now.
21         Q.   All right.  And these are notes, correct me
22   if I'm wrong, that you say were taken contemporaneously by
23   you while you were on that call; is that true?
24         A.   Yes.
25         Q.   Okay.  And this is one, two, three -- four
```

Page 13

1    pages of notes, correct?

2              A.    Yes.

3              Q.    Where in your notes is the identity of your

4    conduit to the call reflected?

5              A.    It is -- it is on this page, yes.

6              Q.    Which page?  There's a Bates stamp -- what

7    we call Bates stamp down on the bottom right.  205, 206,

8    207, 208 are the page numbers on these notes.  Which page?

9              A.    There's no stamp on this page.  Oh, there

10   it is.  205.

11             Q.    All right.  So 205 starts, Who is Eric

12   Dominion guy.  Is that the one you're looking at?

13             A.    It is.

14             Q.    Denver, Colorado Springs, question mark?

15   Then there's the Brian.  Who's Brian?  If I'm reading that

16   correctly.  Does that say Brian?

17             A.    That is not -- that is not who gave me

18   access to the call.

19             Q.    Who is Brian?

20             A.    He's an antifa member.  He's a journalist,

21   I think.

22             Q.    What's his last name?

23             A.    I don't know.

24             Q.    Was he on the call?

25             A.    I don't recall actually.  I'd have to go

                                                      Page 14

1    through my notes.

2        Q.   The next name is -- that appears to be a

3    name is Bev, B-e-v.  Who is that?

4        A.   How do I get to the other pages?

5        MS. HALL:  Just scroll up.

6        THE DEPONENT:  Oh, scroll up.  Okay.  Got

7    it.

8        Q.  (By Mr. Cain)  Who is Bev, that's the

9    question I asked?

10        A.   Bev is the name of somebody that came up

11    on the call.

12        Q.   What do you mean?  You saw a name appear?

13        A.   Yes.

14        Q.   Okay.  Do you have a last name?

15        A.   No.

16        Q.   Do you know who she is?

17        A.   No.

18        Q.   Was this a Zoom?  Was this a Zoom call?

19        A.   Yes.

20        Q.   So you could see the name of the

21    participants that had logged into the call, at least with

22    respect to Bev, right?

23        A.   Yes.

24        Q.   Okay.  Did you see Eric Coomer on the Zoom

25    call reflected?

Page 15

```
 1              A.    No.

 2              Q.    Sam -- well, actually before I move off of

 3     Bev.  Have you subsequently learned who this person is,

 4     Bev?

 5              A.    Yes.  It's an antifa member.

 6              Q.    Okay.  What do you know about her?

 7              A.    Not a lot, actually.

 8              Q.    All right.  What do you know?

 9              A.    Not a lot.  I'd have to review my notes.

10              Q.    Is there something -- when you say your

11     notes, are you referring to Exhibit 29 or some other

12     notes?

13              A.    Just information that I would have

14     on -- on her.

15              Q.    Okay.  Are those reflected on Exhibit 29 or

16     some other notes?

17              A.    It wasn't pertaining to any of this

18     hearing, so I don't even -- I know that --

19                    THE REPORTER:  I'm sorry, but there's too

20     much background noise.  I can't understand the witness.

21                    Could I have the answer repeated, please?

22                    THE DEPONENT:  There's no noise on my

23     side.

24              Q.    (By Mr. Cain)  Can you repeat your answer?

25     She didn't hear you.  She needs to get it down for the
```

Page 16

```
 1    record.
 2              A.   I did collect notes on some of these
 3    people.  So if I have notes on her, then it would
 4    be -- it wouldn't be in these notes, though.
 5              Q.   Okay.  But you do have notes reflecting
 6    some investigation of who she was?
 7              A.   I have questions that I asked when I
 8    started contacting other people that were doing research
 9    on antifa specifically.
10              Q.   Okay.  So do you have notes that reflect
11    who she is -- who her identity is?
12              A.   I was -- I was never able to uncover who
13    she is, specifically.
14              Q.   How about any organization she's involved
15    with?  Do you know that?
16              A.   Antifa.
17              Q.   The next name is Sam with a question mark.
18    Who are you referring to there?  Is that your conduit?
19              A.   No.
20              Q.   Who is Sam?  What information do you have
21    on this person?
22              A.   He's an antifa member.
23              Q.   How do you know?
24              A.   Because he was on the call.
25              Q.   Do you have a last name?
```

Page 17

1            A.    No, no, not as it pertained to the

2    information I was able to collect here.

3            Q.    Well, why did you qualify that?  Do you

4    have any identifying information on this Sam who was on

5    the call?

6            A.    I was told by someone else that a man that

7    went by the name of Sam died a couple months ago.  He was

8    heavily involved in antifa.

9            Q.    Who told you that?

10            MS. HALL:  Object to form.

11            Q.    (By Mr. Cain)  You can answer.

12            A.    It doesn't --

13            THE REPORTER:  I'm sorry.  I just --

14            A.    I said it doesn't have to do with Eric.

15            Q.    (By Mr. Cain)  Who told you that is the

16    question?  You can answer the question.

17            A.    Joey Camp.

18            Q.    Yan-ni is the next name.  And then there's

19    a dash RD knows.

20            Is Yan-ni the conduit to your participation

21    on this call?

22            A.    No.

23            Q.    Do you know who Yan-ni is?  Do you have a

24    last name or any other identifying information?

25            A.    He goes by the name of Yan or Yan-ni.  He

Page 18

1    seems to be an enforcer for the Antifa/BLM movement.

2          Q.   Were you able to identify this person

3    beyond that?

4          A.   To some degree, yes.

5          Q.   Okay.  Tell me -- do you have an address?

6    Do you have a last name?  What identifying information do

7    you have?

8          A.   Just information related to the fact that

9    he was not a journalist.  I wasn't able to disqualify him

10   from being a journalist.

11         Q.   How?

12         A.   By looking up all known people that go by

13   Yan or Yan-ni.

14         Q.   When you were looking up all known people

15   that go by Yan or Yan-ni, were you able to determine who

16   this person is specifically?  Is he a mechanic in the

17   Springs?

18         A.   No.  Because that's not what I was looking

19   for.

20         Q.   So if -- if you wanted to get in touch with

21   Yan-ni at this point -- or Yan, you wouldn't know how to

22   do it?

23         A.   I didn't try to get in touch with an

24   antifa member.  I didn't try.

25         Q.   Okay.  So you -- you don't have any

                                              Page 19

```
 1    information beyond what you told me about Yan or Yan-ni;

 2    is that true?

 3              A.   No, that's not true.

 4              Q.   What other information do you have on this

 5    person?

 6              A.   That he's an antifa member.

 7              Q.   You've already told me that.  I said what

 8    other information.

 9              A.   I'm trying to find the information.  So

10    hold on a second.  I'll see if I can pull up a --

11              Q.   Tell me what you're doing when you're doing

12    it too.  Are you on --

13              A.   I'm just searching files to see anything

14    that I have on Yan or Yan-ni.

15              Q.   I only have so much time, so if you can't

16    find it now, then at a break we can see if we can pull

17    that information down.

18              A.   All right.  Sounds good.

19              Q.   Then there's a dash RD knows.  Who's RD?

20    What do those initials stand for?

21                   What are you looking at, Mr. Oltmann?

22              A.   My attorney.

23              Q.   Who is RD?  The lawyer can't give you the

24    answer.  I can't -- this is not their deposition.  This is

25    your deposition.
```

                                                    Page 20

```
 1              A.   I'm not sure you understand the
 2   significance of what we're dealing with.  As a matter of
 3   fact, I don't think you care.  So I'm going to answer
 4   it -- I'm going to answer it this way.  You asked me for
 5   an answer, I'm going to give you an answer.
 6                   In the last two weeks we've had two antifa
 7   members that have targeted and tried to kill other
 8   people.  We have one that tried to assassinate a guy in
 9   Olympia, Washington.  We have another guy in California
10   that was hunted for stabbing someone at a protest, who is
11   a known antifa member.
12                   We have Joey Camp who's currently in
13   hiding and had to move locations twice in the last couple
14   of months due to antifa putting a hit out on his life.
15   There's another gentleman that worked for Project Veritas
16   out of New York and in 2019/2020 had a posted bounty for
17   his head.
18                   And then there's the dark web of the
19   bounty that's currently on my head by antifa in Colorado
20   and other states.  So you want me to divulge information
21   which, frankly, would need someone like Eric Coomer back
22   to this individual for retribution.  And since we know
23   that the history of Coomer is to have retribution against
24   people, there's a hesitation on my side to divulge
25   anything based on the imminent danger to that particular
```

Page 21

```
 1     individual.

 2                    MR. CAIN:   Objection.   Nonresponsive.

 3               Q.    (By Mr. Cain)  Who is RD?  And I'm going to

 4     ask the Court for more time if this continues.  I want

 5     responses to my questions.

 6               A.    I answered the question.

 7               Q.    Who is RD?

 8               A.    I'm asking for the truth, and you can't

 9     handle the truth.  Or you don't care about the trust,

10     which is obvious by how you act in a courtroom and how

11     you lie in your proceedings.

12               Q.    Who is RD?  Are you going to answer my

13     question or not?  What does that stand for?

14               A.    That stands for the individual that gave

15     me access to the call.

16               Q.    What's the name?

17               A.    That's his name.

18               Q.    RD is his name?

19               A.    Is his name.

20               Q.    What's his last name?

21               A.    RD.

22               Q.    No, sir.  That -- that's not his name.

23               A.    That's his --

24               Q.    Give me the name.

25               A.    That's the information I have on that
```

Page 22

```
 1    individual.
 2              Q.    Pardon?
 3              A.    That is the information that I have on
 4    that individual.
 5              Q.    That's the entirety of the information.
 6    You know this person by RD, period?
 7              A.    I know that person by RD.
 8              Q.    And you don't know his first name?
 9              A.    I know that person by RD.
10              Q.    Do you know his actual first name or not?
11              MS. HALL:  Objection.
12              Q.    (By Mr. Cain)  Let's quit playing games.
13              MR. CAIN:  Counsel, I'm asking a question.
14              MS. HALL:  He's answered you three times.
15              A.    I answered the question.
16              MS. HALL:  You don't like the answer.  He
17    told you he knows the individual by the initials RD.
18              Q.    (By Mr. Cain)  Do you know his actual name,
19    is the question.
20              A.    His name is RD.  That is his name.
21              Q.    Do you know -- what's his last name?
22              A.    RD is his name.  If you know anything
23    by --
24              Q.    What is his last name, sir?  What is his
25    last name?
```

Page 23

1          A.   If you know anything about the antifa

2     movement, everyone in antifa uses names -- other names.

3     That is the name that he gave me.

4          Q.   What is Eric Coomer's antifa name?

5          A.   What do you mean Eric Coomer's antifa

6     name?

7          Q.   You said everybody in antifa uses other

8     names.  What is his -- Eric Coomer's antifa name?

9          A.   I believe Eric Coomer loves his notoriety.

10    I believe Eric Coomer is one that likes to be in the

11    middle of the limelight.  I believe Eric Coomer is the

12    one that wants to be the one in charge.  And frankly, on

13    the call, no one knew -- or there were people that didn't

14    know who he was because they asked who he was.

15         Q.   Sir, you're being evasive.  I --

16         A.   That is not evasive.  That is the answer

17    to the question.  You asked a question; I answered it.

18         Q.   I know.  I asked a different question that

19    you didn't answer.

20         A.   What was that?

21         Q.   So let me ask this question again.

22              Are you in contact with RD --

23         A.   I'm not.

24         Q.   -- or not?

25              When is the last time you spoke with this

Page 24

1     individual?

2              A.    Five months ago, six months ago.

3              Q.    Where does this person live?

4              A.    I do not know.

5              Q.    In Colorado?

6              A.    I do not know.

7              Q.    How did you get in touch with this person

8     initially?

9              A.    He showed up at an FEC meeting.

10             Q.    Where?

11             A.    In Castle Rock, Colorado.

12             Q.    Is he a member of FEC?

13             A.    I do not know the answer to that.

14             Q.    Who would?

15             A.    I would have to check and see if the

16    member --

17             THE REPORTER:  I'm sorry, sir.  Just a

18    moment.  I'm sorry.  I just didn't hear or understand the

19    last part of the answer.  Can you repeat, please?

20             THE DEPONENT:  I would have to check with

21    FEC to see if they have a record of him in their

22    memberships.

23             Q.    (By Mr. Cain)  Can you do that for me since

24    we're taking FEC's deposition tomorrow?

25             A.    Hold on.

                                              Page 25

```
 1              Q.    All right.  I'm going to circle back to

 2   what I was asking you about RD.  Do you know this person's

 3   actual name or not?

 4                    MS. HALL:   Object to form.

 5              A.    He presented himself as RD.

 6                    MR. CAIN:   Objection.   Nonresponsive.

 7              Q.    (By Mr. Cain) My question is:  Do you

 8   know --

 9                    MS. HALL:  He answered the question.  You

10   don't like the answer.  That's your problem.  You've

11   asked this question at least five times.  He's answered

12   the question.  And you keep asking the same question, and

13   you don't like the answer.

14                    MR. CAIN:  Ms. Hall, you can guarantee

15   that I'm going to be asking for more time if you keep

16   interrupting my questions.

17              Q.    (By Mr. Cain) My question was:  Do you

18   know his actual ID beyond these initials?  Do you know his

19   name, and you're just not providing it to me?

20              A.    He was known to me as RD.  He was very,

21   very careful and very, very scared about himself coming

22   out in any of this.  I've already given you more

23   information than I think I'm probably -- that I've been

24   told I can give.

25              Q.    (By Mr. Cain)  Told by whom?
```

                                              Page 26

```
 1                    MS. HALL:  Objection.

 2           A.    I've given -- I've answered your question.

 3           Q.    (By Mr. Cain)  No, you haven't.

 4                 My question is this:  You say he presented

 5    himself as RD.  That's fine.  I understand your testimony

 6    there.  But my question wasn't how he presented himself.

 7    My question was:  Do you actually know his -- his full

 8    name -- his identification and you're just not providing

 9    that to me?

10           A.    I do not know his full name.

11           Q.    Do you know his first name?

12           A.    I've never verified his identity.

13           Q.    So you don't know his first name?

14           A.    He was known to me as RD.  I've given you

15    the information of who he is.

16           Q.    RD isn't a first name.  And my question is:

17    Do you know what the R stands for?

18           A.    No.

19           Q.    Let's go about it that way.  Richard?

20    Roger?  Rick?  Do you know?

21           A.    I do not know what the R stands for.

22           Q.    Do you know what the D stands for?  His

23    last name, perhaps?

24           A.    I do not know what the D stands for.

25           Q.    Do you have contact information for him?  A
```

Page 27

```
1    phone number?

2                    THE REPORTER:  I'm sorry.  The answer?

3                    THE DEPONENT:  I do not.

4            Q.   (By Mr. Cain)  You said five or six months

5    ago was the last time you were in contact with him.  Is

6    that your testimony?

7            A.   To the best of my recollection, yes.

8            Q.   How did you get in touch with him?

9            A.   Through a Signal.

10           Q.   What is his Signal handle?

11           A.   RD.

12           Q.   Have you produced your communications from

13   Signal to your counsel with RD?

14                   MS. HALL:  Objection.  You're asking for

15   attorney-client privileged information.  He's not

16   answering that question.

17                   MR. CAIN:  No, I'm not asking for

18   attorney-client information.  The fact of providing the

19   information to counsel isn't privileged.

20                   MS. HALL:  Yes, it is.

21                   MR. CAIN:  It doesn't fall under advice.

22           Q.   (By Mr. Cain)  Do you have access to your

23   Signal communications with RD, Mr. Oltmann?

24           A.   No.

25           Q.   Why not?
```

Page 28

```
 1              A.   Because Signal deletes after 5 minutes,
 2    10 minutes.  Those communications are deleted inside the
 3    app.
 4              Q.   So there -- there is information that you
 5    have in terms of communications with your conduit that
 6    have been deleted as a result of the use of the Signal
 7    app?  Is that your testimony?
 8              A.   That's not what I said.
 9              Q.   What's -- what's incorrect about my
10    statement?
11              A.   When someone communicates with you via
12    Signal, they set the standard for what can be kept inside
13    of that conversation.
14              Q.   Okay.
15              A.   It's a limitation of the technology.
16              Q.   I understand that.  But my -- my question
17    was, there are communications or were between you and RD
18    that have been deleted?
19              A.   Not true.
20              Q.   So you still have them?
21              A.   I do not have them.
22              Q.   Because they have been deleted?
23              A.   That is not true.  That is a play on words
24    by you.  That is not what happened.  What happened is, is
25    the app limitation is that those are deleted.  When
```

Page 29

**Court File Page No. 14783**

```
 1    someone communicates with you, they set the standard by

 2    which you can keep those communications.

 3              Q.    When did you initially contact -- or make

 4    contact with RD?

 5              A.    End of July, I believe, early September.

 6              Q.    2020?

 7              A.    Yes.

 8              Q.    Describe the -- your initial contact with

 9    this person.

10              A.    I was at a meeting.  He walked up to me

11    and said that he was a part of antifa and he was leaving

12    it, and that it was not the same organization as when it

13    started and something to that effect.  And I basically

14    glad handed him and said, I'm glad you're not a part of

15    antifa anymore.  Shook his hand and told him to stick

16    around and get involved.

17              I shook probably another 100, 150 other

18    people's hands at the same time.  That was the first -- I

19    think that was the first time I met him.

20              Q.    How is it that -- well, just walk me

21    through the progression, Mr. Oltmann, that you shook his

22    hand at an FEC meeting in you said July or September.

23              When was your next contact with him?  Walk

24    me through that progression, please.

25              A.    He made a couple of attempts to contact
```

Page 30

1    me.

2                    Q.    How?

3                    A.    Through Signal.  I think -- let me -- let

4    me go back a little bit.  I think through Signal.  I

5    can't find any text communication from him, and I don't

6    think I gave him my email -- or my phone number.  I know

7    he made a couple of -- he made a couple of attempts to

8    contact me, and I did not return his call or I did not

9    respond.

10                   Q.    When he attempted to contact you, what was

11   he saying?

12                   A.    I don't remember.  I don't recall.  I

13   probably get somewhere between 3 and 400 people in a

14   given week to try to contact me.

15                   Q.    Did you ever communicate with him via cell

16   phone number?

17                   A.    No.

18                   Q.    Via email?

19                   A.    No.

20                   Q.    Via regular text?

21                   A.    No.

22                   Q.    All the communications with RD that weren't

23   in person were through Signal?

24                   A.    I believe so.  Yes.

25                   Q.    So when he attempted to contact you a few

Page 31

```
 1    times, you didn't respond to those, then what happened

 2    next?

 3              A.   He showed up at another FEC meeting, which

 4    was -- I think it was the beginning of September, to the

 5    first week of September.  And this time he walked up to

 6    me again and said, you know, I've been trying to reach

 7    out to you.  I -- I can get you access to these --

 8    getting in the antifa call.

 9              Q.   How did he know you wanted access?

10              A.   I don't think he knew that I wanted access

11    or didn't want access.  He had just made a statement at

12    the previous conversation that he was a part of antifa

13    and that these people that are writing things about you,

14    they're antifa members inside of -- they're antifa

15    journalists.

16              And so it piqued my interest before, but I

17    wasn't -- I was not surprised.  And this time by telling

18    me he can give me access to that call, definitely piqued

19    my interest.

20              Q.   This FEC meeting that you just testified

21    about, was this also in Castle Rock?

22              A.   Yes.

23              Q.   Are those meetings -- do you have sign-ins

24    sheets or anything that would identify who attended the

25    meetings?
```

Page 32

1          A.    I think we started to do that, yes.

2          Q.    Do you still have FEC meeting sign-in

3    sheets from this time period?

4          A.    No.

5          Q.    Why not?

6          A.    Because they're not kept.  They're written

7    in papers.  We wouldn't keep those -- that information.

8          Q.    Well, you -- you acquire the information.

9    Do you then convert it into an electronic record?

10          A.    We take the emails and convert those into

11    electronic records, yes.

12          Q.    Okay.  Did -- did RD provide an email?

13          A.    I do not know.  I did tell you that I

14    would check the logs for members for the deposition

15    tomorrow.

16          Q.    All right.  While you're at it, can you

17    also look at the sign-in sheets or however that's now

18    notated to see if you have information for RD?

19          MS. HALL:  Charlie, just for the record,

20    he told you that he did not keep those.  If anything,

21    there would be an email address.  And he already

22    confirmed that he would look that up.

23          A.    I will check for that information,

24    nonetheless.

25          Q.    (By Mr. Cain)  You said that he indicated

Page 33

```
 1    that he had some information on antifa journalists.  Who
 2    did he say he had information on?
 3              A.   I do not believe at that time he told me
 4    about any one person in particular.
 5              Q.   Okay.  What happened next with respect to
 6    this guy?
 7              A.   He became more agitated.  He contacted me
 8    and told me what day that was going to happen, which I
 9    don't recall the actual day.  It was a pretty busy time
10    for us at FEC and a pretty busy time for us as a country.
11    I invited him to come to my office.
12              Q.   Where you're sitting now?
13              MS. HALL:  Objection.
14              Q.   (By Mr. Cain)  Is that where you -- you met
15    with him where you're sitting now?
16              MS. HALL:  Objection, Charlie.  I told you
17    it's not relevant and he's not answering the question.
18              Q.   (By Mr. Cain)  Are you going to not answer
19    my question?  Did you meet with RD where you're sitting
20    now?
21              A.   The purpose of this deposition being
22    remote is to protect me.  I have to sit here for three
23    hours, and there is no way I'm going to disclose where I
24    am right now that could lead anybody on your side to
25    become here and do harm to me.  So I will not divulge
```

Page 34

**Court File Page No. 14788**

1    where I'm --

2              Q.    Mr. Oltmann, you know what, I've listened

3    to you say our side wants to do harm to you --

4              A.    I am.

5              Q.    -- multiple times.

6              You don't have any evidence of that, and

7    there's absolutely no reason we would want any harm to

8    come to you.  I want you to be sitting there at -- during

9    trial.  Okay?

10             Do you understand that?

11             A.    You ask me a question; I'll answer the

12   question.  You want to put your -- your

13   little -- whatever you want to call what you said, your

14   opinion, I have no interest in listening to you.

15             I will answer your questions.  I'm here

16   for three hours to answer your questions.  Not to be

17   badgered by some prick.  So you figure out what questions

18   you want to ask me.  You ask me those questions, and I

19   will answer those questions.

20             Q.    Okay.  Did you meet with RD there where

21   you're sitting?

22             MS. HALL:  Objection.  Charlie, I told

23   you, move on.  He's not answering that question.  You

24   already went down this road.  And it's not relevant to

25   the issue of defamation where he met with this person.

Page 35

```
 1                    Q.    (By Mr. Cain)  Let me ask you this way --
 2                          MS. HALL:  And whether or not he's there
 3        now.
 4                          MR. CAIN:  Ms. Hall, enough.
 5                    Q.    (By Mr. Cain)  Let me ask you this:  You
 6        said he was agitated, and you had a meeting with him,
 7        correct?
 8                    A.    Yes.
 9                    Q.    Describe his appearance for me.
10                    A.    I'm sorry?
11                    Q.    If I need to pick him out of a line-up,
12        describe his appearance.  How tall is he?  What color of
13        hair?  How old is he?  What race or ethnicity?
14                    A.    This is unbelievable.
15                    Q.    Describe him.
16                          They can't answer your questions.  They can
17        make legal objections, not speaking objections.  They
18        can't answer the questions that I'm asking you.  This is
19        why I wanted this in the courthouse.
20                    A.    You want it in the courthouse because you
21        wanted to have me arrested.  You said so in -- with
22        conferral with counsel.
23                    Q.    Describe --
24                    A.    Exact words, actually.  Even though in the
25        courtroom you lied to me.
```

Page 36

```
 1                    Q.   I did not say that.  That's false.  I did
 2      not say that to your counsel.
 3                    MS. HALL:  Charlie, I'm not going to get
 4      into this during this deposition, but you did say that on
 5      the phone.
 6                    MR. CAIN:  I did not.
 7                    MS. HALL:  Okay.  Well --
 8                    MR. CAIN:  I never said I want to get him
 9      arrested.  And you're wasting my time.
10                    Q.   (By Mr. Cain)  Describe the physical
11      appearance of RD.
12                    A.   He's a white male.
13                    Q.   How old?
14                    A.   Under 30.
15                    Q.   Do you know his educational background,
16      where he went to school?
17                    A.   I do not.
18                    Q.   Do you know what he does for a living?
19                    MS. HALL:  Objection.  Relevance.
20                    Q.   (By Mr. Cain)  Do you know what he does for
21      a living?
22                    A.   I'm not going to answer that question.
23                    Q.   Do you know?
24                    A.   I'm not going to answer that question.
25                    Q.   Why not?  This is identity of your conduit.
```

Page 37

```
 1    You're under a court order to answer these questions.
 2              A.   Oh, I'm very aware of that.
 3              Q.   Okay.
 4              A.   I'm also aware that the judge in this case
 5    marched in June of 2020 in an antifa protest.  I'm also
 6    aware of that.
 7              Q.   And, in fact, you've called her an antifa
 8    judge, haven't you?
 9              MS. HALL:  Charlie, what's the relevance
10    of this?  Like, I mean, what he believes of the judge or
11    what he's done on his own time is not relevant to a
12    defamation case with your client Eric Coomer.
13              MR. CAIN:  I don't think you know what is
14    relevant, and quit interrupting this.
15              MS. HALL:  No.  I have the ability to --
16              Q.   (By Mr. Cain)  Haven't you referred to --
17              MR. CAIN:  No, we're going to get into
18    what is antifa and what isn't, which is highly relevant
19    to this.  And he's called Eric Coomer a member of antifa.
20    We're going to talk about that.
21              Q.   (By Mr. Cain)  You've called the judge an
22    antifa judge, haven't you?  I want to know what qualifies
23    someone to be part of antifa?
24              Why did you call the judge an antifa judge?
25              MS. HALL:  Objection.  Relevance.
```

Page 38

1        Q.   (By Mr. Cain)  What makes someone a member

2   of antifa?  That's the point of my question.

3        A.   It's a pretty well-organized organization

4   for something they say isn't organized.

5        Q.   Okay.  But what makes someone part of

6   antifa?  Are you going to answer my question?

7             You called the judge an antifa judge in our

8   case.  You've referred to Dr. Coomer as a member of

9   antifa.  What makes either of them part of antifa?

10            MS. HALL:  Objection with regard to the

11  judge.

12       A.   Eric being on an antifa call.  Eric

13  putting up posts that were pro antifa, anti-American,

14  anti-police.  Posting literally right after antifa put

15  the manifesto out there, the next day he posted it on his

16  social media.

17       Q.   (By Mr. Cain)  Anything else?

18            Marching in a rally, marching in a Black

19  Lives Matter protest, does that make someone a member of

20  antifa?

21            MS. HALL:  Objection.  Relevance.

22       A.   I think being on an antifa call where you

23  say that somebody is not going to win, and you made sure

24  of it, probably makes you a part of antifa.

25       Q.   (By Mr. Cain)  We'll get to that.

Page 39

Court File Page No. 14793

```
1              A.   Communicating with journalists, who are

2    antifa journalists, journalists that stand up for the

3    fascist/antifascist movement, would probably qualify them

4    as antifa.

5              Q.   Anything else you can think of?  You've

6    called the judge an antifa judge.  That's why I'm asking

7    you what -- what about that would qualify -- our judge

8    would qualify her as part of antifa?

9              MS. HALL:  Objection, Charlie.  Move on

10   with this questioning with regard to the judge.  It is

11   not relevant to your defamation case.

12             MR. CAIN:  Yeah, it is.  I want to know

13   what -- what makes someone antifa.

14             MS. HALL:  But you keep referring --

15             MR. CAIN:  Calling my client -- I'm not

16   debating with you, Ms. Hall.

17             MS. HALL:  Well, then I'm going to start

18   instructing my client not to answer your question.  It's

19   not relevant to your lawsuit.  What is going on with the

20   judge, what he said about the judge is not relevant to

21   Eric Coomer.

22             MR. CAIN:  I'm talking about antifa.

23             MS. HALL:  No, you're not.  You keep

24   referring to the judge.

25             MR. CAIN:  I'm not asking you, Ms. Hall.
```

Page 40

1    Ms. Hall, we're trying to figure out in your client's

2    mind what makes someone a member of antifa.  He's called

3    the judge an antifa judge because she marched in a --

4    allegedly, I have no knowledge of this -- in a rally or

5    some form of a protest.

6            Q.   (By Mr. Cain)  What makes that -- take the

7    judge out of it.  What makes someone who's involved in

8    that activity antifa?

9               MS. HALL:  That's been asked and answered.

10              MR. CAIN:  He hasn't answered it.

11          A.   I did answer it.

12          Q.   (By Mr. Cain)  What makes someone, in your

13   mind, an antifa journalist?

14          A.   A radical leftist that communicates openly

15   with other radical leftists that stand for antifa being

16   antifascist, who are then themselves are the racist

17   pedophiles and racists of our society.  Typically white

18   extremist liberals.

19          Q.   And they have to be racist and pedophiles?

20   Is that part of your definition?

21          A.   This isn't a deposition.

22          Q.   It is a deposition.

23          A.   This is a battering session for you

24   because you don't like the fact that I call you out.  And

25   I'm --

                                              Page  41

```
 1              Q.   I don't --

 2              A.   I'm sorry I hurt your feelings.

 3              Q.   I could care less about anything --

 4              A.   Let's talk about -- let's talk about

 5     antifa and what antifa does.  And let's talk about the

 6     qualifications of the judge because that's what you

 7     wanted to ask.  So I'll talk about that.

 8                   MS. HALL:  No, don't.

 9              Q.   (By Mr. Cain)  No, sir.  I just want

10     answers, and you're being evasive.

11              A.   I'm not being evasive.

12              Q.   If you can't tell me who this person is

13     that was your conduit beyond a white male under 30 with

14     the initials RD.

15                   Do you have anything else going back to RD

16     that would inform me on who this person is?

17              A.   No.

18              Q.   You would not identify where he works.

19              A.   I don't know where he works.  And that

20     wasn't your previous question.

21              Q.   Did you ever know where he was employed?

22              A.   No.

23              Q.   Do you have any employment information on

24     him?

25              A.   No.
```

Page 42

```
 1                  Q.    Do you know what city he lived in during
 2       the period of time you were dealing with him?
 3                  A.    Denver Metro area.
 4                  Q.    Do you know anybody else who knows him,
 5       friends of his, family?
 6                  A.    I've given you all the information on him.
 7       That is what I'm under a court order to disclose, and
 8       I've disclosed that.
 9                  Q.    You didn't answer my question.
10                  Do you know any of his friends,
11       people -- other people who know him?  Family members?
12                  Either you know it or you don't.
13                  A.    (No response.)
14                  Q.    I'm going to reclaim this time at some
15       point.  So there's no point in you just sitting there and
16       not responding to me.
17                  Do you know the answer to my question?
18                  A.    (No response. )
19                  Q.    Family members?  Friends?
20                  A.    (No response. )
21                  Q.    I'm taking by your silence that you do.  Do
22       you know, sir?
23                  A.    I know that the goal of this is to uncover
24       this individual, so this --
25                  Q.    Absolutely.
```

Veritext Legal Solutions
800-336-4000

1          A.   -- so this person is put in danger.

2          Q.   Not true.

3          A.   If you put the person in danger, you hope

4     to punish this person the same way that I'm being

5     punished with a court order --

6          Q.   Sir?

7          A.   The same way that the couple thousand

8     people that have signed affidavits across the country

9     have been punished and threatened.

10         Q.   You have no evidence that we want to do

11    anything like that and nothing could be further from the

12    truth.

13              What I want to know is what happened on

14    this call, and who got you on it and who else was there,

15    which you haven't provided to anyone at this point.  So

16    that's why I'm asking these questions.

17              Do you know friends or family of this RD,

18    and you're just not telling me?

19              Are you refusing to give me that

20    information?

21         A.   (No response.)

22         Q.   Okay.

23         A.   I don't want to speculate.

24         Q.   Did your counsel just provide you with

25    information?  I didn't -- I couldn't hear it, but off

```
 1    camera I want to make sure that Ms. Tubbs got that.
 2              MS. HALL:  I told him not to speculate.
 3              THE REPORTER:  I cannot hear the
 4    whispering.
 5         Q.   (By Mr. Cain)  Okay.  But I'm not asking
 6    you to speculate.
 7              THE REPORTER:  I cannot hear the
 8    whispering.
 9         A.   He did not show up to these meetings
10    alone.
11         Q.   (By Mr. Cain)  Okay.  Who did he show up
12    with.
13         A.   I don't know.
14         Q.   Describe him.  Same person?  Multiple
15    people?
16         A.   No.  The same person, yes.
17         Q.   What's the name of the person he showed up
18    with?
19         A.   I don't remember.
20         Q.   Male or female?
21         A.   Male.
22         Q.   Friend?
23         A.   I assume so.
24         Q.   Okay.  So you know he has a friend that
25    showed up at the meetings.  Is that person still part of
```

Page 45

1     FEC?  Does he show up at meetings still?

2              A.    He was not an FEC person, I think they

3     brought him in.  I think it's just another person that

4     came with him.

5              Q.    Okay.  But this other individual -- do you

6     know who they are?  Are they showing up at FEC meetings?

7              A.    No.

8              Q.    Okay.

9              A.    And I'm not at many of the FEC meetings

10    currently.

11             Q.    All right.  So you said that -- you

12    mentioned that RD was agitated during one of your meetings

13    where you, I guess, won't identify where you were at at

14    this particular meeting.

15                   But what was he agitated about,

16    Mr. Oltmann?

17             A.    So maybe agitated is probably the wrong

18    word.  Scared, paranoid.  Wouldn't meet me for coffee at

19    a coffee shop.  Would make sure that I was -- he was

20    10 minutes late.  I would ask him questions about, you

21    know, who he is as a person.  Typical things that I would

22    do when trying to mentor someone who I think is going

23    down the wrong path.

24             Q.    Okay.  And then how did this develop to him

25    getting you on an antifa call, as you define it?

                                                      Page 46

```
 1              A.    I don't understand the question.

 2              Q.    Well, you were meeting with him.  You said

 3    you had coffee.  He was scared and paranoid.  I want you

 4    to walk me through the history of -- of your relationship

 5    with this person and how he got you on the call.

 6              A.    And the history was pretty vanilla.  I met

 7    with him for coffee, as I do many people.  I met with him

 8    at a park.  Just having conversations about who he is, to

 9    validate who he is, up to the point where I was on the

10    call.  I think it was more for -- as much for him as it

11    was for me.

12              Q.    What did you learn about him that you

13    haven't testified to during this getting-to-know-you

14    process?  You said you were at a park.  You learned about

15    who he is.  What did you learn?

16              A.    I learned that he has family members that

17    are part of antifa.

18              Q.    And?  Is that it?

19              A.    I learned that he just wanted to do good

20    and he thought that antifa was truly doing good.

21              Q.    Okay.  Anything else?

22              A.    I learned that he had kids.

23              Q.    Is he married?

24              A.    And I learned that his fear is, is that

25    his kids would grow up under the same thing that he went
```

Page 47

```
 1   through when he grew up, and that they would be dragged

 2   into something like this that would take him down a path

 3   that he couldn't get them off of.

