# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cv-03440-WJM-KAS

ERIC COOMER, Ph.D.,

      Plaintiff

v.

MAKE YOUR LIFE EPIC LLC dba THRIVETIME SHOW,
REOPEN AMERICA LLC dba REAWAKEN AMERICA TOUR, and
CLAYTON THOMAS CLARK, individually,

      Defendants

---

## EXHIBIT 3

---



1                 IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLORADO
2

     Civil Action Number 1:21-cv-3440-WJM-KAS
3

     ERIC COOMER, PhD,
4

           Plaintiff,
5

     vs.
6

     MAKE YOUR LIFE EPIC LLC dba
7    THRIVETIME SHOW; REOPEN
     AMERICA LLC dba REAWAKEN
8    AMERICA TOUR; and CLAYTON
     THOMAS CLARK, individually,
9

           Defendants.
10

     ----------------------------------------------------------
11
12            REMOTE VIDEO 30(b)(6) DEPOSITION OF:
13        MAKE YOUR LIFE EPIC LLC dba THRIVETIME SHOW,
14                   by CLAYTON CLARK
15                    April 30, 2024
16

     ----------------------------------------------------------
17
18
19
20
21
22
23
24
25

                                            Page  1

```
 1          A P P E A R A N C E S
 2  ON BEHALF OF THE PLAINTIFF:
       CHARLES J. CAIN, ESQ.
 3     BRADLEY A. KLOEWER, ESQ.
       Cain & Skarnulis PLLC
 4     P.O. Box 1064
       Salida, Colorado 81201
 5     Phone:  719.530.3011
       Email:  ccain@cstrial.com
 6         bkloewer@cstrial.com
 7  ON BEHALF OF THE DEFENDANTS:
       THOMAS QUINN, ESQ.
 8     MELISSA WIESE, ESQ.
       Gordon Rees Scully Mansukhani, LLP
 9     555 17th Street, Suite 3400
       Denver, Colorado 80202
10     Phone:  303.534.5160
       Email:  tquinn@grsm.com
11         mwiese@grsm.com
12  Also Present:
       Eric Coomer
13     Dustin Brown, Videographer
       Michael King, Esq.
14
15
16
17
18
19
20
21
22
23
24
25
                              Page 2
```

```
 1             I N D E X
 2
    EXAMINATION:                   PAGE
 3
      By Mr. Kloewer              7
 4
    DEPOSITION EXHIBITS:
 5
    Exhibit 28   Deposition notice        10
 6
    Exhibit 29   Articles of Organization   12
 7
    Exhibit 30   Trade Name Report          28
 8
    Exhibit 31   Defendant Make Your Life Epic,   68
 9     LLC dba ThriveTime Show's Verified
       and First Supplemental Objections
10     and Responses to Plaintiff's
       Second Set of Written Discovery
11     Requests
12  Exhibit 32   Email to Woolery from Clark,   95
       11/26/20, Subject:  More
13
    Exhibit 33   Email to Duden from Clark,   98
14     12/16/20, Subject:  Re: Schedule
       Interview with Joe Oltmann/
15     Conservative Daily
16  Exhibit 34   Article, "Guest Commentary: I   127
       work for Dominion Voting
17     Systems.  I did not commit voter
       fraud. The attacks against me need
18     to stop."
19  Exhibit 35   ThriveTime Show Notes, 12/17/20   150
20  Exhibit 36   Facebook post, 12/22/20      156
21  Exhibit 37   Personally Autographed Apparel   159
22  Exhibit 38   Store page, books         162
23  Exhibit 39   Operating Agreement of Reopen
       America, LLC
24
25
                              Page 4
```

```
 1      PURSUANT TO WRITTEN NOTICE and the appropriate
 2  rules of civil procedure, the deposition of MAKE YOUR
 3  LIFE EPIC LLC dba THRIVETIME SHOW, by CLAYTON CLARK,
 4  called for examination by the Plaintiff, was taken by
 5  remote means, commencing at 10:06 a.m. Central Time on
 6  April 30, 2024, before Kirsten M. Thorngate,
 7  Registered Professional Reporter.
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                              Page 3
```

```
 1  Exhibit 40   Defendant Reopen America, LLC dba
          Reawaken American Tour's
 2        Objections and Responses to
          Plaintiff's First Set of Written
 3        Discovery Requests Defendant Make
          ReOpen America, LLC dba ReAwaken
 4        America
 5  Exhibit 41   Spreadsheet, ticket sales
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                              Page 5
```

2 (Pages 2 - 5)

**Page 6**

1       P R O C E E D I N G S
2      THE VIDEOGRAPHER:  Good morning.
3      We are on record at 10:06 a.m. on
4 April 30, 2024.
5      This is the video-recorded deposition of
6 Clayton Clark as corporate representative for Make
7 Your Life Epic, doing business as ThriveTime Show.
8      My name is Dustin Brown, here with our
9 court reporter, Kirsten Thorngate.  This deposition is
10 being held remotely.
11      The caption of the case is Coomer versus
12 Make Your Life Epic LLC, doing business as ThriveTime
13 Show, et al.
14      Please note that audio and video
15 recording will take place unless all parties agree to
16 go off the record.
17      If there are any objections to
18 proceeding, please state them at the time of your
19 appearance beginning with the noticing attorney.
20      Appearances, please.
21      MR. KLOEWER:  Good morning.
22      This is Brad Kloewer, here on behalf of
23 Plaintiff, Dr. Eric Coomer.
24      MR. QUINN:  Tom Quinn on behalf of
25 Defendants and the deponent.

**Page 7**

1      CLAYTON CLARK,
2 having been first duly sworn to state the whole truth,
3 was examined and testified as follows:
4      EXAMINATION
5 BY MR. KLOEWER:
6    Q.  Good morning, Mr. Clark.  My name is Brad
7 Kloewer.  I'm an attorney.  I represent Dr. Eric
8 Coomer.  He's a plaintiff in this proceeding.
9      Before we get started, I want to just lay
10 a couple ground rules for the deposition.
11      First off, can you state your full name
12 for the record.
13    A.  My name is Clayton Thomas Clark.
14    Q.  All right.
15      And, Mr. Clark, have you ever had your
16 deposition taken before?
17    A.  One time.
18    Q.  And what was the reason for that?
19    A.  It was related to a piece of real estate
20 I purchased well over a decade ago.
21    Q.  And is that when the deposition occurred
22 as well?
23    A.  Yes.  I believe so.
24    Q.  And were you a party to the lawsuit in
25 that case?

**Page 8**

1    A.  My wife and I purchased a property, and
2 the property we purchased, there were some disclosures
3 that were not fully disclosed.  And therefore, we were
4 trying to rectify the purchase of a piece of real
5 estate property.
6    Q.  Okay.  Well, it sounds like it's been a
7 while, so I'll just briefly, sir, remind you of some
8 of the rules for a deposition here.
9      First and foremost, the most important
10 person on this deposition is Kirsten.  You can see her
11 on the screen there.  She is taking down every word
12 that you and I say, so it's important that you and I
13 not speak over each other.
14      It's possible as we go through this that
15 you'll anticipate a question that I'm going to ask and
16 answer before I'm done.  I'd just ask that you let me
17 finish my questions before you answer so that we can
18 get a clean record.
19      Also, I'm as bad at this as anybody, but
20 I'm going to try to speak slowly to be sure that we're
21 able to get everything on the record.  But I just ask
22 that as we proceed through this, we keep Kirsten in
23 mind because she's taking everything down.
24      Throughout this time, if I ask a question
25 that you don't understand or if I ask it in a way that

**Page 9**

1 doesn't make sense, will you let me know?  And I will
2 try to rephrase it or try to ask the question in a way
3 that is easier to understand.
4      If you need to take breaks at any point,
5 that's fine.  The one thing I do ask is that we don't
6 take a break while a question is on the table.  So if
7 I've asked something, let's get through that topic
8 before we stop to take a break.  But we'll be taking
9 breaks throughout the day.  It's not a marathon.  So
10 you can feel free to do that.
11      And the last thing, throughout the
12 deposition, your counsel may raise objections.  If he
13 instructs you not to answer, then we may discuss that.
14 But in general, if there's an objection, that doesn't
15 mean you can't answer.  He's just preserving that
16 objection for later.  So we'll address that when it
17 comes up.  But just hearing "objection" doesn't mean
18 you don't have to answer the question.
19      Does that make sense?
20    A.  Yes, sir.
21    Q.  Okay.  Great.
22      And, Mr. Clark, you're here today as the
23 corporate representative for Make Your Life Epic,
24 doing business as the ThriveTime Show; is that
25 correct?

1      A.   That is correct.
2      Q.   Okay.  And what is your role with that
3   organization?
4      A.   I'm the sole member of that organization.
5      Q.   Sole member.  Okay.  Do you have any
6   title associated with that position?
7      A.   No.
8      Q.   Okay.  I'm going to real quickly share my
9   screen here.  We don't need to get into this exhibit
10   quite yet, but just so we're clear at the outset.
11         And we'll see if I do a better job of
12   admitting this exhibit now than I did last time.  So
13   I'm going to share my screen here.
14         (Discussion off the record.)
15      Q.   Okay.  Can you see my screen there,
16   Mr. Clark?
17      A.   Yes.
18      Q.   Okay.  I'm going to introduce this
19   exhibit.  We're going to do this sequentially, and we
20   are up to Number 28.
21         (Deposition Exhibit 28 was marked.)
22      Q.   Okay.  Do you see that document on my
23   screen, Mr. Clark?
24      A.   Yes.
25      Q.   Okay.  I'll represent that this is the

Page 10

1   document, we can do so, but I just want to get this
2   entered as our first exhibit today.
3         It sounds like you have not seen this
4   document, and you haven't reviewed the topics that are
5   listed here?
6      A.   I don't recall looking at this document.
7      Q.   Okay.  All right.  We can set that aside
8   for the time being.  We may revisit that, but that
9   will be Exhibit 28 here.
10         Okay.  Before we get into really the
11   substance and discussing more of the documents, things
12   of that nature, I want to sort of go back in time and
13   understand the two sort of -- well, obviously, there's
14   only one entity here, but I want to start by
15   understanding what Make Your Life Epic is.
16         Can you tell me, when did Make Your Life
17   Epic -- when did that company start?
18      A.   You have to look at the tax filing to
19   figure out the first year that it was incorporated.
20   But I've been doing consulting since 2005.
21      Q.   Okay.  And since you raised it and just
22   so we have a clear record here, let me pull that up
23   for you.
24         I'll mark this as Exhibit 29.
25         (Deposition Exhibit 29 was marked.)

Page 12

1         So we have Exhibit A, includes
2   scroll down here real briefly.
3         So we have Exhibit A, includes
4   definitions.
5         Down here on page 7 of this exhibit, it
6   begins a list of Matters Upon Which Examination is
7   Requested.
8         Do you recognize this document,
9   Mr. Clark?
10      A.   No.
11      Q.   Okay.  Well, we provided a list of topics
12   that we're going to address throughout the deposition
13   to your counsel.  Have you had a chance to review
14   these topics?
15      A.   I have not looked at this document.
16      Q.   Okay.
17         MR. QUINN:  Hey, Brad, just a sec.  This
18   is the deposition notice?
19         MR. KLOEWER:  Yes.
20         MR. KING:  With the 33 topics.
21      A.   I haven't looked at these topics.  I
22   mean, maybe I should have, but I have not.
23      Q.   (BY MR. KLOEWER)  Okay.  Well, we're
24   going to be addressing these topics throughout this
25   deposition today.  If we need to revisit this

Page 11

1      Q.   Share my screen again.
2         Okay.  Can you see that document,
3   Mr. Clark?
4      A.   Yes.
5      Q.   Okay.  And this a document we pulled from
6   the Oklahoma Secretary of State's office.  It
7   indicates the filing of Articles of Organization, and
8   the date listed at the top under Submit Date states
9   December 18 of 2008.
10         Does that sound right?
11      A.   That sounds right.
12      Q.   Okay.  But if I heard you correctly
13   before, you started doing business in about 2005?
14      A.   Started doing consulting.  Yes, sir.
15      Q.   Okay.  And so the filing of the -- of the
16   LLC followed that by a couple of years.
17         We see here the agent name is Vanessa
18   Clark.  And I know the answer to this, but can you
19   tell me, who is Vanessa Clark?
20      A.   That's my wonderful wife.
21      Q.   Okay.  And what is Mrs. Clark's role with
22   the company?
23      A.   Well, I pretty much run everything, and
24   then she sometimes is a second set of eyes to look at
25   numbers.

Page 13

4 (Pages 10 - 13)

1      Q.   And when would you rely on her to be that
2  second set of eyes?
3      A.   If I'm ever buying something or spending
4  money in an amount that I think could affect my
5  family's financial future.
6      Q.   Okay.  All right.  We can set that aside
7  for now.
8          So you got started with the business in
9  2008.  What was Make Your Life Epic doing at that
10  time?
11      A.   I was being asked to do speaking events,
12  and so I started writing a book called Make Your Life
13  Epic.  And the organization was designed to teach
14  people how to grow companies.
15      Q.   And what did that look like at the time?
16  I know you didn't -- we'll get into the ThriveTime
17  Show later, but as far as in 2008, what were you doing
18  in terms of what you just described?
19      A.   I would have colleges that would reach
20  out and ask if I could teach entrepreneurship.  I
21  would have small businesses that would ask if I could
22  help teach them how to grow their bridal store or
23  teach them how to grow their business.  So it was
24  basically speaking events from time to time, as well
25  as consulting with small business owners.

Page 14

1      Q.   So you had other businesses that you were
2  running at the time alongside Make Your Life Epic; is
3  that fair?
4      A.   Yes.
5      Q.   And what other businesses were you
6  operating at the time?
7      A.   And again, Brad, to my knowledge, and I
8  want to be very accurate because I'm obviously being
9  deposed here, I started a company in college called
10  DJConnection.com, and then I also started
11  EpicPhotos.com.
12          (Interruption by reporter for
13  clarification.)
14      A.   And then I also acquired a party rental
15  company called Party Perfect.  And I was also running
16  an organization called the Tulsa Bridal Association;
17  essentially, a big bridal show.  And I was also
18  running a videography brand called Cherished
19  Traditions Videography.  And I was doing speaking.
20          And then that was sort of what I was
21  doing around that time, Mr. Brad [sic], but I don't
22  know the specific dates.
23      Q.   And so Make Your Life Epic was sort of a
24  complement to the other -- the business management
25  work you were doing?  This was something -- a project

Page 15

1  on the side to do business coaching, if I understand
2  you correctly?
3      A.   Yes.
4      Q.   Okay.  And in the beginning, it was
5  speaking engagements at businesses and colleges?
6      A.   Yes.  That's correct.
7      Q.   And was anybody else involved in Make
8  Your Life Epic at the time?  Obviously, we discussed
9  your wife briefly here, but do you have any other --
10  did you have any other businesses partners at the
11  time?
12      A.   I don't recall working with anybody at
13  that time.
14      Q.   And we've already discussed, you're the
15  only -- you're the only officer of the company, the
16  only member?
17      A.   Yes, sir.
18      Q.   Okay.  And has that changed over time, or
19  have you always been the -- the sole member of the
20  company?
21      A.   I've always been the sole member of the
22  company.
23      Q.   So no one came in at some point between
24  2008 and now and left, leaving you the sole member
25  again?

Page 16

1      A.   That's correct.  I've always been the
2  sole member.
3      Q.   Okay.  And what is your role at Make Your
4  Life -- well, we can get into that as we get more --
5  closer to the current time.
6          Is anybody else authorized to speak on
7  behalf of Make Your Life Epic, or are you the only
8  person who can sort of represent that entity?
9      A.   I believe that I'm the only one who can
10  represent my organization.  But I don't really do a
11  lot of -- I do the same thing over and over
12  repetitively.  How about that?  So I basically help
13  businesses grow, and so that's my normal flow.  So I
14  don't deal with a lot of ongoing legal things out of
15  my normal repetitive tasks.
16      Q.   And tell me, what is the relationship of
17  Thrive15 with Make Your Life Epic?
18      A.   Well, Thrive15, I was doing consulting,
19  and I could only work with a certain number of clients
20  because I'm the one who meets with the clients.
21          So, Brad, the way my business works is if
22  you were my client, which would be odd because we're
23  in this legal thing, but, you know, if I was working
24  with you, I would meet my client every week at the
25  same time to go over the action items that they need

Page 17

5 (Pages 14 - 17)

Page 18

1  to get done. It's a month-to-month program, and at a
2  certain point, I had every hour booked out in my day.
3  So much like a personal trainer for fitness, I'm a
4  personal trainer for business.
5         And so my thought was we could create an
6  online platform so that people who are not engaging
7  with me one-on-one could benefit from the training
8  that we provided via a video platform, sort of a -- I
9  guess the buzzword is a MOC, or a massive online
10  course. That was the idea.
11     Q. And is Thrive15 -- does that sort of fall
12  under the umbrella of Make Your Life Epic, or is it a
13  separate entity?
14     A. A separate entity.
15     Q. And is anyone else -- is Thrive15 -- are
16  you also the sole member of that organization?
17     A. Thrive15, there was multiple partners in
18  that. And so Dr. Robert Zoellner and I worked on that
19  hand in hand.
20         I don't know of the actual officers and
21  operators and all that. But basically, it's an online
22  education platform. We're putting out videos to teach
23  people how to grow a company.
24     Q. And who is Dr. Robert Zoellner?
25         How did you meet him?

Page 19

1     A. He was my wife's boss when she was 18
2  years old, and he's very much a mentor in my life. I
3  would consider him to be a father figure and a guy I
4  respect quite a bit.
5     Q. Did you meet him through your wife?
6         Was she the conduit there?
7     A. I used to pick my wife up at work when
8  she worked at Dr. Robert Zoellner & Associates. And
9  she was -- at the time, she was working as a freshman
10  at Oral Roberts University. So I'd pick her up, and
11  she was 18 years old-ish, and I'd pick her up from
12  Dr. Zoellner's office.
13     Q. Does Dr. Zoellner have any interest or
14  any involvement with Make Your Life Epic?
15     A. No.
16     Q. Okay. And are all these businesses, are
17  they operated out of the same location?
18     A. When you say "all these businesses,"
19  could you clarify?
20     Q. Sure. Make Your Life Epic and Thrive15,
21  just to keep it simple for now.
22     A. Yes. They're out of the same location.
23     Q. And -- well, we'll get into employees in
24  a bit and discuss if there's any crossover there. When
25         Tell me about the ThriveTime Show.

Page 20

1  did the ThriveTime Show begin?
2     A. I don't know the date that we started
3  recording those shows. I feel like it's been eight
4  years, nine years-ish.
5     Q. How did that -- how did the idea to start
6  the ThriveTime Show -- where did that come from?
7     A. I've always wanted to do a radio show.
8  It's always been a big goal of mine. And Dr. Robert
9  Zoellner called me and said, Hey, would you be open to
10  doing an AM radio show on Talk Radio 1170. And so I
11  said yes.
12     Q. So the ThriveTime Show started on a.m.
13  radio?
14     A. I believe the betas we did were just
15  podcasts, and then we did AM radio. But I found the
16  format of my show extended beyond the two-hour
17  boundaries of the daily show, so I preferred to put it
18  on a podcast.
19     Q. How long was the show published on
20  AM radio?
21     A. Approximately three years, I believe.
22     Q. What was the focus of the ThriveTime Show
23  at that time?
24     A. Business school without the B.S., where
25  we don't talk about religion or politics.

Page 21

1     Q. How frequently was the ThriveTime Show on
2  AM radio at the time?
3     A. Well, the way it worked is we put out a
4  daily show, but if the radio station had breaking news
5  or they needed to air something that was local, then
6  the show wouldn't go out. So typically, it was like
7  four or five days a week, but I like to record seven
8  days a week.
9     Q. And you said the format was a two-hour
10  format; is that correct?
11     A. That's about the package that we were
12  told for 1170.
13     Q. Were you simultaneously publishing those
14  shows through your own podcast, or was that
15  exclusively through the radio station?
16     A. Well, I'd say two-thirds of the content
17  went out on the podcast, and a third went out on the
18  radio show.
19     Q. So those were -- those were running
20  simultaneously together. You had your own podcast you
21  were publishing, and you were publishing through the
22  radio station.
23         Do I understand that correctly?
24     A. Yes, sir.
25     Q. And that's been -- you said about eight

Veritext Legal Solutions
800-336-4000

1  or nine years would be your guess as to when the --
2  when the program started?
3      A.  Yes, sir.  If I'm guessing.
4      Q.  Do you have any idea how many -- how many
5  episodes of the ThriveTime Show you've done at this
6  point?
7      A.  Many, because I do them every day.  So I
8  don't know the actual number.
9      Q.  Your -- if I told you your most recent
10  podcast indicated it was Number 1,091, would you
11  disagree with that?
12      A.  I think sometimes people upload the
13  podcasts on my team.  They'll number them just to be
14  funny because I don't keep track of them that way.  So
15  I don't know that's an actual number that is attached
16  to anything on purpose.
17      Q.  I see.  And you said you record the show
18  every day.  Is that seven days a week?
19      A.  I try to.
20      Q.  Is it just one show per day or multiple?
21      A.  Multiple.  So yesterday, I think I put
22  out two, as an example.  But then I think on Saturday,
23  I put out more than five.  And then if I'm
24  unencumbered, I might put out eight or nine in one
25  day.

Page 22

1      Q.  And those are hour-long episodes
2  typically, or . . .
3      A.  Well, it's as long as -- it's as long as
4  we need it to be to cover the topic.
5      Q.  So some of them, presumably, are much
6  shorter and some longer; is that fair?
7      A.  Yes, sir.
8      Q.  Okay.  So whose -- you mentioned that
9  Dr. Zoellner suggested the idea to you.
10      Was anybody else involved with this
11  decision to begin the ThriveTime Show?
12      A.  No.  And just to be clear on that, I was
13  beta testing podcasts and not relisting them because I
14  wanted to perfect it before I put it out.  And then
15  Dr. Zoellner called me and said, Hey, Talk Radio 1170,
16  they're looking for a show, and if you're willing to
17  provide the show for free, they'll put you on the air.
18      And that was always a goal I always had,
19  so it was a -- kind of a home run at that time.
20      Q.  And were you -- was the radio station
21  advertising during your show at that time?
22      A.  Yes.
23      Q.  And were you being compensated for that
24  show?
25      A.  No.

