**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 21-cv-03440-WJM-KAS

ERIC COOMER, Ph.D.,

      Plaintiff

v.

MAKE YOUR LIFE EPIC LLC dba THRIVETIME SHOW,
REOPEN AMERICA LLC dba REAWAKEN AMERICA TOUR, and
CLAYTON THOMAS CLARK, individually,

      Defendants

---

**EXHIBIT 6**

---

1            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO

2

ERIC COOMER, Ph.D,          )

3                     )
        Plaintiff,    )

4                     )
vs.                 ) No. 21-cv-03440-WJM-KLM

5                     )
MAKE YOUR LIFE EPIC, LLC dba  )

6  THRIVETIME SHOW, and CLAYTON  )
THOMAS CLARK, individually,   )

7                     )
        Defendants.   )

8

9
                 * * * * * *

10

      VIDEOTAPED DEPOSITION OF CLAYTON THOMAS CLARK

11

         TAKEN ON BEHALF OF THE DEFENDANTS

12

            IN TULSA, OKLAHOMA

13

             ON MAY 1, 2024

14

                * * * * * *

15

16

17

18

19

20  REPORTED BY:  KEVIN LEE IDLEMAN, CSR #01652

21

22

23

24

25

                           Page 1

APPEARANCES

FOR THE PLAINTIFF:

    Charles J. Cain
    CAIN & SKARNULIS, PLLC
    303 Colorado Street
    Suite 2850
    Austin, Texas 78701
    719-530-3011
    ccain@cstrial.com

FOR THE DEFENDANTS:

    Thomas B. Quinn
    Melisa Wiese (ZOOM)
    GORDON REES SCULLY MANSUKHANI, LLP
    555 Seventeenth Street
    Suite 3400
    Denver, Colorado 80202
    tquinn@grsm.com
    mwiese@grsm.com

ALSO PRESENT:  Jim Langlois, Videographer
    Eric Coomer

---

CONTENTS

           Page Line

STIPULATIONS                            4   1
DIRECT EXAMINATION BY MR  MR  CAIN       6   3
THE FOLLOWING PORTION OF TESTIMONY IS MARKED   158   5
   CONFIDENTIAL
ENDING OF CONFIDENTIAL TESTIMONY        160  25
JURAT                                   243   1
REPORTER'S CERTIFICATE                  245   1

PLAINTIFF'S EXHIBITS

    Description                 Page Line

Exhibit 42 (Website Screenshot)       7   14
Exhibit 43 (AntiFa Posting)          62    7
Exhibit 44 (E-mail)                 101   15
Exhibit 45 (Audio clip of prophecy)  135   23
Exhibit 46 (Patents)                150   24
Exhibit 47 (Social Media Post)      174   18
Exhibit 48 (E-mail on 11-5-20)      198    8
Exhibit 49 (Article)                203   22
Exhibit 50 (E-mail from 12-24-21)   212    3
Exhibit 51 (Internet Posting)       217   10
Exhibit 52 (Letter from Charles Cain)  231   7

* * * * * *

---

S T I P U L A T I O N S

    IT IS HEREBY STIPULATED AND AGREED by and
among the attorneys for the respective parties hereto
that the videotaped deposition of CLAYTON THOMAS CLARK
may be taken on behalf of the Defendants, on MAY 1,
2023, in TULSA, Oklahoma, by Kevin Lee Idleman,
Certified Shorthand Reporter for the State of Oklahoma,
pursuant to notice and Oklahoma rules of civil
procedure.

    IT IS FURTHER STIPULATED AND AGREED by and
among the attorneys for the respective parties hereto
that all objections, except as to the form of the
question, are reserved until the time of trial, at which
time they may be made with the same force and effect as
if made at the time of the taking of this deposition.

       * * * * * *

---

    THE VIDEOGRAPHER:  We are now on the record.
This is a videotape deposition taken of Clayton Thomas
Clark.  It is Wednesday.  It's May 1st.  The year is
2024.  In the matter of Eric Coomer, Ph.D. versus Make
Your Life Epic.  This deposition is being held at
Winters and King Law Firm.  Address is 2448 East 81st
Street, Suite 5900 in Tulsa, Oklahoma.

    Will the parties present please state their
names for the record.

    MR. CAIN:  My name is Charlie Cain.  I
represent the Plaintiff.  I'm joined in by my client,
Dr. Coomer.

    MR. QUINN:  I'm Tom Quinn.  I represent the
Deponent and the Defendants.  And soon my colleague,
Melissa Wiese will be joining me, and I believe that
counsel for Plaintiffs, Mr. Kloewer, will be joining as
well in a few moments once we get that taken care of.

    MR. CLARK:  I'm Clay Clark or Clayton Clark.

    MR. QUINN:  You're fine.  He'll -- they'll get
you taken care of.

    MR. CLARK:  Okay.

    THE VIDEOGRAPHER:  You may swear in the
witness.

    CLAYTON THOMAS CLARK,
being first duly sworn, deposes and says in reply to the

1  questions propounded as follows:
2          * * * * * *
3          DIRECT EXAMINATION
4  BY MR. CAIN:
5      Q    All right.  Now you can tell us your first
6  name and your last name and your middle name.
7      A    My name is Clayton Thomas Clark.
8      Q    All right.  Good morning, Mr. Clark.  You
9  gave a deposition pretty much all day yesterday; right?
10     A    Yes, sir.
11     Q    All right.  Same rules apply to this one as
12  yesterday.  Do you understand those?
13     A    Yes.
14     Q    All right.  And, Jim, the videographer, noted
15  the style of the case.  But you understand you have been
16  sued personally in this case in addition to the two
17  corporate entities?
18     A    Yes, I do.
19     Q    Okay.  Good.  And you've had at least the
20  opportunity to sleep after last -- yesterday's
21  deposition.  Having done that and thinking back to
22  yesterday, are there any answers you gave us yesterday
23  that you feel like were not accurate or truthful upon
24  reflection?
25         MR. CAIN:  Object to form.  Go ahead and
Page 6

1  What is Exhibit 42?
2      A    It is a thumbnail and a post from the
3  Thrivetime show podcast.
4      Q    And you, as you stated yesterday, that's the
5  podcast that you own and operate?
6      A    Yes, sir.
7      Q    This post and the content of the post, are
8  you responsible for the -- for doing this?
9      A    Yes.
10         MR. QUINN:  Object -- object to form.  Go
11  ahead.
12         THE WITNESS:  Yes, I am.
13     Q    (By Mr. Cain)  All right.  And you wrote the
14  words associated with the post?
15     A    Yes.
16     Q    All right.  So let's just look at what you
17  wrote.  This purports to have been posted on December
18  22nd of 2022.  Is that accurate?
19     A    I think the post is December 22nd of 2020.
20     Q    Excuse me.  You're right.  And I didn't sleep
21  well last night.  There were thunderstorms in your
22  lovely city.
23     A    Wild thunderstorms.
24     Q    If I say something that's inaccurate in my
25  question, as you were told yesterday, just let me know.
Page 8

1  answer.
2         THE WITNESS:  I don't believe that anything I
3  said yesterday was untruthful.
4      Q    (By Mr. Cain)  Okay.  How about inaccurate?
5      A    I don't believe anything I said yesterday was
6  inaccurate.
7      Q    Okay.  And -- and as you know, I'm sure
8  you'll have an opportunity to review the transcript for
9  inaccuracies.  I just wanted to down date it to today
10  and find out if you can think of anything that you may
11  have misspoke about.  And as I understand it, you said
12  no.
13     A    That is correct.
14         (Plaintiff's Exhibit No. 42 was marked for
15         identification purposes and made part of the
16         record)
17     Q    (By Mr. Cain)  All right.  Yesterday, you --
18  you were shown Exhibit 36 but my co-counsel had some
19  issues with marking those on the -- the Veritext site.
20  So I'm going to remark that as Exhibit 42.
21         MR. CAIN:  Tom, there's one for you.
22         MR. QUINN:  Thank you.  No. 42?
23     Q    (By Mr. Cain)  And I had to serve as my own
24  paralegal.  So to the extent that there's problems with
25  the exhibit, I can't blame anybody other than myself.
Page 7

1  Okay.  Like you just did.  That was perfect.  All right.
2  So this is from December 22nd of 2020; right?
3      A    That is correct.
4      Q    And it's entitled, Joe Oltmann, Exposing The
5  Treasonous Eric Coomer the AntiFa Member and the
6  Director of Strategy and Security at Dominion Voting
7  Systems.  That's the title up top; right?
8      A    That is correct.
9      Q    And that -- that's something you wrote?
10     A    Yes, sir.
11     Q    Now, obviously the term treasonous is
12  somewhat inflammatory.  That's my comment on it.  But
13  would you agree with me that you didn't qualify the term
14  treasonous in any way?  For example, you didn't say he's
15  possibly treasonous, he could be treasonous, he's
16  allegedly treasonous, or anything along those lines, did
17  you?
18     A    I would confirm that the words that are
19  posted here, I wrote those words.
20     Q    All right.  But you decided not to qualify
21  them, didn't you?
22     A    Well, I decided to write these words.
23     Q    Why didn't you -- why didn't you qualify the
24  term treasonous as it relates to Eric Coomer, either as
25  allegedly treasonous or possibly treasonous or words to
Page 9

3 (Pages 6 - 9)

1  that effect?
2    A   I know that at the time the only thing that I
3  knew about Dr. Coomer was the social media posts that I
4  had seen he had made.  And I knew that he had the
5  patents.  And so I looked at it as though you have
6  somebody who is academically a genius.  Who also posted
7  social media posts that seem to indicate that he was pro
8  AntiFa.  And pro -- or anti cop.  Anti police officer.
9  And so that was the variables that went into that post.
10    Q   Right.  But -- and we'll get to that.  You've
11  testified to that yesterday.  But being pro AntiFa or
12  anti cop and holding patents doesn't amount to treason,
13  does it?
14      MR. QUINN:  Object to form.
15      THE WITNESS:  Well, the three variables that,
16  I think, are most concerning as relates to Dr. Coomer
17  would be his position as the director of security and
18  strategy for Dominion, as well as the social media
19  posts, there was 13 posts I thought were concerning.
20  And then the 12 patents that he had.  So given those
21  three variables, I thought it was very concerning.  Or
22  alarming, I guess is the word I would use.
23      MR. CAIN:  Objection.  Non-responsive.
24    Q   (By Mr. Cain)  My question was, those don't
25  amount in your mind to treason, do they?

Page 10

1    A   The reason -- the reason why I wrote this --
2  this title was because of those variables.
3      MR. CAIN:  Objection.  Non-responsive.
4    Q   (By Mr. Cain)  Those variables don't amount
5  to treason, do they?
6      MR. QUINN:  Object to form.
7      THE WITNESS:  They would certainly empower
8  somebody who wanted to change the votes to do so if they
9  wanted to.
10    Q   (By Mr. Cain)  Right.  But you chose not to
11  write, they will certainly empower someone or words to
12  that effect.  You wrote what you wrote.  You own what
13  you wrote; right?
14    A   I do acknowledge I wrote these words.
15    Q   Okay.  So isn't it true that those variables
16  that you've just described for us do not amount to
17  treason?  Yes or no?
18      MR. QUINN:  Object to form.  Asked and
19  answered.
20      THE WITNESS:  I don't know.
21    Q   (By Mr. Cain)  You don't know?
22    A   I don't know.
23    Q   You didn't look up what treason meant?
24    A   Well, when looking at the post that
25  Dr. Coomer posted, it indicated that he was --

Page 11

1    Q   Let me stop you.
2    A   Very much in favor.
3      MR. QUINN:  He gets to answer.
4    Q   (By Mr. Cain)  Did you look up what treason
5  meant?
6      MR. QUINN:  Counsel, go back and read the last
7  question.  You answer that, then you can have the next
8  question.
9      MR. CAIN:  I just restated the question.
10      MR. QUINN:  Then don't interrupt him, please.
11    Q   (By Mr. Cain)  Did you look up what treason
12  meant?
13    A   I have looked up what the word treason has
14  meant over the years, sedition, treason, subversion.
15  These sorts of things.
16    Q   Okay.  Prior to making this post?
17    A   I don't know that I looked up the word
18  treason directly before posting this.  But I do know I
19  have looked up the word sedition or treason or these
20  sorts of things in the past.
21    Q   Okay.  So how do you -- whenever you looked
22  it up, how do you define it?  Just your understanding of
23  it.
24    A   An intent -- a willful intent to overthrow a
25  government.

Page 12

1    Q   Okay.  So the variables that you described in
2  your understanding of the term treason, you would agree
3  with me that -- that what you've described about
4  Dr. Coomer does not amount -- amount to a willful
5  attempt to overthrow the government?
6    A   I think if the intent behind his posts
7  culminated with his position as the director of security
8  and strategy for Dominion, and the fact that he has the
9  patents, it would certainly provide an opportunity to
10  commit treasonous activities.
11    Q   Well, you didn't say that in your post.  You
12  didn't say that Eric Coomer had the opportunity to
13  commit treason, did you?
14    A   I did not write that Eric Coomer had the
15  opportunity to commit treason.
16    Q   You said he was treasonous, didn't you?
17    A   The title here is what I wrote.
18    Q   Okay.
19    A   So I would say, as a clarifier, one could
20  look at Eric Coomer's social media posts and infer that
21  he was in favor of murdering police officers, based upon
22  the songs he posted about killing cops.  Whether he
23  actually meant to kill cops or not, that would be a
24  question you could ask Dr. Coomer.
25    Q   Well, I mean, musical choices are in the eye

Page 13

4 (Pages 10 - 13)

1 of the beholder.  You may not like MWA or some of those
2 groups.  But -- but your choice in music doesn't infer
3 that you are likely or more likely to commit treason,
4 does it?
5      MR. QUINN:  Object to form.
6      THE WITNESS:  I think the theme of the lyrics
7 of the songs that were posted were alarming.
8      Q    (By Mr. Cain)  Okay.  But you're not actually
9 accusing -- what day is it.  May 1st, 2024.  On May 1st
10 of 2024, you're not actually accusing Dr. Coomer, under
11 oath, of committing treason, are you?
12      A    I am not accusing him of committing treason.
13      Q    And irrespective of your concerns that --
14 that you've described, you're not aware of any facts, as
15 you sit here today, to suggest that Dr. Coomer, in fact,
16 committed treason?
17      A    I go back to the -- to the social media post.
18 He posted 13 of which I thought were alarming.  12
19 patents that he had.  And given his title as director of
20 security and strategy, I found the combination of those
21 three to be alarming.
22      Q    I know that's what you've said, but my
23 question was a little different.  As you sit here today,
24 you're not aware of any facts that would suggest that
25 Dr. Coomer actually committed treason, irrespective of

Page 14

1 his title, his music choices and his posts.
2      MR. QUINN:  Object to form.  Go ahead.
3      THE WITNESS:  I don't have any video -- I
4 don't have any video footage of him utilizing his
5 patents to change the election results.
6      Q    (By Mr. Cain)  I'm not asking about just
7 video.  I'm asking in general.
8      A    Well, I don't have video footage or some sort
9 of secret intel that would indicate that somebody
10 utilized his patents to change the votes.
11      Q    Have you informed any of your audiences
12 whether on a Thrivetime show or other podcasts you've
13 visited that you don't have any -- any evidence to
14 support the fact that Dr. Coomer committed treason or
15 not?
16      A    I think on the show, my consistent take has
17 been, I'm concerned about his social media posts.  And
18 given the conjunction he has the patents and has the
19 title -- or had the title as the former director of
20 security and strategy for Dominion.
21      Q    Well, you -- you testified yesterday that you
22 are -- my word is prolific, but you do a lot of content
23 on your website; right?
24      A    I do produce a lot of content.  That is
25 correct.

Page 15

1      Q    It's pretty impressive.  I -- you sometimes
2 do multiple podcasts a day; right?
3      A    Typically I do.  Yes, sir.
4      Q    In any of those publications that you've made
5 to your audience, have you ever told your audience that
6 you don't have any evidence that Dr. Coomer actually
7 committed treason?
8      MR. QUINN:  Object to form.  Go ahead.
9      THE WITNESS:  I don't recall having done that.
10      Q    (By Mr. Cain)  Why not?  Doesn't fit your
11 narrative?
12      MR. QUINN:  Object to form.  Go ahead and let
13 him answer the first question.  You can have the second
14 question back.
15      THE WITNESS:  I believe most people should see
16 the posts that Dr. Coomer posts on Facebook.  And they
17 should be aware of the patents that he has.  And that
18 the proper authorities should look into the election
19 security.
20      Q    (By Mr. Cain)  Read back my question, please.
21 The first one.
22      THE REPORTER:  In any of those publications
23 that you've made to your audience, have you ever told
24 your audience that you don't have any evidence that
25 Dr. Coomer actually committed treason?

Page 16

1      Q    (By Mr. Cain)  Sounds like a yes or no
2 question.  Have you ever told them that?
3      A    I have never told them that.
4      Q    And then as your counsel pointed out, I asked
5 you two questions in one.  The second one is I'll ask a
6 little differently.  Why not?  Didn't fit your
7 narrative?
8      MR. QUINN:  Object to form.  Argumentative.
9 Go ahead.
10      THE WITNESS:  I think most people should be
11 aware of Dr. Coomer's position, his social media posts
12 and his patents.
13      Q    Right.  You could have said that in your --
14 in this Exhibit 42 that we're looking at.  You could
15 have said words to the effect of Dr. Coomer has
16 concerning social media posts.  He has patents.  And he,
17 you know, is in a position at Dominion to do certain
18 things with respect to election security.  But -- but
19 you chose to use the term treasonous.  And I'm -- I'm
20 having a little trouble connecting those dots.  So one
21 last time, why did you equate those variables that you
22 described to mean treason?
23      MR. QUINN:  Object to form.  Go ahead.
24      THE WITNESS:  Well, in our country we have 330
25 some-odd million people, one person of which was the

Page 17

5 (Pages 14 - 17)

1 head of security and strategy for Dominion, that would
2 be Eric Coomer.  One person had, from my research, the
3 intellect needed to put together the patents, 12 patents
4 for adjudication and other aspects of the elections.
5 And I don't think most people were aware of his social
6 media posts.
7        MR. CAIN:  Objection.  Non-responsive.
8    Q    (By Mr. Cain)  You're speculating, aren't
9 you,  based on these factors you've described that
10 Dr. Coomer used his access and his role at Dominion to
11 affect the 2020 presidential election.  That's just pure
12 speculation on your part, isn't it?
13    A    I think he could have.
14    Q    So it's speculation?
15    A    I'm not sure how one would prove that he did
16 or didn't.  But I think what you do is you look to say,
17 well, here are the 13 social media posts.  Here are the
18 12 patents, here is his job titles director of security
19 and strategy.  And you would put those three together
20 and it would be alarming.
21    Q    Well, you said you're not -- you're not sure
22 how you would prove it.  But you have no proof, do you?
23 You have no proof that Dr. Coomer utilized his role at
24 Dominion voting Systems to rig the 2020 election, do
25 you?

*Page 18*

1    A    I don't know that it's possible to produce
2 proof of how the patents could or couldn't be used
3 outside of asking Dr. Coomer how those patents would
4 work or wouldn't work.  But I go back to, again, his
5 social media posts were inflammatory, concerning,
6 alarming, anti-police, anti -- he posted posts as though
7 he indicated he was in favor of AntiFa.  He said that
8 only racist fascists, quote unquote, F-tards, I believe,
9 could vote for President Trump.  And then he had the --
10 the title.  So he had the title, the social media posts
11 and the patents.
12    Q    You said you don't know that it's possible to
13 actually prove whether he rigged the election or not.
14 You know that at least in the swing states, all of those
15 results have been audited, some multiple times; right?
16    A    I haven't followed the election cases as one
17 of my core areas of ongoing research.  I typically
18 follow and talk about the Great Reset.
19    Q    So on the front end, you accused Dr. Coomer
20 of being treasonous with respect to his role at
21 Dominion, but on the -- on the tail end, you don't
22 follow the results of the cases and the actual audits or
23 the results.  Is that your testimony?
24    A    I have not been following all of the
25 different cases.  There's a -- variety of cases going

*Page 19*

1 on.  So I haven't been following that.  But I have been
2 following the -- the Great Reset.
3    Q    Why not?  I mean, if you're accusing someone
4 at Dominion of being treasonous, why wouldn't you follow
5 the results to see if that panned out?
6    A    I did follow Dr. Coomer's deposition.  I did
7 watch it ten or more times.
8    Q    Not asking about the deposition.
9    A    So I have followed that because that has been
10 my core concern.
11    Q    Okay.  Why didn't you follow -- if you're
12 accusing someone who worked at Dominion of treason, why
13 haven't you followed up with the -- the actual audits of
14 the -- of the swing state results, and frankly the
15 litigation relating to that to determine whether your
16 theory panned out?
17    A    My focus has been on Eric Coomer.
18 Dr. Coomer.
19    Q    The guy that you accused of treason?
20    A    My focus has been on Dr. Eric Coomer.
21    Q    Okay.  Well, the -- the Court and potentially
22 the jury's going to be listening to this or shown this
23 at some point.  And they may want to know why it is that
24 you didn't actually follow up to see if this theory
25 panned out.  So I'll ask you one more time.  Wasn't it

*Page 20*

1 important to you to see whether or not Dr. Coomer
2 actually committed treason that resulted in these
3 various swing state elections being rigged?
4    A    I believe that Dr. Coomer is a genius who has
5 an academic background that would prove he's a genius.
6 And that he developed 12 patents that I, frankly, do not
7 understand how those patents work.  And I believe that
8 Dr. Coomer, who again, is a genius who created this
9 technology, also posted 13 social media posts that I
10 found to be alarming.  And that he had the title as the
11 director of security and strategy for Dominion.  So my
12 focus as it relates to elections has been primarily on
13 what Dr. Coomer has said previous to elections and
14 activities after the elections.
15        MR. CAIN:  Objection.  Non-responsive.
16    Q    (By Mr. Cain)  Are you aware that Dr. Coomer,
17 to this day, is receiving death threats as a result of
18 allegations that he is treasonous and he rigged the
19 election?
20    A    Through this process of this litigation, I've
21 been told that.  And I sincerely hope that he and nobody
22 else receives death threats.  I also will add to the
23 record, I could uniquely empathize because I have also
24 received death threats.  And so we are in a -- clearly a
25 time in American history where you have many people

*Page 21*

6 (Pages 18 - 21)

1 receiving death threats.
2    Q   Okay.  So you empathize with him.  Have you
3 taken any action, just looking at Exhibit 42, to -- to
4 take that down off of the Thrivetime site?
5    A   I've not taken that down off the Thrivetime
6 website.
7    Q   Why not?
8    A   I wanted to have this conversation.
9    Q   You and me?
10    A   Dr. Coomer and I.
11    Q   Well, he's not going to be deposed today.  I
12 don't -- I don't understand.  What do you mean you
13 wanted to have this conversation?
14    A   I wanted to know how the 12 patents work and
15 why he posted those 13 social media posts.
16    Q   Well, you don't know -- let's assume it's 12
17 patents.  You know, how can you infer from the fact that
18 he has 12 patents that somehow those patents relate to
19 the ability to rig an election as opposed to, for
20 example, ensure that it's more secure?
21    MR. QUINN:  Object to form.  Go ahead.
22    THE WITNESS:  I can only read the description
23 of the patents.  But I think it would be fair to ask
24 Dr. Coomer what those patents do and how they work.
25    Q   So you don't know, as you sit here, what they
Page 22

1 focus has been and will continue to be on Dr. Eric
2 Coomer, the man who is the head of security and strategy
3 for Dominion.
4    So a good example would be like if you had a
5 hardware store, I'm not trying to be patronizing, just
6 an example.  If you had a hardware store and there were
7 concerns about theft at the hardware store, and you
8 looked into the manager of the hardware store, and you
9 found out the manager of the hardware store was posting
10 posts that indicated that he was advocating for
11 nefarious activity, it would be alarming.
12    Q   Do you have any posts of Dr. Coomer where
13 he's -- was advocating for rigging the 2020 election?
14    A   I have pro AntiFa posts and pro murdering cop
15 posts.
16    Q   So the answer to my question is, no, you
17 don't have any posts of Dr. Coomer advocating for
18 rigging the 2020 election or subverting democracy?
19    A   There's one post --
20    MR. QUINN:  Object to form.  Go ahead.
21    THE WITNESS:  There's one post I have.  I
22 don't have my notes where I can read it.  But I have one
23 post where the statements made indicated that he was
24 adamantly opposed, he being Dr. Coomer, was adamantly
25 opposed to President Trump becoming president of the
Page 24

1 do and how they working, do you?
2    A   I would like to know how they -- what they do
3 and how they work.
4    Q   So you don't know?
5    A   Which is why we're here.
6    Q   Well, working backwards, you know, if we
7 start with the concept of Dr. Coomer being treason --
8 treasonous, in your words, or having committed treason,
9 and by implication, the 2020 election was rigged in some
10 form of fashion, have you found -- I know you said you
11 don't follow the cases.  But have you found any of the
12 claims of election fraud on -- on a mass scale to have
13 been established either through a court finding or
14 through the finding of the various jurisdictions
15 associated with running the elections?
16    A   I found that Dr. Coomer during a deposition
17 testified under oath that the social media posts he
18 posted were his posts.
19    Q   I'm not asking by posts.  I'm asking about
20 election fraud?
21    A   My focus is on Dr. Coomer.
22    Q   Okay.  Well, I'm asking about election fraud.
23 You can focus on him as much as you want.  He's sitting
24 right here.  But do you need me to re-ask my question?
25    A   You can re-ask the question.  But that -- my
Page 23

1 United States.  There's one post that I believe that I
2 can read.
3    Q   (By Mr. Cain)  Okay.  Well, he has a First
4 Amendment right, you would agree, to -- to have a
5 political viewpoint just like you do; right?
6    A   I do agree he has a First Amendment right.
7    Q   Right.  And I suspect given the volume of
8 people that work in elections, they all may or may not
9 have a political viewpoint; right?
10    MR. QUINN:  Object to form.  Go ahead.
11    THE WITNESS:  Everybody has a political
12 viewpoint.
13    Q   (By Mr. Cain)  Right.  Okay.  So you're not
14 equating that, are you, with, you know, intent and
15 motive and opportunity and, in fact, actions taken to
16 rig an election; right?  A plus B doesn't equal C in
17 this instance, does it?
18    MR. QUINN:  Object to form.  Go ahead.
19    THE WITNESS:  At the risk of being redundant,
20 if you have that job title, very few people have that
21 job title.  In fact, Dr. Coomer is the only one who had
22 that job title as director of security and strategy, so
23 one could argue it's one of the most important jobs in
24 American at the time.  And Dr. Coomer was also posting
25 posts that were alarming.  And he also has the patents.
Page 25

Veritext Legal Solutions
800-336-4000

1    Q   (By Mr. Cain) Right. And -- and I need to
2  make this quicker. Those three variables, you can
3  just -- you can repeat them, that's fine. But maybe we
4  can just refer to those as the three variables as a --
5  as a thumbnail for your statement. You understand what
6  I'm saying? I get what you're saying, three variables.
7  That can be your answer if that's going to be your
8  answer, but that's probably enough for today.
9    A   I don't think it is.
10   Q   All right. So but to go back, you don't
11 fault a person working in elections for having a
12 political viewpoint; right?
13   A   I don't.
14   Q   All right. It's likely, given the law of
15 averages, that there are people that are adamant Trump
16 supporters who work in elections; right?
17   A   That would be correct.
18   Q   And just because they support President Trump
19 doesn't mean that they don't believe that the election
20 should be, you know, fairly adjudicated; right?
21   A   Could you repeat that question?
22   Q   Just because they work in elections and
23 support President -- former President Trump doesn't mean
24 that they can't fairly adjudicate elections; right?
25   A   That sounds correct.

Page 26

1    Q   All right. And the converse would be true.
2  Just because someone may support current President Biden
3  doesn't mean that -- that they can't fairly work in
4  elections and adjudicate the results accurately, does
5  it?
6    A   That also sounds correct.
7    Q   All right. So back to what I was asking you
8  about when we started this particular line of question.
9  We -- you started with this post. We've talked about
10 the fact that you haven't really focused on the cases
11 associated with election fraud that have come out in the
12 year since the election; right?
13   A   My focus has been on the Great Reset and
14 specifically Dr. Eric Coomer as it relates to election
15 integrity.
16   Q   So again, by that answer, the answer to my
17 question is, yes, you haven't focused on the -- the
18 actual results of these cases looking into potential
19 election fraud; right?
20   A   That has not been my core focus. That is
21 correct.
22   Q   So for example, you're not aware of
23 Mr. Lindell's recent case in front of the United States
24 Supreme Court?
25   MR. QUINN: Object to form. Go ahead.

Page 27

1    THE WITNESS: I have not been following
2  Mr. Lindell's case with the Supreme Court.
3    Q   (By Mr. Cain) Okay. So you're not aware
4  that the Supreme Court denied his request for cert on an
5  election fraud case recently?
6    A   Previous to this discussion, I've not had
7  that discussion or looked -- looked it up.
8    Q   Do you still have him on your tour?
9    A   He will not be joining us at the final
10 confirmed event we have in Detroit, Michigan. And he
11 has an open invitation to attend events if he would like
12 to. And I said yesterday in the deposition and I'll say
13 it again, if Dr. Coomer would like to come to an event
14 to explain how election integrity works, and not in a
15 facetious way, sincerely, I would allow him to do it.
16   Q   Well, there may be some security concerns
17 with that offer, as generous as it sounds.
18   A   I would have the best security possible. I
19 would make sure it's -- and he could answer any
20 questions he wants. And we've extended -- you know, I
21 think it would be a great opportunity. Because I mean
22 this and I'll just continue. I do believe that
23 Dr. Coomer had a critical role as the direct of security
24 and strategy for Dominion, I do believe that, and so.
25 And I do believe that as somebody with his academic

Page 28

1  background, he created these patents in a way that most
2  people can't understand. And so I think it would be a
3  great idea to have him come to the events and -- or
4  event, an event, with the best security possible. And
5  with not an ounce of sarcasm to it or anything. Just --
6  and I would love to do a question/answer session with
7  him. Or maybe you could do a question/answer session
8  with him. I would be happy to do that.
9    Q   Are you agreeable to allowing Dr. Coomer to
10 record a video message regarding his position on being
11 a -- treasonous and his role in the election as opposed
12 to a personal attendance?
13   A   Absolutely. And also for people that watch
14 my show, I know my mother doesn't and I know my wife
15 doesn't, but some people do, I've invited, you all know
16 Herrari to come to the ReAwaken Tour. And I've also
17 invited Klaus Schwab to -- to come to the ReAwaken Tour.
18   Q   All right. Well, they're in a different --
19   A   I -- I understand. I just want you to know
20 the context. I don't expect you to listen to all my
21 shows, but.
22   Q   Going back to Mr. Lindell. You say he has an
23 open invitation. Sounds like he's -- you only have one
24 more scheduled event.
25   A   We have one more in June. That's June 7th

Page 29

8 (Pages 26 - 29)

1 and 8th. And that's the -- that's the final one we have
2 confirmed. Yes. June.
3    Q    Okay. Have you followed -- I asked you if
4 you followed his case in front of the Supreme Court.
5 Have you followed his loss in arbitration with respect
6 to the -- the cyber secure -- security symposium. Hard
7 for me to say. Let me put that back. What time is it?
8 It's early. So I'll try to speak slower. I usually do.
9 But we have a lot to cover.
10      Have you followed the arbitration in
11 connection with his cyber security symposium?
12    A    I have not.
13    Q    You don't know about his loss on that one?
14    A    I have not. Previous to this conversation,
15 no, I haven't covered that or thought about it.
16    Q    Did you attend the cyber security symposium?
17    A    I did not attend the cyber security
18 symposium?
19    Q    Did you know Mr. Lindell back then when he
20 had it?
21    A    Well, I met Mike Lindell through an
22 introduction from General Flynn. And the conversation I
23 had Mike Lindell has pretty much consisted of, what time
24 would you like to speak at our event, and those sorts of
25 things. So I have not followed the work he's doing. I

Page 30

1 have not followed the work he's doing.
2    Q    How about Kari Lake? Are you aware that she
3 recently lost her -- her appeal relating to election --
4 alleged election fraud in Arizona?
5      MR. QUINN: Object to form. Go ahead and
6 answer.
7      THE WITNESS: I know the name Kari Lake. But
8 I have never met Kari Lake, nor have I followed that
9 situation.
10    Q    (By Mr. Cain) Have you followed any of the
11 indictments that have been issued in Georgia and Arizona
12 with -- with respect to these electors or fake elector
13 claims?
14    A    There was a ticket buyer the other day that I
15 spoke to who told me that Christina Bobb had been
16 indicted. And so I called Christina Bobb to tell her
17 that I'm praying for her.
18    Q    Other than that, you're not aware of any of
19 the particulars with respect to those indictments?
20    A    I have not been following those.
21    Q    How do you know Christina Bobb?
22    A    I met her through the ReAwaken Tour. I think
23 that she was on the show -- she's been on the show
24 twice. And so it's kind of a small world. And so I was
25 introduced to her, I believe, backstage at an event or

Page 31

1 via text message or something like that.
2    Q    Okay. So you call her and just said you were
3 praying for her?
4    A    Yes.
5    Q    Because she's in legal trouble?
6    A    Well, I had heard about it and so I just put
7 out a show that showed the names of the people that had
8 been indicted. And I just said -- I called her and
9 said, we just put out a show letting people know we're
10 praying for you. If we can do anything for you, let me
11 know.
12    Q    And you know Rudy Giuliani was indicted as
13 well?
14    A    I do know that because I believe that I
15 was -- he spoke at the church I go to. So he spoke at
16 the church I go to the week before those indictments
17 came out. And so I had been in communication with him.
18 I interviewed him on a Friday podcast.
19    Q    Well, let's -- let's digress to Mr. Giuliani.
20 The church you go to he spoke at, which church is that?
21    A    Sheradin.church is the website. It's a local
22 church in Tulsa, Oklahoma. Pastored by Pastor Jackson
23 Lahmeyer.
24    Q    And that's the fella that ran for senate?
25    A    That is the gentleman that ran for senate.