 4           Q.   Did you learn whether he was married or

 5   not?

 6           A.   He's in a relationship, yes.

 7           Q.   Do you know who his partner is?

 8           A.   I have not.

 9           Q.   Never met him or her?

10           A.   I have not.

11           Q.   All right.  So this -- this

12   getting-to-know-you process occurred during what period of

13   time?  The summer of 2020?

14           A.   No.  It happened -- it went back in time

15   and said July to September, I met with him a couple

16   times.  It was a pretty busy time given all the unrest

17   that was happening in Denver.

18           Q.   Okay.  Then where did the idea come that he

19   would provide you access to a call?

20           A.   At first he said that he didn't have the

21   information for when the call would occur.  And I believe

22   he called me a couple days before the call to ask me

23   questions, and then we had the -- the call itself.

24                Now, I did attempt to -- I think I can

25   divulge this.  I did attempt to gather the information
```

Page 48

1   related to that call some months later.

2          Q.   What do you mean?  I don't understand that.

3          A.   I attempted to contact Zoom and see if

4   they could, given a certain period of time, find out --

5   and given a certain IP address or bank of IPs -- how I

6   could recover that particular call.

7          Q.   Why?  Why did you do that?

8          A.   To have more concrete, tie it down to the

9   actual number itself or access code that would give me

10  access to that information so that I could then subpoena

11  that information for -- access that information related

12  to this.

13          Q.   And did Zoom provide any information to you

14  that was of use?

15          A.   No.  But it's well-documented.

16          Q.   What do you mean?

17          A.   It's documented.  I went to someone within

18  my company and asked that person to do this research for

19  me.

20          Q.   Do you have some record of the research

21  results?

22          A.   I can check.  I don't think so, but I can

23  check.  I'm sure that there's conversations that happened

24  related to it, yes.

25          Q.   All right.  If you can put that on your

**Court File Page No. 14803**

```
 1    list, I'd like to get that information if it's available.

 2                  All right.  So when -- did you -- did you

 3    get a sense from RD that he had been on calls like this in

 4    the past and, therefore, thought this particular call

 5    would be of interest to you?  Describe how, you know, that

 6    came about.

 7            A.   Oh, at that point the only focus was

 8    antifa journalists.  That is the only focus I had

 9    throughout the entire thing is the things that people

10    were saying about me.

11            Q.   You didn't like what was being written

12    about you by certain members of the media at the time?

13            A.   I don't think it was as much being written

14    about me as it was being written about FEC United.

15            Q.   Okay.  And who were the journalists that

16    bothered you in particular?

17            A.   Be Sean Beedle, down in Colorado Springs.

18    Sean Heidi Beedle.

19            Q.   Okay.  Anyone else?

20            A.   Yeah.  Eric -- I don't know how to say his

21    last name.

22            Q.   Mobich [phonetic]?

23            A.   Mobich.  Oh, yeah, you know him, huh?

24            Q.   Anyone else?

25            A.   Yeah.  Kyle Clark.  I don't know if Kyle
```

Page 50

```
 1    Clark was before or after.  But I certainly know that

 2    he's affiliated with antifa.

 3               Q.    So he too is an antifa journalist?

 4               A.    I guess you could call him that.

 5               Q.    All right.  I'm not going to call him that.

 6    I asked you the question.

 7               A.    I mean, in my opinion I would call him

 8    that, yes, I would call him an antifa journalist.

 9               Q.    Okay.  So I've heard the storey before, of

10    course, that you were concerned about these journalists

11    and what they were saying about you.  So is it fair then

12    to say that your -- your interest in RD was, he was going

13    to be able to put you on a call with some of these

14    journalists who were writing bad things about you?

15               A.    Yes.

16               Q.    Okay.  And in were any of these journalists

17    that you mentioned actually on this Zoom call?

18               A.    There -- there was a couple journalists on

19    there, but they weren't doing -- and I only take this by

20    the friendliest comment related to the call.  I was

21    somewhat underwhelmed by the conversations because it was

22    filled with rhetoric.  But it was fascinating because of

23    the planning and the fact that they were very, very well

24    organized on how they communicated on these calls.

25               Q.    All I'm asking you about right now is -- is
```

Page 51

```
 1    the identity of the people that were on the call itself.

 2         A.   I believe if you check my notes, you will

 3    walk, through, and I started putting down information

 4    related to who I thought was on the call.

 5         Q.   Okay.  Let's do that, then.  Let's segue

 6    into that.  We'll come back to how you got on the call in

 7    a minute.  I can't define from your notes who was on the

 8    call or who was just being discussed.

 9              So referring to Plaintiff's Exhibit 29,

10    your notes, who was it that you can say for a fact was on

11    the call, journalists or otherwise, besides yourself, and

12    as you claim, Mr. Coomer?

13         A.   Well, the information from that call led

14    me to information about Heidi Beedle.  I thought she was

15    on that call, but then again, nobody used names on the

16    call.  No one used names.  The only one that popped up

17    was the Bev that popped up.  And I wrote that down as it

18    came up.

19         Q.   Okay.  You've said, I think in the past,

20    that you thought there were about 15 to 20 people on the

21    call while you were on the call; is that right?

22         A.   Yes.

23         Q.   Okay.  Why can't -- I'm sorry.  Go ahead.

24         A.   Go ahead.

25         Q.   So why can you not positively identify
```

Page 52

```
 1    Heidi Beedle being on the call, or can you?
 2            A.   I cannot because no one had names to
 3    verify that.  So the only names that came up during this
 4    are the names that I wrote down.
 5            Q.   Well, you wrote down Heidi.  Did you write
 6    Ron at one point?
 7            A.   I suspected that that was the person that
 8    was beginning to speak at the beginning of the call.
 9            Q.   What do you -- what do you recall her
10    saying?
11            A.   The -- that particular person was talking
12    about the Colorado Springs Independent, which is why I
13    thought that was Heidi because it sounded like Heidi, but
14    I wasn't sure.  So the more that that person talked, the
15    more I wrote down information related to that person to
16    hone in on that particular conversation.
17            Q.   Okay.  Did you ever learn subsequent to
18    this call whether it was Heidi, in fact, that was on the
19    call?
20            A.   You mean did I definitively say that that
21    was him?
22            Q.   Yes.
23            A.   I don't think that -- I think I was able
24    to validate that he was an antifa journalist, yes.
25            Q.   I'm just asking -- you did research after
```

Page 53

```
 1   this call on Dr. Coomer.  Did you research -- do any
 2   research to try to authenticate whether Heidi was on the
 3   call or not?
 4             A.   I authenticated Beedle as being an antifa
 5   journalist based on this conversation and this call, yes.
 6             Q.   Okay.  That's a different answer to the
 7   question I asked.  Did you do any research --
 8             A.   I did -- I did do research on Mr. Beedle,
 9   yes.
10             Q.   Okay.  As you sit here today, what level of
11   certainty do you have as to whether she was on the call or
12   not?
13             A.   I don't.  I don't have a level of
14   certainty.  I have a level of certainty that she is an
15   antifa journalist.
16             Q.   Okay.
17             A.   If I had to give you a degree of
18   certainty, that degree of certainty would probably be in
19   the 70 to 80 percent range.
20             Q.   I don't know the pronoun of this person.
21   He or she was on the call, you would say you're 70 to
22   80 percent certain of that?
23             A.   I'm taking a wild guess.
24             Q.   That's your best -- best estimate based on
25   your perception in what you've learned about Ms. Beedle;
```

Page 54

Court File Page No. 14808

1   is that fair?

2          A.   I would say that Mr. Beedle is a pretty

3   disgusting human being, and I learned a lot about

4   Mr. Beedle.

5          Q.   That's not responsive.  I was saying that's

6   your best estimate based on participating in this call and

7   what you subsequently learned, you're about 70 to

8   80 percent sure that Heidi Beedle was on this call; is

9   that fair?

10         A.   The basis for this call was to uncover

11   antifa journalists.  During the course of this call, I

12   uncovered an antifa journalist, a person that actively is

13   an activist rather than a journalist that writes slanted

14   and defamatory articles about people of the opposite

15   political affiliation.  That is what I learned by this.

16   I learned that this person is, in fact, an antifa

17   journalist.

18         Q.   But that -- again, sir, that's not what I

19   was asking you.  You had said -- I had asked you how

20   certain you were that she was on this call, and you said

21   you're about 70 to 80 percent certain that she was

22   actually a participant.

23              And my question is:  Is that your

24   testimony?  Is that a fair estimate?

25         A.   That's me taking a wild guess.

Page 55

```
 1              Q.   All right.  From your notes, can you

 2   identify anybody else -- or actually, I'm not going to

 3   hamstring you to your notes.  But either through referring

 4   to your notes from the call or other observations, can you

 5   identify anyone else who you can testify with certainty

 6   was on the call?

 7              A.   Eric Coomer.

 8              Q.   We'll get to Mr. Coomer -- Dr. Coomer in a

 9   minute, but excluding him, because that's obviously in

10   dispute.  Anybody other than, as you say, Dr. Coomer and

11   yourself that you can identify as having been on this

12   call?

13              A.   I think that they do that on purpose where

14   they hide their identities on these calls.  If you'll

15   look at subsequent disclosures of antifa communication

16   across the country, this is -- what I'm telling you right

17   now about their communication on this particular call,

18   and how they spread out communication across different

19   devices and different platforms, is that they often use

20   either names -- code names or don't use any names at all

21   in order to -- in order to have those conversations as

22   anonymous as possible.

23              Q.   That's an explanation, but it's not -- it's

24   not an answer to what I asked you.  I said:  Is there

25   anyone else on this call that you can identify with
```

                                                    Page 56

 1    certainty by name?

 2                A.    Eric Coomer.

 3                Q.    A code name or -- or anything like that.  I

 4    just want to know who could authenticate, besides

 5    yourself, and as you would say, Dr. Coomer since you claim

 6    he was on the call.  But who can -- who can you

 7    authenticate that was on the call so that we could talk to

 8    them about what occurred?

 9                A.    Well, if Eric Coomer wasn't on the call,

10    why did he clean up all of his social media platforms?

11    Totally wipe the internet of his name or -- or any of

12    the --

13                Q.    That's not a response to my question.

14                A.    Let me finish.  You asked me a question,

15    and I get to answer that question.  Now, at the end of me

16    answering that question, if you want to ask me or tell me

17    that that's not answering the question --

18                Q.    I didn't ask you about Eric Coomer deleting

19    anything.  I asked you, who can you identify with

20    certainty was on the call?

21                A.    And I answered that question with 100

22    percent certainty that Eric Coomer was on that call.

23                Q.    And I already told you we're going to deal

24    with that in a minute.  I want to know, other than

25    yourself, and as you claim Dr. Coomer, is there anyone

                                                    Page 57

```
 1    that you can say was on the call with certainty?
 2            A.   I mean, I know for certainty that other
 3    people were on the call, yes.  But I don't know for
 4    certainty the direct identity of those people.
 5            Q.   So you were -- it's now a year since
 6    you -- approximately, since you say this call occurred.
 7    And a year later, as you sit here, you cannot identify a
 8    single person other than Dr. Coomer, as you claim, and
 9    yourself that was on this call; is that true?
10            A.   I'm -- I'm fairly sure that of the other
11    people that were on this call, that if I had -- if I had
12    to take a guess -- and the problem with taking a guess
13    and pinpointing those people is that I did an amazing
14    amount of research on antifa journalists to find more
15    information that would corroborate the fact that they
16    were, in fact, acting as a proxy for the antifa movement.
17                 So at the time this was not my focus.  My
18    focus was not who necessarily is on the call.  My focus
19    was on the people that were out there actively writing
20    things about FEC and others that correlated with antifa
21    and were doing so, in other words, because they were
22    politically motivated.
23                 So at the time, my whole thing was to
24    un-demask antifa journalists.  I used this as a catalyst
25    to do that.  So to my mindset when all this occurred was
```

Page 58

1    strictly to get as much information as possible so that I

2    knew that I could identify those people that were inside

3    of our journalist environment who are really just

4    actively antifa members that were just defaming and

5    slandering people because they didn't agree with them on

6    a political level.

7           Q.   That's an explanation, but it's not an

8    answer to my question.

9           A.   Well, it actually is an answer because the

10   answer that I gave you directly correlates to the fact

11   that I was looking for evidence that these were actually

12   people that were inside of the journalistic environment.

13   I found that.  I used that information in order to go

14   down a path to figure out who these people are.

15          Q.   You can't tell me another person that was

16   on this call, can you, other than yourself, and as you

17   claim, Dr. Coomer?

18          A.   I have a pretty high degree of likelihood

19   that Mr. Beedle was on that call.

20          Q.   Okay.

21          A.   I have a high --

22          Q.   Understood that?

23          A.   -- high likelihood correlates to

24   Mr. Beedle's massive involvement in the antifa movement,

25   a massive involvement in our revolution, a massive

                                              Page 59

1     involvement in writing a Marxist manifesto herself.

2              Q.   Okay.  Thank you.  We're building a list.

3                   You have certainty with respect to two

4     individuals:  Yourself and Dr. Coomer.  You have a high

5     level of certainty with respect to Heidi Beedle.

6                   Is there anyone else that you can identify

7     with either certainty or a high level of certainty that

8     you believe was on this call?

9              A.   The interesting part about -- and if I can

10    clarify the information about Beedle.  The interesting

11    part about Beedle is that she had been communicating on

12    Twitter with another individual dating back to June of

13    2020 by the name of Will Coomer, William Coomer.  Back

14    into June of last year, I believe, they were

15    communicating via Twitter, William Coomer underneath,

16    Heidi Beedle on the Twitter account.

17                  This has continued all the way into 2021

18    where Will Coomer, just -- I guess you could say it's a

19    coincidence by your -- by your terms -- is still

20    communicating with Heidi Beedle on Twitter.

21                  So if -- if I had to just correlate those

22    two together, that would -- we've been able to do a lot

23    of research on William Coomer, and so I would say that

24    there's a high likelihood based on all that information.

25                  Again, I don't want to say 100 percent of

Page 60

```
 1   the -- of the time that this the smoking gun.  I think
 2   that antifa members are very careful not to have smoking
 3   guns as you'll see in this election, but -- although I do
 4   think there are some.  But I would use that as a
 5   correlation to Coomer being on the call and Beedle having
 6   a probability of being on that call.
 7            Q.   And the Coomer you're referring to, though,
 8   in that -- in your last part of your answer is William
 9   Coomer?
10            A.   No.  The last part of my answer is William
11   Coomer communicating with Heidi Beedle via Twitter, and
12   the correlation of Eric from Dominion being on that call.
13   And the fact that I had written down, first off, in my
14   notes, that Heidi Beedle is this Navy, probably inside of
15   my notes on page 1.
16            Q.   Okay.  You lost me with respect to the
17   William Coomer aspect.  My question wasn't about the
18   Twitter communications.  My question was who with a high
19   degree of certainty or certainty can you identify as being
20   on the call?
21            A.   Well, Heidi Beedle has paid a lot of
22   attention to me over the last nine months and has gotten
23   into --
24            Q.   No, sir.  I -- I'm not asking about Heidi.
25   You've already identified her as someone.  So I'm asking
```

Page 61

Court File Page No. 14815

```
 1    for anyone else.

 2              A.    No.

 3              Q.    No.  That's it?

 4              A.    I gained more information as this

 5    progressed.  But, no --

 6              Q.    Okay.

 7              A.    -- on this call.

 8              Q.    And are you saying that William Coomer has

 9    some relation to Dr. Eric Coomer?

10              A.    I'm not saying anything at this point.

11              Q.    Do you know if -- I had understood

12    someone -- well, strike that.

13                    Do you know whether he's related to

14    Dr. Coomer?

15              MS. HALL:  Objection.

16              A.    I don't know.  I mean, I was told

17    that -- that -- that there was a relation, but I'm yet to

18    fully verify that.

19              Q.    (By Mr. Cain)  All right.  So --

20              MS. HALL:  Charlie, could we take a break?

21              MR. CAIN:  Yeah, that's fine.  How long

22    have we been on the record?

23              THE VIDEOGRAPHER:  One hour, 19 minutes.

24              MR. CAIN:  Yeah, let's -- let's take a

25    break.
```

Page 62

**Court File Page No. 14816**

```
 1                    THE VIDEOGRAPHER:  Going off the record.
 2        The time is 11:23.
 3                    (Discussion off the record.)
 4                    (Recess from 11:23 a.m. to 11:42 a.m.)
 5                    THE VIDEOGRAPHER:  We're back on the
 6        record.  The time is 11:42.
 7              Q.    (By Mr. Cain)  All right.  Mr. Oltmann, I
 8        want to kind of pick up where we left off.  But before I
 9        do that, I had a note here -- I looked at my Signal app
10        during the break and observed that it's phone
11        number-based.  And so if -- did you say you still have
12        access to your Signal app and RD to where you can provide
13        us with his phone number?
14              A.    No.  I did try -- I did try to recover
15        that information through counsel.
16              Q.    What happened to the information?
17              A.    I believe my phone was replaced sometime
18        in the middle of my security and there were a number of
19        changes.  So if someone removed you as a contact, you
20        don't have access to that information.  But I went
21        through and scoured it looking for any conversations that
22        I had during that time period, and that -- at the request
23        of counsel.
24              Q.    So let me make sure I understand.  I know
25        there were some pictures that we were provided that looked
```

Page 63

Court File Page No. 14817

```
 1    like a phone had -- had some damage to -- done to it.  Is
 2    that what you're referring to?  You had some damage to
 3    your phone?
 4              A.   I was asked to provide a picture of the
 5    damaged phone.  I was asked to provide a picture for the
 6    new contract when I had the phone replaced.  I replied --
 7    I gave that information as a request, I think on your
 8    side or the Court's side, to provide that information
 9    relevant to what information I was or was not able to
10    recover on the phone.
11              Q.   Okay.  And I -- and you've said many times
12    you're a tech guy.  I'm not.  In terms of the Signal app,
13    you have that installed on your phone currently, right?
14              A.   I do.
15              Q.   But you weren't able to recover the contact
16    that you had for RD in order to provide us with a number
17    that -- that you were given, the actual cell number?
18              A.   No.  So I don't know the technology for
19    this specifically, but if somebody removes you, then you
20    will not see them in your contacts.
21              Q.   And you don't have any other record of the
22    cell phone number for RD?
23              A.   I was never contacted on a cell phone
24    record, no.
25              Q.   Well, I know.  But when you -- when you
```

Page 64

1    associate someone on Signal, you have to -- you get their

2    cell number.  They have to provide that information.  So

3    at one point you had it.

4              A.   I don't believe that you're correct.  I

5    believe that you can use -- you do not have to use your

6    cell phone number in order to log in to Signal.  I don't

7    believe that that is a requirement.

8              Q.   If you wanted to contact RD now, how would

9    you go about doing so?

10             A.   I have been trying.  Knowing that I was

11   going to have this information, I was trying.

12             Q.   Okay.  What -- what efforts have you gone

13   to?  When you said you've been trying, what have you done

14   specifically?

15             A.   I've reached out to people that have

16   information about antifa members.  I've reached out to

17   people that are deep in the researching or investigations

18   of antifa members.  I've asked if they could uncover

19   information that would lead to them to have a

20   conversation with this individual, or any information

21   that I did disclose could put this person in danger.

22                  THE REPORTER:  I'm sorry.  I'm having

23   trouble understanding and hearing the deponent.  Could

24   you get closer to the phone or the computer to pick you

25   up better?

                                        Page 65

```
 1                         THE DEPONENT:  All right.  Is that better?

 2                         THE REPORTER:  Yes.

 3                         MR. CAIN:  Yes.

 4                         THE DEPONENT:  Okay.

 5            Q.   (By Mr. Cain)  You are muffled.

 6            A.   I'm trying to write while I'm talk- --

 7      take notes while I'm --

 8            Q.   Okay.  So I guess to summarize, you don't

 9      have access to any information right now that

10      would -- that would put us or anyone in touch with RD,

11      true?

12            A.   True.

13            Q.   You've identified for us some members that

14      were on the call.  We've already discussed that.  You have

15      said that the purpose for being on this call was to

16      uncover antifa journalists, fair?  Is that a fair

17      statement?

18            A.   Yes.

19            Q.   All right.  And as a result of the call,

20      you uncovered Heidi Beedle as an antifa journalist, right?

21            A.   I did not 100 percent confirm that, but

22      that was my -- in my notes.  That was my -- that was my

23      recollection.  That was my opinion of who was on the

24      call, yes.

25            Q.   All right.  And you mentioned two others,
```

Page 66

1       Eric Mobich and Kyle Clark.  Were either of those

2       individuals on the call, if you know?

3                   A.   No.  They talked about them as being

4       friendlies.

5                   Q.   Okay.

6                   A.   They didn't actually talk about Kyle

7       Clark.  They talked about another individual related to

8       that --

9                   THE REPORTER:  I'm sorry, sir.  I can't

10      understand you still.  Can you get closer -- I don't

11      know.  Can we go off the record a minute?

12                  MR. CAIN:  Sure.

13                  THE VIDEOGRAPHER:  Going off the record.

14      The time is 11:47.

15                  (Discussion off the record.)

16                  (Recess from 11:47 a.m. to 11:50 a.m.)

17                  THE VIDEOGRAPHER:  We're back on the

18      record.  The time is 11:50.

19                  Q.   (By Mr. Cain)  Okay.  This RD, was this --

20      the call -- the antifa call that we've been discussing,

21      was that the first antifa call that he arranged for you to

22      be on?

23                  A.   Yeah.  No.  Well, actually, yes, yes.

24                  Q.   Because you've indicated in the past that

25      you've -- you were on more than one.  You infiltrated more

                                                        Page 67

```
 1    than one call, right?
 2            A.   Well, I said that I've infiltrated other
 3    communications, yes.
 4            Q.   Okay.  What do you mean by that?
 5            A.   I mean, I've been involved in -- and I
 6    didn't say that I had, but we had.  We had infiltrated
 7    other things, other meetings, other communication, other
 8    protests.
 9            Q.   Okay.  And you're using the royal "we."
10    Who are you referring to when you say "we had"?
11            A.   Other people that were involved in or
12    associated with FEC or knew ADF.
13            Q.   Okay.  Can you -- is there a point person
14    or a core group of people that you can identify that were
15    involved in this?  By name.
16            A.   I don't understand.  So there's lots of
17    research being done on antifa.
18            Q.   Okay.  All right.  Well, let me backtrack a
19    second.
20                 Other than the call that we've described
21    where you -- obviously you didn't identify yourself on
22    this Zoom call in question, right?
23            A.   I did not.
24            Q.   My question earlier was geared towards
25    that, other calls that you were able to get on through a
```

Page 68

```
 1    conduit such as RD.  Was this the only one?
 2              A.   No.  The only call that I was on related
 3    to this was this call.  The previous time that I had a
 4    scheduling conflict, I could not get on the previous
 5    call.  So this was the call that I could actually be on
 6    at my -- you know, at my office.
 7              Q.   Okay.  And that's -- that was the point.
 8              So as far as this -- this scenario where
 9    someone gets you on a call that you can monitor
10    anonymously, this is the only one that you can testify to
11    as having been on under these circumstances?
12              MS. HALL:  Objection.  Relevance.
13              A.   I -- can you repeat the question?
14              Q.   (By Mr. Cain) Yeah.  I'm just trying
15    to -- you said in the past that you had infiltrated antifa
16    calls.  I'm trying to find out how many other calls you
17    were on such as this one.
18              MS. HALL:  Charlie -- I'm trying to -- I'm
19    trying to figure out why this is relevant to limited
20    discovery.  We're here for one specific call that dealt
21    with your client, not other calls.
22              THE DEPONENT:  Is that an objection?
23              MR. CAIN:  No.  It's a speaking objection,
24    and it's waived.
25              He's testified to this and provided
```

Page 69

```
 1    information on this, and I want to get an answer to my
 2    question.
 3              Q.   (By Mr. Cain)  Are there other calls or was
 4    this --
 5              MS. HALL:  Again, it's not relevant.
 6              MR. CAIN:  I don't -- either make an
 7    instruction, but quit interrupting my questions, please.
 8              MS. HALL:  I did.  I'm objecting.
 9         Q.   (By Mr. Cain)  So --
10              MR. CAIN:  Okay.  Make your objection and
11    then I will ask the question.  He'll answer it unless you
12    make an instruction.
13              Q.   (By Mr. Cain)  Let's just focus on RD.  Was
14    this the only call that this particular conduit got you
15    on?
16         A.   Yes.
17         Q.   Okay.  Were there other similar calls
18    relating to uncovering antifa members besides the one in
19    question that you were on?
20              MS. HALL:  Objection.
21         A.   Any type of communication or ways that
22    antifa communicated that we were able to get on or be at,
23    whether it be a meeting or otherwise, we did so legally.
24         Q.   (By Mr. Cain)  I don't -- I don't -- I'm
25    not asking about legality at this point.  I'm just asking:
```

Page 70

```
 1    Is there any other calls such as the one that you've been

 2    describing that you were on.  Either yes or no.  I'm not

 3    asking about whether it was legal.

 4              MS. HALL:  Objection.

 5         A.   That I was on?

 6         Q.   (By Mr. Cain)  Yes, that you were on.

 7         A.   Okay.  That I was on, no.

 8         Q.   Okay.

 9         A.   Personally.

10         Q.   Now, going back to the antifa call, I have

11    seen various dates -- or a range of dates that this call

12    was alleged to occur.  What specific date did this Zoom

13    call occur?

14         A.   It happened between the mid and end of

15    September.

16         Q.   Right.  And so my question was,

17    specifically.  We have notes from the call that are not

18    dated, correct?

19         A.   Correct.

20         Q.   And you've said in your affidavit that it

21    was on or about the week of September 27th of 2020.  And

22    then you've said in testimony -- including just now -- mid

23    to late.

24              Why can you not provide us the actual date

25    that the call occurred?
```

```
 1                   A.   Because it wasn't on my calendar.  And the

 2        only thing that I can do is get within a few days of the

 3        September 26th screenshot, which is when I did the

 4        information search related to Eric Dominion, Denver,

 5        Colorado.

 6                   Q.   Right.  Because we have a screenshot of you

 7        doing that on September 26th, right?

 8                   A.   Yes.

 9                   Q.   So the call obviously would have occurred

10        prior to that, based on your prior testimony, correct?

11                   A.   It would have, yes.

12                   Q.   And so your best recollection, I guess,

13        would have been that the call would have been within a few

14        days of September 26th prior to that?

15                   A.   That's me guessing.  Yes.

16                   Q.   Well, that's the most likely scenario, is

17        it not, based on your recollection?

18                   A.   It's been a year, so I don't know.

19                   Q.   And you -- do you keep a calendar?

20                   A.   I do.

21                   Q.   Is it an electronic calendar or a

22        handwritten one, old-fashioned?

23                   A.   Sometimes a little bit of both.

24                   Q.   Okay.  What were you doing -- what do you

25        remember doing on the date that this call occurred?
```

Page 72

**Court File Page No. 14826**

```
 1            A.   I don't.  I mean, I can't go back that far
 2    and give you that information.  I mean, I can check my
 3    calendar to see what I was doing on those dates, but
 4    that's as close I can get.
 5            Q.   Well, have you tried to go back -- I mean,
 6    has anybody asked you to triangulate the actual date?  I
 7    don't want to ask you about your lawyers.  But has anybody
 8    asked you to do that?  Any of the other defendants, to try
 9    to get an actual date?
10            A.   No.  My lawyer has asked me those
11    questions, yes, and I've gone back and done as much
12    research as I possibly can.  There's a lot of moving
13    parts happening at the same time.  I also ran a company
14    at the same time I was involved in building up FEC
15    United, and the same time that I was advocating for
16    people's rights in this community related to faith,
17    education, and small businesses.
18                 THE REPORTER:  I'm sorry.  And small
19    businesses?
20                 THE DEPONENT:  Yes.  Yes, ma'am.  Small
21    businesses.
22            Q.   (By Mr. Cain)  All right.  So as you sit
23    here today, your testimony is it would have been -- within
24    a few days is your best estimate that the antifa call
25    occurred; is that fair?
```

Page 73

```
 1                    MS. HALL:  Objection.

 2            A.   I'd rather not speculate, which is why I

 3     said from the middle to end of September.  I know it

 4     happened before the 26th of September.

 5            Q.   (By Mr. Cain) And you can't -- despite

 6     efforts in looking at your calendar, you can't recreate

 7     your schedule in order to get us a specific date, true?

 8            A.   I've attempted to.

 9            Q.   The book that has your notes in it --

10            A.   Yes.

11            Q.   -- do you still have that book?

12            A.   I do.

13            Q.   Does it have other notes besides the notes

14     relating to the antifa call?

15            A.   It does.

16            Q.   In other words, subsequent to these notes,

17     are you able to look at any material that would help you

18     nail down the date in question?

19            A.   No.  My schedule is pretty tight.  I'm

20     fairly busy on a daily business.  It's one of the key

21     complaints that my attorneys have in me getting back to

22     them promptly.

23            Q.   Okay.  Back to the Zoom call.  Was there

24     any video associated with this particular call?

25            A.   We were not in a video set, no.  We
```

                                                   Page 74

```
 1    weren't video'ing the call.
 2              Q.   Right.  I understand you weren't on video.
 3    But were other people on the call on video?
 4              A.   No.
 5              Q.   And the person RD, was he with you during
 6    the course of this call?
 7              A.   For part of it.
 8              Q.   Okay.  Explain which part he was with you.
 9    Just to get you on the call?
10              A.   No.  He was here for part of the call.
11              Q.   Okay.  So you two were there in your office
12    and you started the call, and then he left?
13              A.   I think he came in and out, yes.
14              Q.   In and out.
15                   Did he hear -- was he there during the time
16    that this conversation about Eric from Dominion occurred?
17              A.   I believe so, yes.
18              Q.   And since he was associated with antifa, as
19    you understood it before, did he identify for you anyone
20    else that was on the call from his -- from his own
21    knowledge?
22              A.   I believe he gave me some context behind
23    this Yan guy or Yan-ni guy.
24              Q.   So you think he knew him?
25              A.   I do, yeah.
```

Page 75

```
 1              Q.    All right.  Anything else that you can
 2     recall?
 3              A.    Not that I can recall.
 4              Q.    There's other names on your notes that we
 5     didn't discuss on the first page, on Bates 205.  I think
 6     we've -- we've discussed everybody but Joey Camp.
 7              Joey Camp was not on this call, I take it,
 8     right?
 9              A.    I do not believe so.
10              Q.    Was part of the discussion on this call
11     about Joey Camp?
12              A.    Yes.  At that point I had never met Joey
13     Camp, and I really didn't know who he was.
14              Q.    Okay.  Can you -- is it fair to say that
15     Mr. Camp was one of the -- one of the primary topics of
16     this call?
17              A.    No.
18              Q.    All right.  And how much time was spent
19     discussing Joey Camp while you were on the call?
20              A.    A few minutes probably.
21              Q.    Do you remember what was said about him?
22              A.    Yeah, that he's a rat.  They had a lot of
23     choice things to say about him.
24              Q.    Okay.  A rat meaning -- meaning what?  What
25     did you understand that to be referring to?
```

Page 76

```
 1              A.    They were not talking about him in
 2    endearing terms.
 3              Q.    And then you also have listed -- I don't
 4    think we got to them -- you put rat in your notes, I do
 5    believe.
 6              A.    Yeah.
 7              Q.    Help contact this Joey.  So is that your
 8    note to yourself to say you need to get in touch with him
 9    as a result of what was said about him?
10              A.    Yes.
11              Q.    I mean, the idea of being an enemy of
12    antifa as a potential friend or alley for you?
13              A.    It was just another point of data.
14              Q.    Then you say under that note about Joey,
15    Tay, hyphen, question mark.  This guy is antifa, two
16    question marks.
17              What is the -- why did you write that down?
18              A.    They were talking about Tay Anderson.  And
19    that -- it came up because of connection between the -- I
20    think it was PSL and antifa.  I think that that's the
21    socialist movement on DSL.  I think it's DSL.
22              Q.    Okay.  Well, what was the discussion about
23    Mr. Anderson?
24              A.    Mr. Anderson was, I guess, involved in
25    organizing protests and was standing up.  And I don't
```

Page 77

```
 1    remember the context behind it.  It was just the context

 2    of them bringing in someone that is a school board member

 3    into the conversation.

 4              Q.   Did RD tell you who actually organized this

 5    Zoom call?

 6              A.   No.

 7              Q.   And you don't know?

 8              A.   No, no.  But nobody questioned -- well, it

 9    doesn't matter.

10              Q.   Nobody questioned what?

11              A.   Nobody questioned him being on the call.

12              Q.   Oh, RD.  Okay.

13                   Do you know whether Tay Anderson was a part

14    of this call at any point?

15              A.   I can't say for certain, no.

16              Q.   Were you on the call when it began?

17              A.   No.

18              Q.   Were you on the call when it ended?

19              A.   No.

20              Q.   So you don't know how long the call was in

21    total?

22              A.   I can speculate.  But, no, I don't.

23              Q.   How -- approximately how long were you on?

24              A.   40 minutes, I believe is what I recall,

25    45 minutes.  Maybe a little less, a little more.
```

Page 78

1          Q.    You -- you say in your notes, quote, Four

2     to five, close quote, training.

3          A.    What page are you on?

4          Q.    And then -- I'm sorry?

5          A.    What page is that on?  I'm sorry.

6          Q.    Bates 208 at the top.  I've actually

7     bookmarked that for a second.

8                These notes are not in order, are they?

9     Like in the order you wrote them.

10         A.    Based on what I'm looking at, no, they're

11    not.

12         Q.    Okay.  In fact, what is the first page of

13    the note?  Antif- -- is it -- is it 206 where you say

14    antifa call - RD?

15         A.    Yes.

16         Q.    Okay.  So 206 is page 1?

17         A.    Yes.

18         Q.    What is page 2?

19         A.    Page 2 is "fortify training."

20         Q.    So that's --

21         A.    The next one is 208.

22         Q.    208 is page 2.

23         A.    Then page 3 is, Contact this Joey.  And

24    then page 4 is, Who is.

25         Q.    Okay.  So then when you got on your first

Page 79

```
 1     note was, Who is this woman?  That's referring to Heidi

 2     Beedle.  When you got off, your last note was Jojo, Joey

 3     Camp, media, question mark.  Hit this guy.

 4                    Is that a reference to contacting him?

 5                    A.   No.  I think it was a reference to them

 6     wanting to go after this guy.

 7                    Q.   Okay.

 8                    A.   Somebody referred to him as Jojo and

 9     somebody referred to him as Joey Camp.  And at that

10     point, I didn't know who Joey Camp was.

11                    Q.   But you do now?

12                    A.   I do.

13                    Q.   Actually, while I'm thinking about it,

14     let's -- I just received this -- I'm going to see if I can

15     share my screen with you because this is not -- it's

16     probably something that you have in front of you.

17                    This is Plaintiff's Exhibit 131.  This was

18     posted, I think yesterday, on GAB by Joey Camp.  And it's

19     a two-page document.

20                    Did you see this posting, Mr. Oltmann?

21                    MS. HALL:  Charlie, we don't see anything

22     on the screen.

23                    THE DEPONENT:  I see nothing on the

24     screen.