Page 23

1      Q.  So those advertising proceeds flowed
2  exclusively to the radio station?
3      A.  To the best of my knowledge, yes, sir.
4      Q.  So what was your incentive to keep doing
5  the show if you weren't being compensated for it?
6      A.  I enjoy teaching entrepreneurship.
7      Q.  So it was a purely altruistic endeavor?
8      MR. QUINN:  Object to form.
9      Go ahead and answer.
10      A.  There's people that love playing
11  basketball, and there's people that love carving
12  ducks, and I like recording podcasts.
13      Q.  (BY MR. KLOEWER)  All right.  So you said
14  in the beginning, your show is business school without
15  the B.S.  Just business coaching, no politics and no
16  religion; is that right?
17      A.  Yeah.  But the thing we would say is we
18  would say, Welcome to the ThriveTime Show, where we
19  teach business school without the B.S.; and
20  specifically, we don't talk about religion or
21  politics.
22      That's what we say often.
23      Q.  And did you ever have a cohost on the
24  show, or has it always been yourself?
25      A.  I like to grab random people that are in

Page 24

1  the room to be on the show.  So it could be a
2  janitorial service member.  It could be a mail guy who
3  is delivering mail.  It could be a client that's in
4  the room.  It could be an employee we just hired
5  yesterday.
6      So it's always -- I like to grab other
7  people if I can.
8      Q.  But as far as a dedicated cohost,
9  somebody who sits in the chair next to you every day,
10  have you ever had an arrangement like that?
11      A.  I've tried to avoid that.  And, Brad,
12  just to be clear, we've had other people that have
13  wanted to cohost.  And I've tried to rotate it so we
14  don't have a consistent cohost, because I prefer not
15  to have a consistent cohost.
16      Q.  Why is that?
17      A.  Well, I like to record it every day, and
18  I don't want to be dependent upon somebody that
19  doesn't want to record every day.
20      Q.  Has Dr. Zoellner ever cohosted with you?
21      A.  Yeah.  Well, he would do, at the peak --
22  and again, you'd have to go look at the uploads, but
23  at the peak, I think he would do two or three days a
24  week of the five to seven shows we'd do.
25      Q.  When you say "peak," what do you mean by

Page 25

7 (Pages 22 - 25)

1  that?
2      A.  Well, there was a flow in his life, a
3  time in his life, where he would record -- you know,
4  he was available more, two or three days a week.  And
5  then there was a time in his life where he's
6  available, like right now, zero days per week.
7      And our friendship remains, but it's not
8  a transactional thing.  We just both do it because
9  it's something we enjoy doing.
10     Q.  Okay.  So when you say "at the peak," you
11  just mean at the -- at the time when he -- when
12  Dr. Zoellner was most available for that purpose?
13     A.  Right.  Yes, sir.
14     Q.  Okay.  Does he ever advise you on topics
15  for the show or for subject matter?
16     A.  No.  He shows up, and then I'll typically
17  bring up the topic, and he'll pontificate about that.
18     Q.  And where do you get topics for the show?
19     A.  Typically, from phone calls with
20  listeners.
21     Q.  And so you just keep a running list of
22  those and revisit in subsequent episodes?
23     A.  Yeah.  I mean, I'll just give an example.
24      Yesterday, I spoke to a lady who has
25  somebody in their family that wants to start a window

Page 26

1  tinting company, and she wanted to know how to do
2  that.  So as soon as we wrap up today, I'm going to
3  record a show about window tinting.
4     Q.  And do you -- how do you know about
5  window tinting?
6     A.  Growing a business has always been very
7  easy for me.
8     Q.  But as far as the specific topic matter,
9  is there any topic you feel you're not qualified to
10  discuss?
11     A.  Well, if you look at the facts, and you
12  gather those facts, then I think you can comment on
13  something.
14      But if you don't have facts, and you
15  don't have information you can offer of value, then
16  you don't cover it, at least in my case.
17     Q.  So I take it, then -- or have you been
18  collecting facts on the window tinting industry, just
19  to run with this example, since you heard from this
20  woman yesterday?
21     A.  Well, there's a proven path if you're
22  going to operate a window tinting business or an
23  auto-wrap business.  And so I've coached businesses,
24  and it's a very analogous path if you're going to be
25  an auto-wrapper or a window tinter or a sign company.

Page 27

1  It's very similar.
2     Q.  All right.  When did the -- when did
3  the -- well, let's take a look at another document
4  here.
5      I will show you what we will mark as
6  Exhibit 30.
7      (Deposition Exhibit 30 was marked.)
8     Q.  Okay.  Do you see this document,
9  Mr. Clark?
10     A.  Yes.
11     Q.  Okay.  So what we're looking at here,
12  this is another document we pulled from the Oklahoma
13  Secretary of State's office.  This indicates a filing
14  of a trade name, and the submission date at the top
15  there is October 18 of 2021.  It indicates that the
16  registration of the trade name the ThriveTime Show
17  under the Make Your Life Epic LLC sort of umbrella
18  there.
19      Do you see that?
20     A.  Yes, sir.
21     Q.  Can you tell me, why did you ultimately
22  decide to file the trade name under Make Your Life
23  Epic?
24     A.  I think you have to ask my wife.
25     Q.  Okay.  Why would I need to ask her for

Page 28

1  that?
2     A.  Because I don't know that I wanted to do
3  that or didn't want to do that.
4     Q.  Okay.  So does she make decisions with
5  respect to the sort of corporate structure or the
6  organization of the different entities that you run?
7     A.  If it's a big decision that's going to
8  affect our family's future, we typically talk about
9  it.  So I'm sure at some point she brought this up.
10     Q.  Do you recall the conversation that led
11  to the filing of this trade name report?
12     A.  I do not.
13     Q.  And we've discussed you have -- you run
14  several other businesses alongside Make Your Life
15  Epic.  Well, do you -- maybe I didn't ask that
16  question.
17      Do you still run all those businesses
18  that you mentioned before?
19      You mentioned DJ Connection, the bridal
20  show, and various others.  As you sit here today --
21     A.  I don't have involvement --
22     MR. QUINN:  Let him finish.
23     Q.  (BY MR. KLOEWER)  Sorry.  I'm rambling a
24  bit as well.
25      As you sit here today, which other

Page 29

8 (Pages 26 - 29)

1 businesses, aside from Make Your Life Epic, do you
2 play an active role in running?
3     A.  Well, what I do is, with our consulting
4 clients, of which we have over a hundred at any given
5 time, what I like to do is coach the clients down the
6 proven path, and then I receive a small percentage of
7 their revenue to help them grow.
8     Q.  Are you identified as an officer or
9 manager of any of those entities?
10     A.  I try not to be, as a rule.
11     Q.  Okay.  It's a slightly different answer
12 than my question.
13         Are you listed as an officer or manager
14 of any of those companies, despite your efforts not to
15 be?
16     A.  I think on the Make Your Dog Epic I am
17 listed as an officer right now.
18     Q.  Okay.  What is Make Your Dog Epic?
19     A.  It's a dog training company, and we're
20 not yet in Colorado.
21     Q.  All right.  Anything else -- what about,
22 for example, you know, DJ Connection, the bridal show,
23 are those still occurring, or are those --
24     A.  I sold those --
25     Q.  -- still active entities?

Page 30

---

1     A.  -- businesses --
2         MR. QUINN:  Go ahead.  Just make sure he
3 finishes up his question.  It's okay.
4     Q.  (BY MR. KLOEWER)  So are you still
5 involved with those companies?
6     A.  No.
7     Q.  Are there any companies that -- that you
8 own and manage that you're actively involved with
9 other than Make Your Life Epic?
10     A.  I do not want to mislead you, so I'm
11 trying to recall.  And I'm not a person that does well
12 operating without notes.
13     Q.  As you sit here today, can you recall any
14 other companies that you own and manage actively as of
15 April 2024?
16     A.  You have Make Your Dog Epic.  You have
17 Make Your Life Epic.  You have the Reopen America LLC.
18 And you have Clark Holdings.
19     Q.  So it sounds like over time, you've sort
20 of shifted your focus more to business coaching rather
21 than active business management yourself.
22         Is that a fair assessment?
23     A.  There's one more company that I need to
24 mention, Elephant in the Room Men's Grooming Lounge is
25 a haircut chain that I run.

Page 31

---

1     Q.  Do you still own or run that entity?
2     A.  Yes.  I do.
3     Q.  All right.  Okay.  So just to return to
4 my original question, it sounds like your focus over
5 time has shifted to being more of a coaching -- to
6 coaching other businesses rather than running your
7 own; is that fair?
8     A.  No.
9     Q.  No.  How much of your time would you say
10 you dedicate -- if you had to guess or to sort of
11 segregate on a percentage basis, how much of your time
12 would you say you spend coaching other businesses
13 versus running your own business?
14     A.  Well, it depends on what the business
15 needs for that week.  So this week in particular, I'm
16 spending a lot of time on Elephant in the Room; but
17 last week, I wasn't as much.
18     Q.  So on an average basis, is it a 50/50
19 split between your time running your own businesses
20 versus coaching others, or is it a different split?
21     A.  You know, Mr. Brad, to be very just
22 honest and transparent with you, I don't have a
23 percentage because it varies from week to week so
24 much.
25         But just as an example, for the Elephant

Page 32

---

1 in the Room, we had one of our stores broken into
2 about two months ago.  And then that became my myopic
3 focus was fixing that door, replacing that door, and
4 making sure that my staff felt safe and then finding
5 who actually committed the crime.  And so that was the
6 entirety of that week.
7         And then this week, I'm focusing on
8 staffing for Elephant in the Room and bringing on a
9 couple new stylists that I want to recruit.
10         And so it does change quite a bit week to
11 week.
12     Q.  Understood.  So it sounds like at a
13 minimum, though, you're still -- you're still hosting
14 the podcast for at least an hour a day; is that fair?
15 At least one episode --
16     A.  I typically do the podcasts in between
17 things.  So if I have a client that does not show up
18 for a meeting, or I have a canceled appointment, then
19 I typically record my podcast during those gaps.
20     Q.  I see.  And the podcast itself, do you
21 have advertisers on the podcast?
22     A.  Right now, we consistently recommend or
23 tell people about the ReAwaken Tour, and then we tell
24 people about Andrew Sorchini with Beverly Hills
25 Precious Metals.  We tell people about Mike Lindell

Page 33

---

9 (Pages 30 - 33)

1 and My Pillow.  And we tell people about Dr. Mark
2 Sherwood and Sherwood.tv.
3     Q.   And are those paying advertisers,
4 Mr. Sorchini and Lindell and Sherwood that you
5 mentioned?  Are they --
6     A.   They're all affiliate driven, so it's --
7 you don't get paid anything unless somebody actually
8 buys something.
9     Q.   So that's like a percentage share?
10        For example, if somebody buys a My
11 Pillow, and they put in your promo code, you collect a
12 profit off that, for example?
13     A.   Yes, sir.
14     Q.   But the actual -- the airtime, the space,
15 My Pillow isn't paying you for that; is that correct?
16     A.   That is correct.
17     Q.   And is that a similar arrangement that
18 you have with the other entities you just mentioned?
19     A.   Yes.
20     Q.   And over the nine years that the
21 ThriveTime Show has -- or eight or nine years, as
22 you've described, it has been in business, have you
23 had paid advertisers during that time?
24     A.   We had one organization called Medi-Share
25 that wanted to advertise with us.  And I just recall I

Page 34

1 documentary.  So FlynnMovie.com.
2     Q.   So correct me if I'm wrong, but it sounds
3 like you're more comfortable with the -- that sort of
4 advertising arrangement where you collect a portion as
5 opposed to selling dedicated airtime; is that fair?
6     A.   That is correct.
7     Q.   And does the ThriveTime Show -- well, let
8 me see.
9        Have you ever advertised for any of Joe
10 Oltmann's entities on the ThriveTime Show?
11     A.   To the best my knowledge, no.  And as a
12 rule, I don't like to take advertisement dollars in
13 exchange for airtime.  So I believe as a rule, no.
14 But I don't believe -- I don't believe I have done an
15 affiliate with him either.
16     Q.   Does the name PIN Business Network mean
17 anything to you?
18        Are you familiar with that entity?
19     A.   The name PIN Business Network was first
20 introduced to me when the name Joe Oltmann was first
21 introduced to me.
22     Q.   Have you ever referred clients or
23 potential clients to PIN Business Network?
24     A.   To the best of my knowledge, no.
25     Q.   What about DCF Guns?

Page 36

1 don't like the idea of someone buying your time
2 because then I have to say what they want me to say.
3 And therefore, I let them know within a 30-day window
4 that it wasn't a good fit.
5     Q.   Have you had any of these other sort of,
6 I believe you described them as, affiliate
7 relationships, like you just described with Sherwood
8 and Lindell, where you -- you could potentially
9 collect a portion of any sales attributed to your
10 show?
11        Has that arrangement -- have you had
12 those previously?
13     A.   Yes.
14        There's a company called Grid Down Chow
15 Down.  It's a meat that's freeze-dried.
16        There's another meat-related affiliate,
17 but I cannot recall the name of the company.  A guy by
18 the name of Jason Nelson ran the organization.  Jason
19 Nelson.
20        And then there's a man by the name of
21 Jason Dean -- Jason Dean -- who offers supplements and
22 nutritional products.
23        There is Dr. Stella Immanuel.  So
24 Dr. Stella Immanuel.  It's DrStellaMD.com.
25        And then General Flynn released his new

Page 35

1        Are you familiar with that entity?
2     A.   DCF Guns?
3     Q.   Douglas County Firearms is the -- what
4 the acronym --
5     A.   To the best of my knowledge, no.  But I'm
6 trying to think.
7        There was a couple -- there was a couple
8 that wanted to do an affiliate with us, and they ran a
9 gun dealership.  They were in a West Coast state.  But
10 I don't think they ever sold anything.
11     Q.   But as far as -- as far as DCF, you don't
12 have any recollection of working with them?
13     A.   I'm just thinking through it right now.
14 But I -- there's a couple in the West Coast, Mr. Brad.
15 I don't know the state.  They're on the West Coast.
16 And they wanted to do an affiliate with us, but nobody
17 bought anything.
18        MR. QUINN:  Hey, Brad, can you take down
19 the exhibit so we can see you?
20        MR. KLOEWER:  Oh, sure.  Sorry.  Yep.
21        MR. QUINN:  That's no problem.  Thanks.
22        MR. KLOEWER:  Tired of looking at the --
23 yeah.  Sorry.
24        MR. QUINN:  If you're done with it.
25 That's all right.

Page 37

10 (Pages 34 - 37)

| | |
|---|---|
| 1      MR. KLOEWER:  Yeah, no worries. | 1    guest, for example, or what's the percentage look |
| 2      Q.  (BY MR. KLOEWER)  Okay.  What about a | 2    like? |
| 3   company called PiDoxa?  Are you familiar with PiDoxa? | 3      A.  Again, being very aware that I'm speaking |
| 4   It's P-i-D-o-x-a. | 4    under oath, just be very honest, I don't know that |
| 5      A.  That does not sound familiar. | 5    percentage.  So I don't want to mislead you. |
| 6      Q.  Have you ever discussed -- has | 6      But I feel as though many of the shows I |
| 7   Mr. Oltmann ever proposed providing any sort of | 7    record, I don't have a guest on those shows.  But |
| 8   platform management for you for your website or any | 8    you'd have to just look through the shows to -- you |
| 9   sort of technical expertise? | 9    know. |
| 10      A.  We had a meet-and-greet event, Brad, at | 10      Q.  You described a minute ago -- I think you |
| 11   one of the events.  And he said in passing, Hey, if | 11    described it as an industrial complex of folks that |
| 12   you ever want me to host your website, let me know. | 12    send you referrals or try to get people on your show. |
| 13      And I think that's as far as that | 13      A.  Yeah. |
| 14   conversation went. | 14      Q.  Can you be a little more specific on |
| 15      Q.  You weren't interested in having him do | 15    that?  Who are these referral sources? |
| 16   that? | 16      A.  Well, I don't know them specifically, but |
| 17      A.  Yeah, I try not to do business with | 17    there's a lot of PR firms, or public relations firms. |
| 18   anything unless it's been proven to work, and I've got | 18    So the way it works is that an author will have a new |
| 19   a comfort level with it.  And I feel like GoDaddy | 19    book, and that author will want to get on your show to |
| 20   hosting has always been reliable for me, and so I felt | 20    talk about the book.  And so that's that industrial |
| 21   no need to switch because I had that comfort level. | 21    complex.  It's the author has an agent. |
| 22      Q.  I see.  All right.  I want to talk about | 22      And that was very heavy when I was doing |
| 23   the sort of show mechanics a little bit.  We've | 23    just business-related shows, which, for the record, I |
| 24   discussed some already to an extent.  But I'm curious | 24    prefer to just do business shows.  So that was very |
| 25   about how you go about -- we discussed topics, but | 25    heavy then, because you have these publicists that |
| <div align="right">Page 38</div> | <div align="right">Page 40</div> |
| 1   what about guests? | 1    want you to interview their author. |
| 2      How do you identify guests for your show? | 2      Q.  And how are these folks contacting you? |
| 3      A.  There's one of three ways, typically. | 3      A.  Typically get an email.  That's typical. |
| 4      So one would be there's just people I | 4    They'll email.  And they'll say, Such-and-such is the |
| 5   know, and I think it would be great to hear their | 5    award winner of this, the award winner of that, and he |
| 6   story.  So I've interviewed pastors of churches I've | 6    wrote a new book about this; would you have 15 minutes |
| 7   gone to, people that run local businesses I'm | 7    to interview them? |
| 8   interested in, that sort of thing. | 8      Q.  And what email address are you getting |
| 9      The second is there's sort of an | 9    those referrals at? |
| 10   industrial complex where the speaker will have a | 10      A.  Founder@thrive15.com. |
| 11   booker.  They'll reach out to me and say, Do you have | 11      Q.  And maybe -- forgive me if I mentioned |
| 12   any interest in interviewing this guest? | 12    this before when we talked about companies you still |
| 13      And then there's the third, where | 13    have an active role in owning and managing. |
| 14   somebody introduces them to me.  Someone says, Wow, | 14      Is Thrive15 one of those? |
| 15   you should introduce this -- you should have this | 15      A.  Yes. |
| 16   person on your show. | 16      Q.  Okay.  And so people are reaching out to |
| 17      Q.  So sometimes you find people, sometimes | 17    that entity.  Are they contacting you directly, or do |
| 18   people find you, and sometimes people are referred to | 18    you have a sort of receptionist or somebody who reads |
| 19   you. | 19    through those emails and says, Maybe you should take a |
| 20      Is that a fair summary of how you | 20    look at this one and . . . |
| 21   identify folks for your show? | 21      A.  Let me answer it succinctly but just |
| 22      A.  Yes, sir, Mr. Brad. | 22    explain to you the timeline briefly. |
| 23      Q.  How frequently do you have guests on your | 23      Today, I make all the decisions on who's |
| 24   show as sort of a -- I don't know if you would be able | 24    on my show. |
| 25   to answer that.  But do you try to always have a | 25      There was a window of time in the middle |
| <div align="right">Page 39</div> | <div align="right">Page 41</div> |

<div align="right">11 (Pages 38 - 41)</div>

1 there somewhere where a man by the name of Jonathan
2 Kelly, who preferred to communicate under the pen name
3 Michael Peters, wanted to be involved in that role.
4       And then there was a time before Jonathan
5 where I did it all myself.
6       And so I prefer doing it all myself.
7       Q.  So those communications are all coming to
8 you directly, and you sort of read through them and
9 decide which folks you would like to interview?
10       A.  That is correct.
11       Q.  How do interviews -- do you typically --
12 how do you prepare for an interview with somebody you
13 haven't met?  Do you have a meet-and-greet with them
14 beforehand to sort of --
15       A.  I --
16       Q.  -- decide what to discuss?
17       A.  I try not to.
18       Jerry Seinfeld and I share the same world
19 view.  We try not to do a preshow so it feels more
20 real.  And so I learned that by watching Jerry
21 Seinfeld.  So I like to do it right there on the spot,
22 so I don't like to do a lot of offline banter.
23       Q.  Do you ever exchange topics or sort of
24 foreshadow what you'd like to discuss with somebody?
25       A.  That happens from time to time.

Page 42

1       Q.  Are there circum- -- are there reasons
2 why that would happen with some guests and not with
3 others?
4       A.  Well, with the shows right now, in the
5 last four years, three years, I feel like more guests
6 are leery of what you're going to ask them, and more
7 hosts are leery of what the guests are going to say.
8 So I think that has been a dynamic in the last three
9 or four years that's a little bit new that wasn't as
10 heavy in the past.
11       Q.  Is it -- has your own practice changed
12 with conducting interviews to do more due diligence on
13 the front end, then?
14       A.  On the back end I do a lot more due
15 diligence now.  So I try not to record a show live.
16 And then after I record the show, I like to go back
17 and listen to the show and ask myself, Should this
18 show be aired?
19       Q.  What criteria are you applying when you
20 make that assessment?
21       A.  My Biblical world view.
22       Q.  Okay.  And you apply that across the
23 board to all interviews that you conduct?
24       A.  I really, really tried to do a better job
25 discerning every show I do.  So every show I do, I try

Page 43

1 to do a better job of discerning from a Biblical world
2 view.
3       Q.  What is your Biblical world view?
4       How would you describe that?
5       A.  I believe the Bible is literal.  I
6 believe God is Alpha and Omega, the beginning and the
7 end.  And I believe the only way to achieve eternal
8 life is through having Jesus Christ come into your
9 heart and to forgive you of your sins.
10       Q.  The Ten Commandments, for example, you
11 take those --
12       A.  I do believe in the Ten Commandments.  I
13 believe the Ten Commandments are the aim which, as a
14 Christian, I should aspire to aim for.
15       Q.  So when you are assessing whether an
16 interview should be published or not, you're applying
17 this sort of -- your understanding of the Bible to
18 whether that publication -- I'm struggling to
19 understand.
20       Give me an example of when you have not
21 aired an interview after conducting that assessment.
22       A.  Well, I'll give you an example.
23       Years ago, we interviewed a man who was
24 talking about how Google was going to create an AI
25 that would have the power of God.

Page 44

1       Q.  And you determined you didn't want to air
2 that interview?
3       A.  I did not air that interview.
4       Q.  Okay.  And why exactly -- is it that you
5 didn't want to get that message out?  Is it that you
6 didn't support the work he was doing?
7       What exactly was the -- the reasoning
8 behind that?
9       A.  I believe that the technology that was
10 being created and discussed on my show was fulfilling
11 the mark of the Beast, and I did not want to be a part
12 of celebrating the Revelation, Chapter 13, Verse 16
13 through 18, Beast technology.
14       Q.  Any other examples you can think of where
15 you determined that an interview wasn't fit to
16 publish?
17       A.  Yeah.  And again, I'm being -- I'm --
18 we're doing this deposition, and so I also don't want
19 to bring up people that have no connection to this
20 case, so I'm just giving examples.
21       But I've had people on my show who claim
22 to be an insurance agent, and then I found out they
23 were not an insurance agent.  So I contacted them and
24 said, What you said today is not true.
25       And they said, You're right.

Page 45

12 (Pages 42 - 45)

1    And so I didn't air it.  I didn't post
2  about it online.  Didn't attack them, didn't tell
3  anybody.  But I just didn't air it.
4    Q.  So when you find out that something is
5  false, you -- you don't publish that sort of material?
6    A.  That is my aim.
7    Q.  And in that instance that you just
8  described, it sounds like you do research after the
9  interviews you conduct to determine whether the
10  information presented is accurate or not?
11    A.  My goal is before the show to know who
12  the person is and to see if their background checks
13  out; and then after the show, see if what they said is
14  accurate.
15    Q.  So you don't do any fact-checking of the
16  substance prior to the show; you do that afterwards?
17    A.  Typically.
18    Q.  Okay.  And your -- your front end is
19  limited to investigating the individual and their
20  background?
21    A.  Yes.  And I don't know, Brad, if you'll
22  find this to be funny in a deposition, but this is how
23  it is.  There are people that will say they were pro
24  athletes, and you'll find that they did not play
25  professional sports.  And so you just don't interview

1  just based on how you've described your role in this.
2  But do you have any written standards for the show as
3  to when, for example, a retraction should be issued?
4    A.  No, sir.
5    Q.  Okay.  Do you have written standards for
6  the show as far as, you know, what -- what sort of
7  investigation needs to be conducted before inviting
8  someone on?
9    A.  No.
10    Q.  Okay.  These are just your own practice
11  standards that you've developed over time?
12    A.  Yes, sir.
13    Q.  And -- and do you have any sort of
14  research team?  Do you have anybody you rely on to
15  say, Hey, can you look into this person, they're going
16  to come on next week, but I don't have time for it, or
17  anything like that?
18    A.  No.
19    Q.  Okay.  So you're the -- you are the sole
20  determining factor of what gets published on the show
21  and what does not?
22    A.  I'm the sole determining factor of what
23  gets inter-- what gets aired.
24    Q.  You mentioned before that you no longer
25  do the live interviews, that you edit them afterwards.