Page 32

1 Yes, sir.
2    Q    I think he lost?
3    A    He did lose.
4    Q    And was the Giuliani visit to the church
5 taped?
6    A    It was taped. It was taped and it was
7 streamed.
8    Q    And then just kind of filling in the -- the
9 relationship, when did you meet Mr. Giuliani?
10    A    I think -- well, let me -- again, we're in a
11 deposition so I'm just thinking out loud. I apologize
12 because you're taking notes. There was an event that
13 Pastor Jackson Lahmeyer hosted at his church when he was
14 running for office. And at that -- at that event that's
15 the first time I -- I saw Rudy Giuliani or shook his
16 hand and said hello. But I don't know that he knew my
17 name or would know who I was. And then for Pastor
18 Jackson Lahmeyer, occasionally he'll ask me to come in
19 and MC events. And so that was the first time two weeks
20 ago, maybe a week and a half ago, that I would have what
21 I consider to be a meaningful rela -- or meaningful
22 conversation where you're looking at someone and they
23 go, oh, what's your name again. That kind of thing.
24    Q    Okay. When was Pastor Lahmeyer running for
25 office? What year was that?

Page 33

9 (Pages 30 - 33)

1    A    I do not recall.  Nor am I trying to hide it.
2  I just don't remember the dates.
3    Q    Was it mid-term, 2022?
4    A    That sounds correct.
5    Q    So forgive me.  I didn't quite -- I didn't
6  quite understand what you were saying.  You've -- you've
7  met Mr. Giuliani twice then in person?
8    A    Yes.  And I just -- to make sure we're super
9  clear here.  There was an event that Pastor Jackson
10  Lahmeyer was hosting and he was a speaker at that event.
11  And so I met him, but I don't know that he would recall
12  me meeting him.  It was just, like, a passing thing.
13  And then he came to the church to speak at the church
14  here a couple of weeks ago.
15    Q    At your invitation?
16    A    At the invitation of Pastor Jackson Lahmeyer.
17  But I also had, you know, I wanted to have Mayor
18  Giuliani come speak as well.  So I was -- I was, you
19  know, excited about the opportunity.  And then that's
20  the first time we had a meaningful conversation.
21    Q    Did -- did Mr. Giuliani speak about election
22  issues at the church the other day?
23    A    Well, it's taped.  So people can watch it and
24  get the transcript.  But he focused on cleaning up New
25  York.  That was the first part of his speach.  Then he

Page 34

1  talked about his ongoing litigation that he's involved
2  in.  And then opened it up for a question and answer
3  session.  But I don't know how much he got into the
4  mechanics of election issues.  It was more about his
5  litigation he's involved in.
6    Q    All right.  Well, going back to sort of
7  the -- the time period of the election, and you know,
8  obviously we have a claim against Mr. Giuliani, although
9  he's in bankruptcy now.  But back in the -- the weeks
10  before and after the 2020 election on November 3rd, did
11  you have any contact -- I know not in person given your
12  testimony -- but over the phone or E-mail or text with
13  Mr. Giuliani?
14    A    I believe you guys have all my cell phone
15  records and text records so you should have that.  My
16  cell phone number, when people ask for tickets for the
17  ReAwaken Tour, the number they text in is my number.  So
18  I do get a lot of text messages from people.  But I
19  don't recall communicating with him.  I don't have his
20  cell phone number today.  Do not have his number.  But I
21  don't believe I've ever communicated with him via text
22  or phone or anything like that.
23    I clarify this that my phone number if you
24  text in to request tickets, it is my cell phone number.
25  So I do get a lot of text messages.

Page 35

1    Q    So you had no coordination with Mr. Giuliani
2  with respect for any Stop the Steal type events?
3    A    No coordination with Mr. Giuliani.
4    Q    Were you part of or do you consider yourself
5  to have been part of the Stop the Steal movement?
6    A    No.
7    Q    I did -- it may have been taken down.  But I
8  did see some video of you at Freedom Plaza January 5th
9  of --
10    A    Yeah.  I got asked to speak there and it went
11  kind of viral when I encouraged people to give each
12  other a hug.
13    Q    Yeah.  That part did.  You got to let me
14  finish my question even though I'm speaking slower now
15  and you're anticipating what I'm going to -- to ask.  So
16  yes.  You did encourage people to give each other hugs
17  at that speech?
18    A    Yes.
19    Q    And during the Covid pandemic; right?
20    A    That's correct.
21    Q    And that's the part that went viral?
22    A    Yes.
23    Q    How did you end up at Freedom Plaza?
24    A    I was invited to speak by Charlene Bollinger.
25    Q    If Brad were here, he could tell me who she

Page 36

1  is.  Who is Charlene Bollinger?
2    A    She runs a medical freedom organization.
3    Q    And then it sounds to me then, correct me if
4  I'm wrong, that you were invited to speak really on
5  this -- the issue of Covid and related topics, not so
6  much on election security issues?
7    A    Covid has been the area I focused on because
8  the Great Reset is my main focus area.
9    Q    Did you stay over on the 6th during the --
10    A    I did.  I did stay with Pastor Dave Scarlet.
11    Q    During the events at the Capitol?
12    A    I did stay with Pastor Dave Scarlet.
13    Q    Were -- were you down at the Capitol?
14    A    I did not go down to the Capitol.
15    Q    And you said Pastor who?
16    A    Dave Scarlet.
17    Q    Is he here in Oklahoma?
18    A    No.  He's in Texas.
19    Q    Is he on your tour?
20    A    He does speak at the tour from time to time.
21  He's participated in them through his entity called His
22  Glory.
23    Q    Does he have a -- a health care focus or
24  re-set focus?
25    A    He's a Biblical focus.  And his website is

Page 37

10 (Pages 34 - 37)

1 His -- it's HisGlory.me.
2 Q Okay. So have we discussed -- going back to
3 Mr. Giuliani. You talked about the two in-person
4 contacts. You told me you have -- I have your cell
5 phone records. You've told me that you didn't have any
6 communications with him around the election period. And
7 that -- and specifically not about the Stop the Steal
8 movement. Is that all correct?
9 A That is correct.
10 Q All right. Did anybody associated with the
11 Trump campaign, to your knowledge, ask you to get
12 involved in election fraud issues in the time period
13 preceding the 2020 election or shortly thereafter?
14 MR. QUINN: Object to form.
15 THE WITNESS: Nobody within the Trump
16 organization asked me to get involved with election
17 integrity issues.
18 Q (By Mr. Cain) Did anybody ever outside of
19 that?
20 A I do not believe that anybody asked me to get
21 involved with election integrity issues.
22 Q Do you associate with any election integrity
23 organizations? I know we talked about Stop the Steal
24 and your testimony is clear on that. Any other
25 organizations that you have an associate with?

Page 38

1 MR. QUINN: Object to form. Go ahead.
2 THE WITNESS: I do not associate with any
3 organizations like that. But just to be super clear.
4 Mike Lindell does speak at our events. And so whatever
5 things he's involved in, I guess. But I -- I don't
6 participate in them directly.
7 Q And you -- you mentioned this yesterday.
8 You're wearing your personal hat today, not your
9 corporate hat, so there may be some redundancies from
10 some of the questions. But I want to make sure we cover
11 it in all capacities. Mr. Lindell, you mentioned, I
12 think, that you have a promo code, Clay, that you're
13 listeners can use if they go to his website; right?
14 A That's correct.
15 Q And Mr. Clay asked you, or you call him
16 Mr. Brad. I call him Mr. Brad. I like that better.
17 A Okay.
18 Q Asked you a little bit about that. As far as
19 the revenue associated with the relationship with
20 Mr. Lindell, what entity, or maybe you personally, does
21 that funnel down in to?
22 A My wife handles that.
23 Q So you don't know?
24 A I don't know.
25 Q All right. I'm going to get back to 42. But

Page 39

1 since we mention your wife handling that I want to -- I
2 think maybe it makes sense to -- to talk a little bit
3 more about your business interests. Actually before I
4 do that, so we're going to go three steps back. We
5 didn't really get into your background much yesterday.
6 You look like a young person. How -- how old are you?
7 A 43.
8 Q Not so young.
9 A Yeah.
10 Q You told us a little bit about --
11 MR. QUINN: Seems pretty young to me, but
12 that's --
13 MR. CAIN: Well, you have considerably more --
14 MR. QUINN: Seems like spring chicken to me,
15 but keep going.
16 MR. CAIN: Have considerably more gray hair
17 than me. And less. Sorry.
18 Q (By Mr. Cain) So you're 43 years old. I
19 know you have five kiddos. You're married here in
20 Tulsa. You've talked about your disengagement with the
21 Oral Roberts University yesterday.
22 A That is correct.
23 Q And you don't -- I extrapolated from that,
24 but correct me if I'm wrong, but you don't have a
25 college degree or you do?

Page 40

1 A I do not have a college degree.
2 Q Did you go to high school here in Tulsa?
3 A I went to Dassel-Cokato High School in
4 Minnesota.
5 Q Is that where you're from?
6 A I was born in Tulsa. And we moved to
7 Minnesota when we were -- I was 12 due to financial
8 issues. And so my mom and dad moved us to Cokato,
9 Minnesota, Dassel-Cokato, Minnesota. And I went to high
10 school there. And then the way Minnesota works is if
11 you have enough credits, you can go to college early.
12 And so I went to St. Cloud State early and took college
13 courses to the extent they would let me take them in
14 high school. And then I went to Oral Roberts
15 University.
16 Q And how long were you at Oral Roberts before
17 you were asked to leave?
18 A Approximately a year and a half.
19 Q And I didn't hear you yesterday talk about
20 any particular expertise in election security issues.
21 It's fair to say that you don't have any -- any
22 education relating to election security issues, do you?
23 A I do not have any education on a practical
24 level or academic level related to election security
25 issues.

Page 41

11 (Pages 38 - 41)

1    Q    And hence, you wouldn't hold yourself out to
2  be an election security expert, would you?
3    A    I would not hold myself out to be an election
4  security expert.
5    Q    Okay.  Have you consulted -- I know you've --
6  you've said that what you've said about the treasonous
7  Eric Coomer.  But have you consulted with any election
8  security experts to -- to test your hyperthesis based on
9  these variables you've described that what is claimed
10  about him relating to rigging the election is actually
11  possible or accurate?
12    A    I have not talked to election security
13  experts.
14    Q    And no one prevented you from doing that.
15  That was just your choice; right?
16    A    That was my choice.
17    Q    Okay.  Well, I don't want to go too deep into
18  the origin story.  So I'll go, I guess, from -- I mean,
19  you've had a frankly, my characterization, a pretty
20  remarkable run on -- on creating businesses, at least as
21  you've described it.  I looked at your website online,
22  which by the way, if -- if I want to go on to Thrivetime
23  and get content, I have to subscribe; right?
24    A    Well, you have Thrive 15, which is on-line
25  paid training where you pay approximately $19 a month.

Page 42

1  And that's the on-line school.
2    Q    Right.  But -- but if I go to the -- I forget
3  the URL on it.  But the one that gets your Thrivetime
4  show.  What's the URL?
5    A    The Thrive 15.  Thrive15.com.
6    Q    No.  What's the other one?
7    A    Thrivetime show?
8    Q    Yeah.
9    A    ThrivetimeShow.com.
10    Q    Okay.  And I want to -- I want to get content
11  from that.  I have to give you my E-mail address and who
12  I am and that sort of thing; right?
13    A    Yeah.  It's a $19 a month subscription model.
14        MR. QUINN:  They make promo codes for them.
15        THE WITNESS:  I don't have any promo codes.
16    Q    (By Mr. Cain)  Well, I had someone pay, I
17  guess, you $19 to get access in my team.  There's a
18  website video that is about 30 minutes long.
19    A    Okay.
20    Q    I watched that the other day.
21    A    Okay.
22    Q    You said you, I think on that, that you
23  established 13 multimillion dollar businesses?
24    A    Yeah.  What I do is basically people team up
25  with me and I help them grow their business.  Primarily

Page 43

1  in a non-equity position.  That's how I prefer to do it.
2    Q    Okay.  So of the 13, not -- not all of those
3  are ones that you're shareholder in the business.  Those
4  are ones that you helped reach --
5    A    Yeah.  And Dr. Zahn and I always say, we are
6  on our show, we say, between the two of us we've built
7  13 multimillion dollar businesses.  That's how we say
8  it.
9    Q    You got to let me finish my -- my question.
10  Okay?  I will say that a lot of my depositions there's,
11  like, a dash because I pause a lot due to numerous
12  factors.  So just please be patient with me.  Okay?
13    A    Okay.
14    Q    So let's just talk, not about the success
15  stories for others, but about your own businesses
16  briefly.  You mentioned the Thrive 15.  And that's the
17  one that you own with Dr. Zelner?
18    A    Yes, sir.
19    Q    And that's your -- your business -- on-line
20  business coaching business?
21    A    That's an on-line school where you can watch
22  the videos.  Because as a consultant there's only so
23  many clients that I can work with on a one-on-one basis.
24  So the idea was to build the on-line school so that
25  people who aren't clients could learn the same

Page 44

1  information.
2    Q    Okay.  Well, I asked you about election
3  stuff, experience.  I want -- I want to understand the
4  business experience.  So that's -- that's the topic.
5  The on-line stuff you've -- you've just indicated.  You
6  mentioned yesterday something about a dog training
7  company.  So that's Business No. 2, I wrote down.  Make
8  Your Dog Epic; right?
9    A    Correct.  And that's a newer venture.  The
10  previous venture that I was involved in was called
11  TipTopK9.com.  And that was a business that was around
12  before I met them.  And the business was around for
13  approximately eight or nine years.  And it was doing
14  around $350,000 a year of revenue.  And we helped them
15  grow it to over a $1 million in Tulsa.  And then we
16  helped them open up several additional north of a
17  million dollar franchise locations.
18    Q    As this new entity, Make Your Dog --
19    A    No.  As Tip Top K9.
20    Q    Okay.  So what's -- I'm sorry.
21    A    And then recently we decided to kind of
22  mutual buy-out.  So I'm no longer involved with that
23  brand.  And so I'm starting another brand called Make
24  Your Dog Epic.
25    Q    Do you have partners in that deal?

Page 45

12 (Pages 42 - 45)

1      A     That's a business that's owned, I believe,
2   under Clark Holdings.  But it fits into Clark Holdings.
3   And then the gentleman that would run it for Oklahoma is
4   JT Lawson.
5      Q     But you've already told us or you told us
6   yesterday, the holding company is -- that's wholly owned
7   by you; right?
8      A     The holding company is owned by me.  But
9   that's where the Make Your Dog Epic is under that.
10     Q     You produced some corporate documents
11  amending, I believe, the operating agreement for that
12  company to remove your wife as a member.  Do you
13  remember doing that?
14     A     I know that there was some situation.  I
15  would have to talk to legal counsel.  But where --
16  because Make Your Life Epic, when I founded it, I was
17  the sole member.  And at some point somehow she signed
18  off on something.  And so they amended it to go back to
19  how it was.
20     Q     All right.  The original intent was for it
21  just to be you?
22     A     That's correct.
23     Q     It just didn't get documented that way so it
24  was amended to correct that?
25     A     Correct.

Page 46

1   Room.
2      A     Yes.  That's EITRLounge.com.
3      Q     Get in that plug.  And that's also one you
4   own wholly yourself?
5      A     I own that with a partner by the name of
6   Jonathan Barnett.
7      Q     Are there shares of that -- are membership
8   interests, as the case may be, owned in the holding
9   company or personally?
10     A     I don't know.
11     Q     And then Re-Open was deposed yesterday.  We
12  can -- I want to visit a little bit more about that.
13  But that's one you wholly own through the holding
14  company?
15     A     That is -- I wholly own Make Your Life Epic.
16  I wholly own Clark Holdings.  And then I wholly own
17  ReOpen America.  So -- but I don't know exactly how
18  those are all organized beyond that.
19     Q     Okay.  And Make Your Dog Epic, I apologize,
20  did you tell me you -- you wholly own that one as?
21     A     That should be wholly owned under Clark
22  Holdings, I believe.
23     Q     Okay.  All right.  So that's, by my count,
24  five.  And just dealing with not the -- the businesses
25  that you helped as a coach, are there other businesses

Page 48

1      MR. QUINN:  We've been going right at an hour.
2   Can we take five or when you get a moment?
3      MR. CAIN:  I'm just going to ask about the
4   next business.  So I can take --
5      MR. QUINN:  Sure.  If you want to finish up
6   the businesses or you can --
7      MR. CAIN:  That's going to take me a little
8   more than seven minutes.  So why don't we take a break.
9      MR. QUINN:  Why don't we do that.  We'll just
10  take five minutes and we'll come right back.
11     MR. CAIN:  Sure.
12     THE VIDEOGRAPHER:  Off the record.  The time
13  is 10:02.
14     (A short break was had; after which the
15        following proceedings took place:)
16     THE VIDEOGRAPHER:  Back on the record.  The
17  time is 10:13.
18     Q     (By Mr. Cain)  Okay.  So we're talking about
19  your businesses.  And we talked about two-ish Thrive 15,
20  Make Your Dog Epic.  Yesterday you appeared for Make
21  Your Life Epic.  That's one of the businesses you own
22  wholly; right?
23     A     Yes, sir.
24     Q     And then I just asked you about your haircut.
25  And that relates to another business Elephant In The

Page 47

1   that you're involved with currently?
2      A     How I make money is I get a small percentage
3   of the growth.  So I'm not on the documents as an owner,
4   but I get a small percentage of the -- of the growth.
5   And so I think yesterday I listed off them.
6      Q     I don't -- and I apologize to jump in.  But I
7   don't need to know the ones that you own the small
8   percentage of the growth.  I presume that that income
9   flows into one of these entities; right?
10     A     Make Your Life Epic should be primarily what
11  I do.  It's the same thing over and over.
12     Q     Okay.  So outside of that, are there any
13  other businesses like Make Your Life Epic that -- that
14  you're involved with currently?  Along those lines where
15  you own the company.
16     A     We mentioned Elephant In The Room.  We
17  mentioned Make Your Life Epic.  We mentioned Make Your
18  Dog Epic.  I think that would be it.
19     Q     Okay.  Now, going back to ReOpen American,
20  I'm not going to replow that ground.  But you were shown
21  P&L statements from that company.  I had some follow-up
22  on that.  The binder in front of you is some prior
23  exhibits.  Can you grab that.  And you're familiar
24  with -- as a business coach, you're familiar with the
25  formatting of balance sheets and profit and loss

Page 49

13 (Pages 46 - 49)

1 statements?

2 A Yes.

3 Q Okay. Let's talk about Exhibit 12 briefly.

4 That's the balance sheet for 2021 for ReOpen America.

5 Are you with me?

6 A Yes, sir.

7 Q And Mr. Brad asked you some questions about,

8 maybe not the balance sheet, but he did ask you about

9 contributions into ReOpen America. There's a line item

10 in the liabilities and equity section of this document

11 under contributions. Do you see that?

12 A Yes.

13 Q And for 2021, reported contributions into

14 that entity were $300,220.02. Are you with me on that?

15 A Yes.

16 Q Okay. And I don't think you knew the answer

17 yesterday as to where that money came from. But as you

18 sit here, are those personal contributions into that

19 entity?

20 A Those should be personal contributions into

21 that entity. I would clarify. CCK is the accounting

22 firm I utilize. And so they keep track of that.

23 Q Okay. But I assume you have a -- you write a

24 check to the company and deposit that into a capital

25 account for contributions?

Page 50

1 A That has been the process.

2 Q All right. So first year of operations you

3 contributed roughly $300,000. And the next page is your

4 P&L's where you showed, I believe, a $481,000 net income

5 for your first year of operations of ReOpen; is that

6 right?

7 A That was the amount left in the account. But

8 we had an event associated with those ticket sales that

9 we had to fulfill.

10 Q Right. But because you're cash counting

11 method as you described it yesterday, you don't accrue

12 those liabilities into 2021 from an accounting

13 standpoint; right?

14 A I look at it as though somebody paid us to

15 build a house and we haven't built the house yet.

16 Q Right. But you don't --

17 A This isn't profit that I can keep and spend

18 because it's associated with the next event.

19 Q That's different than -- I mean, that's

20 different than -- I have the same issue with my law

21 firm. You got to hold back money if you're expecting to

22 have to pay bills. But you're on a cash counting method

23 for -- for the company; right?

24 A Yes.

25 Q So you may look at the end of the year in

Page 51

1 2021 and say, I've got $481,000 in profit, but I need to

2 reserve money because I've got some dedicated

3 liabilities. You know they are going to come due the

4 first quarter of the next year?

5 A Well, I would say for this, all of this was

6 dedicated to the future events.

7 Q Okay. And you're managing the company, so

8 that's an evaluation that you would make personally;

9 right?

10 A Right. Having an estimate of ticket sales

11 and expenses associated with them.

12 Q Okay. Let's fast forward to 2022. The

13 balance sheet for 2022 is Exhibit 14. If I look back to

14 the same line item that we talked about before, it shows

15 contributions of $61,340.04. You see that?

16 A Which page are you on?

17 Q I'm on Exhibit 14, the first page.

18 A Okay. Could you repeat that, sir?

19 Q Yeah. So for 2022, according to the balance

20 sheet that -- that you provided us with, we show

21 contributions of $61,340.04; right?

22 A That looks to be correct.

23 Q And like 2021, those would have been personal

24 contributions by you into that entity; true?

25 A That looks to be correct.

Page 52

1 Q And I didn't see any meeting minutes or --

2 or notes that reflect a vote. I know you'd have to be

3 in the room with yourself and -- and -- and do that

4 yourself. But what was your methodology in determining

5 when you were going to contribute capital into the

6 company?

7 A When we had bills to pay and there wasn't

8 income there to pay those bills.

9 Q And Exhibit 15 reflects 2022 net income as

10 3 -- negative, excuse me, $365,408.08; right?

11 A That is correct.

12 Q All right. So reported profit year one,

13 2021, reported loss, year two, 2022; right? At least

14 accounting?

15 A Because we do cash counting, this is what the

16 numbers were at the end of the year. But I don't

17 consider that to be profit because, again, it's -- it's

18 income associated with an expense.

19 Q I understand. In 2021 and 2022, you didn't

20 take a distribution as a member?

21 A I did not take a distribution as a member.

22 Q 2023, balance sheet you've graciously

23 provided us with. It's Exhibit 16. Same line item.

24 Contributions appear to be $590,000 total; is that

25 right?

Page 53

14 (Pages 50 - 53)

Page 54

1    A    That appears to be correct.
2    Q    And like with the prior years, these would
3  have been checks or some similar form of payment by you
4  personally into the company?
5    A    Yes, sir.
6    Q    So my fuzzy math has you at about a million
7  dollars out-of-pocket, give or take, for the three years
8  in terms of contributions to this company?
9    A    That is correct if the math adds up.  And as
10  a clarifier, the venues -- some of the venues were very
11  hard to get done.  And that's why you have these balloon
12  expenses.  So you look at Oregon, I believe in Oregon,
13  that's where we had to build a massive facility.  And
14  same thing in Batavia, New York.
15    Q    Yeah.  Because Oregon, they wouldn't -- they
16  wouldn't let you rent the facilities there.  They had
17  some objection to your group being present at their
18  facilities; right?
19    A    Correct.  That's the one that I had a crowd
20  of people yell death threats at me as well, so.
21    Q    Protesters to your event?
22    A    Yes.
23    Q    Okay.  So 2023 on the P&L's, the next
24  exhibit, Exhibit 17.  That shows, on the second page,
25  confirm this, a loss of $780,309.66; is that correct?

Page 55

1    A    Looks to be correct.
2    Q    So if -- if I did the math and if -- if you
3  take the three years, you've put in a million bucks
4  approximately into the -- this endeavor, and over the
5  three years combine losses of about 655,000 for the
6  three-year period; is that right?
7    A    If the math checks out, that sounds correct,
8  according to these documents.
9    Q    All right.  And are you losing money in -- in
10  2024?
11    A    Well, if we go to TimeToFreeAmerica.com, we
12  can see when the last event we did was.  But I believe
13  this is the second event of this year.  I believe the
14  one in Michigan is the second event of the year.  So
15  we've done two events this year.  And so I do plan on
16  ending, based on current numbers, with a loss.
17    Q    Okay.  And I -- I -- you kind of touched on
18  this yesterday.  I didn't -- I was in and out of your
19  deposition.  The current plan is to continue this tour
20  for the foreseeable future; is that right?
21    A    I don't want to do the tour.  So I'm doing
22  one in June in Michigan.  And so my goal has been to
23  stop the Great Reset.
24    Q    Right.  And you said that as your -- your end
25  date.  But we -- we don't know when that's going to

Page 56

1  happen; right?
2    A    Yeah.  I think you're going to see the
3  introduction of a central bank, digital currency, and
4  the ending of American freedom as we know it.  To which
5  point, there would be no purposes of having a ReOpen
6  America event.
7    Q    Because you would have lost the battle?
8    A    Correct.
9    Q    Okay.  But when that happens, if that
10  happens, there's no obviously no set date for that;
11  right?
12    A    I think it has happened.  And as BRICS,
13  Brazil, Russia, India, China, South Africa have decided
14  to completely de-dollarize, and they'll be introducing a
15  new currency, which will remove the US dollar as the
16  world reserve currency.  I believe that the era of what
17  you might call America and American exceptionalism or
18  western exceptionalism, I think, is ending.
19    Q    Yeah.  And I saw that with respect to Russia.
20  Wasn't aware of the other countries.
21    A    They've been -- I know this is a deposition,
22  we're not supposed to say a lot, but I'm going to say
23  it.  So Brazil, Russia, India, China, South Africa,
24  they've been hoarding gold for the last 17 years.  And
25  they have been -- on January 1st they added Iran, Egypt,

Page 57

1  Ethiopia, Dibai and Saudi Arabia.  And these countries
2  are teaming up.  And Russia announced the expansion of
3  BRICS by an additional 25 countries.  And at that point,
4  they are going to no longer use the US dollar as the
5  world's reserve currency.  And at that point, our money
6  won't be worth less, it will be worthless.  And so it
7  would not make a lot of sense to do a ReOpen America
8  tour.
9    Q    Okay.  We can go into the weeds more on that,
10  but I don't know that it's highly probative.  I guess
11  let me circle back to this business structure.  You're
12  obviously, as a coach, teaching people how to make money
13  in business.  Can you explain to the jury why you're
14  willing to operate ReOpen America at a significant cost
15  to you and then significant loss to the company over
16  these three years of time?
17    A    I describe myself as a struggling evangelist.
18    Q    Cool.  What does that have to do with my
19  question?
20    A    I'm not trying to make money with these
21  events.
22    Q    But it's a business?
23    A    I don't think the -- the purpose of a tour is
24  to make money.
25    Q    Do you have any other businesses where you're

15 (Pages 54 - 57)

Page 58

1  not trying to make money?
2      A   In the past I've had ideas that were ideas
3  that I was excited about.  But I didn't turn them into a
4  business because it was, you know, I like Silkie
5  chickens.  And I like --
6      Q   Soaking?
7      A   Silkie chickens.  Silkie chickens.  They're
8  like a feathered bird.  I like Silkie chickens.  I like
9  goats.  I like dogs.  These kind of things.  And so
10  those are things that I'm into and those would be
11  considered as like a hobby.  But I'm not selling tickets
12  to come watch me pursue my hobby.  By as for the
13  ReAwaken Tour, it does cost money to put the events on.
14  We have to have some mechanism with which to lose,
15  theoretically, less money.
16      Q   Okay.  I appreciate that response.  I -- I --
17  my question was do you have any other businesses that
18  you've formed, like an LLC in this case, where you're
19  not trying to make money other than this ReOpen America?
20      A   This is the only thing that I have formed
21  with a specific purpose of not trying to make money.
22      Q   Now, we know from your testimony that the
23  shares, or in this case, the membership interests are
24  owned -- actually owned by Clark Holdings, which you own
25  100 percent of; right?

Page 59

1      A   That is correct.
2      Q   Do you know, this may be a question for your
3  accounting firm, but do you know whether or not the
4  businesses that are rolled up into that holding company
5  file consolidated tax returns?
6      A   I do not know that.
7      Q   Do you know whether or not the losses for
8  ReOpen America where you're not trying to make money are
9  netted against any profit in the other businesses?
10      A   I do not know that.  But that would be a good
11  question for the accounting company.
12      Q   That wasn't your design here to off-set
13  profit in other entities by not trying to make money in
14  this one?
15      A   That was not my design.
16      Q   If you're not trying to make money in ReOpen,
17  LLC, why didn't you just simply form a nonprofit?
18      A   You could argue that it would be a good idea
19  to start a nonprofit.  I just -- I thought we were going
20  to do one event, and then it turned into two.  And I
21  thought, well, we'll be done soon.  And then here we are
22  now 20 something events later.
23      Q   And, Mr. Brad, yesterday, kind of touched on
24  this.  We've had some discussions with the Court about
25  how to trace revenue streams from the ReOpen entity that

Page 60

1  does business as ReAwaken America.  But I want to
2  confirm in your deposition, you can't -- you're --
3  you're not in a position -- strike that.  Let me try to
4  ask it more concisely, if possible.
5          You're not tracking revenue at the ReAwaken
6  America tour by let's just limit it to speakers.  Like,
7  when Joe Oltmann gets on your stage, there is no
8  streaming revenue as an example that you could -- you
9  could trace his statements or his presence on your
10  stage; right?
11      A   That is correct.
12      Q   Does he sell, he, Mr. Oltmann, sell
13  merchandise at the ReAwaken tours?  Or did he, I should
14  say.
15      A   We allow all of the speakers to sell
16  merchandise.  But I don't know that he did or didn't
17  because I don't really get involved in that portion of
18  it.
19      Q   Okay.  So hypothetically, if someone got on
20  the ReAwaken America stage and defamed Dr. Coomer, there
21  would be no internal accounting mechanism to quantify
22  what -- what type of revenue would be associated with
23  that -- that speaker and those statements.  Is that
24  fair?
25      A   That's fair.  I will tell you one way I was

Page 61

1  looking at though.  You have about 70 speakers at an
2  event.  So we start at 8:00 and we go until about 8:00,
3  and you have about three to four speakers per hour.  To
4  give you a context, there's about 36 speakers a day.  So
5  let's say 70 total.  And so when Joe Oltmann spoke, he
6  was given 15-minute slots.  He was given 15 minutes.  So
7  he was given -- if there were 70 speakers,
8  approximately, he was given 1/70th of the time.
9      Q   Okay.  That's helpful.  Thank you.  So I can
10  put this exhibit away.  Let's segue back to Exhibit 42.
11  I have a few more questions on that, or maybe an
12  associated exhibit.  I'm not going to replow this
13  -- this treasonous statement about Dr. Coomer, at least
14  not right now.  Your -- your statement though on the top
15  after Treasonous Eric Cooper -- Coomer, you go on to say
16  the AntiFa member and the director of strategy and
17  security at Dominion Voting Systems.  Now, the AntiFa
18  member part of that, let's focus on that for a second.
19  That, in part, I think is derived from your review of a
20  post that Dr. Coomer made with respect to the AntiFa
21  manifesto.
22      A   Yeah.  There was a two-part post Dr. Coomer
23  made.  So there was, like, a post one and then there was
24  kind of an additional edit to it, a clarifier.  And so
25  that's where that was referenced.