25                    MR. CAIN:  Well, let's see.
```

Page 80

Court File Page No. 14834

```
 1                      MR. BURNS:  For what it's worth, Charlie,
 2      I was able to see it.
 3                      THE REPORTER:  Who just said that?
 4                      MR. BURNS:  John Burns.
 5                      THE DEPONENT:  I think you've made me the
 6      spotlight, so everyone else can see it, but I can't see
 7      it.  So hold on a second.  No.  Well, I can't see it.
 8                      MR. CAIN:  Let's do this.  I don't want to
 9      waste time on this.  Let's go off the record for a
10      minute.
11                      THE VIDEOGRAPHER:  Going off the record.
12      The time is 12:09.
13                      (Recess from 12:09 p.m. to 12:17 p.m.)
14                      THE VIDEOGRAPHER:  Okay.  We're back on
15      the record.  The time is 12:17.
16                      Q.   (By Mr. Cain)  All right.  Mr. Oltmann,
17      before the technical issues, we were talking about Joey
18      Camp that is referenced in your notes.  And then I had
19      marked Exhibit 131, tried to share my screen, and
20      that -- I understand you have it actually in front of you;
21      is that true?
22                      A.   I do.
23                      MR. CAIN:  And for the record, Exhibit 131
24      was posted on GAB.  It hasn't been produced by any
25      parties.  We were made aware of it last night.  And it
```

                                                        Page 81

```
 1    purports to be a posting from Joey Camp at Joey Camp

 2    2020.

 3              Q.   (By Mr. Cain)  Do you recognize -- well,

 4    let me ask it a little different way.  Do you follow

 5    Mr. Camp on GAB?

 6              A.   No.

 7              Q.   Have you ever seen this posting before now?

 8              A.   I have not.

 9              Q.   Are you in communication with Mr. Camp?

10              A.   From time to time, yes.

11              Q.   All right.  Well, this may be helpful or it

12    may not be since you hadn't seen it, but he makes some

13    statements that I wanted to ask you about.

14              At the beginning of this document, he says,

15    When my team preserved material from Eric Coomer, we did

16    so because of his connection to antifa, not because of his

17    connection to Dominion, which we didn't even know existed

18    before --

19              Do you know what he's referring to --

20              MS. HALL:  Objection.

21              Q.   (By Mr. Cain)  -- with that comment?

22              MS. HALL:  I apologize, Charlie.

23    Objection.  Calls for speculation.

24              A.   No.

25              Q.   (By Mr. Cain)  In other words, have you
```

                                                        Page 82

**Court File Page No. 14836**

```
 1    received material regarding Eric Coomer from Mr. Camp or
 2    his team?
 3              A.   I don't believe so, no.  I have gotten
 4    emails from Joey, but that's about it.
 5              Q.   Do any of those relate to Dr. Coomer?
 6              A.   I do not believe so.  If they did, they
 7    would be in the discovery request.
 8              Q.   Then on the bottom of -- well, actually,
 9    let me ask you one other thing.
10              In this posting, in the middle of the
11    posting, there's a paragraph that says, During the phone
12    call with Eric Coomer on the line with other known members
13    of antifa nationwide, one of the antifa members spoke
14    about finding and killing me.  That was end of last year.
15              Now, as far as you know, Mr. Camp was not
16    on the call that you have been describing, right?
17              A.   Not -- not that I'm --
18              MS. HALL:  Objection.  He can only answer
19    this question if it doesn't deal with attorney-client
20    privilege.
21              Q.   (By Mr. Cain)  Yeah, I'm not asking if your
22    lawyers told you anything about this.  It's just
23    like -- my question was:  As far as you know, Mr. Camp was
24    not on this call, correct?
25              A.   Correct.
```

Page 83

```
 1                Q.   Have you spoken to Mr. Camp about what
 2      occurred on this call?
 3                A.   No.
 4                Q.   So you don't have any idea where he's
 5      getting this particular information from; is that fair?
 6                MS. HALL:   Objection.   He can only answer
 7      that question if it does not relate to attorney-client
 8      privilege.
 9                Q.   (By Mr. Cain)  And that's fine.   If this --
10                A.   On this --
11                Q.   No, no, I don't -- not -- not if it's just
12      repeating something your lawyer said.   I'm interested in
13      your testimony, not theirs.
14                A.   Okay.   Can you repeat the question?
15                Q.   Probably not.
16                MR. CAIN:   Laurel?
17                (The last question was read.)
18                A.   Correct.
19                Q.   (By Mr. Cain)  And was Mr. Camp or
20      anyone -- any team members, as he calls them -- did they
21      provide you with Dr. Coomer's Facebook pages?
22                A.   No.
23                Q.   The screenshot of the pages?
24                A.   No.
25                Q.   Because you -- let me actually back up for
```

Page 84

1    a second.

2              You provided -- I think it was counsel for

3    Sidney Powell and Defending the Republic, you provided

4    them with sworn testimony on or about August 18, I

5    believe, of this year, correct?

6         A.   Yes.

7         Q.   And part of -- and that's testimony that,

8    as you sit here today, you were under oath, you swore that

9    it was true, and that testimony is true and accurate,

10   correct?

11        A.   Correct.

12        Q.   I don't want -- I don't want to repeat or

13   reinvent anything from it.

14             But one of the things that you refer to is

15   getting screenshots of Dr. Coomer's Facebook pages.  And

16   as I appreciate your testimony, those screenshots did not

17   come from Joey Camp; is that fair?

18        A.   That is fair.

19        Q.   All right.  So who did -- who did you get

20   the screenshots of the Facebook pages from?

21        A.   I got those screenshots from someone who

22   had access to that legally.

23        Q.   Yeah.  And you've said that.

24        A.   Can we take a quick break?  I need to use

25   the restroom.  I just drank a bunch of water.

                                              Page 85

```
 1                 Q.   Well, let me -- let me ask you a follow-up,
 2      then we can take the break, it relates to the question
 3      that I just asked you.
 4                 A.   All right.  I'll answer it.
 5                 Q.   The -- the question was whose -- who gave
 6      you -- this is along the lines of the other question about
 7      the conduit, RD -- who is the person who gave you access
 8      to the Facebook pages by giving you screenshots?
 9                 A.   Someone that had legally -- legal access
10      to those screenshots.
11                 Q.   I'm asking you for the name.
12                 A.   I won't give you the name.  I will not
13      answer that question.
14                 Q.   You've been ordered by the Court to answer
15      that question.
16                 A.   I understand.  I also understand the
17      consequences that come from not answering that question.
18                 Q.   What's the basis for refusing to answer the
19      question?
20                 A.   Eric Coomer's lack of control, and his
21      ability to and desire to hurt those that speak out
22      against him.
23                 Q.   How has --
24                 A.   There's -- let me -- let me actually
25      finish that.  There's also another problem in that that
```

Page 86

1    person is not protected under any protection order.  And

2    at the point that he would be protected under a

3    protection order, I would seek that that protection order

4    also prohibit Eric Coomer from having access to that

5    information as well.

6              Q.   In the hearing, we stipulated that the

7    protective order would be covered by the Facebook conduit

8    as well.  So they are protected, and that's our position

9    and stipulation.  So --

10             A.   It is my position that that has not been

11   stipulated.  It is also my position that having Eric

12   Coomer have access to this individual would be a danger

13   to this person, given Eric Coomer's history with antifa.

14             Q.   Sir, you're -- I just want to make sure

15   that you understand what you're doing.  The Court has

16   ordered you to provide that information to us.  And -- and

17   you are aware that there's an order in place to that

18   effect, right?

19             A.   I also understand that on --

20             Q.   But just answer that question first.  Can

21   you answer that?

22             A.   I'm answering that question for you right

23   now.  On December 8th, Mr. Coomer said specifically that

24   those posts were fabricated.  He furthermore said that he

25   had no -- never had any sort of desire to push out

                                              Page 87

```
 1    anything that would be politically motivated or biased.
 2    That was, I think, paragraph 3.
 3               So as far as Mr. Coomer is concerned, I
 4    fabricated those.  Now, you want me to come forward with
 5    the person that gave me access to that information.  Even
 6    given the history of Mr. Coomer even as -- as recently as
 7    a couple months ago where he got in a bar fight.
 8               So, I mean, you want me to give you
 9    information related to this individual to a person who
10    has a history of flying off the -- off the handle, and I
11    don't think that that is appropriate.  So given that, I
12    understand the consequences.  I understand we'll go back
13    in front of the Court.  I will not divulge that
14    information unless I feel that that person is safeguarded
15    against Mr. Coomer specifically.
16               MS. HALL:  Charlie, and I'm going to at
17    this point say we need to take a break and go off the
18    record.
19               MR. CAIN:  I'm not agreeing to it.  I
20    mean, you can do what you want, but I want to get to the
21    bottom of this.
22               MS. HALL:  And I understand -- there's no
23    question posed, and he asked for a break about four
24    questions ago.  So I'm asking for a break.
25               A.   Just a quick break just to use the
```

Page 88

```
 1    restroom, and I'll be right back.
 2              Q.   (By Mr. Cain)  You're going to do it no
 3    matter what.  I'm just saying I'm in the middle of a
 4    topic, and so I'm not -- it's not an agreed-upon break.
 5              MS. HALL:  Okay.  Break.  We'll come back
 6    in a few minutes.  Thank you.
 7              THE DEPONENT:  I'm just going to use the
 8    restroom.  I'll be right back.
 9              THE VIDEOGRAPHER:  Going off the record.
10    The time is 12:26 p.m.
11              (Recess from 12:26 p.m. to 12:34 p.m.)
12              THE VIDEOGRAPHER:  We're back on the
13    record.  This is the beginning of Media Number 2.  The
14    time is 12:34.
15              Q.   (By Mr. Cain)  Okay.  Mr. Oltmann, before
16    the break, I was asking you about the access to the
17    Facebook pages.  It wasn't an agreed break.  I don't want
18    to know if you -- the substance of your conversations, but
19    did you confer with counsel during the last break?
20              MS. HALL:  Objection.
21              A.   I didn't, no.  I went to the bathroom like
22    I told you I was going to.
23              Q.   (By Mr. Cain)  So you didn't confer with
24    counsel?
25              A.   I did not.
```

Page 89

```
 1              Q.   Having had time to visit the restroom, I'm
 2     going to give you one more shot.  Are you going to respond
 3     to my question as to who the person was that gave you
 4     access to Dr. Coomer's Facebook pages?
 5              A.   No.  Put it in the protective order, and I
 6     feel that that person is protected, then I may be
 7     compelled to release that information.  But given, again,
 8     the irrational nature of Mr. Coomer, I'm not -- I'm not
 9     prepared to do that right now.
10              Q.   All right.  Well, I'll bite on -- and I
11     don't agree with you, I do believe it's protected.  We've
12     already stipulated that it's protected and it's been
13     ordered.  So --
14              A.   That doesn't stop -- that doesn't stop
15     Eric Coomer from being on this call right now and for him
16     getting access to that information.
17              Q.   Right.
18                   And you're speculating, though, as to what
19     anyone would do with that information.
20              A.   I'm not speculating.  I'm using -- I'm
21     using the habits and behavior of Mr. Coomer himself in
22     order to dictate what I think he will do in the future.
23              Q.   Okay.  I'm going to burn a minute on this
24     because we're going to have to address this with the
25     Court.
```

                                                    Page 90

1           You said because of Dr. Coomer's lack of

2    control, you mentioned a bar fight.  What specifically are

3    you saying presents a danger to the Facebook page person

4    by Dr. Coomer?

5           A.   His -- his own writings that date back all

6    the way back to 1996.  His involvement with the

7    skinheads.  His previous addiction to heroin.  His

8    multiple arrests for DUI.  His inability to control

9    himself, comments and things that he's done in the past.

10          I mean, he's just a wrecking ball.

11   Writing stuff publicly about how he abused his wife at

12   the time.  I didn't write these things, he did.  And

13   those aren't the writings of someone who is a sane

14   individual.  So I used his own writings and the things

15   that he wrote in order to come to a conclusion on what

16   he's likely to do to someone else based on his

17   recklessness with his own life.

18          Q.   This -- this individual, as you understand

19   it -- but you also mentioned a bar fight.  What does that

20   have to do with this?

21          A.   I mean, you have a bar fight in the middle

22   of all of this.  I mean, I don't know.  I -- I don't --

23          Q.   Who told you he had a bar fight?

24          A.   Someone in the -- someone in the Salida

25   area.

**Court File Page No. 14845**

1          Q.   You mentioned, I think in the past, maybe

2     it was on one of your shows, that Dr. Coomer you said

3     assaulted two individuals.  Is that -- is that what you're

4     referring to?

5          A.   That is the information that was provided

6     to me, yes.

7          Q.   Okay.  So do you know whether or not

8     Dr. Coomer was charged with assault in this alleged bar

9     fight?

10         A.   I do not believe he was.

11         Q.   Right.

12              And, in fact, do you know whether the other

13    individuals involved in this incident were charged

14    criminally?

15         A.   I do not know that as well.

16         Q.   You don't have any firsthand knowledge of

17    anything related to a bar fight in Salida, do you?

18         A.   I hired a private investigator through

19    counsel.

20         Q.   Right.

21              Is Dr. Coomer under surveillance right now?

22              MS. HALL:  Objection.

23         A.   No.

24         Q.   (By Mr. Cain)  Has he been in the past?

25              MS. HALL:  Objection.

Page 92

Court File Page No. 14846

```
 1                  A.   I don't know what my attorneys have done
 2      in order to garner information about Mr. Coomer.
 3                  Q.   (By Mr. Cain)  I'm not asking you about
 4      your attorneys.  I'm talking specifically about whether
 5      you have him under surveillance.
 6                  A.   I personally do not have him under
 7      surveillance, no.
 8                  Q.   Have you ever sent someone to Dr. Coomer's
 9      house to surveil him?
10                  A.   No.  Somebody volunteered to go by his
11      home to see if he was there because I was asked by
12      someone else if I'd seen Eric Coomer.  Lots of people
13      reached out to me all over, giving me information about
14      Mr. Coomer.
15                  Q.   Can you see my screen?
16                  A.   I cannot.  You have to hit the share
17      screen button at the bottom.
18                  Q.   I'm screen sharing.  In the exhibits, it's
19      Exhibit 104.  You can't see it, I guess, because of your
20      setup, but it's on the screen.
21                  A.   Hold on.  Let me go to Exhibit 104.
22                  Q.   It was produced by Mr. Hoft.
23                  A.   Okay.
24                  Q.   It comes from the phone number
25      303-667-5105.  Is that your phone number?
```

Page 93

 1                    A.    It is.

 2                    Q.    Is that your text to him, I sent someone to

 3       his house and no sign of him?

 4                    A.    I don't have that text in any of my texts.

 5       And I don't understand the context of this.

 6                    Q.    I asked you, Have you sent people to his

 7       house to surveil him?  You said, No, that you had

 8       volunteers.

 9                          Did you send this text and did you send

10       someone to Dr. Coomer's house in November of 2020?

11                    A.    I did not send someone to his house.  I

12       sent someone to see if he was there.  Because they called

13       me and said, I'm here.  I can check and see if he's at

14       his house.

15                    Q.    Okay.  Who did you send to his house?

16                    A.    It was a guy that lives in Salida that

17       reached out to me via Signal and said I live in Salida.

18       There's a lot of really bad people that live here.  Those

19       are his exact words.  How can I help?

20                    Q.    Okay.  And my question is:  Just like all

21       these other questions that you're not answering, who is

22       this person?

23                    A.    I've answered every single one of your

24       questions.

25                    Q.    Who is the individual that you sent to

                                                    Page 94

```
 1    Dr. Coomer's house?  What's his name or her?

 2                   MS. HALL:  Objection.

 3              Q.   (By Mr. Cain)  Who?

 4              A.   His name is Dave.

 5              Q.   Last name?

 6              A.   I actually don't have his last name.

 7              Q.   Oh.  Convenient.

 8                   MS. HALL:  Charlie, we don't need the side

 9    comments.

10              Q.   (By Mr. Cain)  All right.  Dave in Salida,

11    you sent to Dr. Coomer's house in November, or at least he

12    volunteered to do it, right?

13              A.   He actually said that he would go by

14    there.

15              Q.   Is this the same person who provided you

16    information about some so-called bar fight?

17              A.   No.  It was a private investigator that

18    got that information.

19              Q.   So did you send this text or not on

20    Exhibit 104?

21              A.   I'd have to see the text in order to see

22    that, if I did or didn't.

23              Q.   The text is Exhibit 104, sir.  It's in the

24    Exhibit Share.  It's a one-liner.  It has your phone

25    number on it, you testified to, and is says, I sent
```

Page 95

1    someone to his house and no sign of him.

2                    MS. HALL:  Charlie, you have cherry-picked

3    one sentence.  This thread shows that there's 14 text

4    messages.

5            A.    Where are the rest?

6            Q.    (By Mr. Cain)  I'm not going to ask about

7    the rest.  I have limited time.  I want to know the answer

8    to my question.  Did you send this text or not?

9            A.    Well, I can't see the context of this

10   text.  I don't have this text in my possession, because

11   when my phone was replaced, that did not go with it.  So

12   if you can show me the rest of the text, I can tell you

13   whether or not I sent it in the context of --

14           Q.    This is what I have.  You can go back and I

15   guess talk to Mr. Hoft and review the records with your

16   counsel.

17                    My question is:  Did you send the text?  As

18   you sit here, do you know or not?

19           A.    I don't know.  I mean, I'll assume that I

20   did if it came from Mr. Hoft, but I don't know.  I don't

21   have this text in my possession.

22           Q.    You talked about Dr. Coomer lacking control

23   and that's why you're not telling me the Facebook conduit.

24                    I'm going to show you what's been marked

25   previously as Exhibit 46.  This is a Parlor post.  You --

Page 96

```
 1     I'm sharing my screen, but you can't see it, so I guess
 2     this is for the benefit of everyone else.
 3                    Do you have that up?
 4            A.    Yeah.  What day was this?
 5            Q.    Does it matter?
 6            A.    Yeah.
 7            Q.    I don't know.  You sent it, didn't you?
 8            A.    I did not send that.  That was what's
 9     called an echo.
10            Q.    Okay.  Tell me what that is.
11            A.    An echo is where you share somebody else's
12     post, and you can add your own thing to it.
13            Q.    Okay.
14            A.    But I do --
15            Q.    I'm sorry.  Go ahead.
16            A.    I do believe that when your family gets
17     threatened, when you have to surround your bed with metal
18     plates because you're afraid someone is going to come
19     kill your family, and you have to higher personal
20     security detail when people send you powder in the mail,
21     when people come to your house with a gun, those are all
22     things -- by the way, I didn't attack Dominion.  I went
23     after the credibility of Eric Coomer and his connection
24     to the election fraud based on his own words.  Right?
25                    So that happened within a couple of days
```

Page 97

```
 1    of -- of me actually coming out that Monday.  So I

 2    didn't -- you don't cut the tongue out of the person

 3    that's lying.  You cut the tongue out of the person who's

 4    telling the truth.

 5                When you get attacked with such -- with

 6    such vitriol, you have a tendency to get really pissed

 7    off, especially when your kids and your wife are in

 8    danger.  So, yeah, emotions fly high.

 9                So I don't know when this was written.  My

10    guess is that the top section was written

11    somewhere -- somewhere after or before he put up a post

12    related to the fact that those posts were manufactured.

13          Q.    Okay.  You don't remember the con- -- the

14    circumstances that caused to you put this post up?

15          A.    I'm sure it was anger.

16          Q.    Okay.

17          A.    I'm sure it was written out of anger.

18          Q.    You're not denying that this is your post,

19    are you?

20          A.    Well, I don't -- I don't know because I

21    don't have that post anywhere in any of the posts that I

22    have on Parlor.  It does not exist.

23          Q.    Okay.  Well, we were able to get it from

24    Parlor, obviously.  Are you denying that you sent --

25          A.    Hold on a second.  You got this from
```

Page 98

1    Parlor?

2            Q.   Yes.

3            A.   You said you got this from Parlor.  You

4    got this from Parlor.  So Parlor gave you this post?

5            Q.   No.  It was posted to your Parlor account.

6            A.   Well, I went to Parlor and asked them if I

7    could get a record of my previous posts that did not show

8    up, and they denied me.

9            Q.   Are you denying that you posted this, yes

10   or no?

11           A.   I don't know if I posted it.  To me,

12   something like that would be an echo.  It would not

13   be -- an echo is where you basically repost somebody

14   else's post.

15           Q.   Okay.  So did you repost -- when you say,

16   I've been busy doing 15 interviews in the last two days,

17   are you saying someone else posted that and then you just

18   reposted someone who had been doing 15 interviews in the

19   last two days?

20           A.   No, no, no.  You don't understand how

21   Parlor works.  So you'll repost the post, which is a

22   picture, and then above it you just put your own -- your

23   own stuff into it.

24           Q.   Okay.  So the picture was posted, and you

25   grabbed the -- the screenshot.  This is of Dr. Coomer's

                                              Page 99

Court File Page No. 14853

1    house, isn't it, in Salida?

2              A.    I think so.  I've never been there.

3              Q.    Okay.  That was your understanding, though,

4    when you echoed that picture?

5              A.    Sure.  If I did it, yeah.

6                    I've never -- I've never seen this post.

7              Q.    Well, you typed it, didn't you?

8              A.    Again, I went back in Parlor and I don't

9    have any access to any of those records.  It's kind of

10   like the stuff with YouTube.  So you can tell me that I

11   posted this, but I can't find it anywhere.

12             Q.    Well, do you remember doing it?  Do you

13   remember saying, So it's up to you, blow this shit up.

14   Share.  Put his name everywhere.  No rest for this

15   shitbag.  Eric Coomer.  Eric Coomer.  Eric Coomer.  This

16   shitbag and the corrupt ass hats in Dominion voting

17   systems must not steal our election and our country.

18   Eric, we are watching you.

19                   You don't remember typing that?

20             A.    No.  But it's possible that I did type it.

21             Q.    You did, didn't you?

22             A.    I just answered your question.

23             Q.    And you wanted people to go to his house.

24   That's why you reposted -- or echoed that picture?

25             A.    You want to restate your question?

Page 100

```
 1                  Q.   Yeah.  What do you mean by "blow this shit

 2     up"?

 3                  A.   I'm not even sure I wrote it.

 4                  Q.   So you're not standing by this?

 5                  A.   I can't find it anywhere at Parlor.  You

 6     said you got it from Parlor, yet conveniently I can't go

 7     to Parlor and get any posts previously.  Nor are you

 8     willing to give me the date that this was supposedly

 9     posted.

10                  Q.   Did you delete this post?

11                  A.   I did not.  I've deleted nothing.

12                  Q.   You're under oath, sir.

13                  A.   Unlike your client.  Unlike your client, I

14     have deleted nothing.

15                  Q.   Including the Facebook video that you took

16     while you were in Grand Junction the other day that you

17     deleted?

18                  A.   What do you mean I deleted?  I didn't

19     delete it.

20                  Q.   Yeah, you did.  It was taken down.

21                  A.   That's not true.

22                  Q.   Who took it down?

23                  A.   It was never taken down.

24                  Q.   So that Facebook -- you're actually on

25     record saying you had to delete it.
```

Page 101

```
 1                A.    You cannot be this stupid.  Maybe you are.

 2      Maybe you don't use social media.  But all's I have to

 3      do, and all's Eric had to do on all of those posts that

 4      he deleted was change the settings so that they were not

 5      public, and that he was the only one that could have

 6      access to them.  So that's what I did.  I preserve

 7      everything.  And you're the one that came out and said

 8      that you preserved them as well.

 9                Q.    Oh.

10                A.    So you want to have a debate about your

11      client, we can have a debate about your client.  If you

12      want to ask me questions related to your client and

13      his -- and whether or not he was on that call, whether or

14      not he was a part of election fraud, you know, we can

15      just starting mounting up the evidence.  I've been

16      through all your photos and exhibits.

17                     So if you'd like to ask me questions about

18      those, I'm prepared to answer those.  But this subjective

19      stuff that you want to throw in the middle of it and ask

20      me questions about things that either are not relevant or

21      not true, I'm not going to sit here and stand for it.

22      You can bully someone else.  You're not going to bully

23      me.

24                Q.    Are you through?

25                A.    Are you?
```

Page 102

1          Q.    Nope.

2          A.    Then let's go.

3          Q.    So you said online that you took down the

4    video the other day from Grand Junction.

5          A.    Yes.

6          Q.    Okay.  So where you're quibbling with me is

7    deleting it versus taking them down?

8          A.    That's what you said.

9                MS. HALL:  And, Charlie, how is this

10   relevant?  What is this have to do with your client Eric

11   Coomer?  Does the video have something to do with your

12   client?  Because if not, please move on.

13               MR. CAIN:  It's my time, Counsel.

14               MS. HALL:  Then we'll sit here and you can

15   stare at my client, because the questions are not

16   relevant.  You're going beyond the scope of limited

17   discovery.  And you've done this with all of the

18   defendants, and I'm not cool with it anymore.

19               MR. CAIN:  You've got intentional -- well,

20   first of all, I'm not going to debate you because it's a

21   waste of time.  He testified that my client lacked

22   control.  I've got an intentional infliction claim.  And

23   your client is unwilling to own up to what he posted on

24   Parlor as Exhibit 46.

25               A.    No.  You're not asking me questions.  I

                                              Page 103

1     will answer those questions.  When you purposely lie to

2     me, as you have to the judge and in this case, which you

3     have done, then I'm going to correct that.

4                     You said that I deleted those posts.  Your

5     words, not mine.  I did not delete those posts.  I made

6     them private.  There's a difference between making

7     something private and preserving those things and

8     deleting them.  I did not delete them.

9          Q.   (By Mr. Cain)  You took them down.  Then if

10    that's the issue that you have, then I stand corrected.

11                   MS. HALL:  Charlie, he did not take them

12    down.  He just told you he made the post private.  So

13    that means you and all of your team and all of your

14    experts and everything that you're doing to follow my

15    client 24 hours a day can no longer see that.  It is

16    still on his Facebook page.  If you are friends with Joe

17    Oltmann, you can go on his Facebook page --

18                   THE DEPONENT:  No, you can't.  No.

19                   MS. HALL:  -- and see it.

20                   THE DEPONENT:  No, but I'll show it to

21    him.

22         Q.   (By Mr. Cain)  All right.  I'm going to

23    move on.  I can -- I guess what I can conclude from this

24    is that it's possible that you posted an echo of a picture

25    of Dr. Coomer's house and you wrote these words, but you

                                                  Page 104

**Court File Page No. 14858**

```
 1    won't confirm that for me?

 2            A.    There you go.  There's my video.  See,

 3    this is Facebook.  See that?  That's the video you said I

 4    took down.  It's still up on Facebook.

 5            Q.    That's the video you said you took down.

 6            A.    I'm sorry?

 7            Q.    That's the video you said you took down.

 8            A.    No.  Okay.  Anyway --

 9            Q.    You're -- you're starting -- well, I'm not

10    going to comment.

11                  What we'll do is, I guess, move on to --

12            A.    It's a good idea.

13            Q.    -- to another topic.

14                  Actually, you know what?  I'm going to take

15    a bathroom break.

16                  MS. HALL:  Oh, we object, Charlie.

17                  THE DEPONENT:  No, we don't.  Stop it.

18    Stop.  Please stop.  Charlie, take a bathroom break.  Do

19    you want a bathroom break, seriously?

20                  MR. CAIN:  Yeah.  We're going to go off

21    the record because we've got limited amount of time and

22    we've wasted a lot of it.  And I need to kind of organize

23    what I'm going to cover with you because I suspect your

24    lawyers are not going to agree to go past three hours

25    today.
```

Page 105

```
 1                    THE DEPONENT:  They may not agree but, I
 2     mean, obviously, I --
 3                    MS. HALL:  Sure.
 4                    MR. CAIN:  Let's go off the record.
 5                    THE VIDEOGRAPHER:  Going off the record.
 6     The time is 12:55.
 7                    (Recess from 12:55 p.m. to 1:02 p.m.)
 8                    THE VIDEOGRAPHER:  We're back on the
 9     error.  The time is 1:02.
10           Q.   (By Mr. Cain)  Mr. Oltmann, since we have
11     45 minutes, I'll probably jump around a little bit.  I
12     like to call it the lightening round.
13                    But before I get off on some topics, I was
14     informed by one of our lawyers that the Parlor post was on
15     or about December 5th, which would have been before they
16     took the Parlor down and I think there was some loss of
17     data.
18                    Does that help you in terms of your
19     recollection as to whether you posted that echo?
20           A.   No, because once I saw this post, which
21     I've seen before, I went back to Parlor to try and
22     recover some of the information on Parlor to see if I had
23     posted that, in fact.  And I could find no record of it,
24     not at Parlor.
25                    But again, I guess that when the tech
```

Page 106

```
 1    giants decided that they were going to sensor half of
 2    America, they in essence deleted history and part of that
 3    is the stuff that was up on Parlor.
 4             Q.    All right.  So did anybody else in December
 5    of 2020, did anybody else have access to your Parlor
 6    account besides yourself?
 7             A.    I'm not sure I understand the question.
 8             Q.    Well, someone posted this from your Parlor
 9    account.  The point of my question is:  Did someone else
10    have access?  Could someone else have posted this?
11             A.    Well, I can't authenticate that post.  I
12    mean, that post doesn't show that there's any comments.
13    That post doesn't show that there's any -- it doesn't
14    show anything.  It doesn't look like what Parlor looks
15    like today, which is the reason why I went back to Parlor
16    to ask them if this is a post that they could recover for
17    me.
18             Q.    And it's your sworn testimony that you
19    don't recall -- or you can't recall having actually made
20    that post?
21             A.    No.  But I've called Eric Coomer a shitbag
22    numerous times.
23             Q.    Okay.  So you stand by the content.  It's
24    just you don't know if that's actually your post?
25             A.    I stand by that comment.
```

Page 107

Court File Page No. 14861

1          Q.   All right.  So let's -- let's talk a little

2     bit about -- we talked about the antifa call, and your

3     conduit has been identified as RD., and that's essentially

4     it.  We've talked about Facebook.  I want to follow-up on

5     the Facebook question now.

6                You -- when you got this -- the original

7     screenshots from Dr. Coomer's Facebook account, were you

8     located at that elk hunt home that you had referred to in

9     some of your prior testimony?

10         A.   Yes.

11         Q.   Okay.  So just help me a little bit about

12    the timeline.  You had testified that you were -- you had

13    this epiphany when you were at this elk hunt.  This would

14    have been November 6 of 2020; is that correct?

15         A.   I never had an epiphany.

16         Q.   Okay.  Well, I don't mean to -- whatever it

17    was, on November 6th is when you started looking back at

18    Dr. Coomer as a result of an article that you read; is

19    that fair?

20         A.   Correct.  Correct.

21         Q.   And that's why you were out elk hunting, I

22    think in New Mexico; is that right?

23         A.   I was not elk hunting in New Mexico.

24         Q.   Okay.  What were you doing?

25         A.   I was elk hunting.

                                        Page 108

```
 1              Q.   Okay.  Where were you?

 2              A.   In Colorado.

 3              Q.   All right.  And in terms of getting access

 4    to the Facebook post, how did you go about actually

 5    getting that data?

 6              A.   Somebody gave me access to it.

 7              Q.   Okay.  And the somebody is the person

 8    you're not going to reveal, correct?

 9              A.   I'm not going to reveal that person

10    because Eric Coomer is on this call, and the subject is

11    not subject, thus, I can see to the protection order by

12    giving you that information.

13              Q.   Was it -- well, I'm not going to give you

14    too many names.  Was it Ryan McBride?

15              A.   I -- I am not going to disclose who the

16    person is.

17              Q.   Do you know Mr. McBride?

18              A.   I'm not going to disclose -- yes, I do.

19              Q.   And you're not going to tell me whether it

20    was him that gave you access?

21              A.   I'm not going to tell you -- I'm not going

22    to tell you who gave me access.

23              Q.   Okay.  Was November 6th the day that you

24    first received screenshots from the Facebook page?

25    November 6.
```

```
 1              A.   Yes.
 2              Q.   Okay.  And had you already been talking to
 3     one of Dr. Coomer's Facebook friends about getting access
 4     to his Facebook page prior to that point?
 5              A.   No.
 6              Q.   Did you know -- well, strike that.
 7              Had you had access to Dr. Coomer's Facebook
 8     account prior to November 6?
 9              A.   No.
10              Q.   Walk me through the steps on November 6th
11     that you took in order to get access.
12              And I understand you're not going to tell
13     me the names -- or name, but -- and I don't agree with
14     that, obviously.  But just kind of walk me through how you
15     were able to do that.
16              A.   Okay.  Repeat your -- is that a question
17     or what --
18              Q.   Yes.  Walk me through how you got access to
19     the Facebook page.
20              A.   Somebody sent me the Facebook post.
21              Q.   I get that.
22              You must have called someone.  Tell me --
23     tell me how it came about.
24              A.   I reached out to numerous people to see
25     who'd be willing to give me information.
```

Page 110

```
 1              Q.   Okay.  But specifically Facebook

 2    information.  Why did you think Facebook might have

 3    information on Dr. Coomer?

 4              A.   I didn't.  I wanted to validate the

 5    information that I had previously.

 6              Q.   So you just started calling or reaching

 7    out, as you said, to various people to see if they could

 8    get you access to his Facebook?

 9              A.   I started doing research on the 6th to get

10    access to information that would have corroborated the

11    information that I had previously going back to

12    September.

13              Q.   Okay.  And then how did you -- did you find

14    someone in your -- in your investigation who told you,

15    Hey, I can get you access to the Facebook account?

16              A.   No.  I just started doing research.

17              Q.   Okay.  You're being evasive.  I'm trying to

18    get --

19              A.   Actually, that's exactly what I did.  I

20    started doing research.  I started doing research on

21    social media accounts.  And was able to uncover Instagram

22    account, Twitter account that had been previously

23    deactivated.  A Facebook account that was not

24    deactivated.

25                        I started looking at pictures that were
```

Page 111

```
 1    publicly available of people that were connected to those

 2    people, and looked to see if there was a 2 degree

 3    separation of Eric Coomer and other people that I could

 4    get access to that information.

 5            Q.   And so you found through looking at -- or

 6    doing that research, someone that you recognized as a

 7    friend of Dr. Coomer?

 8            A.   Not right away, no.

 9            Q.   Well, you got the information on the 6th,

10    right?  You were able to get screenshots that day,

11    correct?

12            A.   Yes.  Some of them on that day, yes.

13            Q.   All right.  And so how did you receive

14    those?  How were they transmitted to you?

15            A.   Signal.  I believe Signal, yeah.

16            Q.   And same thing with -- well, were all of

17    the Facebook pages sent to you via Signal?

18            A.   Again, the best I can recollect.  I don't

19    have access to my previous phone content.

20            Q.   Is the person who gave you the Facebook

21    pages still a contact on your Signal account?