1  them, and that's as far as you go, you know.
2    And then you have -- so I just try to do
3  basic research, Google search, is this person a pro
4  athlete, is this person a business owner, did they win
5  that award, et cetera, and then interview them and
6  then analyze what they said and see if it's worthy of
7  being broadcast.
8    Q.  And that's a determination you make
9  between the time of the interview and the time of
10  publication?
11    A.  That's correct.
12    Q.  Have you ever published an interview and
13  found out after the fact that the information in that
14  interview was inaccurate?
15    A.  To my knowledge, this is the first
16  situation now where the information I've said on a
17  show has been contested.  So I've never had, you know,
18  someone reach out to me and say the content I put on
19  my show isn't true; therefore, I should take it down.
20  Outside of this current situation.
21    Q.  So you've never issued a retraction or an
22  apology or anything of that nature for content that
23  you published?
24    A.  To my knowledge, no.  I have not.
25    Q.  And I think I know the answer to this

1    What do you -- what do you -- well, do
2  you do that editing process yourself personally?  Are
3  you --
4    A.  Yes.
5    Q.  -- familiar with video technology and
6  things to cut and clip the film?
7    A.  I edit everything myself.
8    But just to be super clear, with the
9  radio show we did, they would air it as a live show,
10  but I did not record the show live.
11    Q.  Okay.  And so when did you start -- when
12  did you stop doing live interviews in preference of
13  these sort of edited ones?
14    A.  I have done maybe half a percent.  I'd
15  say a third of a percent of my shows, approximately,
16  have ever been live.  So 99.7 percent have not been
17  live.  I really don't like doing live shows.
18    Q.  What's the reason for that?
19    A.  Well, theoretically, it would reduce the
20  probability of conversations like this.
21    Q.  Okay.  Okay.  Because the editing process
22  allows you to determine if the material you're
23  publishing is true or not.
24    Is that what you mean?
25    A.  That's accurate.  And also, you have Zoom

13 (Pages 46 - 49)

Page 50

```
 1  glitches.  I'll just give you a fun example.
 2          When I interviewed Ben Carson and when I
 3  interviewed Dr. -- or Dr. Ben Carson and Wolfgang
 4  Puck, when I interviewed Wolfgang Puck, his audio kept
 5  cutting out.  And so, you know, English is his second
 6  language.  And to show respect for Mr. Wolfgang Puck,
 7  I had to go through and put parts together so that it
 8  made a cohesive statement and just removed things when
 9  the glitches were pretty bad.
10          And with Dr. Ben Carson, the same thing.
11      Q.  What else are you editing for when you go
12  through that process?
13          Obviously, as you just described, you
14  know, smoothing out the recording and removing
15  glitches, but is there anything you try to remove
16  before publication?
17      A.  Pretty much just glitches.  Pretty much
18  just glitches.  I'd say, you know, 99.9 percent of the
19  issues are just glitches, little audio snafus.  I was
20  a disc jockey.
21      Q.  Do you make substantive edits at all?
22      A.  Occasionally.
23      Q.  And what -- what sort of stuff would you
24  edit out on a substantive basis?
25      A.  Okay.  I interviewed a guy by the name of
```

Page 51

```
 1  Bruce Clay, who is known as the father of search
 2  engine optimization.  And he was talking about
 3  hypertext markup language and title tags and meta
 4  descriptions.  And during the interview, he
 5  accidentally misspoke and said the word keyword
 6  instead of html or something like that.  This was
 7  years ago.
 8          And so in talking to him, he said, Hey,
 9  by the way, if you could take that part out or fix
10  that, that would be great.
11          And so it's just little things like that
12  to honor the guest if they misspoke, that kind of
13  thing.
14      Q.  What about profanity, things like that?
15          Do you -- do you screen for that?
16      A.  You know, I try to.  I really do try to,
17  Mr. Brad.
18      Q.  Do you have a rule on your show about
19  that, where -- I mean, obviously, on a podcast format,
20  you can say whatever you like.  Do you advise guests
21  how you prefer they speak, or is it not an issue for
22  you?
23          MR. QUINN:  Object to form.
24          Go ahead and answer.
25      A.  I try to tell the guests not to curse on
```

Page 52

```
 1  my show, but most of the guests I interview on my show
 2  don't curse.
 3      Q.  (BY MR. KLOEWER)  What happens if you
 4  have an interview where somebody does?
 5          Do you go back and bleep that out, or do
 6  you leave it?
 7      A.  I bleep it.  I add in Ninja crane-kick
 8  sounds.  I do something where it is funny, in my
 9  opinion.
10      Q.  I see.  And as far as fact-checking it,
11  you described a little bit that process.  You know,
12  you mentioned finding out somebody wasn't an insurance
13  agent.
14          What do you do -- what does the
15  fact-checking process look like?  Do you listen and
16  try to identify statements of fact and confirm if
17  those are true, or what is your -- what is your
18  process for that?
19      A.  Well, I'll do an example with Wolfgang
20  Puck and Dr. Ben Carson, just because those are two we
21  talked about.
22          So Wolfgang Puck's career is incredible,
23  and I was sort of new to discovering his career.  So I
24  knew that he was a celebrity chef.  I knew he had
25  written a book.  But I didn't know about his
```

Page 53

```
 1  childhood.
 2          And so for Wolfgang Puck, I really poured
 3  a lot of time into researching him.  And that's not
 4  normal, but I was really excited to have him on the
 5  show.  And there's a lot of things that he -- I just
 6  wanted to be really educated to a level that met the
 7  gravity of the interview, in my mind.
 8          And then we look at Dr. Ben Carson.  He
 9  had -- he has a career filled with multisyllable words
10  that I couldn't pronounce.  So, you know, when you're
11  talking to somebody who's going to use the phrase
12  "epidemiologist" or talking about neurology, I wanted
13  to know a little bit about that person beyond just
14  some basic facts.
15      Q.  But as far as confirming that what, you
16  know, Mr. Puck or Mr. Carson said on the episode was
17  factually accurate, did you do anything like that in
18  those instances to say, you know, did he actually go
19  to this medical school that he described, or did he
20  really start this restaurant?
21      A.  I try to verify as much as I can before I
22  put out a show out.  My show exists to provide a free
23  speech platform, very similar to maybe a less-viewed
24  Joe Rogan podcast.  So I try to let people share their
25  information.
```

14 (Pages 50 - 53)

1     But I'm also one man, and I choose to run
2 it that way, and so there's limitations to the amount
3 of research I can do.
4     Q.   And after you've edited an interview, do
5 you keep the outtakes from --
6     A.   I do not.
7     Q.   No.  Does that all just sort of go to the
8 chopping room floor at the time of the edits, or do
9 you house them for a certain amount of time?
10     A.   There's a book called Think and Grow
11 Rich, and there's another book called Seven Habits of
12 Highly Effective People.  And I really like those two
13 books.
14     And Seven Habits of Highly Effective
15 People, one of the principles is touch it once.  So I
16 try to touch it once and move on.  So once I edit it,
17 I try to just move on.
18     Q.   I see.  Have you ever tried to have
19 anybody do any fact-checking for you, or do you rely
20 exclusively on yourself for that process?
21     A.   I have had people that have wanted to
22 fact-check for me, and I have not wanted them to
23 fact-check.
24     Q.   Why not?
25     A.   I prefer to work alone on my podcast,

Page 54

1     A.   Well, in my office, you know, we'll have
2 young men, young women, old men, old women, that'll
3 say, Hey, I'd love to -- because I think doing a show
4 is kind of exciting for certain people.  And they'll
5 say, Hey, I'd like to help you on the show.
6     And I try to let them know, Hey, I
7 appreciate you, but I don't want anybody to help me on
8 the show.
9     Q.   Is there a reason why people have offered
10 fact-checking services in particular?
11     A.   It's not fact-checking.  People want
12 to -- Mr. Brad, they want to help produce; they want
13 to help edit; they want to help supply show ideas;
14 they want to -- and I just -- I'm not interested.
15     Q.   You mentioned before that this case is
16 the first time where somebody has taken issue with
17 something you've published.
18     Do you have anybody that works for you
19 that sort of does like legal compliance, oversight
20 work, to -- to take a look at your publications before
21 they go out?
22     A.   No.
23     MR. QUINN:  Object to form.
24     Q.   (BY MR. KLOEWER)  And what I just mean by
25 that, I mean, have you ever gotten, for example,

Page 56

1 probably in the way the standup comedian prefers to be
2 on the stage by themselves.  I think there's a certain
3 authenticity that a listener will have, and I just
4 don't like to delegate that.
5     MR. QUINN:  Brad, we've been going about
6 an hour.  We don't need to take a break right now.
7 Why don't you just find a natural break point in your
8 outline, and then we'll -- we'll take it then, if that
9 works for you.
10     MR. KLOEWER:  Sure.  Yeah, that's fine.
11     We can break now.  That's fine.  I've got
12 kind of a similar block for the next five or ten
13 minutes, but we can -- we can hop off now and come
14 back on --
15     MR. QUINN:  We can keep on going.  If you
16 want to just wrap up this block, that's fine with us.
17 That's -- I just wanted to bring it to your attention.
18 Keep going, and when you get to a block, we'll -- end
19 at something, we'll -- we'll be ready for the next
20 one.
21     MR. KLOEWER:  Sure.  I've got probably --
22 probably five more minutes here, so . . .
23     Q.   (BY MR. KLOEWER)  Okay.  You said that
24 people have wanted to fact-check for you.
25     Who has wanted to fact-check for you?

Page 55

1 copyright claims, copyright notice that you're
2 infringing on a copyright?
3     A.   Not to my knowledge.
4     Q.   Have you ever received a cease and desist
5 from anybody about something you've published on your
6 show?
7     A.   Not to my knowledge.
8     Q.   And obviously, you interview a lot of
9 entrepreneurs and businesspeople.  Have you ever
10 received notice about, you know, false advertising,
11 false product claims, anything of that nature?
12     A.   Not to my knowledge.
13     Q.   When you talk about your due diligence
14 that you do on these things, does that include
15 ensuring that claims made about products may be
16 accurate or supportable?
17     A.   Well, I'll just use an example.
18     My Pillow mattress, we sleep on the
19 mattress; and so, therefore, I feel like I can talk
20 about it confidently.
21     But like the slippers, I don't wear the
22 slippers.  And so some people like the slippers; some
23 people don't.
24     But it's sort of a promo code
25 environment, so I don't hard pitch that you have to

Page 57

15 (Pages 54 - 57)

1 buy from this thing. I just present it as an option.
2     Q. Understood.
3     So it sounds like, if I understand you
4 correctly, this is the first retraction demand you've
5 ever gotten. And you've received copies of our
6 retraction demands that we've served on you; is that
7 correct?
8     MR. QUINN: Object to form.
9     If you can answer that without discussing
10 what you discussed with counsel, go ahead and do so.
11 And if you can't, just -- then don't answer.
12     A. I guess not answer.
13     Q. (BY MR. KLOEWER) Okay. Who decides
14 whether a retraction is issued or not?
15     Is that solely your decision?
16     MR. QUINN: Object to form.
17     Go ahead and answer.
18     A. Well, this is the first time, I believe,
19 that I've been asked to retract something. So this is
20 the first time I'm having this discussion.
21     Q. (BY MR. KLOEWER) And so it's -- has been
22 your decision not to retract the claims?
23     MR. QUINN: Object to form.
24     If you can answer that question without
25 revealing discussions with counsel, please do so.

Page 58

1 Otherwise, don't answer.
2     A. No answer.
3     MR. QUINN: Brad, you're frozen. Maybe
4 this is a good time for a break. Oh, you're back.
5 Now you're back.
6     MR. KLOEWER: Yeah. I think we froze up
7 there for a moment.
8     (Discussion off the record.)
9     MR. QUINN: Brad, just so you're aware, I
10 don't know when you froze up. I gave him the --
11 counseled attorney-client privilege admonition.
12     And so his answer in response to that is
13 no answer; he can't.
14     MR. KLOEWER: Understood.
15     MR. QUINN: Thank you.
16     MR. KLOEWER: I think we can break there.
17 We'll take -- how long do you want? 10, 15 minutes?
18     MR. QUINN: Five or ten -- five is fine
19 with us.
20     Is five fine with you?
21     Five is fine with us.
22     MR. KLOEWER: All right.
23     We'll hop back on at 10:16.
24     THE VIDEOGRAPHER: All right. Off
25 record. 11:11 a.m.

Page 59

1     (Recess taken, 11:11 a.m. to 11:19 a.m.)
2     THE VIDEOGRAPHER: We're back on record,
3 11:19 a.m.
4     Q. (BY MR. KLOEWER) All right, Mr. Clark,
5 we're back on the record here.
6     I wanted to discuss your -- the different
7 platforms that you publish on and how you track those
8 metrics a bit.
9     So can you tell me, where all is the
10 ThriveTime Show published?
11     A. I put it -- when I record a show, I put
12 it up on Rumble, and then I put it up on Twitter or X.
13 And then I put it up on BitChute, which is an
14 interesting name, B-i-c-t-h-u-t-e [sic].
15     I put it up on -- there's like an
16 aggregator where I upload it to, and then it goes out
17 to other platforms.
18     But through the censorship process, I
19 can't really put out most of my shows on YouTube
20 anymore or LinkedIn or platforms like that.
21     Q. And this aggregator you mentioned, is
22 that a separate third-party service that you use to
23 get your podcasts to other outlets?
24     A. Yeah. And I set it up many years ago,
25 and I think it's called Podbean, but I'm not exactly

Page 60

1 sure. I don't recall what that is.
2     I think it's Libsyn. L-i-b-s-i-n [sic],
3 Libsyn. And I think Libsyn sends some of the content
4 to Podbean. I think that's how it works.
5     Q. Is that -- is that the means by which
6 your show appears on Apple Podcast, for example?
7     A. Well, Apple, most of the subjects that --
8 I would say half of the subjects I'm talking about
9 today on my show, you can't put out on iTunes.
10     Q. Well, your show is still on -- available
11 on Apple Podcasts, correct?
12     A. Absolutely. But I do business shows
13 primarily. That's where I -- that's my focus. That's
14 what I like to do is business shows.
15     So half the shows can go out on Spotify
16 and iTunes and that place. And then the other half
17 can't.
18     Q. And are you attempting to publish them
19 all, and some of them are being sent back?
20     Or how does that happen that some of them
21 make it and some of them don't?
22     A. I no longer -- I've given up on the
23 idea of trying to upload any geopolitical shows to
24 iTunes or Spotify.
25     Q. Okay. So that's a -- you're

Page 61

16 (Pages 58 - 61)

1  self-selecting for topic matter for what you're --
2  what you're sending to the sort of aggregator, what
3  you think they won't send -- send back?
4      A.  And that's after receiving what they call
5  a strike, I think, on iTunes, or a warning on Spotify,
6  that sort of thing.
7      Q.  So the selection of shows I could find on
8  my iPhone, for example, those are just your business
9  shows that you have forwarded to that service on an
10 understanding those won't be rejected.
11     Am I understanding you correctly?
12     A.  Yes.
13     Q.  Okay.  But the others, the other content
14 that addresses, I believe as you described it,
15 geopolitical content, those ones you're uploading
16 yourself onto these third-party platforms like Rumble,
17 X, BitChute, any other --
18     A.  Yes, sir.
19     Q.  Okay.  And how many strikes did you get
20 before you made this determination that you needed to
21 start self-screening your content?
22     A.  I don't recall how many strikes I got.
23 But I do remember, Mr. Brad, that I did get removed
24 from LinkedIn, and I had large amounts of content
25 removed off of YouTube very early during that lockdown

Page 62

1  period, lockdowns, quarantines, curfews, that whole
2  COVID-19 area.
3      Q.  And what was the purpose, as you
4  understood it, for those removals at the time?
5      A.  I believe, to the best of my knowledge, I
6  was discussing hydroxychloroquine and that
7  hydroxychloroquine could be used to treat people that
8  tested positive for COVID-19.
9      Q.  And did you attempt to re-establish your
10 attempts on those platforms like LinkedIn and YouTube
11 after -- well, were you removed -- was your account
12 removed entirely or just specific publications?
13     A.  I believe on LinkedIn, my account was
14 removed entirely.
15     And then on YouTube, I believe I had lots
16 of content removed.
17     Q.  And have you attempted to re-establish
18 your LinkedIn account since then?
19     A.  I did yesterday, because, back to the
20 haircut business, we are running now-hiring ads, and I
21 need to advertise on certain platforms.  And
22 therefore, as of this morning, Mr. Brad, I have six
23 connections on LinkedIn.
24     Q.  Congratulations.  It's an exciting time.
25     MR. QUINN:  Hey, Brad, one of them is

Page 63

1  Charlie.
2      MR. KLOEWER:  Well, I -- congratulations
3  to Charlie as well, then.  It's an exciting morning
4  for all of us.
5      Q.  (BY MR. KLOEWER)  So -- okay.  And as far
6  as YouTube, your account is still up, but much of your
7  content has been removed?
8      A.  Yeah, a lot of content -- again, it's
9  hard to have a business that's open if it's forced to
10 be closed.  So when they were talking about closing
11 businesses, they specifically, the World Health
12 Organization, CNN, even conservative governors,
13 Democrat governors, health officials, they were
14 talking about the lockdowns.  I wanted people to know
15 that the models that said 2.2 million people had died
16 from COVID were in error, that the polymerase chain
17 reaction tests could be misinterpreted to inflate
18 cases, and that COVID was treatable using
19 hydroxychloroquine.
20     For whatever reason, that content was not
21 liked by many of the platforms.
22     Q.  And do you still publish content to
23 YouTube, your business-focused content?
24     A.  I do.  Primarily client testimonials and
25 business-related shows.

Page 64

1      Q.  And have you ever gotten a strike, as you
2  described it, for election-related content from any of
3  these platforms?
4      A.  Not to my knowledge.  But I think I
5  earned my strikes before the election.
6      Q.  So you -- by the time of the election,
7  you were no longer publishing on platforms that were
8  removing your content?
9      A.  To the best of my knowledge, I had
10 stopped attempting to upload content to places that
11 had shown they didn't want the content.
12     Q.  What do you do to track your engagement
13 numbers on these various platforms?
14     Do you keep tallies of which -- where
15 you're getting the most traffic, for example?
16     A.  I don't do that.  I'm not really into the
17 numbers.  But on the public-facing side, like on
18 Rumble, as an example, it will show you how many
19 subscribers you have.
20     Q.  But as far as view counts, do you track
21 those to see, you know, how many people watch, you
22 know, the Tour event, for example?
23     A.  Well, as an example, Mike Adams from
24 Brighteon called me after the first event we did in
25 Tulsa and said there were millions of people that were

Page 65

17 (Pages 62 - 65)

1  watching on his platform. But I don't actively seek
2  that number out.
3      Q.  Doesn't that concern you, how much
4  engagement you're getting?
5      A.  Well, I know that I don't listen, and my
6  wife doesn't either, and certain people I know do. So
7  I record the shows because I enjoy it, like the guy
8  who likes to carve ducks likes carving ducks. I'm not
9  really concerned about the number of viewers.
10     Q.  Have you made -- so you're not actively
11  making efforts to attract new audience members, for
12  example?
13     A.  That's not a goal of mine.
14     Q.  Do you track engagement across any
15  platforms?
16         I mean, you can see view counts on
17  Rumble, for example. Do you -- do you keep an eye out
18  on where your podcast is at on Apple Podcast rankings,
19  anything of that nature?
20     A.  Well, when we were doing the business
21  show, that was something that was exciting. You could
22  watch the business show on the iTunes ranking.
23         But once they started censoring shows, I
24  sort of gave up on the idea of tracking anything at
25  all.

Page 66

1      And so when people buy tickets for the
2  ReAwaken Tour, ticket buyers were telling me, Hey, do
3  you know that your interview with Chad Prather from
4  the Blaze and Robert Kiyosaki, that number of views
5  never goes up?
6         And so that's the reason why I don't
7  track, because it's not a thing I believe you can
8  actually track and -- accurately track.
9      Q.  (BY MR. KLOEWER) Is there any platform
10  you believe does produce accurate results of how many
11  people are viewing your content?
12     A.  Well, I've just given up on the idea of
13  tracking altogether.
14     Q.  Okay. Let's -- let me share my screen
15  here.
16         (Deposition Exhibit 31 was marked.)
17     Q.  Okay. Do you see this document,
18  Mr. Clark?
19     A.  Yes.
20     Q.  And it strikes me this may be a little
21  small for you. Is that better?
22     A.  Yes.
23     Q.  Okay. This is what's been labeled as
24  Defendant Make Your Life Epic LLC doing business as
25  ThriveTime Show's Verified and First Supplemental

Page 68

1      Q.  Does -- the business podcast is -- I
2  would think is a driver for your other business at
3  Thrive15; is that fair?
4      A.  It does tell people about Thrive15. Yes,
5  sir.
6      Q.  So do you make any effort to promote
7  Thrive15 through your podcasts?
8      A.  I do tell people about Thrive15 on the
9  podcast.
10     Q.  Okay. But you're not concerned about how
11  many people you're reaching with those messages?
12     A.  I am not concerned about how many people
13  I'm reaching those platforms.
14     Q.  Let's take a quick look here. Let me
15  pull up a document just to confirm a few things here.
16     A.  While you're pulling that up --
17         THE DEPONENT: Ms. Kirsten [sic], I just
18  want to put this on the record as an example for
19  Mr. Brad here.
20     A.  I did a show on the Chad Prather podcast
21  on YouTube, which is a Blaze Network show. And I did
22  an interview on Robert Kiyosaki's podcast, which is
23  called the Rich Dad Poor Dad podcast. And on both of
24  those podcasts, the number of viewers got capped at a
25  certain number.

Page 67

1  Objections and Responses to Plaintiff's Second Set of
2  Written Discovery Requests.
3         Long title there.
4         This is a document that was produced to
5  us on April 11.
6         Do you recognize this document,
7  Mr. Clark?
8      A.  I do not recognize this document.
9      Q.  Okay. I'll scroll down. It might
10  refresh your memory a bit.
11         MR. KLOEWER: Sorry. Kirsten, I've
12  labeled this as Exhibit Number 31.
13     Q.  (BY MR. KLOEWER) So we'll scroll down
14  here. We sent over to you a number of written
15  discovery requests for answers to specific questions
16  or requests for production of documents. And these
17  are the answers to some of those questions. So I just
18  wanted to address a couple of those for you -- or with
19  you.
20         So one of the first things we asked was
21  to identify every individual responsible for
22  producing, publishing, or uploading content created by
23  ThriveTime to these different platforms. We indicated
24  a few of them: Rumble, YouTube, Telegram, Truth
25  Social, X, and the ThriveTime Show.