16 (Pages 58 - 61)

1    Q    Okay.  And just so that we're maybe talking
2  apples and apples, let me give you a companion exhibit
3  that was filed in one of the related cases.
4        MR. QUINN:  Which one is this?  I'm sorry.
5        MR. CAIN:  This is 43.
6        MR. QUINN:  Thank you.
7        (Plaintiff's Exhibit No. 43 was marked for
8         identification purposes and made part of the
9         record)
10   Q    (By Mr. Cain)  While you're reviewing that,
11  for the record Exhibit 43 was filed in, I believe, the
12  case against the Trump campaign, et al.  Hence that
13  marking on the bottom EC 22cv, et cetera.  Have you
14  familiarized yourself with that exhibit, Mr. Clark?
15   A    I am looking at it now.
16       MR. QUINN:  This is Mike King.
17       MR. CAIN:  Well, welcome, Mr. King.
18       MR. KING:  How are you?
19       MR. CAIN:  Delightful as usual.
20       MR. KING:  I don't mean to interrupt you.
21   Q    (By Mr. Cain)  I'm not asking you to digest.
22  I'm just asking you to familiarize yourself.  Have you
23  done that?
24   A    Yes, sir.
25   Q    All right.  Is this Exhibit 43 one of the two

Page 62

1  posts that you just referred to?
2   A    It looks like the first portion on the
3  document you handed to me was what I saw on Eric
4  Coomer's social media, the first portion.  And it looks
5  like the last portion.
6   Q    And I -- I said this off the record before,
7  I'm my own paralegal on this particular one.  So what is
8  the other portion that you remember seeing that's not
9  represented by Exhibit 43.
10   A    The part where it was signed as -- it says,
11  currently media and other actors wishing to contact this
12  author may do so through the page.  Should
13  Mr. Zuckerberg, who has displayed plenty of -- that
14  portion there seems to be what I recall from Eric
15  Coomer's post.
16   Q    Okay.  All right.  And this is one of the
17  documents that -- that you've already told us concerned
18  you about Dr. Coomer as part of your sort of three
19  variables we discussed?
20   A    Yes.
21   Q    Now, this starts -- we're not going to go
22  through it all obviously.  It's a -- appears to be an
23  open letter to Mr. Trump.  And it says, AntiFa isn't an
24  organization.  There's no membership, no meetings, no
25  dues, no rules, no leaders, no structure.  It is

Page 63

1  literally an idea, nothing more.  You see that at the
2  top?
3   A    Yes.
4   Q    Now, your post on Exhibit 43 calls Dr. Coomer
5  AntiFa member.  Are you -- are you saying that -- that
6  you understand him to be part of some organized group as
7  a member of AntiFa or something else?
8   A    Well, here it says AntiFa isn't an
9  organization.  There are no membership, no meetings, no
10  dues, no -- and so I believe that the comments that
11  Dr. Coomer posted indicated that he is in favor of this
12  organization or whatever it is.  This ideology.
13   Q    Yeah.  I mean, it's -- if you take it at face
14  value, it's a -- it's a movement or an ideology.
15  Doesn't have any actual organized structure, isn't --
16  isn't that right?
17   A    I am not part of AntiFa.  But it appears as
18  though this is what AntiFa's stating that AntiFa is.
19   Q    Okay.  But you're not -- you can't go on the
20  web and find the AntiFa organization and sign up to be a
21  member; right?
22   A    I never tried to become a member of AntiFa.
23  I just -- I -- I don't know about the inner workings of
24  AntiFa.
25   Q    I'm just wondering why you're calling him a

Page 64

1  member of an organization that doesn't actually have an
2  organizational structure?
3   A    I think it -- AntiFa appears to have been
4  designed so that it would be hard to say someone was a
5  member of it because it doesn't have members.
6   Q    Okay.  So then he's not a member of this
7  amorphous organization, is he?
8        MR. QUINN:  Object to form.
9        THE WITNESS:  I think this is a -- a word
10  salad designed to confuse.  I believe that Satan is the
11  author of confusion.
12   Q    (By Mr. Cain)  So Satan authorized and
13  authored Exhibit 43?
14   A    I believe that Satan is the author of
15  confusion and a double-minded man is unstable in all his
16  ways.  And this is designed to be complicated to
17  understand.
18   Q    So it was inspired, designed by Satanic
19  purpose.
20        MR. QUINN:  Object to form.  Go ahead.
21        THE WITNESS:  I believe the mindset that goes
22  into saying -- this -- this concept here is designed to
23  be confusing.
24   Q    (By Mr. Cain)  Thus it has Satanic origins?
25   A    I believe this content was written to be

Page 65

17 (Pages 62 - 65)

1 designed to be confusing.
2 Q Well, I'm using your words. You used them
3 previously. So you seem to be backing off that. Does
4 this have Satanic origins or not.
5 MR. QUINN: Object to form. Go ahead.
6 THE WITNESS: I really don't know how to
7 respond to that.
8 Q (By Mr. Cain) Okay. Well, you agree this --
9 whatever this is, doesn't have an organizational
10 structure in the -- in the true sense of that word;
11 right?
12 A I -- I don't -- I have not looked into the
13 inner workings of AntiFa. I just thought it was
14 concerning that Dr. Coomer was posting statements in
15 favor of this amorphous, whatever this is.
16 Q I get that. You -- you haven't done any
17 research to determine whether there's some legal entity
18 associated with AntiFa; right?
19 A I don't know what AntiFa is. I believe it to
20 be an ideology that Dr. Coomer is in favor of is how I
21 would -- I guess the most succinct way to explain it.
22 Q Okay. And you're not aware of Dr. Coomer
23 speaking at any AntiFa rallies or anything along those
24 lines; right?
25 A I have not heard any audio of Dr. Coomer

Page 66

1 you know, the guy who is the director of security and
2 strategy, this guys is posting these things on social
3 media. And so I kept hearing about it consistently.
4 And so that led me to just do Duck Duck Go researches
5 and tried to find something.
6 Q Duck Duck Go is a search engine?
7 A Yes, sir.
8 Q Okay. Do you have the results of your
9 research?
10 A No.
11 Q Anything else you can tell the jury about
12 your research before you made the statement that the
13 treasonous Eric Coomer is an AntiFa member?
14 A It was pretty much his 13 social media posts
15 that I deemed to be alarming, and the 12 patents that he
16 has and his title as the director of security and
17 strategy for Dominion.
18 Q Can you give us -- I tried to find where
19 you're getting this number 12 patents from. And I -- I
20 can't -- I'll represent to you, I can't do that unless I
21 sign up and subscribe to something associated with,
22 which no disrespect, I don't want to do. Can you go
23 onto your website, maybe even at lunch, and print out
24 the patents?
25 A I have them ready. Yeah.

Page 68

1 speaking at rallies or seen any hard evidence that he
2 spoke at rallies.
3 Q So the source of the statement that he's an
4 AntiFa member, given that it's an ideology and you
5 haven't heard him speak at any other demonstrations or
6 rallies, to the extent that they have those, is from
7 what, how you label him as an AntiFa member. Where does
8 that come from?
9 A His statements he was making on social media
10 to me indicated he was in favor of AntiFa.
11 Q So solely from the social media?
12 A That's -- that was my research led me to
13 believe that he was sympathetic to the AntiFa ideas.
14 Q Well, you've broadened it to research. So
15 let's talk about that. You said the statements in his
16 social media. I get that. I wrote it down.
17 A Right.
18 Q Your research is No. 2. So tell me about
19 your research.
20 A Well, when we did -- when the lockdowns first
21 started happening, we would have Town Halls that would
22 happen each week in opposition significances to the
23 lockdowns. And people would show up and, you know, they
24 would show you a picture on their phone or something
25 they had printed out. And they would go, hey, just so

Page 67

1 Q Okay. You do?
2 MR. QUINN: You can get them right -- I mean,
3 he can -- you don't have to pay for them. They're right
4 on the internet.
5 MR. CAIN: Okay.
6 MR. QUINN: Tell him the website.
7 THE WITNESS: Yeah. It's
8 TimeToFreeAmerica.com. And then there's a button called
9 2020 Election Fraud, I believe. And I put them out
10 there as, like, public facing. But then I also have
11 a --
12 MR. QUINN: He's got -- he -- he tried to give
13 it to you. Tell -- tell Brad that yesterday.
14 MR. CAIN: Yeah. I -- I -- I tried to do that
15 and it asked for my -- my E-mail address. And I -- I
16 just don't want news letters.
17 THE WITNESS: You don't need to subscribe to
18 get to it here.
19 MR. CAIN: Okay. We'll -- we'll do that at a
20 break.
21 MR. QUINN: At the break, we'll go back and
22 get it for you.
23 MR. CAIN: Can we print it in the old
24 fashioned way --
25 MR. QUINN: Yes.

Page 69

18 (Pages 66 - 69)

1    MR. CAIN:  -- so that I can mark it?
2    MR. QUINN:  Yeah.
3    MR. CAIN:  That would be -- that would be
4    great.
5    Q    (By Mr. Cain)  Okay.  Anything else on your
6    research on Dr. Coomer being an AntiFa member other than
7    what you've described?
8    A    Just the 13 posts I found.  And approximately
9    12 posts.  It could be when we print them out, the 12
10   patents, it could be 14.  But I think it's 12.
11   Q    Cool.  And I think from your testimony
12   yesterday, I gathered, that the research you were doing
13   was independent of -- of anything relating to Joe
14   Oltmann?
15   A    Correct.
16   Q    In other words, Joe didn't call you up and
17   say, hey, Clay, you need to look at this guy.
18   A    And actually I didn't know who Joe was.  And
19   Ann Vandersteel introduced Joe to me.  And I had already
20   been doing my own research.  And Ann said, Joe can bring
21   the receipts.  And then when having just a brief
22   conversation with Joe, he referenced his posts, which I
23   had already found, and he referenced something about his
24   patents, which I had already researched.
25   Q    Okay.  But it had -- Dr. Coomer had to have

Page 70

1    come to your attention in some manner outside of
2    Mr. Oltmann for you to start your search, unless you had
3    something divine, you know, tell you you need to start
4    looking into Dr. Coomer.
5    A    It wasn't divine.  It was just there was a
6    lot of talk about concerns about the election.  And so I
7    just began looking up who was in charge of our election,
8    who was in charge of -- who was at the top potentially
9    of Dominion.  And I found Eric Coomer.  And the people
10   at these Town Halls we do we have hundreds of people who
11   would come.  And, you know, different people would tell
12   me, hey, this is somebody that you should look into.
13   This is somebody that you should look at, so.
14   Q    Okay.  That makes sense.  So it may have been
15   essentially a tip from an attendee?
16   A    It wasn't an attendee, it was attendees
17   plural.  I mean, we had a lot of people that were coming
18   to these.  And each week you would have a new crowd of
19   people.  Because it was, like, an open Town Hall.  And a
20   little background context, this is when pretty much all
21   churches were closed and all these organizations and
22   things weren't open.  And so we were one of the only
23   places that was open at that time.
24   Q    Okay.  And respectfully you're cutting me off
25   again.  You know what I'm asking.  That's great.  At

Page 71

1    some point Kevin's going to probably hit me first.  But
2    just please let me finish my question.
3    A    Okay.
4    Q    I would encourage him to hit you first since
5    you're the one cutting me off.  So you don't --
6    don't know of any -- I like at the end of these blocks
7    to -- to make sure I'm -- I'm getting it at least.  The
8    13 posts you saw through your research, his position at
9    Dominion, hasn't seen any -- any evidence that he had
10   spoke at demonstrations.  But what you saw, at least on
11   the on-line posts, was enough to give you this
12   conclusion that Dr. Coomer is an AntiFa member.  Is that
13   fair?
14   A    I was very concerned that he was in favor of
15   AntiFa, whatever it is.
16   Q    Well, you're -- I'm certainly not going to
17   debate politics here with you today.  But you're not a
18   fascist, I take it.
19   A    Not in favor of fascism.
20   Q    Okay.  So being against fascism in and of
21   itself, you don't have any problem with that; right?
22   A    I'm not in favor of a totalitarian
23   government.
24   Q    Okay.  So someone who doesn't agree or
25   believe in -- and fights against fascism, that in and of

Page 72

1    itself doesn't offend your notions of fairness and
2    justice, does it?
3    A    It does not bother me if somebody is against
4    fascism.
5    Q    And I know you said you were reluctant -- you
6    were reluctant to get involved in politics and religion
7    as it relates to your on-line persona; right?
8    A    In my off-line persona.
9    Q    A lot of people choose to keep their politics
10   private; right?
11   A    That's correct.
12   Q    And their religion, for that matter?
13   A    That is correct.
14   Q    And you did that -- well, strike that.  What
15   was the tipping point for you on the political side,
16   that you were -- you were willing to start -- let's just
17   take the election security issue.  What was the tipping
18   point for you that -- that convinced you that you should
19   change that policy?
20   A    I don't -- I don't say this to be quippy, I'm
21   just saying it was my -- how I think.  I discovered that
22   it would be hard for businesses to be open if they were
23   forced to be closed.  And so therefore that was my
24   tipping point.
25   Q    So as it relates to politics, are you a

Page 73

19 (Pages 70 - 73)

1  registered Republican?
2     A   I am a registered Republican.
3     Q   And have you been so for some time?
4     A   Yes.  I've been so for some time.
5     Q   But -- but because of the businesses or any
6  kind of mandates associated with operation during the --
7  the pandemic, is it fair to say you linked the
8  Republican party as being more conducive to keeping
9  businesses open during that period of time?  Is that a
10  fair statement?
11     MR. QUINN:  Object to form.  Go ahead.
12     THE WITNESS:  I actually would -- would not --
13  I don't think that the Republicans have done much better
14  than the Democrats as it relates to the keeping America
15  open.  I think that both Republicans and Democrats,
16  primarily don't have the personal freedoms of the
17  average American in their mind.
18     Q   Okay.  But you didn't start a non-partisan
19  crusade with respect to this issue.  You -- you very
20  firmly became a vocal supporter of former President
21  Trump; right?
22     MR. QUINN:  Object to form.  Go ahead.
23     THE WITNESS:  I will communicate that which I
24  say on my show as well.  So I apologize.  That's a
25  longer forum.  I do agree with Trump on making a vibrant

Page 74

1  medical advisor for the governor of Texas for seven
2  years.  Dr. Malone, who claims to be the inventor of the
3  MRNA technology.  And then the current Surgeon General
4  of Florida.
5     Q   Okay.  So I asked you what the tipping point
6  was and you've been responsive on that.  I appreciate
7  that.  So that -- that time period when you're -- you
8  were focusing, beginning to focus on this as a political
9  issue was roughly when?
10     A   I had listeners to our podcast or clients
11  that would ask me how am I supposed to keep my business
12  open if it's forced to be closed.  And so whenever that
13  time line was of that the lockdowns, that's when I spoke
14  out because I really felt it was hard to have a business
15  that's open if you're forced to be closed.
16     Q   And then sort of draw the historical line
17  between those lockdown events that you just described
18  and getting with General Flynn regarding the tour.  How
19  did that evolve?
20     A   Well, when the lockdowns first were discussed
21  but they hadn't happened yet, I did my own research.
22  And I found that the models that said 2.2 million people
23  would die from Covid were incorrect.  Debra Burks
24  actually stood behind the podium and said the models
25  were off by approximately 25 times, by 25 times.  Then I

Page 76

1  economy.  I do agree with Trump on having safety in our
2  cities.  I do not agree with President Trump on the RNA
3  modifying Covid shots.  So those are probably the three
4  big issues that are in my mind as the economy, safety
5  and health freedom.  So do not agree with President
6  Trump about Operation Warp Speed.  I do agree with him
7  about the economy.  And I do agree with him about
8  safety.
9     Q   Safety meaning crime?
10     A   Yeah.  Not inner city chaos.
11     Q   Okay.  Well, I -- if the -- if the vaccine
12  and the Covid issues, those are important topics to you
13  obviously; right?
14     A   It's the most important because it is the --
15  a key component of the Great Reset.
16     Q   Okay.  So I'm having a little trouble linking
17  your support of President -- former President Trump
18  under these circumstances if you don't agree with his
19  prior position on the RNA component to the vaccine.
20     A   Well, Joe Biden wants to mandate the shots
21  and President Trump suggests the shots.  And I would
22  suggest that President Trump should stop suggesting the
23  shots.  And an expert or a doctor that -- doctors,
24  plural, that would share my view would be Dr. Peter
25  McCullah, Dr. Richard Bartlett, who was a former top

Page 75

1  began researching the polymerase chain reaction test or
2  PCR test.  And I found the inventor of those tests.  His
3  name is Kary Mullis.  And Kary Mullis said that those
4  tests could be misconstrued and produce false positives.
5  And then I looked up and I found the hydroxychloric one.
6  Was an effective treatment.  And so people in my life
7  that said they have Covid, I would refer them to
8  Dr. Meehan and Dr. Sherwood and nobody was dying.  So I
9  told my wife, if they did a lockdown in Tulsa, I'll sue
10  the mayor of Tulsa.  And I'll turn our building into a
11  church so that people can have a place to worship and
12  learn about the Gospel.  And so that's what I did.  And
13  then, as I stated yesterday, Dr. Zoellner and myself and
14  Aaron Antis and a handful of people sued the mayor of
15  Tulsa with me.  And we started doing Town Halls or what
16  some might call church.  But I would just call it a
17  gathering to learn about the Gospel.
18     So each week those events would pick up
19  momentum.  And eventually at one point Sean Foit, the
20  praise and worship leader, came in and we had -- some
21  people described it as 1,000, some people said 500.  But
22  let's say lots of people were there.  And then we had
23  General Flynn flew in to endorse Pastor Jackson Lahmeyer
24  to run for senate opposite of Lankford.  And that's the
25  first time I met General Flynn.

Page 77

20 (Pages 74 - 77)

1    Q    Okay. And let's unpack that a little bit, as
2  the kids like to say. You sued the mayor. We talk --
3  you talked about that yesterday. You lost that lawsuit.
4    A    Yeah. It was an interesting situation. And
5  James Lankford was the attorney -- or not James Lankford
6  but James DeCristofaro was the attorney that was helping
7  with that. And again, you have to ask him. He's an
8  attorney and I'm not. I don't understand all the
9  legalese. But essentially, the City of Tulsa didn't
10  want to hear the lawsuit because of the medical
11  emergency, which was the reason why we were filing a
12  lawsuit. So it was a circle that could not be ended, is
13  my understanding.
14    Q    Okay. So that got dismissed?
15    A    I don't know exactly how that ended. I just
16  know that at one point James told me we're going to be
17  well on the other side of Covid before this lawsuit ever
18  gets seen.
19    Q    Were you guys at these events that you
20  described, were you holding events in violation of the
21  lockdown end dates?
22    MR. QUINN: Object to form. Go ahead.
23    THE WITNESS: I don't know what the actual
24  restrictions were at the time. But I did not shut down
25  my core operations.

Page 78

1  headliners on the tour; right?
2    A    I would argue that he is the headliner.
3    Q    Because I think I've seen some advertisements
4  where it's sort of the -- you guys have top billing.
5  It's General Flynn's Tour and it's your tour?
6    A    Well, I've tried to put Clay Clark's on it.
7  And just to be clear, Mr. Charlie, we had a lot of
8  people that would do other events and they would ask me,
9  well, hey, how come you're not speaking? And I said,
10  well, that's not my event. I'm not organizing that
11  event. And they go, oh, well, it looked to be a similar
12  lineup, or looked to be similar speakers. And so I made
13  sure at that point, maybe it was after the first one or
14  the second one, that my name was always on the top of
15  the flier for any event that I was organizing.
16    Q    Okay. And it's Cain?
17    A    Mr. Cain.
18    Q    I guess as enabled.
19    A    Okay.
20    Q    So the relationship with -- with General
21  Flynn grew. And I think you -- you've described him as
22  a good friend of yours now; right?
23    A    I would consider him to be a very good
24  friend. Yes.
25    Q    All right. Now, on, I think it was maybe

Page 80

1    Q    (By Mr. Cain) So people stepped -- well, the
2  office that you do your podcast in, did you have that
3  office while you were --
4    A    I was at the Riverwalk at the time.
5    Q    When did you switch?
6    A    We were at the Riverwalk for, I think,
7  approximately six years or seven years. And then my
8  wife and I had discussed selling the property and kind
9  of putting our office and home before one place. Right
10  around maybe about a year before the lockdowns ish.
11    Q    Okay. And then you mentioned, and I had made
12  a note yesterday. You mention Aaron Antis as well
13  yesterday. Who is -- who is he and what does he do?
14    A    He's a client of mine.
15    Q    What does he do?
16    A    He helps home builders to grow their home
17  building businesses. And so he hires me to help him
18  grow home building companies.
19    Q    So he's not one of your coaches?
20    A    I do pay him from time to time as a
21  contracted resource, but he's not an employee.
22    Q    All right. Then fast forwarding. You
23  mentioned that's how you got hooked up with General
24  Flynn through Pastor Lahmeyer. And that relationship
25  obviously grew to General Flynn being one of

Page 79

1  November going back to 2017, approximately in that
2  period of time, that's when General Flynn pled guilty to
3  lying to the FBI about his contacts with the Russian
4  ambassador; right?
5    A    You might know more of the inner workings of
6  that case than I would.
7    Q    Okay. But I -- I guess my -- my -- the
8  thrust of my question was, did you know when you became
9  friends and you had this get together with the Pastor,
10  that General Flynn had pled guilty to lying to the FBI?
11    A    I did know about the formal announcement. I
12  do believe that there was a lot of variables that went
13  into that that weren't reported by the mainstream media
14  that perhaps General Flynn can walk through the inner
15  workings of that more than I could. But yes. I was
16  aware that he had pled guilty.
17    Q    Okay. And you've sort of castigated
18  Dr. Coomer on your podcast for, I think you say it
19  jokingly, running -- running into a parked building or
20  something like that?
21    A    A moving --
22    Q    A moving car into a parked building?
23    A    Yes.
24    Q    And then lying to or misleading the police
25  as -- as a result of that incident; right?

Page 81

21 (Pages 78 - 81)

1    A    Yeah.  I have watched that video a lot.  So I
2  kind of took my own transcript down of that.  And I have
3  that.  I can go through with you line by line.
4    Q    You have the transcript of the video?
5    A    I don't have the transcript here, but I -- I
6  did print it off.  And I could easily during a break, we
7  could go through it line by line.
8    Q    I suspect your counsel has a flight and he
9  would prefer me not to go through that line by line.
10  And I don't intend to.
11    A    Okay.
12    Q    Anyway, in any event, you've -- you've made a
13  point of discussing that on your podcast in the past
14  multiple times; right?
15    A    That's correct.
16    Q    And if you -- if you have it line by line,
17  you noted, didn't you, that despite a false start
18  perhaps, Dr. Coomer did explain exactly what had
19  happened to the police.  And specifically that he ran
20  into that building.  He didn't lie about it in the sense
21  that -- that he was charged for example with some
22  obstruction or claim by the police that he lied to them;
23  right?
24    A    I'm not sure how this legal stuff works, but
25  I would like to just go through it line by line, even if

1  we have to miss flights and stay here for two days.
2    Q    Okay.  So did you -- I appreciate your
3  desire.  But isn't it true he wasn't charged with lying,
4  like General Flynn, who was charged and pled guilty for
5  lying to the -- in this case, the FBI, which is a police
6  organization.  Dr. Coomer was never charged with lying
7  to the police as a result of that incident, was he?
8    MR. QUINN:  Object to the form.
9    THE WITNESS:  Can I request to get the notes?
10    MR. QUINN:  You have to answer his question.
11    Q    (By Mr. Cain)  Yeah.  I'm just asking the --
12  the notes are not going to reflect the --
13    A    I have the transcript of the actual --
14    Q    I get it.  But you know he wasn't charged
15  with lying to the police, was he?
16    A    I have the transcript of what he said.
17    Q    I'm not asking you about the transcript.  I'm
18  asking you, from your personal knowledge, you know and
19  you would agree with me, that he wasn't charged with
20  lying to the police, was he?
21    A    I'm referencing the transcript.
22    Q    Cool.  You can -- you can think about that
23  all you want.  Answer my question, please.
24    A    I would go back to the transcript.
25    Q    Okay.  But the transcript doesn't contain a

1  charge.  That's something that's done in the courts.
2  All right?  So that's not going to answer your question.
3  You know, don't you, that he was not charged like
4  General Flynn with lying to a police organization?  In
5  this case, the Salida PD?
6    A    I would like to read the transcript to you.
7    MR. CAIN:  Objection.  Non-responsive.
8    Q    (By Mr. Cain)  Do you know the answer to my
9  question or not?
10    A    I would like to read the transcript to you.
11    Q    It's not going to happen.  Can you answer my
12  question?
13    A    I don't know how the Court ruled.
14    Q    So you don't know.  I mean, in your -- in
15  your research -- I understand you're desire to read the
16  transcript.  But you don't have any documentation -- if
17  I wanted to go look at the guilty plea by General Flynn,
18  I could get it on the internet right now.  You don't
19  have in your possession a court document showing that
20  either Dr. Coomer pled guilty to lying to the police or
21  was adjudicated to have done so; right?
22    MR. QUINN:  Object to form.
23    THE WITNESS:  I don't have that.
24    Q    (By Mr. Cain)  Why did you want to include
25  General Flynn on your tour if he had admitted to being a

1  liar?
2    MR. QUINN:  Object to form.
3    THE WITNESS:  I think that General Flynn is a
4  man who is speaking out against the Great Reset.  And so
5  I wanted to also stop the Great Reset.
6    Q    So if -- if an admitted liar is willing to
7  talk about topics that you agree with, then you will
8  associate with them.  Is that a fair statement?
9    A    I think General Flynn has shown to me to be
10  an honest person.  And I believe that we have a
11  weaponized legal system.
12    Q    Well, no one put a gun to his head and made
13  him plead guilty.  He actually had to take that
14  affirmative step.  So you're castigating Dr. Coomer on
15  the one hand for this incident, but you're associating
16  with someone like General Flynn who is willing to talk
17  about the Great Reset.  Isn't that a fair statement?
18    MR. QUINN:  Object to form.  Go ahead and
19  answer.
20    THE WITNESS:  I would like to read the
21  transcripts to you.
22    Q    (By Mr. Cain)  You mentioned yesterday
23  that -- I think you said you had maybe one contact with
24  Sidney Powell in the past?
25    A    That seems correct.  Yes.

1    Q    And refresh my memory on that.  I don't know
2 if you described it or not.  How did you get in touch
3 with her --
4    A    When we were doing the first --
5    Q    -- in person?
6    A    When we were doing the first event in Tulsa,
7 she, I think through an assistant, let me know that she
8 could not speak at the event but she wanted to chime in
9 via Zoom because of something that came up.  And so I
10 contacted the person who was the assistant, I believe.
11 And then we did a brief speaker phone call that was just
12 basically, hey, I apologize, I can't be there in person,
13 but I'll Zoom in.
14    Q    And that was the -- the sum total?
15    A    Yes, sir.
16    Q    You knew she represented General Flynn not
17 General Powell, different general.  But you knew she
18 represented General Flynn and his guilty plea?
19    A    I did know that Sidney Powell represented
20 General Flynn.
21    Q    All right.  And I know you said you haven't
22 really followed the cases.  But as it relates to the
23 subsequent election fraud cases, but as it relates to
24 Sidney Powell, were you aware that she also pled guilty
25 in Georgia?

Page 86

1    A    I actually was aware of that because I think
2 ticket buyers had texted me.
3    Q    And like Mr. Lindell, does Ms. Powell still
4 have a -- or does she have an open invitation to speak
5 on the tour?
6    A    I have not reached back out to her to have
7 her speak.  And it's not a criticism of her.  But I try
8 to invite people to speak that do speak.  And so if
9 somebody can't make it, as a general rule, I try to
10 focus on the people that do show up when they're
11 confirmed to speak.
12    Q    Okay.  And you may not be able to answer
13 this.  But if she called you tomorrow and asked you to
14 speak on the tour, would you let her?
15    A    I couldn't because all the spots are booked
16 and she's not on my short list of people that I would
17 invite right now.
18    Q    Not on the short list?
19    A    Right.
20    Q    Medium list?
21    A    No.  I have no problem with her.  It's just
22 we have -- one of my -- I always say in my office, but
23 one of my favorite things I look for is when people can
24 say they're going to be somewhere, if they do show up,
25 that resolves that concern that they are going to be

Page 87

1 there or not.  And for whatever reason, she wasn't able
2 to be there.  And I understand she's involved in a lot
3 of things.  But I just typically don't have people come
4 back if they weren't able to attend.
5    Q    Such as Mr. Oltmann as you described
6 yesterday?
7    A    Yeah.  There you go.
8    Q    Okay.  All right.  Do you think -- you -- you
9 mentioned the term Biblical world view yesterday.  Do
10 you think that General Flynn shares your Biblical world
11 view?
12    MR. QUINN:  Object to form.  Go ahead.
13    THE WITNESS:  I think he's reading the Bible
14 now.  And I think many of us are, much more vigorously
15 than we have in the past.  And I think he's deepening
16 his understanding of the Bible.  That's how I would
17 describe it.
18    Q    All right.  And -- and I'm sensitive to, you
19 know, religious topics, but it seems to be a motivating
20 factor for you in some sense.  But in terms of your
21 Biblical world view, let's -- two-part question.  First,
22 how do you describe that Biblical world view as it
23 relates to the political issues you started getting
24 interested in as you've described in this deposition?
25    A    Well, the Bible states that where the fear --

Page 88

1 where the Spirit of the Lord is, there's freedom.  And
2 then in Hebrews 10:25 it tells us to not forsake the
3 gathering, even as we draw closer to the end, but to
4 exhort one another.  And so much more as you see the day
5 approaching.  So I feel like we are mandated to not stop
6 getting together.  And we should get together to learn
7 more about the Bible.
8    Q    And then that's the -- the mandates or the
9 antithesis of that?
10    A    The lockdowns.  Yes.  Which will transition
11 into a 15-minute city.  Which is part of the world
12 economic forum's plans.  Or the Great Reset.  Or also
13 called the Fourth Industrial Revolution.
14    Q    Okay.  I've got an exhibit to talk to you
15 about with that sitting in front of me.  But before I
16 get to that, I asked you whether General Flynn, you
17 understood him to share your Biblical world view.  And I
18 think you told me that he's reading the Bible more or
19 something?
20    A    I would say when we talk maybe half or more
21 of the conversations relate to the Bible.
22    Q    And the Bible, I'm not a scholar, despite my
23 last name.  But obviously it -- it also tells you not to
24 bear false witness against your neighbor.  One of the
25 Commandments?

Page 89

23 (Pages 86 - 89)

1    A    That is true.

2    Q    All right.  And so when you're talking
3  about -- he may not be your neighbor.  He lives in
4  Colorado.  But when you're talking about Dr. Coomer, you
5  take that to heart; right?  You shouldn't lie about him
6  as part of your Biblical world view; right?

7        MR. QUINN:  Object to form.  Go ahead.

8        THE WITNESS:  I think the Bible -- I think the
9  Bible lays out our -- our aims.  And the Ten
10  Commandments are the -- the aim.  And that's what we
11  should try to do.  Yes.

12    Q    (By Mr. Cain)  Okay.  Does Roger Stone share
13  your Biblical world view?

14        MR. QUINN:  Object to form.

15    Q    (By Mr. Cain)  If you know.

16    A    Roger Stone is a man who talks about the
17  Bible more than other people.  He talks about the Bible
18  often.  So off-line he talks about the Bible.  And in my
19  opinion, he comes across as very much like a Saul figure
20  in the Bible.  So if you read the Bible, Saul was a
21  character that was not serving the Lord.  And then God
22  appeared to him through a light and physically knocked
23  him off of his horse.  And then Saul, when he -- he went
24  blind.  And when he got his vision back, he claimed that
25  God revealed himself to him.  And then he passionately

1  began preaching and teaching the Gospel.  And then wrote
2  13 books of the Bible.  Some would say 14.  But 13 books
3  of the Bible.  But before that, Saul used to round up
4  Christians and persecute them.  That was his occupation
5  before that.  And so I believe that Roger Stone,
6  although he didn't feed Christians to lions, he is a
7  person who had admittedly had sort of a later in life
8  epiphany.  And I believe that he's trying to serve God,
9  at least from what I've seen.

10    Q    Would you associate him or have in the past
11  with the ReAwaken America tour; right?

12    A    He does speak at the events.  He's spoken at
13  about half of them.

14    Q    And you consider him a friend; right?

15    A    He's a guy that I am very friendly with.  But
16  I would just say this to be clear.  I always tell people
17  that a friendship is somebody you spend time with and
18  you share their values.

19    Q    Yeah.  You said that yesterday, I think.

20    A    And so I don't spend a lot of time with him
21  outside of him speaking at the events.  So I would say
22  I'm friendly with him, but I don't necessarily consider
23  him a friend just because I don't spend a whole lot of
24  time with him.

25    Q    Is his discussions at the tour about half the

1  events, do those touch on -- obviously he's a political
2  figure.  Does it touch on election fraud issues?

3    A    I haven't watched a lot of his talks.  I know
4  that Roger Stone gets out there and he says, I'm Roger
5  Stone and I'm excited to hear what I have to say.  He
6  has a little opening joke.  And then he, each time, he
7  talks about whatever he's going to talk about.  And then
8  he ends with kind of his signature pose he does.  But I
9  haven't watched a whole lot of his speeches from end to
10  end.

11    Q    I was going to ask you to do the pose, but I
12  don't think that's fair on video.  I'm not familiar with
13  it.  Were you aware before -- like with General Flynn,
14  were you aware before Mr. Stone began speaking on the
15  tour, that he had actually went to trial?  I believe it
16  was in Florida.  I may not be --

17    A    Roger Stone is a man that entered into my
18  life through the tour.  But I -- he's not a guy that I
19  studied his career quite a bit before these events.
20  Whereas General Flynn, I was more aware of.

21    Q    Okay.  So do you -- were you not aware that,
22  I think -- well, I don't think.  It was in November of
23  2019, he went to trial and was convicted of five counts
24  of lying to Congress?

25    A    I didn't follow that case super clearly.  But

1  I found it odd that Roger Stone was claiming to be a
2  spirit filled Christian when I heard about him.

3    Q    But did you know about it?

4    A    I did not know about the details of his case.
5  No, sir.

6    Q    You don't even know the details.  And I
7  guess, let me re-ask the question.  Before you put him
8  on the tour, were you aware that he had been found
9  guilty of five counts of lying to Congress?