22            A.   I haven't looked at it, but probably.

23            Q.   Take a look real quick.  I want to know.

24                 THE REPORTER:  I'm sorry.  I didn't

25    understand.
```

Page 112

```
 1                    THE DEPONENT:  I just have to keep going
 2     backwards in time.
 3              Q.   (By Mr. Cain)  If you're not going to find
 4     it, I don't have time.  Certainly don't stall the process.
 5              A.   You asked me to look for it.  I'm looking
 6     through every conversation that I've had.
 7              Q.   All right.  Well, then we'll go off the
 8     record and you can do it off the record.
 9                    THE VIDEOGRAPHER:  We're going off the
10     record.  The time is 1:12.
11                    (Recess from 1:12 p.m. to 1:13 p.m.)
12                    THE VIDEOGRAPHER:  Back on the record.
13     The time is 1:13.
14              Q.   (By Mr. Cain)  All right.  You indicated
15     off the record, Mr. Oltmann, that through your search
16     function, you're not able to pull up messages from the
17     Facebook contact; is that true?
18              A.   That is true.
19              Q.   You'd have to individually go through that.
20     And we don't have time for that, at least today we don't.
21                    You mentioned also that you had reached out
22     to a number of people to do some invest- -- or in your
23     investigation of Dr. Coomer on the 6th.  Who else did you
24     reach out to?
25              A.   Publicly available people that were -- you
```

Page 113

```
 1     know, the same thing.  Just trying to figure out if

 2     somebody would give me access to that information, that

 3     would be friendly to the idea of validating who Eric

 4     Coomer is.

 5              Q.   Okay.  And as you sit here today, are you

 6     able to -- if you know, to pull up from Signal the

 7     transmittal of the Facebook pages to you?

 8              A.   I'm not sure I understand the question.

 9              Q.   Well, is that -- is that transmittal data

10     still on your Signal app, if you know?

11              A.   Well, if it was on my Signal app, I would

12     have been able to find it, so, again, I believe that the

13     Signal when I downloaded the information did not carry

14     through -- carry over.

15              Q.   Did you ask that the information be sent

16     via Signal to you?

17              A.   I don't -- I don't recall, no.

18              Q.   Is there any way as you sit here to trace

19     the information of when and from whom you received the

20     Facebook pages?

21              A.   I'm not sure I understand the question.

22              Q.   Well, I'm just -- if I want to show the

23     Court, Here is evidence of when these Facebook pages were

24     transmitted to Joe Oltmann, as I sit here, I don't have

25     anything but your word.
```

Page 114

```
 1                    So is there any physical evidence that you
 2     can think of that would show that transmission?
 3              A.   Yeah.  I mean, I don't know.  As I sit
 4     here right now, no, but if I'm given more time to think
 5     about it, I can probably come up with some sort of record
 6     of where it came from.
 7              Q.   But you're certain, as I understand your
 8     testimony, that this person that gave you the screenshots
 9     was one of Dr. Coomer's friends on his Facebook page at
10     the time?
11              A.   Yeah, I think still friends.
12              Q.   Did he or she -- is it a he or she, can you
13     at least tell me that?
14              A.   No.
15              Q.   Did he or she explain to you why they were
16     willing to provide you access to this information; what
17     their motivation was?
18              A.   Yeah.  I don't -- I don't think they
19     probably had a motivation other than my explanation of
20     what I was dealing with.  I mean, look it's a pretty
21     heavy conversation, right?  It's not something to
22     be -- you know, to take lightly.
23              Q.   Did you have to convince this person the
24     reason for --
25                    THE DEPONENT:  Sorry.
```

Page 115

```
 1                    (Phone ringing.)
 2          A.    Apologies.  Can you repeat that question?
 3          Q.    (By Mr. Cain)  Yeah.
 4                Did you have to convince this person to
 5    provide you this information?  In other words, were they
 6    reluctant to do so?
 7          A.    No.
 8          Q.    And again, the reason you're not giving
 9    this to me is because you think that their -- that the
10    reveal of their identity would subject them to some form
11    of retribution by Dr. Coomer?
12                MS. HALL:  Objection, Charlie.  He has
13    told you 5 to 10 times already.  He doesn't believe it's
14    in the protected order.
15                MR. CAIN:  I've already stipulated to
16    that.  I'm --
17                MS. HALL:  I understand what you've said
18    on this deposition.  There is nothing in the protective
19    order that was previously filed with the Court that
20    addresses what the Court just said the last time we were
21    there.  So I get what your position is.  You've heard
22    what my clients' is, and I guess we'll take it up with
23    the court.
24                MR. CAIN:  Oh.  So let's assume for the
25    sake of argument that -- that that needs to be buttoned
```

Page 116

```
 1    up.  I don't believe that's the case.  And I already told
 2    you that our view is that it's subject to the protective
 3    order.
 4              Q.   (By Mr. Cain)  But assuming that
 5    information -- or that protective order was extended to
 6    this information, would you be willing to provide us with
 7    that testimony at that -- at that time?
 8              A.   I think that I would give up more
 9    information if I knew that Eric was not going to get
10    access to that information.
11              Q.   Okay.  Would you provide us with the
12    identity of this person?
13              A.   If Eric did not have access --
14              MS. HALL:  Objection.
15              Q.   (By Mr. Cain)  Is that a Yes?
16              A.   I can't speculate.
17              Q.   Okay.  Let's -- let's talk a little bit
18    about your affidavit.  We've spent almost all this
19    deposition talking about the antifa call and some of this
20    Facebook stuff.
21              The affidavit which is Plaintiff's
22    Exhibit 2, I provided that to you previously, was signed
23    by you -- I believe on November 13 of 2020; is that
24    correct?
25              A.   Yes.  Is that -- Exhibit 2?
```

Veritext Legal Solutions
800-336-4000

1              MR. KIMREY:  Mr. Cain, I have a question,

2      a point of clarification.  Shall we deem all exhibits

3      that you are referring to within this deposition as

4      exhibits to this deposition?

5              MR. CAIN:  Yes.

6              MR. KIMREY:  Thank you.

7          Q.  (By Mr. Cain)  Are you with me,

8      Mr. Oltmann?

9          A.  Yes.

10         Q.  Okay.  So this affidavit you signed

11     November 13, right?

12         A.  Yes.

13         Q.  And the purpose --

14         A.  November 13th, you said?

15         Q.  Yes, sir.  1-3.

16         A.  All right.  Perfect.  Okay.

17         Q.  Who asked you to sign an affidavit?

18         A.  I don't remember the person.

19         Q.  Who were they associated with?

20         A.  With Sidney Powell, I do believe.

21         Q.  You understood that this affidavit

22     potentially was going to be used by Ms. Powell in

23     connection with litigation?

24         A.  Yes.

25         Q.  Okay.  And you allowed this affidavit to be

                                              Page 118

```
 1    filed of record in lawsuits that Ms. Powell was associated
 2    with?
 3           A.   No.  I just filed an affidavit, and I
 4    signed it.
 5           Q.   Okay.  But your expectation was that this
 6    could be used as evidence in a lawsuit Ms. Powell was
 7    involved with?
 8           A.   The only expectation I had was that I was
 9    going to sign an affidavit of what I knew.
10           Q.   Okay.  Well, in terms of what you knew,
11    just looking at the affidavit, I have a few questions.
12    You go over, of course, the antifa call, right?
13           A.   Yep.  Yes.
14           Q.   On page 2.
15                You refer to the call as being on or about
16    the week of September 27.  But that's not correct, right?
17    It was prior to that week, true?
18           A.   I think that's why I wrote -- they put "on
19    or about."  So I had this -- they drafted this.  I gave
20    them information.  They drafted it.  And then I signed
21    it.  So there's parts of this that were not complete, or
22    that had pulled stuff out and made it so that the context
23    could be changed.
24                But overall, the information is still
25    accurate because they did put on or around, I think.
```

Page 119

```
 1    Actually, I can't -- yeah, on or about --
 2                  THE REPORTER:  I'm sorry.  Whoa, whoa,
 3    whoa.
 4             Q.   (By Mr. Cain)  But it's more accurate --
 5                  THE REPORTER:  I just didn't get the last
 6    part of your statement, sir.  You dropped your voice.
 7                  THE DEPONENT:  I said on or about the week
 8    of September 27th.
 9                  MR. KIMREY:  And I just note for the
10    record that Plaintiff's Exhibit 2 is Bates Powell 206
11    through Powell 211.
12                  THE REPORTER:  Who just spoke?
13                  MR. KIMREY:  That was Blaine Kimrey.
14                  THE REPORTER:  Thank you.
15             Q.   (By Mr. Cain)  All right.  To be more
16    accurate, the -- the antifa call -- you say meeting here,
17    but was prior to September 26, not during the week of
18    September 27th, true?
19             A.   Well, it says on or about the week of
20    September 27th.  So that was still on or about the week.
21    So this had happened before the 26th.  So, yes, then this
22    would be factually accurate.
23             Q.   And this -- well, this affidavit was done
24    less than two months after the call, right?
25             A.   Yes.
```

Page 120

```
 1              Q.   And so you did your best to be as complete
 2     and accurate in this affidavit as possible, right?
 3              A.   I -- I gave them a bunch of information.
 4     I don't think I gave them completely all the information.
 5     Just the information I felt was important to the
 6     affidavit.
 7              Q.   Right.
 8                   And no one from the Powell camp asked you
 9     any of these questions about how did you get on the call
10     in terms of your conduit and that sort of thing, did they?
11              A.   I think there's a lot of moving parts at
12     the time, and the things that they were more concerned
13     with was the litany of affidavits that were coming in
14     from across the nation.  And it was getting as much of
15     this information as possible so that they could do
16     fact-finding and figure out what the credibility was of
17     all that information collectively, in the middle of
18     having SISA and other organizations within days of the
19     election say that there's nothing to see here, this is
20     the safest election ever, without even doing any sort of
21     discovery into the sheer volume of fraud that was
22     existing across our nation.
23                   MR. CAIN:  Objection.  Nonresponsive.
24              Q.   (By Mr. Cain) All I'm asking is:  No one
25     from the Powell camp that was involved in obtaining this
```

Page 121

```
 1    affidavit asked to speak to your conduit or interview them
 2    associated with confirming your story, fair?
 3            A.   I didn't have a credibility issue.  I
 4    didn't have an issue where you --
 5            Q.   No, sir.  I asked you if they asked for
 6    that information.  Yes or no?
 7            A.   No.
 8            Q.   You say in here, and you wrote in your
 9    notes -- you use the word in your notes, "fortifying."
10    But when you're talking about Eric speaking on this -- and
11    this is on the middle of page 2 of the affidavit, Powell
12    207 -- Eric continued with fortifying the groups and
13    recruiting.
14            Okay.  Are you referring to Eric Coomer in
15    that sentence?
16            A.   Where is this part?
17            Q.   It's in -- a little higher than the middle
18    of the page on the second page of your affidavit.  You go,
19    The conversation went like this.
20            And then you described the conversation
21    about Eric being the Dominion guy, et cetera?
22            A.   What -- what page are you referring to?
23            Q.   Sir, I don't -- I've already said that
24    twice now.  The second page of your affidavit, Powell 207
25    is the Bates number on the bottom right.
```

Page 122

```
 1              A.    Okay.

 2              Q.    You're talking about the conversation on

 3     the antifa call.  At the middle of it, you say, Eric

 4     continued with fortifying the groups and recruiting.

 5              My question was:  You're referring there,

 6     obviously, to Eric Coomer, correct?

 7              A.    I am.

 8              Q.    All right.  I want you to tell me what you

 9     remember Eric Coomer saying about fortifying the groups

10     and recruiting specifically.

11              A.    So there's a ton of rhetoric going on on

12     the call itself and the comments made about keeping up

13     and fortifying their efforts.  There was a bunch of

14     people talking all at the same time.  So, you know, Eric

15     was in the middle of communicating on the call, along

16     with all these other people.

17              So when I talk about being excentric and

18     boisterous, it's the -- it's the vulgarness of -- by

19     which they all seem to communicate.  The F word is

20     probably every other word.

21              Q.    Yes, sir.  But you say and swore in this

22     affidavit that Eric did and said certain things.  He

23     talked about fortifying the groups and recruiting.

24              A.    Right.

25              Q.    What specifically did he talk about in
```

Page 123

```
 1    terms of fortifying the groups and recruiting?
 2             A.   So I just answered that question as it
 3    relates to them talking about fortifying, right?  Again,
 4    I referred back to my notes when I had -- when I was
 5    writing this stuff, and some of this information is
 6    missing other paragraphs that I would have left in it.
 7    Right.
 8                  So the fortifying and saying that, Hey, we
 9    need to keep up the pressure, those comments came out of
10    Eric's mouth.  Those comments came out of other people's
11    mouths.  It was -- it was a centric bit of hyperbole.
12             Q.   All right.  So you say, Keep up the
13    pressure.  You're attributing words to that effect -- to
14    Eric Coomer.  What was he referring to about keeping up
15    the pressure?
16             A.   I don't know.  I would assume it's related
17    to antifa and the things that they are doing across the
18    state of Colorado and the country at that point.  I mean,
19    they were terrorizing communities and burning down
20    buildings and looting and shooting and stabbing and
21    throwing frozen water bottles and feces.
22                  So it probably had something to do with
23    that.
24             Q.   Let me -- let me ask you.  You've done a
25    lot of research into antifa, it's clear.  What evidence do
```

Page 124

```
 1    you have that Dr. Coomer was involved, outside of this
 2    call, as you've alleged, was involved in any
 3    activity -- antifa-related activities, whether it's March
 4    or speaking at a rally or throwing feces, as you say?
 5    What evidence do you have that he actually was part of an
 6    antifa movement?
 7            A.   So -- well, first of all, he posted the
 8    antifa manifesto on his Facebook page on, I think,
 9    June 5th or June of 6th.
10            Q.   And we've talked about the Facebook.  I'm
11    talking about --
12            A.   We haven't specifically talked about that
13    particular post.
14            Q.   Right.  I'll exclude since we don't have
15    time, and we know what -- we can look to in terms of
16    Facebook.  I'm asking, based on the amount of time that
17    you spent looking into Eric Coomer and his association
18    with antifa, carving out any kind of Facebook --
19            A.   Okay.  I'll bite.  All right.  Let me walk
20    through -- let me walk through all the information that I
21    learned about Eric Coomer.
22            Q.   I'm asking a specific question.  Not --
23            A.   That's the specific question.  You
24    can't -- you can't carve it out and say you don't want me
25    to answer the question.
```

Page 125

```
 1              Q.   Here's the question.  Here's the question.
 2    Listen to my question.
 3              A.   Okay.
 4              Q.   What information do you have that -- that
 5    puts Eric Coomer in an antifa event, rally, as a speaker,
 6    as a member of an association that you -- that you equate
 7    with antifa?  What specifically do you know about that?
 8              A.   I know that I was on this call, and I know
 9    that Eric at Dominion was on that call.  I know that I
10    walked through and listened to other videos that had Eric
11    Coomer on it, and it was the same voice that was on this
12    call, who was on those other calls doing demonstrations
13    across the country.
14              So I know that I did an amazing amount of
15    due diligence to tie back the Eric who was on the antifa
16    call to the Facebook posts, and the likelihood of that
17    happening.  And then going even further into that and
18    finding information related to owning the adjudication
19    process -- or excuse me, being a patentholder for the
20    adjudication process for the Dominion voting systems, as
21    well as the numerous affidavits across the country, which
22    as it came to light even after this time, tied back
23    improprieties to Dominion, such as the fact that there is
24    a modum inside the machine, yet the CEO of the Dominion
25    voting system said that there was no modem inside it.
```

Page 126

1              They now have amended that and said, Oh,

2     there is one, but it's not used and it wasn't turned on

3     during the course of the election.

4          Q.   I'm asking you about motives.

5              Did you -- have you seen Dr. Coomer at a --

6     at an antifa really?

7          A.   You asked me what information would be

8     provided that would lead me to believe that Eric Coomer

9     was, in fact, a part of antifa and what other information

10    do you have that would lead me to that conclusion.  I'm

11    trying to give that you information that led me to that

12    conclusion, and you don't want to hear my opinions.  Not

13    because it's not --

14         Q.   Sir, you're wasting time again.

15             Have you seen -- let me -- let me break it

16    down for you.

17             Have you seen video evidence or in-person

18    evidence of Dr. Coomer at what you would consider an

19    antifa rally, yes or no?

20         A.   No.

21         Q.   Have you seen him speak at -- or at a

22    movement or some event that involved antifa?

23         A.   Yes.

24         Q.   Which one?

25         A.   This call that I was on back in September.

                                        Page 127

```
 1                Q.   All right.  I'm talking about any kind of
 2      public event that -- that antifa was associated with.
 3      Speaker at a rally or anything like that.
 4                A.   Well, I didn't attend antifa rallies.
 5                Q.   Have you seen any evidence of that, videos
 6      of Dr. Coomer speaking at an antifa rally?
 7                A.   I have not reviewed any of the antifa
 8      videos, and everyone during the summer of 2020 was
 9      wearing masks and covering their identity.  So getting
10      access --
11                Q.   So your answer is no --
12                THE REPORTER:  Just a moment.  One at a
13      time.
14                THE DEPONENT:  Apologies.
15                THE REPORTER:  Still, one at a time.
16                Q.   (By Mr. Cain)  Go ahead.
17                A.   The difficulty in uncovering who was at
18      any of these antifa rallies, even given the videos that
19      you have there, would be very difficult because of the
20      fact that all their faces were covered.
21                So, you know, can I say for -- with
22      certainty that -- that he was at a -- at an antifa rally,
23      the answer to that question is no.  Can I say that he
24      wasn't?  The answer to that question would be no, as
25      well.
```

Page 128

```
 1              Q.    Well, you're certain -- and you've said
 2    this previously about Heidi Beedle -- that she's part of a
 3    group called Revolution, I think; is that right?
 4              A.    Yes.
 5              Q.    Yeah, that's your testimony on that.
 6                    What group, if you know, is Dr. Coomer
 7    involved with that you view as an antifa-related
 8    organization?
 9              A.    Well, most of the antifa members of the --
10    how you say an idea and not an organization, although
11    it's a very, very well-run organization, do not make
12    themselves known.  They do not make themselves
13    associated, because by that association, they would
14    associate with murderers and rapists and people that hurt
15    people in the community and bully them to get them to, I
16    guess, stay in their homes.  Intimidate them.
17              Q.    So you can't identify a specific
18    organization that you've been able to research and
19    conclude that Dr. Coomer is involved with some leftist
20    organization?
21              A.    Yes, I can actually.  He proclaimed
22    himself that he was a part of the skinhead movement and
23    in the article written in the New York Times by Susan
24    Dominus, he admitted that he was a part of the skinheads,
25    but it was a special group of skinheads that are against
```

Page 129

Court File Page No. 14883

1    racism.

2              So that is a far left organization that

3    has strong ties to communism and Marxism, and he was

4    by -- self-proclaimed a part of that even dating back to

5    his time in Denver, Colorado.

6              Q.   Thanks.  So skinhead organization.  Is that

7    it?

8              A.   I don't -- I don't know.  I haven't

9    done -- I will say for right now, to answer your

10   question, yes.

11             Q.   All right.  So when he was talking about,

12   as you say in your affidavit, recruiting -- antifa

13   recruiting, what specifically was Dr. Coomer saying he

14   wanted to do to recruit new members of this group?

15             A.   Well, I think it was the comments that

16   they have collectively where they were agreeing with and

17   talking to them about keeping the pressure on and staying

18   the course that were directly related to that

19   recruitment.

20             I don't use it from recruiting from the

21   standpoint of walk through a door, knock, knock.  Just

22   recruitment of making sure we get more people to show up

23   to these events.

24             Q.   Would you describe Dr. -- I'm sorry.  I

25   thought you were finished.

Page 130

```
 1              A.   No.

 2              Q.   Would you describe --

 3              A.   Go ahead.

 4              Q.   Would you describe Dr. Coomer as being one

 5    of the leaders of the antifa group that was assembled on

 6    this call?

 7              A.   No.  Nor did I at the time believe that he

 8    was actually -- after doing research, that he would

 9    associate himself with antifa.

10              Q.   You mention -- I don't want to spend a lot

11    of time on this.

12                   So at the end of your affidavit, the last

13    full paragraph, you talk about you used ARIMA, A-R-I-M

14    analysis to show trends.

15              A.   Yeah.

16              Q.   Do you remember that?

17              A.   Yeah.

18              Q.   Okay.  Do you have that analysis handy

19    still?

20              A.   I have some of the information related to

21    what I did on the -- on other analyses later, but ARIMA

22    is -- uses -- I mean, do you know what ARIMA is.

23              Q.   I know what it stands for.  But I guess my

24    question is:  If I -- you talk about it in your affidavit.

25    If you have datasets involved with that, if you have
```

Page 131

```
 1     some -- some analysis, I'd like to see it.

 2                   Have you produced any of that information

 3     to anyone, either the defendants in this case or other

 4     experts?

 5           A.    No, but I created a chart.  So this is the

 6     stuff that I can get into more specifically.  But I

 7     created a chart that looked at the voting probability of

 8     people voting a certain way during a time series, and

 9     then voting a certain way after that time series and the

10     likelihood of that actually happening by using previous

11     lags as opposed to what happened in the future.

12                   So using a stationary point, and then

13     creating a plotted chart to show me whether or not

14     there's any irregularities or errors in the data that

15     were -- that would not be probable based upon the

16     information that was input.

17           Q.    So my question is that the charting that

18     you used and the datasets -- or the charting that you

19     created and the datasets, do you still have that

20     information?

21           A.    I think so.

22           Q.    Did you -- and you -- but you didn't

23     provide it to anybody outside of your own group; is that

24     correct?

25           A.    So that's not necessarily true.  I brought
```

Page 132

```
 1    some of those charts to Washington, D.C. in early
 2    January.  I provided that information as it relates to
 3    Dominion voting systems and the vulnerabilities that they
 4    had in the Dominion voting systems.  And the process of
 5    walking a through path of Dominion to the Black Box, to
 6    how they recover those votes, how it's transferred over
 7    to SCYTL, how SCYTL goes on to Edison, how Edison then
 8    translates that over to the New York Times.
 9              Q.   Right.  And you talked about that in your
10    August 18 testimony from -- when Sidney Powell's lawyers
11    were asking you about this issue, right?
12              A.   Yes.
13              Q.   And you said then that you know how
14    Dr. Coomer can flip the Election, to use your words,
15    right?
16              A.   Is that what I said?
17              Q.   Yes.  You said you know how Dr. Coomer
18    flipped the election.
19              A.   Is that what I said?
20              Q.   Yes.
21              A.   I haven't seen the transcript.
22              MS. HALL:  Well, Charlie, the reason he's
23    asking you is you obviously have a copy of the
24    transcript.  We haven't seen the transcript yet.  So
25    where did you get the transcript?
```

Page 133

```
 1                      MR. CAIN:  Sidney Powell's lawyers sent it
 2      to everybody.
 3                      MS. HALL:  Well, I haven't seen it.  I
 4      didn't get it.
 5                      MR. CAIN:  Well, that's not on me.
 6                      MS. HALL:  I didn't say it was.  I'm just
 7      saying he hasn't seen the transcript.
 8                      THE DEPONENT:  No.  Show me
 9      the transcript.
10                      MR. CAIN:  All right.  So here on
11      page 181 --
12                      MR. ARRINGTON:  This Barry Arrington.  I'm
13      going to put on the record that I sent the transcript to
14      everyone.
15                      THE REPORTER:  Who just spoke?
16                      MR. ARRINGTON:  This is Barry Arrington.
17                      I don't know why you're saying you haven't
18      seen it.  I sent it to everyone.
19                      MS. HALL:  I'm not saying you didn't,
20      Barry.  I'm just saying I did not receive anything, and
21      neither did Ingrid.  So that's all I'm saying.
22                      Q.   (By Mr. Cain)  I'll go about it this way
23      since we don't have --
24                      A.   Therefore, I haven't reviewed it.
25                      Q.   Outside of the transcript -- I mean, you
```

Page 134

```
 1    can just testify now.  Do you or do you not know how
 2    Dr. Coomer flipped the Election?
 3              A.   I believe I know how the election was
 4    influence and/or stolen, yes.
 5              Q.   And I -- you used a passive.  I asked -- I
 6    said Dr. Coomer.  You know how Dr. Coomer, at least
 7    according to your -- your analysis, how he was involved in
 8    flipping the election, true?
 9              A.   I know that Coomer was a director of
10    strategy and security for Dominion voting systems, and in
11    that capacity and owning the adjudication process
12    in -- in that system, I know where the election
13    was -- was affected, yes.  I know where it was
14    compromised.
15              And Eric Coomer is responsible for those
16    things, and therefore, I think that I know -- actually I
17    know that I know -- how Dominion was able to affect or
18    leave open vulnerabilities to allow for the election to
19    be stolen.
20              Q.   Right.  And you've testified -- you've
21    testified at length in questions from Ms. Powell's lawyers
22    about that specific topic, right?
23              A.   Yep.
24              Q.   Just a few weeks ago.  And you said that
25    you hadn't reduced, as of that time, your analysis to some
```

```
 1    written format or report.

 2                Have you done that now?  Have you prepared

 3    a report reflecting your analysis?

 4                MS. HALL:  Objection.  Relevance.

 5          A.    No.  I did.  I provided a diagram -- a

 6    very crude diagram that the public can understand.  I

 7    worked on the deviations between the -- four deviations

 8    that happened inside the Dominion system.

 9          Q.    (By Mr. Cain)  Okay.  Let me make sure -- I

10    want to make sure we get this on the record.

11          A.    Can you hear me?

12          Q.    Yeah, who's speaking?

13                MR. KIMREY:  I'm sorry.  This is Blaine

14    Kimrey.

15                So we're new to this matter.  I'm

16    wondering, just for clarification, Mr. Cain, if you have

17    a copy of the sworn statement, could you enter it in the

18    deposition since you're talking about it a lot?

19    And Mr. Oltmann has acknowledged that he did give a sworn

20    statement, so maybe if we could actually see it and he

21    could confirm it as entered in the deposition, that would

22    make everything easier to follow.  Just a suggestion.

23                MR. CAIN:  I appreciate it.  I'm moving

24    off that now because I asked him the question outside of

25    this sworn statement, and I'm not -- I just don't have
```

Page 136

1    time to address that.

2              Q.   (By Mr. Cain)  So let me -- let me get back

3    on to what I was talking about.  You had testified that

4    you -- that you had done analysis in this -- of behavioral

5    deviations and tech deviations, it's part of what you

6    said.

7              And then I asked you, Has this been reduced

8    to writing?  And you said it -- you referenced a schematic

9    or something that we could all understand.  Is that fair?

10             A.   Yes.  So I've been assisting with

11   gathering information related to how the Dominion system

12   works.  So I was able to -- I've done it in different

13   parts, related to even like the ICX machine, the ability

14   to bypass the ICX in cases of balance outstanding or the

15   alignment being off.

16             So I've done multiple things where I've

17   written out diagrams on how the system can be

18   manipulated -- be manipulated inside of the -- inside of

19   the Dominion system, depending on which part you have.

20             Q.   Well, we'll conclude on this as probably

21   the last topic.  On Exhibit 103, which we previously

22   marked from your recent disclosures, this is

23   Document 0 -- I believe it's small -- but it is 0881,

24   which is a diagram -- it looks like a voting system

25   diagram.  I want you to --

```
 1                      (Phone ringing.)

 2                      THE REPORTER:  Just a moment.  I can't

 3      hear.

 4                      THE DEPONENT:  I don't know why it came

 5      through my phone.  Hold on.

 6              Q.    (By Mr. Cain)  So Exhibit 103 has a diagram

 7      that I think is what you're referring to.  Can you confirm

 8      that this is the diagram that you were just talking about?

 9              A.    Yes.

10              Q.    Okay.  So the -- the work that you've done

11      regarding -- at least as of this date regarding

12      Dr. Coomer's participation in flipping the election, in

13      part, is reflected on this particular diagram that we're

14      looking at, correct?

15              A.    Those -- that diagram walks through the

16      vulnerabilities of the Dominion voting systems and the

17      possible ways to, what I call, big cons and small cons.

18      Small cons to keep you distracted, and the big con of how

19      you were able to take invalidated fraudulent votes and

20      then reconnect them with people that vote.

21              Q.    And your -- your conclusion is that

22      Dr. Coomer's part of the big con; is that right?

23              A.    My conclusion is that -- that Eric made

24      comments related to making sure that President Trump was

25      not going to win.  And I did not make statements related
```

                                              Page 138

```
 1    to that Biden was going to win because I didn't hear

 2    that.  I just heard that President Trump was not going to

 3    win, and those came from him.

 4                  And I validated him, and then after that I

 5    validated his social posts, which are very boisterous

 6    and -- that validate that -- number one, he's not in a

 7    position where he could influence it.  And number 2, he

 8    said he would influence it.  And number 3, that his clear

 9    bias and hatred for just the country, police officers,

10    and his support for antifa was -- was well noted.

11            Q.   (By Mr. Cain)  Okay.  Well, that's

12    different than what you've testified to before in terms

13    of --

14            A.   How is that different?

15            Q.   -- to actually having -- I had understood

16    that you said from a technical standpoint, Dr. Coomer was

17    involved in rigging the election, which would affect

18    results, and you even testified to this -- in places like

19    Antrim County; in Mesa County, Colorado; and Cobb County,

20    Georgia?

21            A.   That he would have the ability to do that

22    and he's in a position to do that, absolutely.

23            Q.   Okay.

24            A.   I was very clear on that.  I've been clear

25    the entire time.  I've never once changed anything about
```

Page 139

```
 1     what I've said, not once.

 2              Q.   Well, and you've said, in fact, that

 3     he -- you -- at least in your last testimony, that you're

 4     95 percent sure that he actually engaged in that activity

 5     of flipping the election.

 6              A.   I don't have a transcript.

 7              THE REPORTER:  I'm sorry.  I can't

 8     understand Ms. Hall.

 9              A.   I don't even know if that's a question or

10     not.

11              Q.   (By Mr. Cain)  Yeah.  You have a high

12     degree of certainty -- you've testified already --

13              A.   I do.

14              Q.   -- in the deposition with the Powell

15     attorneys that you have a 95 percent degree of certainty

16     that Dr. Coomer was involved in flipping the election.

17              A.   Yes.

18              Q.   All right.  By the way, while I'm thinking

19     about it, you -- do you hold yourself out as an election

20     security expert?

21              MS. HALL:  Objection.  Relevance.

22              A.   No, I'm a data guy.

23              Q.   (By Mr. Cain)  Okay.  So you would agree

24     with me that you are not an election security expert?

25              MS. HALL:  Objection.
```

Page 140

```
 1                    THE DEPONENT:  Should I answer?

 2            A.    Okay.  So I built a system that

 3    develops --

 4                    THE REPORTER:  I'm sorry.  I'm sorry, sir.

 5    Can you slow down just a bit?

 6            A.    I built a system that creates quality

 7    scores, relevant inspectors, and correlations of data on

 8    individual DNA of an individual.  I built the

 9    architecture behind a system that allows for us to

10    perform very well, actually above anyone else in the

11    country related to how we position messaging in front of

12    millions of people.  I built that.

13                    We're one of the largest first-party data

14    aggregators in the nation when I ran my company.  I know

15    that within a couple of days of me coming out and talking

16    about what information I did have, I had death threats.

17    I know that that -- those death threats have continued

18    through the last nine months.

19            Q.    (By Mr. Cain)  Sir, my question was

20    election security expert.  Do you hold yourself out as an

21    expert in election security issues?

22            A.    I would hold myself out as an expert in

23    system architecture.  I would hold myself out at -- and I

24    can prove over time as a two-time Ernst & Young

25    entrepreneur of the year nominee and one-time finalist in
```

Page 141

1    2020, after going through some rigorous tests by many of

2    the people on those panels, that I know what I'm talking

3    about when it comes to code and when I'm talking about

4    when you are talk about the Black Box, RUP kits, having

5    people overseas write code for you.  What the

6    implications are of having connections to different

7    systems that are not secured.  Having internet access

8    with the ability to access those systems.

9              From an architecture standpoint, I could

10   punch holes in what Dominion has built over and over and

11   over again.  I don't need to know that you have to take a

12   stack of votes and put it through the system.  I have to

13   know that you can secure those votes through technology

14   that allows for transparency, which is what the system is

15   supposed to be built on.

16        Q.   You're -- you're speaking quickly, which is

17   find except for Laurel.  She's probably going to kill both

18   of us after this deposition.

19              My -- you're not answering my question.

20        A.   I did answer your question.

21        Q.   Have you -- let me ask a different question

22   and see if you can answer this one.

23              Do you have any experience working in

24   elections or in election security?

25              MS. HALL:  Objection.  Relevance.

Page 142

1               Q.   (By Mr. Cain)  You can answer.

2                    MS. HALL:  Please explain how this is

3       relevant to your defamation claim, Charlie.

4                    MR. CAIN:  Nope.

5                    MS. HALL:  Okay.  Well, then move on.  And

6       you're done.

7                    MS. DEFRANCO:  He's done.

8                    MS. HALL:  What's the time?

9                    THE VIDEOGRAPHER:  It's three hours and

10      three minutes.

11                   MS. HALL:  Thanks.  We're done, Charlie.

12              A.   Can I answer this last question?

13              Q.   (By Mr. Cain)  Yeah.  You're going to

14      answer potentially more, but why don't you finish

15      this with -- we have tomorrow, obviously set aside as

16      well, but go ahead.

17                   MS. HALL:  No.  Charlie.  You have PCU

18      United tomorrow, Shuffling Madness, and CD Solutions.  So

19      there will be no questions that are posed to Mr. Oltmann.

20              A.   I'm going to answer this question if I can

21      because it's fresh in my mind.

22                   THE DEPONENT:  Can I answer it?

23              A.   Okay.  I have not worked in Dominion,

24      Sequoia, ESNS, Hart, Clear Ballot, I've never worked

25      inside of an election system.  With that said, there are

                                                Page 143

```
 1    certain things that you have to do in order to secure a

 2    system.

 3                  I did and was a CEO of a company that did

 4    MSP services, so I understand that's Managed Service

 5    Provider, which is the IOT of an internet of things --

 6                  THE REPORTER:  I'm sorry.  Of the

 7    internet?  I just didn't hear the word.

 8                  THE DEPONENT:  Internet of things.

 9         Q.   (By Mr. Cain)  I-O-T.

10         A.   We also have an e-commerce platform that

11    is a headless design.  It services some fortune 100

12    companies in the United States.  So I'm very familiar

13    with security, and as it relates to how the systems

14    interconnect and the API that are available, how to move

15    things offline and online.  How to find out or discover

16    whether or not something is or is not connected to the

17    internet, and the probability of those things being

18    connected to the internet by way of looking at the math

19    and science, which is why I used mathematical equations

20    to figure out whether or not this is probable.

21                  So it leads me back to fact-checking the

22    information related to the system architecture.  It's a

23    simple process that anyone that's involved in technology

24    goes through in order to make sure that they can validate

25    or invalidate their theory.
```

Page 144

```
 1                    In this case the theory came back, and I
 2      was able to look at what would probably happen in Georgia
 3      as an example on early January that related to, and it
 4      came true.  The system came down, it came back up.  We
 5      were able to validate other information that we call
 6      offline information in order to validate that there was a
 7      probable system interference.
 8                    Now, whether or not that system
 9      interference was caused by Dominion is -- is not
10      even -- it's not even up for debate.  It's not up for
11      debate.  Dominion has a system that Antrim, Mesa County,
12      and other counties were able to validate would show that
13      in the math of how they calculate votes.
14                    Dominion was complicit in that behavior,
15      that is -- and I think that I have enough expertise and
16      technology that I can come to that conclusion without
17      actually working for Dominion.
18                    MR. CAIN:  I'm prepared to move forward
19      with additional questions which counsel seems to believe
20      that --
21                    MS. HALL:  We're done.  No, your three
22      hours is up, Charlie.  I'm going to do some clarification
23      now with my client here.
24      /////
25      /////
```

Page 145

```
 1                          EXAMINATION

 2     BY MS. HALL:

 3              Q.   So, Joe, you were asked by Mr. Cain about

 4     this contact for your ability to get on a call.  Who -- or

 5     not who reached out to you, but did you reach out to that

 6     person or --

 7              A.   No.

 8              Q.   -- did they reach out to you?

 9                   Explain that.

10              A.   They reached -- they reached out to me.

11              Q.   Can you explain that a little bit more?

12              A.   I never made a proactive approach to a

13     person that got me on the antifa call.  I wasn't the one

14     that did the reaching out.  They reached out to me.