Page 69

18 (Pages 66 - 69)

1    Your response to that was that "Clay
2  Clark edits and" upholds -- "uploads video content."
3    And there are a few other individuals
4  responsible for streaming content. We see Cadi
5  Buskirk, Havana Clark, and "short term clerical
6  employees."
7    Can you tell me, Cadi, is that a -- is
8  that Ms. Buskirk? Is that a female name?
9    A.  Yes.
10   Q.  And what does Ms. Buskirk do as far as
11 uploading your content?
12   What's her role?
13   A.  When I edit a show, and I record it up
14 to -- I upload it to Rumble myself, to X myself, to
15 Telegram myself.
16   And then from there, she will grab those
17 shows and, from time to time, put them up on different
18 platforms. But it's a thing where I typically record
19 more shows than anybody can keep up with. So it goes
20 back to my core thing where I like to do everything
21 myself. But she helps do that.
22   And then if we're doing a live event, she
23 currently -- if I host a live church service -- so
24 every Thursday, I'm not the pastor, but Pastor Leon
25 Benjamin comes in to teach the word of God at our
Page 70

1  a church who I had never met before, just a random
2  church attendee, and they said, Oh, I love your new
3  interview with John Maxwell. And they didn't know
4  that I recorded that years ago.
5    So I always put out -- because I have so
6  many shows.
7    Q.  And these short-term clerical employees
8  here, who are you referring to there?
9    Are these interns or --
10   MR. QUINN:  Brad, let me -- let me
11 interject here, and I can explain why we did this.
12   These are some high school students that
13 do summer -- hourly summer work, and we're
14 uncomfortable in disclosing their names.
15   MR. KLOEWER:  That's all the response I
16 need to that, then.
17   MR. QUINN:  Okay. Thank you.
18   If we need -- if you want to talk more
19 offline, we're happy to do so. But I think that gives
20 a perspective to it.
21   MR. KLOEWER:  That -- that's fine. This
22 is -- I'm just trying to be sure I am aware of
23 everybody that's doing this. But if it's high school
24 kids doing a summer job, that's fine by me.
25   Q.  (BY MR. KLOEWER) I want to scroll down
Page 72

1  office on Thursdays. And she will stream those
2  events.
3    Q.  So when you're -- when you're out in
4  front of the camera, she's sort of behind it getting
5  things uploaded when you can't do that yourself; is
6  that fair?
7    A.  Yes. Yes.
8    Q.  And then Havana Clark, what role does she
9  play in that process?
10   A.  That's my wonderful daughter. And she
11 does the same role as the short-term clerical
12 employees.
13   So she'll grab content that I have
14 recorded, you know, a year ago or a month ago or a day
15 ago and put that on various platforms.
16   Q.  And for what reason would you be going
17 back to pull old content to republish?
18   A.  Well, I put out content at a rate much
19 faster than people can consume it.
20   Q.  So that's just to allow people an
21 opportunity to catch up and see things they may
22 have -- may have missed previously?
23   A.  Yes. And as a brief example, I did an
24 interview with John Maxwell many, many years ago. And
25 I re-put it out recently. And I ran into somebody at
Page 71

1  here and look at these requests for production on the
2  topic of tracking the metrics.
3    So we also requested a number of
4  documents from you through requests for production.
5  And one of them is that we requested all documents --
6  this is Number 7 under Requests for Production. We're
7  on page-- what are we on here -- 8 of this exhibit.
8    We asked for the documents describing,
9  tracking, or quantifying the ThriveTime Show's content
10 on these different platforms.
11   And we've just discussed this; I just
12 want to confirm. So you don't house any sort of
13 records of how many viewers the show is getting on --
14 across any platform?
15   A.  Correct. And again, the reason why I
16 don't track it is that I don't believe the numbers are
17 accurate.
18   Q.  So we have a similar question here for
19 Number 9.
20   We asked for those same documents,
21 including streaming counts, page views, download
22 counts, with respect to interviews conducted with Joe
23 Oltmann. And you produced the same response, that you
24 don't track any of those metrics across any platform.
25   Is that accurate with respect to the
Page 73

19 (Pages 70 - 73)

1  Oltmann interviews as well?
2      A.  That is accurate.
3      Q.  And the last one I wanted to address on
4  this topic is down here, Number 14, documents
5  reflecting any revenue that ThriveTime collects as a
6  result of publication of content by the Tour.
7          The Tour -- you know, when you watch
8  the Tour's videos on Rumble, sometimes you'll have ads
9  pop up.  I presume the Tour is collecting revenue from
10 those ads.
11         Am I mistaken in that?
12     A.  Well, the way Rumble works is when you
13 log on to your dashboard, it will show you your
14 earnings for the month.  And again, I know I'm being
15 deposed, so I'm going to be very accurate, but I don't
16 know the numbers.  It's around $300 a month.  And
17 that's because Rumble is not monetized to the extent
18 that YouTube is.
19     Q.  So do you track the revenue that you
20 collect on Rumble or . . .
21     A.  Well, when you log on to upload a video,
22 it will show you in the top right your earnings.  And
23 so I see it, but it's not something that I spend a lot
24 of time on.
25     Q.  What about X?  Do you have a verified

Page 74

1  account there?  Do you collect revenue from your
2  publications there?
3      A.  I do not collect any monetization from X.
4      Q.  Okay.  You mentioned BitChute.  Is there
5  a -- is that account monetized?
6      A.  I do not collect any monetization from
7  BitChute.
8      Q.  Podbean, Libsyn, do you collect any
9  revenue from those publications?
10     A.  I do not collect any revenue from those
11 publications.
12     Q.  So that sort of $300 number you mentioned
13 speculating to for -- for Rumble, how do those
14 payments work?
15         Do they send you a check every month for
16 whatever you collected, or do you have to
17 affirmatively seek payment?
18     A.  It's a direct deposit situation.
19     Q.  So it's -- so every -- does that mean
20 every ad that plays on one of your shows, you get a
21 dollar or two put in your bank account, or . . .
22     A.  No.  I'll upload a bunch of shows -- and
23 I'm just trying to give you examples.  But, you know,
24 today, I'm uploading a show about dedollarization.
25 And when I do, it'll have a thing at the top right

Page 75

1  that shows your earnings as of now.  And then you
2  can -- almost like you can claim cash back on a credit
3  card, you can claim your earnings now.  And it is
4  approximately $300 per month.
5      Q.  All right.  So once a month you go in
6  there and say, I'd like my $300, please, and cash out,
7  or is that --
8      A.  That's accurate.  Yeah.
9      Q.  Okay.  I'll put this document away here.
10         When did the podcast begin to shift its
11 topic matter?
12         We discussed before how, you know, the
13 title of the podcast is Without B.S., which you
14 describe as religion or politics.  Obviously, that's
15 no longer the case.
16         When did the podcast begin to start
17 discussing these topics?
18     A.  When the discussion about lockdowns
19 became topical in the news, I had the working thesis
20 that it's hard to have a business that's open if
21 you're forced to be closed.
22     Q.  So we're talking spring of 2020; is that
23 fair?  About March, April of 2020?
24     A.  To the best of my knowledge, yes.
25     Q.  Had you ever discussed political or

Page 76

1  religious topics on the podcast prior to that time?
2      A.  I had interviewed pastors in the past.  I
3  am a person who is of faith.  I believe in Jesus.  So
4  that would come out from time to time during shows.
5  But I really stri-- tried to stay away from anything
6  related to religion or politics.
7      Q.  Did you consider yourself a politically
8  active or politically minded person prior to this
9  time?
10     A.  No.  I've been un-- equally unimpressed
11 with Republicans and Democrats.
12     Q.  Were you a supporter of former President
13 Trump when he ran for office in 2016?
14     MR. QUINN:  Object to form.
15     Go ahead.  Go ahead and answer.
16     A.  Ben Carson is who I wanted to win.  And
17 so that's who I wanted to win.
18         And then when Ben Carson lost to
19 President Trump, and President Trump emerged as the
20 candidate for the Republican party, I decided to vote
21 for him, although it was a reluctant vote, in 2016.
22     Q.  (BY MR. KLOEWER)  But by 2020, it sounds
23 like your enthusiasm for former President Trump had
24 increased; is that fair?
25     MR. QUINN:  Object to form.

Page 77

20 (Pages 74 - 77)

1     Go ahead.
2     A.  I saw that President Trump had revised
3 the economy and had lowered taxes.  And so he had
4 earned my respect and/or admiration by making the
5 economy vibrant.
6     Q.  (BY MR. KLOEWER)  So your political sort
7 of shift really came in conjunction with the COVID
8 lockdowns.
9     Did you begin focusing on other political
10 topics at the time as well, or were you primarily
11 focused on COVID?
12     A.  Well, there's a book by Klaus Schwab
13 called the Great Reset.  And the Great Reset involves
14 a great reset of the way in which we live.  And so I
15 have been consistently pushing back against Klaus
16 Schwab's Great Reset.
17     Q.  And when did you read that book?
18     A.  I don't know the specific date in which I
19 read the book, but I had read Klaus' book -- Klaus
20 Schwab's book called the Fourth Industrial Revolution,
21 and I had seen other topics or talks he had given at
22 the World Economic Forum that were disturbing.
23     Q.  Why did you begin reading content from
24 Mr. Schwab?
25     Was it recommended to you, or how did

Page 78

1 that come about?
2     A.  Well, I, around 2016, 2017-ish, began
3 hearing more conference attendees asking me, Hey, what
4 do you think about this Klaus Schwab guy; what do you
5 think about the World Economic Forum?
6     And at that point, I wasn't really
7 thinking about Klaus Schwab or the World Economic
8 Forum.  So I began to look into it more.  And then I
9 found since 1971, he's been leading this organization
10 called the World Economic Forum.
11     Q.  So you made the determination at this
12 time to start publishing podcasts about the World
13 Economic Forum as well?
14     A.  Yes.  The World Economic Forum is the
15 organization driving much of the chaos that we see in
16 the world today.
17     Q.  When did you start covering religious
18 topics?
19     A.  When I decided World Economic Forum is
20 the human manifestation of the Antichrist agenda.
21     Q.  And when did you discover that?
22     A.  While researching the World Economic
23 Forum.  Sorry to be circular.
24     Q.  Okay.  So at some point in this process,
25 you determined that -- well, you decided that you

Page 79

1 would start doing religious podcasts as well?
2     A.  Yeah.  I feel like that my research was
3 reaching an -- about the World Economic Forum was
4 reaching an apex at the time that the lockdowns were
5 being imposed.
6     Q.  And what is the Antichrist agenda as it
7 relates to the World Economic Forum?
8     A.  Klaus Schwab has said that the fourth
9 industrial revolution isn't so much about changing
10 what you do for a living; it's about changing you
11 through gene editing.  And he said that during a
12 Charlie Rose interview.
13     And then Yuval Noah Harari -- Yuval Noah
14 Harari -- he has said that COVID makes surveillance go
15 under the skin during his New York Times interview.
16 He has said that humans are hackable animals, "he"
17 being Yuval Noah Harari.  He has suggested that we
18 should rewrite the Bible using AI.
19     So he, Yuval Noah Harari, and Klaus
20 Schwab are putting forth this agenda.
21     Q.  Agenda to turn humans into something
22 other than human?  Is that the Antichrist agenda?
23     A.  Well, I think you would have to ask Klaus
24 Schwab, who I know is not available today, but in his
25 book, he lays out the Great Reset agenda.  And then

Page 80

1 they say -- Klaus Schwab says during interviews, he
2 also calls this the fourth industrial revolution,
3 which he says is not so much about changing what you
4 do for a living but changing you through gene editing.
5 Klaus Schwab.
6     Q.  So at some point during this spring and
7 summer of 2020, as you're growing concerned about the
8 COVID -- about COVID-19 and the Antichrist agenda from
9 the World Economic Forum, at some point, you develop
10 concerns about the integrity of the 2020 election; is
11 that fair?
12     A.  Well, I was gaining concerns for what
13 looked to be an attempt to take away people's ability
14 to vote in a fair and balanced way.
15     Q.  So you were concerned that the election
16 results would not be accurate even before the election
17 occurred?
18     A.  I was concerned about the idea of doing
19 mail-in ballots and ballot harvesting, and I continue
20 to be concerned about it.  And today, I'm concerned
21 about ballot harvesting by either Republicans or
22 Democrats.
23     Q.  Did you publish any podcasts prior to the
24 election warning that the election would be rigged?
25     MR. QUINN:  Object to form.

Page 81

21 (Pages 78 - 81)

```
 1        Go ahead and answer.
 2     A.  I don't recall doing that.  I know that
 3 my focus was on making sure that America's businesses
 4 could be open, because the models that said
 5 2.2 million people had died from COVID were in error,
 6 and the polymerase chain reaction test, PCR tests,
 7 could be misread to inflate cases.  And at that point,
 8 COVID was treatable with budesonide, ivermectin, and
 9 hydroxychloroquine.
10     Q.  (BY MR. KLOEWER)  You mentioned ballot
11 harvesting before.
12        How do you define that term?
13     A.  It's a term that I keep hearing people on
14 the right and the left discuss that they need to
15 harvest ballots and get additional ballots from people
16 that would otherwise not vote.
17     Q.  So you understand ballot harvesting is
18 encouraging people to vote who wouldn't otherwise?
19     A.  Well, examples would be a woman is
20 elderly, and she's in a nursing home, and was this
21 person coerced to vote Republican or Democrat.
22     Q.  So that would be an example of ballot
23 harvesting is an elderly person submitting a ballot?
24     A.  Another example would see footage where
25 people are stuffing large amounts of ballots into a
```
Page 82

```
 1 ballot drop box, drop-off zone or spot.
 2     Q.  Okay.  So it sounds like you're
 3 describing a variety of different conduct that sort of
 4 falls under the umbrella of what you understand to be
 5 ballot harvesting?
 6     A.  I don't claim to be a ballot harvesting
 7 expert, but I do think it's a smart idea that if --
 8 Mr. Brad or Mr. Clark, if we want to go vote, we
 9 should bring an ID, and we should vote, and we
10 shouldn't do a mail-in ballot.
11     Q.  But suffice it to say prior to the
12 election, your concerns about these different
13 practices led you to doubt that the election results
14 would be accurate.
15        Is that a fair assessment?
16        MR. QUINN:  Object to form.
17        Go ahead and answer.
18     A.  I was very concerned that America had
19 been locked down, quarantined, and curfewed and that
20 nonvoting -- that not voting in person was becoming
21 normal.
22     Q.  (BY MR. KLOEWER)  Okay.  That's not
23 exactly my question.
24        Before the election occurred, you didn't
25 believe that the results could be trusted, correct?
```
Page 83

```
 1        MR. QUINN:  Object to form.
 2     A.  I don't know that I believed that.  I
 3 just had concerns about the Great Reset.
 4     Q.  (BY MR. KLOEWER)  How does the 2020
 5 election -- how is the Great Reset relevant to the
 6 2020 election?
 7     A.  Well, Joe Biden was the keynote speaker
 8 at the World Economic Forum in 2016, where Joe Biden
 9 was to be invited to be the keynote speaker about
10 mastering the fourth industrial revolution.
11     Q.  Okay.  Do you believe that Joe Biden is
12 attempting to -- I'm trying to recall how you
13 described the Great Reset -- attempting to change
14 human bodies to something other than what they
15 currently are?
16        Is that your fear?
17     A.  Well, Klaus --
18        MR. QUINN:  Object to form.
19        Go ahead and answer, please.
20     A.  Klaus Schwab says that the Great Reset
21 doesn't so much -- he says -- Klaus Schwab says the
22 fourth industrial revolution doesn't so much change
23 what you're doing for a living as much as it changes
24 you through gene editing.  That's what Klaus Schwab
25 says.  And Klaus Schwab invited Joe Biden to be the
```
Page 84

```
 1 keynote speaker at the World Economic Forum in 2016 to
 2 discuss mastering the fourth industrial revolution.
 3     Q.  (BY MR. KLOEWER)  So it's your belief
 4 that Joe Biden wants to further this process of gene
 5 editing, and that's why the 2020 election is related
 6 to this Great Reset?
 7     A.  It is a fact that Klaus Schwab invited
 8 Joe Biden to be the keynote speaker to speak on the
 9 topic of mastering the fourth industrial revolution,
10 also known as the Great Reset.  So it would be likely
11 that Joe Biden and Klaus Schwab have had that
12 discussion.
13     Q.  Okay.  And that's why -- that's why you
14 were concerned about the 2020 election results is that
15 you believed that this conversation had occurred
16 between Klaus Schwab and Joe Biden relating to gene
17 editing?
18     A.  Well, I know that Klaus Schwab invited
19 Joe Biden to be the keynote speaker at the World
20 Economic Forum to talk about mastering the fourth
21 industrial revolution.  So I'm of the opinion if
22 you've been invited to give a talk, keynote, about
23 mastering the fourth industrial revolution, you
24 probably know something about it.
25     Q.  As you sit here today, is it your belief
```
Page 85

22 (Pages 82 - 85)

Page 86

1 that the 2020 election was rigged?
2     MR. QUINN: Object to form.
3     Go ahead and answer.
4     A. I believe that it could have been rigged.
5     Q. (BY MR. KLOEWER) Okay. That's not my
6 question.
7     Is it your belief that it was rigged, yes
8 or no?
9     MR. QUINN: Object to form.
10     You don't have to answer yes or no. You
11 can give the answer you like.
12     Counsel, you can't do that. You can't do
13 that.
14     So object to form.
15     A. It could have been.
16     Q. (BY MR. KLOEWER) What credible evidence
17 have you seen that the election was rigged?
18     A. I try to document all my findings at
19 TimetoFreeAmerica.com. And there's a button there
20 where you click it, the 2020 election fraud. And any
21 evidence that I've found to be credible, I've put it
22 there.
23     Q. What's the most credible evidence that
24 occurs to you as you sit here today that the 2020
25 election was rigged?

Page 87

1     A. I don't know that I could answer that
2 question. But I do know that all my facts supporting
3 my concerns with the election have been documented
4 there at TimetoFreeAmerica.com on the election fraud
5 button.
6     Q. So as you sit here under oath, you can't
7 identify any specific evidence that you deem to be
8 credible evidence the election was rigged?
9     MR. QUINN: Counsel, are you asking this
10 in his individual capacity or in his corporate
11 capacity?
12     MR. KLOEWER: Well, we're going to get to
13 the Oltmann interview here. I'm just --
14     MR. QUINN: So this is an answer of
15 ThriveTime, an entity?
16     MR. KLOEWER: Well, maybe -- let me get
17 through the next line of questioning first, and
18 we'll -- we'll circle back to this topic.
19     Q. (BY MR. KLOEWER) Did you believe the
20 election was rigged in the days immediately following
21 the election?
22     MR. QUINN: Object to form.
23     Is this -- are you asking on behalf of
24 the entity or on behalf of his personal capacity?
25     MR. KLOEWER: Well, I'm asking on behalf

Page 88

1 of the entity because I want to get to the Joe Oltmann
2 interview.
3     Q. (BY MR. KLOEWER) Let's talk about Joel
4 Oltmann. When did you first meet Joe Oltmann?
5     A. I don't know the date, but I know it had
6 to have been before the first interview, and I do know
7 I was introduced to him by Ann Vandersteel.
8     Q. Ann Vandersteel. Who is that?
9     A. She is an independent investigative
10 journalist.
11     Q. And did she introduce you to him
12 personally?
13     A. She called me -- and again, it's been a
14 couple years -- but she called me and said that he is
15 an award-nominated entrepreneur, and that he has been
16 gathering information related to election integrity.
17     Q. And did she then connect you to him
18 personally, or did you reach out to him, or how did
19 that process work?
20     A. Most people in my life tend to group text
21 me, so they'll text three people on a text. You know,
22 they'll text and say, Clay, meet Joe; Joe, meet Clay.
23 Something like that.
24     Q. And that's what occurred here?
25     A. I believe so.

Page 89

1     Q. Okay. And presumably that third person
2 being Ann Vandersteel saying, Meet Joe?
3     A. Yes. As I sit here today, that -- I
4 believe that's true.
5     Q. Did you do any research into
6 Ms. Vandersteel's claims to see what she was talking
7 about?
8     A. Well, Ms. Vandersteel said, Hey, there's
9 a gentleman that owns, I believe, 12 patents related
10 to election technology. And this person, his name is
11 Eric Coomer.
12     And to which I said, I know. Something
13 to that effect.
14     And she said, You know?
15     I said, Yeah, I've researched patents and
16 who owned various patents.
17     And she said, Well, there's a guy who
18 knows a lot about him, and if you'd like to interview
19 him, I think he could really let you into the mindset
20 of this person.
21     Q. So you had researched election technology
22 patents prior to your conversation with
23 Ms. Vandersteel?
24     A. Yes.
25     Q. Why?

23 (Pages 86 - 89)

1    A.   Well, it's kind of like the World
2  Economic Forum and the Great Reset.  I just had
3  researched who was at the top of the World Economic
4  Forum, and that was Klaus Schwab, Yuval Noah Harari.
5  And I was looking into the elections, and I was
6  thinking, you know, if there's concerns about election
7  integrity, perhaps we should know who is involved in
8  the election integrity.
9        And at that time, it led me to finding
10  that the director of security and strategy -- I don't
11  want to get the title wrong -- was Dr. Coomer, who I
12  believe was a nuclear physicist or something.  And I
13  thought, Wow, that is impressive.  That's got to have
14  some intellectual capacity there.  I wonder what else
15  Dr. Coomer knows.
16        So that's how my research began.
17    Q.   And in your research, you concluded that
18  Dr. Coomer owns, I believe you said, 12 patents?
19    A.   I don't want to get the number wrong.  I
20  know we're under oath.  But I have them all documented
21  at TimetoFreeAmerica.com, all the patents that I could
22  find.
23    Q.   Okay.  And it's your understanding or
24  belief that he owns and controls those patents?
25    A.   Well, patent law is not something in

Page 90

1    A.   From Dr. Coomer's 2017, I believe,
2  presentation, it's when somebody goes to vote, and
3  you -- the machine can't ascertain who the voter
4  intended on voting for.
5    Q.   Okay.  And what is your understanding of
6  what role Dr. Coomer played in adjudication
7  technology?
8    A.   Well, all I can look at was the patents
9  and then what he had said during just a handful of
10  presentations like that.
11    Q.   Is it your understanding that he invented
12  adjudication?
13    A.   I've never said he invented adjudication.
14    Q.   Well, I'm trying to understand.  What
15  role do you think he played in development of that
16  technology?
17    A.   Well, if you have the patents for it, I
18  mean, I -- that's fairly impressive.  I think he would
19  know a lot about adjudication because he had the
20  patents.
21    Q.   So it's your understanding that he
22  patented the process of adjudication?
23    A.   Well, it's my understanding he has 12
24  patents related to election integrity.  Some of the
25  patent titles reference adjudication.

Page 92

1  which I'm an expert, but I understand that he's -- his
2  name is listed on the patents, and the earliest
3  patents I could find were like 2011, I believe, 2012.
4  Those kind of -- going back, I believe as far as 2011,
5  '12.
6    Q.   And what do those patents pertain to?
7        What sort of technologies do they
8  address?
9    A.   I don't have my notes in front of me.  So
10  I put them at TimetoFreeAmerica.com on the election
11  fraud button so you can see patents.
12        But there -- there's technology -- I wish
13  I had it in front of me so I could tell you the
14  patents.  I don't have the patents in front of me.
15    Q.   And do you have any sort of technical
16  training or expertise that would allow you to assess
17  the -- the purpose or function of those patents?
18    A.   Well, I found an interview -- or it
19  wasn't -- it was a presentation where Dr. Coomer was
20  explaining how adjudication worked, and I saw that he
21  had patents for adjudication.  And so that led me to
22  research, you know, what is adjudication; what does
23  that mean.
24    Q.   Well, what did you determine?
25        What is adjudication?