10    A    Yes.

11    Q    So why would you put him on the -- you've got
12  General Flynn that we discussed.  You got Roger Stone
13  who we've discussed somewhat.  But why would you put
14  Roger Stone on your tour who had a jury convict of
15  lying?

16    A    He asked if he could speak, I believe is that
17  conversation.  And he seemed to be a man, at the time
18  when I talked to him, that wanted to talk about -- I
19  think if you watched the earlier videos because that's
20  where I first connected with him, he wanted to talk
21  about how he turned his life to Christ.  And that was
22  really, I guess, the initial intersection of our two
23  worlds was that he was talking about discovering Christ
24  and turning to Christ.  And so that was interesting to
25  me.

24 (Pages 90 - 93)

1    Q    Well, that's -- well, if -- if Dr. Coomer
2  was -- was out publicly talking about Christ or the
3  Great Reset in the case of General Flynn, would you put
4  him on the tour?
5    A    He has an open invitation to me to speak if
6  he'd like to at the event in June.  I'll give him a half
7  hour spot.
8    Q    I guess what I'm trying to test is why are
9  you willing to put these folks who actually have been
10  adjudicated as liars on your tour but you seem to be
11  casting stones at Dr. Coomer for this incident in Salida
12  involving the police where he wasn't charged?
13    MR. QUINN:  Object to form.
14    Q    (By Mr. Cain)  Why would you do that?
15    A    I believe if anybody were to watch the Eric
16  Coomer police incident, I believe they would have a
17  similar understanding of the events as I would have.
18    Q    Well, you seemed to have drilled down on
19  that.  You watched the video.  You made a transcript.
20  But you don't really even know anything about Roger
21  Stone's actual conviction.  Why are you focused on
22  Coomer?
23    A    I mean, one is Eric Coomer was the head of
24  security and strategy for Dominion.  And obviously I'm
25  in this room today to discuss Dr. Coomer.  And so,

Page 94

1  Mr. King, that's why I focused in on learning more about
2  Dr. Coomer.
3    Q    Yeah.  But Dominion -- there's no case that
4  you can cite as to either involving Dominion Voting
5  Systems or Dr. Coomer where a court has determined that
6  they interfered or obstructed the 2020 election.  You
7  agree with me on that; right?
8    A    I cannot dispute what you just said.
9    Q    Okay.  All right.  I'm going to focus on this
10  exhibit.  I don't know where we're -- we're at on time.
11  But it might be good to do a stretch before I get into
12  it.
13    MR. QUINN:  Okay.
14    THE VIDEOGRAPHER:  Off the record.  The time
15  is 11:20.
16    (A short break was had; after which the
17    following proceedings took place:)
18    THE VIDEOGRAPHER:  Back on the record.  Time
19  is 11:36.
20    Q    (By Mr. Cain)  Mr. Clark, we were talking
21  about Roger Stone before we broke and General Flynn.
22  You mentioned you have a transcript of Dr. Coomer's
23  video with the police; is that right?
24    A    I typed it out myself.
25    Q    And that's something you can produce for us

Page 95

1  pretty easily?
2    A    Yes, sir.
3    Q    All right.  Did you -- well, actually did you
4  know on that video there's a stamp on it that I think
5  says, your Daddy Joey or something along those lines.
6  Have you ever heard that?
7    A    I do recall at the bottom right there's a
8  stamp.
9    Q    Okay.  And does that sound right?  Something
10  along those lines?  Something about Joey.
11    A    I do recall because I've -- I've watched it
12  repeatedly.  I do recall the bottom right there's some
13  sort of water mark.
14    Q    Okay.  Do you know who Joey Camp is?
15    A    I do not.
16    Q    Never met him?
17    A    I've not met Joey Camp.
18    Q    Has Mr. Oltmann ever brought his name up?
19    A    I don't recall.
20    Q    Has Mr. Oltmann ever told you how he -- who
21  was his conduit to getting on the so-called AntiFa call?
22    A    Well, the interactions with Mr. Oltmann have
23  pretty much been limited to the podcasts that he was on
24  and him speaking at our events.  And so I don't really
25  talk to him on a regular basis.  And he has not

Page 96

1  mentioned that.  But we don't talk very much.
2    Q    You never asked him?
3    A    I never asked him.  Well, I would say this,
4  on our show, I did do a follow-up question because he
5  made a comment about, I was on a call.  And I said,
6  could you show that to me or could you get that to me.
7  And then he used an irregular phrase that I hadn't heard
8  people use before.  He said, I'll ship it to you.
9    Q    All right.  And you're still waiting on that
10  shipment?
11    A    Right.  I've never heard somebody say or I
12  don't recall hearing someone say, I'll ship something to
13  you as relates to information.
14    Q    Okay.  Well, I'll just -- I'll follow up with
15  my question then although you answered it yesterday.
16  But he's -- he's never shipped whatever it is that he
17  was referring to you?
18    A    I have never received the audio or video or
19  whatever that was that provided any proof that Eric
20  Coomer -- Dr. Coomer was on a phone call.
21    Q    Okay.  And there was also, you know, the
22  Facebook pages that you got of Dr. Coomer through your
23  research.  Were you aware that those -- that wasn't a
24  public Facebook page, that was a private page?
25    MR. QUINN:  Object to form.  Go ahead.

Page 97

25 (Pages 94 - 97)

THE WITNESS: I was not -- I was not. Again, my time frame's been years. But the time -- speaking out against the lockdowns, we had these Town Halls. And people would show up and present me with stuff all the time. And I just kept hearing that as a theme.

Q   (By Mr. Cain) I don't -- I don't know if the first part of your answer was -- was the answer. But were you aware of whether those were private, at least formally private, Facebook posts are public?

A   I was not aware of that.

Q   And did you have any discussions with Mr. Oltmann about how he was able to get access to Dr. Coomer's Facebook page, whether it's private or public?

A   I was not.

Q   Now, you read or you transcribed this video of Dr. Coomer, did you read General Flynn's deposition?

A   I did not read General Flynn's deposition.

Q   Were you on the Zoom link for that deposition?

A   I was not on the Zoom link for that deposition.

Q   Well, I'll represent to you he -- he was asked some questions at Page 60 of the dep -- deposition transcript. And the question from Mr. Brad was:

Page 98

Q   Have you seen any evidence that you would consider credible, Mr. Flynn, that Eric Coomer played a role in rigging the 2020 presidential election? Yes or no?

And his answer was:

A   I have not. No.

Have you, yourself, seen any evidence that you consider credible, Mr. Clark, that Eric Coomer played a role in rigging the 2020 presidential election? Yes or no?

MR. QUINN: Object to form.

THE WITNESS: The four things I've seen adding one was Eric Coomer has the -- the patents for election technology. His title was that of director and strategy and security for Dominion. His social media posts were alarming. And then there was a video that I think The Gateway Pundit had put out from 2017. It's about a 90-second video where Dr. Coomer was explaining how adjudication works, and how -- paraphrasing. So I apologize if I'm misspeaking for Dr. Coomer. But there's a portion where he's saying that if somebody checks an oval or checks a box and you can't tell who that person intended to vote for, that through this technology, they could adjudicate and determine who that vote was meant to be cast for.

Page 99

Q   Okay. Is that it?

A   Those are the four pieces of information that I have.

Q   And forgive me, does that, in your mind, equate to Dr. Coomer actually rigging the election?

A   I have no proof that he actually did rig the election.

Q   And then the follow-up to General Flynn was a little different. The first question that he was asked and you were then just now asked is whether you saw any evidence. The second question that General Flynn was asked at Line 20 on that same page is, do you believe that Eric Coomer rigged the 2020 election. And his answer at Line 23 was, no. Yeah. I have no idea. And that was the end of his statement on that. Do you, yourself, believe that Eric Coomer rigged the 2020 presidential election? Do you believe that?

MR. QUINN: Object to form. Go ahead.

THE WITNESS: I believe that he could have. And I have no proof that he did.

Q   (By Mr. Cain) Is there anybody else besides Dr. Coomer that you believe could have rigged the election?

MR. QUINN: Object to form. Go ahead and answer.

Page 100

THE WITNESS: Well, I think that it would be wonderful to have Dr. Coomer explain how those patents work and that technology works because he was the director of Dominion, and the head of security and strategy. So I think he would -- he would know more about that than anybody on the planet. He would be an expert.

Q   Right. But I -- I asked you about other people. I asked you, is there anybody other than Dr. Coomer that you believe could have rigged the 2020 presidential election?

A   I think somebody could have. I just think that there would -- Dr. Coomer would be the -- the authority in the subject.

(Plaintiff's Exhibit No. 44 was marked for identification purposes and made part of the record)

Q   (By Mr. Cain) Okay. All right. Let's transition to another document. This is going to be labeled Plaintiff's Exhibit 44. It's produced by Make Your Life Epic beginning at Page 594. Give you -- appears to be a three-page document. Give you a minute to triangulate on that.

A   (Witness examined document) Okay.

Q   So this is dated November 16 of 2020. Are

Page 101

26 (Pages 98 - 101)

1 you with me on that, at the top?
2    A   Yes.
3    Q   It's from Info@Thrivetimeshow.com. And it's
4 to Founder at Thrive15.com. And you're the founder of
5 Thrive15.com on this chain; right?
6    A   I am the founder of Thrive15.com.
7    Q   And who -- do you know who the person was
8 that sent the E-mail, from the info E-mail?
9    A   I don't. But typically in our office, Devon
10 Woolery is sort of our -- our web guy. That's what he
11 does. And at the time I believe an employee by the name
12 Jonathan Kelly were also, those two were working behind
13 the scenes.
14    Q   Okay. And is Kelly the fella that had the
15 pseudonym?
16    A   Yes. And he just likes to stay out of
17 politics. And -- and he joined me when we were talking
18 on the Thrivetime show, we never talked about religion
19 or politics, which resonated with him. And then as
20 we started on these things, it did not resonate with
21 him.
22    Q   Okay. Forgive me on this too. Is -- what
23 was his pseudonym?
24    A   Peters. Michael Peters is the name he chose.
25    Q   Okay. So one of those two gentleman would
Page 102

1 have sent you this E-mail in November of 2020?
2    A   They could have hit send, but I don't think
3 they would have created the content in here.
4    Q   Well that was kind of going to be my
5 follow-up. Do you know who created the content?
6    A   More than likely I would have.
7    Q   So unless you tell me otherwise, I'm going to
8 assume that the content that we are going to go over is
9 something that you compiled. Is that fair?
10    A   It seems like something I could have
11 compiled.
12    Q   Okay. So this is roughly two weeks after the
13 2020 presidential election, just to orient us in time;
14 right?
15    A   Okay.
16    Q   And you had started E-mailing. I -- I don't
17 have many E-mails from you. And I think -- I take it
18 from your prior testimony, you're not a big E-mailer?
19    A   I don't like to E-mail. That's true.
20    Q   And we do have some texts from you and you
21 referenced them earlier. You text on your -- your
22 iPhone?
23    A   Primarily. Yes, sir.
24    Q   And the stuff that we have is from iMessage
25 account associated with iPhone. I didn't see any other
Page 103

1 platforms that had texts. Doesn't mean they are not
2 there. But during this period of time around the
3 election and thereafter, were you using Signal or
4 WhatsApp or some -- some communication like that to
5 text?
6    A   I don't use those platforms. However on an
7 exception there was Marla Maples. That would be
8 President Trump's ex-wife, who had concerns about the
9 shots. And so she had told me, you have to reach me on
10 Signal. And there was a gentleman by the name of Mike
11 Adams. But I believe outside of that, I know as a -- as
12 a rule I don't use those platforms.
13    Q   But sounds like you -- you have the app at
14 least on your phone?
15    A   I think I had that app. Yes, sir. For those
16 two interactions.
17    Q   Who is Mike Adams?
18    A   He is a call it an independent podcaster,
19 broadcaster.
20    Q   Where is his -- do you know the name of his
21 show?
22    A   He has a platform called Brighteon,
23 B-r-i-g-h-t-e-o-n. And he has another platform called
24 Life Site News. And that's where a lot of content is
25 pulled from within what I would call the truth
Page 104

1 community, which I would define as people that are left
2 of center, libertarian, or right of center who seek to
3 know the truth about the Great Reset.
4    Q   Okay. All right. So why were you creating
5 the content that we see on Exhibit 44?
6    A   I think that this content that was being
7 discussed wasn't making its way into the mainstream.
8 And so people would send me information and they would
9 say, hey, this, you know, needs to get out. And so I
10 was sort of taking in information, like oxygen maybe,
11 and then breathing it out.
12    Q   Okay. Well, who did you breathe this on?
13    A   Well, this would have gone to people that had
14 signed up for our newsletter.
15    Q   And that's through Make Your Life Epic?
16    A   That would have been TimeToFreeAmerica.com.
17 And just to create a little distinction. What I found
18 is that the people that are interested in stopping the
19 Great Reset have little to no interest in how to start
20 and grow a company or vice versa. So
21 TimeToFreeAmerican.com is where information pertained to
22 the Great Reset goes. And then information related to
23 growing a company goes to ThriveTimeShow.com.
24    Q   Okay. And -- and forgive me if you've
25 answered this, but I -- I -- what's the correlation, if
Page 105

27 (Pages 102 - 105)

1 there is one, between voter fraud issues and the Great
2 Reset in your mind, if any?
3    A    Well, Joe Biden was the keynote speaker at
4 the World Economic Forum in 2016, where he was invited
5 to speak on mastering the Fourth Industrial Revolution.
6 And that video is not sensored on YouTube as of today, I
7 believe.  And you can watch it in its entirety.  And
8 he's introduced by Klaus Schwab, he, being Joe Biden.
9 And so that was in 2016.  And Klaus Schwab, during his
10 interview on Charlie Rose, has described the Great
11 Reset, which he also -- he calls the Fourth Industrial
12 Revolution and the Great Reset as two -- as an
13 interchangeable idea.  So he uses those words
14 interchangeably.  So Klaus Schwab had said during his
15 interview with Charlie Rose that the Fourth Industrial
16 Revolution doesn't change so much what you're doing for
17 a living, is it changes you if you take the genetic
18 editing.  And then you all know Harari during an
19 interview he did with the New York Times explained that
20 Covid was the moment when surveillance began going under
21 the skin.  And then Klaus Schwab, on other clips, talks
22 about the fusion of the digital and your biological --
23 your digital and your biological identities and that's
24 Klaus Schwab.
25    Q    And that -- is it fair to say then that given
Page 106

1    Q    Did Biden dry up the Euphrates?
2    A    Biden did not dry up the Euphrates.
3    Q    Okay.  Good.
4    A    So my main thing is Revelation Chapter 16,
5 Verse 12 through 14.  I encourage you to read that.
6    Q    I have.
7    A    So it says, when the Euphrates River dries
8 up, the false profit will show you, China and Russia
9 will team up.  And then the nations of the world will
10 gather for a big battle and stuff will blow up.  And the
11 beast technology will begin to show up.  So my focus is
12 trying to share the gospel at scale with as many people
13 as possible.
14    Q    In this paradigm, who is the false profit or
15 do we know yet?
16    A    I believe you all know Herrari is the false
17 profit.
18    Q    And the beast technology, which who -- what
19 is that?
20    A    I would say it's going to be a technology
21 what makes it impossible for you to buy or sell.  So
22 technology that -- I would say on left you might hear it
23 described by Robert F. Kennedy, Jr.  On the right you
24 might hear it described by Tucker Carlson.  On the
25 middle you might hear it by Joe Rogan.  But it's Central
Page 108

1 the association between current President Biden and the
2 World Economic Forum and Mr. Schwab, et al, that's
3 motivating your political desire to see that he not be
4 reflected in this current election or certainly the 2020
5 election?
6        MR. QUINN:  Object to form.  Go ahead.
7        THE WITNESS:  Well, there's three main issues
8 that I focus on.  I'm not saying that people should.
9 These are my three.  You know, I wanted to make sure
10 that our communities are safe, that the economy is
11 vibrant, and that people have medical freedom.
12        And so Joe Biden is in favor of mandating
13 vaccinations where Trump in err is in favor of
14 distributing the Covid 19 shots.  So I am against the
15 distributing and the mandating of the Covid shots.
16    Q    (By Mr. Cain) Okay.  So as a result, that
17 has motivated you to work against politically the
18 reelection of Joe Biden and the prior election of Joe
19 Biden?
20        MR. QUINN:  Object to form.
21    Q    (By Mr. Cain) Right?  Isn't that a
22 motivating factor?
23    A    The main motivating factor I want people to
24 know is that the Euphrates River is drying up.  The
25 false profit is showing up.
Page 107

1 Bank digital currency.  And then MIT has a device called
2 the quantum dot, which stores your medical records under
3 your skin.  And MIT has also developed the central bank
4 digital currencies.
5    Q    Okay.  Well, let's focus -- thank you for
6 that.  Let's focus on Exhibit 44 as part of this
7 discussion.  Point 1, you say what kind of news
8 organizations and politicians, would not, all caps, want
9 Americans to know about the epic voter fraud, all caps.
10 You see that?
11    A    Yes, sir.
12    Q    And now looking at this, I guess, with the
13 benefit of hindsight, would you agree that none of the
14 voter fraud claims that are contained under this point
15 have ever actually been demonstrated to be true?
16    A    I believe that --
17        MR. QUINN:  Object to form.  Go ahead.
18        THE WITNESS:  I believe that no court of law
19 has ruled in favor of people bringing up these
20 allegations.
21    Q    (By Mr. Cain )  Okay.  But do you nonetheless
22 still believe them to be true?
23        MR. QUINN:  Object to the form.  Go ahead.
24        THE WITNESS:  I believe they could be true.
25    Q    (By Mr. Cain)  Well, I could be a lot of
Page 109

28 (Pages 106 - 109)

1  things myself.  But I don't know that that helps us.  My
2  question is, do you -- do you personally believe that
3  the items listed under point one are true or not?
4      MR. QUINN:  Object to form.  Go ahead and
5  answer.
6      THE WITNESS:  Because of the --
7  Q    (By Mr. Cain)  Or you don't know maybe?
8  A    I will say I don't know.
9  Q    Okay.  Item No. 1 under Point 1, did you
10 write this?  I know you said that you created this
11 document but sometimes you cut and paste from sources.
12 Do you know if you cut and pasted this stuff in here?
13 A    A lot of this looks to be cut and pasted.
14 Q    But you chose, at least that was important
15 enough to you, to cut and paste into this document.  Is
16 that fair?
17 A    That's fair.
18 Q    The Luciferian left is trying to claim
19 dominion over American.  I'll just stop there.  What are
20 you referring to as the Luciferian left?
21     MR. QUINN:  Object to form.  Go ahead.
22 Q    (By Mr. Cain)  Or what -- what do you
23 understand that to mean in this context?
24     MR. QUINN:  Same objection.  Go ahead.
25     THE WITNESS:  I would just say those wishing

Page 110

1  to introduce a central bank, digital currency, where you
2  can't buy or sell without an approved social credit
3  score, a/k/a China's Skynet program.
4  Q    (By Mr. Cain)  Okay.  And you're not --
5  you're not claiming that Dr. Coomer's that category
6  of people, are you?
7  A    I've never seen any connection to Dr. Coomer
8  with China.
9  Q    Do you believe that Dr. Coomer is motivated
10 by Satanic forces?
11     MR. QUINN:  Object to form.
12     THE WITNESS:  I have seen Dr. Coomer post
13 statements that indicate he's in favor of AntiFa,
14 whatever that amorphous organization was.  I believe
15 I've seen him post songs that indicate that he is in
16 favor of lyrics that call for the murdering of police
17 officers.  But I don't know at the core what motivates
18 Dr. Coomer.
19 Q    (By Mr. Cain)  All right.  This Item 1 goes
20 on to say that the left is claiming, I'll paraphrase,
21 dominion over America by using the Clinton Global
22 Initiative funded Dominion.  I'll stop there.  What do
23 you mean by -- or what do you understand that to mean?
24 A    I think a lot of this --
25     MR. QUINN:  Object to form.  Go ahead.

Page 111

1      THE WITNESS:  I think a lot of this would have
2  been something -- again, as we are going back years, so
3  I don't recall it.  But I think this would have been
4  something that would have been probably copied and
5  pasted from something that Sidney Powell would have been
6  discussing at the time.  That's how I look at this.
7  Just looking through the document and trying to
8  familiarize myself with it.
9  Q    Why do you -- why do you escribe this, at
10 least in some form or fashion, to Sidney Powell?
11 A    It's just a different format than which I
12 would communicate today, and previous to that how I
13 would communicate.
14 Q    Well, you're -- you're putting this content
15 out to the public; right?  You said you -- you posted
16 this?
17 A    Yes.  And I believe that our show, much in
18 like the Joe Rogan show, we try to be a platform for
19 people to hear the truth as we see it.  And so that's
20 what we were attempting to do.
21 Q    Well, what's contained on Exhibit 44 is the
22 truth as you see it; right?
23 A    These were the facts as presented to me.  Or
24 the facts as I researched.
25 Q    Okay.  That's a little different though.

Page 112

1  These were facts that were -- you call them facts that
2  were presented to you.  I guess my question is, you also
3  said that you present the truth.  So are you vouching
4  for these facts or not when you --
5      MR. QUINN:  Object to form.  Go ahead.
6      THE WITNESS:  Well, if we look at -- if we
7  look at it four years later, I know you're the one doing
8  the deposition, I'm just rhetorically asking the
9  question.  If we go to Page 2 and we look at
10 BudesonideWorks.com, that website, Budesonide has been
11 shown to be an effective treatment for Covid 19 that was
12 once labeled as a conspiracy theory, but has now been
13 proven to be true.  So that would be something that's
14 been proven to be accurate.  The PCR test having
15 inflated cases, that has been proven to be true.  The --
16 the idea that Neal Ferguson, who produced the models
17 that 2.2 million people will die from Covid.  Those have
18 been shown to be -- its correct his models were false.
19 I don't know that Neal Ferguson was nefariously
20 motivated.  I just think he was wrong.  His models were
21 wrong.  So there's a lot of things in here that have
22 been, over time, that were labeled to be false that have
23 been shown to be true.
24 Q    (By Mr. Cain)  And there's -- there's items
25 here that were false from the get-go and they are still

Page 113

29 (Pages 110 - 113)

1  false; right?
2      A   I would say that --
3      Q   Let's just focus on the first one we are
4  talking about.
5      A   Okay.
6      Q   Dominion automated voting machines,
7  paraphrasing, deleted 2.7 million President Trump votes.
8  That false, isn't it?
9      MR. QUINN:  Object to form.
10      THE WITNESS:  Well, this stuff was presented
11  primarily from the likes of a Sidney Powell or a -- I
12  think his -- I think it's Colonel McInerney.  This is
13  going back four years now.  But people that were, you
14  know, very respected.  They've got a career that span
15  decades, and they were presenting information that was
16  true -- or they presented as being true.  And so we were
17  putting it out there.
18      Q   (By Mr. Cain)  Well, you jumped on some items
19  that you say have been proven to be true.
20      A   Yes, sir.
21      Q   That's why I'm asking you now about other
22  items.  Do you know one way or the other, I guess I'll
23  ask it that way, whether this claim that Dominion voting
24  machines deleted 2.7 million votes from President Trump
25  was ever proven to be true?

Page 114

1      MR. QUINN:  Object to form.  Go ahead.
2      THE WITNESS:  I don't -- I don't know if its
3  still being deliberated.  I think this is what we're
4  still dealing with four years later.  There's still
5  discussions of these topics.
6      Q   (By Mr. Cain)  Well, there may be discussion.
7  Have you seen any evidence that those claims were proven
8  to be true?  Yes or no?
9      A   I have not seen anything in a court of law
10  that has shown this to be true.  But I'm not following
11  these -- these cases very actively.  Or actively at all
12  actually.
13      Q   Well, you know that that's false, don't you,
14  as you sit here?
15      A   I do not know that it's false.  But I haven't
16  been following these -- these cases.  My focus has been
17  stopping the Great Reset.
18      Q   Do you have someone on your team that is more
19  knowledgeable about the voter fraud issues, whether it's
20  Mr. Woolery or Mr. Kelly, aka Mr. Peters?  Anybody else
21  in your organization that follows these more closely
22  than you?
23      A   I would say Mr. Woolery, this is not a
24  disparaging comment, he typically just, you know, hits
25  send or copy, paste, that kind of thing.  I don't think

Page 115

1  he spends much of his waking hours or any of his waking
2  hours thinking about this.  And I don't think that
3  Jonathan Kelly, a/k/a Mr. Peters, spent his waking hours
4  think about these items either.
5      Q   Okay.  And I --
6      A   It's really just --
7      Q   Broader.  I use them as examples.  But
8  anybody in your organization, for example, before you
9  hit send or instructed one of your employees to put this
10  on your site, did you share this information with
11  someone in order to test its voracity?
12      A   Well, it was coming primarily from the time
13  Colonel McInerney and Sidney Powell, those were the two
14  main vocal people.  And both of them had a very
15  respective career up to that point.  And so I looked at
16  it as information that was coming from a very credible
17  source.  This is obviously unprecedented territory as a
18  country to be in, so.
19      Q   Those are outside sources.  I didn't ask you
20  about that.  I asked you about inside sources.
21      A   I don't have anybody else in my office who
22  looks into this information.
23      Q   This goes on to say after the deletion of the
24  2.7 million votes for Trump, that the Dominion machines,
25  again paraphrasing, also switched 221,000 Pennsylvania

Page 116

1  votes from President Trump to Biden.  Do you see that?
2      A   Yes, I do.
3      Q   And you don't have any support as -- even now
4  on May 1st of 2024, that would suggest that statement's
5  also true.
6      MR. QUINN:  Object to form.  Go ahead.
7      THE WITNESS:  As I sit here today, again, most
8  of this information was pulled from Colonel McInerney
9  and Sidney Powell.
10      Q   (By Mr. Cain)  Okay.  So you can't verity the
11  voracity of that either, can you?
12      A   And I'm not being facetious.  Voracity, I
13  believe, means like the --
14      Q   Truth.
15      A   -- passionate pursuit of truth or something.
16  Yeah.  I have not seen -- again I received information,
17  learned about information from the posts of Sidney
18  Powell and General McInerney at the time.  Those were
19  the two most vocal.  And then we were taking that
20  information and sharing that primarily through a copy
21  and paste feature through this.  And I say we, I was
22  doing the copying and pasting.  And I was having Devon
23  primarily hit send.  But I had not tasked Devon to
24  research this.
25      Q   Kind of get back to the -- the motivating

Page 117

30 (Pages 114 - 117)

Page 118

```
 1  factor that I was asking you about earlier.  Is -- what
 2  was motivating you to send information out into the
 3  internet along the lines of what we're seeing on Point
 4  1?  Was it this Joe Biden association with the World
 5  Economic Forum?
 6      A   I was trying to stop the Great Reset.
 7          MR. QUINN:  Object to form.  But go ahead.
 8      Q    (By Mr. Cain)  And in exposing voter fraud,
 9  how is that supposed to stop the Great Reset?
10          MR. QUINN:  Object to form.  Go ahead.
11          THE WITNESS:  Well, Joe Biden was the keynote
12  speaker on mastering the Fourth Industrial Revolution.
13      Q    (By Mr. Cain)  I'm sorry to interrupt you.
14  This is the same discussion we had earlier.
15      A   No.  There's additional details.
16      Q   Okay.  Give me the additional details.
17      A   So the World Economic Forum, they host their
18  annual event.  And they bring in a group of people to
19  speak.  And many of them are household names.  They are
20  very well known people.  And they brought in Joseph
21  Biden, now our president, to speak not, you know,
22  anecdotally or to comment, but to be the keynote speaker
23  on mastering the Fourth Industrial Revolution.  And so
24  because he was the keynote speaker on mastering the
25  Fourth Industrial Revolution, aka the Great Reset, I
```

Page 119

```
 1  felt it was very concerning that the man who was the
 2  keynote speaker talking about mastering the Fourth
 3  Industrial Revolution was now headed into presidency
 4  where he would have the capacity to implement the Great
 5  Reset.
 6      Q   That hasn't happened yet, has it?
 7      A   The Great Reset?
 8      Q   Yes.
 9      A   It's happening.
10      Q   And I don't -- maybe you follow this news
11  since it sounds like it's -- it's a focus of yours on
12  it's great Reset.  But has -- has the Biden
13  administration indicated that it was going to go to
14  this -- this new form of currency as part of its policy?
15          MR. QUINN:  Object to form.
16          THE WITNESS:  Joe Biden signed Executive Order
17  14067.  And that Executive Order 14067, as I interpret
18  it, would pave the way for Central Bank digital
19  currencies.  And Fed Chairman Powell is discussing
20  saying that -- I hate to paraphrase because I try to use
21  clips primarily.  But he's stating that there's a lot of
22  economic factors right now that are causing instability.
23  And he's talking about that.  And then simultaneously
24  you have, and people need to know this, Brazil, Russia,
25  India, China, South Africa, which is known as the BRICS
```

Page 120

```
 1  Block.
 2      Q   You mentioned that.
 3      A   But I don't think most people know that.  So
 4  those are countries are -- on June 1st, they added
 5  additional members to include Iran and Saudia Arabia.
 6  And then Putin, who is the head of BRICS, this year
 7  Russia is.  They've announced they are going to add 25
 8  up to 40 new members.  And so they are looking to
 9  de-dollarize.
10      Q   Okay.  So you go from -- if I'm being overly
11  simplistic, which I'm sure I am, you go from the Biden
12  administration and the Executive Order you mentioned as
13  employing what you've described as this beast
14  technology, which is foretold by Revelations?
15      A   Chapter 13, Verse 16 through 18 letter.
16      Q   Okay.  But did I -- but did I draw the
17  pyramid correctly?  Connect the dots?
18      A   I think almost.  In order to do that, to
19  implement a new programmable Central Bank digital
20  currency, you would need to destroy the value of the US
21  dollar through consistent inflation and/or hyper
22  inflation.
23      Q   And that -- you've -- you've talked about
24  that.  I maybe even have a clip about hyper inflation as
25  being some evidence that we're going down this path?
```

Page 121

```
 1      A   Well, I would have to say that if I were
 2  printing money at this rate, or if you or anybody we
 3  knew would, at a certain point it's too stupid to be
 4  stupid.  It's intentional.
 5      Q   Okay.  Skip Item No. 2 under Point 1 on
 6  Exhibit 44, since I think it seems to relate back to
 7  Item No. 1 in some form or fashion.  Item No. 3, Mayor
 8  Giuliani exhaustively followed the money and found,
 9  colon.  See that in the middle of the page?
10      A   Yes.
11      Q   You've already shared with us your -- your
12  interactions with Rudy Giuliani.  So I take it these
13  items here were another cut and paste that you put into
14  this document?
15      A   Correct.  These were cut and paste items.
16      Q   Okay.  Have the -- have you actually looked
17  into the -- the six items listed in here as it relates
18  to voter fraud issues?
19      A   This was more of a cut and paste job because
20  at that time what I was doing was, there was people that
21  would post something and then it would get deleted off
22  of various social media platforms.  And so I was copying
23  and pasting and sending that information out.
24      Q   And I -- forgive me again.  On -- has you --
25  either Make Your Life Epic or you personally or any of
```

31 (Pages 118 - 121)

1 the businesses that produce content on the internet for
2 you, have they been banned from any of the on-line
3 platforms?
4   A   I got banned off of LinkedIn really quickly
5 for discussing Hydroxychloroquine, I believe that's
6 correct.  And PCR tests, polymerase chain reaction test.
7 But that was before people started talking about getting
8 banned.  It just got banned.  And then I wrote a book
9 called Fear Unmasked, which was banned on Amazon for a
10 period.  And then YouTube videos would just disappear.
11 Or Facebook videos would disappear.  And then two
12 examples, there's probably more, but two just to give
13 you the -- one, would be I did an interview with the
14 Blaze network, it's a Glenn Beck network, with a man by
15 the name of Chad Prather.  And I did the interview.  And
16 I just remember different ticket buyers.  And my normal
17 is I talk to a lot of ticket buyers, because when you
18 text to request a ticket, it goes to my phone.  And so
19 they were saying, hey, your interview, I just watched
20 it, and it's stuck at X number of views.  Like, no
21 matter how many people watch it, it's stuck.  I thought,
22 that's interesting.  People kept telling me that.  I
23 thought, wow.  I didn't know that was a thing where
24 YouTube would limit the number of views a video would
25 have.  And then the same thing happened with an

Page 122

1 interview I did with Robert Kiyosaki from the Rich Dad
2 Poor Dad network.  Where I did the interview and then
3 the number of views seemed to be capped.
4   Q   Do you know if any of your voter fraud claims
5 have been sensored?
6   A   I don't know that.
7   Q   All right.  Okay.  As it relates to this
8 topic on Giuliani, I think I know the answer to these
9 questions.  But I guess we'll find out.  There's various
10 steps that are referenced.  The first step is that the
11 Canadian owned Dominion vote counting machines are used
12 in 28 states.  Now, are you aware that Dominion is owned
13 by Staple Street Capital, at least the majority interest
14 and that that company is not Canadian?
15       MR. QUINN:  Object to form.
16       THE WITNESS:  I am not.
17   Q   (By Mr. Cain)  Second item, Dominion gets its
18 software from Smartmatic.  You know that that's not
19 true, don't you?
20   A   I do not know that.  And this was, again,
21 about four years back.  And this was information that I
22 was -- again, I don't -- most of the -- at the time the
23 resources I was looking at was General McInerney and
24 Sidney Powell.  Those were the main ones.  And then
25 occasionally Rudy Giuliani information would be sent to

Page 123

1 me.  And then I would try to copy and paste it and send
2 it out to people.
3   Q   You're not vouching for this; right?
4   A   Yeah.  I -- I -- It's been four years and I
5 don't -- you know.  A lot of information.  But I
6 don't -- I -- I don't -- this is not my wheel house
7 right here.
8       MR. QUINN:  Mr. Clark, you can't write on
9 these.  They are exhibits.  They'll be marked and in
10 evidence.
11   Q   (By Mr. Cain)  Oops.
12   A   Well, I just wrote Staple Street is owned.
13       MR. QUINN:  Okay.  That's fine.  Just going
14 forward.
15   Q   (By Mr. Cain)  Thank you for that general
16 explanation.  I'm -- I'm going to ask the questions and
17 if you don't know, then that's -- that's your answer.
18 Our votes, third item, are stored on a server in
19 Frankfurt, Germany.  Do you know that that's true or
20 false?
21   A   I don't know.
22   Q   Then our votes are actually counted in
23 Barcelona, Spain.  And Smartmatic has a special software
24 feature that allows user to change votes.  Do you know
25 if that's true or false?