15              Q.   And what was the purpose of you getting on

16     that call?

17              A.   It was just to discover antifa

18     journalists.  And if you go back to October 15th, I

19     believe it was, I'd have to check -- either October 15th

20     or 14th, I was in an FEC meeting.  And I said, We have

21     been -- we have infiltrated antifa.  Based on that call,

22     that I got all the information I was able to collect

23     afterwards, that said that, Hey, we were able to uncover

24     these antifa journalists and uncover these antifa

25     journalists, the next day an antifa journalist wrote an
```

Page 146

**Court File Page No. 14900**

1    article about the fact that I had threatened antifa

2    journalists on that -- in that FEC meeting.

3                    That was prior to the election, before I

4    even knew Dominion's name.  I knew their name, but I

5    didn't know the significance of Dominion across the

6    country.

7                    Q.   And these journalists were actually doxing

8    you, correct?

9                    A.   Yes, and they were using -- they weren't

10   just doxing me.  They were doxing other people.  They

11   were using systems and relationships that they had.

12   People that were working in other places, such as working

13   in vet centers.  That they would gather information of

14   people that owned pets, and they would report those pets

15   to the animal control to say that they were abusing their

16   animals.

17                    They would report people for their kids,

18   to CPS, that said that they were abusing their kids.  So

19   they used their positions in this web of -- or group of

20   people in order to intimidate, threaten, dox, and cause

21   harm to other people in the community.  It wasn't just

22   me.

23                    MS. HALL:  Okay.  We're complete.

24                    MR. ARRINGTON:  I'm going to have some

25   follow up.

Page 147

```
 1                    THE REPORTER:  Who's speaking?

 2                    MR. ARRINGTON:  This is Barry Arlington.

 3                    MS. HALL:  No.  No.  Barry, we're not

 4      going to -- we're not going to agree to that.

 5                    MR. ARRINGTON:  I don't care if you agree,

 6      Andrea.  This is a deposition.  I'm counsel at the

 7      deposition, and I'm going to do some cross-examination.

 8                            EXAMINATION

 9      BY MR. ARRINGTON:

10           Q.   My first question -- so, Mr. Oltmann, I

11      have a couple of questions about your prior testimony.

12      The question is this:  In response to one of Mr. Cain's

13      questions, you said about -- about whether Dr. Coomer was

14      affiliated with antifa.  I thought you said, Nor did I

15      believe --

16                    THE REPORTER:  I'm sorry.  Just a moment.

17      Just a moment.  Just a moment.  Just a moment.  Just a

18      moment, please.  There are multiple people talking, and I

19      cannot hear the question.

20                    MR. ARRINGTON:  I'll repeat the question.

21           Q.   (By Mr. Arrington)  So I believe you said

22      in response to one of Mr. Cain's questions about

23      Dr. Coomer's association with antifa, that, quote -- I

24      tried to jot this down -- quote, Nor did I believe after

25      conducting research he, meaning Dr. Coomer, would
```

Veritext Legal Solutions
800-336-4000

**Court File Page No. 14902**

1    associate himself with --

2              Did I -- did I misunderstand you?  I

3    thought you believed that he was associated with antifa.

4              A.   Yes, I did.  So let me clarify that.  This

5    is the context part where it's taken out of -- when I did

6    the original research on Eric Coomer, and I found out

7    that he had a doctorate in nuclear engineering, I did

8    not, at that point in time back in September, feel that

9    he was -- he wasn't my target.  I thought maybe he was

10   CIA or FBI.

11             I did not believe -- I couldn't understand

12   why someone who was -- had a doctorate in nuclear

13   engineering would associate himself with antifa.  And

14   since he wasn't the person I was looking for at the time,

15   I just filed all this stuff away for Eric Coomer as he

16   was on that call, but I didn't understand the

17   significance of it.  Does that make sense?

18             When I verify that that's who he was, it

19   just didn't seem normal to me that a person that has a

20   doctorate in -- in nuclear engineering would be involved

21   in this type of -- in this type of organization.

22             So as I went through and revalidated

23   information related to his social posts and started doing

24   more research on Mr. Coomer and, you know, his history of

25   being involved in the skinhead movement and some of the

Page 149

```
 1    other things that he had done related to information

 2    we've been able to dig up, I certainly believe that he

 3    was a part of the antifa movement and had a significant

 4    role in antifa just based on someone else knowing who he

 5    was and what his capabilities are and the breadth of what

 6    Dominion voting systems does across the nation, the

 7    influence that they have.

 8                    Does that clarify that?

 9         Q.   (By Mr. Arrington)  Yes.  Thank you.

10                    You also said that you provided certain

11    information to Ms. Powell.  I'm going to -- I'm sorry for

12    this.  For some reason there was a misdirection that you

13    didn't get the transcript of your testimony from last

14    month.

15                    But at one point -- I'm reading from the

16    transcript -- it says -- you testified that you may have

17    sent Sidney Powell some of this information.

18                    MR. ARRINGTON:  And for counsel's

19    information, I'm reading from page 138, starting at

20    line 4.  I'll start over.

21         Q.   (By Mr. Arrington)  And you testified that

22    you may have sent Sidney Powell some of this information

23    you were gathering.  You have specific recollection that

24    you did send it to her?  If so, when?

25                    And you answered, So other than the
```

Page 150

 1   information that I had provided, if I had sent anything to

 2   Sidney, it would have been with Randy Corporon on it as

 3   far as lawyer to lawyer.

 4            So is it a fact that you're -- you did not

 5   communicate directly with Ms. Powell, that -- that you

 6   communicated with her through Mr. Corporon?

 7            A.   Yeah.  So I -- I'm going to say this

 8   because I actually went back and listened to everyone

 9   else's depositions as well.  I did not have any direct

10   conversations with Sidney Powell.  All right?  Those

11   conversations happened through attorneys.  So me and

12   Sidney Powell directly did not have any conversations.

13            Q.   So you've testified that you've done

14   extensive research regarding Dr. Coomer; is that correct?

15            A.   Yes.

16            Q.   Can you summarize some of the things that

17   you found out about his background that you have personal

18   knowledge of in terms of your research that would lead

19   you -- that would lend credence to your accusation that he

20   was associated with antifa and that he was a -- I don't

21   remember your exact words, but a -- someone who was an

22   agitator or aggressive or however you want to suggest

23   that?

24            A.   Well, there's someone that -- yeah, so as

25   I went through and did research, I was able to uncover

                                          Page 151

**Court File Page No. 14905**

```
 1    certain things about Mr. Coomer.  One of which is being a
 2    part of the skinhead movement.  Two, the way that he
 3    spoke was -- you know, it's pretty -- it's pretty vulgar.
 4    And where he speaks that vulgarity and how he speaks it,
 5    lend credibility to how antifa acts as well.
 6              Then you have the -- the information that
 7    Eric wrote specifically about his wife where he talked
 8    about sexually battering, urinating on, making bark like
 9    a dog and some of the other things that Eric did.  And
10    then publicly put that information out there in an effort
11    to humiliate his wife.
12              Then there's the -- the post that he put
13    up, and the things that he admitted to about being a drug
14    addict and getting in fights and being the person that --
15    that not only is -- you know, I guess a nuclear student
16    or a physicist, that is -- that can beat up people.
17    Right?
18              And I'm paraphrasing some of the things
19    that I have learned about him.  And then you look at the
20    other things that came up related to how he treats
21    people, and talking about other people that had worked
22    with Eric Coomer.
23              So there's just not a lot of redeeming
24    stuff that's out there about Eric Coomer relating to --
25              Q.   Let me ask you this:  Did you have any
```

Veritext Legal Solutions
800-336-4000

```
 1    occasion to find out anything that he personally said
 2    about his own mental health?
 3              A.   It --
 4              MR. CAIN:  Let me -- hold on, Mr. Oltmann.
 5    Mr. Arrington, I've done this in prior depositions, and I
 6    don't want there to be -- my silence to be
 7    misinterpreted.  That I believe you're outside of the
 8    scope of the discovery order, and I would object on that
 9    basis.  But out of deference to you, if I can just have
10    that running understanding, I won't interrupt your
11    questions.
12              MR. ARRINGTON:  I appreciate that,
13    Mr. Cain.  I would suggest that everything that I'm
14    talking about here can be tied back into questions that
15    you asked on direct.  So if the court reporter could read
16    back the question, I'd appreciate it.
17              (The last question was read.)
18              A.   The answer is yes.  He had a writing where
19    he said that -- again, I'm trying to find the writings
20    themself.  But admits to being bipolar, admits to having
21    a drug problem, admits to lying multiple times, not just
22    the times that he's admitted to lying when he said that
23    the posts were fabricated or deleting information.  So
24    he -- there's a habit, I would say, of -- of this.
25              Q.   (By Mr. Arrington)  But did your research
```

Page 153

```
 1    lead to crimes, such as DUIs and jail time?

 2                    MR. CAIN:  Same objections.

 3                    Barry, I didn't understand from your prior

 4    comment if you'll agree that I can just have a running

 5    objection.  We can disagree about scope issues or

 6    propriety of going outside of the discovery order.  But

 7    if I can have a running objection, I won't have to make

 8    it.

 9                    MR. ARRINGTON:  Yes.  We can disagree

10    whether my cross relates back to your direct and,

11    therefore, it would be within the discovery order, and to

12    the extent that your direct was within the discovery

13    order.  And yes, we can agree to your standing objection.

14                    MR. CAIN:  Thank you.

15                    THE REPORTER:  I'm sorry.  Just a moment.

16    Counsel, there -- Counsel, there is background noise

17    coming through Mr. Arrington's mic that I'm having

18    trouble hearing you all the time, Mr. Arrington.

19                    MR. ARRINGTON:  I'm sorry about that.

20                    Could you repeat the last question or

21    reread the last question?

22                    (The last question was read.)

23                    MR. ARRINGTON:  That was the question

24    before last.  Let me make another run at it.

25                    Q.   (By Mr. Arrington)  Did you have occasion
```

Page 154

1   to -- to find out any information about whether he had

2   committed DUIs and been in jail?

3           A.   Yes.  He bragged about that in some posts

4   that he put on a blog site -- I believe it was a Google

5   blog site -- about having a good lawyer, otherwise, he

6   would have spent quite a bit of time in jail.

7               And then through subsequent information

8   that I was able to uncovered, it showed that he had

9   multiple DUIs.

10              MR. ARRINGTON:  That's all of my

11  questions.  Thank you.

12              MR. CAIN:  Well, unless counsel for

13  Mr. Oltmann is going to allow us to continue, we're done

14  for today.

15              MS. HALL:  No.  We're done.

16              THE VIDEOGRAPHER:  Going off -- going off

17  the record/, the time is 2:07.

18              (Video deposition concluded.)

19              THE REPORTER:  Same orders, Counsel?

20  Transcript orders?

21              MR. KIMREY:  I don't know what those

22  orders are.  I can tell you what I want, though.  Should

23  I do that?

24              THE REPORTER:  Yes.

25              MR. KIMREY:  So I'd like a rough ASCII.

                                        Page 155

```
 1    How quickly can you produce that?

 2                    THE REPORTER:  How soon would you like it?

 3                    MR. KIMREY:  I don't want to engage in any

 4    sort of cruel and unusual request.  You know, I don't

 5    know what else you have.  What's reasonable for you given

 6    other things you need to work on?

 7                    (Discussion off the record.)

 8                    MR. ARRINGTON:  This is Barry Arlington.

 9    Do we have to order today or can we order later?  Can we

10    put --

11                    THE REPORTER:  You can order later if

12    you'd like.

13                    MR. ARRINGTON:  Okay.  Thank you.

14                    THE REPORTER:  Mr. Cain, your order?

15                    MR. CAIN:  Whatever Scotty says.  I

16    believe we did a one-day turnaround expedite.

17                    MS. HALL:  And this is Andrea Hall.  We'll

18    just -- whatever, I guess -- yeah, reading and signing.

19    I don't know what your turnaround is on that, but, yeah,

20    we'll take the reading and signing.

21                    THE REPORTER:  Have I covered ordering,

22    counsel?

23                    MS. BOEHMER:  This is Margaret Boehmer on

24    behalf of Eric Metaxas.  We'll take an Etran.  We don't

25    need it expedited, and we do not need a rough.
```

                                                    Page 156

```
 1                    THE REPORTER:  Other counsel?

 2                    MR. HOLWAY:  This is Eric Holway on behalf

 3     of the Trump campaign, and I would like an e-transcript

 4     as well, please.  And no, I don't need it expedited.

 5     Thank you.

 6                    THE REPORTER:  Any other counsel?  No?

 7                    I'm off the record.

 8                        *   *   *   *   *   *   *

 9                    WHEREUPON, the foregoing deposition was

10     concluded at the hour of 2:11 p.m.  Total time on the

11     record was 3 hours and 25 minutes.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Veritext Legal Solutions
800-336-4000

**Court File Page No. 14911**

1                    I, JOSEPH OLTMANN, the deponent in the

2      above deposition, do hereby acknowledge that I have read

3      the foregoing transcript of my testimony and state under

4      oath that it, together with any attached Amendment to

5      Deposition pages, constitutes my sworn testimony.

6

7      _____ I have made changes to my deposition

8      _____ I have NOT made any changes to my deposition

9

10

                        _____

11                             JOSEPH OLTMANN

12

13     Subscribed and sworn to before me this _____

14     day of _____, 20_____.

15

16     My commission expires: _____

17

18                                _____

                                  Notary Public

19

20                                _____

                                  Address

21

22

23

24

25        Job No. TX4792290

                                                    Page 158

Court File Page No. 14912

REPORTER'S CERTIFICATE

I, Laurel S. Tubbs, a Registered Professional Reporter and Notary Public within the State of Colorado, do hereby certify that previous to the commencement of the examination, the deponent was duly sworn by me to testify to the truth.

I further certify that this deposition was taken in shorthand by me at the time and place herein set forth and thereafter reduced to a typewritten form; that the foregoing constitutes a true and correct transcript.

I further certify that I am not related to, employed by, nor of counsel for any of the parties or attorneys herein, nor otherwise interested in the result of the within action.

My commission expires September 1, 2023.

LAUREL S. TUBBS
Registered Professional Reporter,
Certified Realtime Reporter
and Notary Public

Page 159

```
 1   Coomer, Eric, Ph.D. v. Donald J. Trump For President, Inc.

 2   Joseph Oltmann Job No. 4792290

 3                  E R R A T A   S H E E T

 4   PAGE_____ LINE_____ CHANGE_____

 5   _____

 6   REASON_____

 7   PAGE_____ LINE_____ CHANGE_____

 8   _____

 9   REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____      _____

24   Joseph Oltmann                           Date

25
                                                   Page 160
```

Court File Page No. 14914

1    defrancoi@yahoo.com

2                        September 9, 2021

3    RE: Coomer, Eric, Ph.D. v. Donald J. Trump For President, Inc.

4    DEPOSITION OF: Joseph Oltmann 4792290

5        The above-referenced witness transcript is

6    available for read and sign.

7        Within the applicable timeframe, the witness

8    should read the testimony to verify its accuracy. If

9    there are any changes, the witness should note those

10   on the attached Errata Sheet.

11       The witness should sign and notarize the

12   attached Errata pages and return to Veritext at

13   errata-tx@veritext.com.

14       According to applicable rules or agreements, if

15   the witness fails to do so within the time allotted,

16   a certified copy of the transcript may be used as if

17   signed.

18                        Yours,

19                        Veritext Legal Solutions

20

21

22

23

24

25

                                        Page 161

**[& - 80]**

| & |
| --- |
| **&** 2:4 4:3,7,22 141:24 |

| 0 |
| --- |
| **0** 137:23 |
| **0881** 137:23 |

| 1 |
| --- |
| **1** 61:15 79:16 159:17 |
| **1-3** 118:15 |
| **10** 29:2 46:20 116:13 |
| **100** 30:17 57:21 60:25 66:21 144:11 |
| **103** 5:17 137:21 138:6 |
| **104** 5:18 93:19,21 95:20,23 |
| **1040** 2:20 |
| **1064** 2:5 |
| **1099** 2:15 |
| **10:04** 5:5 6:4 |
| **117** 5:14 |
| **11:23** 63:2,4 |
| **11:42** 63:4,6 |
| **11:47** 67:14,16 |
| **11:50** 67:16,18 |
| **12** 5:15 |
| **128** 3:13 |
| **12:09** 81:12,13 |
| **12:17** 81:13,15 |
| **12:26** 89:10,11 |
| **12:34** 89:11,14 |
| **12:55** 106:6,7 |
| **13** 117:23 118:11 |
| **131** 5:19 80:17 81:19,23 |
| **137** 5:17 |

| **138** 150:19 |
| --- |
| **13th** 118:14 |
| **14** 96:3 |
| **1400** 2:10 |
| **1437** 1:3 |
| **146** 5:11 |
| **148** 5:12 |
| **14th** 146:20 |
| **15** 52:20 99:16,18 |
| **150** 30:17 |
| **1515** 4:17 |
| **15th** 146:18,19 |
| **1600** 2:10 |
| **17th** 4:7,22 |
| **18** 85:4 133:10 |
| **181** 134:11 |
| **18th** 2:15 |
| **19** 62:23 |
| **191250** 3:17 |
| **1996** 91:6 |
| **1:02** 106:7,9 |
| **1:12** 113:10,11 |
| **1:13** 113:11,13 |

| 2 |
| --- |
| **2** 5:14 79:18,19,22 89:13 112:2 117:22,25 119:14 120:10 122:11 139:7 |
| **20** 52:20 158:14 |
| **2019/2020** 21:16 |
| **2020** 30:6 38:5 48:13 60:13 71:21 82:2 94:10 107:5 108:14 117:23 128:8 142:1 |
| **2021** 1:17 5:5 6:4 60:17 161:2 |
| **2023** 159:17 |
| **205** 14:7,10,11 76:5 |

| **206** 14:7 79:13,16 120:10 |
| --- |
| **207** 14:8 122:12,24 |
| **208** 14:8 79:6,21 79:22 |
| **20cv34319** 1:6 |
| **211** 120:11 |
| **2150** 2:15 |
| **222** 4:12 |
| **22402** 159:19 |
| **2251** 3:8 |
| **24** 104:15 |
| **25** 157:11 |
| **26** 120:17 |
| **26th** 72:3,7,14 74:4 120:21 |
| **27** 119:16 |
| **27th** 71:21 120:8 120:18,20 |
| **2821** 3:22 |
| **29** 5:15 12:22 13:16,18 16:11,15 52:9 |
| **2:07** 155:17 |
| **2:11** 157:10 |

| 3 |
| --- |
| **3** 31:13 79:23 88:2 139:8 157:11 |
| **30** 37:14 42:13 |
| **303-205-7870** 3:5 |
| **303-390-0016** 2:16 |
| **303-443-1749** 3:14 |
| **303-534-5160** 4:8 |
| **303-573-1900** 2:11 |
| **303-667-5105** 93:25 |
| **303-734-3400** 2:21 |
| **303-741-4539** 4:4 |
| **303-749-0062** 3:23 |
| **312-609-7865** 4:13 |

| **314-329-5040** 3:18 |
| --- |
| **3400** 4:7 |
| **3801** 3:4 |

| 4 |
| --- |
| **4** 79:24 150:20 |
| **40** 78:24 |
| **400** 4:3 31:13 |
| **409** 1:7 |
| **45** 78:25 106:11 |
| **46** 5:16 96:25 103:24 |
| **4792290** 160:2 161:4 |

| 5 |
| --- |
| **5** 29:1 116:13 |
| **555** 3:22 4:7 |
| **5613** 4:3 |
| **5th** 106:15 125:9 |

| 6 |
| --- |
| **6** 108:14 109:25 110:8 |
| **600** 4:17 |
| **60601** 4:13 |
| **63119** 3:18 |
| **6420** 4:22 |
| **6th** 108:17 109:23 110:10 111:9 112:9 113:23 125:9 |

| 7 |
| --- |
| **7** 5:11 |
| **70** 54:19,21 55:7 55:21 |
| **719-530-3011** 2:6 |
| **720-931-3200** 4:18 |

| 8 |
| --- |
| **8** 1:17 5:5 |
| **80** 5:19 54:19,22 55:8,21 |

Page 1

**[80014 - amazing]**

| | | | |
|---|---|---|---|
| **80014** 3:22 | **abused** 91:11 | **activities** 125:3 | **affiliation** 55:15 |
| **80111** 2:20 4:4 | **abusing** 147:15,18 | **activity** 41:8 125:3 | **affirmed** 7:3 |
| **80202** 1:4 2:11,16 | **access** 11:5,10,12 | 140:4 | **afraid** 97:18 |
| 4:8,18 | 12:19 14:18 22:15 | **acts** 152:5 | **aggregators** |
| **80210** 3:4 | 28:22 32:7,9,10,11 | **actual** 23:10,18 | 141:14 |
| **80539** 3:9 | 32:18 48:19 49:9 | 26:3,18 34:9 49:9 | **aggressive** 151:22 |
| **80601** 3:13 | 49:10,11 63:12,20 | 64:17 71:24 73:6 | **agitated** 34:7 36:6 |
| **81201** 2:5 | 66:9 85:22 86:7,9 | 73:9 | 46:12,15,17 |
| **830** 3:4 | 87:4,12 88:5 | **add** 97:12 | **agitator** 151:22 |
| **8400** 2:20 | 89:16 90:4,16 | **addict** 152:14 | **ago** 18:7 25:2,2 |
| **8th** 6:4 87:23 | 100:9 102:6 107:5 | **addiction** 91:7 | 28:5 88:7,24 |
| **9** | 107:10 109:3,6,20 | **additional** 145:19 | 135:24 |
| **9** 161:2 | 109:22 110:3,7,11 | **address** 1:3 19:5 | **agree** 6:24 7:1 |
| **90048** 4:23 | 110:18 111:8,10 | 33:21 49:5 90:24 | 59:5 90:11 105:24 |
| **93** 5:18 | 111:15 112:4,19 | 137:1 158:20 | 106:1 110:13 |
| **95** 140:4,15 | 114:2 115:16 | **addresses** 116:20 | 140:23 148:4,5 |
| **96** 5:16 | 117:10,13 128:10 | **adf** 68:12 | 154:4,13 |
| **970-419-8234** 3:9 | 142:7,8 | **adjudication** | **agreed** 89:4,17 |
| 4:23 | **account** 60:16 | 126:18,20 135:11 | **agreeing** 88:19 |
| **a** | 99:5 107:6,9 | **administered** 6:16 | 130:16 |
| **a.m.** 5:5 63:4,4 | 108:7 110:8 | **admits** 153:20,20 | **agreement** 6:21,22 |
| 67:16,16 | 111:15,22,22,23 | 153:21 | **agreements** |
| **ability** 38:15 86:21 | 112:21 | **admitted** 129:24 | 161:14 |
| 137:13 139:21 | **accounts** 111:21 | 152:13 153:22 | **ahead** 52:23,24 |
| 142:8 146:4 | **accuracy** 161:8 | **advice** 28:21 | 97:15 128:16 |
| **able** 17:12 18:2 | **accurate** 85:9 | **advise** 8:12 | 131:3 143:16 |
| 19:2,9,15 51:13 | 119:25 120:4,16 | **advocating** 73:15 | **alignment** 137:15 |
| 53:23 60:22 64:9 | 120:22 121:2 | **affect** 135:17 | **all's** 102:2,3 |
| 64:15 68:25 70:22 | **accusation** 151:19 | 139:17 | **alleged** 71:12 92:8 |
| 74:17 81:2 98:23 | **acknowledge** 6:13 | **affidavit** 5:14 | 125:2 |
| 110:15 111:21 | 6:16 158:2 | 71:20 117:18,21 | **allegedly** 41:4 |
| 112:10 113:16 | **acknowledged** | 118:10,17,21,25 | **alley** 77:12 |
| 114:6,12 129:18 | 136:19 | 119:3,9,11 120:23 | **allotted** 161:15 |
| 135:17 137:12 | **acquire** 33:8 | 121:2,6 122:1,11 | **allow** 10:8 135:18 |
| 138:19 145:2,5,12 | **act** 22:10 | 122:18,24 123:22 | 155:13 |
| 146:22,23 150:2 | **acting** 58:16 | 130:12 131:12,24 | **allowed** 118:25 |
| 151:25 155:8 | **action** 159:16 | **affidavits** 44:8 | **allows** 141:9 |
| **absolutely** 35:7 | **actively** 55:12 | 121:13 126:21 | 142:14 |
| 43:25 139:22 | 58:19 59:4 | **affiliated** 51:2 | **amazing** 58:13 |
| | **activist** 55:13 | 148:14 | 126:14 |

Page 2

Veritext Legal Solutions
800-336-4000

[amended - article]

amended 127:1
amendment 158:4
america 1:13 4:10
4:15,20 107:2
american 39:13
amount 58:14
105:21 125:16
126:14
analyses 131:21
analysis 131:14,18
132:1 135:7,25
136:3 137:4
anderson 77:18,23
77:24 78:13
andrea 3:7,10 6:8
6:25 148:6 156:17
angeles 4:23
anger 98:15,17
animal 147:15
animals 147:16
anonymous 56:22
anonymously
69:10
answer 8:11,13,20
9:19 12:6,8,9
16:21,24 18:11,16
20:24 21:3,4,5,5
22:12 23:16 24:16
24:19 25:13,19
26:10,13 28:2
34:18 35:11,15,16
35:19 36:16,18
37:22,24 38:1
39:6 40:18 41:11
43:9,17 54:6
56:24 57:15 59:8
59:9,10 61:8,10
70:1,11 83:18
84:6 86:4,13,14,18
87:20,21 96:7
102:18 104:1

125:25 128:11,23
128:24 130:9
141:1 142:20,22
143:1,12,14,20,22
153:18
answered 12:7
22:6 23:14,15
24:17 26:9,11
27:2 41:9,10
57:21 94:23
100:22 124:2
150:25
answering 9:7
28:16 34:17 35:23
57:16,17 86:17
87:22 94:21
142:19
answers 7:25
42:10
anti 39:13,14
antif 79:13
antifa 10:21 11:1,5
11:12,25 12:11
14:20 16:5 17:9
17:16,22 18:8
19:1,24 20:6 21:6
21:11,14,19 24:1,2
24:4,5,7,8 30:11
30:15 32:8,12,14
32:14 34:1 38:5,7
38:18,19,22,23,24
39:2,6,7,9,9,12,13
39:14,20,22,24
40:2,4,6,8,13,22
41:2,3,8,13,15
42:5,5 46:25
47:17,20 50:8
51:2,3,8 53:24
54:4,15 55:11,12
55:16 56:15 58:14
58:16,20,24 59:4

59:24 61:2 65:16
65:18 66:16,20
67:20,21 68:17
69:15 70:18,22
71:10 73:24 74:14
75:18 77:12,15,20
79:14 82:16 83:13
83:13 87:13 108:2
117:19 119:12
120:16 123:3
124:17,25 125:3,6
125:8,18 126:5,7
126:15 127:6,9,19
127:22 128:2,4,6,7
128:18,22 129:7,9
130:12 131:5,9
139:10 146:13,17
146:21,24,24,25
147:1 148:14,23
149:3,13 150:3,4
151:20 152:5
antifascist 40:3
41:16
antrim 139:19
145:11
anybody 34:24
43:4 56:2,10 73:6
73:7 107:4,5
132:23
anymore 30:15
103:18
anyway 105:8
api 144:14
apologies 116:2
128:14
apologize 82:22
app 29:3,7,25 63:9
63:12 64:12
114:10,11
appear 15:12

appearance 36:9
36:12 37:11
appearances 2:1
3:1 4:1
appears 15:2
applicable 161:7
161:14
appreciate 85:16
136:23 153:12,16
approach 146:12
appropriate 5:2
88:11
approximately
58:6 78:23
architecture 141:9
141:23 142:9
144:22
area 43:3 91:25
argument 116:25
arima 131:13,21
131:22
arlington 148:2
156:8
arranged 67:21
arrangement 6:19
arrested 36:21
37:9
arrests 91:8
arrington 3:3,3
5:12 134:12,12,16
134:16 147:24
148:2,5,9,20,21
150:9,18,21 153:5
153:12,25 154:9
154:18,19,23,25
155:10 156:8,13
arrington's 154:17
arringtonpc.com
3:5
article 108:18
129:23 147:1

Court File Page No. 14918

[articles - behalf]

**articles** 55:14
**ascii** 155:25
**aside** 143:15
**asked** 7:13 15:9
    17:7 21:4 24:14
    24:17,18 26:11
    41:9 49:18 51:6
    54:7 55:19 56:24
    57:14,19 64:4,5
    65:18 73:6,8,10
    86:3 88:23 93:11
    94:6 99:6 113:5
    118:17 121:8
    122:1,5,5 127:7
    135:5 136:24
    137:7 146:3
    153:15
**asking** 9:6,7 10:4
    22:8 23:13 26:2
    26:12,15 28:14,17
    36:18 40:6,25
    44:16 45:5 51:25
    53:25 55:19 61:24
    61:25 70:25,25
    71:3 83:21 86:11
    88:24 89:16 93:3
    103:25 121:24
    125:16,22 127:4
    133:11,23
**aspect** 61:17
**ass** 100:16
**assassinate** 21:8
**assault** 92:8
**assaulted** 92:3
**assembled** 131:5
**assisting** 137:10
**associate** 65:1
    129:14 131:9
    149:1,13
**associated** 68:12
    74:24 75:18

118:19 119:1
    122:2 128:2
    129:13 149:3
    151:20
**association** 125:17
    126:6 129:13
    148:23
**assume** 45:23
    96:19 116:24
    124:16
**assuming** 117:4
**attached** 158:4
    161:10,12
**attack** 97:22
**attacked** 98:5
**attempt** 48:24,25
**attempted** 31:10
    31:25 49:3 74:8
**attempts** 30:25
    31:7
**attend** 128:4
**attended** 32:24
**attention** 61:22
**attorney** 6:23
    20:22 28:15,18
    83:19 84:7
**attorneys** 6:12
    10:13 74:21 93:1
    93:4 140:15
    151:11 159:15
**attributing** 124:13
**august** 85:4
    133:10
**aurora** 3:22
**authenticate** 54:2
    57:4,7 107:11
**authenticated**
    54:4
**available** 11:9
    50:1 112:1 113:25
    144:14 161:6

**avenue** 2:20 3:4
**aware** 10:19,22
    38:2,4,6 81:25
    87:17

**b**

**b** 1:11,12,13 3:7
    3:11,16,20,21 4:20
    15:3
**back** 21:21 26:1
    31:4 42:15 48:14
    52:6 60:12,13
    63:5 67:17 71:10
    73:1,5,11 74:21,23
    81:14 84:25 88:12
    89:1,5,8,12 91:5,6
    96:14 100:8 106:8
    106:21 107:15
    108:17 111:11
    113:12 124:4
    126:15,22 127:25
    130:4 137:2
    144:21 145:1,4
    146:18 149:8
    151:8 153:14,16
    154:10
**background** 16:20
    37:15 151:17
    154:16
**backtrack** 68:18
**backwards** 113:2
**bad** 51:14 94:18
**badgered** 35:17
**balance** 137:14
**ball** 91:10
**ballot** 143:24
**bank** 49:5
**bannock** 1:3
**bar** 88:7 91:2,19
    91:21,23 92:8,17
    95:16

**bark** 152:8
**barry** 3:3,5 134:12
    134:16,20 148:2,3
    154:3 156:8
**based** 21:25 54:5
    54:24 55:6 60:24
    63:11 72:10,17
    79:10 91:16 97:24
    125:16 132:15
    146:21 150:4
**basically** 30:13
    99:13
**basis** 55:10 86:18
    153:9
**bates** 14:6,7 76:5
    79:6 120:10
    122:25
**bathroom** 89:21
    105:15,18,19
**battering** 41:23
    152:8
**bclark** 4:14
**beat** 152:16
**bed** 97:17
**beedle** 50:17,18
    52:14 53:1 54:4,8
    54:25 55:2,4,8
    59:19 60:5,10,11
    60:16,20 61:5,11
    61:14,21 66:20
    80:2 129:2
**beedle's** 59:24
**began** 78:16
**beginning** 6:22
    32:4 53:8,8 82:14
    89:13
**begins** 6:2
**behalf** 2:2,9,13,18
    3:2,6,11,15,20 4:2
    4:6,10,15,20
    156:24 157:2

Page 4

[behavior - call]

**behavior** 90:21
145:14
**behavioral** 137:4
**believe** 24:9,10,11
30:5 31:24 34:3
48:21 52:2 60:8
60:14 63:17 65:4
65:5,7 75:17,22
76:9 77:5 78:24
83:3,6 85:5 90:11
92:10 97:16
112:15 114:12
116:13 117:1,23
118:20 127:8
131:7 135:3
137:23 145:19
146:19 148:15,21
148:24 149:11
150:2 153:7 155:4
156:16
**believed** 149:3
**believes** 38:10
**benefit** 97:2
**best** 28:7 54:24,24
55:6 72:12 73:24
112:18 121:1
**beth** 2:14
**beth.chambers**
2:17
**better** 65:25 66:1
**bev** 15:3,8,10,22
16:3,4 52:17
**beyond** 19:3 20:1
26:18 42:13
103:16
**bias** 139:9
**biased** 88:1
**biden** 139:1
**big** 138:17,18,22
**binder** 7:16,17

**bipolar** 153:20
**bit** 31:4 72:23
106:11 108:2,11
117:17 124:11
141:5 146:11
155:6
**bite** 90:10 125:19
**bkimrey** 4:14
**bkloewer** 2:7
**black** 39:18 133:5
142:4
**blaine** 4:11 13:1,9
120:13 136:13
**blm** 19:1
**blog** 155:4,5
**blow** 100:13 101:1
**board** 78:2
**boehmer** 4:6
156:23,23
**boisterous** 123:18
139:5
**book** 74:9,11
**bookmarked** 79:7
**bothered** 50:16
**bottles** 124:21
**bottom** 14:7 83:8
88:21 93:17
122:25
**boulevard** 4:22
**bounty** 21:16,19
**bowman** 2:4
**box** 2:5 3:8,13,17
133:5 142:4
**brad** 2:3
**bragged** 155:3
**breadth** 150:5
**break** 20:16 62:20
62:25 63:10 85:24
86:2 88:17,23,24
88:25 89:4,5,16,17
89:19 105:15,18