Page 91

1    Q.   Okay.  But as you sit here today, you
2  don't really know what those patents pertain to
3  specifically?
4    A.   I have never been shown by Dr. Coomer how
5  those patents are used.
6    Q.   And what, if anything, is problematic
7  about the adjudication process, in your view?
8    A.   I don't know enough about the
9  adjudication process to specifically articulate any
10  part of adjudication that's not done properly.
11    Q.   So you can't identify any reason to be
12  concerned about adjudication?
13        MR. QUINN:  Object to form.
14        Go ahead and answer.
15    A.   Well, Mr. Brad, this is how I would look
16  at it.  If Mr. Brad and Mr. Clay, we go in to vote,
17  and we fill out the oval, and then somebody else gets
18  to look at it on the screen, and they get to decide
19  who we meant to vote for, that could be a bad thing if
20  the person who is making that determination doesn't
21  agree with the intent of the voter.
22    Q.   (BY MR. KLOEWER)  Have you looked into
23  standards for adjudication as far as who adjudicates a
24  ballot?
25    A.   I have not looked into that.

Page 93

24 (Pages 90 - 93)

1    Q.  Okay.  Do you know if there are any state
2  or local rules that may apply to the adjudication
3  process?
4    A.  In the 2017 video I found, which I
5  documented at TimetoFreeAmerica.com, Dr. Coomer
6  explains there is state adjudication qualifications.
7  I believe that's the phrase he used.
8    Q.  But you haven't done any investigation
9  yourself beyond what Dr. Coomer stated in that video
10  to determine who oversees adjudication standards?
11    A.  I have not.
12    Q.  Do you know if those are controlled by
13  state or federal law or local law?
14    Do you have any idea?
15    A.  I do not.
16    Q.  Okay.  So Ms. Vandersteel suggested you
17  should take a look at this guy Joe Oltmann.  By the
18  time you made that connection, you had already done
19  some investigation of voting machine patents, it
20  sounds like.
21    Had you seen any of Mr. Oltmann's
22  interviews where he described his claims about
23  Dr. Coomer?
24    A.  No.
25    Q.  I'm going to show you what we'll mark as

Page 94

1    A.  Yes.
2    Q.  And what's his job title?
3    A.  I don't really do job titles, but I would
4  call him a Web guy.
5    Q.  Okay.  If we look at -- we've got one,
6  two, three, four, five, six, seven -- the fifth item
7  down here in this email says Title -- or "Call
8  Jonathan - BitChute the following video - Title - Joe
9  Oltmann (now banned from Twitter) exposes pro-Antifa,
10  cop hatred-inciting rants of Eric Coomer, Vice
11  President of Strategy/Security of Dominion Voting
12  Systems."
13    And the link here we can see is Twitter
14  is a Michelle Malkin status.
15    Have you ever watched the interview that
16  Michelle Malkin conducted with Joe Oltmann?
17    A.  I don't recall watching that.
18    Q.  Do you know Michelle Malkin?
19    Have you ever met her?
20    A.  I don't believe so.
21    Q.  Okay.  You've never interviewed her on
22  your show, for example?
23    A.  I don't believe so.  And, Mr. Brad, there
24  is one One America News reporter that had conducted an
25  interview with Joe Oltmann, I believe.  And I believe

Page 96

1  the next exhibit here.
2    (Deposition Exhibit 32 was marked.)
3    MR. KLOEWER:  Designate this as
4  Exhibit 32.
5    Q.  (BY MR. KLOEWER)  Mr. Clark, can you see
6  my screen there?
7    A.  Yes.
8    Q.  Okay.  This was a document that you
9  produced to us.  I hope I didn't put the exhibit stamp
10  over it.  It's Make Your Life Epic, Exhibit 000615.
11  This appears to be an email from you,
12  founder@thrive15, to Devin.Woolery@gmail.com, and this
13  is dated Thursday, November 26 of 2020.
14    Do you recognize this document,
15  Mr. Clark?
16    A.  It seems like -- typically when I send an
17  email, I don't send it as a screenshot like that.  I
18  typically send it where it's text that's not like in
19  that format.
20    Q.  Okay.  Well, tell me this:  Who is Devin
21  Woolery?
22    A.  He's a guy who works in my office who
23  uploads content to various websites for me when I need
24  to upload.
25    Q.  Does he still work for you?

Page 95

1  that's the only media feature that I had seen him
2  appear on.
3    Q.  Okay.  You're referring to Chanel Rion?
4    A.  Yes.  I believe that's who it is.
5    Q.  Okay.  Are you aware Dr. Coomer filed a
6  lawsuit against OAN and Chanel Rion?
7    A.  I was not aware he filed one against
8  Chanel Rion.  I did know that he filed one against One
9  America.
10    Q.  Okay.  And you're aware that both of
11  those -- well, both Rion and OAN have settled their
12  lawsuit with Dr. Coomer?
13    A.  I was not aware of that.
14    Q.  So it sounds like you sent these videos,
15  but you don't recall having watched them; is that
16  correct?
17    Or you just don't recall watching this
18  Michelle Malkin video?
19    A.  Well, the format where it came through as
20  like a screenshot like that doesn't look like how I
21  would normally send an email.
22    Q.  Okay.  But as you sit here today, do you
23  have any recollection of watching an interview with
24  Joe Oltmann and Michelle Malkin?
25    A.  I don't recall that.  But I do recall

Page 97

25 (Pages 94 - 97)

1  watching the one with the One America person.
2     Q.  Okay.  All right.  We'll put this away,
3  and I'm going to show you another document here.
4        I'm going to show you an email exchange
5  that was actually produced to us by Joe Oltmann.  Let
6  me get this tagged here first.  I'm going to mark this
7  as Exhibit 33.
8        (Deposition Exhibit 33 was marked.)
9     Q.  Okay.  Mr. Clark, do you see this
10 document?
11    A.  Yes.  If you could zoom in a little bit,
12 please.
13    Q.  Okay.  So we have a date at the top here
14 as December 16, 2020.  This is from your email address
15 to Lyn Duden.
16        Can you tell me, who is Lyn Duden, if you
17 recall?
18    A.  I don't know who Lyn Duden is.
19    Q.  Okay.  The email address there is
20 lduden@pinbn.com.
21    I'll just represent for you, it's our
22 understanding that Ms. Duden is Joe Oltmann's personal
23 assistant.  And as is the way with these threads, the
24 first page here is the last communication in that
25 thread.  You appear to be providing a Zoom link.
Page 98

1  4:22 a.m.  You sent this link, a Zoom link.  It has
2  the credentials.  And you state "Here's the Zoom link
3  and the questions."
4        Did you draft these questions yourself,
5  do you recall, as you look at them here today?
6     A.  Let me clarify this.  That email would
7  have been sent by an employee of mine by the name of
8  Jonathan Kelly, who was going by the pen name Michael
9  Peters because he has no interest in geopolitical
10 things.  So that's where the email would have been
11 sent.
12        Now, the questions themselves do look
13 like the kinds of questions that I would write if I
14 were to write questions.
15    Q.  Okay.  Do you -- is -- do you believe
16 that Mr. -- not Peters, pseudonym Peters, did he write
17 these questions?
18        Do you have any reason to believe he did?
19        MR. QUINN:  Object to form.
20    A.  I don't believe he wrote those questions.
21    Q.  (BY MR. KLOEWER)  Okay.  But you said
22 they seem to be the same format of questions that
23 you'd write for this type of interview?
24    A.  If I were to write questions in advance,
25 that's how I would have done it at that time, yes.
Page 100

1        I'm going to scroll down to page 6 of
2  this document so we can see where this exchange began.
3        And the first email that we have in this
4  thread from Mr. Oltmann is dated December 3 of 2020.
5  So that's -- if you recall, we just looked at an email
6  to Mr. Woolery on November 26.  So we're looking about
7  seven or eight days after that.
8        Ms. Duden writes "Good morning.  I am
9  following up on an email request for an interview with
10 Joe Oltmann.  Please let me know available times."
11        Do you recall getting this communication
12 from Ms. Duden?
13    A.  I don't.
14    Q.  Okay.  But it sounds like you reached out
15 to Joe for an interview; is that fair?
16    A.  I believe that Ann introduced us and
17 suggested that we should interview him.
18    Q.  Okay.  All right.  If we scroll up here a
19 little bit, we see a response from you shortly
20 thereafter that says "Give me any time and I will make
21 it work."
22        Ms. Duden provides a few possible dates
23 and times that same afternoon or that same morning.
24        I want to take a look at this email that
25 you sent on December 4, so this is the next day, at
Page 99

1     Q.  Okay.  And as we read through these, the
2  first "Joe, for your listeners who are not familiar
3  with your background, can you tell us a little bit
4  about your background?"
5        What was your understanding of
6  Mr. Oltmann's background at this time?
7     A.  He was introduced to me by Ms. Ann
8  Vandersteel and described as a award-nominated tech
9  entrepreneur.
10    Q.  Okay.  What awards was he nominated for?
11    A.  Something affiliated with Ernst & Young.
12    Q.  Okay.  Did you look that up to see if he
13 had, in fact, been nominated for any awards?
14    A.  I don't recall whether I did or didn't at
15 that time.
16    Q.  Okay.  And when you say "tech
17 entrepreneur," what type of tech was he involved with?
18    A.  I do not know.
19    Q.  Okay.  Well, correct me if I'm wrong.  It
20 sounds like we discussed previously your due diligence
21 process where you look into the individuals on the
22 front end.  It sounds like you didn't do that with
23 Mr. Oltmann in this case?
24    A.  Well, this was years ago, and so I didn't
25 want to mislead you into the level of research I did
Page 101

26 (Pages 98 - 101)

1 or didn't do. But I just know that he was described
2 to me as an award-winning tech entrepreneur. And I
3 had -- you know, so I did research, but it was very --
4 you know, I don't recall the depth at which I went
5 into it at that time.
6     Q. Did you know that he hosted a podcast
7 himself?
8     A. That was mentioned to me at some point,
9 but I wasn't a listener of the show.
10     Q. Did you know anything about his
11 organization, FEC United?
12     A. Well, when people request tickets to the
13 event, they text my cell phone number. So people
14 would often say comments like, Oh, you know, you
15 should check out this guy or that guy or this guy.
16         But we were on a very lean organization
17 on the ReAwaken Tour, so I talked to a lot of
18 different people, Mr. Brad, on the phone. So I do
19 remember vaguely people mentioning it.
20     Q. What research did you do into
21 Mr. Oltmann?
22         What do you recall knowing about him
23 beyond just that he is a tech entrepreneur?
24     A. I knew that he had found Eric Coomer's
25 Facebook posts, and they were the same Facebook posts

Page 102

1 that I had also found. And so I knew that. I knew he
2 was a tech entrepreneur. I knew he had done an
3 interview on One America.
4         But again, we're going back years, so I
5 don't remember if I knew that he did the interview
6 with One America before I interviewed him or
7 afterwards. I don't recall that.
8     Q. So you found Dr. Coomer's Facebook posts
9 independently of Joe Oltmann?
10     A. Yes.
11     Q. How did you do that?
12     A. I believe I was DuckDuckGo-ing. And then
13 I believe I was at one of the ReAwaken Tour events,
14 and somebody said, Hey, you should look into the
15 social media posts of Eric Coomer.
16         And so I began researching per the
17 recommendation of attendees at our conferences.
18     Q. Well, I'm a little confused by the
19 timeline here, because this email is from December 4
20 of 2020.
21     A. Okay.
22     Q. And as I understand it, the first
23 ReAwaken America Tour event happened in April of 2021,
24 about six months later, five months later.
25     A. Kind of. When the lockdown started, I

Page 103

1 began hosting every week town halls. And so it was a
2 town hall where people in the community of Tulsa could
3 come to the events and essentially share what was
4 going on during the peak of the lockdown and beyond.
5         And so we would have doctors and lawyers
6 and experts, and people would show up and were sharing
7 information because, if we go back in time, we were
8 largely locked down, and certain things couldn't be
9 shared on social media.
10     Q. So you're describing those town hall
11 events as being Tour events as well, or ReAwaken
12 events?
13     A. I categorize them as one and the same in
14 my mind.
15     Q. Okay. So it's your recollection that
16 somebody came to you at these events and told you to
17 look into Eric Coomer's Facebook posts?
18     A. Somebodies, plural. Multiple people had
19 mentioned it.
20     Q. And where did those Facebook posts come
21 from?
22     A. I believe the final grouping I got was
23 from Joe Oltmann, but I had found them myself by just
24 looking on DuckDuckGo.
25     Q. Okay. Who posted the Facebook posts that

Page 104

1 you found on DuckDuckGo?
2     A. I don't recall. I mean, that was, you
3 know, years ago. I just remember that we were coming
4 to these town halls, and people were -- themes that
5 kept being explained by attendees were, Hey, you know,
6 COVID is treatable with hydroxychloroquine. We had a
7 lot of doctors showing up in my world telling me about
8 that.
9         And then we had a lot of people that were
10 into election integrity talking to me about election
11 security and, Hey, did you know the guy that was
12 running the security and strategy for Dominion posts
13 troubling things on his Facebook?
14         And that's how I came to that
15 knowledge.
16     Q. Do you know who got access to
17 Dr. Coomer's Facebook account?
18     A. I do not.
19     Q. Do you know when they got that access?
20     A. I do not.
21     Q. Do you have any reason to believe that
22 the Facebook posts you saw were not the same Facebook
23 posts that Joe Oltmann published?
24     MR. QUINN: Object to form.
25         Brad, could you rephrase?

Page 105

27 (Pages 102 - 105)

1    MR. KLOEWER:  Yeah, I can rephrase the
2   question.  I can rephrase the question.  Sorry.  That
3   was a little awkward.
4    Q.  (BY MR. KLOEWER)  You said these Facebook
5   posts the same that Joe Oltmann had found.
6    What I'm trying to understand is, are you
7   sure you didn't just find what Joe Oltmann had already
8   published?
9    A.  Well, people were coming to me at these
10  events and were showing me, like, Look, you know, they
11  were showing me on their phone or printouts or these
12  kind of things.
13   Q.  Right.
14   A.  So it was consistent with what I kept
15  seeing.
16    But the one that was, Brad, the most --
17  the most concerning ones were where Dr. Coomer was
18  posting songs that appeared to be antipolice.  And so
19  those were the ones that were the most alarming to me.
20  And I just don't see a lot of people that post songs
21  on their social media that are antipolice.
22   Q.  Can you tell me why -- in these notes
23  here, we see a couple words here that are consistently
24  capitalized.
25    Why is Dominion capitalized throughout

1   this?
2    A.  I think Dominion was -- has been like
3   capitalized on other documents I've seen.
4    Q.  What about Antifa?
5    A.  Well, on the Eric Coomer -- or Dr. Coomer
6   Facebook posts, he actually signed one of his posts as
7   Antifa and signed it differently.  So I don't know how
8   to write Antifa.
9    Q.  Okay.  You're telling me you've seen a
10  Facebook post from Eric Coomer that he signed as
11  Antifa?
12   A.  Yes, it appears -- to the best of my, you
13  know, knowledge -- yeah, I put all my documentation
14  there, TimeToFreeAmerica.com.
15    But it appears that Dr. Coomer posted a
16  post on social media that indicated that he -- that
17  Antifa was an organization that you can't stop.  And
18  it was directed to -- it says something like An Open
19  Letter to the President or Dear President or something
20  like that, and then it talked about how Antifa isn't
21  something that you can stop.
22   Q.  You also see the word "voting"
23  capitalized here.
24    Why is that?
25   A.  I don't know.  But, again, I don't recall

1   sending this email.  So it could be -- I just don't
2   email a lot as a best practice.  I try not to email.
3    Q.  And same with "voter fraud."  You don't
4   know why you would have capitalized that?
5    A.  I don't.  But I don't -- I don't recall
6   sending that email.
7    Q.  Is it possible that you had highlighted
8   these -- or capitalized these words to -- to show the
9   focus of the interview that you intended to take?
10   A.  I don't believe so.  But, again, at the
11  risk of being redundant, I don't recall sending that
12  email.
13   Q.  Okay.  Look at Number 10 here.  It states
14  "So Joe, you went elk hunting . . . and then someone
15  sent you an article . . . what happened?"
16    What are you referring to about
17  Mr. Oltmann going elk hunting?
18   A.  I have no idea.  I don't recall writing
19  that, sending that, or discussing with him about elk
20  hunting.
21   Q.  Okay.  Well, are you aware that
22  Mr. Oltmann has claimed that he was elk hunting when
23  he had a recollection about having infiltrated an
24  Antifa call months prior?
25   A.  I don't recall that.

1    Q.  Okay.  I'm just trying to understand.
2   This is a very specific detail.  It strikes me that
3   you must have reviewed some prior interviews with
4   Mr. Oltmann to know about this fact.
5    A.  Let me walk you through the process,
6   Mr. Brad, of how I do just interviews in general.
7    If I wanted to interview you today,
8   Mr. Brad, I would say, Hey, can we get you on the
9   show; are there a handful of things you want to talk
10  about?
11    And I would usually take notes on paper,
12  jot down, and then I would say, Hey, let's book a
13  time.
14    That's my normal best practice, and I
15  would want to book that time myself.  But I just -- I
16  don't -- I don't recall sending this email.
17   Q.  Okay.  Does anyone else have access to
18  this email account other than Mr. --
19   A.  It's a community -- it's a community
20  email.  So the way it works is that Jonathan Kelly,
21  aka Michael Peters, would use that email.
22    And I like to keep my in-box down at zero
23  if I can.  And I tell everyone that I talk to, Please
24  don't ever email me, because I don't like emails.  So
25  I kind of treat mail, physical mail, and email the

1　same way.  I don't want them.
2　　　　And so the best practice at that time we
3　were doing -- at that time, I believe I'm correct --
4　was that if there was a guest who couldn't just over
5　the phone tell me what time they were available,
6　Jonathan, aka pen name Michael Peters, would go back
7　and forth with whoever it was to try to nail down a
8　time.
9　　Q.  You're not disputing or denying that you
10　sent this email, though, are you?
11　　A.  I don't believe I sent it, but I do
12　believe those questions look as though I wrote them.
13　But I do not recall anything related to elk hunting.
14　　Q.  Is there anyone else who would be using
15　this email account at 4:22 a.m.?
16　　A.  That would be Jonathan Kelly, who -- aka
17　Michael Peters, because every morning, we would
18　just -- you know, I do it to this day -- I want to get
19　my email down to zero.  So I want to get the in-box
20　down to zero.
21　　　　And then Jonathan, aka Michael Peters, he
22　had really very limited interest in this.  And just to
23　be super transparent, he did not want to, you know,
24　spend his day researching these topics.  So a lot of
25　times, he would just go back and forth.  Oftentimes he

Page 110

1　would hop on the phone with somebody's assistant and
2　talk to them about things.  Or, you know, they would
3　say, I can't do a 2 o'clock, maybe I could do 3:00; I
4　can't do 4:00, maybe I can do 5:00.  That kind of
5　thing; so . . .
6　　　　MR. QUINN:  Hey, Brad -- hey, Brad,
7　let's -- if you could wrap it up in another five
8　minutes or so, we'll take a five-minute break.  We've
9　been going a little more than an hour.  But within the
10　next five minutes if that works for you.
11　　　　MR. KLOEWER:  Sure.  Yeah.  Let me get
12　through this email thread here, and then we'll take a
13　break.
14　　　　MR. QUINN:  Sure.
15　　Q.  (BY MR. KLOEWER)  So you mentioned before
16　you jotted down some handwritten notes; you may have.
17　　　　Do you still have those notes today?
18　　A.  I don't.  I don't typically keep my
19　notes.
20　　Q.  Okay.  Let's look at -- so Number 10
21　references this article that someone sent to Joe
22　Oltmann.
23　　　　Did you ask him for the article?
24　　A.  Article?  Where is that?
25　　Q.  Number 10, it says "you went elk

Page 111

1　hunting . . . and then someone sent you an article."
2　　　　What happened?
3　　　　Do you know what article that is?
4　　A.  Honest to God, I don't recall that
5　discussion of an article or elk hunting.
6　　Q.  Okay.  Did Mr. Oltmann provide you a copy
7　of that article at any point?
8　　A.  I also don't recall receiving an article
9　about elk hunting.
10　　Q.  Okay.  Well, I don't think it's an
11　article about elk hunting.  It's someone sent him an
12　article, is what it indicates here.  But if you didn't
13　get it, then we can move on.
14　　　　Number 11, "What happened to the voting
15　systems in Georgia, and what was Eric Coomer's role in
16　this?"
17　　　　What is this question about?
18　　A.  And again, it's been multiple years, but
19　when talking to Joe Oltmann briefly over the phone, he
20　indicated that he had concerns about Dr. Coomer's
21　social media posts, and I did as well.
22　　　　And then as far as the specific voting
23　focus, my focus has always been more on the health,
24　freedom, and stopping the Great Reset.  So some of
25　those things.

Page 112

1　　　　It could have been a suggestion maybe on
2　a phone call where he said, Hey, make sure you mention
3　this.  Or, you know, Jonathan could have potentially
4　talked to whoever the booker was, and they might have
5　mentioned it.  But I don't recall specifically what
6　that was.
7　　Q.  So as you sit here today, you're not
8　aware of anything that happened with the voting
9　systems in Georgia or what Eric Coomer's role might
10　have been in that?
11　　A.  It hasn't been a big focus in my life.
12　No.
13　　Q.  Okay.  Number 13 says "My understanding
14　is that you actually signed an affidavit for Sidney
15　Powell's investigation into voter fraud . . . is that
16　correct?"
17　　　　Do you know if Mr. Oltmann did sign an
18　affidavit?
19　　A.  I don't know if he did.
20　　Q.  Did he ever provide you a copy of that
21　affidavit?
22　　A.  Anytime someone sends me a fact that's
23　cited, I try to put it on TimeToFreeAmerica.com.  So
24　if you can't find it there, it probably doesn't exist.
25　　Q.  Did you ask for the affidavit?