Page 124

1   A   I don't know.
2   Q   Item 5 seems to reference back to Item 4.
3 And then Item 6 is, Oh and Smartmatic owns Dominion.
4 Now you know that false, don't you?
5   A   I don't know that.
6   Q   Okay.  Well, do you know whether all this
7 sort of voter fraud stuff that we're seeing Giuliani,
8 attributed to Giuliani at least, turned out to be
9 nonsense?
10   A   Well, we have a Jenna Ellis reference here
11 where she was on the Dan Bongino show.
12   Q   Yeah.  She's been indicted.  You know that;
13 right?
14   A   I do know that.
15   Q   Okay.
16   A   So I -- as I looked at it in Tulsa -- in
17 Tulsa, I don't know Rudy Giuliani at this time, don't
18 know Sidney Powell, don't know Jenna Ellis, don't know
19 Dan Bongino, don't know Colonel McInerney.  And so at
20 that time we were copying and pasting information and
21 sending it out.  They were broadcasting.
22   Q   Okay.  So you were essentially posting or
23 republishing their content in this context?
24   A   Yes, sir.
25   Q   And you -- and you felt comfortable doing

Page 125

32 (Pages 122 - 125)

1 that despite the fact that you hadn't vetted the
2 information that they were purporting to provide to the
3 public?
4      MR. QUINN: Object to form.
5      THE WITNESS: Well, I'll give you an example.
6 Mayor Giuliani was a guy that I remember him being the
7 Mayor of New York during the terrible events of 9-11.
8 And I had actually paid to go see him speak years ago
9 when he came to Tulsa. He's a guy that I read a Harvard
10 case study called Service Profit Chain about him. And
11 so he was a guy that I had respect for. And so he's a
12 person that I thought that would not share information
13 that was not true. And so I tried to only share from
14 sources that I perceived to be credible.
15     Q    All right. I get that. It's one thing to
16 put out information based on what you're describing.
17 It's another thing to -- to keep that information up
18 after subsequent events. Is this Exhibit 44 still up on
19 your website?
20     MR. QUINN: Object to form. Go ahead.
21     THE WITNESS: I don't know. But I don't
22 believe that this particular content is, but I don't
23 know.
24     Q    (By Mr. Cain) Well, I thought you said
25 yesterday that -- that you're the guy that decides what

Page 126

1      THE WITNESS: Well, I just -- give you an
2 example. I don't mean to communicate long form, I just
3 have a thing. So whatever. But, you know, there's
4 people that have spoken at our events and so we allow
5 them to speak. And then somebody will reach out to me
6 later and say, hey, you know, this particular person
7 went on a show and said that later. And so I think to
8 myself, I probably don't want that on the website. So
9 those have been a few of the updates that we've done.
10 Just as a categorically how we do it.
11     Q    Yeah. I -- I -- you said that yesterday. I
12 understand that. I -- my question was more generated or
13 designed, I should say, towards taking down content
14 based on substantive concerns about its voracity as it
15 relates to voter fraud issues.
16     A    I don't recall removing content.
17     Q    All right. Let's flip over to the next page
18 on this exhibit. I'm going to kind -- I'm sure we could
19 talk about Covid all day long but we're not going to do
20 that. You referenced in the middle of this page, this
21 call to action. And I can't pronounce it as well as
22 you. Budis -- budisine.
23     A    Budesonide.
24     Q    Budesonide. You're much better at that. So
25 I don't really have -- you've already kind of covered

Page 128

1 goes up?
2      A    Correct.
3      Q    And what comes down?
4      A    Correct. But I'm like a -- a one-man show.
5 So I don't recall every single thing that's on the
6 website or not.
7      Q    I totally get that.
8      A    Okay.
9      Q    As you sit here today, you don't know if it's
10 up or not?
11     A    As I sit here today, I don't know.
12     Q    Have you pulled out any voter fraud related
13 content from your websites?
14     A    Occasionally someone will tell me there's a
15 link that's dead. Or you know, like, the link has been
16 removed or something like that. So it's kind of like
17 a -- a garden a little bit where we do weed from -- I
18 say we, but I weed from time to time, remove things.
19     Q    I'm not -- yeah. I'm not asking about broken
20 links. I'm asking about based on substance that you
21 determined to be false?
22     A    Well, I mean.
23     Q    And just as it relates to voter fraud. We
24 don't need to talk about Covid?
25     MR. QUINN: Object to form. Go ahead.

Page 127

1 that. But what is the -- the first item here related
2 to -- you say I -- or it is said on this document, I
3 have an in quote, Esther nation saving message for
4 President Trump and Elon Musk. And then you go on.
5 What does that mean?
6      A    I was wanting people to know that Budesonide
7 is an effective life-saving treatment for Covid.
8      Q    Right. The first part though I don't -- I
9 don't quite get.
10     A    In the Bible, Esther was a woman who spoke up
11 to save her people. And I knew a lot of people that I
12 met through the ReAwaken tour who had lost husbands and
13 wives and family members because they didn't know that
14 Budesonide was an effective treatment. And so I was
15 trying to provide a life-saving treatment to people that
16 they could go to our resource.
17     Q    All right. And then the last item on the
18 call to action, we must pray for the one man standing in
19 the way, communist China funded Luciferian left. Who --
20 who is the one man you're referring to there? Or that
21 is being referred to, if you know?
22     MR. QUINN: Object to form. Go ahead.
23     THE WITNESS: I believe that President Trump
24 at the time was the one person standing up for medical
25 freedom through the right to try. And so I wanted

Page 129

33 (Pages 126 - 129)

1  Budesonide, Ivermectin and Hydroxychloroquine to be
2  available to people that wanted it.  And I had no way to
3  reach President Trump at that time.
4      Q    (By Mr. Cain)  Okay.  Well, you had say on
5  one of your shows that I had the good fortune to watch
6  that you did meet with President Trump at some point?
7      A    I did.
8      Q    And this next item says, points to go over
9  with President Donald J. Trump?
10     A    Yes.
11     Q    So let's -- let's put some meat on the bones
12  as it relates to that.
13     A    Yeah.
14     Q    When did you ultimately meet with former
15  President Trump?
16         MR. QUINN:  Object to form.
17         THE WITNESS:  I think it's somewhat public
18  record because I mentioned it on some social media
19  platform.  I don't know the -- the -- the date of it.  I
20  don't recall the specific date.
21     Q    (By Mr. Cain)  Was it Tuesday?  Last Tuesday?
22     A    No.  I think it was --
23         MR. QUINN:  Object to form.
24         THE WITNESS:  -- over a year ago.
25     Q    (By Mr. Cain)  So 2023?

Page 130

1      A    That seems correct.  But I don't want to
2  mislead you, Mr. Cain, or to think -- or you to think
3  I'm messing with you.  I don't know the actual date.
4      Q    Where did you meet with him?
5          MR. QUINN:  Object to form.
6          THE WITNESS:  At Mar-a-Lago.
7      Q    (By Mr. Cain)  Who -- who was at the meeting?
8          MR. QUINN:  Object to form.
9          THE WITNESS:  It was my wife, Vanessa.  It was
10  General Flynn.  It was President Trump.  And it was
11  Susie Wiles.
12     Q    (By Mr. Cain)  Who is Susie Wiles?
13         MR. QUINN:  Object to form.  Go ahead.
14         THE WITNESS:  I don't know what her role is.
15     Q    (By Mr. Cain)  Do you know who she works for?
16         MR. QUINN:  Object to form.
17         THE WITNESS:  She -- she was greeting me but I
18  didn't know if -- but she's not a greeter it didn't seem
19  like.  It just seemed like she was in the office.
20     Q    At Mar-a-Lago?
21     A    Yes.
22         MR. QUINN:  Object to form.
23     Q    (By Mr. Cain)  And did General Flynn set this
24  meeting up?
25         MR. QUINN:  Object to form.

Page 131

1          THE WITNESS:  General Flynn did assist in
2  setting -- I believe he's the one who set that up.
3      Q    (By Mr. Cain)  How long was the meeting?
4          MR. QUINN:  Object to form.
5          THE WITNESS:  I believe we were there for
6  approximately one -- like over one hour.
7      Q    (By Mr. Cain)  And did you go over any of
8  these points that are referenced on Exhibit 44?
9          MR. QUINN:  Object to form.  Go ahead.
10         THE WITNESS:  I went over -- I have a poster
11  of the points I went over because I made it a
12  presentation.
13     Q    (By Mr. Cain)  Uh-huh.  You -- well, I'm
14  sorry to interrupt you.
15     A    I'm just telling you.  I mentioned that on
16  shows too, you know.  But I went over with him that
17  there's this thing called the Great Reset, which is
18  Klaus Schwab.  And that they are trying to implement --
19  they being Klaus Schwab, are trying to implement the
20  Great Reset.  And then I explained to him that the
21  models that said 2.2 million people would die from Covid
22  were false.  I explained to him that the polymorace
23  chain reaction tests could be misinterpreted to fit
24  cases.  And that Covid was treatable using Budesonide,
25  Ivermectin, Hydroxychloroquine.  And then I explained to

Page 132

1  him about Central Bank digital currencies.  And I
2  explained to him about the dedollarization efforts that
3  were occurring.  And then we watched Kim Clement
4  prophecy videos with him after my wife prayed with him.
5      Q    Okay.  What was -- what were you hoping to
6  get out of this meeting?
7          MR. QUINN:  Object to form.
8          THE WITNESS:  I wanted to stop the Great
9  Reset.  And to let him know that he was incorrect about
10  the RNA modifying shots.  Covid shots.
11     Q    (By Mr. Cain)  Did you receive any
12  commitments from former President Trump on any of these
13  topics?
14         MR. QUINN:  Object to form.
15         THE WITNESS:  No.  He was kind but non-comital
16  to any action steps.
17     Q    (By Mr. Cain)  And that's your sole meeting
18  with him?
19     A    That was the sole meeting where we sat down
20  and had a meeting.  And I once -- I shook his hand at
21  Laura Trump's birthday where I exchanged 30 seconds
22  of, I would say, greetings or pleasantries.  But I do
23  not believe at that time he had any idea who I was.
24     Q    All right.  Well, let's -- let's drill down
25  on some of those topics.  But before I do that actually,

Page 133

34 (Pages 130 - 133)

1  you said there's a -- I apologize again, I don't have
2  time to review all your content.
3      A    That's fair.
4      Q    Which is prolific.  There's a poster?
5      A    Yes, sir.
6      Q    And is that -- where is that contained?
7      A    Well, I made -- I made a poster.  To -- like
8  a corkboard to go over it with him.  And so I gave him
9  the poster.  But I do have, like, a digital copy of it.
10     Q    But the post is set -- when we're in court,
11 at least back in the old days, we had this foam board
12 thing on a tripod.  Is that what you're referring to?
13     A    Yeah.  Just like that.
14     Q    You don't -- do you still have that?
15     A    I gave him a copy that I brought.  I brought
16 one.  I was flying.  So I brought this corkboard and
17 gave it to him.  But I have a digital copy that I could
18 provide to you.
19     Q    Okay.  Thank you.  I'll be -- I'll ask your
20 counsel for that.  Let's talk about Kim Clement first.
21 There's a -- on this document, Exhibit 44, there's a
22 reference that on item No. 1.  Says, I am the Mr. Clark
23 referenced in the following Kim Clement prophecy video.
24 And then there's a link on the -- how do you say it?
25 Bitchute?

Page 134

1      A    Yeah.  That's an unfortunate domain name that
2  somebody came up with.
3      Q    Okay.  Is that the video that you showed him?
4      A    No.  I went over a shorter video, like a
5  17-minute highlight I put together.
6      Q    Okay.  Do you still have that highlight?
7      A    Yes.  I mean, I put it out there for all to
8  see.  Yeah.
9      Q    So 17 minutes.  So you all sat around for 17
10 minutes watching a video?
11     A    I -- I -- again, we're under oath, so I never
12 want to mislead anybody at all about anything.  I don't
13 know the actual amount of time, but we did watch it
14 together.  I know that the video that I put out, there's
15 like a highlight, it's about 17 minutes long.  But I
16 don't know whether -- you know, it's like, we would
17 watch it and then pause and go over certain things.
18     Q    I see.  Well, let's take a look at the one
19 that's referenced on this -- well, let's take a listen
20 of the one that's referenced on this.  It's a shorter,
21 it's not 17 minutes or I wouldn't play it.  It's a
22 minute and 36.  And I guess what I'll do is --
23         (Plaintiff's Exhibit No. 45 was marked for
24          identification purposes and made part of the
25          record)

Page 135

1      Q    (By Mr. Cain) Let's do a place holder for
2  this one as Exhibit 45.  And that will be the Kim
3  Clement minute and 36 video.  I suspect you've listened
4  to this one and watched it before?
5      A    I -- I have.  But again, it's been a long
6  time so I don't know what specific length this is.
7      Q    Let's refresh your memory.  This one
8  starts -- I don't have my second screen with me, so I'm
9  just going to play the audio.
10        (The following is the audio clip played in
11         deposition:)
12        There's a man by the name of Mr. Clark and
13 there's also another man by the name of Donald.  You are
14 both watching me saying, could it be that God's speaking
15 to me?  Yes, he is.  Somebody just a few minutes before
16 you came on the show, you went out and you took the
17 American flag and you said, I'm proud of my nation.  You
18 raised it up.  And God said, you have been determined
19 through your prayers to influence this nation.  You're
20 watching me.  You're an influential person.  The Spirit
21 of God says, hear the word of the profit to you as a
22 king.  I will open that door that you prayed about.  And
23 when it comes time for the election, you will be
24 elected.  There will be a praying president not a
25 religious one, for I will fool the people, says the

Page 136

1  Lord.  I will fool the people.  Yes, I will.  God says,
2  the one that is chosen shall go in and they shall say,
3  he has hot blood, for the Spirit of God says, yes, he
4  may have hot blood, but he will bring the walls of
5  protection on this country in a greater way and the
6  economy of this country shall change rapidly says the
7  Lord of Hosts.  Listen to the word of the Lord.  God
8  says, I will put him to a helm for two terms.  A
9  president that will pray.  But he will not be a praying
10 president when he starts.  I will put him in office and
11 then I will baptize him with the Holy Spirit and my
12 power says the Lord of Host.  Come on.
13     Q    (By Mr. Cain) That's the end of that.  So
14 help the jury understand, who -- who is -- and the Court
15 perhaps, who is Kim Clement?
16        MR. QUINN:  Object to form.
17        THE WITNESS:  He was -- he was a profit.  A
18 late profit who prophesied the events of 9-11 and other
19 events.  And he passed away, I believe, in 2017 ish.
20     Q    And Mr. Clement, did you know him personally?
21     A    Never met him.
22     Q    You say on Exhibit 44, I -- I am the
23 Mr. Clark referenced in the following Kim Clement
24 prophecy video.  Do you believe that?
25     A    I do believe that.

Page 137

35 (Pages 134 - 137)

1  Q   So --
2       MR. QUINN:  Object to the form of the last
3  question.
4  Q   (By Mr. Cain)  There are a lot of Clarks, I
5  suspect in the world.  But what makes you think you're
6  the Mr. Clark that he's referring to?
7       MR. QUINN:  Object to form.
8       THE WITNESS:  Well, the day that I got that
9  text to me, it was text to me by a guy by the name of
10 Charles Colaw.  And so Charles Colaw is a long-time
11 client of mine.  And he says, hey, you should watch
12 this.  So I watched the video and I thought this is
13 probably not related to me, to your point there's a lot
14 of Clarks, probably only one Trump we all know, but a
15 lot of Clarks.  So I disregarded it.  And then a few
16 minutes later I got a call from CJ Wheeler.  And she
17 said, hey, your book that got banned, Fear Unmasked, One
18 America would like to interview you from that at this
19 particular date in Washington, D.C. at this particular
20 day.  And I don't recall the date but it was a specific
21 date.  And then I got a call later, this is all within
22 just an hour.  I got a call from Richard Manning.  And
23 Richard Manning was a guy who is an acquaintance but not
24 like a -- I don't have a problem with him, he's an
25 acquaintance.  And he's a -- he contributes sometimes

Page 138

1  for independent media Washington Times of Fox.  And he
2  says, hey, you've been invited to attend the Trump
3  deregulation event he's hosting at the Whitehouse.  And
4  so I thought, that's interesting.  And I put the phone
5  down again and CJ called back and said, hey, Newsmax
6  would like to interview you on this same particular day.
7  So it's like I don't go to D.C.  I don't have a desire
8  to meet Republicans or Democrats.  And so -- and I had
9  the invitation from One America, Newsmax and the Trump
10 team through Richard Manning to go to a deregulation
11 event all on the same day.  And so I thought that's
12 still -- I don't know.  Up to that point in my life, I
13 never watched prophecies.  And so then I got a -- a
14 knock at the door.  And a man by the name of Mace
15 Roberts, who's been a long-time client of mine.  And he
16 knew at that point, as well as Charles Colaw, that I
17 don't do -- I did not do prophetic videos.  And he says,
18 hey, I -- I -- before I did your show this morning, I
19 took out the American flag and I said, I'm proud of this
20 nation with my son.  And I -- for some reason I feel the
21 need to tell you.  And he had kind of tears in his eyes
22 and he was pretty emotional about it.  And at that
23 point, I recognized, oh, no, this is probably referring
24 to me.  And so I called Aaron Antis, who went to Rhema
25 Bible College.  And I said, Aaron, I need you to tell me

Page 139

1  about how prophecy works.  And Aaron said, what do you
2  mean how prophecy works.  I said, I know the Bible and
3  you got 25 percent of the Bible ish is prophetic and 75
4  percent is historical.  But how does that work.  And he
5  said, well, I need to meet you.  And he came over and
6  prayed for me.  And then since that time, all this
7  ReAwaken America stuff that was not things I wanted to
8  do, and it's not things I want to do have been
9  happening.
10 Q   Okay.  Well, as the individual that's
11 specifically named in this prophecy video, what -- as --
12 again, as it relates to the election issues, what have
13 you been called to do?
14 A   I think I'm called to share the truth, which
15 is uncomfortable for Republicans and Democrats.  And to
16 expose the Great Reset.
17 Q   Okay.  Well, I was -- I was really -- maybe
18 it doesn't relate to elections.  But so I'll just ask
19 you, does -- does your role in this prophecy have
20 anything to do with whether the elections are rigged,
21 and by -- particularly by this guy sitting next to me?
22 A   That is not the biggest issue.  That's not
23 what I focus on.  I focus on the Great Reset versus the
24 Great Reawakening and leading people back to Christ.
25 Q   Okay.  Well, Mr. Clement, you know, he

Page 140

1  referred to Donald?
2  A   Yeah.
3  Q   And that first part was in 2013, I believe?
4  A   Right.  I believe -- well -- and I'm ready
5  to respond slower.  But I -- I'm just saying, I don't
6  know the actual date.  But the date's stamped on the
7  video.
8  Q   Yeah.  I don't either.  But that's what the
9  date is on the video; correct?  And I think part of that
10 also was in 2007.
11 A   Which makes it even more abnormal.
12 Q   Okay.  But just your understanding, the
13 Donald in the video you took that to mean Trump?
14 A   I believe that God --
15     MR. QUINN:  Object to form.  Go ahead.
16     THE WITNESS:  I believe that God has called
17 President Trump to be a trumpet in a First Thessalonians
18 Chapter 4 kind of way.  Where he's supposed to wake up
19 people to things that are going on, which is hard for me
20 to -- to reconcile in the fact that he's -- was pushing
21 Operation Warp speed.  So I don't know exactly how God
22 has it all planned out.  But I know the Euphrates River
23 is drying up.  And the false profit has shown up.  China
24 and Russia are teaming up.  And beast technology is
25 showing up.

Page 141

36 (Pages 138 - 141)

1   Q   Okay. But -- but I guess my question, in
2   your mind, is the Donald that Mr. Clement is referring
3   to -- I'm trying to get to what's kind of motivating you
4   to do what you do. Is the Donald that's referred to in
5   this video, did you take that to mean Trump?
6   A   I believe that's who Kim Clement was
7   referring to. Yes, sir.
8   Q   And for example, Mr. Clement in that video
9   said something about two terms. Did you take that to
10  mean that -- that Donald Trump, based on this prophecy
11  was going to serve two terms?
12      MR. QUINN: Object to form.
13      THE WITNESS: I believe that if you listen to
14  the Kim Clement prophecy that he said that Trump would
15  have to be filled with the Holy Spirit first. And I
16  don't believe that has happened first. So I believe
17  that when President Trump is filled with the Holy
18  Spirit, then I believe that God will use him to wake
19  people up. And to a second term of some kind. But I
20  don't know how that all works.
21  Q   Okay. So that's TBD as they say? You don't
22  believe he's been filled with the Holy Spirit yet?
23  A   It's hard for me to know a person's heart.
24  Just like Dr. Coomer, I know you're sitting across from
25  me here. I -- hopefully you know I'm being sincere. I
Page 142

1   know you -- hopefully you're being sincere. And that's
2   the understanding, but you can't get in someone's mind
3   and read their -- their thoughts. So I don't -- I don't
4   know. I just pray that he is filled with the Holy
5   Spirit so that my five kids can enjoy the freedoms that
6   I grew up with.
7   Q   Okay. Thank you for that. I guess, you
8   know, there was a couple of comments on that video about
9   essentially being the chosen one and the two terms, some
10  discussion about the economy. As you sit here today,
11  are you motivated by this prophecy specifically
12  supporting former President Trump to fulfill his two
13  terms in office?
14      MR. QUINN: Object to form.
15      THE WITNESS: I feel like the prophecy's sort
16  of dragging me along.
17  Q   (By Mr. Cain) Well, I'm not -- I'm not a --
18  no one has a prophecy on -- on the internet relating to
19  Mr. Cain, so --
20  A   Maybe -- maybe there is. I -- I -- this
21  is -- this is the thing.
22  Q   What do you mean it's dragging you along?
23  A   This is not something I've ever wanted to do.
24  You know, I -- I think if my wife would approve it, I
25  would become Amish.
Page 143

1   Q   Okay. But what are you doing to -- to
2   facilitate or fulfill this prophecy, if anything?
3       MR. QUINN: Object to form.
4       THE WITNESS: Well, when I brought Robert F.
5   Kennedy, Jr. on the stage, many conservatives were
6   going, why are you bringing him. This guy's not
7   conservative. What are you doing? And I brought him
8   because I thought he knew the truth about the RNA
9   modifying nano technology in the shots. So that's why I
10  brought him. And so that would be the truth column.
11  But it's not on the conservative column. And when I
12  called out Governor Abbot for having a porous border, a
13  lot of conservatives said, why are you -- why are you
14  doing that? He's a conservative. Well, I think it's
15  bigger than that. Hence the Great Reset versus the
16  Great Reawakening. I'm just trying to lead people back
17  to Christ.
18  Q   Well, are those, you know, you talked about
19  the social media post of Dr. Coomer as not being, shall
20  we say, flattering of -- of Donald Trump. Are those
21  that are not in line with Donald Trump, such as
22  Dr. Coomer, at least based on his social media posts,
23  working against the will of God?
24      MR. QUINN: Object to form.
25      THE WITNESS: I don't believe they are working
Page 144

1   against the will of God.
2   Q   (By Mr. Cain) Are there any other prophecies
3   that you think are applicable to you as it relates to
4   either Donald Trump or -- well, just as it relates to
5   Donald Trump? Let's just leave it at that.
6       MR. QUINN: Object to form.
7       THE WITNESS: No. And being at the center of
8   a prophecy is an interesting thing because I didn't want
9   to be at the center of a prophecy.
10  Q   (By Mr. Cain) And that's similar to what
11  Oltmann says, he didn't want to get involved in this.
12  But you feel compelled as a result of a prophecy is how
13  I'm viewing this.
14      MR. QUINN: Object to form. Sorry.
15  Apologies.
16      THE WITNESS: I was hosting my Town Halls
17  before the prophecy because I felt called to do it. But
18  I don't want to do it. I just want to stop the Great
19  Reset.
20      MR. QUINN: Counsel, it's almost lunch time
21  when you're ready, when you get a minute.
22      MR. CAIN: Well, I was going to talk about
23  Luciferase next, which seems to be slightly different.
24  Maybe it's all related. So let's take a break because
25  it's fine.
Page 145

37 (Pages 142 - 145)

1    THE WITNESS:  Okay.
2    THE VIDEOGRAPHER:  Off the record.  The time
3 is 12:44.
4    (A short break was had; after which the
5       following proceedings took place:)
6    THE VIDEOGRAPHER:  Back on the record.  The
7 time is 1:23.
8    Q    (By Mr. Cain)  Just to wrap up what we were
9 talking about.  Are there any other -- I know we played
10 that segment, which was video Exhibit 45 of Kim Clement.
11 Are there any other Clement prophecies?  I know you
12 mentioned a longer version of stuff that you showed
13 former President Trump.  But are there any other
14 prophecies you think are applicable to you either by
15 Mr. Clement or someone like him that related to your
16 actions in the last four years or so?
17    A    I do not.
18    Q    And item No. 2 on Exhibit 45, I have the
19 associated video.  I don't think we need to play it.
20 But I -- I do need to understand it.  Item No. 2 on
21 points to go over with President Donald J. Trump, learn
22 about the Luciferase technology embedded in the Covid 19
23 vaccines, which include:  RNA-modifying body-activated
24 cryptocurrency with Patent No. W02020-060606.  Are you
25 with me on that?

Page 146

1    A    Yes, sir.
2    Q    Okay.  So is this something that -- that you
3 believe in as well?
4    A    Robert Malone is the inventor of -- he claims
5 to be the inventor of the MRNA technology.  And he
6 claims to be the inventor of the -- he's since educated
7 me and told me is Luciferase is what he calls it.
8 Luciferase.  Spelled the same way.
9    Q    Okay.  But that's not my question.  I said,
10 is this something that you believe in?
11    A    Well, I believe that Robert Malone, who is
12 the inventor of MRNA and Luciferase has said that he
13 invented those technologies.
14    Q    But do you believe that that technology is
15 actually in the Covid 19 vaccines?
16    MR. QUINN:  Object to form.
17    THE WITNESS:  I believe that the Surgeon
18 General of Florida would be the best person to ask on
19 that because they are a doctor.  Followed by Dr. Malone,
20 who has said that the technology in the shots is part of
21 the transhumanism agenda during his interview with Glenn
22 Beck.
23    Q    I'm asking Clay Clark since you're in front
24 of me.  Do you believe in this embedded technology in
25 the Covid vaccines?

Page 147

1    MR. QUINN:  Object to form.
2    THE WITNESS:  Yes.
3    Q    (By Mr. Cain)  And would that include the
4 idea that there are nano technologies in the vaccine that
5 are collecting biometric data on everyone who has been
6 injected?
7    A    I don't --
8    MR. QUINN:  Object to form.  Go ahead.
9    THE WITNESS:  I don't know how the technology
10 works.  But I do know that doctors, who study this,
11 believe that there is RNA modifying nano technology in
12 the shots.
13    Q    (By Mr. Cain)  Do you?
14    A    Yes.
15    Q    And what does that mean for someone like me
16 who had the misfortune of being vaccinated for Covid 19?
17    A    I don't know.
18    Q    Well, isn't it -- I understood it that at
19 some point that technology is going to be triggered and
20 cause some response in humans that had the vaccine; is
21 that right?
22    MR. QUINN:  Object to form.
23    THE WITNESS:  Dr. Rasheed Bitar, a friend of
24 mine, is deceased.  Rasheed Bitar and Dr. Zelenko,
25 friend of mine, deceased, both of them are deceased and

Page 148

1 both of them were friends of mine.  They both believe
2 that there is technology in the shot that's RNA
3 modifying nano technology that most people who took the
4 shot were not aware of.  But as far as how it interacts
5 with the human body, I don't know.
6    Q    Okay.  And like the prophecy video, is
7 this -- you -- you -- I think you noted this as a topic
8 with former President Trump.  Is that also something
9 that you shared with him?
10    A    I did share that with him.
11    Q    Did you talk to former President Trump about
12 Dr. Coomer or election rigging issues?
13    A    I did not.
14    Q    Okay.  There's other items on this list that
15 I'm just not going to cover because I don't think we
16 have the time, or I don't have the intestinal fortitude
17 for it.  Actually at the end, this is -- you say, I need
18 to speak with Pastor Robison as soon as possible to
19 discuss and then there's a colon without anything.
20 You -- do you know what that's about?
21    A    I don't.  And I don't think that I know of
22 anybody by the name of Pastor Robison.  That's why when
23 I look at this document, I'm not -- it seems like it was
24 copy pasted.  But I don't recall knowing a Pastor
25 Robison.

Page 149

38 (Pages 146 - 149)

1    Q    Okay.  This morning you referenced -- pardon
2  me.  I'm vibrating.  Vaccine maybe.
3    A    Is that too soon for those jokes?
4    Q    No.  I'm trying to get as many on the record
5  as possible.
6    A    Okay.
7    Q    I guess going back to what I was discussing
8  with you on the Trump meeting, if you believed that you
9  had been part of uncovering someone who was involved in
10  rigging the 2020 election, why wouldn't you have
11  mentioned that to -- to former President Trump?
12        MR. QUINN:  Object to form.
13        THE WITNESS:  Do I still answer the question?
14        MR. QUINN:  Yes.
15        THE WITNESS:  Yeah.  I -- I -- it wasn't on my
16  agenda of -- things I felt were super important.  So
17  I made a post of things I felt like were important,
18  which is the Great Reset and stopping it.
19    Q    (By Mr. Cain)  Did he ask you about any of
20  the election security issues that had been raised either
21  by you or people like you?
22    A    No.
23        MR. QUINN:  Object to form.
24        (Plaintiff's Exhibit No. 46 was marked for
25        identification purposes and made part of the

Page 150

1        record)
2    Q    (By Mr. Cain)  All right.  Let's mark this --
3  okay.  Part of your now four-legged stool.  It was three
4  and now we've added a fourth leg as it relates to
5  Dr. Coomer, was this idea that -- that Dr. Coomer had
6  patents related to election technology.  So I want to
7  circle back to that.  Okay?
8    A    Sounds fair.
9    Q    At break, your counsel kindly provided us
10  with a copy of Exhibit 46.  Have you seen this document
11  before?
12    A    Yes, sir.
13    Q    Okay.  A few questions on it.  Are these
14  the -- the 12 patents -- I actually didn't count them.
15  But are these the 12 patents or so that you were
16  referring to earlier in your testimony?
17    A    Yes, sir.
18    Q    Now you're not a patent expert; right?
19    A    That is correct.
20    Q    Do you know the difference between a patent
21  application and the grant of a patent?
22    A    No.  Not a patent expert.
23    Q    So if I -- let's just look at the first two
24  items here.  The first is -- has an associated patent
25  number on the top.  It has an abstract, which I'll

Page 151

1  represent to you describes the -- the nature of the
2  patent.  Do you understand that?
3    A    Yes, sir.
4    Q    And then it has the type.  Do you see that?
5    A    Yep.
6    Q    And you see -- what's the word next to the
7  type on the first one?
8    A    Grant.
9    Q    Okay.  And then a date, and the assignee and
10  the inventors.  So back when you were doing your
11  research, this is one of them that saw that --
12  that referred to Dr. Eric Coomer; right?
13    A    Yes.
14    Q    And there are a handful of inventors that are
15  listed on this exhibit; right?
16    A    That is correct.
17    Q    And the assignee is Dominion Voting Systems;
18  right?
19    A    Yes, sir.
20    Q    Do you know the difference -- or did
21  you -- let's go back in time.  Maybe you learned
22  subsequently.  But did you know the difference at the
23  time between the owner of a patent and the inventor?
24    A    No.
25    Q    These other individuals that are listed on

Page 152

1  the first granted patent, did you do any research into
2  them on their background?
3    A    I just do some Duck Duck Go searches.  But
4  what was getting my attention was that Dr. Coomer
5  was the head of security and strategy for Dominion.  And
6  that his name was also considered to be an inventor or
7  on these patents.
8    Q    Okay.  But did you do any research into these
9  other individuals?
10    A    I just did Duck Duck Go searches.  So yes, I
11  did.
12    Q    Okay.  Did you look for their social media?
13    A    No.
14    Q    The second item here is under the type is
15  listed as a patent application.  Now, you know -- well,
16  maybe you don't.  That you have to apply for a patent
17  before that patent is granted by the trade office;
18  right?
19    A    I have heard that.
20    Q    Okay.  So because there's an application,
21  those can be either accepted as a new patent or they can
22  be denied or modified or amended.  Were you aware of the
23  fact that a patent application is different than the
24  grant of a patent at the time you were doing this
25  research?