105:19 127:15
**brian** 14:15,15,16
14:19
**brighton** 3:13
**bringing** 78:2
**brought** 46:3
132:25
**bryan** 4:11
**building** 60:2
73:14
**buildings** 124:20
**built** 141:2,6,8,12
142:10,15
**bully** 102:22,22
129:15
**bunch** 85:25 121:3
123:13
**burn** 90:23
**burning** 124:19
**burns** 3:16,17 81:1
81:4,4
**business** 74:20
**businesses** 73:17
73:19,21
**busy** 34:9,10
48:16 74:20 99:16
**button** 93:17
**buttoned** 116:25
**bypass** 137:14

**c**

**c** 6:1
**cain** 2:2,4 5:11 6:7
6:7,24,24 7:6 8:19
8:23 9:1,2 10:1,6
10:8,11 13:1,4,9
13:15,16 15:8
16:24 18:11,15
22:2,3 23:12,13,18
25:23 26:6,7,14,17
26:25 27:3 28:4
28:17,21,22 33:25

34:14,18 36:1,4,5
37:6,8,10,20 38:13
38:16,17,21 39:1
39:17,25 40:12,15
40:22,25 41:6,10
41:12 42:9 45:5
45:11 62:19,21,24
63:7 66:3,5 67:12
67:19 69:14,23
70:3,6,9,10,13,24
71:6 73:22 74:5
80:25 81:8,16,23
82:3,21,25 83:21
84:9,16,19 88:19
89:2,15,23 92:24
93:3 95:3,10 96:6
103:13,19 104:9
104:22 105:20
106:4,10 113:3,14
116:3,15,24 117:4
117:15 118:1,5,7
120:4,15 121:23
121:24 128:16
134:1,5,10,22
136:9,16,23 137:2
138:6 139:11
140:11,23 141:19
143:1,4,13 144:9
145:18 146:3
153:4,13 154:2,14
155:12 156:14,15
**cain's** 148:12,22
**calculate** 145:13
**calendar** 72:1,19
72:21 73:3 74:6
**california** 2:5 4:23
21:9
**call** 10:21,21 11:1
11:5,12,16,24 12:1
12:12,20 13:23
14:4,7,18,24 15:11

[call - client]

| | | | |
|---|---|---|---|
| 15:18,21,25 17:24 | **called** 5:3 38:7,19 | **ccain** 2:6 | 34:16 35:22 37:3 |
| 18:5,21 22:15 | 38:21 39:7 40:6 | **cd** 143:18 | 69:18 80:21 81:1 |
| 24:13 31:8 32:8 | 41:2 48:22 94:12 | **cell** 31:15 64:17,22 | 82:22 88:16 95:8 |
| 32:18 35:13 38:24 | 95:16 97:9 107:21 | 64:23 65:2,6 | 96:2 103:9 104:11 |
| 39:12,22 41:24 | 110:22 129:3 | **centers** 147:13 | 105:16,18 116:12 |
| 44:14 46:25 47:5 | **calling** 40:15 | **centric** 124:11 | 133:22 143:3,11 |
| 47:10 48:19,21,22 | 111:6 | **ceo** 126:24 144:3 | 143:17 145:22 |
| 48:23 49:1,6 50:4 | **calls** 50:3 51:24 | **certain** 11:6 49:4,5 | **chart** 132:5,7,13 |
| 51:4,5,7,8,13,17 | 56:14 68:25 69:16 | 50:12 54:22 55:20 | **charting** 132:17 |
| 51:20 52:1,4,6,8 | 69:16,21 70:3,17 | 55:21 78:15 115:7 | 132:18 |
| 52:11,13,15,16,21 | 71:1 82:23 84:20 | 123:22 129:1 | **charts** 133:1 |
| 52:21 53:1,8,18,19 | 126:12 | 132:8,9 144:1 | **check** 25:15,20 |
| 54:1,3,5,11,21 | **camera** 45:1 | 150:10 152:1 | 33:14,23 49:22,23 |
| 55:6,8,10,11,20 | **camp** 5:19 12:16 | **certainly** 51:1 | 52:2 73:2 94:13 |
| 56:4,6,12,17,25 | 18:17 21:12 76:6 | 113:4 150:2 | 146:19 |
| 57:6,7,9,20,22 | 76:7,11,13,15,19 | **certainty** 54:11,14 | **checking** 144:21 |
| 58:1,3,6,9,11,18 | 80:3,9,10,18 81:18 | 54:14,18,18 56:5 | **cherry** 96:2 |
| 59:16,19 60:8 | 82:1,1,5,9 83:1,15 | 57:1,20,22 58:1,2 | **chicago** 4:13 |
| 61:5,6,12,20 62:7 | 83:23 84:1,19 | 58:4 60:3,5,7,7 | **choice** 76:23 |
| 66:14,15,19,24 | 85:17 121:8,25 | 61:19,19 128:22 | **christopher** 2:19 |
| 67:2,20,20,21 68:1 | **campaign** 157:3 | 140:12,15 | **cia** 149:10 |
| 68:20,22 69:2,3,5 | **capabilities** 150:5 | **certificate** 159:1 | **circle** 26:1 |
| 69:5,9,20 70:14 | **capacity** 135:11 | **certified** 5:7 | **circumstances** |
| 71:10,11,13,17,25 | **care** 21:3 22:9 | 159:20 161:16 | 69:11 98:14 |
| 72:9,13,25 73:24 | 42:3 148:5 | **certify** 159:6,9,13 | **city** 43:1 |
| 74:14,23,24 75:1,3 | **careful** 26:21 61:2 | **cetera** 122:21 | **civil** 5:2 |
| 75:6,9,10,12,20 | **carry** 114:13,14 | **chambers** 2:14 | **claim** 52:12 57:5 |
| 76:7,10,16,19 78:5 | **carve** 125:24 | **chanel** 1:12 4:10 | 57:25 58:8 59:17 |
| 78:11,14,16,18,20 | **carving** 125:18 | 4:15,20 13:7 | 103:22 143:3 |
| 79:14 83:12,16,24 | **case** 1:6 7:11 | **change** 102:4 | **clarification** 118:2 |
| 84:2 90:15 102:13 | 10:17 13:3,10 | 160:4,7,10,13,16 | 136:16 145:22 |
| 106:12 108:2 | 38:4,12 39:8 | 160:19 | **clarify** 60:10 |
| 109:10 117:19 | 40:11 104:2 117:1 | **changed** 119:23 | 149:4 150:8 |
| 119:12,15 120:16 | 132:3 145:1 | 139:25 | **clark** 4:11 50:25 |
| 120:24 121:9 | **cases** 137:14 | **changes** 63:19 | 51:1 67:1,7 |
| 123:3,12,15 125:2 | **castle** 25:11 32:21 | 158:7,8 161:9 | **clean** 57:10 |
| 126:8,9,12,16 | **catalyst** 58:24 | **charge** 24:12 | **clear** 124:25 139:8 |
| 127:25 131:6 | **cause** 147:20 | **charged** 92:8,13 | 139:24,24 143:24 |
| 138:17 145:5 | **caused** 98:14 | **charles** 2:2 | **clarify** |
| 146:4,13,16,21 | 145:9 | **charlie** 6:7,24 8:17 | **client** 8:19 28:15 |
| 149:16 | | 8:24 10:1 33:19 | 28:18 38:12 40:15 |

Veritext Legal Solutions
800-336-4000

[client - continued]

40:18 69:21 83:19
84:7 101:13,13
102:11,11,12
103:10,12,15,21
103:23 104:15
145:23
client's 41:1
clients 116:22
close 73:4 79:2
closer 65:24 67:10
cobb 139:19
code 49:9 56:20
57:3 142:3,5
coffee 46:18,19
47:3,7
coincidence 60:19
collect 17:2 18:2
146:22
collectively 121:17
130:16
color 36:12
colorado 1:1 2:11
2:16,20 3:4,9,13
3:22 4:4,8,18 5:8
14:14 21:19 25:5
25:11 50:17 53:12
72:5 109:2 124:18
130:5 139:19
159:6
come 34:11 35:8
48:18 52:6 85:17
86:17 88:4 89:5
91:15 97:18,21
115:5 145:16
comes 93:24 142:3
coming 26:21 98:1
121:13 141:15
154:17
commencement
159:7

commencing 5:5
comment 51:20
82:21 105:10
107:25 154:4
comments 91:9
95:9 107:12
123:12 124:9,10
130:15 138:24
commerce 144:10
commission
158:16 159:17
commitment
11:13
committed 155:2
communicate 9:17
31:15 123:19
151:5
communicated
51:24 70:22 151:6
communicates
29:11 30:1 41:14
communicating
40:1 60:11,15,20
61:11 123:15
communication
31:5 56:15,17,18
68:7 70:21 82:9
communications
1:11 3:16,20
28:12,23 29:2,5,17
30:2 31:22 61:18
68:3
communism 130:3
communities
124:19
community 73:16
129:15 147:21
companies 144:12
company 49:18
73:13 141:14
144:3

compelled 90:7
complaints 74:21
complete 119:21
121:1 147:23
completely 121:4
complicit 145:14
compromised
135:14
computer 7:19
65:24
con 98:13 138:18
138:22
concerned 51:10
88:3 121:12
concerning 11:4
conclude 104:23
129:19 137:20
concluded 155:18
157:10
conclusion 91:15
127:10,12 138:21
138:23 145:16
concrete 49:8
conducting 7:22
148:25
conduit 10:21 11:1
12:5,11 14:4
17:18 18:20 29:5
37:25 42:13 69:1
70:14 86:7 87:7
96:23 108:3
121:10 122:1
confer 89:19,23
conferral 36:22
confirm 66:21
105:1 136:21
138:7
confirmed 33:22
confirming 122:2
conflict 69:4

connected 112:1
144:16,18
connection 77:19
82:16,17 97:23
118:23
connections 142:6
cons 138:17,17,18
consent 6:19
consequences
86:17 88:12
conservative 1:11
3:7,11
consider 127:18
constitutes 158:5
159:12
cont'd 3:1 4:1
contact 24:22
27:25 28:5 30:3,4
30:8,23,25 31:8,10
31:14,25 49:3
63:19 64:15 65:8
77:7 79:23 112:21
113:17 146:4
contacted 34:7
64:23
contacting 17:8
80:4
contacts 64:20
contemporaneou...
13:22
content 107:23
112:19
context 7:25 75:22
78:1,1 94:5 96:9
96:13 119:22
149:5
continue 155:13
continued 60:17
122:12 123:4
141:17

**[continues - d]**

**continues** 22:4
**contract** 64:6
**control** 86:20 91:2
  91:8 96:22 103:22
  147:15
**convenient** 95:7
**conveniently**
  101:6
**conversation**
  29:13 32:12 53:16
  54:5 65:20 75:16
  78:3 113:6 115:21
  122:19,20 123:2
**conversations**
  47:8 49:23 51:21
  56:21 63:21 89:18
  151:10,11,12
**convert** 33:9,10
**convince** 115:23
  116:4
**cool** 103:18
**coomer** 1:6 11:24
  11:24 12:1 15:24
  21:21,23 24:9,10
  24:11 38:12,19
  39:8 40:21 52:12
  54:1 56:7,8,8,10
  57:2,5,9,18,22,25
  58:8 59:17 60:4
  60:13,13,15,18,23
  61:5,7,9,11,17
  62:8,9,14 82:15
  83:1,5,12 87:4,12
  87:23 88:3,6,15
  90:8,15,21 91:4
  92:2,8,21 93:2,12
  93:14 96:22 97:23
  100:15,15,15
  103:11 107:21
  108:18 109:10
  111:3 112:3,7

113:23 114:4
116:11 122:14
123:6,9 124:14
125:1,17,21 126:5
126:11 127:5,8,18
128:6 129:6,19
130:13 131:4
133:14,17 135:2,6
135:6,9,15 139:16
140:16 148:13,25
149:6,15,24
151:14 152:1,22
152:24 160:1
161:3
**coomer's** 24:4,5,8
  84:21 85:15 86:20
  87:13 90:4 91:1
  93:8 94:10 95:1
  95:11 99:25
  104:25 108:7
  110:3,7 115:9
  138:12,22 148:23
**copies** 13:6
**copy** 13:19 133:23
  136:17 161:16
**core** 68:14
**corporon** 3:21,21
  151:2,6
**corporonlaw.com**
  3:23
**correct** 7:11 13:21
  14:1 36:7 65:4
  71:18,19 72:10
  83:24,25 84:18
  85:5,10,11 104:3
  108:14,20,20
  109:8 112:11
  117:24 119:16
  123:6 132:24
  138:14 147:8
  151:14 159:12

**corrected** 104:10
**correctly** 14:16
**correlate** 60:21
**correlated** 58:20
**correlates** 59:10
  59:23
**correlation** 61:5
  61:12
**correlations** 141:7
**corroborate** 58:15
**corroborated**
  111:10
**corrupt** 100:16
**counsel** 6:5,19
  7:14 8:11 9:20
  13:3,7 23:13
  28:13,19 36:22
  37:2 44:24 63:15
  63:23 85:2 89:19
  89:24 92:19 96:16
  103:13 145:19
  148:6 154:16,16
  155:12,19 156:22
  157:1,6 159:14
**counsel's** 150:18
**counties** 145:12
**country** 34:10
  44:8 56:16 100:17
  124:18 126:13,21
  139:9 141:11
  147:6
**county** 1:1 139:19
  139:19,19 145:11
**couple** 8:1 18:7
  21:13 30:25 31:7
  31:7 44:7 48:15
  48:22 51:18 88:7
  97:25 141:15
  148:11
**course** 9:18 51:10
  55:11 75:6 119:12

127:3 130:18
**court** 1:1,3,4 6:10
  7:10 11:20 22:4
  38:1 43:7 44:5
  86:14 87:15 88:13
  90:25 114:23
  116:19,20,23
  153:15
**court's** 64:8
**courthouse** 36:19
  36:20
**courtroom** 1:7
  22:10 36:25
**cover** 105:23
**covered** 87:7
  128:20 156:21
**covering** 128:9
**cps** 147:18
**created** 132:5,7,19
**creates** 141:6
**creating** 132:13
**credence** 151:19
**credibility** 97:23
  121:16 122:3
  152:5
**crimes** 154:1
**criminally** 92:14
**cross** 148:7 154:10
**crude** 136:6
**cruel** 156:4
**cseerveld** 2:21
**cstrial.com** 2:6,7,7
  2:8
**currently** 9:11
  21:12,19 46:10
  64:13
**cut** 98:2,3

**d**

**d** 1:11,12,13 3:7
  3:11,16,20 4:20
  6:1 27:22,24

[d.c. - directly]

**d.c.** 133:1
**daily** 1:11 3:7,11 74:20
**damage** 64:1,2
**damaged** 64:5
**danger** 21:25 44:1 44:3 65:21 87:12 91:3 98:8
**dark** 21:18
**dash** 18:19 20:19
**data** 77:13 106:17 109:5 114:9 132:14 140:22 141:7,13
**datasets** 131:25 132:18,19
**date** 6:3 71:12,24 72:25 73:6,9 74:7 74:18 91:5 101:8 138:11 160:24
**dated** 71:18
**dates** 71:11,11 73:3
**dating** 60:12 130:4
**dave** 95:4,10
**day** 34:8,9 39:15 97:4 101:16 103:4 104:15 109:23 112:10,12 146:25 156:16 158:14
**days** 48:22 72:2,14 73:24 97:25 99:16 99:19 121:18 141:15
**deactivated** 111:23,24
**deal** 57:23 83:19
**dealing** 21:2 43:2 115:20
**dealt** 69:20

**death** 141:16,17
**debate** 102:10,11 103:20 145:10,11
**debating** 40:16
**december** 87:23 106:15 107:4
**decided** 107:1
**declare** 6:17
**deem** 118:2
**deep** 65:17
**defamation** 35:25 38:12 40:11 143:3
**defamatory** 55:14
**defaming** 59:4
**defendant** 2:13,18 3:2 4:2,6,10
**defendants** 1:15 3:6,11,15,20 4:15 4:20 73:8 103:18 132:3
**defending** 2:18 85:3
**deference** 153:9
**define** 46:25 52:7
**definitely** 32:18
**definition** 41:20
**definitively** 53:20
**defranco** 3:12,12 6:8,8 7:1 143:7
**defrancoi** 3:14 161:1
**degree** 19:4 54:17 54:18 59:18 61:19 112:2 140:12,15
**delete** 101:10,19 101:25 104:5,8
**deleted** 29:2,6,18 29:22,25 101:11 101:14,17,18 102:4 104:4 107:2

**deletes** 29:1
**deleting** 57:18 103:7 104:8 153:23
**demask** 58:24
**demonstrations** 126:12
**denied** 99:8
**denver** 1:1,4 2:11 2:16 3:4 4:8,18 14:14 43:3 48:17 72:4 130:5
**denying** 98:18,24 99:9
**depending** 137:19
**deponent** 15:6 16:22 25:20 28:3 65:23 66:1,4 69:22 73:20 80:23 81:5 89:7 104:18 104:20 105:17 106:1 113:1 115:25 120:7 128:14 134:8 138:4 141:1 143:22 144:8 158:1 159:7
**deposition** 1:16 5:3 6:3,13,14,15 7:22 9:18 10:4 20:24,25 25:24 33:14 34:21 37:4 41:21,22 116:18 117:19 118:3,4 136:18,21 140:14 142:18 148:6,7 155:18 157:9 158:2,5,7,8 159:9 161:4
**depositions** 151:9 153:5

**describe** 30:8 36:9 36:12,15,23 37:10 45:14 50:5 130:24 131:2,4
**described** 68:20 122:20
**describing** 71:2 83:16
**design** 144:11
**desire** 86:21 87:25
**despite** 74:5
**detail** 97:20
**determine** 19:15
**develop** 46:24
**develops** 141:3
**deviations** 136:7,7 137:5,5
**device** 9:10
**devices** 8:3 56:19
**dexter** 4:16
**diagram** 136:5,6 137:24,25 138:6,8 138:13,15
**diagrams** 137:17
**dictate** 90:22
**died** 18:7
**difference** 104:6
**different** 24:18 54:6 56:18,19 82:4 137:12 139:12,14 142:6 142:21
**difficult** 128:19
**difficulty** 128:17
**dig** 150:2
**diligence** 126:15
**direct** 58:4 151:9 153:15 154:10,12
**directly** 59:10 130:18 151:5,12

**Court File Page No. 14924**

Veritext Legal Solutions
800-336-4000

[director - endearing]

**director** 135:9
**disagree** 154:5,9
**disclose** 11:13
34:23 43:7 65:21
109:15,18
**disclosed** 43:8
**disclosure** 10:20
10:22
**disclosures** 56:15
137:22
**discover** 144:15
146:17
**discovery** 69:20
83:7 103:17
121:21 153:8
154:6,11,12
**discuss** 76:5
**discussed** 52:8
66:14 76:6
**discussing** 67:20
76:19
**discussion** 63:3
67:15 76:10 77:22
156:7
**disgusting** 55:3
**dispute** 56:10
**disqualify** 19:9
**distracted** 138:18
**district** 1:1
**divulge** 21:20,24
34:25 48:25 88:13
**dna** 141:8
**doctorate** 149:7
149:12,20
**document** 5:16
80:19 82:14
137:23
**documented** 49:15
49:17
**documents** 12:21

**dog** 152:9
**doing** 17:8 20:11
20:11 47:20 51:19
58:21 65:9 72:7
72:24,25 73:3
87:15 99:16,18
100:12 104:14
108:24 111:9,16
111:20,20 112:6
121:20 124:17
126:12 131:8
149:23
**dominion** 14:12
61:12 72:4 75:16
82:17 97:22
100:16 122:21
126:9,20,23,24
133:3,4,5 135:10
135:17 136:8
137:11,19 138:16
142:10 143:23
145:9,11,14,17
147:5 150:6
**dominion's** 147:4
**dominus** 129:24
**donald** 1:9 2:13
160:1 161:3
**door** 130:21
**downloaded**
114:13
**dox** 147:20
**doxing** 147:7,10
147:10
**dr** 39:8 54:1 56:8
56:10 57:5,25
58:8 59:17 60:4
62:9,14 83:5
84:21 85:15 90:4
91:1,4 92:2,8,21
93:8 94:10 95:1
95:11 96:22 99:25

104:25 108:7,18
110:3,7 111:3
112:7 113:23
115:9 116:11
125:1 127:5,18
128:6 129:6,19
130:13,24 131:4
133:14,17 135:2,6
135:6 138:12,22
139:16 140:16
148:13,23,25
151:14
**drafted** 119:19,20
**dragged** 48:1
**drank** 85:25
**drc** 2:21
**dropped** 120:6
**drug** 152:13
153:21
**dsl** 77:21,21
**dtc** 4:3
**due** 21:14 126:15
**dui** 91:8
**duis** 154:1 155:2,9
**duly** 7:3 159:7
**dymond** 2:19

**e**

**e** 6:1,1 15:3 144:10
157:3 160:3,3,3
**earlier** 68:24
**early** 4:22 30:5
133:1 145:3
**earlysullivan.com**
4:24,24
**easier** 136:22
**east** 2:20 3:4
**echo** 97:9,11 99:12
99:13 104:24
106:19
**echoed** 100:4,24

**edison** 133:7,7
**education** 73:17
**educational** 37:15
**effect** 30:13 87:18
124:13
**effort** 152:10
**efforts** 65:12 74:6
123:13
**either** 39:9 43:12
56:3,20 60:7 67:1
70:6 71:2 102:20
132:3 146:19
**election** 61:3
97:24 100:17
102:14 121:19,20
127:3 133:14,18
135:2,3,8,12,18
138:12 139:17
140:5,16,19,24
141:20,21 142:24
143:25 147:3
**elections** 142:24
**electronic** 33:9,11
72:21
**elk** 108:8,13,21,23
108:25
**else's** 97:11 99:14
151:9
**email** 2:6,7,7,8,12
2:17,17,21 3:5,10
3:14,19,23 4:5,9
4:14,14,19,24,24
5:17 31:6,18
33:12,21
**emails** 33:10 83:4
**emotions** 98:8
**employed** 42:21
159:14
**employment** 42:23
**endearing** 77:2

[ended - fair]

**ended**  78:18
**enemy**  77:11
**enforcer**  19:1
**engage**  156:3
**engaged**  140:4
**engineering**  149:7
149:13,20
**enter**  136:17
**entered**  10:17
136:21
**entire**  50:9 139:25
**entirety**  23:5
**entitled**  5:16
**entrepreneur**
141:25
**environment**  59:3
59:12
**epiphany**  108:13
108:15
**equate**  126:6
**equations**  144:19
**eric**  1:6,12 2:14
4:6 14:11 15:24
18:14 21:21 24:4
24:5,8,9,10,11
38:12,19 39:12,12
40:21 50:20 56:7
57:2,9,18,22 61:12
62:9 67:1 72:4
75:16 82:15 83:1
83:12 86:20 87:4
87:11,13 90:15
93:12 97:23
100:15,15,15,18
102:3 103:10
107:21 109:10
112:3 114:3 117:9
117:13 122:10,12
122:14,21 123:3,6
123:9,14,22
124:14 125:17,21

126:5,9,10,15
127:8 135:15
138:23 149:6,15
152:7,9,22,24
156:24 157:2
160:1 161:3
**eric's**  124:10
**eric.holway**  2:17
**ernst**  141:24
**errata**  161:10,12
161:13
**error**  106:9
**errors**  132:14
**esns**  143:24
**especially**  98:7
**esq**  2:2,3,3,4,9,14
2:14,19 3:3,7,12
3:16,21 4:2,6,11
4:11,16,21,21
**essence**  107:2
**essentially**  108:3
**estimate**  54:24
55:6,24 73:24
**et**  122:21
**ethnicity**  36:13
**etran**  156:24
**evasive**  24:15,16
42:10,11 111:17
**event**  126:5
127:22 128:2
**events**  130:23
**everybody**  24:7
76:6 134:2
**evidence**  35:6
44:10 59:11
102:15 114:23
115:1 119:6
124:25 125:5
127:17,18 128:5
**exact**  36:24 94:19
151:21

**exactly**  111:19
**examination**  5:4
5:10 7:5 146:1
148:7,8 159:7
**examined**  7:3
**example**  145:3
**excentric**  123:17
**exclude**  125:14
**excluding**  56:9
**excuse**  126:19
**exhibit**  5:14,15,16
5:17,18,19 12:22
13:10,16,18 16:11
16:15 52:9 80:17
81:19,23 93:19,21
95:20,23,24 96:25
103:24 117:22,25
120:10 137:21
138:6
**exhibits**  5:13 7:14
7:15,17 13:2,6,8
93:18 102:16
118:2,4
**exist**  98:22
**existed**  82:17
**existing**  121:22
**expectation**  119:5
119:8
**expedite**  156:16
**expedited**  156:25
157:4
**experience**  142:23
**expert**  140:20,24
141:20,21,22
**expertise**  145:15
**experts**  104:14
132:4
**expires**  158:16
159:17
**explain**  8:1,9 75:8
115:15 143:2

146:9,11
**explanation**  56:23
59:7 115:19
**extended**  117:5
**extensive**  151:14
**extent**  11:6,7,8
154:12
**extremist**  41:18

**f**

**f**  123:19
**fabricated**  87:24
88:4 153:23
**facebook**  84:21
85:15,20 86:8
87:7 89:17 90:4
91:3 96:23 101:15
101:24 104:16,17
105:3,4 108:4,5,7
109:4,24 110:3,4,7
110:19,20 111:1,2
111:8,15,23
112:17,20 113:17
114:7,20,23 115:9
117:20 125:8,10
125:16,18 126:16
**faces**  128:20
**fact**  19:8 21:3
28:18 38:7 41:24
51:23 52:10 53:18
55:16 58:15,16
59:10 61:13 79:12
92:12 98:12
106:23 121:16
126:23 127:9
128:20 140:2
144:21 147:1
151:4
**factually**  120:22
**fails**  161:15
**fair**  13:14 51:11
55:1,9,24 66:16,16

**Court File Page No. 14926**

**[fair - give]**

73:25 76:14 84:5
85:17,18 108:19
122:2 137:9
**fairly** 58:10 74:20
**faith** 73:16
**fall** 28:21
**false** 37:1
**familiar** 144:12
**family** 43:5,11,19
44:17 47:16 97:16
97:19
**far** 69:8 73:1
83:15,23 88:3
130:2 151:3
**fascinating** 51:22
**fascist** 40:3
**fashioned** 72:22
**fbi** 149:10
**fear** 47:24
**fec** 1:10 3:6,11
25:9,12,21 30:22
32:3,20 33:2
34:10 46:1,2,6,9
50:14 58:20 68:12
73:14 146:20
147:2
**fec's** 25:24
**feces** 124:21 125:4
**feel** 88:14 90:6
149:8
**feelings** 42:2
**felt** 121:5
**female** 45:20
**fight** 88:7 91:2,19
91:21,23 92:9,17
95:16
**fights** 152:14
**figure** 35:17 41:1
59:14 69:19 114:1
121:16 144:20

**file** 13:8
**filed** 116:19 119:1
119:3 149:15
**files** 20:13
**filled** 51:22
**finalist** 141:25
**find** 20:9,16 31:5
49:4 58:14 69:16
100:11 101:5
106:23 111:13
113:3 114:12
142:17 144:15
153:1,19 155:1
**finding** 83:14
121:16 126:18
**fine** 27:5 62:21
84:9
**finish** 57:14 86:25
143:14
**finished** 130:25
**firm** 3:3,17
**first** 7:3 8:2 23:8
23:10 27:11,13,16
30:18,19 32:5
48:20 61:13 67:21
76:5 79:12,25
87:20 103:20
109:24 125:7
141:13 148:10
**firsthand** 92:16
**five** 25:2 26:11
28:4 79:2
**flip** 133:14
**flipped** 133:18
135:2
**flipping** 135:8
138:12 140:5,16
**floor** 4:22
**florida** 3:4
**fly** 98:8

**flying** 88:10
**focus** 50:7,8 58:17
58:18,18 70:13
**follow** 82:4 86:1
104:14 108:4
136:22 147:25
**follows** 7:4
**foregoing** 157:9
158:3 159:12
**form** 18:10 26:4
41:5 116:10
159:11
**format** 136:1
**forth** 159:11
**fortify** 79:19
**fortifying** 122:9
122:12 123:4,9,13
123:23 124:1,3,8
**fortune** 144:11
**forward** 13:8 88:4
145:18
**found** 59:13 112:5
149:6 151:17
**four** 13:25 79:1
88:23 136:7
**frankly** 21:21
24:12
**fraud** 97:24
102:14 121:21
**fraudulent** 138:19
**fresh** 143:21
**friend** 45:22,24
77:12 112:7
**friendlies** 67:4
**friendliest** 51:20
**friendly** 114:3
**friends** 43:5,10,19
44:17 104:16
110:3 115:9,11
**front** 7:17 80:16
81:20 88:13

141:11
**frozen** 124:21
**full** 7:7 27:7,10
131:13
**fully** 62:18
**function** 13:11
113:16
**further** 6:15 44:11
126:17 159:9,13
**furthermore**
87:24
**future** 90:22
132:11

**g**

**g** 6:1
**gab** 80:18 81:24
82:5
**gained** 62:4
**games** 23:12
**garner** 93:2
**gateway** 1:12 3:16
3:20
**gather** 48:25
147:13
**gathering** 137:11
150:23
**geared** 68:24
**gentleman** 21:15
**georgia** 139:20
145:2
**getting** 7:24 9:19
32:8 46:25 47:13
48:12 74:21 84:5
85:15 90:16 109:3
109:5 110:3
121:14 128:9
146:15 152:14
**giants** 107:1
**giuliani** 1:10
**give** 7:10 11:8 12:5
12:12 20:23 21:5

[give - happening]

22:24 26:24 32:18
44:19 49:9 54:17
73:2 86:12 88:8
90:2 101:8 109:13
110:25 114:2
117:8 127:11
136:19
**given** 26:22 27:2
27:14 31:14 43:6
48:16 49:4,5
64:17 87:13 88:6
88:11 90:7 115:4
128:18 156:5
**giving** 86:8 93:13
109:12 116:8
**gizer** 4:22
**glad** 30:14,14
**go** 8:10 14:25
19:12,15 27:19
31:4 52:23,24
59:13 65:9 67:11
73:1,5 80:6 81:9
88:12,17 93:10,21
95:13 96:11,14
97:15 100:23
101:6 103:2
104:17 105:2,20
105:24 106:4
109:4 113:7,19
119:12 122:18
128:16 131:3
134:22 143:16
146:18
**goal** 43:23
**goes** 18:25 133:7
144:24
**going** 8:10,10,11
10:1,8 11:19,22
21:3,4,5 22:3,12
26:1,15 34:8,18,23
37:3,22,24 38:17

38:20 39:6,23
40:17,19 42:15
43:14 46:22 51:5
51:12 56:2 57:23
63:1 65:11 67:13
71:10 80:14 81:11
88:16 89:2,7,9,22
90:2,2,23,24 96:6
96:24 97:18
102:21,22 103:16
103:20 104:3,22
105:10,14,20,23
105:24 106:5
107:1 109:8,9,13
109:15,18,19,21
109:21 110:12
111:11 113:1,3,9
117:9 118:22
119:9 123:11
126:17 134:13
138:25 139:1,2
142:1,17 143:13
143:20 145:22
147:24 148:4,4,7
150:11 151:7
154:6 155:13,16
155:16
**good** 20:18 47:19
47:20 105:12
155:5
**google** 155:4
**gordon** 4:2,7
**gotten** 61:22 83:3
**gpm** 4:17
**gqueenan** 4:5
**grabbed** 99:25
**grand** 101:16
103:4
**gray** 4:21
**greenwood** 2:20
4:4

**grew** 48:1
**group** 68:14 129:3
129:6,25 130:14
131:5 132:23
147:19
**groups** 122:12
123:4,9,23 124:1
**grow** 47:25
**grsm.com** 4:9
**guarantee** 26:14
**guess** 46:13 51:4
54:23 55:25 58:12
58:12 60:18 66:8
72:12 77:24 93:19
96:15 97:1 98:10
104:23 105:11
106:25 116:22
129:16 131:23
152:15 156:18
**guessing** 72:15
**gun** 61:1 97:21
**guns** 61:3
**guy** 14:12 21:8,9
34:6 64:12 75:23
75:23 77:15 80:3
80:6 94:16 122:21
140:22

| h |
| --- |

**h** 160:3
**habit** 153:24
**habits** 90:21
**hair** 36:13
**half** 107:1
**hall** 3:7,8 5:11 6:9
6:25,25 8:17,22,24
15:5 18:10 23:11
23:14,16 26:4,9,14
27:1 28:14,20
33:19 34:13,16
35:22 36:2,4 37:3
37:7,19 38:9,15,25

39:10,21 40:9,14
40:16,17,23,25
41:1,9 42:8 45:2
62:15,20 69:12,18
70:5,8,20 71:4
74:1 80:21 82:20
82:22 83:18 84:6
88:16,22 89:5,20
92:22,25 95:2,8
96:2 103:9,14
104:11,19 105:16
106:3 116:12,17
117:14 133:22
134:3,6,19 136:4
140:8,21,25
142:25 143:2,5,8
143:11,17 145:21
146:2 147:23
148:3 155:15
156:17,17
**hamstring** 56:3
**hand** 30:15,22
**handed** 30:14
**handle** 22:9 28:10
88:10
**hands** 30:18
**handwritten**
72:22
**handy** 131:18
**happen** 34:8 145:2
**happened** 29:24
29:24 32:1 34:5
44:13 48:14 49:23
63:16 71:14 74:4
97:25 120:21
132:11 136:8
151:11
**happening** 48:17
73:13 126:17
132:10

**harm** 34:25 35:3,7 147:21
**hart** 143:24
**hatred** 139:9
**hats** 100:16
**he'll** 70:11
**head** 21:17,19
**headless** 144:11
**health** 153:2
**hear** 16:25 25:18 44:25 45:3,7 75:15 127:12 136:11 138:3 139:1 144:7 148:19
**heard** 51:9 116:21 139:2
**hearing** 16:18 65:23 87:6 154:18
**heavily** 18:8
**heavy** 115:21
**heidi** 50:18 52:14 53:1,5,13,13,18 54:2 55:8 60:5,16 60:20 61:11,14,21 61:24 66:20 80:1 129:2
**help** 74:17 77:7 94:19 106:18 108:11
**helpful** 82:11
**heroin** 91:7
**herring** 1:13 4:20
**hesitation** 21:24
**hey** 111:15 124:8 146:23
**hide** 56:14
**hiding** 21:13
**high** 59:18,21,23 60:4,7,24 61:18 98:8 140:11

**higher** 97:19 122:17
**highly** 38:18
**hired** 92:18
**history** 21:23 47:4 47:6 87:13 88:6 88:10 107:2 149:24
**hit** 21:14 80:3 93:16
**hoft** 1:11 3:15,20 93:22 96:15,20
**hold** 12:25 20:10 25:25 81:7 93:21 98:25 138:5 140:19 141:20,22 141:23 153:4
**holes** 142:10
**holway** 2:14 157:2 157:2
**home** 93:11 108:8
**homes** 129:16
**hone** 53:16
**hope** 44:3
**hour** 62:23 157:10
**hours** 34:23 35:16 104:15 105:24 143:9 145:22 157:11
**house** 93:9 94:3,7 94:10,11,14,15 95:1,11 96:1 97:21 100:1,23 104:25
**huh** 50:23
**human** 55:3
**humiliate** 152:11
**hunt** 108:8,13
**hunted** 21:10
**hunting** 108:21,23 108:25