Page 113

1    A.  I don't recall, because the interview was
2  a long time ago.
3    Q.  Do you recall reading the affidavit or
4  any of its allegations?
5    A.  I don't recall.  There was a lot of new
6  people in my life at that time, a lot of new
7  conversations, and a lot of information being
8  presented on our -- and I was trying to provide a
9  platform for people to freely discuss ideas.
10    Q.  Well, the purpose of this interview
11  was -- was Oltmann's claims that he had overheard
12  Dr. Coomer claiming he had rigged the election, right?
13    A.  Well --
14    MR. QUINN:  Object to form.
15    Go ahead.
16    A.  -- if you listen to the shows I did with
17  him or -- I think you'll be able to hear what we
18  actually asked on the show, because it's, you know,
19  public record, I guess.  So whatever I asked him on
20  the show, I asked him.  But I don't necessarily -- I
21  don't recall sending this email.
22    Q.  (BY MR. KLOEWER)  Okay.  But at any point
23  in time, have you ever read the affidavit?
24    A.  I don't recall reading the affidavit.
25    Q.  Okay.  Were you in touch with Sidney

Page 114

1  Powell at the time?
2    A.  I've spoken to Sidney Powell on the phone
3  one time, on speakerphone, to discuss her speaking at
4  our very first event we did in Tulsa in April, I
5  believe, the first, you know, big event, the first
6  event beyond my office.  And it was for her to tell me
7  that she couldn't attend in person, but she would be
8  joining us via Zoom.
9    Q.  But as of November, December 2020, were
10  you in contact with her then?
11    A.  No.  No.
12    Q.  Number 15 here says "What do we do with
13  people that commit treason, sedition, and subversive
14  activities?"
15    Why is this included here?
16    A.  Well, the allegations that were being
17  made by Joe Oltmann at the time was that Dr. Coomer
18  had the ability to change election results through his
19  technology.
20    Q.  So why are we talking about treason here?
21    A.  Well, if you theoretically overthrew your
22  government by switching the votes, that would be
23  considered to be subversive activity, in my mind.
24    Q.  And why are you asking what we do with
25  people that commit treason?

Page 115

1    A.  Well, I think the listeners out there
2  were asking, you know, if we have the votes being
3  switched, what happens.
4    Q.  Well, what does happen to people that
5  commit treason, Mr. Clark?
6    A.  I don't know.
7    MR. QUINN:  Object to form.
8    Go ahead and answer.
9    A.  I don't know.
10    Q.  (BY MR. KLOEWER)  Well, you attached a
11  link here to a U.S. code section.
12    Do you recall doing that?
13    A.  I don't recall doing that.
14    Q.  Do you know what the punishment for
15  treason is?
16    A.  I do not.
17    Q.  I'll ask that one more time since we're
18  under oath here, Mr. Clark.
19    Do you know what the punishment for
20  treason is?
21    A.  I do not know what the punishment for
22  treason is.  I've heard many people say different
23  things.
24    Q.  You know that the punishment for treason
25  is death, don't you?

Page 116

1    MR. QUINN:  Object to form.
2    A.  There's a lot of podcasts, Mr. Brad,
3  where a lot of people suggest a lot of things should
4  be done to people that are treasonous.
5    Q.  (BY MR. KLOEWER)  Including your own,
6  right?
7    A.  Absolutely.
8    Q.  In fact, we'll watch the video here soon,
9  but your podcast did go on to suggest that Dr. Coomer
10  could be put to death for treason, didn't it?
11    A.  Well, if you have video footage of me
12  saying it, I'm not going to deny that I said it.
13    Q.  Okay.  We'll get to that.
14    You said "Is Eric Coomer going to go to
15  jail for this?"
16    This is -- you know, this is two weeks
17  before the interview eventually occurred.  You were
18  anticipating and preparing to have an interview
19  accusing Dr. Coomer of treason, weren't you?
20    MR. QUINN:  Object to form.
21    A.  I don't know.
22    Q.  (BY MR. KLOEWER)  Look at Number 17 here.
23  "Why is it important for people to know that George
24  Soros and Dominion actually shared office space?"
25    What is the basis for this claim that --

Page 117

30 (Pages 114 - 117)

1  well, do you believe that Dominion and George Soros
2  shared office space?
3       MR. QUINN:  Object to form.
4       A.  I don't know.
5       Q.  (BY MR. KLOEWER)  Do you believe that
6  George Soros and Dominion shared office space?
7       MR. QUINN:  Object to form.
8       Go ahead and answer.
9       A.  I don't know.
10      Q.  (BY MR. KLOEWER)  Why are you asking Joe
11 Oltmann about George Soros?
12      MR. QUINN:  Object to form.
13      Go ahead and answer.
14      A.  George Soros has consistently made
15 statements to indicate that he is not a fan of the
16 current American system.
17      Q.  (BY MR. KLOEWER)  That's not really my
18 question.
19      Why are you asking Joe Oltmann about
20 George Soros?
21      MR. QUINN:  Object to form.
22      Go ahead and answer.
23      A.  I think because at that time, the
24 connection between George Soros potentially sharing
25 office space with Dominion was being brought up.

Page 118

1       Q.  (BY MR. KLOEWER)  By who?
2       A.  I would say multiple investigative
3  journalists.  And specifically, there was a show in
4  Canada, and it was a Canadian show, and I don't know
5  the name of it.  But they were talking about that --
6  they were talking about the topic.  But I don't recall
7  the other show.
8       MR. QUINN:  Object to the form of the
9  last question.
10      I just couldn't interject it in time.
11      Go ahead.
12      Q.  (BY MR. KLOEWER)  So you think you saw a
13 Canadian show that referenced George Soros, and you --
14 it's still not clear to me why you're asking Joe
15 Oltmann about that.
16      What does Joe Oltmann know about George
17 Soros?
18      MR. QUINN:  Object to form.
19      A.  I don't -- I don't know what they -- what
20 he would know about George Soros.
21      Q.  (BY MR. KLOEWER)  Okay.  And just to wrap
22 up this line of questioning, Mr. Clark, I asked you if
23 you were anticipating a podcast accusing Eric Coomer
24 of treason, and you said no.
25      Is that really what you're going to tell

Page 119

1  the jury?
2       MR. QUINN:  Object to form.
3       Go ahead and answer.
4       A.  I don't know.
5       MR. KLOEWER:  Okay.  Let's take a break.
6  How long do you want, Tom?
7       MR. QUINN:  Five minutes.
8       THE VIDEOGRAPHER:  Pardon me, folks.
9  Going off record, 12:35 p.m.
10      (Recess taken, 12:35 p.m. to 12:56 p.m.)
11      THE VIDEOGRAPHER:  We're back on record
12 at 12:56 p.m.
13      Q.  (BY MR. KLOEWER)  All right.  Mr. Clark,
14 before we went off the record, we were talking about
15 some emails preparing for the interview you conducted
16 with Joe Oltmann at the end of 2020.  I'm going to
17 share my screen so we go back to taking a look at that
18 thread.  I want to finish out that -- that exchange
19 here; so . . .
20      Okay.  So we were looking at this series
21 of questions that had been sent over to Mr. Oltmann on
22 December 4.  As we scroll up here through the thread,
23 Ms. Duden writes "Any chance we could move this
24 interview up?"
25      This is on December 7.  There's a bit of

Page 120

1  back-and-forth here.  We don't need to read every line
2  of it.
3       On December 9, she writes and says "Joe
4  will have to reschedule this morning.  He is home sick
5  today."
6       And then you say "When should we
7  reschedule?"
8       All of this is to say, by the time we're
9  up here to December 15, we've confirmed, and we've
10 gotten back to the point where we originally started,
11 which was December 16, sending the -- the Zoom
12 credentials for that interview with Mr. Oltmann.
13      So I want to actually take a look at a
14 few clips from that interview since we discussed it
15 already.  We've already showed a couple of these.  I
16 don't have any new videos to add today fortunately.
17 It keeps things simple for -- for Kirsten here.  But
18 I'm going to show you what's been previously marked as
19 Exhibit 10, clip 1.
20      So I'm going to play this.  I may pause
21 it a couple times as we go through to ask you some
22 specific questions.  I'll try to get this whole size
23 so we can take a look, but first time, we may need to
24 adjust the volume or something.  We'll see here.
25      (Video played but not reported.)

Page 121

31 (Pages 118 - 121)

1    Q.  Can you hear that okay, Mr. Clark?
2    A.  Yes.
3    Q.  Okay.  I'm going to start from the
4  beginning again.  This video, every time I play it, is
5  a little glitchy, but the subtitles at the bottom
6  are -- can help you keep along if the video glitches.
7  So let me . . .
8       (Video played but not reported.)
9    Q.  Okay.  So that's just a brief -- brief
10 clip there.
11      Did you ever ask Mr. Oltmann how he got
12 on this conference call?
13   A.  Mr. Brad, I believe you guys probably
14 have, you know, taken all the videos I've done and put
15 up transcripts for them.  And so I don't recall -- I
16 don't recall that.
17   Q.  Okay.  You never asked Mr. Oltmann how he
18 got on this call?
19   A.  I don't recall doing that.  But I mean,
20 you would have my shows and transcripts.  So I don't
21 recall doing that.
22   Q.  Well, why not?
23   A.  I don't know.
24   Q.  Not why don't you recall, but why didn't
25 you ask him?

Page 122

1    A.  Well, I don't know that I didn't ask him.
2    Q.  But you don't -- if I asked you today,
3  How did Joe Oltmann get on the call -- well, how did
4  he get on the call?
5    A.  I do not know how he got on the call.
6    Q.  Do you know who -- who else was on the
7  call?
8    A.  I do not.
9    Q.  Did you ever ask?
10   A.  I don't recall.
11   Q.  Why -- why didn't you ask?
12   A.  I don't recall not asking or asking.
13   Q.  Did it concern you that even by Oltmann's
14 own rendition, the person who identifies Eric is
15 anonymous?
16      You heard he said someone else said
17 that's Eric.  Does that concern you?
18      MR. QUINN:  Object to form.
19      Is this individual?  I mean, are we --
20 are we still -- weren't we going to do his individual
21 deposition for tomorrow, or is this a corporate rep
22 depo?
23      MR. KLOEWER:  Well, he's the corporate
24 rep here for the corporation that published this
25 statement, so I would like to know what the

Page 123

1  corporation's position is on -- on whether -- whether
2  the entity had concerns that this claim was based on
3  an anonymous source.
4       MR. QUINN:  You can answer that question.
5    A.  Mr. Brad, could you repeat the question,
6  sir?
7    Q.  (BY MR. KLOEWER)  Yeah.  We just heard
8  Mr. Oltmann say "Someone else said Eric.  He's the
9  Dominion guy."
10      Did it bother you or did it concern you
11 that the person identifying Eric was anonymous?
12   A.  I don't recall not asking him about it.
13   Q.  Okay.  Do you know who identified him as
14 Eric as you sit here today?
15   A.  I do not.
16   Q.  Okay.  You didn't really believe this
17 story, did you, Mr. Clark?
18      MR. QUINN:  Object to form.
19   A.  You mean the entity?
20   Q.  (BY MR. KLOEWER)  Yes.
21      MR. QUINN:  Then I --
22   Q.  (BY MR. KLOEWER)  The ThriveTime Show
23 didn't really believe this, did it?
24   A.  I don't understand the question.
25   Q.  Well, let me put it this way:  If I had

Page 124

1  been presented with evidence of the biggest crime in
2  the history of the country, I would have wanted --
3  that additional information.
4       MR. QUINN:  Counsel, I'm going to object.
5       Can you explain what the "biggest crime"
6  is?
7       MR. KLOEWER:  The rigging of the 2020
8  presidential election.
9    Q.  (BY MR. KLOEWER)  Did you --
10      MR. QUINN:  But that's not the question.
11 The statement you just played, Counsel, was
12 prospective.  You're talking about afterwards, looking
13 back.  The -- with -- the quote you said was
14 prospective.
15      Does that make sense to you?  I mean,
16 that's -- that's a pretty important distinction.  He's
17 not -- and I'd ask that you clarify it.
18   Q.  (BY MR. KLOEWER)  I'm trying to
19 understand why you didn't want more information about
20 Mr. Oltmann's claims, because they are sensational
21 claims.  And it strikes me that there is -- there are
22 various pieces of information, threads that could have
23 been pulled, to find out more about this story.  And
24 I'm wondering why the ThriveTime Show didn't pull
25 those threads.

Page 125

32 (Pages 122 - 125)

1    A.  Well, I don't recall not asking him about
2  the call, one.
3        And then, two, my own research which had
4  led me to finding the patents that Eric Coomer had and
5  to the social media posts that I believe that were his
6  were alarming.
7    Q.  You're aware that Joe Oltmann is the
8  source of claims about Eric Coomer, right?
9        MR. QUINN:  Object to form.
10    A.  The only person that I know who claimed
11  to have been on a call with Eric Coomer is Joe
12  Oltmann.
13        The only -- but the patents that Eric
14  Coomer had are accessible to the public.  And Eric
15  Coomer's op-ed interview in the New York Times is
16  accessible to the public.  And Eric Coomer's social
17  media posts were accessible to the public.
18    Q.  (BY MR. KLOEWER)  And you raise an
19  important point there about Dr. Coomer's op-ed.
20        So this interview is taking place in late
21  December.  We saw the email exchange on December 4
22  with proposed topics.
23        What research did you do between the time
24  of the emails and the time of the interview to
25  determine whether the claims that Joe Oltmann was

*Page 126*

1  going to present were true or false?
2    A.  I don't recall.
3    Q.  But you're aware that Dr. Coomer did
4  write an op-ed, correct?
5    A.  Yes.  In the New York Times, I believe.
6        MR. KLOEWER:  Let me find the next
7  exhibit here.  Sorry.  I'm having an issue sharing
8  this exhibit here and stamping it with Veritext.  Let
9  me -- I'll just share my screen, and we can show it,
10  and I will just manually mark this as 34.
11        (Deposition Exhibit 34 was marked.)
12    Q.  Okay.  Can you see my screen there?
13    A.  Yes.
14    Q.  Okay.  This states "Guest Commentary:  I
15  work for Dominion Voting Systems.  I did not commit
16  voter fraud.  The attacks against me need to stop."
17        This is by Eric Coomer.  It was dated
18  December 8 of 2020.
19        Do you see that?
20    A.  Yes.
21    Q.  And the Bates stamp down here is
22  MYLE_000105.  So this was produced to us by you.
23        Did you read this -- this op-ed?
24    A.  All of the research that I had done
25  related to Coomer, I believe I've documented that at

*Page 127*

1  that TimeToFreeAmerica.com on the election fraud
2  button.  I don't recall reading this specific article.
3        I know there was one article that I'd
4  read, an op-ed, where Eric Coomer had said that he'd
5  had a DUI -- or DUIs, plural, that had caused him to
6  have some marriage issues and some financial issues.
7  That's the one I recall looking at, but I don't -- I
8  don't know if this is the same document.
9    Q.  Well, in this op-ed, Dr. Coomer denies
10  any involvement with election rigging, states that the
11  elections were safe and secure.
12        We're not going to read the entire thing
13  now, but I'm just wondering if you recall having read
14  this statement from Dr. Coomer denying any involvement
15  with any sort of election rigging or election fraud?
16    A.  I don't recall reading this.
17    Q.  Okay.  And before you conducted the
18  interview with Oltmann -- so it sounds like you didn't
19  do anything additional between December 4 and the time
20  of the interview to try to get more information about
21  these claims; is that fair?
22        MR. QUINN:  Object to form.
23    A.  I don't recall doing so or not doing so.
24    Q.  (BY MR. KLOEWER)  Did you attempt to
25  contact Dr. Coomer prior to the interview?

*Page 128*

1    A.  I do not believe that I have ever tried
2  to contact Dr. Coomer.
3    Q.  Why not?
4    A.  The statements that I had read, his
5  social media posts I had seen, indicated that he was
6  in favor of Antifa and cop killing, and he posted a
7  song called Cop Shots, I believe, and another song
8  called All Cops are Bastards.  There are multiple
9  songs he had posted that are -- I'm sure you have
10  record of that would not indicate he was pro-police.
11  Therefore, I wasn't really a guy who wanted to
12  interview him.
13    Q.  You didn't want to hear if that stuff was
14  even true?
15    A.  Well, I was looking at --
16        MR. QUINN:  Object to form.
17    A.  Sorry.
18        MR. QUINN:  Go ahead.
19    A.  I was looking at his own posts, his own
20  social media posts, that just indicated that he was
21  not pro-police.
22    Q.  (BY MR. KLOEWER)  Did you know that those
23  were his social media posts?
24    A.  I believed that they were.
25    Q.  Okay.  But did you know for a fact that

*Page 129*

33 (Pages 126 - 129)

1 they were?

2     A. I did not know for a fact that they were.

3     Q. Is there anyone you could have contacted

4 to find out if they were?

5     A. I believe that Eric, during his own

6 deposition, admitted that those posts were his.

7     Q. I'm just trying to get to -- did you try

8 to contact Dominion Voting Systems to see if these

9 alle- -- claims about Eric Coomer were true?

10     MR. QUINN: Object to form.

11     Go ahead.

12     A. I did not, Mr. Brad.

13     Q. (BY MR. KLOEWER) What efforts did you

14 make to find any sort of contact information for

15 either Dr. Coomer or Dominion Voting Systems?

16     MR. QUINN: Object to form.

17     A. I did not try to reach out to Dr. Coomer

18 based upon his social media posts, which he has now

19 admitted during his deposition that he did make,

20 because they were alarming to me.

21     Q. (BY MR. KLOEWER) Why didn't you ask --

22 why didn't you think you should ask if he was on an

23 Antifa call?

24     A. The social media posts that Eric Coomer

25 made, which I'm sure you've seen, and the deposition

1 where he admitted that he did, in fact, post them,

2 were very, very alarming to me.

3     Q. Okay. But that's not my question.

4     Didn't you think you should confirm

5 whether he was on a call before publishing claims that

6 he was?

7     MR. QUINN: Object to form.

8     A. I'm not trying to be difficult. I would

9 just say his posts confirmed to me -- he has admitted

10 during his own deposition that those were his social

11 media posts. They were very concerning.

12     So to elaborate, if you see somebody

13 posting a song called Cop Shots, which he posted, and

14 All Cops are Bastards -- and there's other songs. I

15 don't have my notes in front of me. I apologize.

16     But he's -- if you read the lyrics of the

17 songs he posted, it would indicate that perhaps we

18 should be alarmed about interacting with him at all.

19     Q. (BY MR. KLOEWER) Well, Mr. Clark, not to

20 go too far into the weeds here, but, I mean, you

21 yourself were kicked out of college for doing a

22 musical parody, right?

23     A. I was --

24     MR. QUINN: Object to form.

25     A. I was asked to no longer go to that

1 school because I wrote a parody about the school's

2 president when I was, I believe, 18 years old.

3     Q. (BY MR. KLOEWER) You would agree that if

4 somebody had accused you of a crime on the basis of a

5 song you had posted, that would be quite a logical

6 leap, right?

7     MR. QUINN: Object to form.

8     Go ahead and answer.

9     A. Well, if somebody put out a song that

10 advocated for killing police, that would indicate that

11 they might be thinking about doing -- killing police.

12     My song that I recorded when I was 18

13 with a young man -- young man by the name of Adam

14 Bagwell was about Oral Roberts University and various

15 things that I did not agree with as an 18-year-old.

16     Q. (BY MR. KLOEWER) Okay. So your concerns

17 about Eric Coomer's music preferences led you to

18 believe it was likely that he had rigged the 2020

19 election.

20     Am I understanding you correctly?

21     MR. QUINN: Object to form.

22     Go ahead and answer.

23     A. There were 13 posts that I believe are

24 the most concerning. And those led me -- led me to

25 believe that he was an individual who had some

1 problems.

2     Q. (BY MR. KLOEWER) Okay. But it sounds

3 like you believe that his music preferences were

4 sufficient evidence for you to believe that he -- he

5 had rigged the election?

6     MR. QUINN: Object to form.

7     Go ahead and answer.

8     A. One, I don't believe that he did rig the

9 election. I believe he could have rigged the

10 election.

11     Two, given his position, I mean, that's

12 the director of security and strategy for -- what one

13 would argue is a very important position, those posts,

14 in conjunction with his title and the patents he had,

15 those three variables were alarming.

16     Q. (BY MR. KLOEWER) Okay. So you don't

17 believe that Eric Coomer rigged the election.

18     Is that what you just said?

19     A. I believe he could have.

20     Q. Okay. But you don't believe that he did?

21     MR. QUINN: Object to form. Asked and

22 answered.

23     Go ahead.

24     A. I believe he could have.

25     Q. (BY MR. KLOEWER) Let's take a look at

1 another clip from that interview.  This has been
2 previously marked as Exhibit 10, clip 2.
3       (Video played but not reported.)
4    Q.  Okay.  A couple questions about that one.
5       Who are these folks that we hear off
6 screen?
7       Do you have a studio audience for the
8 show?
9    A.  Well, I usually just grab random people.
10 So I believe that that person was a part-time
11 employee, I believe.  We're going back, what, three,
12 four years, so I don't know who that is.
13       I believe he was in the -- I don't know.
14 I believe he was a part-time employee who had a beard.
15 I'm involved in a lot of different business things,
16 but I believe he had a beard, and I believe that he
17 once had served in the military.
18    Q.  And you described Dr. Coomer there as
19 someone who wants to overthrow our country.
20       What was the basis for that?
21       MR. QUINN:  Object to form.
22    A.  Am I allowed to pull out -- I just -- I
23 have like Eric Coomer's posts on social media.  I
24 think if I read it, I think that would maybe be
25 helpful.  I don't -- I just don't have access to them.

Page 134

1       Can I break and get them or . . .
2    Q.  (BY MR. KLOEWER)  No.  No.  We're not --
3 I'm basing these questions off of your recollection as
4 you sit here today --
5    A.  Okay.
6    Q.  -- Mr. Clark.
7       I'm just -- as you sit here today, do you
8 believe that Eric Coomer is a person who wants to
9 overthrow our country?
10       MR. QUINN:  Object to form.
11       Go ahead and answer.
12    A.  I believe that the posts he made were
13 very alarming, and specifically the posts related to
14 police were concerning given his title and his
15 patents.
16       MR. KLOEWER:  Objection.  Nonresponsive.
17    Q.  (BY MR. KLOEWER)  Do you believe that
18 Eric Coomer wants to overthrow our country?
19       MR. QUINN:  Object to form.
20       Go ahead and answer.
21    A.  I believe that he posted posts on social
22 media that were alarming.  I think you would have to
23 ask him why he posted those posts.
24    Q.  (BY MR. KLOEWER)  Well, I'm asking you if
25 you think he wants to overthrow our country.

Page 135

1       MR. QUINN:  Object to form.
2       Go ahead and answer.
3    A.  I can't read Eric Coomer's mind.  But I
4 do pray for him often.  I hope that he, you know,
5 has a different world view soon that doesn't cause him
6 to post those kinds of things on social media.
7    Q.  (BY MR. KLOEWER)  Do you believe that
8 everybody who posts negative comments on the Internet
9 wants to overthrow the country?
10       MR. QUINN:  Object to form.
11       Go ahead and answer.
12    A.  Well, I'll use two examples.  Maybe
13 they're relevant.
14       Example one would be if you're the
15 director of security and strategy for a company like
16 Dominion, I think that what you post has a certain
17 weight to it if that's your title.
18       And I think if you're maybe a high school
19 student, you're 15 years old, and you're upset about
20 the score of a game, and you post something about not
21 being happy with the outcome of the game, I think
22 those are two different conversations.
23    Q.  (BY MR. KLOEWER)  But you would agree
24 that a social media post -- it's a big leap to jump
25 from a social media post to an accusation that

Page 136

1 somebody committed treason, right?
2       MR. QUINN:  Object to form.
3       Go ahead and answer.
4    A.  I think the continuity of thought, seeing
5 his social media posts, indicates a pattern of
6 thought.
7       I think the patents that he had shows
8 that he is a genius.  He, Mr. Eric Coomer, Dr. Coomer,
9 is a genius, clearly knows more about his subject than
10 most people.  I think he's a genius or a very
11 intelligent person.
12       And I think that he showed continuity of
13 thought to his posts.  And I think through his own
14 deposition, he's admitted that those posts were, in
15 fact, his social media posts.
16    Q.  (BY MR. KLOEWER)  As we watch that clip,
17 Joe Oltmann goes on to state that if someone has
18 interrupted what the will of the people, then they can
19 be put to death.
20       We could see that in the subtitles, but
21 the word "death" was bleeped out.
22       Did you hear that?
23    A.  I did see that the word "death" was
24 bleeped out in the clip you just played.  Yes.
25    Q.  Okay.  Why did you do that?