Page 153

39 (Pages 150 - 153)

1    A    No.
2    Q    Were you aware at the time that a patent can
3  be amended?  It's the same technology, but there's an
4  amendment to it that modifies the patent in some way?
5    A    No.
6    Q    Did you consult with any patent lawyers in
7  connection with your analysis or at least research about
8  Dr. Coomer's patents?
9    A    No.
10    Q    So when your -- when you testified that there
11  are 12 or so patents related to Dr. Coomer, are you
12  seeing on Exhibit 46, you're including both granted
13  patents, and also if we just look at the document, a
14  number of patent applications; right?
15    A    These 12 items is what I was referencing.
16    Q    Okay.  But you understand, right, that a
17  patent application is different than a granted patent?
18    A    You're telling me this, so I'm learning right
19  now.
20    Q    Did you look -- I guess if I'm putting the
21  pieces together in sequential order, you must have had
22  the Facebook post prior to pulling the information on
23  patents?
24    A    Well, at our Town Halls people were telling
25  me, you know, you should look into the guy who is
Page 154

1  running election security and strategy for Dominion.  I
2  would hear that.  And so I don't have an exact time line
3  of how I did that.  It was an ongoing conversation.
4    Q    Okay.  And I -- I want to understand the time
5  line a little better.  The Town Halls, can you think of
6  the specific Town Hall, or Town Halls plural, that you
7  were hearing this, this information about Dr. Coomer?
8    A    No.  But I can say there was an avalanche of
9  information that was coming in.  People were talking
10  about election integrity.  And people were talking about
11  the medical industrial complex.  And those were sort of
12  the topics that people kept coming to me with.
13    Q    Was this before the election though?
14    A    A lot of this stuff, yes, was before the
15  election.
16    Q    Okay.  But we just can't triangulate it
17  beyond that?
18    A    I can't because I was doing them every week.
19  And I was interacting with hundreds of people.
20    Q    Did you look into any of the -- you may know
21  this, may not -- but other voting companies there were
22  allegations that had been raised by people like Sidney
23  Powell, who we discussed, that they had some involvement
24  in the rigging of the 2020 election?  Did you look into
25  any other voting company or just Dominion?
Page 155

1    MR. QUINN:  Object to form.  Go ahead.
2    THE WITNESS:  I believe that the three voices
3  that I was hearing, you know, the podcast, didn't know
4  them but heard them a lot.  I always listened to.  Was
5  McInerney and then Sidney Powell and Mayor Rudy
6  Giuliani.  Those were the three.  And so what they were
7  talking about was information I was learning.  So
8  whatever they were talking about at that time is
9  probably where I was getting information from.
10    Q    Okay.  But did you look at, for example,
11  employees of ES&S or Smartmatic to see if they had some
12  indication that they had patents relating to election
13  technology?
14    A    There was one lady who came to one of your
15  Town Halls that was from Venezuela.  And she claimed to
16  have knowledge about Smartmatic and the Meduro and
17  Chavez family.  And she sort of was passionate about
18  that.  And that's probably the only time I ever had
19  anybody that was passionate about Smartmatic
20  specifically.
21    Q    Okay.  But my question is, did you do the
22  same sort of Duck Duck Go research into ES&S or
23  Smartmatic?
24    A    Well, I tried to verify what they were
25  saying.  And so the only thing I could verify was that
Page 156

1  Eric Coomer had these patents.  And so that's -- that's
2  all I could verify.  As far as Smartmatic, people will
3  just -- when you meet people at scale, at a Town Hall,
4  people say a lot of things.  And I'm just trying to sift
5  through the information.
6    Q    You said Eric Coomer had these patents.  And
7  we just look at the first one that you came up with.
8  He's listed as one of seven inventors of that patent.
9  The patent though was owned, by your own research, or
10  was assigned to Dominion; right?
11    A    Okay.
12    Q    You agree with me on that?
13    A    Well, I'm just going off of what this says
14  here.  I have no reason to believe that this document
15  from Justia is misleading us.
16    Q    So why -- why just focus then ultimately on
17  Dr. Coomer?  Is it because of the social media?
18    A    It was that people were saying he had posted
19  alarming social media posts.  And because his position
20  at the time was, you know, director of security and
21  strategy.
22    Q    And I was focusing my questions on the sort
23  of contemporaneous time period back then.  But since
24  that period of time, have you done any other research
25  with respect to Eric Coomer's involvement in obtaining
Page 157

40 (Pages 154 - 157)

1  patents on behalf of Dominion?

2      A    No.  I just watched his deposition and then

3  the body cam video of the police, interaction with him

4  multiple times.



Page 158

25      Q    (By Mr. Cain)  I think Mr. Brad played some

Page 160

1  videos for you yesterday.  I'm not going to replay

2  those.  The first Thrivetime appearance by Mr. Oltmann

3  was, I think, published on December 22nd of 2020.  Does

4  that sound about right?

5      A    I don't want to disagree with whatever the

6  facts show.  That sounds correct.

7      Q    All right.  And that's the one that we looked

8  at the exhibit that has -- I don't have it in front of

9  me, but it was the first exhibit that we looked at.

10  That's the one that you republished through Thrivetime;

11  right?

12      A    Yes.

13      Q    Other than what you've already described in

14  both yesterday's deposition and today, did you do

15  anything else to corroborate Mr. Oltmann's allegations

16  that he was on an AntiFa call and that Dr. Coomer was on

17  that call and boasted about rigging the 2020 election?

18      A    I have asked him on -- on the show multiple

19  times to provide it.  And then off air I -- I think I

20  said something to the effect of, hey, we put out your

21  show.  If you could send that to me, that would be

22  wonderful.  That's about the extent of our conversation.

23      Q    But before Mr. Oltmann came on, you obviously

24  knew he was going to talk about Dr. Coomer; correct?

25      A    On -- on my show?

Page 161

41 (Pages 158 - 161)

1   Q    Yes, sir.

2   A    Yes, sir.

3   Q    That's why you brought him on?

4   A    I brought him on because Ann Vandersteel
5   suggested I should have him on.  And just to add to
6   that.  Ann has been someone in my life that has only
7   suggested guests that she has vetted.  And so she
8   typically doesn't call me and say, hey, you know, you
9   should interview people.  So she called me and said,
10  hey, I really believe you should interview Joe Oltmann.
11  He quote/unquote brings receipts.  I remember her saying
12  that.

13  Q    Did you -- I'm sorry.  I thought you were
14  done.

15  A    So that's what she said.  And I remember Joe
16  Oltmann saying he would ship it to me.  And so my
17  follow-up to call was just seeing if he could
18  quote-unquote ship it to me or get it to me.

19  Q    Okay.  Did -- did you -- had you listened to
20  the Conservative -- his prior podcast on Conservative
21  Daily before he came on Thrivetime?

22  A    I had not.

23  Q    So you weren't aware of his statements on
24  prior -- the prior podcast that he could not actually
25  confirm that it was Eric Coomer that was on the call?

Page 162

1   A    I did not listen to his podcast, nor did I
2   know that he couldn't confirm it.

3   Q    Because when he went on your show it was
4   pretty clear that he was -- he was talking about
5   Dr. Coomer and that he had confirmed that he was on the
6   call.  That's how you took that; right?

7   A    Yes.  And then I asked him on the show, can
8   you -- can we prove that?  Could you send that to me?
9   Something to that effect.  It's in the transcript.  And
10  then he responded on the show and off the show, I'll
11  ship it to you.  And then I never got it.

12  Q    Now, you remember Mr. Oltmann saying that he
13  had done a Google search after this AntiFa call to sort
14  of connect the dots between Eric Coomer and Dominion
15  Voting Systems?

16  A    I do recall that.  And I remember that Ann,
17  when she introduced Joe to me, she said to the effect
18  of, hey, could I talk to Ann?  I talked to Ann, plural,
19  a lot at that time.  And she had said, hey, this guy has
20  found some social media stuff that Eric Coomer has
21  posted.  And he's got -- he's got the receipts.  And --
22  and that resonated with me because I've heard other
23  people mention that to me.  And I had done my own
24  research into it.

25  Q    Okay.  But specifically with respect to the

Page 163

1   Google search, were you aware of his claim, he being
2   Mr. Oltmann, that he had done a Google search after this
3   call, and it brought up results of Dr. Coomer at
4   Dominion Voting Systems in Denver.

5   A    I don't recall that.

6   Q    So as you sit here today, have you seen the
7   alleged screenshot of the Google search that Mr. Oltmann
8   says he did in September of 2020, that brought this
9   information up about Dr. Coomer?

10  A    I don't recall ever seeing that.

11  Q    Do you recall that Mr. Oltmann claiming that
12  Dr. Coomer was a major shareholder of Dominion?

13  A    I don't recall that.  But before -- in
14  addition to -- before this deposition today?

15  Q    Yes, sir.

16  A    Over the last, you know, of six months or so,
17  I've reflected upon that interview.  I've listened to
18  the interview a couple of times, the initial interview,
19  and reflected upon the, you know, listen to the audio of
20  what he said there, but.  So I have listened to the
21  audio a few times.

22  Q    Okay.  But as you sit here, do you know --
23  have you verified information provided by Mr. Oltmann
24  that -- that Dr. Coomer is supposedly a major
25  shareholder at Dominion?

Page 164

1   A    No.  I've never seen that.  I think that was
2   part of the information he was going to ship to me is
3   what he said.

4   Q    Now, I presume you're going to say that
5   you -- you believed Mr. Oltmann's story about Dr. Coomer
6   at the time you heard it; is that right?

7   A    I -- it resonated with me when he referenced
8   the patents because I knew about the patents.  It
9   resonated to me as being true because I knew what Eric
10  Coomer's position was.  It resonated to me as true
11  because I had seen Eric Coomer's social media posts.  It
12  resonated to me to be true because, you know, there's a
13  video that Gateway Pundit had put out where Dr. Coomer
14  explains how the adjudication works.  The part to me
15  that I wanted to verify and that I asked for was to hear
16  the -- the call, the AntiFa call.  And I never did
17  receive that call.

18  Q    As you sit here today, do you believe
19  Dr. Coomer was on an AntiFa call and boasting about
20  rigging the election?

21  A    I have not seen any proof that would lead me
22  to believe that he was on the call.

23  Q    Have you published that statement on any of
24  your social media?

25  A    I have not published that on social media.

Page 165

42 (Pages 162 - 165)

1 And as I said previously, I'd be happy to do an
2 interview with Dr. Coomer where he could explain his
3 side of the story. And I'd gladly put it out.
4     Q    Well, we may arm wrestle about that. But why
5 haven't you published a statement to the effect of that
6 you have not seen evidence that Dr. Coomer was on the
7 AntiFa call at this stage in time?
8     A    This is the first time in my life being
9 involved in prolonged litigation and I wasn't sure how
10 you were supposed to handle that or this process. So.
11     Q    At the time that these initial publications
12 were made about Dr. Coomer, you asked one of the
13 listeners -- I think I have the clip. Might as well
14 just play it. Bear with me a second.
15     A    I do recall watching that yesterday.
16     Q    Well, if we watched it yesterday, there's --
17 there's a section in there where you say, does it bother
18 you -- you're asking the question -- knowing that the
19 head of security and strategy for Dominion is a member
20 of AntiFa. We've covered that. Who wants to overthrow
21 our country. Do you remember saying that?
22     A    Everything in the video exhibit you showed me
23 has -- to my knowledge, the audio hasn't been edited at
24 any point. So, you know, I have no reason to believe I
25 didn't say that if that's what the video clip said.

Page 166

1 activity that is -- I think we've seen what happens to
2 Portland, Oregon or Kenosha, Wisconsin, I think Seattle,
3 New York, college campuses. We've seen that. So I
4 think that is a big concern for me is advocating for the
5 harm of the police.
6     Q    Is that it? I'm -- I'm asking you about a
7 statement that Dr. Coomer wants to overthrow our country
8 and you're talking to me about rap songs by Ice T.
9 What -- how did you intend for your listeners to take
10 your message that Dr. Coomer wants to overthrow our
11 country? Just the songs or something else?
12     MR. QUINN: Object to form. Go ahead.
13     THE WITNESS: The posts that were on social
14 media, the 13 posts that I keep referencing, they
15 weren't just by Ice T. They are by other musical
16 artists too. And they were advocating for the lyrics of
17 the songs. And I would assume that somebody who I would
18 classify as a genius as it relates to elections, would
19 also be able to read and listen to the lyrics of a song
20 before posting them, also given his position as the head
21 of security and strategy for Dominion. And those who
22 want to kill our police are not a fan of having a
23 stable, law and order environment.
24     Q    I like Sweet Home Alabama. Doesn't mean that
25 I'm living in Alabama and loving that state. I don't --

Page 168

1     Q    Okay. So in terms of, you know, ascribing
2 this motive of wanting to overthrow our country to
3 Dr. Coomer, were you, in your mind at the time, thinking
4 that the overthrowing of the country would be through
5 the manipulation of our election systems? Is that at
6 least one of the what you were referring to?
7     A    I think there's five primary ways in which
8 the Great Reset will be implemented.
9     Q    Is one of them what I'm talking about?
10     A    Elections?
11     Q    Yes, sir.
12     A    I would say it will be getting Joe Biden or
13 some leader to implement a Fourth Industrial Revolution.
14     Q    Okay. Well, I -- I'm keenly interested in my
15 client for obvious reasons.
16     A    I understand.
17     Q    So his role in that process in overthrowing
18 our country is through the manipulation of the voting
19 systems. Is that a fair statement?
20     MR. QUINN: Object to form. Go ahead.
21     THE WITNESS: Well, one of the things that is
22 used to implement the Great Reset is a destabilization
23 of peace. And so when you're advocating for -- or
24 putting out songs that advocate for killing the cops or
25 police or law enforcement, that is a destabilizing

Page 167

1 I don't get your logic, sir.
2     A    I don't get your logical as well.
3     Q    Well, he has not -- he, Dr. Coomer, hasn't
4 made any public statements advocating for the overthrow
5 of our country. You would agree with me on that; right?
6     MR. QUINN: Object to form.
7     THE WITNESS: I think that if you post on
8 social media, one could argue it's public or private.
9     Q    (By Mr. Cain) Well, you know his Facebook
10 page was private before it was released?
11     A    Which you established today, I believe.
12     Q    Well, through my questions. I'm not
13 testifying. But you know that's true, don't you?
14     A    How many people were following him at the
15 time?
16     Q    Do you know?
17     A    I don't know.
18     Q    I do.
19     A    Okay.
20     Q    But I'm not going to testify to it.
21     A    That's fair.
22     Q    Okay. Well, to try to put a bracket on this
23 overthrowing our country, you've mentioned the harmful
24 and, as you put it, lyrics of these songs that were on
25 Dr. Coomer's Facebook page. Is there anything else that

Page 169

43 (Pages 166 - 169)

1 you're ascribing to Dr. Coomer that led you to want to
2 make a statement that he wants to overthrow our country
3 besides the songs?
4      A    The re-posting of Exhibit 43 that you showed
5 me.
6      Q    Anything else than what we discussed?
7      A    There's 13 social media posts that I don't
8 have in front of me.  But I typically try to work off
9 notes if I can.
10     Q    Discussed or referenced.  Anything else?
11     A    The posts would indicate advocating for
12 groups that are hostile toward the police.
13     Q    And I know we covered this, but I -- I think
14 the same, you would have the same answer for what we
15 discussed about calling him treasonous.  It relates back
16 to these same -- these posts and the things that we've
17 described; right?
18     A    The job title of director of security and
19 strategy for Dominion, the social media posts, the
20 patents and/or the patent grants or patent applications,
21 or however you're classifying that.  And then the video
22 that the Gateway Pundit put out, where he explains how
23 the adjudication process works would indicate to me that
24 his social media posts would have a much more profound
25 impact then that of the average person.

Page 170

1      Q    Okay.  Well, we -- I think we've established,
2 correct me if I'm wrong, before you put Oltmann on the
3 air, your air, you hadn't listened to his original
4 podcast, I believe that was on November 9th of 2020,
5 concerning his discovery of -- of Eric Coomer?
6      A    As a practice I do not listen to his podcast
7 and did not listen to his podcast.  People do text me a
8 lot of things during the day and they'll say, you should
9 check out this clip or that clip, as you know because
10 you've seen my text messages.  But I do not recall
11 listening to any Joe -- Joe Oltmann podcasts.
12     Q    Okay.  Well, all these items I'm talking
13 about right now would have been before the first
14 publication by Thrivetime on December -- I think it
15 actually occurred on the 21st, but was published the
16 following day, the 22nd of 2020.  So I'm just kind of
17 dealing with that pre time frame right now.  Okay?
18     A    Yes, sir.
19     Q    I saw a link to it on the -- on one of your
20 documents.  But there was an interview that was done by
21 Michelle Malkin of Mr. Oltmann on or about December --
22 excuse me, November 13th, 2020.  You haven't reviewed
23 that -- that interview as well?
24     A    Michelle Malkin interview?
25     Q    Yes, sir.

Page 171

1      A    I could look at the clip.  But I don't recall
2 watching a Michelle Malkin clip.
3      Q    Okay.  Had you read or seen any of the
4 interviews Mr. Oltmann had done with Jim Hoft, Gateway
5 Pundit, OAN or Eric Metaxas?
6      A    Let's go through those one by one.  So Eric
7 Metaxas.
8      Q    Yeah.
9      A    I have never -- I don't recall seeing an
10 interview with Eric Metaxas.  But I also don't watch
11 Eric Metaxas' program.  What was the next one?
12     Q    The first one was Jim Hoft and the Gateway
13 Pundit.
14     A    Jim Hoft, I don't watch that program.
15     Q    I don't know that he has a program.  He has a
16 website, Gateway Pundit.
17     A    There's two Hofts.  One of which has spoken
18 at our event.  But I don't know the Hofts very well.  I
19 don't watch their programs.
20     Q    Yeah.  It's -- I -- I think that's not Jim.
21 That's his brother Joe?
22     A    Okay.
23     Q    OAN did a piece on Mr. Oltmann, Eric Coomer
24 called Dominionizing the vote?
25     A    I do vividly recall watching the Michelle was

Page 172

1 it Rhian?  Rhian on America -- not Michelle.  Rhian,
2 it's like a -- she's an Asian woman I believe.
3      Q    You're mixing them up, I think.
4      A    It's Rhian.
5      Q    It's Shanelle.
6      A    Shanelle Rhian, yes.  So I do remember
7 watching that one because I ran into her when I got
8 invited to attend the deregulation in D.C. -- event in
9 D.C.  And I ran into her.  She probably wouldn't
10 remember me.  But she was at a coffee shop.  So I
11 remember saying, oh, this is her, you know.  And so I
12 walked up.
13     Q    Okay.  But all this information, at least,
14 was in the -- in the public media prior to Mr. Oltmann
15 coming on your -- your -- your show.  You just chose not
16 to watch that?
17     A    Yes.  I did not watch it.
18     Q    All right.  And there were a couple of
19 Conservative Daily podcasts before Oltmann came on your
20 show.  Another one on December 14th, entitled Dominion
21 Audit Proves Fraud.  We Oltmann is quoted as saying,
22 he -- he, referring to this guy right here.  Should
23 never be allowed to leave his house at all without
24 everybody knowing who he is, where he is.  I have people
25 in Salida that literally are following him around.  And

Page 173

44 (Pages 170 - 173)

1 saying, all right, Joe, here's where he's at next.
2 Here's where he's at next. I found him. He's staying
3 in this basement up here. Oh, he's at his house now.
4     Were you aware that Mr. Oltmann, at least, was
5 claiming that he was having people follow Dr. Coomer
6 before he came on your show?
7     A    I was not aware of that.
8     Q    If you knew that, would you have allowed him
9 on?
10     A    I would not have --
11     MR. QUINN: Object to form. Go ahead.
12     Q    (By Mr. Cain) You don't agree with harassing
13 people like that, do you?
14     A    I really don't agree with those statements.
15     Q    I mean, have you seen some of Joe Oltmann's
16 postings about Dr. Coomer's personal and private life?
17     A    I have not.
18     (Plaintiff's Exhibit No. 47 was marked for
19         identification purposes and made part of the
20         record)
21     Q    (By Mr. Cain) I'm going to double mark this
22 one because it was previously marked in -- in another
23 case. I'm going to show you what's been marked as
24 Exhibit 46 --
25     MR. QUINN: 47, you mean?

Page 174

1     Q    (By Mr. Cain) 47. So scratch out -- you
2 don't do this. But for Counsel's record, Exhibit 47 has
3 another Plaintiff's Exhibit attached to it. So I'll
4 clarify that on the record, at least. Take a look at
5 this document. I take it you're not on Parler?
6     A    I'm not on Parler. Well, how about this, I
7 don't post on Parler, but there are sometimes there are
8 accounts that are made where people will say it's me or
9 something on Rumble or different platforms. But I am
10 not an active poster on Parler.
11     Q    Okay. This is short. I'll just get into it.
12 This is from Joe Oltmann. I learned this because I'm --
13 I'm not astute on social media. That a parley is a post
14 on Parler. Joe Oltmann, I've been busy doing 15
15 interviews in the last two days. Was told today after
16 questioning why the MSM, I assume that's mainstream
17 media, has not picked up Eric Coomer, that I was, quote,
18 breaking something that they were running away from,
19 closed quote. Why the living hell is he -- is that
20 supposed to mean? AntiFa in the middle of 28 states, by
21 proxy of one of the largest shareholders in Dominion
22 Voting Systems. So it is up to you. Blow this shit up.
23 Share. Put his name everywhere. No rest for this
24 shitbag. Eric Coomer, Eric Coomer, Eric Coomer. This
25 shitbag and the corrupt asshats at Dominion Voting

Page 175

1 Systems must not steal our election and our country.
2 Eric, we are watching you. And then there's a picture
3 of -- of a home. That is Dr. Coomer's home in Salida.
4 Is this the first you've seen of this?
5     A    First time I've seen this.
6     Q    Like the -- the other statement that I read.
7 At the time that this was posted, I'll represent to you
8 Mr. Oltmann was appearing on the ReAwaken America tour
9 as a speaker. But you -- you didn't know that he was
10 posting this stuff about Dr. Coomer?
11     A    I did not know he was posting that about
12 Dr. Coomer.
13     Q    Had you known this stuff was being posted by
14 Joe Oltmann about Dr. Coomer, you wouldn't have let him
15 on the ReAwaken America tour, would you?
16     A    I would not have let him -- let him be on the
17 tour if I had seen this. And since you're in the room,
18 I apologize that he said those things about you.
19     Q    Does it trouble you now knowing that
20 Mr. Oltmann was putting out this material that you gave
21 a platform to Joe Oltmann?
22     MR. QUINN: Object to form. Go ahead.
23     THE WITNESS: Had I had seen this, I would not
24 have interviewed him on my show. So -- and I don't
25 think it's a good idea, regardless of your political

Page 176

1 affiliation to post things like this where appears to be
2 calling people to show up at Mr. Coomer's house.
3     Q    (By Mr. Cain) Well, if you call someone
4 treasonous and that their -- what did you say, wanting
5 to overthrow our country. You would expect, would you
6 not, that some of your listeners would react to that?
7     MR. QUINN: Object to form. Go ahead.
8     THE WITNESS: I think that the posts I've seen
9 posted by Eric -- Dr. Coomer, Eric Coomer, are just as
10 alarming or concerning as this post. They are both
11 concerning to me.
12     Q    (By Mr. Cain) Well, that's not responsive to
13 what I asked. If you're telling people, you're
14 audience, that this guy wants to overthrow our country
15 and that he's committing treason, doesn't surprise you
16 that people would harass him individually, does it?
17     MR. QUINN: Object to form.
18     THE WITNESS: I was not calling for anyone to
19 harass him.
20     Q    (By Mr. Cain) Okay. But it doesn't surprise
21 you that they did?
22     A    Well, people have yelled death threats at me
23 at our events. And I don't think that Joe Biden is
24 causing people to throw death threats my way. People
25 disagree and people will react how they react. And so I

Page 177

45 (Pages 174 - 177)

1  don't blame a democrat or I don't blame a post of Eric
2  Coomer advocating for -- songs advocating for cop
3  killing as the motive that caused someone to kill a
4  police officer.
5      Q   Well, but Dr. Coomer doesn't put Kevin, the
6  court reporter, on one of his shows to accuse you of
7  treason.  It's a little different than what you just
8  described.  It was your expectation that your audience
9  would react to these types of very sundry comments about
10  Dr. Coomer.  You knew they were going to come after him,
11  didn't you?
12      MR. QUINN:  Object to the form.
13      THE WITNESS:  I did not know that.
14      Q   (By Mr. Cain)  Haven't you seen the article
15  he wrote talking about the death treats that he was
16  getting?
17      A   I have not read the articles about the death
18  threats that he was receiving.  Nor do I expect him to
19  know about death threats that I was receiving.  I think
20  we are in an unprecedented time in American history
21  where people are looting Targets, people are threatening
22  each other.  And it's an unfortunate time in American
23  history.
24      Q   Do you accept any responsibility for your
25  role in that?

Page 178

1      MR. QUINN:  Object to form.  Go ahead.
2      THE WITNESS:  For my role in?
3      Q   (By Mr. Cain)  Putting out material like
4  we've -- we've been discussing that accuses someone who
5  worked at Dominion --
6      A   I don't --
7      Q   -- or at least these activities?
8      A   I don't expect Dr. Coomer to accept
9  responsibility for people that are murdering police
10  officers because he put out songs that would indicate
11  he's in favor of that world view.  Nor do I accept
12  responsibility that somebody listens to my show decides
13  to take action that I didn't intend.
14      Q   Well, to your knowledge, Dr. Coomer has never
15  accused you of treason, has he?
16      A   I don't believe he's accused me of treason.
17      Q   And given that you didn't have information
18  about Oltmann such as what we're looking at on Exhibit
19  47, as I understood your testimony yesterday, your
20  decision to remove him from the tour was both -- let me
21  ask just the open-ended question.  What -- what was your
22  decision to remove him based on?
23      A   I had three.  Three.  I try to make decisions
24  in group reasons.  Look at the facts.  So one is that he
25  had said he was going to speak at an event and couldn't

Page 179

1  attend for whatever reason.  So I don't like to book
2  people that then can't attend.  That -- that just on
3  a -- from a business perspective, I just don't prefer to
4  invite people that cannot attend.
5      Second is, you know, for these events we have
6  to buy insurance for these events.  And it doesn't make
7  any sense to me to have a person who is at the center of
8  this litigation continue a conversation.
9      Then the third is at one point he said
10  something to the affect of that he doesn't give an "S"
11  about my legal fees or something of that nature.  Which
12  he then later said on a podcast.  And so I just felt
13  like there was no real benefit for having him.
14      Q   Okay.  And you covered that yesterday.  I
15  think that's pretty much exactly what you said.  As it
16  relates to the last topic, I think I started to maybe
17  get into this.  But there -- I think your wife was shown
18  an exhibit in her deposition.  It's Exhibit 11 in your
19  binder.  So if you to clean up your studio space and
20  flip to that.
21      What are we looking at here, sir, if you know.
22      A   It's the Gifts and Go link where people can
23  donate to support the legal defense fund.
24      Q   For this lawsuit?
25      A   Yes.

Page 180

1      Q   Did you -- are you responsible for the
2  content of this web page?
3      A   The decision to put this up here was made at
4  an event.  And I believe that Devon Woolery actually
5  created the page and made it live.
6      Q   Okay.  But who -- who prepared the content?
7      A   I believe Devon copied and pasted things.
8      Q   You've reviewed it since it was published by
9  Devon?
10      A   Well, once it was up -- I don't know the
11  exact time tabe -- time line.  But once I was told I was
12  being sued, it went live.  And then I've never been in
13  an ongoing legal situation like this.  So my
14  understanding was I'm supposed to just not change a
15  bunch of stuff, keep it how it is so we can look at the
16  situation how it is.
17      Q   Okay.  Well, the -- the document shows that
18  this particular campaign is ReAwaken America versus
19  Dominion lawsuit defense fund.  Obviously Dominion's not
20  a party in this case.
21      A   The clarifying text underneath it says Eric
22  Coomer, the former director of security and strategy for
23  Dominion Voting has filed a lawsuit against Clay Clark
24  and the ReAwaken tour in an attempt to stop the tour.
25  Meet the former, and then there's a link right there.

Page 181

46 (Pages 178 - 181)

1 Meet the former director of security for Dominion who is
2 suing Clay Clark for defamation. And then there's a
3 Rumble link where people can watch that video.
4    Q   That video you're referring to is what?
5    A   I believe this is the video deposition where
6 Eric Coomer admitted that those social media posts are
7 in fact his social media posts.
8    Q   Okay. And it shows on this exhibit that the
9 campaign, this funding campaign for the lawsuit, was
10 created by Clark Holdings. Do you see that?
11    A   Yes.
12    Q   And we've already established what Clark
13 Holdings is. The money that has come in from this
14 campaign that's promoted on the ReAwaken America tour by
15 various individuals, including General Flynn?
16    A   Could you repeat that? I'm sorry.
17    Q   The money that -- well, this campaign, let me
18 say it this way, was promoted on the ReAwaken America
19 tour by some of the speakers including General Flynn;
20 right?
21    A   I don't know --
22     MR. QUINN: Object to form. Go ahead.
23     THE WITNESS: I don't know how much General
24 Flynn promotes this Gifts and Go page. I believe that
25 one particular event we were in Las Vegas. He asked if

Page 182

1 people would support. So I do know he's done that
2 there. But I can't speak to whether he's done that
3 off-line since that time or on-line or wherever he may
4 be.
5    Q   (By Mr. Cain) Okay. Well, at least the time
6 that you can think of.
7    A   Las Vegas is the one that I recall.
8    Q   Okay. So tell me how this works. The money
9 that's come in on this campaign, I did look at the other
10 day. And at that point I think it was earlier in this
11 week it was about $158,000 that had been raised.
12    A   And it's a realtime thing. So whatever it
13 would show today is accurate.
14    Q   Okay. Has that money been withdrawn?
15    A   That money has been utilized to pay legal
16 fees.
17    Q   All the entire amount?
18    A   Yes. I believe -- and my legal team's here
19 and I don't know how this all works. But I believe we
20 spent 330 some odd thousand dollars on legal fees. And
21 I believe that we've brought in a total of approximately
22 158,000 from donations.
23    Q   So Mr. Oltmann was incorrect, then, in terms
24 of the 390 he quoted on his pod -- podcast?
25    A   I think he said 390. I actually watched the

Page 183

1 clip that you -- that was presented yesterday by the
2 other attorney. And at that point he said 390. But I
3 don't recall that discussion. I believe it was 330, I
4 think. But you would have to look at whatever
5 information was submitted to you.
6    Q   Are the entities Make Your Life Epic, ReOpen
7 American, those two entities, having their attorneys
8 fees paid by an insurance company at this point?
9     MR. QUINN: Object to form.
10     THE WITNESS: At a certain point the insurance
11 company kicked in to begin paying legal fees. And so I
12 don't know the exact threshold of when it happened.
13 But -- but right now, the insurance company is paying me
14 ongoing legal fees.
15    Q   (By Mr. Cain) So you're 100 percent covered
16 now? You personally in the entities?
17     MR. QUINN: Object to form.
18     THE WITNESS: I don't exactly know how that
19 works.
20    Q   (By Mr. Cain) Who would know that?
21    A   Potentially legal counsel that's representing
22 the insurance company.
23    Q   Well, they don't write the checks. Who
24 writes the checks?
25    A   I mean, I write checks but I just don't know

Page 184

1 what the -- how the policy works exactly.
2    Q   Well, how long has it been since you've
3 written a check for legal fees?
4     MR. QUINN: Counsel, how is this -- how is
5 this admissible at trial? Seriously. I mean, you know
6 the judge is not going to allow you to talk to anything
7 about insurance. So if you think that this is fruitful
8 about who is writing checks to my firm, you can put on
9 the record right now this is something else we can take
10 to the Court.
11     MR. CAIN: Yeah. I know you're touchy about
12 that.
13     MR. QUINN: Who is writing the checks at my
14 firm.
15     MR. CAIN: I'm not asking about your firm in
16 particular. I'm asking about --
17     MR. QUINN: Okay. Well, that's -- I think
18 who's writing checks to any law firm is -- has anything
19 to do with whether or not he made a defamatory statement
20 about your client.
21     MR. CAIN: Do you want me to finish?
22     MR. QUINN: Please.
23     MR. CAIN: Okay. He's making a plea to his
24 audience for money. I want to know how that money is
25 being spent.