**hurt** 42:2 86:21 129:14
**hyperbole** 124:11
**hyphen** 77:15

**i**

**icx** 137:13,14
**idea** 48:18 77:11 84:4 105:12 114:3 129:10
**identification** 27:8
**identified** 12:22 61:25 66:13 108:3
**identify** 6:5 19:2 32:24 42:18 46:13 52:25 56:2,5,11,25 57:19 58:7 59:2 60:6 61:19 68:14 68:21 75:19 129:17
**identifying** 18:4 18:24 19:6
**identities** 56:14
**identity** 11:1,4,11 12:5 14:3 17:11 27:12 37:25 52:1 58:4 116:10 117:12 128:9
**iii** 2:9
**illinois** 4:13
**imessage** 5:18
**imminent** 21:25
**implications** 142:6
**important** 9:2 121:5
**improprieties** 126:23
**inability** 91:8
**incident** 92:13
**include** 9:19
**including** 71:22 101:15

**incorrect** 29:9
**independent** 53:12
**index** 5:9
**indicate** 6:21
**indicated** 33:25 67:24 113:14
**individual** 11:4,11 12:3 21:22 22:1 22:14 23:1,4,17 25:1 43:24 46:5 60:12 65:20 67:7 87:12 88:9 91:14 91:18 94:25 141:8 141:8
**individually** 113:19
**individuals** 10:20 11:4,11 60:4 67:2 92:3,13
**infiltrated** 67:25 68:2,6 69:15 146:21
**infliction** 103:22
**influence** 135:4 139:7,8 150:7
**inform** 42:16
**information** 7:24 11:9,21,22 12:13 12:14,19 16:13 17:20 18:2,4,24 19:6,8 20:1,4,8,9 20:17 21:20 22:25 23:3,5 26:23 27:15,25 28:15,18 28:19 29:4 33:7,8 33:18,23 34:1,2 42:23 43:6 44:20 44:25 48:21,25 49:10,11,11,13 50:1 52:3,13,14 53:15 58:15 59:1

[information - june]

59:13 60:10,24
62:4 63:15,16,20
64:7,8,9 65:2,11
65:16,19,20 66:9
70:1 72:4 73:2
84:5 87:5,16 88:5
88:9,14 90:7,16,19
92:5 93:2,13
95:16,18 106:22
109:12 110:25
111:2,3,5,10,11
112:4,9 114:2,13
114:15,19 115:16
116:5 117:5,6,9,10
119:20,24 121:3,4
121:5,15,17 122:6
124:5 125:20
126:4,18 127:7,9
127:11 131:20
132:2,16,20 133:2
137:11 141:16
144:22 145:5,6
146:22 147:13
149:23 150:1,11
150:17,19,22
151:1 152:6,10
153:23 155:1,7
**informed** 106:14
**ingrid** 3:12,12 6:8
6:25 134:21
**initial** 30:8
**initially** 25:8 30:3
**initials** 20:20
23:17 26:18 42:14
**input** 132:16
**ins** 32:23
**inside** 12:20 29:2
29:12 32:14 59:2
59:12 61:14
126:24,25 136:8
137:18,18 143:25

**inspectors** 141:7
**instagram** 111:21
**installed** 64:13
**instructing** 8:19
40:18
**instruction** 70:7
70:12
**instructions** 9:19
**intentional** 103:19
103:22
**interconnect**
144:14
**interest** 32:16,19
35:14 50:5 51:12
**interested** 84:12
159:15
**interesting** 60:9
60:10
**interference** 145:7
145:9
**internet** 57:11
142:7 144:5,7,8,17
144:18
**interrupt** 153:10
**interrupting** 26:16
38:14 70:7
**interview** 122:1
**interviews** 99:16
99:18
**intimidate** 129:16
147:20
**invalidate** 144:25
**invalidated** 138:19
**invest** 113:22
**investigation** 17:6
111:14 113:23
**investigations**
65:17
**investigator** 92:18
95:17

**invited** 34:11
**involved** 17:14
18:8 30:16 41:7
68:5,11,15 73:14
77:24 92:13 119:7
121:25 125:1,2
127:22 129:7,19
131:25 135:7
139:17 140:16
144:23 149:20,25
**involvement** 59:24
59:25 60:1 91:6
**ios** 5:18
**iot** 144:5
**ip** 49:5
**ips** 49:5
**irrational** 90:8
**irregularities**
132:14
**issue** 8:12 35:25
104:10 122:3,4
133:11
**issued** 7:10
**issues** 81:17
141:21 154:5

## j

**j** 1:9 2:2,13 3:12
3:12 160:1 161:3
**jackson** 2:15
**jacksonkelly.com**
2:17,17
**jail** 154:1 155:2,6
**james** 1:11 3:15,20
**january** 133:2
145:3
**jeremy** 4:21
**jgray** 4:24
**job** 158:25 160:2
**joe** 104:16 114:24
146:3

**joey** 12:16 18:17
21:12 76:6,7,11,12
76:19 77:7,14
79:23 80:2,9,10,18
81:17 82:1,1 83:4
85:17
**john** 81:4
**jojo** 80:2,8
**jonathan** 3:16
**joseph** 1:10,16 3:6
3:11 5:3 6:3 7:2,8
158:1,11 160:2,24
161:4
**jot** 148:24
**journalist** 14:20
19:9,10 41:13
51:3,8 53:24 54:5
54:15 55:12,13,17
59:3 66:20 146:25
**journalistic** 59:12
**journalists** 32:15
34:1 40:1,2,2 50:8
50:15 51:10,14,16
51:18 52:11 55:11
58:14,24 66:16
146:18,24,25
147:2,7
**judge** 7:11 10:17
38:4,8,10,21,22,24
38:24 39:7,7,11
40:6,6,7,10,20,20
40:24 41:3,3,7
42:6 104:2
**july** 30:5,22 48:15
**jump** 106:11
**junction** 101:16
103:4
**june** 38:5 60:12,14
125:9,9

[keep - line]

| k | | | |
|---|---|---|---|
| **keep**  10:10 26:12 26:15 30:2 33:7 33:20 40:14,23 72:19 113:1 124:9 124:12 138:18 | 37:15,18,20,23 38:13,22 40:12 42:19,21 43:1,4,10 43:11,12,17,22,23 44:13,17 45:13,24 46:6,21 47:13 | **known**  11:15 19:12,14 21:11 26:20 27:14 83:12 129:12 | **learned**  16:3 47:14 47:16,19,22,24 54:25 55:3,7,15,16 125:21 152:19 |

**keep**  10:10 26:12
  26:15 30:2 33:7
  33:20 40:14,23
  72:19 113:1 124:9
  124:12 138:18
**keeping**  123:12
  124:14 130:17
**kelly**  2:15
**kept**  29:12 33:6
**key**  74:20
**kids**  47:22,25 98:7
  147:17,18
**kill**  21:7 97:19
  142:17
**killing**  83:14
**kimrey**  4:11 13:1
  13:2,5,14 118:1,6
  120:9,13,13
  136:13,14 155:21
  155:25 156:3
**kind**  63:8 100:9
  105:22 110:14
  125:18 128:1
**kits**  142:4
**kloewer**  2:3
**knew**  24:13 32:10
  59:2 68:12 75:24
  117:9 119:9,10
  147:4,4
**knock**  130:21,21
**know**  14:23 15:16
  16:6,8,18 17:15,23
  18:23 19:21 21:22
  23:6,7,8,9,10,18
  23:21,22 24:1,14
  24:18 25:4,6,13
  26:2,8,18,18 27:7
  27:10,11,13,17,20
  27:21,22,24 31:6
  32:6,9 33:13 35:2

37:15,18,20,23
38:13,22 40:12
42:19,21 43:1,4,10
43:11,12,17,22,23
44:13,17 45:13,24
46:6,21 47:13
48:7,12 50:5,20,23
50:25 51:1 54:20
57:4,24 58:2,3
62:11,13,16 63:24
64:18,25 67:2,11
69:6 72:18 74:3
76:13 78:7,13,20
80:10 82:17,19
83:15,23 89:18
91:22 92:7,12,15
93:1 96:7,18,19,20
97:7 98:9,20
99:11 102:14
105:14 107:24
109:17 110:6
112:23 114:1,6,10
115:3,22 123:14
124:16 125:15
126:7,8,8,9,14
128:21 129:6
130:8 131:22,23
133:13,17 134:17
135:1,3,6,9,12,13
135:16,17,17
138:4 140:9
141:14,17 142:2
142:11,13 147:5
149:24 152:3,15
155:21 156:4,5,19
**knowing**  65:10
  150:4
**knowledge**  41:4
  75:21 92:16
  151:18

**known**  11:15
  19:12,14 21:11
  26:20 27:14 83:12
  129:12
**knows**  18:19 20:19
  23:17 43:4
**kornfeld**  2:10
**kyle**  50:25,25 67:1
  67:6

| l |
|---|

**lack**  86:20 91:1
**lacked**  103:21
**lacking**  96:22
**lags**  132:11
**largest**  141:13
**lasalle**  4:12
**late**  46:20 71:23
**lathrop**  4:17
**lathropgpm.com**
  4:19
**laurel**  5:6 84:16
  142:17 159:4,19
**law**  3:3,8,12,17,21
**law.com**  2:21
**lawsuit**  40:19
  119:6
**lawsuits**  119:1
**lawyer**  20:23
  73:10 84:12 151:3
  151:3 155:5
**lawyers**  73:7
  83:22 105:24
  106:14 133:10
  134:1 135:21
**lead**  34:24 65:19
  127:8,10 151:18
  154:1
**leaders**  131:5
**leads**  144:21
**learn**  47:12,15
  48:4 53:17

**learned**  16:3 47:14
  47:16,19,22,24
  54:25 55:3,7,15,16
  125:21 152:19
**leave**  135:18
**leaving**  30:11
**led**  52:13 127:11
  124:6 130:2
**leftist**  41:14
  129:19
**leftists**  41:15
**legal**  36:17 71:3
  86:9 161:19
**legality**  70:25
**legally**  70:23
  85:22 86:9
**lend**  151:19 152:5
**length**  135:21
**level**  54:10,13,14
  59:6 60:5,7
**liberals**  41:18
**lie**  22:11 104:1
**lied**  36:25
**lieu**  6:16
**life**  21:14 91:17
**light**  126:22
**lightening**  106:12
**lightly**  115:22
**likelihood**  59:18
  59:23 60:24
  126:16 132:10
**likes**  24:10
**limelight**  24:11
**limitation**  29:15
  29:25
**limited**  69:19 96:7
  103:16 105:21
**line**  10:2 13:15
  36:11 83:12
  150:20 160:4,7,10

Page 16

**[line - members]**

160:13,16,19
**liner** 95:24
**lines** 86:6
**list** 50:1 60:2
**listed** 77:3
**listen** 126:2
**listened** 35:2
126:10 151:8
**listening** 35:14
**litany** 121:13
**literally** 39:14
**litigation** 118:23
**little** 31:4 35:13
72:23 78:25,25
82:4 106:11 108:1
108:11 117:17
122:17 146:11
**live** 25:3 94:17,18
**lived** 43:1
**lives** 39:19 94:16
**living** 37:18,21
**llc** 1:11 3:8,16,20
**llp** 4:17,22
**located** 8:21 108:8
**locations** 21:13
**log** 65:6
**logged** 15:21
**logs** 33:14
**long** 62:21 78:20
78:23
**longer** 104:15
**look** 7:23 33:17,22
56:15 74:17
107:14 112:23
113:5 115:20
125:15 145:2
152:19
**looked** 63:9,25
112:2,22 132:7
**looking** 7:23 13:20
14:12 19:12,14,18

20:21 59:11 63:21
74:6 79:10 108:17
111:25 112:5
113:5 119:11
125:17 138:14
144:18 149:14
**looks** 107:14
137:24
**looting** 124:20
**los** 4:23
**loss** 106:16
**lost** 61:16
**lot** 16:7,9 55:3
60:22 61:21 73:12
76:22 94:18
105:22 121:11
124:25 131:10
136:18 152:23
**lots** 68:16 93:12
**louis** 3:18
**loveland** 3:9
**loves** 24:9
**lying** 98:3 153:21
153:22

**m**

**m** 2:9 3:7 131:13
**ma'am** 73:20
**machine** 126:24
137:13
**madness** 1:10 3:7
3:11 143:18
**mail** 97:20
**making** 104:6
130:22 138:24
152:8
**male** 37:12 42:13
45:20,21
**malkin** 1:12 4:2
**man** 18:6
**managed** 144:4

**manifesto** 11:25
39:15 60:1 125:8
**manipulated**
137:18,18
**manner** 6:20
**manufactured**
98:12
**march** 125:3
**marched** 38:5
41:3
**marching** 39:18
39:18
**margaret** 4:6
156:23
**mark** 14:14 17:17
77:15 80:3
**marked** 81:19
96:24 137:22
**marks** 77:16
**married** 47:23
48:4
**marxism** 130:3
**marxist** 60:1
**masks** 128:9
**massive** 59:24,25
59:25
**material** 74:17
82:15 83:1
**math** 144:18
145:13
**mathematical**
144:19
**matter** 6:18 8:5
21:2 39:19 78:9
89:3 97:5 136:15
**mboehmer** 4:9
**mcbride** 109:14
109:17
**mcrae** 4:22
**mean** 15:12 24:5
38:10 49:2,16

51:7 53:20 58:2
62:16 68:4,5 73:1
73:2,5 77:11 88:8
88:20 91:10,21,22
96:19 101:1,18
106:2 107:12
108:16 115:3,20
124:18 131:22
134:25
**meaning** 76:24,24
148:25
**means** 104:13
**mechanic** 19:16
**media** 1:11,14 3:7
3:11 12:1 39:16
50:12 57:10 80:3
89:13 102:2
111:21
**meet** 34:19 35:20
46:18
**meeting** 25:9
30:10,22 32:3,20
33:2 36:6 46:14
47:2 70:23 120:16
146:20 147:2
**meetings** 32:23,25
45:9,25 46:1,6,9
46:12 68:7
**member** 14:20
16:5 17:22 19:24
20:6 21:11 25:12
25:16 38:19 39:1
39:8,19 41:2 78:2
126:6
**members** 21:7
32:14 33:14 43:11
43:19 47:16 50:12
59:4 61:2 65:16
65:18 66:13 70:18
83:12,13 84:20
129:9 130:14

Veritext Legal Solutions
800-336-4000

**[memberships - nonresponsive]**

**memberships** 25:22
**mental** 153:2
**mention** 131:10
**mentioned** 46:12 51:17 66:25 91:2 91:19 92:1 113:21
**mentor** 46:22
**mesa** 139:19 145:11
**messages** 96:4 113:16
**messaging** 141:11
**met** 30:19 34:14 35:25 47:6,7 48:9 48:15 76:12
**metal** 97:17
**metaxas** 1:12 4:6 156:24
**metro** 43:3
**mexico** 108:22,23
**mic** 154:17
**michelle** 1:12 4:2
**mid** 71:14,22
**middle** 24:11 63:18 74:3 83:10 89:3 91:21 102:19 121:17 122:11,17 123:3,15
**millions** 141:12
**mind** 41:2,13 143:21
**mindset** 58:25
**mine** 104:5
**minute** 52:7 56:9 57:24 67:11 81:10 90:23
**minutes** 29:1,2 46:20 62:23 76:20 78:24,25 89:6 106:11 143:10

157:11
**misdirection** 150:12
**misinterpreted** 153:7
**missing** 124:6
**missouri** 3:18
**misunderstand** 149:2
**mms** 5:18
**mobich** 50:22,23 67:1
**modem** 126:25
**modum** 126:24
**moment** 25:18 128:12 138:2 148:16,17,17,17 148:18 154:15
**monday** 98:1
**monitor** 69:9
**month** 150:14
**months** 18:7 21:14 25:2,2 28:4 49:1 61:22 88:7 120:24 141:18
**moses** 7:11 10:17
**motivated** 58:22 88:1
**motivation** 115:17 115:19
**motives** 127:4
**mounting** 102:15
**mouth** 124:10
**mouths** 124:11
**move** 8:18,22,24 16:2 21:13 35:23 40:9 103:12 104:23 105:11 143:5 144:14 145:18

**movement** 19:1 24:2 40:3 58:16 59:24 77:21 125:6 127:22 129:22 149:25 150:3 152:2
**moving** 73:12 121:11 136:23
**msp** 144:4
**muffled** 66:5
**multiple** 35:5 45:14 91:8 137:16 148:18 153:21 155:9
**murderers** 129:14

**n**

**n** 6:1
**nail** 74:18
**name** 6:21 7:7 11:14 12:12,15 14:22 15:2,3,10,12 15:14,20 17:17,25 18:7,18,24,25 19:6 22:16,17,18,19,20 22:22,24 23:8,10 23:18,20,20,21,22 23:24,25 24:3,4,6 24:8 26:3,19 27:8 27:10,11,13,16,23 45:17 50:21 57:1 57:3,11 60:13 68:15 86:11,12 95:1,4,5,6 100:14 110:13 147:4,4
**names** 24:2,2,8 52:15,16 53:2,3,4 56:20,20,20 76:4 109:14 110:13
**nation** 121:14,22 141:14 150:6

**nationwide** 83:13
**nature** 90:8
**navy** 61:14
**necessarily** 58:18 132:25
**need** 21:21 36:11 77:8 85:24 88:17 95:8 105:22 124:9 142:11 156:6,25 156:25 157:4
**needs** 16:25 116:25
**neither** 134:21
**network** 1:13 4:10 4:16,20
**networks** 1:13 4:20
**never** 17:12 27:12 37:8 48:9 64:23 76:12 87:25 100:2 100:6,6 101:23 108:15 139:25 143:24 146:12
**new** 21:16 64:6 108:22,23 129:23 130:14 133:8 136:15
**news** 1:13 4:10,16 4:20
**newsmax** 1:14
**ni** 18:18,20,23,25 19:13,15,21 20:1 20:14 75:23
**night** 7:15 81:25
**nine** 61:22 141:18
**noise** 16:20,22 154:16
**nominee** 141:25
**nonresponsive** 22:2 26:6 121:23

Page 18

[nope - opinion]

**nope** 103:1 143:4
**normal** 149:19
**north** 4:12
**notarize** 161:11
**notary** 5:7 158:18
    159:5,21
**notated** 33:18
**note** 13:5 63:9
    77:8,14 79:13
    80:1,2 120:9
    161:9
**noted** 139:10
**notes** 5:15 11:15
    11:16 12:14,15,20
    12:23 13:19,21
    14:1,3,8 15:1 16:9
    16:11,12,16 17:2,3
    17:4,5,10 52:2,7
    52:10 56:1,3,4
    61:14,15 66:7,22
    71:17 74:9,13,13
    74:16 76:4 77:4
    79:1,8 81:18
    122:9,9 124:4
**notice** 5:1
**notoriety** 24:9
**november** 94:10
    95:11 108:14,17
    109:23,25 110:8
    110:10 117:23
    118:11,14
**nuclear** 149:7,12
    149:20 152:15
**number** 28:1 31:6
    31:16 49:9 63:11
    63:13,18 64:16,17
    64:22 65:2,6
    89:13 93:24,25
    95:25 113:22
    122:25 139:6,7,8

**numbers** 14:8
**numerous** 107:22
    110:24 126:21

**o**

**o** 6:1 144:9
**oann** 13:7
**oath** 6:16 85:8
    101:12 158:4
**object** 10:1 18:10
    26:4 105:16 153:8
**objecting** 70:8
**objection** 8:17
    22:2 23:11 26:6
    27:1 28:14 34:13
    34:16 35:22 37:19
    38:25 39:10,21
    40:9 62:15 69:12
    69:22,23 70:10,20
    71:4 74:1 82:20
    82:23 83:18 84:6
    89:20 92:22,25
    95:2 116:12
    117:14 121:23
    136:4 140:21,25
    142:25 154:5,7,13
**objections** 6:20
    10:9 36:17,17
    154:2
**observations** 56:4
**observed** 63:10
**obtaining** 121:25
**obvious** 22:10
**obviously** 7:22
    56:9 68:21 72:9
    98:24 106:2
    110:14 123:6
    133:23 143:15
**occasion** 153:1
    154:25
**occur** 48:21 71:12
    71:13

**occurred** 48:12
    57:8 58:6,25
    71:25 72:9,25
    73:25 75:16 84:2
**october** 146:18,19
**office** 3:8,12 8:3,3
    8:7,15 13:8 34:11
    69:6 75:11
**officers** 139:9
**offices** 3:21
**offline** 144:15
    145:6
**oh** 14:9 15:6 38:2
    50:7,23 78:12
    95:7 102:9 105:16
    116:24 127:1
**okay** 11:18 13:14
    13:20,25 15:6,14
    15:24 16:6,15
    17:5,10 19:5,25
    29:14 33:12 34:5
    35:9,20 37:7 38:3
    39:5 44:22 45:5
    45:11,24 46:5,8,24
    47:21 48:18 50:15
    50:19 51:9,16
    52:5,19,23 53:17
    54:6,10,16 59:20
    60:2 61:16 62:6
    64:11 65:12 66:4
    66:8 67:5,19 68:4
    68:9,13,18 69:7
    70:10,17 71:7,8
    72:24 74:23 75:8
    75:11 76:14,24
    77:22 78:12 79:12
    79:16,25 80:7
    81:14 84:14 89:5
    89:15 90:23 92:7
    93:23 94:15,20
    97:10,13 98:13,16

    98:23 99:15,24
    100:3 103:6 105:8
    107:23 108:11,16
    108:24 109:1,7,23
    110:2,16 111:1,13
    111:17 114:5
    117:11,17 118:10
    118:16,25 119:5
    119:10 122:14
    123:1 125:19
    126:3 131:18
    136:9 138:10
    139:11,23 140:23
    141:2 143:5,23
    147:23 156:13
**old** 36:13 37:13
    72:22
**oltmann** 1:10,16
    3:6,11 5:3,14,15
    6:3,9 7:2,8,9,21
    9:2,17 10:12,16
    13:17 20:21 28:23
    30:21 35:2 46:16
    63:7 80:20 81:16
    89:15 104:17
    106:10 113:15
    114:24 118:8
    136:19 143:19
    148:10 153:4
    155:13 158:1,11
    160:2,24 161:4
**olympia** 21:9
**once** 106:20
    139:25 140:1
**online** 103:3
    144:15
**open** 135:18
**openly** 41:14
**opinion** 35:14 51:7
    66:23

Page 19

Veritext Legal Solutions
800-336-4000

[opinions - percent]

| | | | |
|---|---|---|---|
| **opinions** 127:12 | **overall** 119:24 | **pardon** 23:2 | **partner** 48:7 |
| **opposed** 132:11 | **overseas** 142:5 | **park** 47:8,14 | **parts** 73:13 119:21 |
| **opposite** 55:14 | **owned** 147:14 | **parker** 3:22 | 121:11 137:13 |
| **order** 7:10 10:17 | **owning** 126:18 | **parkway** 4:3 | **party** 141:13 |
| 10:20 12:2 38:1 | 135:11 | **parley** 5:16 | **passive** 135:5 |
| 43:7 44:5 56:21 | | **parlor** 96:25 98:22 | **patentholder** |
| 56:21 59:13 64:16 | **p** | 98:24 99:1,3,4,4,5 | 126:19 |
| 65:6 74:7 79:8,9 | | 99:6,21 100:8 | **path** 46:23 48:2 |
| 87:1,3,3,7,17 90:5 | **p** 6:1 | 101:5,6,7 103:24 | 59:14 133:5 |
| 90:22 91:15 93:2 | **p.c.** 1:9 | 106:14,16,21,22 | **patterson** 4:3 |
| 95:21 109:11 | **p.m.** 81:13,13 | 106:24 107:3,5,8 | **pc** 2:10 3:2,21 4:3 |
| 110:11 116:14,19 | 89:10,11,11 106:7 | 107:14,15 | **pcu** 143:17 |
| 117:3,5 144:1,24 | 106:7 113:11,11 | **part** 7:13 25:19 | **pedophiles** 41:17 |
| 145:6 147:20 | 157:10 | 30:11,14 32:12 | 41:19 |
| 153:8 154:6,11,13 | **p.o.** 2:5 3:8,13,17 | 38:23 39:5,9,24 | **penalty** 6:18 |
| 156:9,9,11,14 | **page** 5:10,13 14:5 | 40:8 41:20 45:25 | **people** 17:3,8 |
| **ordered** 11:20 | 14:6,8,8,9 61:15 | 47:17 60:9,11 | 19:12,14 21:8,24 |
| 86:14 87:16 90:13 | 76:5 79:3,5,12,16 | 61:8,10 75:7,8,10 | 24:13 31:13 32:13 |
| **ordering** 156:21 | 79:18,19,22,23,24 | 76:10 78:13 85:7 | 43:11,11 44:8 |
| **orders** 155:19,20 | 80:19 91:3 104:16 | 102:14 107:2 | 45:15 47:7 50:9 |
| 155:22 | 104:17 109:24 | 120:6 122:16 | 52:1,20 55:14 |
| **organization** | 110:4,19 115:9 | 125:5 127:9 129:2 | 58:3,4,11,13,19 |
| 17:14 30:12 39:3 | 119:14 122:11,18 | 129:22,24 130:4 | 59:2,5,12,14 65:15 |
| 129:8,10,11,18,20 | 122:18,22,24 | 137:5,19 138:13 | 65:17 68:11,14 |
| 130:2,6 149:21 | 125:8 134:11 | 138:22 149:5 | 75:3 93:12 94:6 |
| **organizations** | 150:19 160:4,7,10 | 150:3 152:2 | 94:18 97:20,21 |
| 121:18 | 160:13,16,19 | **participant** 55:22 | 100:23 110:24 |
| **organize** 105:22 | **pages** 14:1 15:4 | **participants** 15:21 | 111:7 112:1,2,3 |
| **organized** 39:3,4 | 84:21,23 85:15,20 | **participating** 6:12 | 113:22,25 123:14 |
| 51:24 78:4 | 86:8 89:17 90:4 | 55:6 | 123:16 129:14,15 |
| **organizing** 77:25 | 112:17,21 114:7 | **participation** | 130:22 132:8 |
| **original** 108:6 | 114:20,23 158:5 | 18:20 138:12 | 138:20 141:12 |
| 149:6 | 161:12 | **particular** 21:25 | 142:2,5 147:10,12 |
| **outside** 7:24 9:18 | **paid** 61:21 | 34:4 46:14 49:6 | 147:14,17,20,21 |
| 10:22 125:1 | **panels** 142:2 | 50:4,16 53:11,16 | 148:18 152:16,21 |
| 132:23 134:25 | **papers** 33:7 | 56:17 70:14 74:24 | 152:21 |
| 136:24 153:7 | **paragraph** 83:11 | 84:5 125:13 | **people's** 30:18 |
| 154:6 | 88:2 131:13 | 138:13 | 73:16 124:10 |
| **outstanding** | **paragraphs** 124:6 | **parties** 6:18 9:18 | **perceive** 7:24 8:12 |
| 137:14 | **paranoid** 46:18 | 81:25 159:14 | **percent** 54:19,22 |
| | 47:3 | | 55:8,21 57:22 |
| | **paraphrasing** | | |
| | 152:18 | | |

Page 20

[percent - powell]

60:25 66:21 140:4
140:15
**perception** 54:25
**perfect** 118:16
**perform** 141:10
**period** 23:6 33:3
43:2 48:12 49:4
63:22
**perjury** 6:18
**person** 6:17 7:21
10:3 11:14,14
12:4,5,10 16:3
17:21 19:2,16
20:5 23:6,7,9 25:3
25:7 30:9 31:23
34:4 35:25 42:12
42:16 44:1,3,4
45:14,16,17,25
46:2,3,21 47:5
49:18 53:7,11,14
53:15 54:20 55:12
55:16 58:8 59:15
65:21 68:13 75:5
86:7 87:1,13 88:5
88:9,14 90:3,6
91:3 94:22 95:15
98:2,3 109:7,9,16
112:20 115:8,23
116:4 117:12
118:18 127:17
146:6,13 149:14
149:19 152:14
**person's** 26:2
**personal** 97:19
151:17
**personally** 71:9
93:6 153:1
**persons** 12:10
**pertained** 18:1
**pertaining** 16:17

**peter** 4:21
**pets** 147:14,14
**ph.d.** 1:6 160:1
161:3
**phone** 2:6,11,16
2:21 3:5,9,14,18
3:23 4:4,8,13,18
4:23 28:1 31:6,16
37:5 63:10,13,17
64:1,3,5,6,10,13
64:22,23 65:6,24
83:11 93:24,25
95:24 96:11
112:19 116:1
138:1,5
**phonetic** 50:22
**photos** 102:16
**physical** 37:10
115:1
**physically** 6:13
8:20 9:24 10:7
**physicist** 152:16
**pick** 36:11 63:8
65:24
**picked** 96:2
**picture** 64:4,5
99:22,24 100:4,24
104:24
**pictures** 63:25
111:25
**pinpointing** 58:13
**piqued** 32:16,18
**pissed** 98:6
**place** 87:17 159:10
**places** 139:18
147:12
**plaintiff** 1:7 2:2,9
5:4 6:7
**plaintiff's** 12:22
52:9 80:17 117:21
120:10

**planning** 51:23
**plates** 97:18
**platform** 144:10
**platforms** 56:19
57:10
**play** 29:23
**playing** 23:12
**please** 6:5,11,20
7:7 16:21 25:19
30:24 70:7 103:12
105:18 143:2
148:18 157:4
**pllc** 2:4,15,19
**plotted** 132:13
**pm.me** 3:19
**point** 19:21 39:2
43:15,15 44:15
47:9 50:7 53:6
62:10 65:3 68:13
69:7 70:25 76:12
77:13 78:14 80:10
87:2 88:17 107:9
110:4 118:2
124:18 132:12
149:8 150:15
**police** 39:14 139:9
**political** 55:15
59:6
**politically** 58:22
88:1
**popped** 52:16,17
**posed** 88:23
143:19
**position** 87:8,10
87:11 116:21
139:7,22 141:11
**positions** 147:19
**positively** 52:25
**possession** 96:10
96:21

**possible** 56:22
59:1 100:20
104:24 121:2,15
138:17
**possibly** 73:12
**post** 5:19 96:25
97:12 98:11,14,18
98:21 99:4,14,21
100:6 101:10
104:12 106:14,20
107:11,12,13,16
107:20,24 109:4
110:20 125:13
152:12
**posted** 21:16
39:15 80:18 81:24
99:5,9,11,17,24
100:11 101:9
103:23 104:24
106:19,23 107:8
107:10 125:7
**posting** 39:14
80:20 82:1,7
83:10,11
**posts** 39:13 87:24
98:12,21 99:7
101:7 102:3 104:4
104:5 126:16
139:5 149:23
153:23 155:3
**potential** 77:12
**potentially** 118:22
143:14
**powder** 97:20
**powell** 1:9,9 3:2,2
85:3 118:20,22
119:1,6 120:10,11
121:8,25 122:11
122:24 140:14
150:11,17,22
151:5,10,12

Page 21

Veritext Legal Solutions
800-336-4000

[powell's - queenan]

**powell's** 133:10 134:1 135:21
**prentice** 2:20
**prepared** 10:25 11:3 90:9 102:18 136:2 145:18
**present** 6:14 10:7
**presented** 11:25 26:5 27:4,6
**presents** 91:3
**preserve** 102:6
**preserved** 82:15 102:8
**preserving** 104:7
**president** 1:9 2:13 138:24 139:2 160:1 161:3
**pressure** 124:9,13 124:15 130:17
**pretty** 34:9,10 39:3 47:6 48:16 55:2 59:18 74:19 115:20 152:3,3
**previous** 32:12 42:20 69:3,4 91:7 99:7 112:19 132:10 159:6
**previously** 96:25 101:7 111:5,11,22 116:19 117:22 129:2 137:21
**price** 4:12
**prick** 35:17
**primary** 76:15
**printed** 7:15
**prior** 72:10,10,14 108:9 110:4,8 119:17 120:17 147:3 148:11 153:5 154:3

**private** 92:18 95:17 104:6,7,12
**privilege** 8:12 83:20 84:8
**privileged** 28:15 28:19
**pro** 39:13
**proactive** 146:12
**probability** 61:6 132:7 144:17
**probable** 132:15 144:20 145:7
**probably** 26:23 30:17 31:13 39:24 40:3 46:17 54:18 61:14 76:20 80:16 84:15 106:11 112:22 115:5,19 123:20 124:22 137:20 142:17 145:2
**problem** 26:10 58:12 86:25 153:21
**procedure** 5:2
**proceedings** 10:22 22:11
**process** 47:14 48:12 113:4 126:19,20 133:4 135:11 144:23
**proclaimed** 129:21 130:4
**produce** 156:1
**produced** 28:12 81:24 93:22 132:2
**professional** 5:6 159:5,20
**progressed** 62:5
**progression** 30:21 30:24

**prohibit** 10:20 87:4
**project** 21:15
**promptly** 74:22
**pronoun** 54:20
**propriety** 154:6
**protect** 12:2 34:22
**protected** 87:1,2,8 90:6,11,12 116:14
**protection** 12:2 87:1,3,3 109:11
**protective** 10:17 10:19 87:7 90:5 116:18 117:2,5
**protest** 21:10 38:5 39:19 41:5
**protests** 68:8 77:25
**prove** 141:24
**provide** 7:14 11:21,22 33:12 44:24 48:19 49:13 63:12 64:4,5,8,16 65:2 71:24 84:21 87:16 115:16 116:5 117:6,11 132:23
**provided** 11:10,11 13:2 44:15 63:25 69:25 85:2,3 92:5 95:15 117:22 127:8 133:2 136:5 150:10 151:1
**provider** 144:5
**providing** 26:19 27:8 28:18
**proxy** 58:16
**prpclegal.com** 4:5
**pscott** 4:24
**psl** 77:20

**public** 5:7 102:5 128:2 136:6 158:18 159:5,21
**publicly** 91:11 112:1 113:25 152:10
**pull** 20:10,16 113:16 114:6
**pulled** 119:22
**punch** 142:10
**pundit** 1:12 3:16 3:20
**punish** 44:4
**punished** 44:5,9
**purports** 82:1
**purpose** 34:21 56:13 66:15 118:13 146:15
**purposely** 104:1
**pursuant** 5:1
**push** 87:25
**put** 7:15 35:12 39:14 44:1,3 49:25 51:13 65:21 66:10 77:4 90:5 98:11,14 99:22 100:14 119:18,25 134:13 142:12 152:10,12 155:4 156:10
**puts** 126:5
**putting** 21:14 39:13 52:3

### q

**qualifications** 42:6
**qualifies** 38:22
**qualify** 18:3 40:3 40:7,8
**quality** 141:6
**queenan** 4:2

Page 22

**[question - record]**

**question** 9:5,7,14
11:2 12:6,7,10,10
14:14 15:9 17:17
18:16,16 22:6,13
23:13,15,19 24:17
24:17,18,21 26:7,9
26:11,12,12,17
27:2,4,6,7,16
28:16 29:16 34:17
34:19 35:11,12,23
37:22,24 39:2,6
40:18 42:20 43:9
43:17 47:1 51:6
54:7 55:23 57:13
57:14,15,16,17,21
59:8 61:17,18
68:22,24 69:13
70:2,11,19 71:16
74:18 77:15,16
80:3 83:19,23
84:7,14,17 86:2,5
86:6,13,15,17,19
87:20,22 88:23
90:3 94:20 96:8
96:17 100:22,25
107:7,9 108:5
110:16 114:8,21
116:2 118:1 123:5
124:2 125:22,23
125:25 126:1,1,2
128:23,24 130:10
131:24 132:17
136:24 140:9
141:19 142:19,20
142:21 143:12,20
148:10,12,19,20
153:16,17 154:20
154:21,22,23
**questioned** 78:8
78:10,11