Page 137

35 (Pages 134 - 137)

1     A.  I don't know that I did bleep that out,
2  and I'll just tell you how it works.
3         If you upload a video to platforms, some
4  of the platforms just remove things.  Or sometimes I
5  would remove things if I felt like it would get
6  deleted from a platform.
7     Q.  Okay.  Well, I'll represent to you that's
8  a copy of the interview that we pulled from the --
9  from your website --
10    A.  Sure.
11    Q.  -- that I believe was the original.
12        So are you representing that you did not
13  put the bleep over the word "death"?
14    A.  It seems likely --
15        MR. QUINN:  Object to form.
16        Go ahead and answer.
17    A.  It seems likely that I would have bleeped
18  it out.
19    Q.  (BY MR. KLOEWER)  Why?
20    A.  Well, if you go to Google, and you type
21  in "treason penalties," and you find where the U.S.
22  government talks about it -- not my opinion, but what
23  the U.S. government says about treason -- it's a --
24  not a light accusation.
25    Q.  And you had done that prior to the

Page 138

1  research into sedition and subversion.
2         But I don't know how different people
3  would rule and as to what punishment would be decided
4  upon.
5     Q.  So just going back, so if I understand
6  it, you bleeped out the word "death" to -- to keep the
7  interview from being censored?
8         Am I understanding you correctly?
9         MR. QUINN:  Object to form.
10        Go ahead and answer.
11    A.  I think in my history of doing shows over
12  the years, there hasn't been many shows or very, very
13  few shows there have been where somebody has used the
14  word "death."  And so I removed it because I didn't
15  think that that was appropriate at that time.
16    Q.  (BY MR. KLOEWER)  And it's inappropriate
17  because somebody may take that seriously, right?
18    A.  Well, it's kind of like an F-bomb, you
19  know.  I try to catch the F-bombs on the show.  So if
20  someone drops an F-bomb, I try to get it -- not that I
21  want -- not that I believe that someone would hear an
22  F-bomb and then repeat it.  I just try to remove
23  things that I think that that would be above my own
24  internal dialogue threshold.
25    Q.  Okay.  But as opposed to the F-bomb, as

Page 140

1  interview, hadn't you?
2     A.  What's that?
3     Q.  You had done that prior to the interview,
4  hadn't you?
5     A.  Well, not necessarily related to that.
6  You know, I had looked into, you know -- it's an
7  example.  There was closures of all the schools.  A
8  lot of people -- schools were closed.  People missed
9  their weddings, missed their graduation.  A lot of
10  things happened.
11        And I thought that that behavior, locking
12  down a country and fundamentally changing our economy,
13  forcing masks on people, these sorts of things, they
14  were -- I don't know if seditious or subversive or
15  whatever term you'd have.
16        So I have done research into these kinds
17  of things, but I -- again, I don't know what the
18  penalty would be.
19    Q.  Well, you link to that, the U.S. code
20  that you just referenced that you could find by
21  Googling "treason," which identifies the penalty as
22  death in your call notes.  And you include that link
23  in the email you sent on December 4, right?
24    A.  Well, I don't recall sending the email,
25  but I have looked that up before.  I have done

Page 139

1  you describe it, the term "death" is not profane.  So
2  you bleeped it because you understood the gravity of
3  the accusation, right?
4     A.  There's words that on YouTube in
5  general -- so as an example, Colonel Douglas
6  Macgregor, when he does interviews and he's talking
7  about geopolitical issues, certain words get removed
8  to -- because of all the censorship.  And so certain
9  words could be profanity.  I believe the word "sex" is
10  often beeped out.  COVID-19 vaccines, vaccines, the
11  phrase "vaccines" is getting beeped.  The word "death"
12  is getting beeped.
13        So there's quite a few phrases that have
14  become sort of tribal knowledge that one should remove
15  so you don't get removed off the Internet.
16    Q.  Well, the word "death" isn't removed if
17  you say, We all fear death, for example.  The word
18  "death" is removed when it's a call for execution.
19        You would agree with that, right, that
20  context matters in the use of the term?
21        MR. QUINN:  Object to form.
22        Go ahead.
23    A.  I don't know that I agree with that.  I
24  just know that many, many podcasters will bleep the
25  word "vaccine" or F-bombs or "death" or the word

Page 141

36 (Pages 138 - 141)

1 "sex."
2        And I guess as an example would be,
3 Mr. Brad, you have this Diddy situation, you know, the
4 Diddy investigation.  And there's a lot of independent
5 podcasters that are talking about that, and there's a
6 lot of words that are beeped out.  And I don't know
7 why they're beeped out.
8        Q.  (BY MR. KLOEWER)  You were concerned that
9 your show might be censored because it included a call
10 for execution, right?
11       A.  Well, I recorded that many years ago --
12          MR. QUINN:  Object to form.
13       I'm sorry.
14       Object to form of the last question.
15       Go ahead.
16       A.  I recorded it several years ago, but I
17 believe I was trying to get the show not banned off of
18 a platform.
19       Q.  (BY MR. KLOEWER)  And you were worried
20 that accusing Dr. Coomer of treason and calling for
21 his death could result in that?
22          MR. QUINN:  Object to form.
23       A.  I don't know that anybody was calling for
24 his death.  I believe they were -- yeah, I don't
25 believe anybody was calling for his death.

Page 142

1 violence in the real world; is that right?
2       A.  I don't --
3          MR. QUINN:  Object to form.
4       Go ahead.
5       A.  I don't want my kids to fill their mind
6 with material that is not pro-Christ.  And I believe I
7 do a little bit better job of it every year, Mr. Brad,
8 and I try to do better.
9       Q.  (BY MR. KLOEWER)  Did you care if people
10 took you seriously and believed that Eric Coomer
11 should be put to death?
12          MR. QUINN:  Object to form.
13       Go ahead.
14       A.  My hope was that somebody with the
15 authority to look into the situation would look into
16 Eric Coomer's social media posts and look into the
17 patents he had, and then they could take the
18 appropriate action with our legal system.
19       Q.  (BY MR. KLOEWER)  Did you file a police
20 report to that end?
21          MR. QUINN:  Object to form.
22       A.  I did not file a police report to that
23 end.
24       Q.  (BY MR. KLOEWER)  So you thought that by
25 publishing a podcast saying Dr. Coomer could be put to

Page 144

1       Q.  (BY MR. KLOEWER)  Would it concern you
2 that some of your listeners might take that seriously?
3          MR. QUINN:  Object to form.
4       Q.  (BY MR. KLOEWER)  Believe that Dr. Coomer
5 not only could be put to death, but should?
6          MR. QUINN:  Object to form.
7       Go ahead and answer.
8       A.  I don't believe that when someone listens
9 to -- drop three examples -- my show or Joe Rogan's
10 show -- that's two -- that all listeners are going to
11 react the same way or that everybody is going to -- I
12 can't control how they react.
13       So if somebody is playing violent video
14 games, which I don't want my kids to play, I don't
15 know there's direct causality between playing a
16 violent video game and acting out violent behavior.
17       And I don't know that listening to a
18 podcast, you know, where Joe Rogan will discuss
19 hallucinogenic drugs or on my show where someone is
20 talking about the definition of treason, would cause
21 someone to take action.
22       Q.  (BY MR. KLOEWER)  And you don't want your
23 kids to play violent video games because you
24 understand the connection between -- or you believe
25 there's a connection between violent media and

Page 143

1 death for what he had done -- how would that motivate
2 somebody with authority to conduct the investigation?
3          MR. QUINN:  Object to form.
4       Go ahead.
5       A.  Well, if I give you an example, it would
6 be this.  When COVID began, many of our listeners were
7 tested positive for COVID, and they discovered through
8 our show that there were doctors all across the nation
9 treating people with, at the time, hydroxychloroquine
10 and budesonide.  And so they learned of those
11 solutions, and then they went out and found their
12 local doctor to give them various treatments.
13       And so I was hoping that somebody would
14 hear about Eric Coomer's social media posts and his
15 patents and that they would go to their appropriate
16 elected official, or maybe an elected official
17 themselves would listen, or maybe a senator or
18 somebody who had the power, and they would look at it
19 and say, Is this happening; is this not?
20       And if you look at all the information
21 and you do your research, and you say that Joseph
22 Biden was fairly elected as president, okay.  Or if he
23 found that President Donald J. Trump was elected
24 president, okay.
25       But I think that people should have

Page 145

37 (Pages 142 - 145)

1  known -- should have looked into that situation.
2      Q.  (BY MR. KLOEWER)  You knew at that time
3  that those investigations had occurred, didn't you?
4      MR. QUINN:  Object to form.
5      Go ahead.
6      A.  I hadn't followed all these different
7  cases in litigation super closely.
8      Q.  (BY MR. KLOEWER)  You weren't aware that
9  the attorney general, Trump's own attorney general,
10  Bill Barr, had given a public interview where he said
11  there was no evidence to support claims that the
12  election was rigged?
13      MR. QUINN:  Object to form.
14      Go ahead.
15      A.  I haven't watched much Bill Barr.
16      Q.  (BY MR. KLOEWER)  You knew that he came
17  out and said that, didn't you?
18      A.  I did not know that.
19      Q.  You knew that Trump's efforts to recount
20  the ballots had failed, correct, that multiple
21  recounts had occurred?
22      MR. QUINN:  Object to form.
23      Go ahead and answer.
24      A.  I don't know that I was following the
25  results in each state.

Page 146

1      Q.  (BY MR. KLOEWER)  That's not my question.
2      You knew that his attempts to prevail in
3  recounts of different states had failed, that his
4  legal challenges were failing, correct?
5      A.  I did not know that.
6      MR. QUINN:  Object to form.
7      Go ahead.
8      Q.  (BY MR. KLOEWER)  So you weren't really
9  paying very close attention to the election claims,
10  then, were you?
11      A.  We have 50 states in this -- in these
12  United States, and you have -- I don't even know,
13  Mr. Brad.  You would know more than I would, but
14  there's so many different ongoing conversations and
15  litigations and all these things.  And I just knew
16  that nobody was asking the question about why does a
17  guy who has the patents post these things on social
18  media.
19      Q.  Why didn't you share the op-ed that
20  Dr. Coomer wrote with your audience?
21      A.  I don't know.
22      Q.  You didn't think they deserved to hear
23  his side too?
24      A.  Given his social media posts that he has
25  admitted were his posts during his deposition, I --

Page 147

1  again, I can go back.  I find them to be alarming.
2      Q.  So you believe that because of
3  Dr. Coomer's music preferences, he didn't deserve to
4  be heard in this interview?
5      MR. QUINN:  Object to form.
6      A.  There were other posts he made where he
7  was -- and, again, I wish I had them in front of me.
8  But he posted like what appeared to be an open letter
9  to the President stating that can't stop Antifa
10  because Antifa is not a thing.  I'm paraphrasing.
11      And then given that, he did sort
12  of an edit to it or a second amendment, second
13  clarifier indicating that -- in one of his posts that
14  if you're voting for that fascist, racist F-tard or
15  something like that that he didn't want to be friends
16  with you.
17      And then it was, If you -- he made a
18  comment to the effect of like he would never work for
19  an employer unless -- he wouldn't work with an
20  employer if they didn't agree -- or something that --
21  it indicated as though he was unapologetically against
22  Trump supporters/conservatives.
23      Q.  (BY MR. KLOEWER)  What did Dr. Coomer
24  post about rigging the election?
25      A.  I only have 13 posts that I found that

Page 148

1  were relevant.  And I'm not sure how this attorney
2  thing works, but those were 13 I have I've documented.
3  So that's all I would have to show you.
4      Q.  None of those posts say anything about
5  rigging the election, do they?
6      A.  He strongly indicates that only a racist,
7  fascist F -- whatever those words were -- could vote
8  for Trump.  And then given that he had the patents as
9  well as that position, it was alarming.
10      MR. KLOEWER:  Objection.  Nonresponsive.
11      Q.  (BY MR. KLOEWER)  None of those posts
12  were about rigging the election, were they?
13      A.  Given his title and patents, I would deem
14  them to be alarming.
15      Q.  That's not my question.
16      You know he didn't post anything about
17  rigging the election, don't you?
18      A.  I know that he had a title as the
19  director of security and strategy and that he was
20  making these posts without apology.  So I know that.
21      Q.  Okay.  I don't need to ask the question a
22  dozen times, but I am going to ask it one last time.
23      You know that Eric Coomer didn't post
24  anything about rigging the election, don't you?
25      A.  He made posts that indicated that only a

Page 149

38 (Pages 146 - 149)

1  fascist, racist whatever can vote for Trump as the --
2  when he had the title as the director of security and
3  strategy for Dominion and the patents.
4        MR. KLOEWER:  Objection.  Nonresponsive.
5        Q.  (BY MR. KLOEWER)  Let's take a look at
6  what you posted after the interview that you conducted
7  with Mr. Oltmann.
8        We'll mark this as Exhibit 35.
9        (Deposition Exhibit 35 was marked.)
10       Q.  Now, you titled the interview Joe Oltmann
11 Exposing the Treasonous Eric Coomer, the Antifa Member
12 and the Director of Strategy and Security at Dominion
13 Voting Systems.
14       Can you tell me as you sit here today,
15 Mr. Clark, what specific evidence was presented in
16 this interview that Dr. Coomer committed treason?
17       A.  Well, again, given his title and the
18 patents and his posts, it indicated that he had a
19 motive and an opportunity to get involved with our
20 elections.
21       Q.  Explain that.
22       What opportunity did he have?
23       A.  Well, you have to --
24       Q.  Go ahead.
25       A.  I recognize that I'm the one being

Page 150

1        MR. QUINN:  Object to form.
2        Go ahead and answer.
3        A.  I apologize for being redundant.  All I
4  know is that he had that title, the only one person in
5  America who had that title.  He had the patents, the
6  only person I know who had all those patents and that
7  title.  And he was posting those things on social
8  media.
9        Q.  (BY MR. KLOEWER)  So you don't have any
10 idea how Eric Coomer could have rigged the election,
11 do you?
12       MR. QUINN:  Object to form.
13       Go ahead.
14       A.  I think you'd have to ask Eric how the
15 patents work.  Dr. Eric.
16       Q.  (BY MR. KLOEWER)  Well, you're the one
17 who posted an interview calling him treasonous.  So
18 I'm asking you how it's even possible that he could
19 have done that.  It sounds like you don't have any
20 working theory of what he could have possibly done to
21 rig the election results.
22       If I'm mistaken in that, please correct
23 me, but we can move along otherwise.
24       A.  I think you would have to analyze the
25 patents and then ask him how those patents work.

Page 152

1  deposed, but you'd have to ask him about the function
2  of those patents and how those patents work, "him"
3  being Dr. Eric Coomer.
4        Q.  Did you ask him about those patents and
5  how they would allow him to rig the election?
6        A.  No.  I looked up the patents.  I found
7  them.  But I did not ask him about those patents.
8        Q.  As you sit here today, what's your theory
9  of how one person, namely Dr. Coomer, could have
10 rigged the 2020 election?
11       A.  Well --
12       MR. QUINN:  Object to form.
13       Go ahead.
14       A.  -- I believe that, you know, his title is
15 director of security and strategy.  So he's the
16 director of it, and it's the director, whatever that
17 title means internally.  And I believe that his social
18 media posts were public posts or fairly well-seen
19 posts.  It didn't seem like he was hiding those posts.
20 And he had the patents.
21       So I think you would have to ask him what
22 those patents do.
23       MR. KLOEWER:  Objection.  Nonresponsive.
24       Q.  (BY MR. KLOEWER)  What is your theory of
25 how Eric Coomer could have rigged the election?

Page 151

1        So, Mr. Brad, just to clarify, from what
2  I can tell, Dr. Coomer appears to be a genius.  And he
3  appears to have an academic background that indicates
4  that he's an intelligent person.  And he has patents
5  for elections.  I believe there's 12 I found.  I could
6  be wrong by one or two.  And he's posting on social
7  media, knowing that he has this position.  And I find
8  that to be concerning.
9        And if you don't find that to be
10 concerning -- and I recognize that you're deposing me,
11 but that's my world view.
12       Q.  What makes you believe that Dr. Coomer is
13 a genius?
14       A.  Well, his -- and, again, I don't have my
15 notes in front of me.  But he studied nuclear physics,
16 I believe, which is -- requires quite a bit of
17 education and knowledge of nuclear technology,
18 physics.
19       And so -- and to me, a genius is somebody
20 who knows clearly more than the average person about a
21 subject.  So I think there's, you know, geniuses of
22 music, geniuses of certain areas of life.  And I think
23 he would be a man who would clearly be considered an
24 expert in the field of election integrity.
25       Q.  So we're looking on my screen here at the

Page 153

39 (Pages 150 - 153)

1　show notes we posted, as we discussed.  These were
2　posted after the interview and stayed up for some
3　time.  They appear to almost mirror the questions that
4　we saw in that December 4 email, with a couple of
5　notable changes here.
6　　　　Number 4 states "Joe is the founder of
7　FEC United."
8　　　　What is FEC United?
9　　　A.  I don't know.
10　　Q.  Did you know at the time?
11　　A.  No.  I'll say I don't believe so.
12　　　　I know that Ann Vandersteel said he was a
13　part of some organization that was trying to, you
14　know, stand up against the lockdowns.  That's how that
15　was explained.
16　　Q.  Were you aware or are you aware of
17　Oltmann's affiliation with the UADF, United Armed
18　Defense Forces?
19　　A.  Since that time.  So as I sit here today,
20　people have mentioned that.  But at the time, there
21　was no conversation about that, nor did I know that.
22　　Q.  As we scroll down here, Number 17, we see
23　that link to the U.S. code for the treason statute
24　here is again included.
25　　　　Why did you include that here in the

Page 154

1　notes?
2　　A.  Well, I think it's important that you
3　look at facts when possible.  And so, you know, if
4　somebody is going to discuss treason, I think it's
5　important for people to know what the government has
6　to say about it.
7　　Q.  Namely, that the punishment is -- is
8　death?
9　　A.  I don't know that namely the punishment
10　is death.  The things that I was learning was there's
11　subversion, there's sedition, and there's treason.  So
12　you have different things going on there.
13　　Q.  And, in fact, as we scroll down here in
14　the notes, you expand on the treason discussion.
15　　　　You say, Point Number 1, "What is
16　treason?  The crime of betraying one's country,
17　especially by attempting to kill the sovereign or
18　overthrow the government."
19　　　　You were trying to convey to your
20　audience your belief that Dr. Coomer had done this,
21　correct?
22　　　　MR. QUINN:  Object to form.
23　　A.  I believe I was just trying to provide
24　our audience to the actual definition to the word
25　"treason."

Page 155

1　　Q.  (BY MR. KLOEWER)  Okay.  Let's put that
2　aside for now.
3　　　　We'll take a look at this one here, which
4　we'll label as Exhibit 36.
5　　　　(Deposition Exhibit 36 was marked.)
6　　Q.  Okay.  This is a post from a couple days
7　later.  Do you see this post, Mr. Clark?
8　　A.  Yes.
9　　Q.  Okay.  And this was posted on Facebook on
10　December 22nd of 2020.  Here again, we see the title
11　of this interview included at least three times.  We
12　see it up here, Exposing the Treasonous Eric Coomer.
13　On the screen, we have Exposing the Treasonous Eric
14　Coomer.  And down below, with the link to the
15　ThriveTime Show, it says Joe Oltmann Exposing the
16　Treasonous Eric Coomer, the Antifa Member and the
17　Director of Strategy and Security at Dominion Voting
18　Systems.
19　　　　Who named this interview?
20　　A.  Well, at that time, I was uploading a lot
21　of shows.  And so typically, I would name the shows.
22　　Q.  And who would have uploaded this to
23　the -- I'm presuming -- well, you can correct me if
24　I'm wrong.
25　　　　Did ThriveTime have a Facebook page at

Page 156

1　this time?
2　　A.  I don't recall when I established a
3　Facebook page.  But more than likely, I would have
4　been the one who posted that.
5　　Q.  Okay.  Is there anybody else who might
6　have?
7　　A.  Well, kind of a posting by committee, you
8　know.  So typically we'd have people that were
9　part-time or -- you know, it's very just -- I post
10　something to Rumble or wherever it goes, and then
11　they'll post it multiple places if I can't get to it.
12　But I like to post myself if I can.
13　　　　MR. KLOEWER:  And just to clarify,
14　Kirsten, I marked that Facebook post as Exhibit 36.
15　　　　(Discussion off the record.)
16　　Q.  (BY MR. KLOEWER)  Okay.  Shift gears away
17　from the interview here.
18　　　　I want to understand a little bit more
19　about the relationship between some of these entities.
20　　　　Can you tell me, what is Time to Free
21　America?
22　　A.  That's a website that I post information
23　to as I gather it.
24　　Q.  Okay.  Is that -- is Time to Free America
25　associated with Make Your Life Epic in any way?

Page 157

1      A.  I don't know how it's organized in our
2   GoDaddy account.  I don't know that.
3      Q.  Okay.  Is it in a separate stand-alone
4   entity?
5          Have you registered any paperwork for
6   Time to Free America?
7      A.  In my mind, the Time to Free America
8   website connects with the Reopen America events.
9          And I'm not sure if this is helpful for
10  you to know, but I just -- you know, under oath, being
11  very transparent, my interest in business has been
12  something I've been fascinated with since I was a
13  young kid.  And that's what I talk about, right?
14          But then we have these lockdowns and
15  quarantines and these other topics that are not at all
16  related to those things.
17          And so what I found is that meeting
18  people at my business conferences, the people that are
19  interested in business have virtually no interest in
20  the Great Reset.  And the people who are interested in
21  the Great Reset usually don't have any interest in
22  business.  So there's two separate websites for two
23  different listeners.
24          So you have the business audience.  That's
25  ThriveTimeShow.com.  And then you have the Reopen

Page 158

1   America, which is TimetoFreeAmerica.com.
2      Q.  But the ThriveTime Show also links to the
3   Time to Free America in various places, correct?
4      A.  Yeah, there's some crossover, but it's
5   not a whole lot.
6      Q.  So I'm wondering a little bit about some
7   of that crossover.
8          Share my screen again here.  We'll mark
9   this as Exhibit 37.
10         (Deposition Exhibit 37 was marked.)
11     Q.  So if you go to the Thrive Time store --
12  or ThriveTimeShow.com, and at the top, you click on
13  the store, it takes you to the ReAwaken America store
14  page.
15         Are you aware of that?
16     A.  Yes.
17     Q.  Okay.  And there's a couple different
18  tabs at the top.  There's home, apparel, and books.
19  Here, I've taken a screenshot of the apparel page.  We
20  see some shirts here with the ReAwaken America Tour
21  logo.
22         If I were to buy one of these shirts,
23  where does that money go?
24     A.  I don't recall.  I'd have to look at my
25  notes to figure that out.