Page 185

47 (Pages 182 - 185)

1    MR. QUINN:  Well, he told you.
2    MR. CAIN:  That's why I'm asking.
3    MR. QUINN:  He's already answered it.
4    MR. CAIN:  He hasn't.
5    MR. QUINN:  Now you're asking where he's
6  writing the checks to.
7    MR. CAIN:  No.  I'm asking -- if you'd listen.
8    Q    (By Mr. Cain) How long has it been since you
9  wrote a check to a law firm?  That's what I was asking.
10   A    I don't know the date.  I don't know that
11 date.
12   Q    A year?
13   A    I feel like it's been longer than six months
14 but maybe not a year.
15   Q    So you've drawn down the entirety of the --
16 of the funding and the delta between 158 and roughly
17 330, that's what's -- what hasn't been covered by your
18 campaign.  Is that accurate?
19   MR. QUINN:  Object to form.
20   THE WITNESS:  Could you restate that question?
21   Q    (By Mr. Quinn) Yeah.  I said, you've drawn
22 down the money that you've raised through this public
23 campaign, which is roughly $158,000.  You've testified
24 that -- and you've said it on your podcast, that you're
25 writing -- you're paying 2 to $3,000 a day.

Page 186

1    A    Yeah.
2    Q    Can you testify that that amount is $330,000
3  that you've incurred, not 390 that Mr. Oltmann talked
4  about.  And my question was the delta between those two
5  numbers; 330 and 158, that's something that you still --
6  that has come out of your pocket in essence?
7    A    Yes.
8    Q    Just trying to get the math right.  Other
9  than this campaign, have you raised money utilizing my
10 client's either position, former position at Dominion or
11 any of the lawsuits that he's filed as a result of
12 defamation?  Are you raising money for anybody else?
13   MR. QUINN:  Object to form.  Go ahead.
14   THE WITNESS:  Pastor Jackson Lahmeyer asked if
15 I could MC an event for Mayor Rudy Giuliani at that
16 church we mentioned earlier today, this morning.  And so
17 I did help Mayor Giuliani raise money at that particular
18 church event.
19   Q    (By Mr. Cain) Okay.  Is that it?
20   A    I believe so.  Yes, sir.
21   Q    I'm not sure if -- forgive -- I'll forgive
22 myself for commenting that I didn't listen to all of
23 Mr. Brad's scintillating questions yesterday.  But there
24 was a clip that we had, with your wife at least, that
25 was -- where in essence that she said that she knew that

Page 187

1  you guys were going to get sued when you went to
2  Colorado, but that you were going to, you know, move
3  forward anyway.  Do you remember that clip?
4    A    I don't remember that clip.  I do remember
5  ticket buyers were telling me that Colorado is a very
6  litigious place.  And that you're likely to be sued if
7  you host an event here.  That was a conversation that
8  people were having with me.
9    Q    Well, I think that's clip for Exhibit 10, at
10 least I was told that.  But let's put a bookmark on that
11 because I want to listen to it before I waste our time
12 potentially playing the wrong clip.  Have you heard --
13 I'm going back to Mr. Oltmann.  And you mentioned that
14 he told -- you focused on this word ship.  You remember
15 he was going to ship you the information?
16   A    Yeah.
17   Q    Have you heard Mr. Oltmann also make public
18 statements that he was going to actually reveal the
19 source of who put him on the alleged AntiFa conference
20 call?
21   A    Well, in preparation for this occasion, I've
22 gone back and tried to watch different clips of his over
23 the few months that he said at the ReAwaken tour just to
24 see what he said, you know.  And I do recall him
25 referencing from the stage, I went back and watched him,

Page 188

1  that he had the proof of the call of an AntiFa call that
2  he claimed Mr. Coomer was on.  I do recall clips of him
3  saying that.  Now, as far as the source, I don't recall
4  him talking about the source.
5    Q    All right.  Now, you've appeared on
6  Conservative Daily, or at least you used to.  You're
7  not -- you're not on Conservative Daily any more, are
8  you?
9    A    No.  I don't believe that Joe Oltmann is a
10 fan of mine.  And that's when he told me that -- the
11 words were, and he said it then on his show too.  It was
12 something to the effect of he doesn't give an "S" about
13 my legal fees, so.  And I don't know when that
14 conversation happened.  But I just -- you know, doesn't
15 make a lot of sense to have him on the show.
16   Q    All right.  Let me play you this clip of when
17 you were on, not the one that you just referred to
18 because you weren't on that -- that particular clip when
19 he said he didn't give an "S" about your --
20   A    That was a clip that was played yesterday.
21 But on the phone he said that to me.
22   Q    Okay.  Let's do another place holder for this
23 Conservative Daily clip.  This is from August of 2022.
24 You appeared on it.  I'm just going to play the audio.
25 But I'll show you and Counsel from my screen.  Actually

Page 189

48 (Pages 186 - 189)

1  I can just play it that way you can look at it. There's
2  a lightly haired gentleman sitting next to you in your
3  office. Do you know who that is?
4      A    That is Aaron Antis.
5      Q    Okay. And this is a two-minute clip. I may
6  break it down a little bit.
7          (The following is the audio/video clip from
8          Conservative Daily:)
9          SPEAKER: How's the -- how's the case on
10 the -- the Coomer deal? You pushing your way through
11 that?
12         MR. CLARK: Yeah. I mean, I -- I've been
13 spending several thousand dollars a day on average
14 through this whole litigation there. I try not to think
15 about it too much, but I also pay the bill, you know.
16 So it's -- it's -- it's been averaging about 2 to $3,000
17 a day of legal fees. And you know, Mike Lindell,
18 yourself and myself and now other, you know --
19 there's -- it's got a handful of us that are being sued
20 for these sorts of things. You know, I think the Trump
21 administration is being sued for these sorts of things.
22 So I would just say, I kind of wear it like a badge of
23 honor. However it's kind of like buying seven very
24 large TV's a day you don't own. And you can't --
25         SPEAKER: No. Listen. Listen, listen,

Page 190

1  listen. And the whole thing is pinpointed on was he not
2  on that call; right? Right? No?
3      Q    You hesitated there. Do you remember what
4  you were thinking?
5      A    Well, he talks about this call, but I've
6  never heard the call. And so it's -- it's -- and again,
7  I know you're the one doing the deposition. I'm just
8  saying, if you had told me, you know, I'm going to ship
9  you something and then you don't, and then if you said,
10 I'm going to ship you something and then you don't, and
11 then you say that the reason why you're not going to
12 ship something is because of litigation and you can't,
13 it's -- it's just -- it -- you know, I -- I can't
14 comment on it until there's proof and I haven't ever
15 seen proof.
16     Q    I will pick up at, I believe it's 50 -- 56
17 seconds into the clip.
18         (The following is a continuation of
19         audio/video clip from Conservative Daily:)
20         SPEAKER: No. That's not what it's about.
21 And that's what they're trying to do because it -- and
22 I'm going to tell you this on the show. They're trying
23 to hone in on the AntiFa call. Number one, I have an
24 ace in the -- in the deal because at some point I'm
25 going to come forward with -- with that guy. I'm going

Page 191

1  to. I mean, I'm just telling you right now I'm going
2  to. And it's going to get really bad. All right.
3      Q    (By Mr. Cain) Okay. I'm going to stop
4  there. He says he has an ace in the deal and he's going
5  to come forward with that guy. Now you understood that
6  to mean the person who put him on to this AntiFa call;
7  right?
8      A    I -- I wasn't sure who he was talking about
9  there. Because my understanding is when you have
10 someone on your show, you're interviewing them so you're
11 asking them questions. And he was talking about the
12 situation, not really asking me questions about things
13 such as the Great Reset.
14     Q    Okay. But -- but he said he's going to come
15 forward with the guy. So it's someone that he hadn't
16 previously disclosed. Isn't that fair?
17     A    I think it's fair to discern that's what he
18 meant.
19     Q    After this show -- we can finish out the
20 clip. But after this appearance, I should say, on the
21 Conservative Daily, did you -- did you circle back with
22 Mr. Oltmann and -- and kind of revisit this issue of --
23 of he has this ace, this mysterious person he's going to
24 come forward with that's going to enlighten us on this
25 topic?

Page 192

1      A    I've not. But to provide context I do
2  typically thwart eight shows a day where I'm on as a
3  guest. It's very, very rare that you'll have a person
4  who invites you on their show and they don't ask you a
5  lot of questions, and then they go on their own
6  narrative. So my curiosity to follow up with him on
7  that wasn't very high because I -- in my mind, there's
8  no need to keep talking about it if he's not going to
9  provide the -- he's going to ship it to me.
10     Q    Yeah. But you -- you, in your words, were
11 you had already been sued. And you wore it as -- as a
12 badge of honor. That was your -- how you characterized
13 it. And now you have someone who -- who was on your
14 shows previously who is the subject matter of the
15 lawsuit, and specifically about Dr. Coomer's alleged
16 role in this call. And you've got Mr. Oltmann, who you
17 put on, saying he's got an ace in this deal and someone
18 who can -- he's going to bring forward. So I get what
19 you're saying that you do a lot of shows. But at this
20 point in time you weren't curious enough to follow up
21 with him and try to find out who this person is?
22     A    I did follow up about wanting to get the
23 information that he was going to ship to me. I did
24 follow up on that. And the response was, I'll ship it
25 to you, I'll ship it to you. And then eventually it got

Page 193

49 (Pages 190 - 193)

1   into a -- well, because of the litigation, I'm not at
2   liberty to share this information. So I was going,
3   well, I don't know what that means, why you're not
4   sharing with me.
5       Q    Had you, by this point in time on the
6   appearance on Conservative Daily, had you followed the
7   original lawsuit that Dr. Coomer had filed, the first
8   one against the Trump campaign and Mr. Oltmann and some
9   of the other parties?
10      A    I have not followed it.
11      Q    So you weren't aware that Mr. Oltmann had
12  been refusing, under oath, to provide the identity of
13  the person who got him on the AntiFa conference call?
14      A    I was not aware of that.
15      Q    And he was refusing to provide the identity
16  of the person who gave him access to Dr. Coomer's
17  Facebook -- Facebook account. You weren't aware of that
18  either?
19      A    We had really never had that conversation
20  off-line about who was this person. He just let me know
21  that, hey, I can't discuss it because of ongoing
22  litigation.
23      Q    I'm just -- I'm trying to understand if you
24  knew certain facts that may have motivated your behavior
25  or lack thereof. So I understand your answer to be, no,

Page 194

1       A    That seems correct. And just a little
2   clarifier is, at some point in the conversation, Joe
3   Oltmann said to me, he didn't give an "S" about my legal
4   fees. And I'm glad he had a show where he's set in his
5   own words. But at some point he said that to me. And
6   that was, you know, not a positive interaction. And at
7   some point he indicated he couldn't ship me,
8   quote-unquote, the information because of the lawsuit.
9   So you, Mr. Cain, are a legal expert, that's what you
10  do. And I don't --
11      Q    Some may quibble.
12      A    Okay. Well, I'm just saying, I don't get
13  involved in these kinds of things. So I didn't know if
14  that is true that he can't provide or if it isn't. I
15  didn't know what that was.
16      Q    Have you -- I know you don't live in
17  Colorado. But have you followed Mr. Oltmann's comments
18  where he has called for violence against public figures
19  in the State of Colorado?
20      A    I've not followed that.
21      Q    I assume, like with the Parler post that we
22  looked at, that's the type of conduct that -- that you
23  don't want to be associated with; right?
24      A    That is correct.
25      Q    And it's my understanding, speaking of that

Page 196

1   you weren't aware that Mr. Oltmann had refused to
2   provide the identity of the person who gave him access
3   to Dr. Coomer's Facebook account?
4       A    That is correct.
5       Q    All right. Were you aware of the fact that
6   Mr. Oltmann had been specifically ordered by Judge --
7   State District Judge Moses -- pardon you got Cain and
8   now you got Moses. But he had been ordered to provide
9   that information to me specifically who -- who got him
10  access to the Facebook account. Did you know that?
11      A    I was not aware of that.
12      Q    And that he refused to do so over court
13  order?
14      A    I was not aware of that.
15      Q    And that he had been sanctioned as a result
16  of his refusal. Are you aware of that?
17      A    I was not aware of that.
18      Q    And he has been sanctioned by that court in
19  the amount of approximately $50,000?
20      A    I'm also not aware of that.
21      Q    Okay. Well, I -- I'm not being pejorative.
22  But it sounds to me like you really haven't focused on
23  Mr. Oltmann or the details of -- of the legal
24  proceedings surrounding him since you were sued and your
25  companies were sued by Dr. Coomer. Is that fair?

Page 195

1   Parler post, that that was posted the day after you had
2   sent the E-mail topics that you were going to discuss
3   with him on the -- on your -- on the podcast. But I
4   assume he didn't raise that -- that fact with you?
5       A    Correct. And then -- I mentioned it
6   yesterday. But at that time in my life, Jonathan Kelly,
7   who is a pen name like Peters, he was basic -- if people
8   were hard to, you know, get booked on the show directly,
9   if the schedule's like -- hard to play tetris with the
10  schedule, then he would go back and forth and sort of
11  nail down the time. And so I believe he is the one who
12  quarterbacked with the person who identified as Joe
13  Oltmann's assistant to book that.
14      Q    Okay.
15          MR. CAIN: All right. I think we've been
16  going about an hour. Let's take a little ten-minute
17  break. And I'm going to pair down my voluminous stack
18  because we're not going to go through all of that.
19          THE WITNESS: Okay.
20          THE VIDEOGRAPHER: Off the record. The time
21  is 2:39.
22          (A short break was had; after which the
23          following proceedings took place:)
24          THE VIDEOGRAPHER: Back on the record. The
25  time is 2:55.

Page 197

50 (Pages 194 - 197)

1    Q    (By Mr. Cain)  All right, Mr. Clark, it's
2  mid-afternoon so what I'm going to do probably with most
3  of the rest of my time is kind of burn through some of
4  this stack of paper I have in front of me.  Some of
5  which you produced in this litigation.  And I may only
6  have just one or two questions.  But this is my
7  opportunity to ask them.
8          (Plaintiff's Exhibit No. 48 was marked for
9              identification purposes and made part of the
10             record)
11   Q    (By Mr. Cain)  This is more of a time line
12  question.  Exhibit 48 was produced by Make Your Life
13  Epic.  It's dated two days after the 2020 election.  You
14  with me on that?
15   A    Yes.
16   Q    And is it true that two days after the
17  election is when you created a button on
18  TimeTofreeAmerica.com that says the truth about 2020
19  election voter fraud?
20   A    Yes.  According to this E-mail.
21   Q    Okay.  So at least as early as immediately
22  after the election you started publishing sort of voter
23  fraud related topics on your website?
24       MR. QUINN:  Object to form.
25       THE WITNESS:  Yes.

Page 198

1    Q    (By Mr. Cain)  Had you been publishing voter
2  fraud related topics on this website prior to the
3  election as well?
4    A    I don't recall.
5    Q    Okay.  Well, November 5th was before the
6  election was actually called.  It hadn't been finalized;
7  right?
8    A    That is correct.
9    Q    And you remember President -- former
10  President Trump contending both before this election in
11  2020 and in 2016, that the election was going to be
12  rigged against him.  You know that; right?
13   A    I don't recall him in 2016 saying the
14  election would be rigged against him.
15   Q    Well, he did until he won but.
16   A    I was a person who wanted Ben Carson to win.
17  That was my choice.  And then when President Trump beat
18  him and ended up becoming the Republican nominee, I
19  voted for President Trump.  But I actually went to bed
20  when the votes were being counted when the election was
21  going on.  And I didn't watch it.  So I don't -- my wife
22  watched it, I didn't watch it.
23   Q    I appreciate that.  But is it your
24  recollection that former President Trump, I know you
25  supported Mr. Carson, at least initially, prior to the

Page 199

1  2020 election had this sort of preconception that the
2  election was going to be rigged against him?
3    A    I did see him make posts on Twitter talking
4  about concerns about a rigged election.
5    Q    Did you share President Trump's concerns
6  prior to the election, I guess I should say?
7    A    I shared concerns about the Great Reset based
8  upon Joe Biden's keynote speech at the World Economic
9  Forum in 2016.
10   Q    Is that -- is that responsive though?  I -- I
11  asked about the election, not about the keynote.
12   A    I believe that the entire narrative is about
13  the Fourth Industrial Revolution and the Great Reset.
14   Q    Okay.  Focus -- let me just focus your mind
15  on -- on election fraud specifically, not -- not the
16  Great Reset and that sort of topic.  But prior to the
17  election, I know you went to bed, but before that
18  time -- let me ask it this way, had you shared any of
19  your concerns prior to the election that there was going
20  to be fraud?
21   A    I believe I had.  But it's been multiple
22  years.  But I believe I had.
23   Q    Okay.  And before the election you've
24  identified some of your contacts with Sidney Powell,
25  Mr. Giuliani, et cetera.  But prior to the election, had

Page 200

1  you had contacts with Giuliani -- let me give you a
2  list:  Giuliani, Powell, Jenna Ellis, Boris Epshteyn,
3  John Eastman, Christina Bobb concerning election fraud,
4  potential election fraud in the 2020 election?
5    A    I did not have communications with any of
6  those people to the best of my knowledge, nor had I
7  interacted them with -- interacted with them in any way.
8    Q    Okay.  How about General Flynn, Paul Manafort
9  or Roger Stone?
10   A    General Flynn, we really didn't meet because
11  the first event was in April of 2021, I believe.  And I
12  think that we met at the Jackson -- I know we met at the
13  Jackson Lahmeyer event when he was running for senate.
14  So whenever that date was, when Jackson Lahmeyer was
15  running for senate, whenever that was, I believe it was
16  reported by local media, that was the first time I had
17  met General Flynn in person.  The first time I had
18  meaningful conversation.
19   Q    Had you spoken at any Trump campaign events
20  prior to the 2020 election?
21   A    I didn't speak at any Trump campaign events
22  prior to the 2020 election.
23   Q    Had you spoken at any events in support of
24  President Trump prior to the 2020 election?
25   A    I got asked to MC or co-MC the Republican

Page 201

1 watch party in Oklahoma City on the night of the
2 election.
3     Q    And did you speak at that?
4     A    Yeah.  It was more of an MC function.  So it
5 wasn't a speaker, like, get up here and talk about a
6 subject.  It was more of, you know, announce who is
7 speaking next and the buffet is open.  That kind of
8 thing.
9     Q    Were you a member of the RNC prior to that
10 event or any time thereafter?
11     A    I typically show up and vote Republican.  But
12 I don't agree with the policies they put in place.  So
13 therefore I don't go typically to RNC events.
14     Q    Have you had any interactions at any time
15 with Randy Corporon?
16     A    Randy who?
17     Q    Corporon?
18     A    I don't believe so.
19     Q    So why did you create the button that we see
20 on Exhibit 48 on November 5th of 2020?
21     A    I believe that the Great Reset was going to
22 be implemented.  And the way to do it was to create
23 social unrest through riots, and to do lockdowns and
24 quarantines, and do mail-in ballots.  And to ultimately
25 introduce Joe Biden as the -- a man who knew about

Page 202

1 mastering the Fourth Industrial Revolution and he would
2 be the one leading the Fourth Industrial Revolution.
3     Q    Okay.  And I think we've covered that ad
4 nauseam.  So I don't think I have questions about that
5 particular topic.
6     A    Okay.
7     Q    Did you create sort of a physical checklist
8 of things that you did to investigate Joe Oltmann before
9 you started putting him on your podcast or on the tour?
10     A    I didn't have a physical checklist.  What I
11 did have, and again at the -- at the -- at the risk of
12 being redundant.  When Ann Vandersteel recommended Joe,
13 I took that as a strong recommendation.  And that's
14 really what caused -- what put -- what caused me to even
15 have him on the show.
16     Q    Okay.  After the election but before your
17 first Thrivetime podcast with Mr. Oltmann, had you read
18 the op-ed that Dr. Coomer authored that was published in
19 the Den -- Denver Post?
20     A    I recall reading a New York Times article but
21 not a Denver Post article.
22         (Plaintiff's Exhibit No. 49 was marked for
23         identification purposes and made part of the
24         record)
25     Q    (By Mr. Cain)  Well, you did research

Page 203

1 obviously.  You've described it.  We are not going to go
2 back through it on Dr. Coomer.  I think this was
3 previously marked, but I marked it again.  This is
4 entitled, a Guest Commentary.  I work for Dominion
5 Voting Systems.  I did not commit voter fraud.  The
6 attacks against me need to stop.
7         And it's dated December 8th of 2020.  You see
8 that?
9     A    I do see that.
10     Q    And there's a flattering photo on the second
11 page of Dr. Coomer on the next page.  You see that?
12     A    I do see that.
13     Q    And then on the third page there's some
14 content where he talks about some of the voter issues
15 that did arise.  That he talks about human induced error
16 that caused those -- those glitches as opposed to some
17 algorithm in the system itself.  Are you saying you
18 didn't -- well, you had access to this information via
19 the internet.  Is that fair to say?
20     A    I think that would be fair to say.  Yes.
21     Q    But this didn't come up in your investigation
22 prior to your initial podcast?
23     A    Well, what I was doing was just going to Duck
24 Duck Go and just combing through what I could find.  And
25 so I was trying to find things that would indicate that

Page 204

1 there was anything to be concerned about or if there
2 wasn't.  And so I was finding some things that I thought
3 were concerning in the New York Times article and social
4 media posts.  And so given a -- given his title, I
5 thought, well, I should probably make note of that.
6 Just be mental note of that.
7     Q    Okay.  Well, you made -- certainly made notes
8 of what there was to be concerned about.  But if you
9 look at this exhibit.  A little further down, this is on
10 Page 107, in the one, two, three, fourth paragraph.
11 Dr. Coomer writes, I want to be very clear, I have no
12 connection to the AntiFa movement.  I did not rig or
13 influence the election, nor have I participated in any
14 calls, demonstrations or other demonstrable activity
15 related to any political party or social justice, slash,
16 action group.  All claims that someone recorded me on a
17 call or even overheard me say, don't worry about the
18 election, Trump's not going to win, I made "expletive"
19 sure of that are wholly fabricated.  Moreover, I did not
20 have the capability to do such a thing.  I've not
21 written a single line of code in the Dominion Voting
22 System product.  Did you follow along with me on that?
23     A    Yes, sir.
24     Q    Okay.  Now, this information was not imparted
25 to your audience as part of any of your interviews with

Page 205

52 (Pages 202 - 205)

1  Joe Oltmann or separately by you in your commentary, was
2  it?
3      A    Correct.
4      Q    He goes on to say, these fabrications and
5  attacks against me have upended my life.  Forced me to
6  flee my home and caused my family and loved ones to fear
7  for my safety, and I fear for theirs.  At the bottom of
8  this.  Do you see that as well?
9      A    Yes.
10     Q    Now, are you saying just based on your
11 testimony that -- I guess it's easy to -- to look in
12 hindsight.  But had you had this information would you
13 have published it?
14     A    So the Paragraph No. 5 on Page 3 of Exhibit
15 49, it reads, all claims that someone recorded me on the
16 call or even overheard me saying, don't worry about the
17 election, Trump's not going to win, I made "expletive"
18 sure of that or wholly fabricated.  I have seen no
19 evidence that would -- that would show that what
20 Dr. Coomer is saying right here is false.  So I've seen
21 no evidence indicating that this statement was false.
22 And that would be Paragraph No. 5.
23     Q    And you told us that you saw, you know -- you
24 put on your podcast what information you did procure.
25 But you were also at least willing or open-minded to

Page 206

1  providing information that didn't feed into that
2  narrative.  This was information that didn't feed into
3  Joe Oltmann's narrative.  We can be clear about that;
4  right?
5      A    Paragraph No. 4 I -- I do not agree with this
6  article.  So Photograph No. 4 it says, despite the
7  election security, a litany of defamatory statements
8  continues to be made about me by officials with the
9  Trump campaign, the president's personal attorneys, the
10 president's family members, alt-media personalities, and
11 countless social media trolls.  I want to be --
12     Q    There's no way that Kevin's getting that down
13 by the way.
14     A    Sorry.  Okay.  Or where it says, despite the
15 elections security, a litany of defamatory statements
16 continue to be made about me by officials with the Trump
17 campaign, the president's personal attorneys, the
18 president's family members, alt-media types and
19 countless social media trolls.  I want to be very clear,
20 I have no connection to AntiFa movement.
21         And so I would just say in that right there,
22 which is Paragraph No. 4, that I would disagree with,
23 given his social media posts.
24     Q    Okay.  Well, that -- that wasn't my question.
25 But thank you for the clarification.  He goes on to say,

Page 207

1  I did not rig or influence the election, nor have I
2  participated in any calls.  And I've already read
3  through that so we don't need to belabor the record.
4  But suffice it to say, the counterpoint to your -- the
5  points that you were making with Mr. Oltmann, none of
6  that was published in any of your podcast episodes
7  related to Eric Coomer, was it?
8      A    Well, I believe that that statement was false
9  on Paragraph 4 of this article.
10     Q    You believe, I have no connection to the
11 AntiFa movement was false, but that wasn't my question.
12     A    That's my answer though.
13     Q    Okay.  But you didn't publish, at any point,
14 Dr. Coomer's statements that he wasn't on the call, he
15 didn't rig the election, he wasn't involved any voter
16 fraud, did you?
17     A    I did not.
18     Q    Yesterday you were shown Exhibit 33, which
19 was some E-mails between yourself and Lynn Duden,
20 D-u-d-e-n, who's apparently an assistant to Joe Oltmann.
21 Where you circulated those questions sort of a, I guess,
22 it was a preinterview process?
23     A    I typically don't do a preinterview process.
24 And at that time Jonathan Kelly was serving as the pen
25 name Michael Peters because he didn't want to be

Page 208

1  involved in anything related to the Great Reset.  So but
2  I -- I don't recall ever interacting back and forth with
3  that individual.
4      Q    Referring to Ms. Duden?
5      A    Yes.
6      Q    Okay.  But you testified that the questions
7  that had been assimilated for Mr. Oltmann, you believe
8  looked like ones that you would have written?
9      A    It looked like that.  But on one of the
10 things that we had, just so you -- people reading this
11 can understand, you know, I have a podcast that I've
12 done for years about business school, without the B.S.
13 where I don't talk about religion or politics.  And this
14 Great Reset, these kinds of shows are shows that I
15 didn't want to do, nor do I like doing.  And so
16 Jonathan, aka Michael Peters, was doing the best job he
17 could to help out.  And occasionally he would add in
18 clarifications or, you know, all cap something or put a
19 comma in something or things that I would not normally
20 do.  So that's why I was hesitant to respond to that
21 E-mail because I don't recall ever E-mailing back and
22 forth, nor do I typically ever E-mail back and forth.
23     Q    Okay.  And forgive me again if -- if you
24 answered this yesterday, but it wasn't clear to me why
25 on the occasion of Mr. Oltmann you went to the effort of

Page 209

53 (Pages 206 - 209)

**Page 210**

1  actually producing the questions you thought you were
2  going to be asking him on your podcast in this manner.
3  It sounds like that was not your -- your typical course
4  and practice.
5      A   Well, I think when you look through the --
6  the continuity of my E-mails, you'll see that, you know,
7  the shows I do today and most days I don't presend
8  questions in advance.  But I believe that at that time
9  when Jonathan was trying to help out, he was doing the
10  best he could and was trying to -- and perhaps Lynn, I
11  believe her name is, asked him for questions or
12  something that's not normally my normal flow.
13      Q   Okay.  Did you know prior to Mr. Oltmann
14  coming on for the first time that he was going to make
15  this claim, that Eric Coomer was on the call and -- this
16  AntiFa call, and that he boasted on that call about
17  rigging the election?  Did you -- did you know
18  Mr. Oltmann was going to say that?
19      A   I don't recall knowing he was going to say
20  that.  I do recall Ann Vandersteel telling me that Joe
21  Oltmann could bring the receipts.  I do remember her
22  describing him as a tech entrepreneur.  And her saying
23  something to the fact, oh, you'll like him.  He's an
24  entrepreneur, you know.  He's -- and he brings the
25  receipts.  And so I remember that.  And I remember that

**Page 211**

1  because it was like a emphasized point that, you know,
2  this guy brings the receipts.
3      Q   But he never shipped you the receipts?
4      A   Which he claims that he couldn't ship me --
5  again as I followed up after that, he said, well, I'm
6  involved in litigation, so you know.  Again, I've not
7  been in these involved legal battles before.  So I
8  didn't know what he could share or couldn't share.  How
9  that all works.
10      Q   I don't think I need to mark this.  I
11  think -- well, let me -- let me confirm this -- this
12  fact.  The -- the adjudication function in the Dominion
13  Voting Systems, that whole part of the election process,
14  that's not something that -- that you really understand?
15      A   I would be fascinated to see an interview
16  where Dr. Coomer could explain in great detail how that
17  system works.
18      Q   Okay.  So you -- you need the benefit of that
19  additional information in order to understand it?
20      A   Yes.  And I -- and I sincerely would like to
21  know how that works.
22      Q   Some of these E-mails that I'm skipping have
23  sort of this subject matter where some -- well, comes
24  from your E-mail address.  But it's urgent in all caps.
25  And you're asking your staff to put a button or update a

**Page 212**

1  button on voter fraud issues.  Let me give you an
2  example since I'm looking at it?
3          (Plaintiff's Exhibit No. 50 was marked for
4          identification purposes and made part of the
5          record)
6      Q   (By Mr. Cain)  This particular example is a
7  couple of days after Mr. Oltmann appeared on the first
8  Thrivetime publication.  December 24th.  Well, Christmas
9  Eve.  Urgent, add this to the bottom of the page.  Who
10  is Eric Coomer.  And then there's some links that we can
11  see.  You remember sending this E-mail?
12      A   I don't remember that.  Typically, like, if I
13  send an E-mail, I'll put, like, a -- I'll capitalize the
14  first letter.  So I would have capitalized A.  But it
15  was sent from my E-mail address.  So I'm assuming that
16  Jonathan perhaps sent that because I don't really use
17  E-mail very much.
18      Q   So Jonathan had access to
19  Founder@thrivetime15.com?
20      A   Yeah.  It's used as a community E-mail even
21  today.  So it's not like there's one person that's on
22  the E-mail.
23      Q   Well, after Mr. Oltmann came on, this is a
24  couple of days later, we get this urgent, you know, add
25  this Eric Coomer information.  Do you remember

**Page 213**

1  instructing Jonathan or whomever at your office to
2  continue to publications relating to Dr. Coomer?
3      A   I don't recall sending this particular
4  E-mail.  I do recall asking to make the button.  But I
5  don't recall sending this E-mail.
6      Q   Is it fair to say you were -- you were
7  willing after Mr. Oltmann came on to sort of expand your
8  coverage of Eric Coomer and -- and continue to provide
9  content to your listeners about him specifically?  In
10  other words, you were running with the story?
11      A   I was trying to gather as many facts as I
12  could related to Dr. Eric Coomer.
13      Q   Okay.  But we looked at his op-ed where -- in
14  the Denver Post.  I don't see that linked here.  So you
15  were gathering certain facts about him and not others.
16      A   I -- I just don't believe that some of the
17  statements that were in the op-ed were accurate.
18      Q   Well, you're saying that now.  You didn't
19  look at it back then.
20      A   Well, I went to Duck Duck Go and just went
21  through different articles and looked all over the
22  internet and tried to find information I could find.  So
23  I found a New York Times op-ed that he was in.  And then
24  I found -- you know, but again, looking at it now, look
25  at it today, perhaps it would make sense to add that

54 (Pages 210 - 213)

1 link there.
2 Q Now, I didn't see -- I know of -- I know of
3 which the New York Times article which one you're
4 speaking of. I didn't see that in any of the material
5 that you've produced. But you're saying that that's
6 part of your investigation into Dr. Coomer?
7 A Right. And when I was watching his --
8 Dr. Coomer's deposition, keep saying his because you
9 were here. But when I was watching the -- the five-hour
10 deposition, it -- in that I believe that the New York
11 Times article was discussed. And I recall looking at
12 that.
13 Q Okay. Do you recall -- well, let me ask you
14 maybe a predicate. Do you -- do you take the Newsmax
15 feed? Do you have access to Newsmax?
16 A I don't really trust Newsmax.
17 Q Why not?
18 A My research -- is this private or how does
19 that work?
20 Q We have a protective order if it's subject to
21 it. And your counsel can field that with the Court.
22 MR. QUINN: Here's -- let's -- we can stay on
23 the record for this. But if he's going to speak
24 honestly about another entity --
25 THE WITNESS: I don't want to get --

Page 214

1 mind that I didn't really trust him. But I've not
2 talked about it publicly because I don't think it's a
3 big important issue.
4 Q Have you gone on Newsmax?
5 A I was on Newsmax once before talking about
6 Jeffrey Epstein and Bill Gates and they cut my mike.
7 Q Okay. What about the founder of Newsmax's
8 background troubled you?
9 MR. QUINN: Objection.
10 THE WITNESS: I just don't believe that he
11 shares my world view.
12 Q (By Mr. Cain) Is this a religious issue or
13 political issue or something else?
14 A Well, it was -- and I'll give this analogy
15 and try to be short. I just with -- you know, with
16 Dr. Coomer, I -- I'd looked him up and I thought to
17 myself, okay, mental note. File that away somewhere in
18 my mind. And if his name ever comes up again, then I'll
19 revisit it. And then when Ann introduced me to Joe, I
20 thought, well, there's that name again. That was how --
21 So with Newsmax, I've just had concerns on my own that
22 I've never voiced publicly about Newsmax. And so I just
23 have a overall not good feeling about Newsmax.
24 Q Well, I assume that not good feeling occurred
25 after you were on their show?