**questioning** 10:2
40:10
**questions** 7:25
8:10,11,14,20 9:4
9:20 10:5 17:7
22:5 26:16 35:15
35:16,17,18,19
36:16,18 38:1
44:16 46:20 48:23
70:7 73:11 88:24
94:21,24 102:12
102:17,20 103:15
103:25 104:1
119:11 121:9
135:21 143:19
145:19 148:11,13
148:22 153:11,14
155:11
**quibbling** 103:6
**quick** 85:24 88:25
112:23
**quickly** 142:16
156:1
**quit** 23:12 38:14
70:7
**quite** 155:6
**quote** 79:1,2
148:23,24

**r**

**r** 2:14 6:1 27:17,21
131:13 160:3,3
**race** 36:13
**racism** 130:1
**racist** 41:16,19
**racists** 41:17
**radical** 41:14,15
**rallies** 128:4,18
**rally** 39:18 41:4
125:4 126:5
127:19 128:3,6,22

**ran** 73:13 141:14
**randy** 3:21,21
151:2
**range** 54:19 71:11
**rapists** 129:14
**rat** 76:22,24 77:4
**rbc** 3:23
**rd** 18:19 20:19,19
20:23 22:3,7,12,18
22:21 23:6,7,9,17
23:20,22 24:22
26:2,5,20 27:5,14
27:16 28:11,13,23
29:17 30:4 31:22
33:12,18 34:19
35:20 37:11 42:14
42:15 44:17 46:12
50:3 51:12 63:12
64:16,22 65:8
66:10 67:19 69:1
70:13 75:5 78:4
78:12 79:14 86:7
108:3
**reach** 32:6 113:24
146:5,8
**reached** 65:15,16
93:13 94:17
110:24 113:21
146:5,10,10,14
**reaching** 111:6
146:14
**read** 6:11 84:17
108:18 153:15,17
154:22 158:2
161:6,8
**readily** 11:9
**reading** 14:15
150:15,19 156:18
156:20
**reagor** 2:19

**real** 112:23
**really** 59:3 76:13
94:18 98:6 127:6
**realtime** 5:7
159:20
**reason** 8:13 9:4
35:7 107:15
115:24 116:8
133:22 150:12
160:6,9,12,15,18
160:21
**reasonable** 156:5
**recall** 14:25 31:12
34:9 53:9 76:2,3
78:24 107:19,19
114:17
**receive** 13:6
112:13 134:20
**received** 80:14
83:1 109:24
114:19
**recess** 63:4 67:16
81:13 89:11 106:7
113:11
**recht** 2:10
**recklessness** 91:17
**reclaim** 43:14
**recognize** 82:3
**recognized** 112:6
**recollect** 112:18
**recollection** 28:7
66:23 72:12,17
106:19 150:23
**reconnect** 138:20
**record** 6:6,22 13:3
13:5,12 17:1
25:21 33:9,19
49:20 62:22 63:1
63:3,6 64:21,24
67:11,13,15,18
81:9,11,15,23

Page 23

[record - response]

88:18 89:9,13
99:7 101:25
105:21 106:4,5,23
113:8,8,10,12,15
115:5 119:1
120:10 134:13
136:10 155:17
156:7 157:7,11
**recorded** 9:12
**recording** 8:3 9:9
9:10,11,14
**records** 33:11
96:15 100:9
**recover** 49:6 63:14
64:10,15 106:22
107:16 133:6
**recreate** 74:6
**recruit** 130:14
**recruiting** 122:13
123:4,10,23 124:1
130:12,13,20
**recruitment**
130:19,22
**redeeming** 152:23
**reduced** 135:25
137:7 159:11
**rees** 4:7
**refer** 85:14 119:15
**reference** 80:4,5
**referenced** 81:18
137:8 161:5
**referred** 38:16
39:8 80:8,9 108:8
124:4
**referring** 16:11
17:18 40:14,24
52:9 56:3 61:7
64:2 68:10 76:25
80:1 82:19 92:4
118:3 122:14,22
123:5 124:14

138:7
**reflect** 17:10
**reflected** 14:4
15:25 16:15
138:13
**reflecting** 17:5
136:3
**refusing** 12:6
44:19 86:18
**regard** 39:10
40:10
**regarding** 10:25
83:1 138:11,11
151:14
**registered** 5:6
159:4,20
**regular** 31:20
**reinvent** 85:13
**relate** 83:5 84:7
**related** 19:8 49:1
49:11,24 51:20
52:4 53:15 62:13
67:7 69:2 72:4
73:16 88:9 92:17
98:12 102:12
124:16 125:3
126:18 129:7
130:18 131:20
137:11,13 138:24
138:25 141:11
144:22 145:3
149:23 150:1
152:20 159:13
**relates** 12:13 86:2
124:3 133:2
144:13 154:10
**relating** 70:18
74:14 152:24
**relation** 62:9,17
**relationship** 47:4
48:6

**relationships**
147:11
**release** 90:7
**relevance** 37:19
38:9,25 39:21
69:12 136:4
140:21 142:25
**relevant** 8:6,8,18
8:25 10:2 34:17
35:24 38:11,14,18
40:11,19,20 64:9
69:19 70:5 102:20
103:10,16 141:7
143:3
**reluctant** 116:6
**remember** 31:12
45:19 72:25 76:21
78:1 98:13 100:12
100:13,19 118:18
123:9 131:16
151:21
**remote** 34:22
**remotely** 5:4 6:15
**removed** 63:19
**removes** 64:19
**repeat** 11:2 16:24
25:19 69:13 84:14
85:12 110:16
116:2 148:20
154:20
**repeated** 16:21
**repeating** 84:12
**rephrase** 9:5
**replaced** 63:17
64:6 96:11
**replied** 64:6
**report** 136:1,3
147:14,17
**reporter** 5:6,7
6:10,12 16:19
18:13 25:17 28:2

45:3,7 65:22 66:2
67:9 73:18 81:3
112:24 120:2,5,12
120:14 128:12,15
134:15 138:2
140:7 141:4 144:6
148:1,16 153:15
154:15 155:19,24
156:2,11,14,21
157:1,6 159:5,20
159:20
**reporter's** 159:1
**reporting** 6:15,20
**repost** 99:13,15,21
**reposted** 99:18
100:24
**represent** 6:6
**republic** 2:18 85:3
**request** 63:22 64:7
83:7 156:4
**requirement** 65:7
**reread** 154:21
**research** 17:8
49:18,20 53:25
54:1,2,7,8 58:14
60:23 68:17 73:12
111:9,16,20,20
112:6 124:25
129:18 131:8
148:25 149:6,24
151:14,18,25
153:25
**researching** 65:17
**respect** 15:22 34:5
60:3,5 61:16
**respond** 31:9 32:1
90:2
**responding** 43:16
**response** 8:16
43:13,18,20 44:21
57:13 148:12,22

Page 24

**Court File Page No. 14939**

[responses - see]

responses 22:5
responsible 135:15
responsive 55:5
rest 96:5,7,12 100:14
restate 100:25
restroom 85:25 89:1,8 90:1
result 7:10 12:2 29:6 66:19 77:9 108:18 159:15
results 49:21 139:18
retribution 21:22 21:23 116:11
return 31:8 161:12
revalidated 149:22
reveal 109:8,9 116:10
review 16:9 96:15
reviewed 10:16 128:7 134:24
revolution 59:25 129:3
rhetoric 51:22 123:11
richard 27:19
rick 27:20
rigging 139:17
right 9:24 12:18 12:21 13:8,13,21 14:7,11 15:22 16:8 20:18 26:1 33:16 34:24 39:14 46:11 48:11 49:25 50:2 51:5,25 52:21 56:1,16 62:19 63:7 64:13

66:1,9,19,20,25
68:1,18,22 71:16
72:6,7 73:22 75:2
76:1,8,18 81:16
82:11 83:16 85:19
86:4 87:18,22
89:1,8 90:9,10,15
90:17 92:11,20,21
95:10,12 97:24
104:22 107:4
108:1,22 109:3
112:8,10,13 113:7
113:14 115:4,21
118:11,16 119:12
119:16 120:15,24
121:2,7 122:25
123:8,24 124:3,7
124:12 125:14,19
128:1 129:3 130:9
130:11 133:9,11
133:15 134:10
135:20,22 138:22
140:18 151:10
152:17
rights 73:16
rigorous 142:1
ringing 116:1 138:1
rion 1:12 4:10,15 4:20 13:7
ripplinger 4:3
rklawpc.com 2:12
road 3:22 35:24
rock 25:11 32:21
roger 27:20
rogers 2:9
role 150:4
ron 53:6
room 6:14
rough 155:25 156:25

round 106:12
royal 68:9
rudolph 1:10
rules 5:2 161:14
run 129:11 154:24
running 10:5 153:10 154:4,7
rup 142:4
ryan 109:14

**s**

s 5:6 6:1 159:4,19 160:3
safeguarded 88:14
safest 121:20
sake 116:25
salida 2:5 91:24 92:17 94:16,17 95:10 100:1
sam 16:2 17:17,20 18:4,7
sane 91:13
saw 15:12 106:20
saying 31:11 50:10 51:11 53:10 55:5 62:8,10 89:3 91:3 99:17 100:13 101:25 123:9 124:8 130:13 134:7,17,19,20,21
says 82:14 83:11 95:25 120:19 150:16 156:15
scared 26:21 46:18 47:3
scenario 69:8 72:16
schedule 74:7,19
scheduling 69:4
schematic 137:8
school 37:16 78:2

science 144:19
scope 103:16 153:8 154:5
scores 141:7
scott 4:21
scotty 156:15
scoured 63:21
screen 7:19 80:15 80:22,24 81:19 93:15,17,18,20 97:1
screenshot 72:3,6 84:23 99:25
screenshots 85:15 85:16,20,21 86:8 86:10 108:7 109:24 112:10 115:8
scroll 15:5,6
scytl 133:7,7
sean 50:17,18
search 72:4 113:15
searching 20:13
seating 9:11
second 12:25 20:10 68:19 79:7 81:7 85:1 98:25 122:18,24
section 98:10
secure 142:13 144:1
secured 142:7
security 63:18 97:20 135:10 140:20,24 141:20 141:21 142:24 144:13
see 15:20,24 20:10 20:13,16 25:15,21 33:18 49:3 61:3

Page 25

Veritext Legal Solutions
800-336-4000

[see - somebody]

64:20 73:3 80:14
80:20,21,23,25
81:2,6,6,7 93:11
93:15,19 94:12,13
95:21,21 96:9
97:1 104:15,19
105:2,3 106:22
109:11 110:24
111:7 112:2
121:19 132:1
136:20 142:22
**seeing** 13:18
**seek** 87:3
**seen** 71:11 82:7,12
93:12 100:6
106:21 127:5,15
127:17,21 128:5
133:21,24 134:3,7
134:18
**seerveld** 2:19
**segue** 52:5
**self** 130:4
**send** 94:9,9,11,15
95:19 96:8,17
97:8,20 150:24
**sense** 50:3 149:17
**sensor** 107:1
**sent** 93:8 94:2,6,12
94:25 95:11,25
96:13 97:7 98:24
110:20 112:17
114:15 134:1,13
134:18 150:17,22
151:1
**sentence** 96:3
122:15
**separately** 9:15
**separation** 112:3
**september** 1:17
5:5 6:4 30:5,22
32:4,5 48:15

71:15,21 72:3,7,14
74:3,4 111:12
119:16 120:8,17
120:18,20 127:25
149:8 159:17
161:2
**sequoia** 143:24
**series** 132:8,9
**seriously** 105:19
**served** 12:11
**service** 144:4
**services** 144:4,11
**session** 41:23
**set** 29:12 30:1
74:25 143:15
159:10
**settings** 102:4
**setup** 93:20
**sexually** 152:8
**share** 13:10 80:15
81:19 93:16 95:24
97:11 100:14
**sharing** 93:18 97:1
**sheer** 121:21
**sheet** 161:10
**sheets** 32:24 33:3
33:17
**shit** 100:13 101:1
**shitbag** 100:15,16
107:21
**shook** 30:15,17,21
**shooting** 124:20
**shop** 46:19
**shorthand** 159:10
**shot** 90:2
**show** 45:9,11 46:1
96:12,24 99:7
104:20 107:12,13
107:14 114:22
115:2 130:22
131:14 132:13

134:8 145:12
**showed** 25:9 32:3
45:17,25 155:8
**showing** 46:6
**shows** 92:2 96:3
**shuffling** 1:10 3:7
3:11 143:18
**side** 16:23 21:24
34:24 35:3 64:8,8
95:8
**sidney** 1:9,9 3:2,2
85:3 118:20
133:10 134:1
150:17,22 151:2
151:10,12
**sign** 32:23 33:2,17
94:3 96:1 118:17
119:9 161:6,11
**signal** 28:9,10,13
28:23 29:1,6,12
31:3,4,23 63:9,12
64:12 65:1,6
94:17 112:15,15
112:17,21 114:6
114:10,11,13,16
**signature** 159:19
**signed** 44:8 117:22
118:10 119:4,20
161:17
**significance** 21:2
147:5 149:17
**significant** 150:3
**signing** 156:18,20
**silence** 43:21
153:6
**similar** 70:17
**simple** 144:23
**single** 58:8 94:23
**sir** 8:9 22:22 23:24
24:15 25:17 42:9
43:22 44:6 55:18

61:24 67:9 87:14
95:23 101:12
118:15 120:6
122:5,23 123:21
127:14 141:4,19
**sisa** 121:18
**sit** 34:22 54:10
58:7 73:22 85:8
96:18 102:21
103:14 114:5,18
114:24 115:3
**site** 155:4,5
**sitted** 9:10
**sitting** 34:12,15,19
35:8,21 43:15
**six** 25:2 28:4
**skarnulis** 2:3,4,7
**skinhead** 129:22
130:6 149:25
152:2
**skinheads** 91:7
129:24,25
**slandering** 59:5
**slanted** 55:13
**slow** 141:5
**small** 73:17,18,20
137:23 138:17,18
**smoking** 61:1,2
**sms** 5:18
**social** 11:25 39:16
57:10 102:2
111:21 139:5
149:23
**socialist** 77:21
**society** 41:17
**solutions** 143:18
161:19
**somebody** 15:10
39:23 64:19 80:8
80:9 93:10 97:11
99:13 109:6,7

**[somebody - sure]**

110:20 114:2
**somewhat** 51:21
**soon** 156:2
**sorry** 11:23 16:19
  18:13 25:17,18
  28:2 36:10 42:2
  52:23 65:22 67:9
  73:18 79:4,5
  97:15 105:6
  112:24 115:25
  120:2 130:24
  136:13 140:7
  141:4,4 144:6
  148:16 150:11
  154:15,19
**sort** 87:25 115:5
  121:10,20 156:4
**sounded** 53:13
**sounds** 20:18
**south** 3:22
**speak** 53:8 86:21
  122:1 127:21
**speaker** 126:5
  128:3
**speaking** 10:9
  36:17 69:23
  122:10 125:4
  128:6 136:12
  142:16 148:1
**speaks** 152:4,4
**special** 129:25
**specific** 69:20
  71:12 74:7 125:22
  125:23 129:17
  135:22 150:23
**specifically** 17:9
  17:13 19:16 64:19
  65:14 71:17 87:23
  88:15 91:2 93:4
  111:1 123:10,25
  125:12 126:7

130:13 132:6
  152:7
**speculate** 44:23
  45:2,6 74:2 78:22
  117:16
**speculating** 90:18
  90:20
**speculation** 82:23
**spend** 131:10
**spent** 76:18
  117:18 125:17
  155:6
**spoke** 24:25 83:13
  120:12 134:15
  152:3
**spoken** 84:1
**spotlight** 81:6
**spread** 56:18
**springs** 14:14
  19:17 50:17 53:12
**st** 3:18
**stabbing** 21:10
  124:20
**stack** 142:12
**stall** 113:4
**stamp** 14:6,7,9
**stand** 20:20 22:13
  40:2 41:15 102:21
  104:10 107:23,25
**standard** 29:12
  30:1
**standing** 77:25
  101:4 154:13
**standpoint** 130:21
  139:16 142:9
**stands** 22:14 27:17
  27:21,22,24
  131:23
**stare** 103:15
**start** 10:4 40:17
  150:20

**started** 17:8 30:13
  33:1 52:3 75:12
  108:17 111:6,9,16
  111:20,20,25
  149:23
**starting** 102:15
  105:9 150:19
**starts** 14:11
**state** 1:1 5:8 6:6
  7:7 124:18 158:3
  159:5
**statement** 29:10
  32:11 66:17 120:6
  136:17,20,25
**statements** 82:13
  138:25
**states** 21:20
  144:12
**stating** 6:21
**stationary** 132:12
**stay** 129:16
**staying** 130:17
**steal** 100:17
**stephen** 4:16
**stephen.dexter**
  4:19
**steps** 110:10
**steve** 2:3
**stick** 30:15
**stipulated** 87:6,11
  90:12 116:15
**stipulation** 87:9
**stolen** 135:4,19
**stop** 9:5 90:14,14
  105:17,18,18
**storey** 51:9
**story** 122:2
**stout** 2:10
**strategy** 135:10
**stream** 5:17

**street** 1:3 2:10,15
  4:7,12,17
**strictly** 59:1
**strike** 62:12 110:6
**strong** 130:3
**student** 152:15
**stuff** 91:11 99:23
  100:10 102:19
  107:3 117:20
  119:22 124:5
  132:6 149:15
  152:24
**stupid** 102:1
**subject** 109:10,11
  116:10 117:2
**subjective** 102:18
**subpoena** 49:10
**subscribed** 158:13
**subsequent** 53:17
  56:15 74:16 155:7
**subsequently** 16:3
  55:7
**substance** 89:18
**suggest** 10:4
  151:22 153:13
**suggestion** 136:22
**suite** 2:10,15,20
  3:4,22 4:3,7,17
**sullivan** 4:22
**summarize** 66:8
  151:16
**summer** 48:13
  128:8
**support** 139:10
**supposed** 142:15
**supposedly** 101:8
**sure** 9:6 21:1
  39:23 45:1 46:19
  49:23 53:14 55:8
  58:10 63:24 67:12
  87:14 98:15,17

Veritext Legal Solutions
800-336-4000

**[sure - think]**

100:5 101:3 106:3
107:7 114:8,21
130:22 136:9,10
138:24 140:4
144:24
**surprised**   32:17
**surround**   97:17
**surveil**   93:9 94:7
**surveillance**   92:21
93:5,7
**susan**   129:23
**suspect**   105:23
**suspected**   53:7
**swear**   6:11
**swore**   85:8 123:21
**sworn**   7:3 85:4
107:18 136:17,19
136:25 158:5,13
159:8
**system**   126:25
135:12 136:8
137:11,17,19,24
141:2,6,9,23
142:12,14 143:25
144:2,22 145:4,7,8
145:11
**systems**   100:17
126:20 133:3,4
135:10 138:16
142:7,8 144:13
147:11 150:6

**t**

**t**   144:9 160:3,3
**take**   33:10 41:6
48:2 51:19 58:12
62:20,24 66:7
76:7 85:24 86:2
88:17 104:11
105:14,18 112:23
115:22 116:22
138:19 142:11

156:20,24
**taken**   5:4 13:22
101:20,23 149:5
159:10
**talk**   9:1 13:15
38:20 42:4,4,5,7
57:7 66:6 67:6
96:15 108:1
117:17 123:17,25
131:13,24 142:4
**talked**   53:14 67:3
67:7 96:22 108:2
108:4 123:23
125:10,12 133:9
152:7
**talking**   40:22
53:11 77:1,18
81:17 93:4 110:2
117:19 122:10
123:2,14 124:3
125:11 128:1
130:11,17 136:18
137:3 138:8
141:15 142:2,3
148:18 152:21
153:14
**tall**   36:12
**target**   149:9
**targeted**   21:7
**tay**   77:15,18 78:13
**tblf**   3:19
**team**   82:15 83:2
84:20 104:13
**tech**   64:12 106:25
137:5
**technical**   81:17
139:16
**technology**   29:15
64:18 142:13
144:23 145:16

**tell**   19:5 20:11
33:13 42:12 57:16
59:15 78:4 96:12
97:10 100:10
109:19,21,22
110:12,22,23
115:13 123:8
155:22
**telling**   32:17 44:18
56:16 96:23 98:4
**tendency**   98:6
**terms**   29:5 60:19
64:12 77:2 106:18
109:3 119:10
121:10 124:1
125:15 139:12
151:18
**terrorizing**   124:19
**testified**   7:4 32:20
47:13 69:25 95:25
103:21 108:12
135:20,21 137:3
139:12,18 140:12
150:16,21 151:13
**testify**   10:25 11:3
56:5 69:10 135:1
159:8
**testimony**   6:17
7:10 9:23,24 27:5
28:6 29:7 55:24
71:22 72:10 73:23
84:13 85:4,7,9,16
107:18 108:9
115:8 117:7 129:5
133:10 140:3
148:11 150:13
158:3,5 161:8
**tests**   142:1
**text**   31:5,20 94:2,4
94:9 95:19,21,23
96:3,8,10,10,12,17

96:21
**texts**   94:4
**tgp**   1:11 3:16,20
**thank**   60:2 89:6
118:6 120:14
150:9 154:14
155:11 156:13
157:5
**thanks**   130:6
143:11
**thehalllawoffice...**
3:10
**theirs**   84:13
**themself**   153:20
**theory**   144:25
145:1
**thing**   47:25 50:9
58:23 72:2 83:9
97:12 112:16
114:1 121:10
**things**   8:1 32:13
46:21 50:9 51:14
58:20 68:7 76:23
85:14 91:9,12,14
97:22 102:20
104:7 121:12
123:22 124:17
135:16 137:16
144:1,5,8,15,17
150:1 151:16
152:1,9,13,18,20
156:6
**think**   13:9 14:21
21:3 26:23 30:19
31:3,4,6 32:4,10
33:1 38:13 39:22
40:5 46:2,3,22
47:10 48:24 49:22
50:13 52:19 53:23
53:23 56:13 61:1
61:4 64:7 75:13

Veritext Legal Solutions
800-336-4000

[think - twitter]

| | | | |
|---|---|---|---|
| 75:24 76:5 77:4 | 33:3 34:3,9,10 | 26:25 30:15 33:20 | **trends** 131:14 |
| 77:20,20,21 80:5 | 37:9 38:11 43:2 | 34:3,8,16 35:22 | **trey** 2:9,12 |
| 80:18 81:5 85:2 | 43:14 48:13,14,16 | 45:2 57:23 62:16 | **trial** 35:9 |
| 88:2,11 90:22 | 49:4 50:12 58:17 | 83:22 89:22 91:23 | **triangulate** 73:6 |
| 92:1 100:2 106:16 | 58:23 61:1 63:2,6 | 104:12 111:14 | **tried** 21:7,8 73:5 |
| 108:22 111:2 | 63:22 67:14,18 | 116:13 117:1 | 81:19 148:24 |
| 115:2,4,11,18 | 69:3 73:13,14,15 | **tomorrow** 25:24 | **trouble** 65:23 |
| 116:9 117:8 | 75:15 76:18 81:9 | 33:15 143:15,18 | 154:18 |
| 119:18,25 121:4 | 81:12,15 82:10,10 | **ton** 123:11 | **true** 13:23 20:2,3 |
| 121:11 125:8 | 89:10,14 90:1 | **tongue** 98:2,3 | 29:19,23 44:2 |
| 129:3 130:15 | 91:12 96:7 103:13 | **top** 79:6 98:10 | 58:9 66:11,12 |
| 132:21 135:16 | 103:21 105:21 | **topic** 89:4 105:13 | 74:7 81:21 85:9,9 |
| 138:7 145:15 | 106:6,9 113:2,4,10 | 135:22 137:21 | 101:21 102:21 |
| **thinking** 80:13 | 113:13,20 115:4 | **topics** 76:15 | 113:17,18 119:17 |
| 140:18 | 115:10 116:20 | 106:13 | 120:18 132:25 |
| **thomas** 2:9 | 117:7 121:12 | **total** 78:21 157:10 | 135:8 145:4 |
| **thought** 47:20 | 123:14 125:15,16 | **totally** 57:11 | 159:12 |
| 50:4 52:4,14,20 | 126:22 127:14 | **touch** 19:20,23 | **truly** 47:20 |
| 53:13 130:25 | 128:13,15 130:5 | 25:7 28:8 66:10 | **trump** 1:9 2:13 |
| 148:14 149:3,9 | 131:7,11 132:8,9 | 77:8 | 138:24 139:2 |
| **thousand** 44:7 | 135:25 137:1 | **trace** 114:18 | 157:3 160:1 161:3 |
| **thread** 96:3 | 139:25 141:24,24 | **training** 79:2,19 | **trust** 22:9 |
| **threaten** 147:20 | 141:25 143:8 | **transcript** 133:21 | **truth** 22:8,9 44:12 |
| **threatened** 44:9 | 149:8,14 154:1,18 | 133:24,24,25 | 98:4 159:8 |
| 97:17 147:1 | 155:6,17 157:10 | 134:7,9,13,25 | **try** 19:23,24 31:14 |
| **threats** 141:16,17 | 159:10 161:15 | 140:6 150:13,16 | 54:2 63:14,14 |
| **three** 13:25 23:14 | **timeframe** 161:7 | 155:20 157:3 | 73:8 106:21 |
| 34:22 35:16 | **timeline** 108:12 | 158:3 159:12 | **trying** 20:9 32:6 |
| 105:24 143:9,10 | **times** 23:14 26:11 | 161:5,16 | 41:1 46:22 65:10 |
| 145:21 | 32:1 35:5 48:16 | **transferred** 133:6 | 65:11,13 66:6 |
| **throw** 102:19 | 64:11 107:22 | **translates** 133:8 | 69:14,16,18,19 |
| **throwing** 124:21 | 116:13 129:23 | **transmission** | 111:17 114:1 |
| 125:4 | 133:8 153:21,22 | 115:2 | 127:11 153:19 |
| **tie** 49:8 126:15 | **today** 10:25 11:3 | **transmittal** 114:7 | **tubbs** 5:6 45:1 |
| **tied** 126:22 153:14 | 54:10 73:23 85:8 | 114:9 | 159:4,19 |
| **ties** 130:3 | 105:25 107:15 | **transmitted** | **turnaround** |
| **tight** 74:19 | 113:20 114:5 | 112:14 114:24 | 156:16,19 |
| **time** 6:4 10:5,9 | 155:14 156:9 | **transparency** | **turned** 127:2 |
| 13:12 20:15 22:4 | **today's** 6:3 | 142:14 | **twice** 21:13 122:24 |
| 24:25 26:15 28:5 | **told** 18:6,9,15 20:1 | **treats** 152:20 | **twitter** 60:12,15 |
| 30:18,19 32:5,17 | 20:7 23:17 26:24 | | 60:16,20 61:11,18 |

Veritext Legal Solutions
800-336-4000

**[twitter - want]**

111:22
**two** 13:25 21:6,6
60:3,22 66:25
75:11 77:15 80:19
92:3 99:16,19
120:24 141:24
152:2
**tx** 161:13
**tx4792290** 158:25
**type** 70:21 100:20
149:21,21
**typed** 100:7
**typewritten**
159:11
**typical** 46:21
**typically** 41:17
**typing** 100:19

**u**

**un** 58:24
**unbelievable**
36:14
**uncover** 17:12
43:23 55:10 65:18
66:16 111:21
146:23,24 151:25
**uncovered** 55:12
66:20 155:8
**uncovering** 70:18
128:17
**underneath** 60:15
**understand** 7:9
9:3,4,6,13,21
11:20,21 12:23
16:20 21:1 25:18
27:5 29:16 35:10
47:1 49:2 63:24
67:10 68:16 75:2
76:25 81:20 86:16
86:16 87:15,19
88:12,12,22 91:18
94:5 99:20 107:7

110:12 112:25
114:8,21 115:7
116:17 136:6
137:9 140:8 144:4
149:11,16 154:3
**understanding**
65:23 100:3
153:10
**understood** 59:22
62:11 75:19
118:21 139:15
**underwhelmed**
51:21
**unfortunately**
11:14
**united** 1:10 3:6,11
50:14 73:15
143:18 144:12
**unrest** 48:16
**unusual** 156:4
**unwilling** 103:23
**urinating** 152:8
**use** 1:4 29:6 49:14
56:19,20 61:4
65:5,5 85:24
88:25 89:7 102:2
122:9 130:20
133:14
**uses** 24:2,7 131:22

**v**

**v** 15:3 160:1 161:3
**validate** 47:9
53:24 111:4 139:6
144:24 145:5,6,12
**validated** 139:4,5
**validating** 114:3
**vanilla** 47:6
**various** 71:11
111:7
**vedder** 4:12

**vedderprice.com**
4:14,14
**verbally** 6:17
**verified** 27:12
**verify** 53:3 62:18
149:18 161:8
**veritas** 21:15
**veritext** 13:12
161:12,19
**veritext.com.**
161:13
**versus** 103:7
**vet** 147:13
**video** 1:16 5:2 6:4
74:24,25 75:2,3
101:15 103:4,11
105:2,3,5,7 127:17
155:18
**video'ing** 75:1
**videoconferenced**
1:16 2:1 3:1 4:1
5:3
**videographer** 6:2
6:10 62:23 63:1,5
67:13,17 81:11,14
89:9,12 106:5,8
113:9,12 143:9
155:16
**videos** 126:10
128:5,8,18
**view** 13:11 117:2
129:7
**village** 2:20 4:4
**visit** 90:1
**vitriol** 98:6
**voice** 120:6 126:11
**volume** 121:21
**volunteered** 93:10
95:12
**volunteers** 94:8

**vote** 138:20
**votes** 133:6 138:19
142:12,13 145:13
**voting** 100:16
126:20,25 132:7,8
132:9 133:3,4
135:10 137:24
138:16 150:6
**vs** 1:8
**vulgar** 152:3
**vulgarity** 152:4
**vulgarness** 123:18
**vulnerabilities**
133:3 135:18
138:16

**w**

**waive** 6:19
**waived** 69:24
**walk** 30:20,23
47:4 52:3 110:10
110:14,18 125:19
125:20 130:21
**walked** 30:10 32:5
126:10
**walking** 133:5
**walks** 138:15
**want** 9:23 13:12
21:20 22:4 32:11
35:7,8,12,13,18
36:20 37:8 38:22
40:12 42:9 44:10
44:13,23 45:1
47:3 57:4,16,24
60:25 63:8 70:1
73:7 81:8 85:12
85:12 87:14 88:4
88:8,20,20 89:17
96:7 100:25
102:10,12,19
105:19 108:4
112:23 114:22

Veritext Legal Solutions
800-336-4000

**Court File Page No. 14945**

[want - zoom]

123:8 125:24
127:12 131:10
136:10 137:25
151:22 153:6
155:22 156:3
**wanted** 19:20 32:9
32:10 36:19,21
42:7 47:19 65:8
82:13 100:23
111:4 130:14
**wanting** 80:6
**wants** 24:12 35:3
**washington** 21:9
133:1
**waste** 13:12 81:9
103:21
**wasted** 105:22
**wasting** 37:9
127:14
**watching** 100:18
**water** 85:25
124:21
**way** 21:4 27:19
34:23 36:1 44:4,7
60:17 82:4 91:6
97:22 114:18
132:8,9 134:22
140:18 144:18
152:2
**ways** 70:21 138:17
**we've** 21:6 60:22
66:14 67:20 68:20
76:6,6 90:11
105:21,22 108:4
117:18 125:10
150:2
**wearing** 128:9
**web** 21:18 147:19
**week** 31:14 32:5
71:21 119:16,17
120:7,17,19,20

**weeks** 21:6 135:24
**welcome** 13:10
**went** 18:7 35:24
37:16 47:25 48:14
49:17 63:20 89:21
97:22 99:6 100:8
106:21 107:15
122:19 149:22
151:8,25
**whispering** 45:4,8
**white** 37:12 41:17
42:13
**whoa** 120:2,2,3
**wife** 91:11 98:7
152:7,11
**wild** 54:23 55:25
**william** 60:13,15
60:23 61:8,10,17
62:8
**willing** 101:8
110:25 115:16
117:6
**wilshire** 4:22
**win** 39:23 138:25
139:1,3
**wipe** 57:11
**witness** 6:11,17
16:20 161:5,7,9,11
161:15
**woman** 80:1
**wondering** 136:16
**word** 46:18 114:25
122:9 123:19,20
144:7
**words** 29:23 36:24
58:21 74:16 82:25
94:19 97:24 104:5
104:25 116:5
124:13 133:14
151:21

**work** 138:10 156:6
**worked** 21:15
136:7 143:23,24
152:21
**working** 142:23
145:17 147:12,12
**works** 42:18,19
99:21 137:12
**worth** 81:1
**wrecking** 91:10
**wright** 4:22
**write** 53:5 66:6
77:17 91:12 142:5
**writes** 55:13
**writing** 32:13
51:14 58:19 60:1
91:11 124:5 137:8
153:18
**writings** 91:5,13
91:14 153:19
**written** 5:1 33:6
50:11,13,14 61:13
98:9,10,17 129:23
136:1 137:17
**wrong** 13:22 46:17
46:23
**wrote** 52:17 53:4,5
53:15 79:9 91:15
101:3 104:25
119:18 122:8
146:25 152:7
**wynkoop** 4:17

**y**

**yahoo.com** 3:14
161:1
**yan** 18:18,20,23
18:25,25 19:13,13
19:15,15,21,21
20:1,1,14,14 75:23
75:23

**yeah** 40:12 50:20
50:23,25 62:21,24
67:23 69:14 75:25
76:22 77:6 83:21
85:23 97:4,6 98:8
100:5 101:1,20
105:20 112:15
115:3,11,18 116:3
120:1 129:5
131:15,17 136:12
140:11 143:13
151:7,24 156:18
156:19
**year** 58:5,7 60:14
72:18 83:14 85:5
141:25
**yep** 119:13 135:23
**yesterday** 80:18
**york** 21:16 129:23
133:8
**young** 141:24
**youtube** 100:10

**z**

**zach** 2:4
**zbowman** 2:8
**zoom** 7:22 10:4
15:18,18,24 49:3
49:13 51:17 68:22
71:12 74:23 78:5

Page 31

Colorado Rules of Civil Procedure

Chapter 4, Disclosure and Discovery

Rule 30


(e) Review by Witness; Changes; Signing. If requested by the deponent or a party before completion of the deposition, the deponent shall be notified by the officer that the transcript or recording is available. Within 35 days of receipt of such notification the deponent shall review the transcript or recording and, if the deponent makes changes in the form or substance of the deposition, shall sign a statement reciting such changes and the deponent's reasons for making them and send such statement to the officer. The officer shall indicate in the certificate prescribed by subsection (f)(1) of this rule whether any review was requested and, if so, shall append any changes made by the deponent.


DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.