Page 159

1      Q.  Well, is the ThriveTime Show connected to
2   a bank account associated with ThriveTime?
3          MR. QUINN:  Object to form.
4      A.  There would have to be a bank account
5   associated with the shopping cart.  I just don't
6   recall which bank account that is.
7          And we -- just, again, full transparency,
8   we don't sell a lot of items on the cart.  So when you
9   look at the number of items sold, it's, I would say, a
10  daily occurrence.  You know, we might sell an item a
11  day.
12     Q.  (BY MR. KLOEWER)  And who makes these
13  shirts?
14     A.  Oh, I don't know, but I could find out
15  the vendor, because there has been vendors, plural.
16     Q.  And you purchase them in bulk, I presume,
17  in different sizes?
18     A.  Primar- -- yes, sir.  Sorry to interrupt
19  you.
20         Primarily for the events.
21     Q.  Okay.  And who paid -- who pays to have
22  those made?
23     A.  The Reopen America organization pays to
24  have the shirts made.
25     Q.  Okay.  But they're sold on the ThriveTime

Page 160

1   website, and you're not sure where the money goes when
2   it goes through ThriveTime?
3          MR. QUINN:  Object to form.
4      A.  As I sit here today, I do not know.
5      Q.  (BY MR. KLOEWER)  And similar question
6   for the next set of items here.
7          We have books that are also for sale
8   through the ThriveTime store.  These are primarily
9   your books, from what I can tell, that you publish.
10  We have How to Become Sustainably Rich:  A
11  Step-by-Step Guide to Building a Successful,
12  Money-Generating and Time-Freedom Creating Business.
13         Who publishes these books?
14     A.  I believe the title is Clay Clark
15  Publishing.
16     Q.  You have your own publishing company?
17     A.  I don't know that it's a company, but I
18  do self-publish.  And, Brad, not to skip ahead of your
19  questions, but I just want to answer this.  We sell,
20  you know, typically like a book a day.  That's kind of
21  my average if you look at the -- you know, that's the
22  number.
23         But then where -- I do workshops, so I do
24  a workshop.  At the workshops, I lead people through
25  that book right there you're referencing.

Page 161

41 (Pages 158 - 161)

1  Q.  And we don't need to go through these at
2  all. I'm just scrolling through it.
3     It appears that these are -- do you sell
4  any books that you have not authored?
5  A.  Well, I didn't author the Bible. How
6  about that? I didn't author the Bible. And I do have
7  a King James Version of the Bible there you can buy.
8  And I put them up there because people ask me where
9  they could get them at conferences. But it's not a
10  big industrial complex. There's not a lot of sales
11  going through there.
12  Q.  So same question as I asked with the
13  apparel. If somebody buys a book here, who gets
14  the -- who gets the proceeds from that?
15  A.  It would theoretically go to the same
16  place. But as I sit here today, I don't know where it
17  goes.
18     MR. KLOEWER:  And, Kirsten, just for
19  clarity, I've labeled this as 38, the books page.
20     (Deposition Exhibit 38 was marked.)
21  Q.  (BY MR. KLOEWER)  Okay. And I want to
22  talk a little bit more generally, so -- well, on the
23  topic of these -- these sorts of items, primarily the
24  apparel, do you sell these items at ReAwaken America
25  Tour events as well?

Page 162

1  A.  I do, and I let people pay $25 or
2  whatever price they want to pay.
3  Q.  And do you have a -- does the ThriveTime
4  Show have like a booth that it sets up at the events,
5  or what's the sort of customer-facing interface there?
6  A.  Yeah, when you come to the event, there
7  are a variety of booths. And so you'll have a My
8  Pillow booth, or maybe a local doctor. And what we do
9  on the Tour is we tell people that you can buy a booth
10  for whatever price you can afford. And then the
11  products that I sell in my booth are $25 or whatever
12  price you want to pay.
13  Q.  Okay. So the vendor booths are -- you
14  rent those out, essentially?
15  A.  Yes. And people can name their price on
16  those.
17  Q.  All right. And that's -- we're probably
18  getting ahead of ourselves here. I can anticipate
19  your counsel's objection here.
20  A.  Okay.
21  Q.  But I'm assuming this is a Reopen
22  question, but that's one of the streams of revenue for
23  the Tour, correct, the vendor booths?
24  A.  It is one of the streams of revenue, yes,
25  the booth.

Page 163

1  Q.  Okay. We'll address that more in the
2  follow-up deposition for Reopen America.
3     One question that I don't know if it's
4  getting ahead or not, because it's not clear to me, is
5  with respect to ticket sales.
6     TimetoFreeAmerica.com is where you
7  purchase tickets for Reopen America -- or ReAwaken
8  America events, correct?
9  A.  That is the website that you would go to
10  request a ticket. That is correct, sir.
11  Q.  Okay. And if I go to that website, and I
12  request a ticket, and I pay the money, where does that
13  money go?
14     MR. QUINN:  Brad, are we moving over to
15  ThriveTime now?
16     MR. KLOEWER:  I don't know. That's what
17  I'm trying to understand.
18     MR. QUINN:  Actually, you should know.
19  It's your deposition.
20     Are we talking about ThriveTime now, or
21  are we talking about -- about the show?
22     It's pretty straightforward.
23     Are we talking about the Tour or the
24  Show?
25     MR. KLOEWER:  It is, but the answer's not

Page 164

1  clear, Tom. The website is TimetoFreeAmerica.com,
2  which, as I've just established with the store, links
3  back to ThriveTime Show. And so -- and it's possible
4  that -- and the ticket sales also, if you click on
5  Shop, send you to tickets.
6     Now, it sounds like when you buy a shirt
7  or a book, that money goes to ThriveTime.
8     I don't know where the money goes if you
9  buy a ticket, if that goes to Reopen or if that goes
10  to ThriveTime. That's what I'm trying to establish.
11  If the answer goes to Reopen, then I'll save it for
12  the afternoon, but I don't know the answer to that
13  question.
14     MR. QUINN:  All right.
15     Go ahead and answer.
16  A.  Brad, sorry to be difficult. Could you
17  restate the question, sir?
18  Q.  (BY MR. KLOEWER)  Yeah, if I buy a ticket
19  to the ReAwaken America Show on the ThriveTime
20  website, where does that money go?
21  A.  It goes to Reopen America LLC.
22  Q.  Well, look at that. We resolved it.
23     MR. KLOEWER:  So, Tom, your concern was
24  well placed. We will save that line of questioning
25  for the Reopen deposition.

Page 165

42 (Pages 162 - 165)

1    Q.  (BY MR. KLOEWER)  Okay.  I do -- so just
2  to sort of wrap up Make Your Life Epic, then, can you
3  tell me, what is Make Your Life Epic's relation with
4  the ReAwaken America Tour?
5    A.  Well, I have this core thesis.  And I'm
6  not saying this to be cute.  I'm just telling you.  My
7  core thesis is that it's hard to be open if your
8  business is forced to be closed.
9        So I've got all these business owners
10  that listen to my podcast.  But, again, most of them,
11  Brad, they have no interest in geopolitical stuff.
12  They're just business owners.  And they're saying, you
13  know -- Mr. Podcast goes, How are we supposed to
14  maintain a successful business if we're forced to be
15  closed?
16        And so that's what drew me into or pulled
17  me into or caused me to start talking about these
18  geopolitical topics that I do not wish to talk about.
19    Q.  All right.  So I appreciate that.  My
20  question is more specific, though.
21        What is Make Your Life Epic, and how is
22  it related to the Tour, as you understand it?  Or is
23  it?
24    A.  Well, the ReAwaken Tour is my amazing
25  money-losing machine.  So it expends more -- there are

Page 166

more costs than income.  That's what the Reopen
2  America Tour is, or the Reopen America.  That's what
3  that is.  And that is not a sustainable thing.  And
4  I'm trying to stop the Great Reset.  That's over here.
5        And then Make Your Life Epic is what I
6  actually enjoy doing, which is helping people to start
7  and grow a business.
8    Q.  Does Make Your Life Epic contribute
9  capital or assets to the Tour to allow it to run?
10    MR. QUINN:  Object to form.
11    A.  Am I supposed to answer this question?
12    MR. QUINN:  Who is "you"?
13    Q.  (BY MR. KLOEWER)  Make Your Life Epic.
14        Does Make Your Life Epic contribute
15  capital to the Tour?
16    MR. KING:  It was Make Your Life Epic,
17  not Clay personally.
18    MR. QUINN:  Yeah, so it's -- is the
19  entity -- does one entity give money to the other
20  entity for the Tour?
21    A.  I believe -- and you'd have to ask the
22  accounting firm I work with, but I believe I do
23  capital contributions personally into the Reopen
24  America events.
25        I think Eric is joining us.

Page 167

1    Q.  (BY MR. KLOEWER)  He's been with us all
2  along.  Yes.
3    A.  Hello, Eric.
4    Q.  So do you have -- does Make Your Life
5  Epic have any contractual relationship with Reopen
6  America?
7        Are there any agreements between the two
8  entities of any sort?
9    A.  I do not believe so.
10    Q.  Have you established -- is there any
11  written agreement that grants Make Your Life Epic the
12  publishing rights to the Tour's material?
13    A.  I don't believe so.
14    Q.  But ThriveTime Show does publish all of
15  the Tour videos, correct?
16    A.  Well, I personally publish the videos,
17  and I'm the sole member of the ThriveTime Show.
18    Q.  Well, they're through the ThriveTime
19  account, right?
20        If I go search for ThriveTime, if you had
21  an account on Rumble, I'll find all the videos of the
22  Tour events, right?
23    A.  Yes, on the different platforms, because
24  you have -- like Spotify, you can't talk about
25  geopolitical issues, and iTunes.  Those are all

Page 168

business driven.
2        And then over here, on the platforms
3  where you can, that's where I talk about the Reopen
4  America things.
5    Q.  Does Make Your Life Epic play any role --
6  and I realize that, you know, it may just depend on
7  the hat that you're wearing, and if that's the case,
8  just let me know.
9        But does anybody involved with Make Your
10  Life Epic play any role in selecting speakers for the
11  Tour?
12    A.  No.  And the reason for my hesitation on
13  that is people will say to me in passing -- you know,
14  conference attendees or people in the office will say,
15  Oh, you should interview this guy.
16        And I often don't agree with their
17  recommendations.  Most of time I don't.  So, I mean,
18  99 percent of the time, they have no influence at all
19  over who I interview.
20    Q.  Just as a general overarching question
21  that maybe I should have led with.  It might have
22  clarified some matters today.
23        Is there any way that we could discern --
24  obviously, you wear a lot of different hats and a lot
25  of different roles.

Page 169

43 (Pages 166 - 169)

1   How would I know if I see an email -- or
2   how do I know when Clay Clark is acting on behalf of
3   ThriveTime Show versus when he's acting on behalf of
4   Reopen America versus when it's just Clay Clark?
5       Is there a way to determine that?
6       And, for example, let me -- let me
7   explain. Do you have like separate email addresses
8   you use for different purposes?
9       A. No.
10      Q. No. Okay.
11      Do you have separate phone numbers that
12  you use for different purposes?
13      A. No.
14      Q. Am I correct in understanding that the
15  email address you use for all of your communications
16  is founder@thrive15.com?
17      A. That is correct.
18      Q. And you use that for purposes of both
19  Make Your Life Epic and Reopen America?
20      A. Yes. I use one email address for my
21  whole life, but I try not to use email at all.
22      Q. Okay. But to the extent you do use
23  email, the inquiry as to what entity an email is being
24  sent on behalf of, it sounds like that has to be based
25  on context. There's no other external marker to say

Page 170

1   is kind of a lightning round because there's a few
2   things to clean up.
3       I wanted to briefly just address -- and I
4   don't have this cut as an exhibit. I'm just -- maybe
5   you can clarify for me.
6       I want to show a video here of an
7   interview you conducted with Amanda Grace about a
8   month ago. And the substance of the conversation
9   isn't important, but the reason I'm showing it to you
10  is because you cite a number of views that a certain
11  ThriveTime Show episode had. And I'm trying to
12  clarify where that -- where that comes from, given our
13  prior discussion. So I'm going to share my screen
14  real quick.
15      This, just for the record -- and I can
16  share the link with counsel after this -- this comes
17  from a YouTube user, Arc of Grace Ministries. The
18  title of the interview is Clay Clark Joins Amanda
19  Grace: The Courts and the Attack on Freedom.
20      And I'm skipping forward to about 41
21  minutes and 55 seconds, just for a quick statement
22  here, to see if I can understand the basis for that.
23      So let me share my screen again, and
24  we'll play this just real quickly.
25      (Video played but not reported.)

Page 172

1   this is -- this is Clay Clark acting as ThriveTime
2   Show, for example?
3       A. That seems to be correct.
4       Q. Okay.
5       MR. KLOEWER: I think I'm just about done
6   here. I suspect I have a few little just cleanup
7   questions. If we can take a five-minute break and hop
8   on, and we'll see if I have anything left for this
9   deposition.
10      Otherwise, we can take a break and get
11  started with Reopen America.
12      THE DEPONENT: And know I shouldn't say
13  this, but I'm going to, to Eric Coomer.
14      I pray for you every day.
15      MR. KLOEWER: All right. We'll take a
16  five-minute break, and we'll be back on at ten after
17  1:00.
18      THE VIDEOGRAPHER: All right. Going off
19  record, 2:04.
20      (Recess taken, 2:04 p.m. to 2:18 p.m.)
21      THE VIDEOGRAPHER: We're back on record
22  at 2:18 p.m.
23      Q. (BY MR. KLOEWER) Okay. Mr. Clark, just
24  a few wrap-up questions here to conclude the 30(b)(6)
25  deposition for Make Your Life Epic. These are -- this

Page 171

1       Q. Okay. We don't need to go any further
2   than that.
3       All I'm trying to understand, Mr. Clark,
4   is where did that 7.1 million views number come from?
5       A. That was the number that came from Mike
6   Adams, who was a streaming partner, and then Jonathan
7   Kelly, who worked with me at the time. They were
8   tracking like numbers of streams that were watching at
9   that time. And that was the very first event we did.
10      And then as far as the ticket requests,
11  we had -- Rhema has a capacity of like 5,000 people
12  that can fit in there, and every single seat was full.
13  And then we just had like a spreadsheet where we were
14  putting in ticket requests. And that's how we came up
15  with those numbers.
16      Q. Okay. So those were not, you know,
17  internal metrics that you monitored with ThriveTime.
18  That was provided to you by the --
19      A. Yeah. That was the first time that we
20  did the event, and so we were all meeting each other.
21  And so I had never met Mike Adams. Jon Kelly had
22  never assisted me in streaming an event.
23      And Rhema, I believe, was streaming on
24  their things. And so Jon went through the process of
25  like adding up the different streams, and he was like

Page 173

44 (Pages 170 - 173)

1 Hey, good news, we reached 7 million people.
2          So that's where that stuff came from.
3     Q.   Okay.  And I don't know if I need to show
4 the image again, but was that you sitting in your
5 ThriveTime studio?  Is that where that was recorded?
6     A.   That's where I record.  Yes, sir.
7     Q.   Okay.  With the windows in the back and
8 the brick sort of walls there, is that where you
9 record your show every day?
10    A.   That's where I record my shows nearly
11 every time.
12    Q.   Okay.  All right.  Then just a more
13 general matter.
14         The ThriveTime Show interviewed Joe
15 Oltmann on at least two additional occasions after
16 that first interview, one on June 5 of 2021, and again
17 on October 11 of 2021.  So roughly, I would say, about
18 six months after the first interview, Oltmann came on
19 again as a guest, and about five months after that.
20         In the June 5 interview, you discussed
21 Dr. Coomer again.  You've produced this interview to
22 us.  I don't need to go through all the clips and go
23 through it all again.
24         Mostly what I want to know is after that
25 first interview with Joe Oltmann, what investigation

Page 174

1     Q.   So as of June 5 of 2021, had you
2 conducted any other investigation into the claims?
3         And I'm referring specifically to, did
4 you follow up with Joe Oltmann for additional
5 evidence?
6     A.   I did not.
7     Q.   Okay.  You didn't request his notes from
8 the call?
9     A.   I did not request his notes from the
10 call.
11    Q.   You didn't request information about the
12 other participants on the call?
13    A.   I did not request additional information
14 from the participants of the call.
15    Q.   The interview you conducted with Joe
16 Oltmann, the first one was published actually the day
17 before Dr. Coomer filed a lawsuit against Joe Oltmann.
18         You were aware that Oltmann had been
19 sued, correct?
20    A.   I believe -- and again, I want to answer
21 every question honestly.  So I believe that Eric,
22 during -- that Joe Oltmann, in one of our interviews,
23 said that he was being sued by Eric Coomer.  And I
24 believe that's when I learned about it.
25    Q.   Did you read that lawsuit?

Page 176

1         Have you ever reviewed it?
2     A.   No.
3     Q.   Did you ever ask Oltmann for a copy of
4 the lawsuit?
5     A.   I did not ask Joe Oltmann for a copy of
6 that lawsuit, to the best of my knowledge.
7     Q.   And those videos you referenced watching,
8 the deposition video and the police body cam video,
9 did either of those provide you with any evidence that
10 Dr. Coomer had rigged the election?
11    A.   My core belief is that Dr. Coomer is a
12 genius.  He has patents related to election integrity
13 that he could only -- only he could have because he is
14 a genius of election integrity, and he's done this --
15 they don't give out patents to anybody.  And then
16 given his title of -- as director of security and
17 strategy for Dominion, I believe that he's one of the
18 few people that would even understand what those
19 patents would mean.
20         So I believe that he had the most
21 knowledge of election integrity on the planet, and I
22 think that he could have got involved with the
23 elections.  But I can't say it's a statement of fact
24 that he did.
25    Q.   So neither of those videos presented you

Page 177

1 did you undertake to -- to confirm whether his claims
2 were -- were true?
3     A.   Well, the social media posts, I watched
4 Eric's deposition, which came -- I don't know the time
5 when it came out, but I watched -- it was a five-hour
6 deposition, and I've watched that thing probably an
7 unhealthy amount of times.  I think I've watched it
8 like ten times, maybe.  So I've watched Eric's
9 deposition there.
10         I've watched Eric's -- the body cam video
11 that showed Mr. Coomer -- Dr. Coomer responding to law
12 enforcement that -- when they were called because Eric
13 had ran a moving vehicle into a parked building, and
14 so I watched that.
15         So I watched the body cam footage, and
16 then I'd watched the deposition.
17         And I would say that's pretty much been
18 the only additional research that I've done since that
19 time.
20    Q.   Okay.  So I'll represent for you that the
21 deposition of Dr. Coomer, that -- the video you must
22 be referring to, occurred in September of 2021.  And
23 that body cam footage wasn't released until probably
24 March of '22.
25    A.   Okay.

Page 175

45 (Pages 174 - 177)

| | |
|---|---|
| 1 with any evidence that he had rigged the election? | 1     I, CLAYTON CLARK, the deponent in the above |
| 2     A.  The video -- the deposition -- | 2 deposition, do hereby acknowledge that I have read the |
| 3     MR. QUINN:  Object to form. | 3 foregoing transcript of my testimony and state under |
| 4     Sorry. | 4 oath that it, together with any attached Amendment to |
| 5     A.  The deposition that he had where he was | 5 Deposition pages, constitutes my sworn testimony. |
| 6 commenting on his social media posts increased my | 6 _____ I have made changes to my deposition. |
| 7 level of alarm by -- sorry to quantify, but maybe | 7 _____ I have NOT made any changes to my deposition. |
| 8 double.  It was more concerning. | 8 |
| 9     Q.  (BY MR. KLOEWER)  But as far as specific | 9 |
| 10 evidence that he had rigged the election, you don't | 10     _____ |
| 11 recall anything from either of those videos that made |     CLAYTON CLARK |
| 12 you -- that provided you additional information on | 11 |
| 13 that issue? | 12 Subscribed and sworn to before me this |
| 14     MR. QUINN:  Object to form. | 13 _____ day of _____, 20____. |
| 15     Go ahead. | 14 |
| 16     A.  During his deposition, he never stated | 15 |
| 17 that he rigged the election, so I had no additional | 16 My commission expires:_____ |
| 18 proof that he did so.  I just think that he could. | 17 |
| 19     I just want to make sure I'm | 18     _____ |
| 20 communicating to you, Brad, and anyone deposing me, |     Notary Public |
| 21 I'm just saying I was much more concerned after I | 19 |
| 22 watched his deposition than I was before I'd watched | 20     _____ |
| 23 the deposition. |     Address |
| 24     MR. KLOEWER:  Okay.  I don't think I have | 21 |
| 25 anything further for Make Your Life Epic, so I will | 22 |
|     Page 178 | 23 |
| | 24 |
| | 25 |
| |     Page 180 |

| | |
|---|---|
| 1 pass the witness. | 1     REPORTER'S CERTIFICATE |
| 2     MR. QUINN:  No questions. | 2 STATE OF COLORADO     ) |
| 3     MR. KLOEWER:  Okay.  Well, in that case, |     ) ss. |
| 4 we can probably wrap up here.  I'll wait to go off the | 3 CITY AND COUNTY OF DENVER  ) |
| 5 record to discuss the next one.  So nothing further | 4     I, KIRSTEN M. THORNGATE, a Registered |
| 6 from the plaintiff. | 5 Professional Reporter, do hereby certify that previous |
| 7     THE VIDEOGRAPHER:  Okay.  We're going off | 6 to the commencement of the examination, the witness |
| 8 record at 2:28 p.m.  This concludes this deposition. | 7 was duly sworn or affirmed by me to testify to the |
| 9 Thanks, everybody. | 8 truth. |
| 10     WHEREUPON, the foregoing deposition was | 9     I further certify that this deposition |
| 11 concluded at 2:28 p.m.  Total time on the | 10 was taken in shorthand by me at the time and place |
| 12 record was 3 hours and 39 minutes. | 11 herein set forth and thereafter reduced to a |
| 13     * * * * * * * | 12 typewritten form; that the foregoing constitutes a |
| 14 | 13 true and correct transcript. |
| 15 | 14     I further certify that I am not related |
| 16 | 15 to, employed by, nor of counsel for any of the parties |
| 17 | 16 or attor_____nterested in the |
| 18 | 17 result o_____l, 2024 |
| 19 | 18 |
| 20 | 19 |
| 21 | 20 |
| 22 | 21 |
| 23 | 22     _____ |
| 24 |     Kirsten M. Thorngate |
| 25 |     Registered Professional Reporter |
|     Page 179 | 23 |
| | 24 |
| | 25 |
| |     Page 181 |

Veritext Legal Solutions
800-336-4000

1  Thomas Quinn

2  tquinn@grsm.com

3           May 14, 2024

4  RE:   Coomer, Eric, Ph.D. v. Make Your Life Epic, LLC

5  Corp Rep Make Your Life Epic dba Thrivetime Show (#6667500)

6     The above-referenced transcript is available for

7  review.

8     Within the applicable timeframe, the witness should

9  read the testimony to verify its accuracy. If there are

10  any changes, the witness should note those with the

11  reason, on the attached Errata Sheet.

12     The witness should sign the Acknowledgment of

13  Deponent and Errata and return to the deposing attorney.

14  Copies should be sent to all counsel, and to Veritext at

15  errata-tx@veritext.com.

16  Return completed errata within 30 days from

17  receipt of testimony.

18     If the witness fails to do so within the time

19  allotted, the transcript may be used as if signed.

20

21

22           Yours,

23           Veritext Legal Solutions

24

25

                                    Page 182

Veritext Legal Solutions
800-336-4000

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.