Page 216

1 MR. QUINN: Can we -- whatever his comments
2 are, can we at least have the sense that his comments
3 about Newsmax for the moment will be subject to the
4 protective order so that he can speak freely with you
5 and we can address it later.
6 MR. CAIN: Yeah. Our protective order,
7 Mr. Clark, allows your counsel to designate that. It
8 also allows me, in all candor, to contest that
9 designation. But that's something we've agreed to and
10 the Court can address.
11 MR. QUINN: So if he contests it, we go -- we
12 have a dispute in front of the Court.
13 THE WITNESS: I don't want to get sued for
14 defamation while discussing defamation.
15 MR. QUINN: Understood. But I think -- I
16 think for -- I think we have an agreement at this moment
17 that you can speak freely about Newsmax and under the
18 subject of the protective order.
19 THE WITNESS: I -- I just looked into the
20 founder of Newsmax. Probably in the same way I've
21 looked into Dr. Coomer.
22 Q (By Mr. Cain) You're talking about
23 Mr. Ruddy?
24 A Yeah. The founder of Newsmax. And I -- I
25 just -- this is years ago. And I just determined in my

Page 215

1 A No. It was before that.
2 Q Why did you go on?
3 A I go on a lot of shows that I don't want to
4 be on. In fact, most shows I'm on I don't want to be
5 on. For the record too, I was on CNN. And I also
6 didn't want to be on CNN.
7 Q I want to thank Brooke for providing me with
8 this large and weighty stapler. This exhibit didn't get
9 stapled, Mr. Clark. That's hence the interruption.
10 (Plaintiff's Exhibit No. 51 was marked for
11 identification purposes and made part of the
12 record)
13 Q (By Mr. Cain) When was the -- I know you're
14 looking at that. And I'll certainly give you a chance
15 to familiarize yourself with it. But when was the last
16 time you -- you had Mr. Oltmann either on a Thrivetime
17 podcast or at the ReAwaken American tour?
18 A I do not know. But the events are streamed.
19 So whatever that event was would be public -- publicly
20 discoverable, I should say. But I don't know when that
21 was.
22 Q Well, I have a list of them. But the problem
23 with Mr. Oltmann, as you've identified, is some of them
24 he didn't show up to even though he was on the flyer.
25 A Yeah. It was a very interesting dynamic

Page 217

55 (Pages 214 - 217)

1 because there are -- you know, people -- I'll use
2 example. If General Flynn says, I'll be there to speak
3 at let's say 6:00 p.m. and then he's there at 6:00 p.m.
4 In the case of Joe Oltmann, there was multiple instances
5 he could not be there and I did not know as to why. And
6 usually Mr. Aaron Antis who volunteers stage side, he
7 would say something like, hey, your next speaker's not
8 here.
9    Q    Let's do this and then we'll look -- is it
10 51? Thank you. I have -- my staff put together a list
11 of events that he -- he, Mr. Oltmann, was at least
12 scheduled to be at. And just from your recollection,
13 you can tell me if he was there. July 17, 2021, in
14 Anaheim.
15    A    I believe we watched the Anaheim clip
16 yesterday.
17    Q    I think so. August 19, 2021, Grand Rapids.
18    A    I don't recall him being there. But I'm not
19 saying he wasn't, just have to check the video.
20    Q    That's fine. September 24th, 2021, Colorado
21 Springs?
22    A    We know he was there.
23    Q    Yeah. And this Exhibit 51 is April 30 of
24 2021. Just kind of to cross reference the timing of
25 what I'm saying what you have in front of you. November

Page 218

1 the same day; one in Salem and one in Redmond?
2    A    We had to move it because we had a venue that
3 canceled, which is sort of par for the course for what
4 I'm doing right now.
5    Q    What do you mean?
6    A    Sometimes venues, they get pressure to not
7 host my. And therefore instead of just renting a venue
8 like any normal event would have to do, I have to build
9 a physical structure.
10    Q    Okay. So the one that was -- forgive me.
11 But the one that was in one of the locations had to be
12 canceled and you moved it to a separate location in a
13 different town?
14    A    Yeah. We didn't cancel the event but we
15 moved the location.
16    Q    From Redmond to Salem or from Salem to
17 Redmond?
18    A    I don't recall. But we did set up at a major
19 league -- or minor league baseball stadium, I believe.
20 That's where we ended up doing the event. I don't
21 remember what city we were in.
22    Q    And Mr. Oltmann was there or not there?
23    A    I don't know. But I think if you look around
24 you can find it.
25    Q    And last one, at least on my list, was July

Page 220

1 11th, 2021, San Antonio, Texas?
2    A    I don't recall him being there.
3    Q    December 10th, 2021, Dallas, Texas?
4    A    I believe when I was watching the video clips
5 of him about 30 days ago just to get prepared for our
6 conversation, I believe I saw him there.
7    Q    All right. And then a host in 2022, January
8 14, 2022, in Phoenix?
9    A    I don't recall him being there.
10    Q    February 18, 2022, in Canton?
11    A    I don't recall him being there.
12    Q    March 11, 2022, in San Diego?
13    A    I don't recall on that one. I don't know if
14 he was there or not.
15    Q    This one in Redmond, Oregon that you
16 referenced?
17    A    That was the expensive one.
18    Q    The big tent one?
19    A    Yeah.
20    Q    April 1st of 2022, was he there?
21    A    I don't know. But all the video clips are up
22 there. So I think he would just go to Rumble, search
23 for his name, and then Oregon and you could probably
24 find it that way.
25    Q    Did -- did you guys do two events in Oregon

Page 219

1 8th of 2022, in Virginia Beach.
2    A    I don't recall if he was there either.
3    Q    Okay. Going back to Exhibit 51, it's dated
4 April 30 of 2021. And this would have been before the
5 lawsuit was filed in this case; right?
6    A    Before I was sued?
7    Q    Yes, sir.
8    A    I don't know the date that I was sued.
9    Q    I'll represent to you it was on December 22nd
10 of 2021?
11    A    Okay. So this would have been before that.
12    Q    Yes, sir.
13    A    Okay.
14    Q    Okay. And this is a statement from Newsmax
15 that goes on for a couple of pages. Did you have a
16 chance to look at it?
17    A    I did not have a chance to look at it.
18    Q    It's really on the second page is the -- is
19 the substance of the statement. Take a look at that,
20 please.
21    A    (Witness examines document) Okay.
22    Q    Caught me mid coffee. Is this the first time
23 you've seen this statement from Newsmax?
24    A    Yes. Yes, sir.
25    Q    Did you see the associated video where their

Page 221

56 (Pages 218 - 221)

1 anchor made this very same statement?
2     A    I did not.
3     Q    As you can see, since you read it quickly,
4 Newsmax said on -- in April of 2021, that they would
5 like to clarify their coverage about Dr. Coomer.  And
6 that while Newsmax initially covered claims by President
7 Trump's lawyers, supporters and others that Dr. Coomer
8 played a role in manipulating Dominion voting machines,
9 Dominion voting software, and the final vote counts in
10 the 2020 presidential election.  Newsmax subsequently
11 found no evidence that such allegations were true.  Goes
12 on to say in the next paragraph.  There are several
13 facts that your viewers should be aware of.  Newsmax has
14 found no evidence that Dr. Coomer interfered with
15 Dominion voting machines or voting software in any way,
16 nor that Dr. Coomer ever claimed to have done so.  Nor
17 has Newsmax found any evidence that Dr. Coomer ever
18 participated in any conversation with members of, quote,
19 AntiFa, closed quote, nor that he was directly involved
20 with any partisan political organization.  They go on to
21 issue an apology.
22         Did I read that correctly?
23     A    Yes.  It looks as though you read that
24 correctly -- correctly.
25     Q    So this information you're saying you're

1 hearing for the first time today?
2     A    Yes, sir.
3     Q    And similar the way I asked about
4 Mr. Oltmann, had you been aware in April of 2021, that
5 Newsmax had issued this retraction, would you have put
6 Joe Oltmann on your stage?
7     A    Well, the -- of the things you've showed me
8 today, the most concerning was the Parler post.  And I
9 was not aware of what Newsmax was doing or wasn't doing.
10 So I don't really watch Newsmax.  So had I known what
11 Joe was posting on Parler, I would not have allowed him
12 to come to our events.  But as far as this, we had that
13 conversation earlier about the AntiFa members or being a
14 member of AntiFa.  And I do agree -- it says Newsmax has
15 found in evidence that Dr. Coomer ever participated in
16 conversations with members of AntiFa.  I do believe that
17 to be true because I have also not seen that
18 information.
19     Q    Okay.  I guess my question was, had you known
20 this information that Newsmax, at least, and I haven't
21 heard you say any different, you can correct me if I'm
22 wrong, but they start out by saying that they have
23 uncovered no evidence that Dr. Coomer played a role in
24 manipulating voting machines and goes on to as I read
25 previously.  But had you been aware of that information

1 in April of 2022, would have you allowed Joe Oltmann
2 to -- to go on your stage?
3     A    That information that Newsmax had did a
4 retraction?
5     Q    Yeah.
6     A    I don't really respect Newsmax as an
7 organization.
8     Q    Okay.  So it wouldn't have moved the needle
9 for you?
10     A    Yeah.  I -- I don't consider them to be
11 relevant.  I don't know.  Probably clarify, I just don't
12 ever watch Newsmax.
13     Q    Well, that may be true.  I -- I can't
14 discern, to be honest with you, what information you
15 believe is credible and what -- what source of
16 information -- I'm going to wait until counsel.
17     A    Okay.
18         MR. CAIN:  Let's take a minute and go off the
19 record.
20         THE VIDEOGRAPHER:  Off the record.  The time
21 is 3:37.
22         (A short break was had; after which the
23         following proceedings took place:)
24         THE VIDEOGRAPHER:  We are back on the record.
25 The time is 3:49.

1         MR. CAIN:  Okay.  For the record, Mr. Quinn
2 has had to catch a flight, so his co-counsel will be
3 subbing in.  And she'll be -- make hopefully not too
4 many objections.  But he's turned that obligation over
5 to her.
6     Q    (By Mr. Cain )  Before we broke we were
7 talking about Newsmax.  I was going to go into whether
8 you considered Newsmax to be a reputable source for you
9 or not.  I'm not sure if you quite answered that
10 question.  But do you consider them to be a reputable
11 source?
12     A    I do not listen to Newsmax.  And I've had
13 concerns about the founder of Newsmax that I've shared
14 privately with myself.
15     Q    Okay.  Well, you may not see eye to eye with
16 Mr. Ruddy, who is the current CEO of Newsmax, but in
17 terms of their coverage of events such as the one we're
18 here on today, do you consider them to be a credible
19 news source?
20     A    I don't watch them because I'm not interested
21 in them.  So in terms of them being credible or not,
22 I -- I don't know.  I just don't ever watch them.  So it
23 would be analogous to maybe a South African news station
24 I don't watch.
25     Q    Well, is it fair to say that you at least had

1 access to the internet and if you chose to watch
2 Newsmax, you would have been able to at least become in
3 possession of the retraction that was issued about
4 Dr. Coomer in April of 2021; right?
5     A    That's correct.
6         MS. WIESE:  Object to form.
7     Q    (By Mr. Cain)  And you -- you did mention
8 that you read the New York Times article.  And I don't
9 have that unfortunately in front of me in my big stack.
10 But like the Denver Post article, Dr. Coomer was very
11 clear in denying that he had any role in this AntiFa
12 call or was involved in any political organizations
13 along those lines.  Do you remember that?
14         MS. WIESE:  Object to form.
15         THE WITNESS:  The New York Times article I
16 remember reading was something about -- I wish I had it
17 in front of me.  But it's something about, this would be
18 the perfect guy to blame or something like that.
19     Q    (By Mr. Cain)  Perfect villain?
20     A    Perfect villain.  And then it was Dr. Coomer
21 discussing, in part, his life and some of the challenges
22 he had gone through up to that point.  And how that
23 would potentially make him the perfect villain.
24     Q    And you didn't link that article on your
25 website, did you?

Page 226

1     A    I don't know if it's there now.  I've linked
2 a lot of things.  But I don't recall linking it.
3     Q    So as you sit here today, you can't testify
4 that you did, in fact, link the New York Times article?
5     A    I cannot recall whether I linked the New York
6 Times article.
7     Q    Do you know if you made a decision, as you
8 sit back here and think about it, as to why you may not
9 have linked that article to your listeners and viewers?
10     A    I don't think there was any reason to or --
11 to link it or to not link it.  I just recall when I
12 watched the five-hour Dr. Coomer deposition, that
13 article being referenced.  And then that reminded me
14 that that article existed.
15     Q    Well, I guess I'm trying to get at, you know,
16 certain information you chose to publish about
17 Dr. Coomer and certain information you didn't.  So why
18 didn't you link the New York Times article about
19 Dr. Coomer then where he was interviewed about these
20 topics?
21     A    I don't know that I did or didn't.  I don't
22 recall doing that.  There's thousands of links on that
23 web page.
24     Q    Well, have you -- have you linked any article
25 that references things like we're looking at on Exhibit

Page 227

1 51, which is the Newsmax retraction on the New York
2 Times article that you can tell the jury gives his side
3 of this particular story?
4     A    I don't --
5         MS. WIESE:  Object to form.
6         THE WITNESS:  I don't recall posting
7 anything -- well, I know I didn't post Newsmax, I
8 believe, because I hadn't seen that.  I don't recall
9 posting anything related to that.
10     Q    (By Mr. Cain)  But you could have?
11     A    I think I --
12         MS. WIESE:  Object to form.
13         THE WITNESS:  It's technically possible.  Yes.
14     Q    (By Mr. Cain)  I have an exhibit that
15 I don't think I need to mark.  It's a sanction order
16 against Mr. Oltmann.  I referenced this earlier.  It's
17 from October of 2021.  In relates to his refusal to
18 provide us certain information in a separate lawsuit
19 that Dr. Coomer has brought.  But I think from your
20 testimony you're going to say you haven't seen the
21 sanction order nor heard of it until I just discussed it
22 with you today.  Is that fair?
23     A    I've not seen it.  And the only time that I
24 heard anybody discuss that he, as in Joe Oltmann, wasn't
25 providing you with information was through the course of

Page 228

1 discussing with Counsel, you know, what I knew about --
2     Q    Yeah.  She's not going to want you to go
3 into --
4         MS. WIESE:  Yeah.  Let's not talk about that.
5         THE WITNESS:  Okay.  I mean, that's the only
6 thing I know.  I didn't know from any outside source.
7     Q    (By Mr. Cain)  Okay.  Now you -- you did read
8 the lawsuit that was filed against the initial lawsuit
9 that's been amended when we learned about ReOpen
10 America, LLC.  But you did read that lawsuit; right?
11     A    I did not read that lawsuit.
12     Q    You haven't read the lawsuit that's been
13 filed?
14     A    No.  I have not read the lawsuit.
15     Q    Why not?
16     A    I thought that I should have legal counsel
17 review it.
18     Q    Okay.  So are you not aware that a retraction
19 demand has -- has been made in connection with the
20 filing of the original lawsuit in December of 2021?
21         MS. WIESE:  Objection to the extent this --
22 hold on.  To the extent this calls for any
23 attorney-client communications don't answer.  If you can
24 answer, Mr. Clark, without divulging any information you
25 received from Counsel, then go ahead.

Page 229

58 (Pages 226 - 229)

1    THE WITNESS:  I don't recall.
2    Q    (By Mr. Cain)  Okay.  Well, I think it --
3 maybe it's self-evident since you said you haven't read
4 it, then you wouldn't be aware outside of discussions
5 with counsel, which I don't want you to go into, you
6 wouldn't have been aware that a retraction demand has
7 been made in the lawsuit that's filed?
8    MS. WIESE:  Same objection.  Sorry, Charlie.
9 Same objection.
10    Q    (By Mr. Cain)  Is that fair?
11    A    I don't -- I don't know the legal world.
12    Q    Yeah.  No.  I get it, Mr. Clark.  Let's
13 just -- let's just suffice it to say, you haven't read
14 the lawsuit?
15    A    That is correct.
16    Q    Do you know who Professor Alex Holderman is?
17    A    I do not.
18    Q    Have you reviewed a declaration that he
19 prepared in connection with this lawsuit?
20    A    No.
21    Q    Where he discusses this adjudication process
22 that you're -- we've discussed.  He discusses the
23 plausibility of Dr. Coomer actually being involved in
24 something like rigging the election.  He discusses the
25 screenshot that was manipulated by Mr. Oltmann.  And he
Page 230

1 discusses sort of a number of topics about auditing
2 elections and how that works.  These are just topics
3 that he's touched on in his declaration in this lawsuit.
4 None of those things you've reviewed?
5    A    I've not reviewed those things.
6    MS. WIESE:  Object to form.
7    (Plaintiff's Exhibit No. 52 was marked for
8     identification purposes and made part of the
9     record)
10    Q    (By Mr. Cain)  Were you provided with -- I
11 don't want to go into discussions with Counsel.  But
12 have you seen a letter that I've -- let me just mark it.
13 This is Exhibit 52.  It's a letter from my law firm
14 dated April 24th of 2023.  So roughly a year ago.  Have
15 you seen that letter before?
16    A    I don't recall reviewing this letter.
17    MS. WIESE:  I -- I can't see what letter that
18 is.
19    MR. CAIN:  It's a letter to you and Mr. Quinn,
20 as I mentioned, on that date that among other things
21 references the Dominion settlement with -- with Fox
22 News.  And demands a retraction of all statements and
23 reporting about Dr. Coomer that are based on Joe
24 Oltmann's claims that Dr. Coomer partook in an AntiFa
25 conference call, claimed on that call to have rigged the
Page 231

1 election and to, in fact, rig the election.
2    MS. WIESE:  I'm going to -- I object to this
3 line of questioning to the extent it calls for
4 attorney-client communications that are privileged.
5 Mr. Clark, if you can respond to any questions about
6 this letter without revealing any discussions we've had,
7 you've had with Counsel, then you may go ahead and
8 answer, otherwise do not.
9    Q    (By Mr. Cain)  Can you answer that question
10 without going into discussions with your lawyers?
11    A    I do not understand what's happening right
12 now.
13    Q    Okay.  Well, I guess like with the prior
14 exhibit, this Exhibit 52, you've testified you don't
15 recall ever seeing this before?  I just put it in front
16 of you; right?
17    A    This is correct.
18    Q    And outside of, you know, discussions with
19 your lawyers or this lawsuit, why haven't you retracted
20 these claims about Dr. Coomer?
21    MS. WIESE:  Object to form.
22    Q    (By Mr. Cain)  That he's trying to overthrow
23 our country and that he's treasonous?
24    A    I would like to have Dr. Coomer share as to
25 why he posted those posts.  And especially given his
Page 232

1 role as the director of security and strategy for
2 Dominion.  And how they adjudication system works.
3    Q    Well, you're not even reading as far as the
4 adjudication part Dr. Halderman's report on how that
5 works and how it would have been impossible without
6 detection for Dr. Coomer to have done so.  You haven't
7 even bothered to read that.  Isn't that right?
8    MS. WIESE:  Object to form.
9    THE WITNESS:  I don't know that it's I haven't
10 bothered to.  I think I've been focused on trying to
11 stop the Great Reset.
12    Q    (By Mr. Cain)  Have you reviewed
13 Mr. Oltmann's affidavit that he submitted?  You remember
14 I mentioned that fella, Randy Corporon, you asked me who
15 he was.  I told you.  Have you reviewed an affidavit
16 that Mr. Oltmann submitted that ended up being part of
17 what was known as Sidney Powell's cracken lawsuits that
18 was signed under oath by Mr. Oltmann?
19    A    I have not reviewed that document.
20    Q    Never seen it before?
21    A    I have never seen that document before.
22    Q    Have you reviewed the alleged notes that --
23 handwritten notes that Mr. Oltmann claims to have made
24 during the AntiFa conference call as we've been
25 referring to it?
Page 233

Page 234

1    A    Well, I know during our interview he claimed
2  to have notes.  But I've never seen said notes.  And I
3  think that's part of that package of stuff that he said
4  he would ship to me.  Because I've never received it.
5    Q    Would that have been information that you
6  would have liked to have had in your possession prior to
7  interviewing Mr. Oltmann on your show?
8    MS. WIESE:  Object to the form.
9    THE WITNESS:  I believe that if the
10  information that he claimed to have would have been
11  provided, that would have been the most desirable
12  outcome.
13    Q    (By Mr. Cain) Well, you put him on
14  irrespective; right?  I mean, you -- you -- he said he
15  could ship that information to you.  He didn't do that.
16  But you were willing, nonetheless without his alleged
17  notes from the call or whatever other material,
18  including recording, or on the third item on the list,
19  this disclosure that we listened to that he had -- he
20  didn't say an ace up his sleeve, but words to that
21  effect, some person that was going to come forward, you
22  were still willing to put him on your show without that
23  information in your possession.  Isn't that right?
24    MS. WIESE:  Object to form.  I think you need
25  to be more specific about the time of some of these

Page 235

1  things.
2    Q    (By Mr. Cain) Well, any of your shows?
3    A    Well, given my independent concerns about the
4  social media post of Eric Coomer, and my research into
5  the patents, and my research into Eric Coomer's position
6  as the director of security and strategy for Dominion,
7  and the Gateway Pundit video where he talked about, he,
8  Dr. Eric Coomer, discussed how adjudication -- how
9  adjudication works.  I was concerned about Dr. Eric
10  Coomer's involvement in the election.  That's -- that
11  was why I was concerned about Dr. Eric Coomer.  And then
12  as far as the -- what made me compelled to say yes to
13  the suggestion to interview him was that Ann Vandersteel
14  indicated that he knew a lot about Eric -- Dr. Eric
15  Coomer and he could bring the receipts.
16    Q    Okay.  Well, we don't need to go down that
17  path again other than we've already said he didn't bring
18  the receipts for one reason or another; right?
19    A    Yes.  And the first --
20    MS. WIESE:  Object to form.  Sorry.  Go ahead.
21    THE WITNESS:  First time I asked him on the
22  show I asked him multiple times.  He said, I'll ship it
23  to you.  And then when I confirm speakers for the
24  events, I say something to the effect of, hey, I got you
25  speaking at this time at that date.  It was just a brief

Page 236

1  follow-up of, hey, could you ship me whatever that is.
2  I didn't get it.  If you send the mail, I didn't get it.
3  If you E-mail, didn't -- don't -- I didn't get it.  And
4  then at some point, I don't know when, he said something
5  to the effect of, well, I can't because of a pending
6  investigation or litigation or something.  So I don't
7  know how this whole legal world works.  But I didn't
8  know why he wasn't providing it to me.
9    Q    (By Mr. Cain) My co-counsel reminded me when
10  I asked you about the list of Oltmann appearances that
11  you -- he wasn't cut off the tour until April 26th of
12  2023, as you discussed yesterday.  Is that -- is that
13  accurate?
14    A    Whenever that conversation was.  Because my
15  understanding -- we had listeners that told me they
16  said, hey, you know, Joe Oltmann's doing a show about
17  you and how you cut him out from the tour.  And so
18  whatever day that show came out, that's probably near
19  when I told him directly that we wouldn't be able to
20  have -- I didn't want to have him back on the tour any
21  more.  So whatever that show came out was, it would
22  be right around that time frame.
23    Q    I'm also reminded that on your -- the button
24  that we've been talking about, that as I understood it,
25  you would sort of update as you received additional

Page 237

1  information.  There's an article about Dr. Halderman and
2  his access to a Dominion voting machine and his
3  analysis?
4    A    And I don't recall putting that there.
5    Q    All right.  And I do have very few E-mails
6  between you and Mr. Oltmann.  We've discussed maybe why
7  that is.  Off-line, off your show, there's a lot of
8  references in your E-mail chains to, you know, give me a
9  call, that sort of thing as opposed to texting about a
10  particular subject.  Is that a fair statement?
11    A    Yeah.  If you look at all my text messages,
12  which you have, I tend to tell people, text when free or
13  call when free or I'll text them a dot.  I don't
14  normally E-mail or text much at all.  It's my preferred
15  method of communication.
16    Q    Yeah.  And I was curious why that is?
17    A    I just don't like E-mail.  I've done shows
18  about it.  I don't like E-mail.  Don't like text
19  messages.  Don't like smart phones.  So previous to this
20  Great Reset madness, typically I didn't carry a cell
21  phone.  So I just wasn't reachable.  I would prefer to
22  go back to that time too.
23    Q    You anticipated my follow-up.  Is this
24  preference that you described where you don't like
25  E-mail and you don't like texts, do you apply that to

60 (Pages 234 - 237)

1  your other endeavors outside of the discussions such as
2  the ones with Mr. Oltmann?  For example, in your
3  business coaching --
4      A    Yes.
5      Q    -- life you don't you do E-mail or text?
6      A    I don't like to E-mail.  I don't like to
7  text.
8      Q    So that's across the board?
9      A    I've done shows about that idea.
10     Q    Okay.  Now, one topic I skipped earlier for
11 the sake of your sanity was this -- this appearance that
12 you had, I think it was after you were in Colorado
13 Springs and you went to Canton, Ohio where you sort of
14 reference knowing that if you came to Colorado you would
15 be sued?
16     A    Yeah.
17     Q    You remember that?
18     A    I do.
19     Q    And I have a clip that had -- that we, I
20 think, played for your wife.  It was Clip 4 on Exhibit
21 10.  I'm just going to play a piece of that real quick.
22 Starts at 46 seconds into it and to the second clip.
23 You can hear the audio.  Maybe.
24        (The following was an audio clip:)
25        SPEAKER:  So people told me if you do the

Page 238

1  probability you're going to get sued if you come here.
2  So I just kept hearing that.  Kind of a recurring theme.
3  I also heard the same thing about Colo -- about
4  California.
5      Q    And then you went on to say, well, that's
6  exciting.  Is that just a off-the-cuff comment or were
7  you inviting a lawsuit?
8      A    Well, if you look up the word exciting, I
9  think we could look at the definition of that and maybe
10 see if what I said was accurate.
11     Q    I didn't get that.
12     A    I think if we looked up the definition of
13 exciting --
14     Q    No.  I heard you.  I don't understand what
15 you're saying.
16     A    Well, I think exciting would be abnormal or
17 not normal.  Not within the normal order of things.  So
18 kind of like a departure from what is normal.
19     Q    So you're not -- you're not explaining to the
20 jury in this testimony that you're anticipation about
21 being sued in Colorado was based on the content that you
22 were putting out, but based on just the jurisdiction in
23 and of itself?
24     A    Well, people were telling me to not go to
25 California because we had a high probability to be sued

Page 240

1  tour, if you bring it to Colorado, you're going to get
2  sued.  And I said, well, that's exciting.  Right?  So if
3  we go to TimeToFreeAmerican.com or Thrivetime show, the
4  button there, if you click there lawsuit, Eric Coomer,
5  who is the head of security and strategy for Dominion is
6  suing me personally as well as the tour to make us stop.
7  And so far I've spent $110,000 in 45 days on my lawsuit.
8  So it's like $2500 a day.  So $2500 a day, you too can
9  support me.  But seriously if everybody gave $100 it
10 would really help because it's so expensive.  And it's
11 call law fair.
12        MR. CAIN:  Apology for that interruption.
13 That's my daughter frantically trying to get ahold of
14 me.
15     Q    (By Mr. Cain)  But that clip was from Canton,
16 Ohio.  You said a couple of things.  Maybe it was
17 hyperbole, maybe not.  What is the basis of your
18 premonition that if you went to Colorado you were going
19 to get sued?
20     A    Well, when people request a ticket for the
21 ReAwaken tour, they'll text the number.  And so I talk
22 to a lot of people randomly throughout the day.  And
23 multiple ticket buyers or wannabe ticket buyers, they
24 said, hey, just so you know, if you go to Colorado, it's
25 very litigious.  And so there's, you know, a high

Page 239

1  there.  Hill told me not to go to Colorado because I had
2  a high probability to be sued there.  Also same thing
3  about Oregon.  Heard the same thing about New York.
4  Pretty much blue -- bluer states.
5      Q    Okay.  Well, let's do this, and indulge me if
6  you don't mind.  I know you have five children, but I
7  need to check in on my daughter real quick.  She doesn't
8  typically call me.  And I'm also just about done, I
9  think.  And I want to make sure that I cover everything.
10 So I need the benefit of Counsel, Mr. Brad in
11 particular.  So let's take a -- maybe a seven-minute
12 break and I think we'll be done with our last segment.
13        THE WITNESS:  Okay.  Thank you, Mr. Cain.
14        THE VIDEOGRAPHER:  Off the record.  The time
15 is 4:15.
16        (A short break was had; after which the
17        following proceedings took place:)
18        THE VIDEOGRAPHER:  Back on the record.  The
19 time is 4:26.
20     Q    (By Mr. Cain)  Mr. Clark, depending on your
21 answer to the next question, I may or may not have
22 additional questions for you.  All right?
23     A    Okay.
24     Q    Have I been professional and courteous with
25 you today?

Page 241

61 (Pages 238 - 241)

1      A    Yes.  You've been professional and courteous.
2  And as a clarifier, I wanted you to know that the reason
3  why I mentioned Mr., and then the gentleman's first name
4  yesterday, was not to be facetious.  I just -- that's
5  how I typically communicate.  And then so the reason I'm
6  referring to you as Mr. Cain is because I understand
7  that's how you would prefer to be addressed.
8          MR. CAIN:  Thank you for that clarification.
9  Melissa, I'll pass the witness.
10         MR. QUINN:  Okay.  I -- I don't have any
11  questions.
12         MR. CAIN:  Okay.  You're done.
13         THE REPORTER:  Read and sign?  Melissa?  Read
14  and sign?
15         MS. WIESE:  Yeah.
16         THE VIDEOGRAPHER:  Okay.  We're off the
17  record.  The time is 4:27 p.m.
18      (Signature required; witness excused)
19              * * * * * *
20
21
22
23
24
25

Page 242

---

E R R A T A   S H E E T
WITNESS:  CLAYTON THOMAS CLARK
DATE:    MAY 1, 2024
STYLE:    COOMER -vs- MAKE YOUR LIFE EPIC, LLC et al,
          21-cv-03440-WJM-KLM

REPORTER:  KEVIN LEE IDLEMAN, CSR

PAGE  LINE    CORRECTION

Page 244

---

J U R A T
    I, CLAYTON THOMAS CLARK, state under oath that I
have read the above and foregoing Deposition in its
entirety and that the same is a full, true, and correct
transcription of my testimony so given except for the
corrections noted.

(____)   CORRECTIONS ATTACHED
(____)   NO CORRECTIONS
        _____
        CLAYTON THOMAS CLARK

    SUBSCRIBED AND SWORN TO BEFORE ME, the
Undersigned Notary Public in and for the State of
_____, on the _____ day of
_____, 2024.

        _____
        Notary Public

My Commission Expires:_____

Reported By:   Kevin Lee Idleman, CSR

Page 243

---

C E R T I F I C A T E
STATE OF OKLAHOMA   )
                    ) SS:
COUNTY OF OKLAHOMA  )

    I, KEVIN LEE IDLEMAN, CSR for the State of
Oklahoma, certify that CLAYTON THOMAS CLARK was by me
sworn to testify the truth; that the deposition was
taken by me in stenotype and thereafter transcribed and
is a true and correct transcript of the testimony of the
witness; that the deposition was taken on MAY 1, 2024,
at 9:00 a.m., at 2448 E. 81st, Suite 5900, City of
Tulsa, State of Oklahoma; that I am not an attorney for
or a relative of either party, or otherwise interested
in this action.

    Witness my hand and seal of office on this the
21st day of May, 2024.

        <%8249,Signature%>

        _____
        KEVIN LEE IDLEMAN, CSR
        Oklahoma Certified Shorthand Reporter
        Certificate No. 1652
        Expiration date:  December 31, 2024

Page 245

62 (Pages 242 - 245)

1    Thomas Quinn
2    tquinn@grsm.com
3            May 21, 2024
4    RE: Coomer, Eric, Ph.D. v. Make Your Life Epic, LLC
5        5/1/2024, Clayton Thomas Clark (#6667619)
6        The above-referenced transcript is available for
7    review.
8        Within the applicable timeframe, the witness should
9    read the testimony to verify its accuracy. If there are
10   any changes, the witness should note those with the
11   reason, on the attached Errata Sheet.
12       The witness should sign the Acknowledgment of
13   Deponent and Errata and return to the deposing attorney.
14   Copies should be sent to all counsel, and to Veritext at
15   errata-tx@veritext.com.
16    Return completed errata within 30 days from
17   receipt of testimony.
18     If the witness fails to do so within the time
19   allotted, the transcript may be used as if signed.
20
21
22           Yours,
23           Veritext Legal Solutions
24
25
                                        Page 246

Veritext Legal Solutions
800-336-4000

Federal Rules of Civil Procedure

Rule 30


(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.