# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cv-03440-WJM-KAS

ERIC COOMER, Ph.D.,

      Plaintiff

v.

MAKE YOUR LIFE EPIC LLC dba THRIVETIME SHOW,
REOPEN AMERICA LLC dba REAWAKEN AMERICA TOUR, and
CLAYTON THOMAS CLARK, individually,

      Defendants

---

## EXHIBIT 10

---

```
 1                    IN THE UNITED STATES DISTRICT COURT
                         FOR THE DISTRICT OF COLORADO
 2

 3

 4
          ERIC COOMER, Ph.D.,
 5
                  Plaintiff,
 6
          vs.
 7                                           Civil Action No.
          MAKE YOUR LIFE EPIC LLC d/b/a     21-cv-03440-WJM-KAS
 8        THRIVETIME SHOW, REOPEN
          AMERICA LLC d/b/a REAWAKEN
 9        AMERICA TOUR, and CLAYTON
          THOMAS CLARK, individually,
10
                  Defendants.
11        _____/

12

13

                         VIDEO RECORDED DEPOSITION OF
14                            MICHAEL T. FLYNN
                        (Conducted Via Videoconference)
15

16
            DATE:                April 4, 2024
17
            TIME:                10:03 a.m. to 3:21 p.m.
18
            PURSUANT TO:         Notice by counsel for
19                               Plaintiff for purposes of
                                 discovery, use at trial
20                               or such other purposes
                                 as are permitted under
21                               the Florida Rules
                                 of Civil Procedure
22
            BEFORE:              Nathan F. Perkins, RDR
23                               Notary Public, State of
                                 Florida at Large
24
25                               Pages 1 to 186
```

| | |
|---|---|
| 1 | APPEARANCES: |
| 2 | BRAD KLOEWER, ESQUIRE |
| | CHARLES J. CAIN, ESQUIRE |
| 3 | Cain & Skarnulis PLLC |
| | P.O. Box 1064 |
| 4 | Salida, Colorado  81201 |
| | and |
| 5 | 303 Colorado Street, Suite 2850 |
| | Austin, Texas  78701 |
| 6 | Attorney for Plaintiff |
| 7 | MELISSA WIESE, ESQUIRE |
| | Gordon Rees Scully Mansukhani, LLP |
| 8 | 555 Seventeenth Street |
| | Denver, Colorado  80202 |
| 9 | Attorney for Defendants |
| 10 | JASON GREAVES, ESQUIRE |
| | JARED ROBERTS, ESQUIRE |
| 11 | Binnal Law Group |
| | 717 King Street, Suite 200 |
| 12 | Alexandria, Virginia 22314 |
| | Attorneys for the witness, Michael T. Flynn |
| 13 | |
| | VIDEOGRAPHER:  DAWN MATTHES |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

Page 2

I N D E X

1
2  DIRECT EXAMINATION BY MR. KLOEWER       Page   5
3  CERTIFICATE OF OATH                        Page 183
4  REPORTER'S CERTIFICATE                     Page 184
5  WITNESS' SIGNATURE PAGE                    Page 185
6
7            E X H I B I T S
8  Plaintiff's     Description          Page
9    Exhibit 13  Reopen America LLC Profit and Loss   37
         for 2021
10   Exhibit 15  Reopen America LLC profit and loss   36
         document
11   Exhibit 17  Reopen America LLC Profit and Loss   40
         for 2023
12   Exhibit 19  Composite video           13
     Exhibit 21  E-mail chain ending 11/14/2020 from   86
13        Mike Flynn to Joshua Steinman, et
          al.
14   Exhibit 22  E-mail 12/1/2020 from Ben Sheva to   96
          Mike Flynn, et al.
15   Exhibit 23  E-mail string ending 12/12/2020   99
          from Sidney Powell to Regis Giles,
16        et al.
     Exhibit 24  E-mail chain ending 12/11/2020 from   114
17        Jim Penrose to Sidney Powell, et
          al.
18   Exhibit 25  Document 12/16/2020 headed      126
          Presidential Findings
19   Exhibit 26  E-mail chain ending 12/21/2020 from   129
          Sidney Powell to flynn
20        resilientpatriot.com, et al.
     Exhibit 27  Deposition notice          155
21
22
23
24
25

Page 3

| | |
|---|---|
| 1 | THE VIDEOGRAPHER:  Good morning.  We are going |
| 2 | on the record at 10:03 a.m. on April 4th, 2024. |
| 3 | This is Media Unit 1 of the recorded deposition of |
| 4 | Michael T. Flynn taken by counsel for plaintiff in |
| 5 | the matter of Eric Coomer, Ph.D., versus Make Your |
| 6 | Life Epic, Thrivetime, et al., filed in the United |
| 7 | States District Court for the District of Colorado. |
| 8 | Civil action number 21-CV-03440-WJM-KAS. |
| 9 | The locations of this deposition being |
| 10 | conducted remotely using virtual technology. |
| 11 | My name is Dawn Matthes representing Veritext |
| 12 | Legal Solutions and I'm the legal videographer. |
| 13 | And the court reporter today is Nathan Perkins from |
| 14 | the firm Veritext Legal Solutions. |
| 15 | Counsel and all present now will state their |
| 16 | appearance and affiliation for the record going |
| 17 | with the noticing attorney. |
| 18 | MR. KLOEWER:  Good morning.  This is Brad |
| 19 | Kloewer, here on behalf of the plaintiff, Dr. Eric |
| 20 | Coomer. |
| 21 | MR. GREAVES:  Jason Greaves, on behalf of the |
| 22 | deponent Michael T. Flynn. |
| 23 | MR. ROBERTS:  Jared Roberts, on behalf of the |
| 24 | deponent, Michael T. Flynn. |
| 25 | MS. WIESE:  Melissa Wiese, on behalf of the |

Page 4

| | |
|---|---|
| 1 | defendant Make your Life Epic, Clay Clark, and |
| 2 | ReOpen America. |
| 3 | THE VIDEOGRAPHER:  Will the court reporter |
| 4 | please swear in the witness, and then counsel may |
| 5 | proceed. |
| 6 | MICHAEL T. FLYNN, |
| 7 | the witness herein, being first duly sworn on oath, was |
| 8 | examined and deposed as follows: |
| 9 | DIRECT EXAMINATION |
| 10 | BY MR. KLOEWER: |
| 11 | Q.  All right.  We will get started.  Good |
| 12 | morning, Mr. Flynn.  My name is Brad Kloewer.  I'm an |
| 13 | attorney.  I represent Dr. Eric Coomer.  He's the |
| 14 | plaintiff in this proceeding. |
| 15 | Just real quickly, to clarify for the record, |
| 16 | I'm joined by Charlie Cain, my co-counsel in this case, |
| 17 | and Dr. Eric Coomer is also on the ZOOM this morning. |
| 18 | Before we get started, I want to establish a |
| 19 | couple ground rules.  It may be helpful to understand |
| 20 | first, Mr. Flynn, have you ever had your deposition |
| 21 | taken before? |
| 22 | It appears the screen has frozen up.  Is that |
| 23 | on my end or is it Mr. Flynn? |
| 24 | THE VIDEOGRAPHER:  He has come back on.  Hold |
| 25 | on.  It looks like he dropped. |

Page 5

2 (Pages 2 - 5)

| | |
|---|---|
| 1   THE WITNESS: That was a quick deposition. | 1   question on the table. |
| 2   MR. KLOEWER: All right. Well, we've got a | 2   Is that fair? |
| 3   bit more to get through, so we will continue here. | 3   A. Understood. |
| 4   MR. GREAVES: It might be helpful, I think, if | 4   Q. All right. Mr. Flynn, can you tell me where |
| 5   attorneys that aren't asking questions go off | 5   you are right now? I don't need a physical address but |
| 6   video, just to save the bandwidth here. | 6   it appears that you are in a residence; is that correct? |
| 7   THE WITNESS: Good idea. | 7   A. No. I'm in my office in Venice, Florida. |
| 8   BY MR. KLOEWER: | 8   Q. Venice, Florida. Okay. And is anyone in the |
| 9   Q. Okay, Mr. Flynn. Can you state your full name | 9   room with you this morning? |
| 10   for the record? | 10   A. No, there is not. No one is in the room. |
| 11   A. Michael Thomas Flynn. | 11   Q. Okay. I ask that I just -- when we take a |
| 12   Q. And before we get started, I want to just | 12   remote deposition, it's important that when I ask you a |
| 13   establish some basic ground rules. It may be helpful to | 13   question, I'm getting an answer based on your personal |
| 14   understand, have you ever had your deposition taken | 14   knowledge and that not from any other source. So if it |
| 15   before, Mr. Flynn? | 15   appears that you are -- somebody is speaking to you |
| 16   A. Yes. | 16   outside of the frame or you are looking at your phone or |
| 17   Q. In what cases? | 17   something like that, I'm going to raise that issue. But |
| 18   A. I don't recall the cases. I mean, you know, | 18   I don't anticipate that we'll have in any problems with |
| 19   the -- I have had depositions taken in -- | 19   that. |
| 20   (ZOOM connection became unstable with an | 20   Okay. I want to get started here. We'll jump |
| 21   interruption by the court reporter.) | 21   right in. |
| 22   (A discussion off the record) | 22   As you know, this lawsuit has been filed |
| 23   THE VIDEOGRAPHER: Shall we go off the record | 23   against Clay Clark, Make Your Life Epic, doing business |
| 24   and figure this out? | 24   as the Thrivetime Show, and the entity Reopen America |
| 25   MR. KLOEWER: Yeah. Let's -- | 25   LLC has recently been added to the case. |
| Page 6 | Page 8 |

| | |
|---|---|
| 1   MR. GREAVES: He's back for me. | 1   Can you tell me, Mr. Flynn, when did you first |
| 2   MR. KLOEWER: Okay. | 2   meet Mr. Clark? |
| 3   THE VIDEOGRAPHER: Keep rolling. | 3   A. It was late winter 2021. |
| 4   BY MR. KLOEWER: | 4   Q. Okay. What was the context of that meeting? |
| 5   Q. Yeah. All right. Mr. Flynn, you -- | 5   A. I was in Tulsa, Oklahoma, endorsing a |
| 6   A. In various, various cases, Brad. I mean, I've | 6   political candidate. And I believe it was at Clay's |
| 7   had various depositions taken in various cases. I mean, | 7   business offices when we first met. |
| 8   you know, one up in Georgia. I've had, if I recall, one | 8   Q. Okay. And just to clarify, I believe you just |
| 9   up in Washington, DC. I don't recall the cases or dates | 9   said late winter of 2021. |
| 10   or anything like that. | 10   A. Yeah. Yep. |
| 11   Q. Well, I ask just so that we understand the | 11   Q. Is it -- it possible you met him in late |
| 12   basic mechanics of a deposition. Just a few sort of | 12   2020? |
| 13   rules at the outset. I ask that you not speak over me, | 13   A. 2020? No. |
| 14   and I'll do my best not to speak over you as well. And | 14   Q. Okay. I ask that because we are going to be |
| 15   that's because Nathan -- Nate is taking down every word | 15   looking at some video clips of tour appearances that |
| 16   you say on the transcript, so it's important that we | 16   happened throughout the summer of 2021, so I just want |
| 17   have a clean record here. So even if you anticipate a | 17   to be sure if your recollection is correct on that |
| 18   question I'm asking, I ask that you not jump to answer | 18   matter. |
| 19   that question until I have concluded. And if I ask a | 19   A. You just said 2020. You just said late winter |
| 20   question in a way that doesn't make sense or is unclear, | 20   2020. I said late winter 2021. |
| 21   just let me know. I'm happy to rephrase it, just so | 21   Q. I'm aware of that. I just -- the ReAwaken |
| 22   that we're all on the same page. | 22   America Tour began its appearances in spring and summer |
| 23   The other thing. Breaks are okay. If you | 23   of 2021. So that's -- |
| 24   need a break at any time, please let me know. The one | 24   A. That's right. 2021. 2021. You're right. |
| 25   thing I ask is that we don't take a break with a | 25   Q. Okay. And you said you met him in the context |
| Page 7 | Page 9 |

3 (Pages 6 - 9)

| | |
|---|---|
| 1 of a political candidate that you were endorsing? | 1 the next time that you spoke with Mr. Clark after that |
| 2    A.  Yes. | 2 event? |
| 3    Q.  Who was that candidate? | 3    A.  I mean, I would be guessing.  I don't -- I |
| 4    A.  Jackson Lahmeyer. | 4 don't recall the exact time. |
| 5    Q.  And how do you know Mr. Lahmeyer?  Did you | 5    Q.  Was it at that event that you discussed the |
| 6 know him beforehand? | 6 possibility of starting the ReAwaken America Tour? |
| 7    A.  I did not. | 7    A.  I don't know if it was at an event or -- or in |
| 8    Q.  Why did you make the decision to endorse him? | 8 a subsequent conversation, but I know that -- I know we |
| 9    A.  I liked him.  And some friend had come to me | 9 eventually talked holding a, you know, an event in |
| 10 and asked me if I would consider endorsing him. | 10 Tulsa. |
| 11    Q.  Was it based just on a personal affinity that | 11    Q.  Was that your idea? |
| 12 you decided to extend that endorsement. | 12    A.  I don't recall.  I don't recall. |
| 13    A.  No.  I did -- I did some background and, you | 13    Q.  So you don't recall reaching out to Mr. Clark, |
| 14 know, like I normally do when I do political | 14 for example, to propose starting up the ReAwaken America |
| 15 endorsements for people.  So it was a -- I thought he | 15 Tour or something similar? |
| 16 was a good -- you know, the right -- right person. | 16    A.  No, no.  No, I don't.  I really don't.  We may |
| 17    Q.  And this event was being held by Clay Clark? | 17 have talked about it when we were together.  I don't |
| 18 Do I understand that correctly? | 18 recall, no. |
| 19    A.  Yeah.  I believe it was.  It was at -- at his | 19    Q.  Okay.  I guess we'll just hop right in here |
| 20 office complex the first time.  Yeah.  If I remember | 20 with some of the audio visual stuff and see if this |
| 21 right. | 21 might refresh your recollection. |
| 22    Q.  And so you traveled there to his office | 22      We'll designate the audio visual exhibits for |
| 23 complex in Tulsa for purposes of that endorsement? | 23 this proceeding as Exhibit 19.  And I'm going to play |
| 24    A.  Yes. | 24 just an audio clip, which we will designate as clip 1. |
| 25    Q.  And had you met -- had you spoken to him | 25 This is -- we're utilizing a new discovery provider |
| Page 10 | Page 12 |

| | |
|---|---|
| 1 before traveling to this event?  Did you speak on the | 1 here, Veritext, so bear with me.  I'm going to try to -- |
| 2 phone or communicate by other means prior to traveling | 2 hopefully there's no issue getting this exhibit in here. |
| 3 down there? | 3      (Exhibit 19, Composite video, was marked for |
| 4    A.  I don't recall if we ever spoke prior, no.  I | 4 identification.) |
| 5 don't recall if I did. | 5      (A video clip was played as follows:) |
| 6    Q.  Did you know who Mr. Clark was before this | 6      AN INDIVIDUAL:  So, Steve, we called |
| 7 event? | 7 General -- |
| 8    A.  I don't believe I did. | 8      (The playing of the video clip stopped.) |
| 9    Q.  Had you ever listen to his podcast, the | 9 BY MR. KLOEWER: |
| 10 Thrivetime Show? | 10    Q.  Okay.  I'm going to play this for one moment |
| 11    A.  I don't believe I did.  I don't believe I had | 11 and confirm if you can hear it, and then I'm going to |
| 12 by that time.  I mean, I listen to a lot of things, so, | 12 restart the audio recording so that we all have a clear |
| 13 you know, I'm not going to sit here and tell you that I | 13 record here. |
| 14 didn't hear it, but I don't recall that being one of the | 14      (A video clip was played as follows:) |
| 15 ones that I would watch or listen to. | 15      MR. CLARK:  I said, General Flynn, I think God |
| 16    Q.  Had you read any of his, books? | 16 wants us to do a ReOpen America Tour where we kill |
| 17    A.  Prior? | 17 the spirit -- |
| 18    Q.  Correct. | 18      (The playing of the video clip stopped.) |
| 19    A.  I had not. | 19 BY MR. KLOEWER: |
| 20    Q.  So did you know anything about his background | 20    Q.  Can you hear that okay, Mr. Flynn? |
| 21 at all before that first meeting? | 21    A.  I can. |
| 22    A.  I don't believe I did. | 22    Q.  Okay.  I'm going to restart the recording. |
| 23    Q.  Okay.  So you traveled to Tulsa to endorse | 23 And I'll represent this is from an interview that Mr. |
| 24 Mr. Lahmeyer.  How did your relationship with Mr. Clark | 24 Clark conducted with Stephen Strang on December 2nd of |
| 25 develop from that point?  And let me clarify.  When was | 25 2021? |
| Page 11 | Page 13 |

Page 14

```
 1          (A video clip was played as follows:)
 2          MR. CLARK:  So, Steve, we called General
 3     Flynn.  I said, General Flynn, I think God wants us
 4     to do a ReOpen America Tour where we kill the
 5     spirit of fear, where we explain the truth that the
 6     models are false that 2.2 million Americans have
 7     died from COVID, that PCR tests are false, COVID-19
 8     is 100 percent treatable using budesonide,
 9     ivermectin, hydroxychloroquine.  We've exposed
10     election fraud, medical fraud, religious fraud,
11     monetary fraud, media fraud.  And it's all about
12     getting people back to God.  And General Flynn
13     said, I know, but it has to happen through the
14     church.
15          (The playing of the video clip stopped.)
16  BY MR. KLOEWER:
17     Q.  Okay.  Does that refresh your recollection,
18  Mr. Flynn?  Do you remember having that conversation
19  with Mr. Clark?
20     A.  On that show, or what do you -- be specific.
21  I mean we had --
22     Q.  Just the means by which he described the
23  origins of the Tour, that he called you and proposed it,
24  and that -- and that you agreed but suggested that it
25  should happen, as he stated, quote, through the church.
```

Page 15

```
 1     A.  Yeah.  I mean, I know we had conversations
 2  about that.  I don't recall, you know, that specific set
 3  of statements that he made, but I don't disagree with
 4  anything that he said.
 5     Q.  All right.  And do you recall when the first
 6  ReAwaken Tour event was?
 7     A.  It might have been like April, maybe April
 8  2021.  I don't exactly know.  And it wasn't really the
 9  first one or two, maybe; maybe even first three.  They
10  were called, I think, Health and Freedom.  Health and
11  Freedom Tour I think is what we called them.
12     Q.  That's right.  Those were held in Tulsa,
13  Oklahoma; is that correct?
14     A.  The first one, yes.
15     Q.  Okay.  What sort of discussions did you have
16  with Mr. Clark leading up to that, that event?  And by
17  that I mean did you discuss what you wanted the event to
18  look like?
19     A.  No, I don't think so.  I think it was just,
20  you know, get as many people to attend as possible and
21  get the word out on what we felt was going on at the
22  time.
23     Q.  Did you agree with Mr. Clark on the format of
24  having a variety of speakers on different topics, or did
25  you -- did you have discussions as to how the Tour
```

Page 16

```
 1  content would be presented?
 2     A.  I don't believe we had any specific talks like
 3  that.  I think it was just, you know, get the -- you
 4  know, get a good group of people, get a good group of
 5  speakers, and make sure that, you know.  And, of course,
 6  you know, the place, it turned out to be a much larger
 7  event that I think anybody anticipated.  But no, nothing
 8  any -- nothing specific about those issues that you're
 9  talking about.
10     Q.  And who was in charge of planning that, that
11  first event?
12     A.  Clay.
13     Q.  And what role did you have in that event?
14     A.  I don't recall having a very big role at all
15  other than just making sure that I was just going to be
16  there and attend.
17     Q.  Did you provide any input as to which speakers
18  to include in that first event?
19     A.  I don't believe I did, no.  I don't believe I
20  did.  I think later on maybe, but not that -- I think
21  that one was just get the speakers that we could get.
22     Q.  Did you provide any input as to what topics
23  the Tour would cover or the event would cover?
24     A.  No.  I think that the title covered it, you
25  know, Health and Freedom.
```

Page 17

```
 1     Q.  Well, what does that mean to you?  What topics
 2  did you understand the event would cover?  Under the
 3  health topic, what did you think the event would
 4  address?
 5     A.  Well, I know that that first event we had
 6  some -- some doctors who spoke about the COVID-19 and
 7  all the issues surrounding COVID-19.  And we had some --
 8  we definitely had some pastors spoke.  You know, we
 9  had -- we had some legal scholars speak.  Maybe just had
10  a variety of people.
11     Q.  What about the freedom aspect of the event?
12  What topics would you say fall under that umbrella?
13     A.  I think anything ranging from, you know,
14  protection of our Bill of Rights, Constitution.  Just
15  general topics.  The security of the nation.  I mean,
16  you know, just topics like that.  And I think that those
17  were -- those were probably the umbrella, you know, from
18  that side from the folks that spoke to those issues.
19  But a lot of veterans that attended, that I remember
20  meeting a lot of veterans.
21     Q.  Was one of the purposes of that first event to
22  address concerns surrounding the 2020 election results?
23     A.  I -- I don't recall exactly what we -- what
24  was talked about during that particular event, no.  I
25  mean, it could have been.
```

5 (Pages 14 - 17)

1   Q.  But you would agree that the Tour does feature
2   a variety of topics and speakers that address election
3   integrity and security matters, correct?
4       A.  I would say yeah, that's a good -- that's a
5   good characterization.
6       Q.  And is it your understanding that's one of the
7   purposes of the Tour, is to present that sort of
8   information?
9           MS. WIESE:  Object to the form.
10          THE WITNESS:  I'm sorry?
11  BY MR. KLOEWER:
12      Q.  That was Ms. Wiese.  She's counsel for
13  Mr. Clark.
14          I should have clarified at the beginning, and
15  you may recall this from prior depositions, at different
16  times you may hear objections from counsel.  You can
17  still answer the question.  So Ms. Wiese was objecting
18  to the form of my question there.  I'll reask it just so
19  that -- so that we're clear.
20          I believe my question was you would agree that
21  the Tour was intended to address concerns about the
22  election, correct?
23          MS. WIESE:  Same objection.
24          THE WITNESS:  Yeah.  I don't think that's
25  the -- no, I don't think that's the case.  No, I

Page 18

1   don't.  Because you are making it -- you're
2   saying -- you're stating that the tour's purpose is
3   that, and I don't think that's the tour's purposes.
4   BY MR. KLOEWER:
5       Q.  Is it one of the tour's purposes?
6       A.  It's one of the elements that's discussed
7   during the Tour, yeah, among many.  I mean, we talk
8   about child autism, we talk about education, you know.
9   So we talk about a lot of issues and topics.  That's one
10  among many.
11      Q.  And did you discuss all these topics with Mr.
12  Clark prior to hosting this event?
13      A.  No, I don't believe we did.  I mean, I don't
14  believe we had any specific "we're going to talk about
15  these things."  No, no.  I think we just -- it just
16  evolved and we brought in a different array of speakers.
17  I mean, you know, we talk about human trafficking, we
18  talk about a variety of topics in these -- you know, I
19  think the title ReAwaken America is an appropriate title
20  for what it is that we are -- that is being done.  I
21  mean, I talk about people getting out to register to
22  vote, as an example.
23      Q.  What role do you play in deciding what topics
24  a tour will cover?
25      A.  I play kind of a, I think, like a guidance

Page 19

1   counselor sometimes, I think, with Clay.  He and I will
2   talk about different people that, you know, it has
3   evolved toward that, because sometimes -- sometimes we
4   get people that we vet and, you know, they -- they'll
5   talk, they'll speak, and then we won't -- we won't want
6   them back because of some of the things that they'll
7   speak about or we see things that they do in between an
8   event.  But I think from the beginning it was always
9   just about people who -- who sort of fit the kinds of
10  topics that we wanted to talk about.  And we brought
11  on -- we brought on a lot -- ended up bringing on a lot
12  of people who I think talk about an array of topics like
13  I just -- like I previously mentioned here.
14      Q.  All right.  Well, let's break that down a
15  little bit.  You mentioned a few things there I want to
16  follow up on.  You said you talked to Clay about people
17  and you will vet them.  What does the vetting process
18  look like for potential speakers?
19      A.  Listening to a podcast that they're on or
20  talking to them, meeting them.  That's all.  People will
21  come to us and go, Hey, can we -- we would like to speak
22  at your next ReAwaken Tour.  You know, they may be a
23  political person, it might be an attorney, it might be a
24  pastor.  I mean, and sometimes it's just a matter of
25  meeting them.  You know, they will show up to an event

Page 20

1   and we'll meet them and they will say, Hey, can we come
2   on and join you on the next one?  And, you know, and
3   there will be a decision made, we will talk to them.
4   You know, Clay generally takes a look at them too.
5   That's probably about it.
6       Q.  What about the substance of what those
7   speakers present?  Do you -- do you have them do like a
8   test presentation or something of that nature to see
9   what it is exactly they want to say on stage?
10      A.  I don't.
11      Q.  Do you know if Mr. Clark does?
12      A.  I don't know.  You'd have to ask him.
13      Q.  Is there anyone else who is involved in that,
14  that vetting process you described other than you and
15  Mr. Clark?
16      A.  I -- I don't know.  I don't know if there is.
17      Q.  Beyond meeting a person and listening to maybe
18  one of their podcasts, as you mentioned, do you engage
19  in any other background research on potential speakers
20  to sort of look into them from -- through the lens of
21  third parties, for example, beyond just how they present
22  themselves?
23      A.  I mean, not -- not really.  No, no.  These are
24  people that we -- you know, that we meet and we get to
25  know them, and that's about -- you know, that's -- in

Page 21

6 (Pages 18 - 21)

**Page 22**

1 many cases they're very high profile people, you know,
2 highly respected lawyers, highly respected pastors,
3 highly respected doctors, highly respected political
4 activists, highly respected, you know, government
5 officials, I mean.  So --
6      Q.  You mentioned before that there -- you've
7 talked to him about people that maybe were on the Tour
8 and they were removed from the Tour.  Did I understand
9 you correctly when you said that?
10      A.  Yeah.  There's a couple of examples.
11      Q.  Okay.  Who would those individuals be?
12      A.  Oh, there's people that -- like I -- I don't
13 know if I remember the guy's name, but there was an
14 individual who made some pretty serious anti-Semitic
15 remarks, and so he was asked to, very professionally and
16 very politely, that we would not be inviting him back.
17      Q.  And whose decision was that to remove him from
18 the Tour?  Was that your decision?
19      A.  No.  It's Clay's decision.  I mean, he -- you
20 know, we would talk about it, because it's -- you know,
21 these people get upset and they have -- you know.  And
22 we want to be very professional and very polite in how
23 we deal with everybody.  And I think that -- that kind
24 of stuff was handled, was handled I think appropriately.
25 I think Clay did a masterful job of, you know, letting

**Page 23**

1 that person know.
2      Q.  And were those comments that were made on
3 stage at a tour event?
4      A.  I don't recall -- I don't believe they were.
5 I think that they were made in between events and on
6 some type of broadcast.
7      Q.  And how did those comments come to your
8 attention?
9      A.  I think Clay and I spoke about it.  I think
10 he -- I think he had called me up about it.
11      Q.  So is it your understanding that Mr. Clark
12 monitors the conduct of speakers when they're not on
13 stage at the Tour in addition to, obviously, monitoring
14 their conduct on tour?
15      A.  That he monitors them?
16      Q.  Yeah.  I'm just trying to understand.  You
17 know, is he keeping an eye on what folks are doing when
18 they are not on stage, or are those concerns being
19 brought to his attention by other third parties, if you
20 know?
21      A.  You'll have to ask -- you'll have to ask Clay.
22          MS. WIESE:  Objection, foundation.  Excuse me,
23      General Flynn.
24          THE WITNESS:  I'm sorry.
25 BY MR. KLOEWER:

**Page 24**

1      Q.  And as for you, do you take -- make any
2 efforts to sort of keep an eye on tour speakers when
3 they are not on stage or monitor their conduct?
4      A.  I don't.
5      Q.  This individual that you mentioned who was
6 removed for the anti-Semitic comments, was that the only
7 instance when somebody has been removed from the Tour?
8      A.  I don't think that's the only instance, but
9 that's the one that I recall.  One that I recall.
10      Q.  Have there ever been times when somebody
11 wanted to present on stage and was denied that, that
12 request?
13      A.  You know, I don't recall.  I mean, if there
14 are, it would be a -- I think it would be more of a time
15 factor and we just didn't have the time, there was just
16 not enough time for somebody to present, because there
17 are so many people that want to -- that have wanted to
18 join to speak, because it's a great platform and it's a
19 great event.
20      Q.  Is there a sort of test to determine who is --
21 who is qualified to speak.  And I'm asking that in a
22 couple different ways.  Number 1, in terms of sort of
23 ideology or background.  Is there -- are there, for
24 example, people that would not be welcome to speak on
25 the ReAwaken America Tour?

**Page 25**

1      A.  I don't believe -- I don't believe that's the
2 case at all.  We've -- we've opened the door up to --
3 heck, we've opened the door up to darned near anybody
4 that wants to speak.
5      Q.  So, for example, if somebody wanted to put a
6 presentation on stage explaining that the 2020 election
7 results were fair, that it was a free and fair election,
8 there was no misreporting of election results, would
9 that -- would that presentation be allowed on stage?
10      A.  I don't see why not.
11      Q.  What about somebody who wanted to present on
12 stage saying that transgender rights should be embraced
13 more widely and that we should be teaching that sort of
14 material in elementary school?
15      A.  I don't -- I don't think that that would be
16 appropriate.  You know, I don't think that that would be
17 appropriate to be on -- on the ReAwaken Tour.
18          I -- I will tell you that I've had personally,
19 in the events that I have been at, I have had, you know,
20 discussions with -- with many thousands and thousands of
21 people, and I've had, you know, very interesting
22 discussions with people that would fit that -- fit that
23 description, and -- and you know, I've had actually nice
24 open conversations with them.  I mean, we -- we would
25 probably -- you know, I would be interested in

7 (Pages 22 - 25)

**Page 26**

1  hearing -- in hearing what they have to say.  That's for
2  sure.  So I mean, I -- again, we're pretty open, but I
3  would say that that -- I don't have any idea whether or
4  not we have ever had anybody ever ask us that.
5      Q.  Well, what I am getting at is that the Tour
6  presents a variety -- on a variety of topics from a
7  specific point of view.  Would you agree?
8      A.  No, Brad, I wouldn't agree.  It -- what you
9  are asking is what the media presents the Tour to be.
10  That's what you're asking me.  That's what you're --
11  that's what you're implying.  So no, the Tour is wide
12  open.  We have people of all races, colors, creeds.  We
13  have a lot of people that come on this thing.  It's a --
14  it's a wonderful, wonderful event.  We have thousands of
15  people that attend.  I think the smallest audience we
16  have ever had is three or -- three or four thousand
17  people, I mean.  So no, I disagree.
18      Q.  When the Tour began it was -- it sounds like
19  the Tour has expanded to cover more subject matter over
20  time.  We don't need to go into everything that the Tour
21  covers at speakers cover.  I just want to
22  understand what sort of discussions happened around
23  bringing on new speakers or addressing new topics.  Do
24  you have conversations with Mr. Clark about what you
25  would like the Tour to address, or has he raised those

**Page 27**

1  issues with you?  How does that -- how does the sort of
2  subject matter of the Tour -- how is that established?
3      A.  Yeah.  I mean, we talk about that.  We've
4  brought on comedians, we've brought on wonderful
5  professional singers, we've brought on -- I mean, moms
6  who have stood on the stage and talked about how they
7  are getting involved in their school boards.  We have
8  had -- you know, we have a wonderful young lady who
9  comes on and talks about child autism, which is
10  fascinating.  We have -- God, we have all kinds of
11  topics.  I mean, it's a wonderful event.  You know, you
12  are more than welcome to join us up in Michigan in June.
13      Q.  And what is your role at these events?  You
14  are prominently featured on the advertisements,
15  obviously.  Would you agree with the description that
16  you are sort of the headliner of these events?
17      A.  I'm one of them, yes.
18      Q.  Who else would you consider to be a headliner?
19      A.  Mike Lindell.  There have been so many over
20  time.  Roger Stone.  Some of the doctors we have had.
21  Malone I think we've had.  McCullough we've had.  Simone
22  Gold we've had.  Stella Immanuel.  Hannah Faulkner.
23  She's wonderful.  She's a gifted 16-year-old.  She's
24  been on the Tour a couple of times.  Kimberly Fletcher,
25  Moms for America.  So those are a few -- those are a few

**Page 28**

1  there.
2      Q.  And you are aware the Tour has been referred
3  to as Mike Flynn's ReAwaken America Tour?  Have you seen
4  that before?
5      A.  I have not.  No, I don't recall that.  And, I
6  mean, if people -- if people refer to that, to me as
7  that, that's very humbling.  That's very nice.  But I
8  know that I am one of the headliners for it, and I have
9  been to every single one of them, which is a real badge
10  of honor, to be honest with you, that I have been able
11  to make it to every one.
12      Q.  Well, that was my next question.  So it seems
13  like the Tour events don't happen without you.  Is that
14  fair?
15      A.  We do coordinate schedules.  We definitely
16  coordinate schedules, you know.  Yes, we do coordinate
17  schedules.
18      Q.  And when you are at these events, do you -- do
19  you go and watch the speakers yourself?
20      A.  I try to.  I try to watch every single one.
21  But I mean, just based on other things that I am
22  involved in.  Sometimes I'm out in the audience.  But
23  yeah, I try to -- I try to pay attention to as much of
24  the speakers as possible, because I like their message.
25  I learn a lot.

**Page 29**

1      Q.  Let's talk a little bit about the entities
2  that run the Tour.  Can you tell me who is -- who do you
3  understand is the entity that is in charge of running
4  the Tour?
5      A.  Define "entity."
6      Q.  Well, we've -- we've identified a couple in
7  this proceeding as Make Your Life Epic, which goes under
8  the business name of Thrivetime Show.  Does the
9  Thrivetime Show, are they the ones that are putting
10  this -- the Tour on, as you understand it?
11      A.  I don't know.
12          MS. WIESE:  Objection, foundation.
13          THE WITNESS:  Yeah.  I mean -- yeah.  I mean,
14  I don't know.  Honestly, I really don't know.  I
15  mean, I know Thrivetime Show is the podcast that --
16  that I do with Clay.  But I don't really know.
17  BY MR. KLOEWER:
18      Q.  What about Reopen America, LLC?  Do you know
19  what their role is?
20      A.  I don't.
21      Q.  Does the Tour have employees?
22          MS. WIESE:  Objection, foundation.
23          THE WITNESS:  I mean, I don't know.  I don't
24  know.
25  BY MR. KLOEWER:

1    Q.  You are not aware of anybody that --
2    A.  When you say "employees," there's all type of
3  employees.  I mean, you know, contractors,
4  subcontractors.  You know, you've got -- you got to
5  bring in porta-johns, you've got to do air conditioning
6  if you are in a tent.  I mean, you know.
7    Q.  Are you aware of any full-time employees of
8  the Tour?
9    A.  I am not.  I mean, that's not something that's
10  my business.  I don't know.
11    Q.  Do you know if Thrivetime, the Thrivetime Show
12  makes or sells merchandise at the events?
13    A.  I know that there's a lot of --
14    MS. WEISS:  Objection.
15    THE WITNESS:  I'm sorry.  Go ahead.
16    MS. WEISS:  I was objecting on foundation.
17    THE WITNESS:  Yeah.  I mean, there's --
18  there's 15 to 20 vendors at every, you know -- you
19  know, some.  And the vendor -- the vendor audience
20  has grown over time, because, you know, because
21  they -- they have merchandise to sell.  So there's
22  a lot of vendors that attend these.
23  BY MR. KLOEWER:
24    Q.  Do you personally sell merchandise at the
25  events?

Page 30

1    A.  I do.
2    Q.  What type of merchandise do you sell?
3    A.  Books primarily, and apparel.
4    Q.  And are you selling that as you personally or
5  is that through an entity that you run?
6    A.  It's through an entity.
7    Q.  And what is the name of that entity?
8    A.  Resilient Patriot LLC.
9    Q.  And who owns Resilient Patriot?
10    A.  My wife and I.
11    Q.  Anyone else?
12    A.  No.
13    Q.  Do you have any ownership interest in Make
14  Your Life Epic or the Thrivetime Show?
15    A.  I do not.
16    Q.  What about Reopen America, LLC?  Are you a
17  member of that entity?
18    A.  I am not.
19    Q.  Do you have a contract with the Tour for your
20  appearances and your speaking engagements?
21    A.  I do.  I do.  It's been a while.  But yeah, I
22  do.  I believe I do back in -- early on at the beginning
23  of this thing.
24    Q.  And is that a -- are you an employee of the
25  Tour?  Do you consider yourself to be?

Page 31

1    A.  Well, again, define "employee."
2    Q.  Well, do you collect a salary from the Tour,
3  or are you an independent contractor?  What's your
4  relationship?
5    A.  I'm -- probably -- I guess I would be its --
6  considered an independent contractor that -- yeah.  So
7  probably.  That's probably a good definition or a good
8  description.
9    Q.  And who is the entity on the other side of
10  that contract?  I described it as the Tour, but who is
11  your contract with?
12    A.  I don't -- you know, I don't recall.  I don't
13  recall.  I'd have to go look at the contract, which I
14  haven't looked at in probably three years.
15    Q.  And what are the terms of the contract?  Do
16  they include payment terms for you?  Or what is the
17  contract meant to address?
18    A.  Yeah, they do.  They included a -- travel,
19  lodging, security, and initially a speaking fee.
20    Q.  Okay.  And do you collect a speaking fee from
21  every event?
22    A.  From every event?  You mean, these -- these
23  events or every event or what?  Every time I speak?
24    Q.  Yes.
25    A.  Yes what?

Page 32

1    Q.  Are you paid for your appearances on the Tour?
2    A.  I was for -- well, for lodging,
3  transportation, security.  And initially I was taking a
4  speaking fee, but I haven't taken one in a while,
5  probably the better part of a year or more, just because
6  the -- you know, they are -- they are -- the tours are
7  really, at best, break even.
8    Q.  And what is your fee for speaking on the Tour?
9    A.  Initially, it was around -- I think I was
10  taking around 15K.
11    Q.  Per appearance?
12    A.  For the events that I -- that I requested a
13  speaking fee for, for that event.
14    Q.  And that rate adjusted over time?
15    A.  No.  It went down.  It went down to zero.
16    Q.  Well, you said initially, so I'm just trying
17  to understand when did the rate change?
18    A.  You know, about a year ago.  Probably --
19  probably a little over a year ago.
20    Q.  Okay.  So until that time you were collecting
21  $15,000 per appearance?
22    A.  No.  No.  On five.  One five.
23    Q.  Correct, yes.  Yes, one five?  But --
24    A.  You said 50, I said 15, so one, five.
25    Q.  Understood.  So until about a year ago, so mid

Page 33

9 (Pages 30 - 33)

1  of 2023, you were collecting $15,000 per appearance on
2  the Tour.  Am I understanding that correctly?
3      A.  For -- for -- yes.  So about -- I'd say it
4  might even be longer.  I'd have to go back and look at
5  when I stopped asking for speaking fee.  But it's been
6  well over a year.
7      Q.  Who else collects a speaking fee on the Tour?
8      A.  No idea.  You'd have to ask Clay.
9      Q.  And have you ever discussed with him which
10  speakers are compensated, or should be?
11      A.  No.  I haven't really.  I know when people are
12  asking for too much.  I mean, when somebody -- when we
13  try to get, you know, certain speakers and they're
14  asking for an ungodly amount of money, and we just
15  can't -- you know, I think that the -- we back out.  You
16  know, he'll back out of that because it's just too
17  ridiculous.
18      Q.  What would you describe as an ungodly amount
19  of money?
20      A.  I think people that come in and ask -- I think
21  there has been one or two that have asked for 50 or
22  100K.
23      Q.  And that's -- that's too much.  Has the Tour
24  ever paid that much for any speaker?
25      A.  I have no idea.  And if he did, I probably

Page 34

1      MS. WEISS:  Object to the form.
2      THE WITNESS:  Yeah.  I'm not saying -- I mean,
3  you're asking financial problems.  I don't know of
4  financial problems.  I just know that they do these
5  things, you know, it comes at a cost.  And I
6  personally felt that I didn't need to be paid, I
7  didn't need to be compensated for my speaking fees
8  for that, for this event, for these events.
9      MR. KLOEWER:  Let's take a look at what's been
10  previously marked as Exhibit 15.
11      (Exhibit 15, Reopen America LLC profit and
12  loss document, was previously for identification.)
13  BY MR. KLOEWER:
14      Q.  Can you see this document, Mr. Flynn?
15      A.  Reopen America, titled Reopen America LLC
16  Profit and Loss?
17      Q.  Yes, for January through December of 2022.  Do
18  you see that?
19      A.  I do see it, yes.
20      Q.  All right.  Sorry.  I'll try to get this in a
21  format where you can view it here.
22      So this was produced by Reopen America LLC,
23  and they indicate that in the first year the Tour was
24  operating --
25      Oh, sorry.  This is -- sorry, excuse me.

Page 36

1  would have, you know, told him he was dumb.
2      Q.  Is your contract that you described, is that
3  still in force, as you understand it?
4      A.  I believe so.
5      Q.  But you -- you have stopped requesting
6  compensation for your appearances?
7      A.  For the speaking part, yeah, but not for
8  travel, lodging, and security.
9      Q.  So has Mr. Clark told you that that the Tour
10  couldn't afford to pay you anymore?
11      A.  I just know that in the conversations we have
12  had that these are -- you know, that these have been --
13  these have been difficult, these have been financially
14  difficult for him.
15      Q.  How frequently are those conversations
16  occurring?
17      A.  Not -- not that often.  Not that often.  I
18  mean, you know, one specific example was the event we
19  had in Las Vegas that -- that just absolutely gouged the
20  Tour, you know.  And you know, there's probably some
21  legal term for that, but --
22      Q.  How long would you say you have been aware of
23  financial problems that the Tour has been having?  When
24  did this issue first arise?
25      A.  I --

Page 35

1      Let's take a look at what's been previously
2  marked as Exhibit 13.
3      (Exhibit 13, Reopen America LLC Profit and
4  Loss for 2021, was previously for identification.)
5  BY MR. KLOEWER:
6      Q.  And my apologies.  This is for the year 2021.
7      Down maybe about 10 lines down where my mouse
8  is hovering, you see this line that says "speaker fees"?
9      A.  Yeah.
10      Q.  And on the right-hand column we see $494,381.
11      A.  Okay.
12      Q.  If I understand your testimony correctly, you
13  only ever collected $15,000 per event, correct?
14      A.  No, that's not correct.
15      Q.  Okay.  What's incorrect about that?
16      A.  I also collected travel, transport -- travel,
17  lodging, and security.
18      Q.  Understood.  As far as your compensation
19  outside of those -- that consideration, you were only
20  ever paid $15,000 per event on top of those other items.
21  Is that fair?
22      A.  Up to a certain -- up to a certain event,
23  yeah.  And then I stopped taking the speaker fees.
24      Q.  Okay.  And in 2021, I don't have the exact
25  number in front of me, but is it fair to say in general,

Page 37

10 (Pages 34 - 37)

1 the Tour does about one appearance per month, or was at
2 that time?
3     A. Yeah. We were -- yeah, about one a month.
4 Yeah, yeah, during that time.
5     Q. All right. So if we just estimate that you
6 started in April, call it eight events for the year,
7 that would be $120,000 that you personally collected in
8 speaker fees for 2021. Is that a fair estimate?
9     A. I'm not a math major, so I'll go with your
10 math. I mean, I guess. I mean --
11    Q. All right. So we can assume from these
12 numbers then that other speakers, that upwards of
13 $350,000 was paid to other speakers on the Tour that
14 year. Does that strike you as a fair assumption?
15    A. I mean, that's your assumption. Yeah, I
16 guess, that's -- if you assume that. Sure.
17    Q. And then if we scroll down here, we see
18 salaries and wages where my mouse is hovering. It
19 indicates $244,011. I just want to confirm I understood
20 your prior testimony correctly. You are not aware of
21 anyone who is a full-time employee of the Tour; is that
22 correct?
23        MS. WEISS: Object to the form.
24        And, Brad, I'm going to -- and foundation.
25 This isn't a document that he is familiar with. So
Page 38

1     I understand your testimony to be that your
2 fee per event is 15, on five, $15,000 --
3     A. Yeah.
4     Q. -- so we're clear on the record about that.
5     A. Yeah.
6     Q. But your rate didn't increase in 2022, did it?
7     A. No, no. It actually decreased. It probably
8 decreased in that time, starting toward the end of the
9 year.
10    Q. Was it your understanding that the Tour was
11 losing money by the end of 2022?
12    A. I don't know. I have -- it's not something
13 that I was -- what you are showing me here is just not
14 something that I'm familiar with.
15    Q. And we'll take a quick look at Exhibit 17.
16 This is the same document from 2023.
17        (Exhibit 17, Reopen America LLC Profit and
18        Loss for 2023, was previously for identification.)
19 BY MR. KLOEWER:
20    Q. Here in speaker fees we see $779,490. Do you
21 see what I am indicating there?
22    A. I can, yeah.
23    Q. Were you collecting a fee at all during 2023,
24 or had you stopped?
25    A. 2023? I don't think so. I don't think so. I
Page 40

1 I object to this line of questioning.
2        MR. KLOEWER: Understood. I'm just trying to
3 understand what his familiarity is with the
4 workings of the Tour.
5        THE WITNESS: It's zero, Brad. I have zero
6 familiarity with what you are showing me and what
7 you are asking. I mean, I really do. That's
8 none -- that's none of my business.
9 BY MR. KLOEWER:
10    Q. We'll skip ahead to what's been previously
11 marked as Exhibit 15.
12        This is what we briefly looked at a moment
13 ago. Same document from 2022. In this instance we see
14 speaker fees here have gone up substantially from the
15 year prior. This indicates $1,744,751 in speaker fees
16 issued in 2022. I just want to confirm that the same is
17 true as far as your compensation, that you were
18 collecting $15,000 per event throughout the year of
19 2022. Correct?
20    A. For a period. I don't recall exactly when. I
21 could go back and find -- probably find that out. But I
22 don't recall exactly when I stopped taking one five.
23 I'm hearing you say 50, and it wasn't 50, it was 15.
24    Q. Sorry. I've got a bit of a cold. If I'm
25 misspeaking, I apologize.
Page 39

1 think I had stopped taking the speaker fees. Again, I
2 always took -- I always requested travel,
3 transportation, security so I, you know, I wasn't
4 completely out of pocket.
5     Q. Do you know how the Tour generates revenue?
6     A. I have no idea.
7     Q. Well, they sell tickets, right?
8     A. Yeah. I mean, right.
9     Q. Do you know about how many tickets are sold
10 per event?
11    A. I don't have -- I mean, I could guess, but I
12 would be guessing. So, you know, whatever -- they're
13 usually sold out. They average about I would say
14 anywhere from 2,500 to I think we have had highs of like
15 9,000. So --
16    Q. And how much do tickets cost?
17    A. I don't know.
18    Q. You described yourself before as Mr. Clark's
19 guidance counselor. It sounds like you haven't provided
20 any guidance on the financial aspects of the Tour. Is
21 that fair?
22        MS. WEISS: Object to the form.
23        THE WITNESS: Yeah. I mean that's fair. You
24 know, he's -- he's a smart guy.
25 BY MR. KLOEWER:
Page 41

11 (Pages 38 - 41)

1    Q.  What topics would you say you're fairly
2  described as his guidance counselor on?
3    A.  I mean, he's -- he's about the age of my sons,
4  so I talk to him about life issues, I talk to him about
5  family issues, I talk to him about children, I talk to
6  him about a lot of things.  You know, we talk about
7  the -- we talk about the, you know, the Tour itself and,
8  you know, how hard it is, how exhausting it is.  And so
9  we -- you know, he's able to share, you know, things
10  with me that -- like that.  And because it's -- you
11  know, he doesn't have a lot of people -- you know, he's
12  like anybody, you know, you find -- you find people that
13  you can talk to.  And he and I have a good relationship
14  like that.
15    Q.  Would you say Mr. Clark could call you to
16  discuss any matter that he has concerns about?
17    A.  Not necessarily, no, no.
18    Q.  Are there topics he couldn't discuss with you?
19       MS. WEISS:  Object to the form.  Foundation.
20       THE WITNESS:  Yeah.  I mean, yeah, a lot of
21  topics.
22  BY MR. KLOEWER:
23    Q.  Like what?
24    A.  You tell me.
25       MS. WEISS:  Same objection.

Page 42

1  BY MR. KLOEWER:
2    Q.  I just want to understand if Mr. Clark had a
3  question about a matter and he reached out to you --
4       THE VIDEOGRAPHER:  I'm sorry.
5    Q.  -- he has the ability to reach out to you if
6  he has questions, right?
7       THE VIDEOGRAPHER:  He dropped.
8       MR. KLOEWER:  Okay.
9       THE VIDEOGRAPHER:  He was frozen there for a
10  while.  He's just going to come on and --
11       Would you like to go off the record?  He came
12  back on pretty quickly.  What would you like.
13       MR. CAIN:  Go off the record.
14       MR. KLOEWER:  We'll go off the record for a
15  moment while he comes back.
16       THE VIDEOGRAPHER:  Please stand by.  This time
17  now is 10:55 a.m., and we are going off the record.
18  And this is the end of Media Unit 1.
19       (A recess was had.)
20       THE VIDEOGRAPHER:  The time now is 11:00 a.m.,
21  and we are back on the record and this is the
22  beginning of Media Unit 2.  You may proceed.
23       MR. KLOEWER:  All right.  We are back on the
24  record.  I just want to confirm, do we have Melissa
25  and Jason back in the room at least?

Page 43

1       MR. GREAVES:  Yes.
2       MR. KLOEWER:  Okay.
3       MR. GREAVES:  I'm here.  Is Melissa here?  I
4  may give her another minute here.
5       MR. KLOEWER:  Melissa, we are just waiting for
6  you here.  Can you hear me?
7       Okay.  Let's go back off the record until
8  Melissa hops back on.
9       THE VIDEOGRAPHER:  Okay.  Please stand by.
10  The time now is 11:01 -- 11:02 a.m., and we are
11  going off the record.
12       (A recess was had.)
13       THE VIDEOGRAPHER:  The time now is 11:03 a.m.,
14  and we are back on the record.  And you may
15  proceed.
16  BY MR. KLOEWER:
17    Q.  All right, Mr. Flynn.  Before we went off the
18  record we were discussing the means by which the Tour
19  generates revenue.  We briefly discussed ticket sales.
20       I want to talk a little bit about the
21  merchandising that the Tour does.  You said you sell
22  merchandise through Resilient Patriot at the Tour events
23  yourself.  Is that correct?
24    A.  That's correct.
25    Q.  And so that would be additional income that

Page 44

1  you collect by virtue of your tour appearances as well,
2  correct?
3    A.  That's correct.
4    Q.  Do you have an understanding of how vendors
5  are --
6       THE VIDEOGRAPHER:  He dropped, Brad.
7       MR. KLOEWER:  Well, this is precisely why we
8  requested an in-person deposition.  But --
9       MR. GREAVES:  I have never had this problem
10  with remotes.  We do them regularly.  This is the
11  first time I've ever had this happen.
12       THE VIDEOGRAPHER:  I'll go off the record
13  quickly.  Mr. Kloewer, should we go off the record?
14       MR. KLOEWER:  Yes, please.
15       MR. CAIN:  Go off, Dawn.
16       THE VIDEOGRAPHER:  Okay.  The time now is
17  11:04 a.m., and we are off the record.
18       (A recess was had.)
19       THE VIDEOGRAPHER:  The time now is 11:17, and
20  we are on the record.  You may proceed.
21       MR. KLOEWER:  Okay.  We're back on the record
22  now.
23       We have had to go off the record several times
24  already arising from technical difficulties.
25  Mr. Flynn's Internet connection keeps glitching.

Page 45

12 (Pages 42 - 45)

**Page 46**

1   He left for a while and we tried to determine what
2   the cause of these problems are.  He appears to
3   have moved to a new location and we are going to
4   try again.  But we have been having consistent
5   technical difficulties with the remote deposition
6   so far.
7   BY MR. KLOEWER:
8      Q.  Mr. Flynn, before we had to go off the record
9   again, we were talking about the means by which the Tour
10  generates revenue, and we were talking a bit about
11  merchandise sales.  You sell merchandise at the Tour
12  through Resilient Patriot, as we have established.  Do
13  you have a booth at the Tour?  How exactly do you sell
14  that merchandise?
15     A.  Yes, there's a booth.
16     Q.  Okay.
17     A.  Or a table.
18     Q.  And what type of merchandise do you sell?  I
19  believe you indicate books.  Anything else?
20     A.  Books and apparel.
21     Q.  Okay.  And do you have a contract with the
22  Tour to have that booth present at events?  What does
23  that relationship look like?
24     A.  I have a contract with -- with the Tour.
25     Q.  Is that separate and distinct from the

**Page 47**

1   contract we discussed before regarding your compensation
2   and your incidentals for security?  I'm speaking
3   specifically with respect to the merchandise, the vendor
4   booth that you have.
5      A.  I think it's part of the contract that I have
6   with them.
7      Q.  Okay.  Are you certain that it's part of it,
8   or you just believe that to be the case?
9      A.  I just believe that to be the case.  Like I
10  said, I don't think I have looked at the contract in a
11  couple years.
12     Q.  What role do you play, if any, in working to
13  get vendors to come to the Tour to sell merchandise?
14     A.  I don't really play a role.
15     Q.  Do you know if the other vendors have
16  contracts with the Tour to set up a table and sell their
17  merchandise?
18     A.  I don't.
19     Q.  And how much revenue have your vendor sales
20  through Resilient Patriot generated during the time of
21  the Tour?
22     A.  I can't -- I really don't know.
23     Q.  Can you estimate on average about how much
24  merchandise Resilient Patriot sells at any given event?
25     A.  It's up and down.  I would being guessing if

**Page 48**

1   I -- if I gave you a number.
2      Q.  Do you recall what the most you ever made at
3   any event through merchandise sales was?
4      A.  A couple of thousand dollars.
5      Q.  And forgive me if I asked this before, but
6   when you are paid as a speaker on the Tour, those
7   payments also process through Resilient Patriot; is that
8   correct?
9      A.  Yes, yes.
10     Q.  Do you ever promote any of the other endeavors
11  that you're involved with on the Tour?  And, for
12  example, The America Project.  Have you ever promoted
13  The America Project at any tour events?
14     A.  I may have.
15     Q.  Do you direct people to The America Project
16  website?
17     A.  I may have.
18     Q.  Requested donations to The America Project?
19     A.  I may have.  You know, I don't recall.
20     Q.  Are there any other entities or projects that
21  you're involved with that you have promoted at tour
22  events?
23     A.  I'd say that I do -- I promote a lot of the
24  people that are there.  I mean, I always, you know, help
25  out some of the -- I will go do stuff to talk to

**Page 49**

1   other vendors.  So, I mean, I try to do a lot of things
2   with the folks that are there to help them.  These are
3   people that are all struggling to make a buck.
4      Q.  But as for your own personal endeavors, are
5   there any others beyond The America Project that you
6   have promoted at tour events?
7      A.  Sure.  Yes.
8      Q.  And what would those be?
9      A.  I mean, like I've said, I've promoted the
10  childhood autism, Moms for America are two.  I've
11  promoted people to go watch some of the podcasts that
12  some of these people have.  So, I mean, I would say a
13  range of the people that attend.
14     Q.  Do you agree that the Tour is an opportunity
15  for cross-marketing, meaning to promote these other
16  third parties and individuals?
17     A.  I'm not really sure what that means.
18     Q.  Well, one of the benefits of the Tour is being
19  able to provide a platform for these other efforts, like
20  the autism one you described or Moms for America, for
21  example.  Correct?
22     A.  Sure.  Yes.
23     Q.  Does the Tour ever engage in donations or
24  collecting donations for individuals or causes at tour
25  events?

1    A.  Yes.
2    Q.  What are some of those causes?
3    A.  Legal fees.  Primarily I think legal fees,
4  people that are -- people that are being, you know --
5  that are involved in some type of legal action and legal
6  Defense Fund fees type things.
7    Q.  Does that include the legal Defense Fund that
8  arises from this particular case?
9       MS. WEISS:  Object to the form.
10      THE WITNESS:  Yeah, I don't -- I don't -- I
11  have no idea.
12  BY MR. KLOEWER:
13   Q.  Have you ever encouraged people to donate
14  funds to support Clay Clark in this particular lawsuit?
15   A.  I don't believe I have.
16   Q.  Let's take a look at what has been previously
17  marked as Exhibit 10, a clip.  Let's see here.  6.  This
18  is from August 23rd, last year.  This occurred in Las
19  Vegas.  Let me share my screen here.
20      (A video clip was played as follows:)
21      MR. FLYNN:  Before I make mention of one
22      thing, I want to bring up.  There's a donation
23      page.  Clay will never do this.  I'm going to do
24      it.  And he didn't know I'm going to do it.  But on
25      that TimeToFreeAmerica, if you could bring up the
Page 50

1    Q.  How often do you promote that fundraiser?
2    A.  I don't -- I don't recall.  Actually, I didn't
3  even recall that, doing that.
4    Q.  Okay.  Well, that fundraiser has been up for a
5  while, since at least early 2022.  Is it your testimony
6  that's the only time you have ever directed donations to
7  that fund?
8    A.  You know, I don't recall.  I mean, that's --
9  that's -- you know, is there a problem with directing
10  people to help somebody out who is being sued?
11   Q.  Well, I do have some questions about that
12  fundraiser.  We just looked at the image there and it
13  says, "ReAwaken America versus Dominion Lawsuit."
14      Did you see that on the page?
15   A.  I didn't, no.
16   Q.  Let's take a look here.  I'll show you again.
17      (A video clip was played as follows:)
18      MR. FLYNN:  Before I make mention of one
19      thing, I want to bring up.  There's a donation
20      page.  Clay will never do this.  I'm going to do
21      it.  And he didn't know I'm going to do it.  But on
22      that TimeToFreeAmerica, if you can bring up the
23      donation button.  Right there.  Okay?  So -- so
24      it's off of the -- off of the main page,
25      TimeToFree- --
Page 52

1  donation button.  Right there.  Okay.
2       So -- so it's off of the -- off of the main
3  page, TimeToFreeAmerica, and I'll tell
4  you, to do this -- you know, and I have been up
5  here whining for the last couple of days about all
6  the nonsense that we've gone through for this
7  particular event, but all these events.  But if you
8  just want to, you know, if you just want to help
9  out, five bucks, ten bucks, whatever it is, that --
10      that donation button goes to helping these events.
11      We're going to continue to do these -- we are
12      going to try to do -- in fact, we have probably
13      three more for sure, and we are looking at another
14      10.  Okay?  And we do this through the good graces
15      of you, you know, the people that do help us out.
16      And there's -- there's a whole bunch of people that
17      help us out.  But if you want to -- if you want to
18      donate, it doesn't matter what you donate.  Okay?
19      And so that's the -- that's the donate page.  And
20      it helps.  Every little bit helps.
21      (The playing of the video clip stopped.)
22  BY MR. KLOEWER:
23   Q.  Okay.  So you actually have directed donations
24  to the fundraiser for this lawsuit, haven't you?
25   A.  Okay.
Page 51

1       (The playing of the video clip stopped.)
2  BY MR. KLOEWER:
3    Q.  Right there, Mr. Flynn.  You see that?  The
4  fundraiser is designated as ReAwaken America versus
5  Dominion Lawsuit Defense Fund.
6       Do you see that?
7    A.  I can barely see it, but, yeah, I understand
8  what you're saying.
9    Q.  Okay.  Do you have an understanding of why
10  this lawsuit, this fundraiser describes itself as being
11  ReAwaken America versus Dominion?
12   A.  I don't.
13   Q.  I'm going to skip ahead here to the 40-second
14  mark.  And you state here that the donation button goes
15  to helping these events.  Let's listen to that again
16  real quick.
17      And here we can see more clearly the image of
18  the fundraiser on screen.  And beneath here where my
19  mouse is hovering, it indicates that Eric Coomer, the
20  former director of strategy and security for Dominion
21  Voting Systems, has filed a lawsuit against Clay Clark
22  and the ReAwaken America Tour.
23      Let's play this from the 38-second mark.
24      (A video clip was played as follows:)
25      MR. FLYNN:  That donation button goes to
Page 53

14 (Pages 50 - 53)

1    helping these events.  And we're going to continue
2    to do these -- we're going to try to do -- in fact,
3    we have probably three more for sure, and we're
4    looking at another 10.  Okay?  And we do this
5    through the good graces --
6         (The playing of the video clip stopped.)
7    BY MR. KLOEWER:
8         Q.  How does donating money to this legal Defense
9    Fund help put on ReAwaken America Tour events?
10        A.  I don't know.
11        MS. WEISS:  Objection, foundation.
12        THE WITNESS:  Yeah.  And made -- it's the
13        statement I made.  You know, maybe it's -- maybe
14        it -- maybe it's not too -- as specific as I could
15        have been, but it's what I said.
16   BY MR. KLOEWER:
17        Q.  You don't have any basis for having told
18   people that?
19        A.  No.  Just asking people to donate to a legal
20   Defense Fund.
21        Q.  Do you think it's important to be careful with
22   your language, discussing things like that?
23        A.  Yeah.  It's always important to be careful
24   with your language.  Sure.
25        Q.  Okay.  Now, we just discussed, that fundraiser

Page 54

1    is being designated as being against Dominion.  Who do
2    you understand Dominion to be in that context?
3         A.  In the context of what?
4         Q.  ReAwaken America versus Dominion lawsuit.
5    What is "Dominion" referring to there?
6         MS. WEISS:  Objection, foundation.
7         And my microphone was on mute earlier, and I
8         didn't realize it.  So I can't remember the
9         question now that I had objected to, but it was the
10        line of questioning about the statements about the
11        elections -- or I'm sorry, the donation button.
12        THE WITNESS:  Yeah.
13   BY MR. KLOEWER:
14        Q.  Mr. Flynn, who do you understand Dominion to
15   be?
16        A.  I think it's a voting system that we use in
17   this country.
18        Q.  Okay.  And it's your belief that Dominion
19   Voting Systems rigged the 2020 presidential election.
20   Is that correct?
21        A.  I don't have any -- any comment on that.
22        Q.  Well, do you believe that Dominion Voting
23   Systems rigged the 2020 elections?  It's a "yes" or "no"
24   question.
25        MR. GREAVES:  Objection, foundation.

Page 55

1         THE WITNESS:  I don't really know.  I mean, I
2         don't really know.  I know that there's a lot of --
3         there's a lot being contested.  I know that.  But I
4         don't know that to be true or not.
5    BY MR. KLOEWER:
6         Q.  Have you seen credible evidence that Dominion
7    Voting Systems rigged the 2020 presidential election?
8         A.  No, I don't really know.
9         Q.  You don't know if you've seen credible
10   evidence that Dominion Voting --
11        A.  Well --
12        Q.  -- Systems rigged the presidential --
13        MR. GREAVES:  Objection, asked and answered.
14        THE WITNESS:  Yeah.  I mean, I -- you know.
15        Right.  I don't know.  No.  Because you are saying
16        "credible."  I mean, evidence?  Yeah.  I have seen
17        a lot of evidence.  I mean, you know, a lot of
18        stuff, I've read a lot of reports.  You know,
19        credibility is in the eye of the legal system to
20        determine.
21   BY MR. KLOEWER:
22        Q.  You are not comfortable under oath today
23   stating, identifying any evidence you would describe as
24   credible --
25        MR. GREAVES:  I'm going to object.  Right

Page 56

1    now --
2         THE WITNESS:  Yeah, come on.
3         MS. WEISS:  Hold on, hold on, General Flynn.
4         I'm going to object and I'm going to advise my
5         client at this point not to answer these questions
6         based on his Fifth Amendment rights under the U.S.
7         Constitution.  We are getting into territory here
8         that there are active investigations going on.  So
9         this line of questioning we're not going to go any
10        further on, and General Flynn is going to assert
11        his Fifth Amendment rights.
12        MR. KLOEWER:  Well, I'm going to keep the
13        asking questions.  I'm asking questions of opinion
14        based on his personal knowledge of information that
15        he has seen.  I don't think invocation of the Fifth
16        Amendment when it's not being asserted with a good
17        faith belief that the response would furnish a link
18        in a change of evidence needed to prove a crime is
19        proper.  So --
20        MR. GREAVES:  Mr. Kloewer, that's a
21        misstatement of the law.  But you can ask your
22        question and my client will assert his rights if he
23        needs to.  Any argument about that is going to have
24        to be taken off the record and in court.
25        MR. KLOEWER:  Well, I was just reading from

Page 57

15 (Pages 54 - 57)

1   case law from Florida when I made that statement.
2   We've discussed in this various communications
3   prior to this deposition regarding improper
4   invocation of the Fifth Amendment.  I can give you
5   some case cites, if you would like.  But when I'm
6   asking questions of opinion about what occurred in
7   the 2020 election, I do not believe that's a proper
8   invocation of the Fifth Amendment and it is
9   unnecessarily obstructing the conduct of this -- or
10  this deposition.
11      So I'm going to keep asking the questions, and
12  we'll proceed with this line of questioning.
13  BY MR. KLOEWER:
14      Q.  What evidence have you --
15      Let's discuss this, Mr. Flynn, because you
16  seem to have a concern about the term "credible."  How
17  would you -- what's the difference between credible
18  evidence and evidence that's not credible, in your
19  opinion?  What makes something credible?
20      A.  You know, something --
21          MR. GREAVES:  Advise my client to exercise his
22  Fifth Amendment rights.
23          THE WITNESS:  Yeah.  I mean, yeah.  Exactly.
24  I don't really understand what you're asking me.
25  BY MR. KLOEWER:

Page 58

1      Q.  When you are trying to determine credibility
2   of a piece of evidence, what factors do you look to?
3          MR. GREAVES:  Objection.  My client is here as
4   a fact witness, not as an expert witness.  And,
5   moreover, I'm advising him to assert his Fifth
6   Amendment rights on this line of questioning.  It's
7   also irrelevant, it's overly burdensome.  Need I go
8   on?
9          MR. KLOEWER:  No.  And I will reiterate my
10  position that this is a violation of Rule 30,
11  obstructing the deposition improperly through
12  improper invocation of a privilege that does not
13  apply.
14  BY MR. KLOEWER:
15      Q.  Have you seen any evidence that you would
16  consider credible, Mr. Flynn, that Eric Coomer played a
17  role in rigging the 2020 presidential election?  Yes or
18  no.
19      A.  I have not, no.
20      Q.  Do you believe that Eric Coomer rigged the
21  2020 presidential election?
22          MR. GREAVES:  Objection, foundation.
23          THE WITNESS:  No.  Yeah.  I have no idea.
24  BY MR. KLOEWER:
25      Q.  Have you seen any evidence that makes you

Page 60

1      Q.  Well, you are --
2      A.  I'm not a lawyer, Brad.  Come on.  I'm not a
3   lawyer, so you know, I'm going to -- you know, if you
4   want to go down this, then I will exercise my Fifth
5   Amendment right.
6      Q.  You're a top ranking military --
7      A.  I understand who I am, Brad.  Don't -- don't
8   patronize me.  Okay?  Don't patronize me.  And I
9   understand.  You're now -- you're now going into a
10  territory where you're saying I'm a top ranking guy, and
11  so then use my proper title.  How about that?
12      Q.  That's fair.  General Flynn, you have perhaps
13  more experience than -- well, certainly more experience
14  than anyone in this conversation with respect to
15  determining when intelligence is credible or when it is
16  not.
17      A.  Uh-huh (Affirmative response).
18      Q.  Your career has dealt with those issues in
19  many instances.  So surely you have an opinion about
20  when you can determine a piece of evidence is credible
21  or when it is not.  So --
22          MR. GREAVES:  Objection.  Are you finished
23  with your question?
24          MR. KLOEWER:  No.  I haven't asked it yet.
25  BY MR. KLOEWER:

Page 59

1   suspect that he rigged the 2020 presidential election?
2      A.  No idea.
3      Q.  Have you seen any credible evidence that Eric
4   Coomer manipulated his position with Dominion Voting
5   Systems to alter the election results in 2020?
6      A.  No idea if I have seen anything like that.
7      Q.  Who do you understand Eric Coomer to be,
8   General Flynn?
9      A.  I don't really know him.
10      Q.  Well, that's not exactly my question.  My
11  question is who do you understand him to be?
12      A.  I don't know.
13      Q.  You're familiar with the allegations against
14  Eric Coomer, aren't you?
15      A.  I couldn't sit here and write them down.  If
16  you asked me to write them down, I'm not.
17      Q.  You know who Joe Oltmann is, correct?
18      A.  I -- I do know who he is, yeah.  Yeah, I do
19  know.
20      Q.  Who is Joe Oltmann?
21      A.  I really don't know him well.  I just -- I
22  have -- it's been a long time.  I believe I have met
23  him.  But it's been some time.
24      Q.  When did you first meet Mr. Oltmann?
25      A.  I don't recall.

Page 61

16 (Pages 58 - 61)

1    Q.  Who introduced you?
2    A.  I don't recall.  Don't know.
3    Q.  Did you meet him in 2020?
4    A.  I don't remember if I did.
5    Q.  You were familiar with the allegations about
6  Eric Coomer as early as November of 2020, weren't you?
7    A.  I don't recall.
8    Q.  We'll get into that in a bit.
9       I tell you what.  You've stated before that
10  you have watched every presentation on the ReAwaken
11  America Tour, correct?
12     MR. GREAVES:  Objection, mischaracterization
13    of testimony.
14  BY MR. KLOEWER:
15    Q.  What have I missed?  What did I get wrong
16  there, General Flynn?
17    A.  I try to watch as many as possible, but
18  obviously there's two, two to three days of events.  So
19  I try to watch as many as possible.
20    Q.  You have seen at least one of Mr. Oltmann's
21  presentations.  He was on the Tour many times.  I
22  presume you have seen him present on stage before,
23  correct?
24    A.  I don't recall if I ever -- if I ever -- I
25  mean, if he -- I know he has been on there, but it's
Page 62

1  been a while.  But I don't recall.
2    Q.  Why is Mr. Oltmann a speaker on the Tour, as
3  you understand it?
4    A.  I don't know.
5    Q.  What does he bring to the table?
6    A.  No idea.
7    Q.  What topic is he there to discuss?
8    A.  No idea.
9    Q.  You don't have any idea what Joe Oltmann
10  discusses on the ReAwaken America Tour?
11    A.  If he walked in the door right here in this
12  office I'm in, I wouldn't even recognize him.
13    Q.  You say this even having co-starred in the
14  film The Deep Rig with Mr. Oltmann?
15    A.  Okay.
16    Q.  You are telling me under oath you wouldn't
17  recognize Joe Oltmann if he walked in the door?
18    A.  I really haven't seen him in a while.  I mean,
19  I don't -- the last time I saw him I was in an audience
20  of about 1,000 people in Missouri about six months ago,
21  eight months ago, and that was the last time I saw him.
22  I don't know.  I really don't.  He's not -- he's not
23  somebody that I am -- I know who he is.  I'm not
24  familiar with him, no.
25    Q.  You're familiar with his claims that Eric
Page 63

1  Coomer, our client, partook in an Antifa conference call
2  and claimed on that call to have rigged the election.
3  You are familiar with that, aren't you?
4    A.  I am not, actually.  I don't recall if I am.
5    Q.  So you're telling me you co-starred in The
6  Deep Rig and you didn't even watch it?
7    A.  I don't know if I watched it, no.  I can't sit
8  here and tell you that I watched it, no.
9    Q.  Let's take a look at some of the things that
10  Mr. Oltmann has said on stage with the ReAwaken America
11  Tour.  I'm going to show you -- so we previously
12  designated the audio and video clips from this
13  proceeding as Exhibit 19.  We'll designate this as Clip
14  2.
15       This was Oltmann's first appearance on the
16  ReAwaken America Tour at an event on July 18th, 2021, in
17  Anaheim, California.
18       (A video clip was played as follows:)
19       AN INDIVIDUAL:  Ladies and gentlemen, one more
20  time let's hear it for Pastor Todd Coconato.  Yeah.
21  All right, now.
22       AN INDIVIDUAL:  -- anybody with a massive
23  beard with a little --
24       (The playing of the video clip stopped.)
25       MR. KLOEWER:  Okay.  For the record, I'm
Page 64

1  skipping forward in this clip to the one minute,
2  45-second mark.
3       (A video clip was played as follows:)
4       MR. OLTMANN:  -- nominee.  I was a finalist in
5  2020.  They told me Ernst & Young, entrepreneur of
6  the year --
7       (The playing of the video clip stopped.)
8  BY MR. KLOEWER:
9    Q.  Sorry.  I'm rewinding here.  Let me come back
10  to the one-minute 40-second mark.  This is Mr. Oltmann
11  describing his credentials on stage.  And we can see
12  your image emblazoned on the backdrop here as well,
13  General Flynn.  Let's proceed here with the clip.
14       (A video clip was played as follows:)
15       MR. OLTMANN:  -- tech company.  I was a
16  two-time Ernst & Young entrepreneur of the year
17  nominee.  I was a finalist in 2020.  They told me
18  if you walk away from politics you will win.
19       If anybody knows about the tech world, I built
20  my company on a cocktail napkin over nine years.
21  We represent some of the biggest clients across the
22  country.
23       And I said, I can't do that.
24       If I'm being truthful, I could have walked
25  away and gone and drank a Mai Tai on a beach and
Page 65

1    just lived out the rest of my life.
2         (The playing of the video clip stopped.)
3    BY MR. KLOEWER:
4         Q.  Is this refreshing your recollection, Mr.
5    Flynn, about who Joe Oltmann is?
6         A.  As far as what?  I mean, I don't remember
7    seeing this, no.
8         Q.  Well, you recognize him, don't you?
9         A.  I guess I do, yeah.  I mean, I -- he looks
10   familiar.
11        Q.  You stated before that you, along with
12   Mr. Clark, will vet potential speakers from time to
13   time.  What did you do to vet Mr. Oltmann before he came
14   on stage for the first time at the ReAwaken America
15   Tour?
16        A.  I don't recall if I ever got involved in that
17   one.
18        Q.  So you took no action to investigate who Joe
19   Oltmann was?  Am I understanding that correctly?
20        A.  That's -- that's -- yeah.  I mean, I don't
21   remember doing anything like that.
22        Q.  Do you know who did?
23        A.  I don't.
24        Q.  So all these claims he's making here, that he
25   had hundreds of employees, that he could have retired,
                                                    Page 66

1    that he was -- that Ernst & Young told him that if he
2    wasn't political he would win entrepreneur of the year,
3    you didn't investigate any of those claims, did you?
4         A.  I did not.
5         Q.  Okay.  So when you described yourself as a
6    guidance counselor to Mr. Clark, it doesn't apply with
7    respect to Mr. Oltmann's appearance on the Tour.  Is
8    that fair?
9         MS. WEISS:  Object to the form.
10        THE WITNESS:  That's fair.
11   BY MR. KLOEWER:
12        Q.  Okay.  Let's skip ahead here to about the
13   three minute mark.
14        (A video clip was played as follows:)
15        MR. OLTMANN:  And as a person who followed
16   Jesus that could become an example for them.  I
17   happened to get on a phone call with a guy named
18   Eric Coomer back in September of last year, and he
19   said, "Hey, don't worry about it.  Trump is not
20   going to win.  I made sure of that."
21        I'm in the church of the Lord, so I'm not
22   going to tell you what he said.  But I am going to
23   tell you that I didn't know what I knew at that
24   point.  I didn't know.  I didn't know.  I wrote it
25   down.  I thought these guys were nuts.  And then I
                                                    Page 67

1    moved on.
2         And it wasn't until three days after the
3    election.  You know what happened on the election
4    night.  It wasn't until three days afterwards that
5    I figured out that, as somebody sent me an article
6    when his name was in there, and he was the
7    spokesperson for Dominion Voting Systems, what I
8    was really looking at.
9         I did my research, I do believe things are
10   providential.  I do believe that I didn't have to
11   get involved.
12        (The playing of the video clip stopped.)
13   BY MR. KLOEWER:
14        Q.  All right.  Let's pause there.
15        So you're familiar with this story, aren't
16   you?
17        A.  I -- what Joe Oltmann is talking about?  I'm
18   not familiar with that story.
19        Q.  Is this the first time you heard Joe Oltmann
20   claim that he infiltrated an Antifa conference call with
21   Eric Coomer?
22        A.  I really don't remember that.  I don't
23   remember that.  I'm not going to sit here and tell you
24   that I was in the audience even at that time.  I
25   remember that being -- that one I was -- I was walking
                                                    Page 68

1    around quite a bit, so I don't even remember him being
2    on the stage.
3         Q.  We just watched a video of you a few minutes
4    ago promoting a legal fundraiser for Clay Clark arising
5    from this lawsuit, and --
6         A.  Okay.
7         Q.  -- you're telling me that you have no idea
8    what the basis of this lawsuit is?
9         A.  I don't know what the exact basis of it is.  I
10   really don't.
11        Q.  Have you discussed the lawsuit with Mr. Clark?
12        A.  I -- I have.  I've talked -- talked to him
13   about it in his, you know -- yeah.  I mean, I have
14   spoken to him about it, but not in any kind of detail.
15        Q.  He didn't tell you that the Tour had been sued
16   for publishing Oltmann's claims about Dr. Coomer?
17        A.  I think he -- I think he's just stated that
18   the Tour had been sued.  I didn't know it was about, you
19   know, that -- I don't know how the -- how the details of
20   Joel Oltmann was involved.
21        Q.  When you got a subpoena from Eric Coomer --
22        A.  Uh-huh (Affirmative response).
23        Q.  -- what steps did you take to determine who
24   Eric Coomer was?
25        A.  I mean, I know who Eric Coomer is.  I mean, I
                                                    Page 69

18 (Pages 66 - 69)

1  am aware of who he is, just in -- but I couldn't tell
2  you what his job is or -- just the things that I have
3  seen in podcasts and such and what I have read in the
4  newspapers.
5      Q.  Well, what have you seen in podcasts about
6  Eric Coomer?
7      A.  Just different -- different things that he has
8  said, statements that he has made.
9      Q.  Like what?
10     A.  I don't know.  I don't -- I don't recall what
11  those statements are, but I have -- you know, I have a
12  memory of him, seeing him in a -- speaking to some
13  group, and I just don't recall what it was that he said.
14     Q.  Mr. Oltmann said that he took notes on this
15  call.  Have you ever requested to see those notes?
16     A.  No.
17     Q.  Why not?
18     A.  The first time -- first time I heard that is
19  right now.
20     Q.  If Mr. Oltmann's story is true, that would be
21  a pretty sensational piece of evidence, wouldn't it?
22     A.  I mean, you are -- you are asking me to
23  speculate or what?
24     Q.  Well, you wouldn't answer before if you
25  believed that Dominion Voting Systems rigged the
Page 70

1  election or not, but if it were true that Eric Coomer
2  had made these claims on a phone call, you would agree
3  that that would be an important piece of evidence to
4  suggest that Dominion had rigged the election, correct?
5      MR. GREAVES:  Object.
6      THE WITNESS:  If that was the --
7      MR. GREAVES:  Speculation.
8      THE WITNESS:  Yeah, yeah.  I mean, I think
9  either way --
10     Yeah.  It is -- it's big-time speculation.  I
11  mean, it's big-time.  You know that.  I mean, I
12  would be guessing.
13  BY MR. KLOEWER:
14     Q.  What's big-time speculation?  Mr. Oltmann's
15  claims?
16     A.  No.  Your question.
17     Q.  Well, you don't believe that Joe Oltmann was
18  on this call with Eric Coomer, do you?
19     A.  No idea.
20     Q.  Why didn't you ever look into this?
21     A.  Why didn't I look into what?  Whether Joel
22  Oltmann was on a phone call?
23     Q.  Yeah.
24     A.  This is probably the first time I heard it.
25  And to be honest with you, this is the first time I -- I
Page 71

1  don't think I -- I don't think I was in that audience
2  when he was speaking.  This is the first time I have
3  heard that.  I didn't know he was on a call with Coomer.
4      Q.  He said he did his research.  You never
5  attempted to find out what research he had done?
6      A.  No.
7      Q.  Let's skip ahead here to the 5 minute, 10
8  second mark.
9          (A video clip was played as follows:)
10         MR. OLTMANN:  Because I don't live my life in
11  fear.  Then I got sued by Eric Coomer.  I found
12  myself in the middle of a fight that was unfairly
13  balanced.  I've spent hundreds of thousand of
14  dollars, I have lost millions of dollars.
15         (The playing of the video clip stopped.)
16  BY MR. KLOEWER:
17     Q.  Here Mr. Oltmann is stating on stage in his
18  first appearance that he got sued by Eric Coomer.  Do
19  you know what he got sued by Eric Coomer for?
20     A.  No idea.
21     Q.  You never read the lawsuit?
22     A.  Don't recall if I did.
23     Q.  And you didn't conduct any investigation, even
24  before this deposition, to find out what Eric Coomer had
25  sued Joe Oltmann for?
Page 72

1      A.  I did not.
2      Q.  In your role as guidance counselor to Mr.
3  Clark, you never discussed with him putting people on
4  stage to repeat claims that they had been sued for
5  defamation over?
6      A.  I don't believe we ever have, no.
7      Q.  Does it concern you at all that the Tour is
8  putting speakers on stage who have been sued for making
9  false statements?
10     A.  I'm not sure what you're asking me.  What are
11  you asking me?
12     Q.  Well, it seems like --
13         If I understand your sworn testimony today,
14  you are claiming that for the first time, as you sit
15  here, you are just becoming aware of claims about Eric
16  Coomer, which you can probably discern I'm highly
17  skeptical of that claim.  But knowing as you know now --
18     A.  Well, which claims, Brad?  Which claims?  I
19  mean, there's a lot of claims about a lot of people.  So
20  which claims?  You're making claims about --
21     Q.  Claims that -- claims that Eric Coomer, the
22  former director of strategy and security for Dominion
23  Voting Systems, partook in an Antifa conference call;
24  that he claimed on that call that he had rigged the 2020
25  election; and that he did, in fact, rig the 2020
Page 73

19 (Pages 70 - 73)

Page 74

```
 1    election.
 2        A.   Okay.
 3        Q.   You don't have any reason to believe any of
 4    those claims, do you?
 5        A.   Other than -- other than they -- we just heard
 6    him state it a bit there on this.  I don't.  I mean, I
 7    don't -- I only have -- I have no -- you know, I mean,
 8    I'm not in a position where -- I don't know.  I really
 9    just don't know.  I don't know what it is that you're
10    asking me.  I'm not sure where -- I'm not sure what
11    you're talking about.
12             Are you asking me if I know Coomer?  I don't
13    know Coomer.  The job title you just gave him, that's
14    the first time I think I have heard him described like
15    that.
16             Joe Oltmann.  I don't know him well.
17        I think you said that this -- this video was
18    2021, which probably would have been the third or fourth
19    event that we had.  So we were -- you know, we were --
20    people were joining the Tour, and so we probably, you
21    know --
22             I don't know.  I'm not exactly sure what
23    you're asking me here.  You're just -- you're sort of
24    speculating about a bunch of things, and I'm not exactly
25    sure what you are asking me.
```

Page 75

```
 1        Q.   Beyond Mr. Oltmann's claims about this call,
 2    have you seen any evidence that this supposed call ever
 3    occurred?
 4        A.   I haven't.
 5        Q.   Do you know how Mr. Oltmann got access to this
 6    call?
 7        A.   No idea.
 8        Q.   Do you who else was on it?
 9        A.   I have no knowledge of this call whatsoever.
10        Q.   Did you ever discuss Mr. Oltmann with your
11    brother Joe?
12        A.   I may have.  I don't recall.
13        Q.   You know Joe has been on Oltmann's podcasts a
14    few times, correct?
15        A.   I don't know.  You know, if he has been on it,
16    that's -- that's -- you know, he has been on it.  I -- I
17    don't -- I can't sit here and tell you that he has or
18    has not.  I just, you know.  That's fine.
19        Q.   Have you discussed Mr. Oltmann with Patrick
20    Byrne?
21        A.   I -- I may have.  I don't recall, you know, if
22    we had, you know, lengthy conversations about him or any
23    conversations about him.
24        Q.   You're a board member on The America Project,
25    correct?
```

Page 76

```
 1        A.   No.
 2        Q.   What's your -- what's your role with The
 3    America Project?
 4        A.   It was as an advisor.
 5        Q.   Okay.  And you know that Eric Coomer has sued
 6    The America Project, don't you?
 7        A.   I don't recall, actually.  I haven't been -- I
 8    haven't been around The America Project for quite a
 9    while.
10        Q.   Well, this wasn't the only time Mr. Oltmann
11    made these claims on stage at the ReAwaken America Tour.
12    In fact, he did it many times over a prolonged period.
13             Let's take a look at an appearance that you
14    also were at in Colorado Springs on September 25th of
15    2021.
16             We'll designate this as Exhibit 19, clip 3.
17             (A video clip was played as follows:)
18             MR. CLARK:  All right.  I'm telling you, we're
19    going to go from a level 9 to about a level 11.
20    You're going to leave here, your head is going to
21    explode with knowledge you won't hear anywhere
22    else, so stay tuned.
23             Our next presenter is Colorado's very own tech
24    entrepreneur and freedom-loving patriot exposing
25    the corruption of election fraud.  Ladies and
```

Page 77

```
 1    gentleman, please stand and greet Joe Oltmann.
 2             (The playing of the video clip stopped.)
 3    BY MR. KLOEWER:
 4        Q.   Okay.  Exposing the corruption of election
 5    fraud.  That's how Mr. Clark introduced him.  What
 6    election fraud has Joe Oltmann exposed that you're aware
 7    of?
 8        A.   No idea.
 9        Q.   Do you know anything about Mr. Oltmann's
10    background?
11        A.   I really don't.
12        Q.   Do you know if he has any credentials that --
13    any background in election technology?
14        A.   No idea.
15        Q.   You don't know what kind of education he has?
16        A.   I don't.
17        Q.   Do you know what kind of work he does?
18        A.   I am aware he is working with Mike Lindell.  I
19    am aware of that.
20        Q.   In what capacity?
21        A.   I don't know what capacity -- I don't.  I
22    don't really know what capacity.
23        Q.   Let's skip ahead to the eight-minute mark
24    here.
25             (A video clip was played as follows:)
```

20 (Pages 74 - 77)

| | Page 78 |
|---|---|
| 1 | MR. OLTMANN: -- the (Inaudible) from one |
| 2 | either. |
| 3 | Here is what I know. Number 1, Eric Coomer |
| 4 | was on that call. Eric Coomer, who is the director |
| 5 | of strategy and security for Dominion Voting |
| 6 | Systems, is a liar. I just sat in a deposition |
| 7 | with him where the guy literally lied about |
| 8 | everything. Dominion Voting Systems is a system |
| 9 | just like others that's designed to steal your |
| 10 | voice. |
| 11 | (The playing of the video clip stopped.) |
| 12 | BY MR. KLOEWER: |
| 13 | Q. Okay. Do you recall watching this |
| 14 | presentation in real time, Mr. Flynn? |
| 15 | A. I don't. |
| 16 | Q. Okay. But here we see Oltmann claiming again |
| 17 | that Eric Coomer was on that call. He says, "Dominion |
| 18 | is a system designed to steal your voice." |
| 19 | Do you agree with that assessment? |
| 20 | MR. GREAVES: Objection. I advise -- |
| 21 | THE WITNESS: Right, right. I mean -- yeah. |
| 22 | BY MR. KLOEWER: |
| 23 | Q. Do you agree with that assessment, that |
| 24 | Dominion is system designed to steal your voice? |
| 25 | A. I'm going to -- I'm going to assert my Fifth |

Page 78

| | Page 79 |
|---|---|
| 1 | Amendment right on this one. |
| 2 | Q. Tape. |
| 3 | (A video clip was played as follows:) |
| 4 | MR. OLTMANN: That's not hyperbole. That's |
| 5 | not me making stuff. That's truth. They say, Joe, |
| 6 | you're -- you're advocating for violence. And I'll |
| 7 | tell you this. When is enough going to be enough? |
| 8 | When are you going to keep moving that line back? |
| 9 | Until it kills you? Until they come for your |
| 10 | children? |
| 11 | (The playing of the video clip stopped.) |
| 12 | BY MR. KLOEWER: |
| 13 | Q. You're familiar with Mr. Oltmann's frequent |
| 14 | calls for violence, aren't you, Mr. Flynn? |
| 15 | MS. WEISS: Object to form. |
| 16 | THE WITNESS: I am not. Yeah. I'm not. I'm |
| 17 | not. |
| 18 | BY MR. KLOEWER: |
| 19 | Q. You never discussed Mr. Oltmann's Public |
| 20 | statements with Patrick Byrne? |
| 21 | A. I don't believe I have. |
| 22 | Q. Are you aware that Mr. Byrne has published |
| 23 | multiple statements stating that every conversation he |
| 24 | has ever been in with Joe Oltmann, he's advocating for |
| 25 | violence? |

Page 79

| | Page 80 |
|---|---|
| 1 | A. I don't have any knowledge of that. |
| 2 | Q. Okay. And you heard Oltmann confidently |
| 3 | stating on stage that this is not hyperbole, that this |
| 4 | is truth. |
| 5 | A. I just heard in the video. |
| 6 | Q. Yes. |
| 7 | A. I mean, whatever he just said in the video. |
| 8 | I'm not -- I can't sit here and tell you that I watched |
| 9 | him. |
| 10 | Q. Do you have any reason to believe that Oltmann |
| 11 | was on an Antifa conference call where he overheard Dr. |
| 12 | Coomer speaking? |
| 13 | A. No idea. |
| 14 | Q. And you already stated before that you were at |
| 15 | every event, that you had been at every ReAwaken America |
| 16 | event. So I presume that would include the event that |
| 17 | occurred in Dallas in December of 2021? Is that -- is |
| 18 | that a fair assessment? |
| 19 | A. Okay. If it was a ReAwaken Tour, I was -- I |
| 20 | was at it. If it was in Dallas and it was a ReAwaken |
| 21 | Tour, I was at it. |
| 22 | Q. Was that tour event the victim of an anthrax |
| 23 | attack? |
| 24 | A. Say that again? |
| 25 | Q. Did somebody attack that event with anthrax? |

Page 80

| | Page 81 |
|---|---|
| 1 | A. Is that a serious question? |
| 2 | Q. Yes. |
| 3 | A. I don't have any idea. |
| 4 | Q. You recall allegations that there was an |
| 5 | anthrax attack at that event, don't you? |
| 6 | A. I recall at one event somebody claimed about |
| 7 | some -- you know, the air conditioning system was doing |
| 8 | something, you know. But it was I think just the |
| 9 | humidifier or something. So I remember that. I don't |
| 10 | know whether that was in Dallas or what. But -- |
| 11 | Q. Do you recall who made that claim? |
| 12 | A. I don't. |
| 13 | Q. You don't remember Joe Oltmann claiming that |
| 14 | he and Jovan Pulitzer had been attacked by anthrax at |
| 15 | the Dallas event? |
| 16 | A. I don't remember that, no. |
| 17 | Q. Okay. Is Jovan Pulitzer a speaker on the |
| 18 | ReAwaken America Tour events? |
| 19 | A. He has been, yes. |
| 20 | Q. I can -- I can discern from your skepticism by |
| 21 | my question that you take the premise that the event was |
| 22 | attacked by anthrax to be unreasonable, to put it |
| 23 | gently. Is that fair? |
| 24 | A. I -- I think that your question is not very |
| 25 | clear. |

Page 81

21 (Pages 78 - 81)

1    Q.  Well, what I'm --
2    A.  Your statement.  Your statement is not very
3  clear.
4    Q.  After -- after Mr. Oltmann claimed that the
5  event had been the victim of an anthrax attack and that
6  he and Mr. Pulitzer may have been poisoned with anthrax,
7  did that give you concerns about his credibility?
8    A.  I don't remember that.  I don't recall that.
9    Q.  You didn't discuss with Mr. Clark allegations
10 that the event had been attacked by anthrax, by a
11 chemical agent?
12   A.  If we did, we were -- we probably laughed
13 about it, because anthrax is a very serious, you know.
14 It's a very serious thing, and if it was, we would know
15 about it.  Everybody.  The world would have known about
16 it.
17   Q.  So you would agree that somebody that would
18 make that allegation that lightly is not somebody that
19 you would consider to be reliable.
20   A.  I had no -- no -- I don't know how to answer
21 that question.  I mean, I would just say I don't have
22 any real knowledge about his -- that claim and, you
23 know, nor -- nor what resulted from it.
24   Q.  Does Joe Oltmann still appear with the
25 ReAwaken America Tour?

Page 82

1  the tape and I'll ask you a few questions about that.
2         (A video clip was played as follows:)
3         MR. OLTMANN:  So he goes, first of all, the
4  insurance -- I have spent $390,000 on legal fees
5  with the Eric Coomer case.  Now, so since I know
6  what it cost to actually go through that case,
7  $390,000 seems like an exorbitant amount for his
8  small part of this.  But, you know, neither here
9  nor there.  Maybe it's true.  I hope it's not true,
10 because that just means that lawyers are literally
11 making a bunch of money and trying to bilk him dry.
12        But then he says that the insurance company
13 that he's dealing with will not cover the event if
14 Joe Oltmann speaks.  So if Joe Oltmann gets on the
15 stage and speaks, we will not cover the event.
16        And I went, Oh, all right.  Okay.  Nobody has
17 ever paid me to go to an event.  I paid my expenses
18 on I think, what, five percent of the occasions.
19        A SPEAKER:  Yeah, yeah, about that.
20        MR. OLTMANN:  And otherwise, I go out there
21 because I really want people to understand what the
22 truth is, right?  So.
23        And by the way, I don't really give a shit
24 about your $390,000 in legal fees.  I really don't,
25 but --

Page 84

1    A.  I don't believe he has in a while that I'm
2  aware of.
3    Q.  Why not?
4    A.  No idea.
5    Q.  Did you ever discuss Mr. Oltmann's ongoing
6  appearances with the Tour of Mr. Clark?
7    A.  I don't believe I have.
8    Q.  Did Mr. Clark ever tell you that the Tour,
9  that its insurance carrier had informed him that the
10 Tour would not be insured if Mr. Oltmann continued to
11 appear on stage?
12        MS. WEISS:  Object to form.
13        BY MR. KLOEWER:
14   Q.  Did Mr. Clark tell you that?
15   A.  About what?
16   Q.  That the tour's insurance carrier would not
17 insure the events if Mr. Oltmann continued to appear on
18 stage?
19   A.  I don't recall that.
20   Q.  Let's take a look at what's been previously
21 marked as Exhibit 10, clip 8.
22        This is an appearance, this is Mr. Oltmann's
23 Conservative Daily podcast.  This is an episode from
24 April 26, 2023.  So almost a year ago.  He's describing
25 a conversation he just had with Mr. Clark.  We'll roll

Page 83

1         (The playing of the video clip stopped.)
2  BY MR. KLOEWER:
3    Q.  Okay.  So does that refresh your recollection?
4  Do you remember talking to Mr. Clark about removing
5  Oltmann from the Tour for this reason?
6    A.  I don't.
7    Q.  Is that the sort of thing that Mr. Clark would
8  have talked to you about?
9    A.  Not necessarily.
10   Q.  Well, you are involved in every tour event,
11 right?
12   A.  I -- I show up to every tour event.
13   Q.  So if the Tour could no longer proceed for any
14 reason, do you think that that's something that
15 Mr. Clark would discuss with you?
16   A.  He likely would, yeah.
17   Q.  Okay.  But he didn't -- he didn't raise this
18 issue with you?
19   A.  No.
20   Q.  Mr. Flynn, you've, in fact, known about the
21 claims about Eric Coomer supposedly partaking in an
22 Antifa conference call since just days after Oltmann
23 first made them in November of 2020, haven't you?
24   A.  Okay.  I mean, I don't recall.
25   Q.  Well, let's take a look at some documents

Page 85

22 (Pages 82 - 85)

1   here.
2       And, Nate, I apologize.  I believe I'm at
3   Exhibit 21.  And hopefully it will be the last time I
4   get out of order but I believe that's where we're at.
5       (Exhibit 21, E-mail chain ending 11/14/2020
6      from Mike Flynn to Joshua Steinman, et al., was
7      marked for identification.)
8   BY MR. KLOEWER:
9     Q.  So I'm going to show you what we'll mark as
10  Exhibit 21.  And these are documents that you produced
11  pursuant to a subpoena.  So let's take a look at what's
12  been marked as MTF000011.
13     I'm going to share my screen here.
14     Okay.  Do you see this document on my screen?
15    A.  I do.  I can see it.
16    Q.  At the top of the page it's indicated as an
17  e-mail from zulutym@gmail.com and it includes your name
18  in the quotation marks.  Is that zulutym@gmail, is that
19  an e-mail that you use?
20    A.  Yes.
21    Q.  What do you use that e-mail address for?
22    A.  Just I've had it for a long time, I just -- I
23  use it for a lot of things.  E-mail.
24    Q.  Is it a personal e-mail address or is it --
25    A.  Personal.

Page 86

---

1    Q.  Okay.  As is typically the case with these
2  sort of documents, the correspondence begins at the
3  bottom, and we see it, how it proceeds moving forward.
4  So I'm scrolling down to the lower portion of that
5  document.  This indicates an e-mail from an individual
6  named Jerry Waller to Info@SidneyPowell.com, and the
7  date indicated here is Saturday, November 14th, 2020.
8  Do you see that?
9    A.  I can.
10    Q.  And the subject line is, "Eric Coomer.
11  Dominion"?
12    A.  Okay.
13    Q.  Who is Jerry Waller?
14    A.  No idea.
15    Q.  Okay.  But you know who Sidney Powell is,
16  obviously?
17    A.  I do.
18    Q.  And who is Sidney Powell?
19    A.  She was an attorney of mine.
20    Q.  Is she still representing you?
21    A.  No.
22    Q.  So this is an e-mail.  It appears it was sent
23  to Ms. Powell.  And I'll read the subject.  It appears
24  to be that this is what Mr. Waller wrote down here.
25    It says, "Massive information was given about

Page 87

---

1   Eric Coomer, VP security strategy, Dominion Voting
2   Systems.  Here is the link."
3     And the link we can see is a Facebook link, it
4   goes to the right, Michelle Malkin.  Do you know who
5   Michelle Malkin is?
6    A.  I do.  Yeah, I do know who she is.
7    Q.  Do you know Ms. Malkin personally?
8    A.  No.
9    Q.  Did you watch this clip when it was forwarded
10  to you by Ms. Powell?
11    A.  No idea.
12    Q.  You don't recall watching an interview between
13  Michelle Malkin and Joe Oltmann?
14    A.  I don't recall.
15    Q.  Yeah.  The e-mail states, "At 21 minutes of
16  this video Joe Oltmann discusses Eric Coomer's threats
17  against President Trump."
18    Does this -- did you read this e-mail at the
19  time you received it?
20    A.  I don't recall.
21    Q.  If you saw an e-mail about somebody making
22  threats against President Trump, would that concern you?
23    A.  It would.
24    Q.  Okay.  The next line states, "Eric Coomer may
25  hold the key to the entire election theft by Dominion.

Page 88

---

1   Eric Coomer should be arrested immediately."
2     What did you understand this to mean when you
3   received this e-mail?
4    A.  I don't recall what I understood at the time.
5    Q.  Well, let's put this e-mail in the -- in the
6  appropriate time frame.  This is November 14th, 2020.
7  It's about a week after the election was called for Joe
8  Biden.  At that time you didn't believe that Joe Biden
9  won the election, did you?
10    MR. GREAVES:  Objection.  I'm going to ask my
11    client to assert his Fifth Amendment rights, or
12    advise him to do so.
13    THE WITNESS:  Uh-huh (Affirmative response).
14    MR. KLOEWER:  I'll just have a standing
15    response that we don't believe these objections are
16    proper under Rule 30.
17    MR. GREAVES:  I understand.
18  BY MR. KLOEWER:
19    Q.  At this time, you were actively looking into
20  claims that the election had been rigged, weren't you,
21  Mr. Flynn?
22    MR. GREAVES:  Objection.
23    THE WITNESS:  I was -- yeah.
24    MR. GREAVES:  I'm advising my client to assert
25    his Fifth Amendment rights.

Page 89

---

23 (Pages 86 - 89)

BY MR. KLOEWER:

Q.   And here we have an e-mail stating that a top executive at Dominion may be the key to the theft and he should be arrested immediately.  And Sidney Powell sent this e-mail to you.

Do you know why she sent that to you?

A.   Does it say it on there?

Q.   Well, we'll scroll right up here.  So yes.  If we see the time stamp on the e-mail for Mr. Waller, it's 11:37 a.m. on November 14th.  We scroll up here at 12:31, so less than an hour later Sidney Powell forwards this e-mail to you and says, "Get to Josh ASAP."

Do you know why she was sending this information to you?

A.   I don't.  I don't recall.

Q.   Who is Josh?

A.   Can you go up to the top?  Josh Steinman, Josh Steinman.  I think at the time Josh was still in the White House responsible for cyber security.

Q.   So he was a White House official.  Tell me if this --

A.   I think his -- I think his -- I don't think -- I wouldn't say White House official, but I think he was on the -- he was somewhere in the National Security Council.

Page 90

Q.   If I told you that he was the senior director for cyber policy and deputy assistant to the president; would you disagree with that?

A.   I would not.

Q.   Okay.  So he was a high-ranking government official at the time.  Is that fair?

A.   Okay.

Q.   You would agree with that assessment, that he --

A.   I would.  Yeah.  I'd say that sounds like a pretty important title.

Q.   So why did you send Mr. Steinman this information?

A.   I think because Sidney asked me to.

Q.   You didn't review the information that she had asked you to forward to this government official?

A.   I don't recall if I did.

Q.   Did you -- why didn't Sidney Powell reach out to Mr. Steinman herself?

A.   She may not have had the ability.  I don't know.  You'd have to ask her.

Q.   If Ms. Powell sent you a chain letter saying if you don't send this to 15 people you will be cursed, send it to Josh right away, would you have done that?

What I'm trying to understand, Mr. Flynn, is,

Page 91

you are just forwarding e-mails from Sidney Powell to high-ranking government officials without even reviewing their contents?  Is that your testimony today?

A.   No.  I don't recall if I reviewed the contents.  I may have.  I just don't recall.

Q.   Okay.  But you don't -- this was a claim, that a top Dominion executive had claimed that he rigged the election on a call, and you have no recollection of that?

A.   Of what?  Of the e-mail, the --

Q.   Yeah.

A.   -- statement you just made?  I mean, what are you asking me?

Q.   All of it.  I mean, frankly, it's hard for me to believe.  This is a sensational claim.  Here is someone claiming to have evidence that a top --

A.   Okay.

Q.   -- executive at a voting machine company had confessed to rigging the election in a phone call months before the election.  To my mind that is a remarkable claim.

MR. GREAVES:  Objection.  Is there a question?

BY MR. KLOEWER:

Q.   If it were true, I'm trying to understand -- I'm trying to understand why you didn't look into that

Page 92

claim at the time.  So you don't have any recollection of investigating whether this claim was true when you received this e-mail?

A.   I don't.  I don't recall.

Q.   Did Mr. Steinman respond to this e-mail?

A.   I don't recall if he did or not.

Q.   What is your relationship with Mr. Steinman?

A.   I've known him for a number of years, and I hired him on the National Security Council.

Q.   And it looks like you're e-mailing him from your personal e-mail account.  That's an iCloud account.  That's not his government address, I presume.  Would you say you were a friend of Mr. Steinman's?

A.   I was a colleague.

Q.   But you trusted that if you sent him information through his personal channel he would review it?

A.   I -- I trust Josh, yeah.  I trust him.  Whether or not he reviewed it or not, I don't know.

Q.   Are you still in touch with him?

A.   I am.  I am infrequent.  I am.

Q.   How frequently would you say you're in touch with Mr. Steinman today?

A.   Once a year.

Q.   Did he follow-up on this e-mail with you?

Page 93

24 (Pages 90 - 93)

1    A. I don't recall.
2    Q. Did he call to discuss it?
3    A. I've answered that a couple times.
4    Q. What was -- what did you think Mr. Steinman
5  would do with this information?
6    A. I guess at the time -- I guessed that he would
7  look into it.
8    Q. And you never followed up with him to see if
9  he had looked into it?
10    A. I don't recall if I did.
11    Q. Because you didn't believe that Eric Coomer
12  actually had rigged the election, did you?
13    A. I mean, I -- I have no knowledge of that, and
14  definitely not at the time. I just -- you know, I was
15  helping out Sidney in her -- in the set of cases that
16  she was doing.
17    Q. Why were you working with Sidney Powell on
18  these -- these issues?
19    A. Why was I working with her?
20    Q. Yes.
21    A. Why was I helping Sidney Powell?
22    Q. Yeah.
23    A. Because she helped me.
24    Q. How did she help you?
25    A. Now, Jason, I mean, how ridiculous are we

Page 94

1  going to get here?
2    MR. GREAVES: You can answer that question.
3    THE WITNESS: I mean, she helped me by -- by
4  following through and determining how much the
5  Department of Justice was undermining me -- okay --
6  and how much the Department of Justice was -- was
7  illegally persecuting me.
8  BY MR. KLOEWER:
9    Q. She was working to get you a pardon from
10  President Trump at this time, wasn't she?
11    A. No, no, no, no, no. She -- my case had
12  already been dismissed, so don't -- don't jump to that.
13    Q. Well, your pardon hadn't yet been issued, had
14  it?
15    A. My pardon hadn't been issued?
16    MR. GREAVES: I'm going to object --
17    THE WITNESS: No, I don't know, I mean --
18    MR. GREAVES: Hold on.
19    THE WITNESS: I don't know. Yeah. Go ahead,
20  go ahead.
21    MR. GREAVES: Just for the record, I'm going
22  to object to any questions that ask for
23  attorney-client confidential communications.
24    THE WITNESS: Exactly.
25    MR. GREAVES: And hold on, General Flynn.

Page 95

1    These e-mails that we provided from Sidney
2  Powell, these are not obviously attorney-client
3  communications, which is why they are provided
4  without objection here. But if you are going to
5  ask him about advice that she was giving him
6  regarding his actual legal problems, that's
7  attorney-client privilege, and I'm going to
8  instruct my client not to answer those questions.
9  BY MR. KLOEWER:
10    Q. Understood. I don't need to know what your
11  conversations were with Ms. Powell with respect to her
12  representation of you. I understand that this is a
13  separate matter, as Mr. Greaves just confirmed. I was
14  just getting more towards the factual matter that your
15  pardon wasn't issued until November 22nd of 2020, as a
16  matter of fact. Isn't that correct?
17    A. I don't remember. I don't remember when the
18  pardon was issued.
19    Q. Okay. Let's take a look here at what we will
20  mark -- what you had provided as Exhibit MTF0005. We
21  will designate this as Exhibit 22.
22    (Exhibit 22, E-mail 12/1/2020 from Ben Sheva
23  to Mike Flynn, et al., was marked for
24  identification.)
25  BY MR. KLOEWER:

Page 96

1    Q. Can you see this document, Mr. Flynn?
2    A. From Ben Sheva. Is that what this says? It's
3  an e-mail.
4    Q. Yes, that's correct. It's dated December 1st,
5  2020, at the top?
6    A. Okay.
7    Q. Who is Ben Sheva?
8    A. I don't know.
9    Q. Okay. Well, let's take a look at the e-mail
10  and see if it rings any bells.
11    It says, "Sir, even if Batten will allow
12  forensic examination of servers, the Eleventh Circuit
13  will overrule his decision. Ms. Powell should
14  immediately present testimony of 305 officer and request
15  FBI and GBI to do the job before servers are wiped out."
16    Is this refreshing your recollection? Do you
17  have any idea who Mr. Sheva could be?
18    A. No, I don't. I don't recall it. I don't
19  recall that e-mail.
20    Q. Who is Batten?
21    A. I don't know. I don't remember.
22    Q. Would that be Timothy Batten, Chief United
23  States District Judge for the Northern District of
24  Georgia?
25    A. I mean, I don't know.

Page 97

25 (Pages 94 - 97)

1    Q.   So you don't know who Mr. Sheva is.  Do you
2  know why he's stating with such confidence that the
3  Eleventh Circuit would overrule an order from Judge
4  Batten?
5    A.   I don't recall, no.
6    Q.   "She should also add such a request in her
7  legal filings with Batten.  Nobody can argue that FBI
8  and GBI forensics can compromise Dominion's 'security
9  and proprietary trade secret risks to defendants.'"
10    This e-mail was part of you and Ms. Powell's
11  joint efforts to get access to Dominion voting machines,
12  correct?
13    MR. GREAVES:  Objection.  And I'm
14  instructing -- advising my client to assert his
15  Fifth Amendment privilege.
16    THE WITNESS:  Yeah.  And I will, under advice
17  of my attorney, I'm going to assert the Fifth.
18  BY MR. KLOEWER:
19    Q.   This e-mail says, "Ms. Powell should
20  immediately present testimony of 305 officer."
21    Do you know what this 305 officer refers to?
22    A.   I don't.
23    Q.   Do you recall Ms. Powell working with somebody
24  by the name of Joshua Merritt?
25    A.   I don't recall.

                                              Page 98

1    A.   Which one am I using?  My Resilient Patriot?
2    Q.   Yes.
3    MR. GREAVES:  Objection to form.  Go ahead,
4  sir.
5    THE WITNESS:  It's just -- it's just another
6  e-mail address.
7  BY MR. KLOEWER:
8    Q.   Is that another personal e-mail address?
9    A.   Uh-huh (Affirmative response).
10    Q.   And Ms. Powell says, "Please print," with two
11  exclamation points.  And this is a forward from somebody
12  named Christos Makridis, I believe.  M-A-K-R-I-D-I-S.
13  Who is Christos Makridis?
14    A.   Don't know.  Don't recall.
15    Q.   He says, "Here we go.  The SSL certificate
16  linking Dominion with Venezuela and the ownership
17  interest of China in Dominion through Staple Street."
18    Now, here is a question I have for you, Mr.
19  Flynn, because I don't fully understand the documents
20  you've produced.  So this is the e-mail Bates labeled
21  page 94.  The next page, 95, is what appears to be some
22  sort of draft affidavit.  It's not filled in.
23  Declaration of name, redacted.
24    Paragraph 2 here states, "I was an electronic
25  intelligence analyst under 305th Military Intelligence

                                             Page 100

1    Q.   Do you know Josh Merritt?
2    A.   I don't know.  I don't recognize that name.
3    Q.   You don't recall an individual who went by the
4  pseudonym Spyder and filed affidavits for Ms. Powell?
5    A.   I don't.  I don't recall.
6    Q.   Well, I'll represent to you that it was widely
7  reported at the time, and has since been widely
8  reported, that an individual by the name of Josh Merritt
9  purported to be an officer, a 305 officer.
10    Let me show you the next document here.  Let's
11  take a look at MTF0094.  We will designate it as Exhibit
12  23.
13    A.   Uh-huh (Affirmative response).
14    (Exhibit 23, E-mail string ending 12/12/2020
15    from Sidney Powell to Regis Giles, et al., was
16    marked for identification.)
17  BY MR. KLOEWER:
18    Q.   Again, Mr. Flynn, this is a document from your
19  production from Sidney Powell to Regis Giles and Flynn
20  at ResilientPatriot.com.  This is December 12th, so
21  about 11 days later.  Who is Regis Giles?
22    A.   I don't remember, actually.
23    Q.   You are using a different e-mail address here.
24  Why did you switch over from your zulutym e-mail address
25  to this --

                                              Page 99

1  with experience through SAM surface to air missile
2  system electronic intelligence."
3    Do you recall -- can you tell me what document
4  I'm looking at here?  And again --
5    A.   I don't --
6    Q.   -- it's your production, so --
7    MR. GREAVES:  I might be able to help you out
8  here, Brad.  The way that these were produced is
9  that the sequential numbers of these documents, if
10  there was an attachment to an e-mail, the e-mail
11  attachment comes next in the sequence.  So what you
12  are looking at is 94.  If you look at that, there's
13  an attachment there under the subject line.  And so
14  the next pages are the actual PDF document that was
15  attached to that e-mail.
16    MR. KLOEWER:  All right.  Then -- I thank you
17  for that.
18  BY MR. KLOEWER:
19    Q.   Then my assumption is correct, that I'm
20  assuming that the first document here is Andy_Huang --
21  H-U-A-N-G -- _affidavit.pdf.  Do you recall reviewing
22  this, this PDF at the time, Mr. Flynn?
23    A.   I don't.
24    Q.   Do you know who this intelligence analyst
25  under 305th Military Intelligence was?

                                             Page 101

26 (Pages 98 - 101)

1   A.  I don't.

2   Q.  Do you deny that that individual was Josh

3   Merritt?

4   A.  Do I deny that it was Josh Merritt?

5   Q.  Yeah.  Do you have a reason to deny it?

6   A.  I have no -- no reason to not know who it is.

7   I mean, I don't know -- I don't -- no, I guess not.

8   Q.  And you knew that Josh Merritt was working

9   with the organization called the Allied Security

10  Operations Group at the time, correct?

11  A.  I don't know that.  I don't recall if I did.

12  Q.  What is the Allied Security Operations Group?

13  A.  I vaguely remember the group of -- one of

14  the -- one of the guys was a former military guy.  Phil,

15  I think is his name.  And I forget the gentleman's name

16  that was the --

17  Q.  Phil Waldron?

18  A.  Phil Waldron.  That's an ego.  He was part of

19  it, and there was a couple other people.

20  Q.  And you've known Phil Waldron for some time,

21  haven't you?

22  A.  I know him.  Yeah, I knew him, you know, I

23  knew him but not necessarily -- I mean, our paths may

24  have crossed in the military, but they definitely -- we

25  definitely worked -- you know, we were working together

Page 102

1   at this time.

2   Q.  When you say your paths crossed in the

3   military, what do you mean by that?

4   A.  We probably served on the same battlefield.

5   Q.  Which battlefield?

6   A.  Iraq, Afghanistan.

7   Q.  And did you work in the same unit?

8   A.  I don't recall if we did.

9   Q.  How about Russ Ramsland?  You know

10  Mr. Ramsland, don't you?

11  A.  I have met Russ.  Yes, I do know who he is.

12  Q.  How do you know Russ Ramsland?

13  A.  Just through this, you know, from this period

14  of time.

15  Q.  Did you know Mr. Ramsland prior to the 2020

16  election?

17  A.  I don't believe I did.

18  Q.  You never visited the ASOG hanger in Addison,

19  Texas?

20  A.  I have not.  I don't believe I have.

21  Q.  Did you go with Ms. Powell to see a

22  presentation from ASOG in 2019?

23  A.  In 2019?

24  Q.  Yes.

25  A.  No, I don't believe I did.

Page 103

1   Q.  What about Todd Sanders?

2   A.  I don't recall if I did.  I mean, 2019 is a

3   different time.

4   Q.  You don't recall going with Ms. Powell to an

5   airfield in Addison, Texas, where ASOG had an office

6   on --

7   A.  I don't believe -- I don't recall that I did

8   that, no.  Uh-uh.  (Indicates negatively).

9   Q.  You don't recall seeing a presentation from

10  them suggesting that elections may be manipulated

11  through electronic technology?

12  A.  I saw presentations, but I don't believe I

13  ever went to that place.

14  Q.  What do you mean by that?  You saw

15  presentations from ASOG?

16  A.  You know, PowerPoint presentations that

17  they -- that they had.

18  Q.  When did you see those PowerPoint

19  presentations?

20  A.  It would have been in the 2020 time frame,

21  maybe.  Late 2020 time frame.

22  Q.  And who was the individual presenting those?

23  A.  No idea.  I don't have any recollection other

24  than just I vaguely remember, you know, the -- some

25  presentations.

Page 104

1   Q.  Was it Phil Waldron?

2   A.  I don't recall.  It's been too long.

3   Q.  Do you have reason to deny that it was Phil

4   Waldron?

5   A.  No idea.

6   Q.  Okay.  The same question for Josh Merritt.  Do

7   you have any reason to deny that Josh Merritt was giving

8   you presentations of ASOG information in late 2020?

9   A.  I don't remember.  I don't think I -- I'm not

10  sure I've ever met him, or I don't recall meeting him.

11  Q.  Well, at this time in early December of

12  2020 -- and I'm not hiding the ball here.  I'll cut to

13  the chase.  If we scroll down through this affidavit,

14  this also, if we scroll down to page 115 of your

15  production --

16  A.  Why do you say this is my production?

17  Q.  We subpoenaed you for documents --

18  A.  Oh.  I see.  I see.  My production for this

19  case.  I gotcha.  Because you're --

20  Q.  Yes.  I apologize.  That's some lawyer speak

21  that is -- may not be clear.  This is what your counsel

22  produced to us.

23  A.  Yeah.  I gotcha.

24  Q.  I'm asking, because included with this

25  affidavit are multiple references to Eric Coomer.

Page 105

27 (Pages 102 - 105)

1     A.  Okay.
2     Q.  For example, on page 115 we see that Eric
3   Coomer is one of the inventors of Dominion Voting
4   security features.
5         Were you aware that Dr. Coomer had contributed
6   to patents owned by Dominion Voting Systems?
7     A.  I don't recall if I was.
8     Q.  Did you conduct any investigation into Eric
9   Coomer's role with Dominion Voting Systems at the time?
10    A.  I don't believe -- I don't recall.  I don't
11  believe I conducted any investigation, you know, to
12  answer your specific question.
13    Q.  Do you know anything about what Dr. Coomer's
14  role with Dominion Voting Systems was?
15    A.  I don't recall.
16    Q.  On the next page of this document, forwarded
17  by the 305th officer, we see again another reference
18  saying Eric Coomer is one of the inventors of Dominion
19  Voting security features.
20        MR. GREAVES:  Objection to form.
21  BY MR. KLOEWER:
22    Q.  At this time in early December of 2020, you
23  were working with Ms. Powell at the -- at the -- at Lin
24  Wood's property that's Tomotley Ranch in South Carolina,
25  correct?

Page 106

1     A.  There was a period that we were down there,
2   yes.
3     Q.  Okay.
4     A.  I don't remember the exact time frame but --
5     Q.  Yeah.
6     A.  Yeah.
7     Q.  Who all was working with you at Tomotley?
8     A.  A group of -- I don't know, a couple of
9   lawyers.  Sidney and -- and another young lady.
10    Q.  Is that Abigail Frye?
11    A.  Yes, Abbie Frye, yeah.
12    Q.  Was Katherine Friess there?
13    A.  Who?
14    Q.  Katherine Friess, F-R-I-E-S-S?
15    A.  That name doesn't ring a bell.
16    Q.  Okay.
17    A.  There was people that came in and out of
18  there.
19    Q.  Patrick Byrne was there, correct?
20    A.  Not at the same time.  I mean, we -- we
21  crossed paths, but we -- I don't think we were ever at
22  that -- at his home together.
23    Q.  Who else was at Tomotley at that time?
24    A.  I'm thinking who else.  Boy.  Racking my brain
25  here, Seth Keshel and his wife Carissa, I think.  That's

Page 107

1   a couple that I remember there.
2     Q.  Who is Mr. Keshel?
3     A.  Seth is a young -- young guy who -- who has
4   been involved in -- in election analysis.
5     Q.  Did you serve with Mr. Keshel as well?
6     A.  Well, we served in the military at the same
7   time, roughly the same time.
8     Q.  What about Jim Penrose?  Was he there?
9     A.  Jim Penrose was there, yes.
10    Q.  Who is Jim Penrose?
11    A.  Jim is another smart, you know, technically
12  gifted person.  And he was there helping out with some
13  of the -- some of the -- you know, some of the technical
14  questions.
15    Q.  Was Conan Hayes there?
16    A.  You know, I don't -- I don't recall if he was
17  there.
18    Q.  But you --
19    A.  I don't recall if he was there.
20    Q.  But you know Conan Hayes?
21    A.  I do.
22    Q.  How do you know Mr. Hayes?
23    A.  He's a world class surfer.
24    Q.  Is that how you met him?
25    A.  No.  That's how I knew about him.

Page 108

1     Q.  Okay.  Why was he involved with these efforts
2   at Tomotley?
3     A.  He is, I believe -- I don't know whether he is
4   trained or not, but he's a gifted cyber security type
5   analyst.
6     Q.  And he was working with the Allied Security
7   Operations Group at the time, correct?
8     A.  No idea.
9     Q.  Do you know anything about -- do you have any
10  knowledge about Mr. Hayes's credentials with respect to
11  his forensic background in computer forensics?
12    A.  I don't.
13    Q.  So you're not aware if he has any specific or
14  unique training in that field?
15    A.  I -- I don't recall if I -- if I was ever
16  briefed on it.  I don't, no.
17    Q.  And Doug Logan was also at Tomotley during
18  this time frame, correct?
19    A.  Yes.  Doug Logan was another one there.
20    Q.  Who is Doug Logan?
21    A.  Doug is another cyber security analyst and was
22  helping out with technical questions and issues.
23    Q.  And he went on to work with an entity called
24  Cyber Ninjas; is that correct?
25    A.  I believe that was his company.  Actually, I

Page 109

28 (Pages 106 - 109)

1  think, if I remember right, that's -- you're racking my
2  brain here, but I think that was his company. Cyber
3  Ninjas.
4      Q. Are you still in touch with Mr. Logan?
5      A. I am not.
6      Q. When was the last time you spoke with him?
7      A. Maybe two years ago.
8      Q. Okay.
9      A. It's been a while.
10     Q. And did Joe Oltmann visit Tomotley at this
11 time frame as well?
12     A. I don't recall if he did.
13     Q. Do you have any reason to deny that he came to
14 Tomotley in late 2020?
15     A. I don't, no.
16     MR. KLOEWER: Okay. I think it's probably
17     time everybody would appreciate a lunch break. We
18     can break here and hop back in. Does that -- does
19     that work, if we all hop off the record here for --
20     I don't know. It's 10:37 my time, 12:37 your time.
21     So if we hop back on the record, say, 1:30 Eastern,
22     does that work for everybody?
23     MR. GREAVES: Works for me.
24     MR. KLOEWER: Fifty minutes for lunch. Okay.
25     So let's hop off the record then, and we will get
Page 110

1  back on at 1:30 Eastern Time.
2      THE VIDEOGRAPHER: Please stand by. The time
3      now is 12:37. We are going off the record, and
4      this is the end of Media Unit 2.
5      (A recess was had.)
6      THE VIDEOGRAPHER: The time is 1:29 p.m. We
7      are on the record, and this is the beginning of
8      Media Unit 2. You may proceed.
9  BY MR. KLOEWER:
10     Q. Okay. Mr. Flynn, before we broke for lunch we
11 were discussing some of the communications you had
12 received in November and December of 2020 that
13 referenced Eric Coomer, brought up various claims about
14 him.
15     One of the last things we looked at was what
16 I believe is a draft affidavit from Josh Merritt. And I
17 wanted to talk about him a little bit more.
18     MR. GREAVES: Object to the form and
19     foundation of that but go ahead.
20 BY MR. KLOEWER:
21     Q. Okay. If I recall your testimony correctly,
22 you said you don't recall ever having met Mr. Merritt?
23     A. That's correct.
24     Q. Okay. Do you recall ever communicating with
25 anybody that went by the alias of Spyder, S-P-Y-D-E-R?
Page 111

1      A. I don't recall.
2      Q. And did you ever discuss with Ms. Powell who
3  her sources were that were providing her with the
4  affidavits for her lawsuits at the time?
5      A. I -- I don't. But I was represented, you
6  know, so Sidney was still representing me at the time,
7  so I want to be careful that I am not crossing the line
8  here, Jason.
9      MR. GREAVES: Right.
10 BY MR. KLOEWER:
11     Q. So just so I'm clear on that so we don't cross
12 that line, what matters was Ms. Powell representing you
13 with respect to at that time?
14     A. I mean, just as a lawyer. She was a legal --
15 she was my lawyer at the time.
16     Q. Well, but you hadn't retained her to advise
17 you on matters related to the election, correct?
18     A. I did not.
19     Q. And we've seen various e-mails that she had
20 sent to you, you know, asking you to forward things on
21 to higher-ups and different offices as well during that
22 time frame that were not subject to that privilege.
23 So --
24     MR. GREAVES: Form.
25 BY MR. KLOEWER:
Page 112

1      Q. -- was she just representing you with respect
2  to your appeal of the criminal case?
3      A. I mean, there was no appeal.
4      Q. But your retainer agreement with her was
5  specifically with respect to the criminal allegations
6  against you. Is that fair?
7      A. They -- no, no, not at that time.
8      Q. Okay. Well, what other matters was she
9  representing you on?
10     A. No -- that was not -- that's not a fair
11 statement that you said.
12     Q. Okay. Well, I just want to be sure I
13 understand clearly what matters specifically she was
14 representing you with respect to during this November-
15 December time frame.
16     A. Various -- various legal matters that were
17 still pending.
18     Q. Okay. Were you helping her with legal
19 strategy as far as the lawsuits she was filing related
20 to the election?
21     A. I would not characterize it like that. I
22 mean, legal strategy. I'm not a lawyer.
23     Q. What would you say was your role in --
24     Well, were you involved in any way with
25 the either research or preparation or investigation for
Page 113

29 (Pages 110 - 113)

1  lawsuits that Ms. Powell went on to file?
2      MR. GREAVES:  Object, and advise my client to
3  assert his Fifth Amendment rights.
4  BY MR. KLOEWER:
5      Q.  Did you read any of the lawsuits that Ms.
6  Powell filed?  I'm going to refer to them generally as
7  the Kraken lawsuits.  There were four of them.  Did you
8  read those lawsuits?  And she filed them in Georgia,
9  Arizona, Wisconsin and Michigan.  Did you review any --
10     A.  I don't -- I don't recall.  Uh-uh (Negative
11  response).  I don't recall reading them.
12     Q.  Let's take a look at what you disclosed as
13  MTF-21.  I'll share my page here.  And this is the next
14  sort of chronological documents in that time frame.  We
15  were looking at that before.  This is from December 11th
16  of 2020.  This is an e-mail from Jim Penrose directly to
17  you, Lin Wood, and Ms. Powell.  The subject line reads,
18  From State Bar of Texas, Member Directory.  Dominion
19  Voting Ownership by George Soros.
20         Sorry.  Just to be clear, we will mark this as
21  Exhibit 24.  Sorry I didn't get that in there.  We're at
22  No. 24 now.
23         (Exhibit 24, E-mail chain ending 12/11/2020
24         from Jim Penrose to Sidney Powell, et al., was
25         marked for identification.)

Page 114

BY MR. KLOEWER:
1      Q.  Mr. Penrose states, "We'll dig into this."
2      And if we scroll down we will see that Ms.
3      Powell stated, "To verify," in bold, "and advise."
4      And below we have something from JimStep78.
5      Do you know whose e-mail address that would -- that is?
6      A.  I don't.
7      Q.  Okay.  The information here indicates Soros
8      Fund Management LLC.  I'm not going to read the whole
9      thing.  It's a bit of a lengthy document here.  But it
10     purports to indicate Soros Fund Management LLC having
11     some ownership interest in Dominion Voting Systems.
12         Do you recall looking into this matter at the
13     time, Mr. Flynn?
14     A.  I don't recall.
15     Q.  Okay.  As you sit here today, are you aware of
16     any ownership interests that George Soros has with
17     Dominion Voting Systems?
18     A.  I'm not.
19     Q.  Are you aware of any relationship at all
20     between George Soros and Dominion Voting Systems?
21     A.  I am not.
22     Q.  Okay.  And in this instance we have Lin Wood
23     cc'd on this e-mail.  Can you tell me, how did you start
24     working with Lin Wood?

Page 115

1      MR. GREAVES:  Objection to form.
2      THE WITNESS:  We -- what are you -- I mean,
3      what do you mean, how did I start working with him?
4  BY MR. KLOEWER:
5      Q.  Let's start there.  How did you meet Lin Wood?
6      A.  I showed up to his home.
7      Q.  That was the first time you met him, when you
8      arrived at his house?
9      A.  I believe so.
10     Q.  And why did you go to his house?
11     A.  Sidney I believe was invited, if I remember
12  correctly.
13     Q.  Okay.  So he served as an intermediary,
14  basically introduced you to him?  Is that fair?
15     A.  No.  I mean, an intermediary?  I don't know
16  what you're talking about.
17     Q.  Well, did -- did Sidney Powell introduce you
18  to Lin Wood?
19     A.  I would say she did, yeah.  I mean, you know,
20  she's -- she's the one that had a -- that's the reason
21  why we went down to his home.
22     Q.  And was Mr. Wood representing you in a legal
23  capacity at this time?
24     A.  No.
25     Q.  And who else did you -- did you go just with

Page 116

1  Ms. Powell, or were there more people who showed up at
2  Lin Wood's house?
3      A.  I think we have been through that, but there
4  was a few other people.  You know, you mentioned some --
5      Q.  And --
6      A.  -- earlier.
7      Q.  Why did you go to Lin Wood's house, of all
8  places?
9      A.  I -- I think wanted to -- we wanted to get out
10  of Washington, D.C., as I recall.  And I think it's
11  because of a relationship that -- that, if I recall, I
12  think Sidney had with Lynn.
13     Q.  Why did you want to get out of Washington,
14  D.C.?
15     A.  Just because there was too much traffic.  Too
16  tough -- too tough getting around.
17     Q.  During this time frame when you -- and how
18  long did you stay at Tomotley?
19     A.  Probably, off and on, a good two weeks maybe.
20     Q.  Was that just the late November time frame?
21  Did that extend into December, if you recall?
22     A.  Yeah, it was -- it was over about two weeks I
23  think.  Yeah.  Roughly --
24     Q.  Sorry.  I don't mean to cut you off there.
25         During that time frame when you were at

Page 117

| | Page 118 | | Page 120 |
|---|---|---|---|

1    Tomotley, were you in contact with Ron Watkins?

2      A. I don't know -- I don't know that name.

3      Q. He went by the alias of Code Monkey. Does

4 that sound familiar?

5      A. That does.

6      Q. Okay.

7      A. He was on -- he was on Twitter or something at

8 the time.

9      Q. Okay. You are not familiar with the name Ron

10 Watkins?

11      A. I'm not. I'm not familiar.

12      Q. You don't recall him running for Congress in

13 Arizona?

14      A. I don't, no.

15      Q. Did you have any contact with the individual

16 that went by the name of Code Monkey?

17      A. I don't recall at all, no.

18      Q. All right. I want to take a look at what you

19 disclosed here as MTF-195.

20      A. Uh-huh (Affirmative response).

21      Q. Do you see this e-mail, Mr. Flynn?

22      A. I do. Yes.

23      Q. Okay. And this is from a few days later.

24 This is December 19th of 2020. It's from Sidney Powell,

25 Sidney@FederalAppeals.com, directly to you, nobody else

*Page 118*

---

1      THE WITNESS: I'm going to -- I'm going to

2 assert my constitutional rights on the advice of

3 counsel and respectfully decline to answer your

4 question.

5 BY MR. KLOEWER:

6      Q. The person who opened the door for you was a

7 guy by the name of Garrett Ziegler, correct?

8      MR. GREAVES: Same objection.

9 BY MR. KLOEWER:

10      Q. Garrett Ziegler was a staff for Peter Navarro

11 at the time; is that right?

12      MR. GREAVES: Same objection.

13 BY MR. KLOEWER:

14      Q. When did you first meet Garrett Ziegler?

15      MR. GREAVES: Same objection.

16 BY MR. KLOEWER:

17      Q. Are you still in touch with Garrett Ziegler

18 today?

19      MR. GREAVES: Same objection.

20 BY MR. KLOEWER:

21      Q. Have you discussed Eric Coomer with Garrett

22 Ziegler?

23      MR. GREAVES: Same objection.

24 BY MR. KLOEWER:

25      Q. Are you aware that Garrett Ziegler regularly

*Page 120*

---

1 is cc'd on this, at your Flynn@ResilientPatriot.com

2 e-mail address. And this is just a forward that Ms.

3 Powell appears to have received from an individual named

4 Ted Groves?

5      A. Okay.

6      Q. And it says, "FYI. Wonderful if true.

7 However, I am told Maggie Haberman hasn't left Brooklyn

8 since March."

9      So I believe this is a link here. And if we

10 scroll down in this document, we can see this article

11 dated December 19th. It appears to be from the New York

12 Times. It states, "Trump discussed naming campaign

13 lawyer as special counsel on election fraud."

14      Do you know why Ms. Powell sent you this

15 e-mail?

16      A. I don't recall.

17      Q. Okay. You visited the White House with Ms.

18 Powell and Patrick Byrne the night before on December

19 18th, 2020. Is that correct?

20      MR. GREAVES: Objection. I'm advising my

21 client to assert his Fifth Amendment rights.

22 BY MR. KLOEWER:

23      Q. Who let you into the White House that evening,

24 Mr. Flynn?

25      MR. GREAVES: Objection, objection.

*Page 119*

---

1 posts personal contact information for Eric Coomer on

2 his Telegram page?

3      MR. GREAVES: Same objection.

4 BY MR. KLOEWER:

5      Q. Do you know that he's posted Dr. Coomer's

6 photograph on multiple occasions?

7      MR. GREAVES: Same objection.

8 BY MR. KLOEWER:

9      Q. Are you aware that Mr. Ziegler regularly posts

10 Dr. Coomer's personal phone number on his Telegram page?

11      MR. GREAVES: Same objection.

12 BY MR. KLOEWER:

13      Q. Are you aware that Mr. Ziegler regularly posts

14 photos of Dr. Coomer's home as well as his home address

15 on his Telegram page and encourages people to go and

16 protest outside his house?

17      MR. GREAVES: Same objection.

18 BY MR. KLOEWER:

19      Q. Have you coordinated with Mr. Ziegler on his

20 harassment efforts against Dr. Coomer?

21      MR. GREAVES: Same objection.

22 BY MR. KLOEWER:

23      Q. You're taking that Fifth to that objection; is

24 that correct?

25      MR. GREAVES: We're asserting our Fifth

*Page 121*

---

**31 (Pages 118 - 121)**

1   Amendment on anything related to anything -- you
2   brought this up as a string of questions about
3   meeting at the White House.  And so anything
4   related to that and people involved in that meeting
5   we're asserting the Fifth Amendment right.
6       MR. KLOEWER:  Okay.  My question is more
7   towards the present day whether Mr. Flynn is aware
8   of Mr. Ziegler's ongoing harassment campaign
9   against Dr. Coomer.
10      MR. GREAVES:  Could you rephrase or restate
11  the question then?
12      MR. KLOEWER:  Sure.
13  BY MR. KLOEWER:
14      Q.  Are you aware that Mr. Ziegler continues to
15  publish personal contact information of Dr. Coomer to
16  this day?
17      A.  I'm not --
18      MR. GREAVES:  You can go ahead.
19      THE WITNESS:  Yeah.  I'm not aware.
20  BY MR. KLOEWER:
21      Q.  Do you support that, Mr. Ziegler's efforts to
22  do that, now that you're aware of them?
23      A.  To do what?
24      Q.  To post personal contact information for Dr.
25  Coomer on social media.

Page 122

1       A.  I do not support that type of behavior.
2       Q.  And you were also, in addition to Ms. Powell,
3   you were accompanied by Patrick Byrne at the White House
4   on December 18th, correct?
5       MR. GREAVES:  Objection, Fifth Amendment.
6   BY MR. KLOEWER:
7       Q.  How did you first meet Patrick Byrne?
8       A.  A friend of mine had spoken to me about him,
9   and the first time we actually met we spoke on a phone
10  call.
11      Q.  Do you recall when that phone call occurred?
12      A.  It was summer of 2020.
13      Q.  So summer of 2020, several months prior to the
14  election then.  What was the substance of the
15  conversation?  What did you discuss?
16      A.  He was apologizing.
17      Q.  For what?
18      A.  For being part of the unjust attack against me
19  and my family.
20      Q.  What role did Mr. Byrne play in that?
21      A.  He -- I think he at the time, if I remember
22  correctly, he was working for the government.
23      Q.  In what capacity?
24      A.  You'd have to ask him.
25      Q.  Okay.  Did you accept Mr. Byrne's apology?

Page 123

1       A.  Not necessarily.
2       Q.  Did you discuss anything else on the phone
3   call at the time?
4       A.  I don't recall.
5       Q.  But you're -- you're in contact with
6   Mr. Byrne, you are still in contact with Mr. Byrne
7   today, correct?
8       A.  Yes.
9       Q.  Would you consider him a friend?
10      A.  Yes.
11      Q.  You've worked together on a variety of
12  different matters.  Is that fair?
13      A.  That's fair.
14      Q.  So how did this relationship develop then?  It
15  sounds like you had a phone call, he apologized, and you
16  didn't necessarily accept that apology.  Correct me if
17  I'm misstating your testimony.  But what happened next?
18  How did that relationship develop?
19      A.  Well, I mean, I wouldn't -- whether I accepted
20  it or not, I just -- just it was -- you know, you had --
21  sort of have been there at the moment.  But I think the
22  relationship afterwards, and I forget the next time we
23  met, I think it was after the 2020 election.
24      Q.  So you weren't -- you didn't maintain -- you
25  didn't continue talking to him prior to the election?

Page 124

1       A.  I don't believe I did.  But I don't recall if
2   I did, but I don't believe I did.
3       Q.  Were you aware of Mr. Byrne's election-related
4   efforts prior to the 2020 election, specifically his
5   concerns about election integrity?
6       A.  I was not aware prior.
7       Q.  Did you know about his involvement with the
8   election in Tennessee in 2019?
9       A.  I was not.
10      Q.  So you never discussed election-related
11  matters prior to the 2020 election.  Is that fair?
12      A.  That's fair.
13      Q.  And did he reach out to you after the 2020
14  election, or did you reach out to him?
15      A.  I -- I don't -- I don't recall.
16      Q.  What was the first conversation you had with
17  him after the election had occurred?
18      A.  I have no idea.
19      Q.  Did you meet in person or was it on the phone?
20      A.  No, I don't recall.
21      Q.  Would it have been at Tomotley?
22      A.  No.  It was -- it was prior to that.  It was
23  prior to us going down there.
24      Q.  And the discussions you had at Tomotley
25  eventually led to your visit to the White House on

Page 125

32 (Pages 122 - 125)

1    December 18th; is that fair?
2           MR. GREAVES:  Objection, Fifth Amendment.
3    BY MR. KLOEWER:
4        Q.   And the reason you visited the White House on
5    December 18th was to try to encourage former President
6    Trump to sign an executive order --
7           MR. GREAVES:  Objection.
8    BY MR. KLOEWER:
9        Q.   -- voting machines; is that right?
10          MR. GREAVES:  Objection, Fifth Amendment.
11   BY MR. KLOEWER:
12       Q.   Let's take a look at this document.
13          You went to the White House with a copy of
14   this draft executive order dated December 16th, 2020.
15   "Presidential findings to preserve, collect, and analyze
16   national security information regarding the 2020 general
17   election."
18          Correct?
19          MR. GREAVES:  Objection, Fifth Amendment.
20          MR. KLOEWER:  And again, we'll mark this as
21   Exhibit 25.  I apologize again.
22          (Exhibit 25, Document 12/16/2020 headed
23          Presidential Findings, was marked for
24          identification.)
25   BY MR. KLOEWER:
Page 126

1        Q.   Who wrote this or who drafted this executive
2    order, Mr. Flynn?
3           MR. GREAVES:  Objection, Fifth Amendment.
4    BY MR. KLOEWER:
5        Q.   Did Phil Waldron draft this document?
6           MR. GREAVES:  Objection, Fifth Amendment.
7    BY MR. KLOEWER:
8        Q.   If we look through this document, on the top
9    line of the second page it identifies Dr. Coomer by name
10   and states, "Just days prior to the election of November
11   3rd, 2020, Federal Judge Totenberg found, after three
12   days of testimony, including by Dominion executive Eric
13   Coomers," there's a slight typo there, and it quotes
14   some findings from Judge Totenberg from that proceeding
15   in Georgia.
16          Do you know why Dr. Coomer was referenced in
17   this draft executive order?
18          MR. GREAVES:  Objection, Fifth Amendment.
19   BY MR. KLOEWER:
20       Q.   And you believed at the time, or at least you
21   were arguing that President Trump should sign this order
22   to seize, collect, retain, and analyze all the voting
23   machines in the country, correct?
24          MR. GREAVES:  Objection, Fifth Amendment.
25   BY MR. KLOEWER:
Page 127

1        Q.   And another purpose of your visit to the White
2    House that night was to try to have Sidney Powell
3    appointed as special counsel, correct?
4           MR. GREAVES:  Objection, Fifth Amendment.
5    BY MR. KLOEWER:
6        Q.   Was Sidney Powell appointed as special
7    counsel?
8           MR. GREAVES:  Objection, Fifth Amendment.
9    BY MR. KLOEWER:
10       Q.   Why not?
11          MR. GREAVES:  Objection, Fifth Amendment.
12   BY MR. KLOEWER:
13       Q.   Let's take a look at what's been disclosed as
14   MTF-198.  This is an e-mail from a few days later.  This
15   is from Sidney Powell to you and Abbie Frye, e-mail
16   address Abbie@kracken-wood.com, sent Monday, December
17   21st, 2020.  Who is Abbie Frye?
18       A.   She is a lawyer.
19       Q.   Does she work with Ms. Powell?
20       A.   She did.
21       Q.   The subject line is, "Evidence for
22   Congressional contacts."
23          And if we scroll down here, it states -- and
24   the signature block here is from the same individual we
25   saw before, Christos Makridis.  I'm not sure if I'm
Page 128

1    pronouncing his name correctly, but I believe that's the
2    best I can do.
3           And Mr. Makridis states --
4           I want to go through several aspects of this,
5    so we will spend a little time on this.
6           "Hi Emily and Howard.  I've continued
7    coordinating with Bob Destro and John Baker."
8           So I can see here that this e-mail is
9    addressed to Emily, it appears to be Emily Newman.  Do
10   you know who is Emily Newman?
11       A.   She's a lawyer.
12       Q.   And where does she work?
13       A.   No idea.
14       Q.   Was she working with Ms. Powell at the time?
15       A.   I don't know.  I don't recall.
16       Q.   And for the fourth or fifth but not the last
17   time I have not marked another exhibit.  We are going to
18   call this Exhibit 26.  Apologies.  I'm going to try to
19   pay closer attention here.  Exhibit 26.
20          (Exhibit 26, E-mail ending 12/21/2020
21          from Sidney Powell to flynn resilientpatriot.com,
22          et al., was marked for identification.)
23   BY MR. KLOEWER:
24       Q.   And Howard.  Do you know who Howard is?
25   Howard415@protonmail?
Page 129

33 (Pages 126 - 129)

1      A.  I believe, if it's the guy that I remember,
2  he's a lawyer, another lawyer.
3      Q.  And Emily Newman, she is actually an executive
4  for The America Project as well, correct?
5      A.  I believe she worked with The America Project,
6  yeah, yeah.
7      Q.  So Mr. Makridis states to Ms. Newman and
8  Mr. Kleinhendler, I believe his name is Howard
9  Kleinhendler, "I have continued coordinating with Bob
10  Destro and John Baker."
11      Do you know who Bob Destro is?
12      A.  I don't.
13      Q.  If I told you that he was an undersecretary at
14  the Secretary of State's office, would you have a reason
15  to disagree with that?
16      A.  If you say so.
17      Q.  Okay.  The same question for John Baker.  Do
18  you know who that is?
19      A.  I don't.
20      Q.  Mr. Makridis states, "There are some positive
21  developments in building congressional support.  Senator
22  Cotton needs to know the name of the case from the
23  federal court in Georgia which issued the order
24  preventing changes in the voting machines, whether the
25  order still applies, and the names, contacts and the

Page 130

1  attorneys handling this case."
2      So Ms. Powell has forwarded this to you and
3  Ms. Frye.  Were you involved in efforts to coordinate
4  with members of Congress at this time?
5      A.  I don't recall.
6      Q.  You don't remember if you were meeting with
7  members of Congress in late December of 2020?
8      A.  No, I don't recall if I was.
9      Q.  Did you meet with Senator Cotton?
10      A.  I -- at that time, no, I don't believe I did.
11      Q.  Did you speak with him on the phone?
12      A.  I don't recall if I did.
13      Q.  Mr. Makridis goes on to state, "Relatedly,
14  John Baker has been working with Allied Security and the
15  lawyer who originally got the order in Antrim."
16      So Allied Security I understand to mean the
17  Allied Security Operations Group that we've already
18  discussed.
19      Do you have any reason to disagree with that
20  understanding of this -- what Mr. Makridis has stated
21  here?
22      A.  I have no reason to disagree with it, no.
23      Q.  And the lawyer who originally got the order in
24  Antrim, do you know what he's referring to there?  What
25  is Antrim?

Page 131

1      A.  I don't know what he's referring to.
2      Q.  Okay.  Were you involved in efforts to examine
3  voting machines in Antrim County, Michigan?
4      A.  I was involved in efforts to get people to
5  Antrim County.
6      Q.  Did you go to Antrim County yourself?
7      A.  No.
8      Q.  And why -- why were you involved in efforts to
9  get people to Antrim County?
10      A.  Because I was able to coordinate the travel
11  basically.  Coordinating the travel.
12      Q.  Okay.  But why -- why were people going to
13  Antrim County and why were you helping with that effort?
14      A.  There was -- there was interest in -- if I
15  recall right, there was interest in -- in some outcome
16  of what they learned up there from the 2020 election.
17      Q.  There was some confusion about vote totals out
18  of Antrim County.  Is that a fair assessment?
19      A.  That sounds -- yeah, that sounds about right.
20  That sounds about right.
21      Q.  And who is the lawyer who got an order in
22  Antrim.
23      A.  I don't recall.
24      Q.  Does the name Matthew DePerno sound familiar?
25      A.  It does.

Page 132

1      Q.  Okay.  How do -- do you know Mr. DePerno?
2      A.  I have met him and I know him.
3      Q.  How did you meet Mr. DePerno?
4      A.  I don't know how we first met.  He did -- he
5  and I did meet in Washington, D.C., when he came for a
6  visit one time.  I remember that.
7      Q.  Was that -- was that on January 5th of 2021?
8      A.  I forget -- no.  I forget the date.  I don't
9  recall the date.
10      Q.  And you went on to co-star in The Deep Rig
11  with Mr. DePerno, didn't you?
12      A.  I was in that.  I didn't -- I would not have
13  been able to tell you whether DePerno was in it or not.
14  But I was -- I was filmed for that.
15      Q.  It says, "He's been working with Allied
16  Security and the lawyer who got the order in Antrim, as
17  well as Joe Oltmann, who put the information about Eric
18  Coomer and Garland Favortino."
19      I believe that's another typo referring to
20  Garland Favorito.
21      Do you know who Garland Favorito is?
22      A.  I -- I don't know who he is.  I don't know
23  him.  I have heard of him.
24      Q.  What's the context in which you have heard of
25  Mr. Favorito?

Page 133

34 (Pages 130 - 133)

1      A.   In the media.
2      Q.   And what has the media stated about
3   Mr. Favorito that --
4      A.   I think he's just -- he's another individual
5   who has been fighting election integrity issues, if I
6   recall right, in, I think, in the state of Georgia.
7      Q.   The last line here says, "Our team should 100
8   percent be coordinating with them since they have more
9   information on the machines, but we need to be sharing
10   it."
11          Were you coordinating with Joe Oltmann and
12   Matthew DePerno at this time, as Mr. Makridis suggested
13   you should be?
14      A.   I don't recall if I was.
15      Q.   Do you deny that you were?
16      A.   No, no.  I know I had -- I had been back and
17   forth with Matt DePerno, but not -- I don't recall being
18   back and forth with Oltmann.
19      Q.   You never spoke to him on the phone at the
20   time?
21      A.   I don't remember.
22      Q.   Do you know a guy by the name of Sam Faddis?
23      A.   Sam Faddis.  I do.
24      Q.   How do you know Mr. Faddis?
25      A.   He writes a great substack.

Page 134

1      Q.   Have you met him in person?
2      A.   I don't know if I ever have.  I don't know.
3      Q.   Do you recall speaking with him during this
4   time frame, November-December of 2020?
5      A.   I don't.
6      Q.   Did Ms. Powell tell you that she had had
7   Mr. Faddis come to Colorado to interview Mr. Oltmann?
8      A.   I don't recall that.
9      Q.   Did Mr. Faddis -- did you ever discuss
10   Mr. Oltmann or his claims with Mr. Faddis?
11      A.   I don't remember if I did.
12      Q.   Did Ms. Powell tell you that Mr. Faddis had
13   concluded that Oltmann was embellishing his claims?
14      A.   I don't recall that.
15      Q.   So, but you don't deny working, coordinating
16   with Mr. DePerno and Mr. Oltmann at this time.  Do you
17   know why Ms. Powell was forwarding this e-mail to you?
18      A.   I'm speculating.  Maybe just for my
19   information, I guess.
20      Q.   And are you aware that Mr. Oltmann and
21   Mr. DePerno went on to meet with Bob Destro and John
22   Baker at the Secretary of State's office on January 6th?
23      A.   No, I don't recall that.
24      Q.   Did you help to coordinate that meeting
25   between Mr. Oltmann and the State Department officials?

Page 135

1      A.   I don't believe I did.  I don't -- I don't
2   have any knowledge of that.
3      Q.   Do you deny that you did?
4      A.   Deny I did what?
5      Q.   Helped coordinate a meeting between Joe
6   Oltmann, Matthew DePerno, Bob Destro, and John Baker on
7   January 6th?
8          MR. GREAVES:  I'm going to object and ask my
9   client, advise him to assert his Fifth Amendment
10   rights here.
11   BY MR. KLOEWER:
12      Q.   Do you know why Joe Oltmann and Matthew
13   DePerno would be meeting with people at the State
14   Department on January 6th?
15          MR. GREAVES:  Objection, Fifth Amendment.
16   BY MR. KLOEWER:
17      Q.   Can you think of any good reason for Joe
18   Oltmann and Matthew DePerno to be meeting with people at
19   the State Department on --
20          MR. GREAVES:  Objection.
21   BY MR. KLOEWER:
22      Q.   -- January 6th?
23          MR. GREAVES:  Objection, Fifth Amendment.
24   BY MR. KLOEWER:
25      Q.   Where were you on January 6th, Mr. Flynn?

Page 136

1          MR. GREAVES:  Objection, Fifth Amendment.
2   BY MR. KLOEWER:
3      Q.   Did you go to the State Department with Joe
4   Oltmann and Matthew DePerno that day?
5          MR. GREAVES:  Objection, Fifth Amendment.
6   BY MR. KLOEWER:
7      Q.   Were you staying at the Willard Hotel on
8   January 5th and January 6th?
9          MR. GREAVES:  Objection, Fifth Amendment.
10   BY MR. KLOEWER:
11      Q.   You spoke on stage on Freedom Plaza on the
12   night of January 5th, correct?
13      A.   I did.
14      Q.   And Joe Oltmann also --
15      A.   Now, Freedom -- Freedom Plaza is the one on
16   the end of Pennsylvania Avenue, they call it Pershing
17   Plaza; is that right?
18      Q.   I believe so, yes.
19      A.   I did, yes.
20      Q.   And Joe Oltmann also spoke on stage that
21   night, right?
22      A.   I have no idea.
23      Q.   Did you see Joe Oltmann's speech that night?
24      A.   I don't believe I did.  Don't recall.
25      Q.   You don't remember he was the final speaker of

Page 137

35 (Pages 134 - 137)

1    the evening?
2       A.  I don't -- I don't know that.
3       Q.  Do you recall seeing him present a PowerPoint
4    presentation where he discussed Eric Coomer and his
5    theories about the election being rigged?
6       A.  I don't recall.
7       Q.  Did you speak with Mr. Oltmann back stage at
8    that event that evening?
9       A.  I don't recall if we did or -- or I wasn't --
10   I wasn't there that long.
11      Q.  Do you deny speaking with Joe Oltmann back
12   stage on January 5th?
13      A.  I don't deny it.  I just don't recall if we
14   did.  It was packed with people.
15      Q.  And did you spend any time in the Willard
16   Hotel with Joe Oltmann and Rudy Giuliani and John
17   Eastman?
18      A.  I don't remember if I did.  I know I -- I'm
19   just trying to think if I met with Rudy Giuliani.  I did
20   meet with Rudy, but I don't know if it was in the
21   Willard or not.  I just -- I don't recall that.
22      Q.  When did you meet with Mr. Giuliani?
23         MR. GREAVES:  Objection, Fifth Amendment.
24         THE WITNESS:  Yeah, yeah.
25   BY MR. KLOEWER:

Page 138

1      Q.  Were you in the Willard Hotel on the evening
2   of January 6th after the attack on the capital?
3         MR. GREAVES:  Objection, Fifth Amendment.
4   BY MR. KLOEWER:
5      Q.  Were you in the room with Joe Oltmann, Rudy
6   Giuliani, and Patrick Byrne on the evening of January
7   6th?
8         MR. GREAVES:  Objection, Fifth Amendment.
9   BY MR. KLOEWER:
10      Q.  Are you aware that Mr. Oltmann has repeatedly
11   told a story about how he was sitting at a table with
12   Rudy Giuliani on the evening of January 6th and Patrick
13   Byrne entered the room to request that Mr. Giuliani
14   organize a pardon for him from President Trump?
15      A.  I'm not.  I'm not aware of that.
16      Q.  Were you in the room for that conversation?
17         MR. GREAVES:  Objection, Fifth Amendment.
18   BY MR. KLOEWER:
19      Q.  Has Mr. Byrne ever told you that he requested
20   a pardon from Mr. Giuliani?
21         MR. GREAVES:  Objection, Fifth Amendment.
22   BY MR. KLOEWER:
23      Q.  Do you know if Mr. Byrne requested a pardon?
24      A.  I'm not aware.
25      Q.  Did you request a pardon, Mr. Flynn?

Page 139

1       A.  Be specific.
2       Q.  Did you request --
3         Well, John Eastman famously sent an e-mail
4   stating that he should -- believed that he should be on
5   the pardon list.  And I'm wondering if you also
6   requested a pardon from President Trump for any of your
7   activities related to what occurred on January 6th.
8         MR. GREAVES:  Objection.  The Fifth Amendment.
9   BY MR. KLOEWER:
10      Q.  Do you believe Oltmann's story that Patrick
11   Byrne requested a pardon from Mr. Giuliani that evening?
12      A.  I mean, I don't have any recollection of any
13   story like that, so I just -- you know, I don't -- I
14   don't -- I don't know.
15      Q.  So we have just gone through a whole series of
16   communications throughout November, December and events,
17   possible conversations with Mr. Oltmann, claims about
18   Eric Coomer that long preceded the ReAwaken America
19   Tour.  But if I understand your testimony correctly, you
20   never thought any of those claims were worth even
21   investigating, right?
22         MR. GREAVES:  Objection to form.
23         MS. WEISS:  Join.
24         THE WITNESS:  Which claims?  I mean, you
25   are -- now you are -- like, which claims?  If it

Page 140

1   was last month, maybe I would have a better memory
2   of it all.  But what claims are you talking about?
3   BY MR. KLOEWER:
4      Q.  Claims that Eric Coomer partook in an Antifa
5   conference call, that he claimed on that call to have
6   rigged the election, and that he did, in fact, rig the
7   election.  You never thought those claims were credible,
8   did you?
9      A.  I think I've already answered all those
10   questions.
11      Q.  Well, you stated before you didn't recall ever
12   hearing about Eric Coomer, but now we have gone through
13   all these communications.  I'm wondering if, having
14   refreshed your memory, you have any memory now that you
15   were aware of Eric Coomer but you didn't believe the
16   claims about him were credible?
17         MR. GREAVES:  Objection to form.
18         MS. WEISS:  Join.
19         THE WITNESS:  I mean, you know, I had heard
20   about Eric Coomer in the media and from different
21   things going back and forth.  But, you know, claims
22   of all this stuff, I mean, I just don't have any
23   recollection of what -- what, you know, resulted at
24   that time.
25   BY MR. KLOEWER:

Page 141

36 (Pages 138 - 141)

1      Q.  I'll ask a more general question based on your
2   professional experience.  Are you familiar with the term
3   "actionable intelligence"?
4      A.  I am.
5          MR. GREAVES:  Objection.  My client is a fact
6   witness, not an expert witness.
7          THE WITNESS:  Yeah, yeah.
8   BY MR. KLOEWER:
9      Q.  Yeah.  I'm asking based on his experience in
10  his field.  And I don't intend to utilize this as expert
11  testimony.  I'm just asking for his understanding of
12  what makes intelligence actionable.
13     A.  What makes it actionable?  That it's --
14  it's -- you know, that it has been verified by, you
15  know, good sources.
16     Q.  What's a good source?
17     A.  A bulletproof source would be somebody who is
18  standing with somebody else and says, I'm in the room
19  with, you know, with Brad Kloewer right now, and here's
20  a photo of him standing here with me.
21         That would be pretty good.
22     Q.  And it's important for intelligence to be
23  actionable, because if it's not, people could get hurt,
24  right?
25     A.  Are you asking that as, you know, from a

Page 142

1   lawyer's perspective?
2      Q.  Let me rephrase that.
3      A.  I'm not sure what you're asking me.
4      Q.  Let me rephrase that.  That was a very
5   poorly-worded question.
6          In your experience in the military,
7   intelligence needed to be actionable in order to act on
8   it.  Is that a fair statement?
9      A.  Well, there's things you do on a battlefield
10  that are -- as long as they are within the rules of
11  engagement and the laws of war, that would not
12  necessarily be something that you would, you know, have
13  to go to court over, I mean in terms of what you are
14  talking about.  I mean, there's things that you do on a
15  battle field with intelligence that could result in the
16  death of somebody, and it may not be 100 percent.
17     Q.  Sure.  But you stated that intelligence needed
18  to be verified by a good source --
19     A.  Uh-huh (Affirmative response).
20     Q.  -- for it to be actionable.  And why is that?
21  Why wouldn't you take action on intelligence that hadn't
22  been verified by a good source?  What are the risks?
23         MR. GREAVES:  Form.  And just -- the relevance
24  of this is getting to the point -- and we put --
25  we've tolerated a lot of irrelevant questions here,

Page 143

1   but there's going to come a point where it becomes
2   abusive of my client and his time.  What his
3   opinions on actionable intelligence are, are not
4   even close to at issue in this case.  He's not an
5   expert witness.
6   BY MR. KLOEWER:
7      Q.  What I am getting at is, you had no reason to
8   believe that Eric Coomer -- that Joe Oltmann's claims
9   were true throughout this November-December time frame,
10  did you?
11     A.  I had no reason to believe that Joe Oltmann's
12  claims were true.  And I guess the reverse -- the
13  reverse of that is I had no reason to believe that they
14  weren't.  I mean, I just don't -- I don't recall.
15     Q.  Between this November-December time frame and
16  Mr. Oltmann's first appearance on the ReAwaken America
17  Tour, did you ever learn anything new about Eric Coomer?
18  And I'm talking about the first six months of December
19  2021.
20     A.  I don't remember if I learned anything new
21  about him.  He wasn't certainly the center of my
22  attention.
23     Q.  So you weren't making any effort to learn
24  about him?
25     A.  Not unless I -- no, I really wasn't.  No.

Page 144

1      Q.  Ms. Powell has provided sworn testimony that
2   she considered Eric Coomer to be quote, a gnat, G-N-A-T.
3   Would you share that assessment, that he was an
4   inconsequential figure?
5      A.  I have no opinion about that.
6      Q.  And you know that Eric Coomer sued Sidney
7   Powell for defamation on December 20 of 2020, right?
8      A.  I don't recall that.  You know, I understood
9   that she was sued by somebody.  I didn't know it was --
10  I can't say whether it was Coomer or whomever, but I
11  knew that she was being sued.
12     Q.  Were you aware that Eric Coomer had filed a
13  defamation lawsuit against -- you just answered with
14  respect to Ms. Powell, but that that lawsuit also named
15  Rudy Giuliani, the Trump Campaign, Newsmax, OAN,
16  Michelle Malkin, Eric Matexes, The Gateway Pundit, Jim
17  Hoft, Joe Oltmann?  Were you aware of any of that?
18     A.  Probably from the media.
19     Q.  Did you ever read that lawsuit?
20     A.  I don't believe I ever did, but I don't -- I
21  don't recall reading it.
22     Q.  Were you aware that Newsmax settled with Dr.
23  Coomer in April of 2021?
24     A.  I'm aware that Newsmax settled.  I am.  But I
25  don't remember the date.

Page 145

37 (Pages 142 - 145)

1    Q.  Did you see the on-air retraction that they
2    posted?
3    A.  I don't recall if I did.
4    Q.  So you are not aware or you don't recall
5    seeing Newsmax apologize to Eric Coomer for the harm
6    they had caused?
7    A.  I -- I have been on Newsmax, but I don't watch
8    a lot of -- I don't watch a lot of Newsmax.  So no, I
9    don't recall seeing it.
10    Q.  We talked about a little bit before about the
11    purposes of the Tour when it got started in 2021 and the
12    various different topics that are covered.  But this
13    question of election security was, in fact, the number
14    one reason why the Tour was established, wasn't it?
15    MS. WEISS:  Object to the form.
16    THE WITNESS:  I don't believe it was, no, I
17    don't believe it was.
18    BY MR. KLOEWER:
19    Q.  Let's do this, let's take a look at what we
20    will label as Exhibit 19, Clip 5.  This is an interview
21    you conducted with Stephen Strang on August 11th of
22    2021.  So this is just a couple weeks after Joe
23    Oltmann's first appearance on the Tour.  And we already
24    watched those clips where he tells his story about Eric
25    Coomer.  But let's take a quick look at this video where

Page 146

1    you are describing the purpose of the Tour to
2    Mr. Strang.
3    (A video clip was played as follows:)
4    AN INDIVIDUAL:  Do you and Clay and the other
5    leaders have specific goals that you hope will
6    result from these -- this tour that you're on?
7    MR. FLYNN:  Yes, yes.  So the specific goals
8    are a much greater understanding and awareness of
9    our election security and our election system in
10    this country, and then what people can specifically
11    do at their local levels to fix that, to correct
12    that problem that we have.  Because the elections
13    and our vote, specifically our vote, is a
14    sacrosanct right, liberty, freedom that we have,
15    and it's what makes all of us equal to each other
16    on that -- on that -- at that single moment in time
17    when we vote.  The person with the least of means
18    or the person with the most of means in this
19    country are equal on that -- at that particular
20    moment in time.  So specifically we want to address
21    election integrity, election security, and the
22    system that we have to vote and what we need to do
23    in order for us to have the privilege of voting.
24    That's No. 1.
25    (The playing of the video clip stopped.)

Page 147

1    BY MR. KLOEWER:
2    Q.  Okay.  So there you are telling Mr. Strang
3    that election integrity and strengthening our system is
4    the No. 1 priority of the Tour.  Would you disagree with
5    that?
6    MR. GREAVES:  Objection to form and
7    completeness.
8    THE WITNESS:  Yeah.  I -- I mean, I don't
9    object to anything I said.  I think that's a great
10    education and that people ought to be teaching that
11    to every kid in this country.
12    BY MR. KLOEWER:
13    Q.  So how did Mr. Oltmann's claims that Eric
14    Coomer rigged the election, how did they advance
15    those -- those objectives?
16    A.  Say that again?
17    Q.  How did Mr. Oltmann's claims on the Tour serve
18    the objectives of increasing election integrity?
19    A.  You're making a big -- you're making a big
20    leap.  I mean, that -- Oltmann wasn't the center of my
21    attention at all.  I mean, I -- you know, he -- when I
22    made that -- more than likely when I made that
23    statement -- and I'm speculating here -- but when I
24    talked to him on that show, Joe Oltmann was the furthest
25    thing from my mind and probably the same thing with

Page 148

1    your -- with your client there, Coomer.  I mean, I don't
2    think about them every second of the day or at all, to
3    be honest when you.
4    Q.  Well, maybe the answer -- maybe that's the
5    answer, is the inverse, is that Joe Oltmann's claims
6    don't advance election integrity.  Would you agree with
7    that?
8    MR. GREAVES:  Objection, form.
9    THE WITNESS:  Yeah, I mean, I -- I don't --
10    you know, it's just -- yeah.  I mean, it's like,
11    what are you asking?
12    BY MR. KLOEWER:
13    Q.  Well, I'm trying to understand why Joe Oltmann
14    is on the Tour, and he gets on stage and he talks about
15    how Eric Coomer rigged the election.  And we have you
16    saying that election integrity is the No. 1 priority of
17    the Tour, just weeks after Mr. Oltmann started telling
18    these stories on stage.  I'm trying to understand if you
19    believe Mr. Oltmann's claims and his presentation
20    contribute to what you believe is the No. 1 purpose for
21    the Tour to exist.
22    MR. GREAVES:  Objection to form.
23    MS. WEISS:  Object to the form.
24    THE WITNESS:  Yeah.  I mean, first of all, you
25    only played a certain clip of that, so I don't know

Page 149

38 (Pages 146 - 149)

1    what the hell else I said on that one.  But we have
2    a lot of people that speak on the Tour that talk
3    about a variety of issues.  Election integrity is
4    one of them and election security is one of them,
5    you know.  And it's evolved over time.  But -- and
6    there's a lot of topics that we talk about.
7  BY MR. KLOEWER:
8    Q.  It sounds like you're not willing to say that
9  Mr. Oltmann's presentations advance the cause of
10  election integrity, are you?
11    MS. WEISS:  Object to form.  Argumentative.
12    THE WITNESS:  Do you want to restate your
13    question?  Because I -- it is.  I think it is.  I
14    feel like we are debating about Joe Oltmann and
15    versus something other than Joe Oltmann.  So I just
16    don't understand what you're trying to get at here.
17  BY MR. KLOEWER:
18    Q.  Well, how does claiming that a Dominion
19  employee rigged the election advance --
20    A.  Okay.  Are you saying that I -- I'm sorry to
21  cut in on you, because you asked me not to when you
22  talk.  But are you implying that I am saying that about
23  Joe Oltmann in this statement, or about, you know, the
24  employee of Dominion in this statement that I'm making
25  on the Strang report?

Page 150

1    Q.  No, no.  I'm asking about Oltmann's statements
2  on the Tour.  Do you believe that they advance the cause
3  of election integrity, and if so, how?
4    A.  You know what?  I don't remember Joe Oltmann,
5  any of the speeches that he gave.  I don't recall
6  anything specifically that he said.  I just -- I just
7  don't.
8    Q.  Well, you know what he said now because we've
9  just watched the videos, right?
10    A.  I do, yeah, from today.
11    Q.  And as you sit here today, can you think of
12  any way that Joe Oltmann's claims about Eric Coomer
13  advance the causes of securing elections?
14    A.  I don't.  I mean -- I mean, I don't -- you
15  know, I think it's -- I'm trying to decide whether it's,
16  you know, apples and refrigerators here.  I'm not sure
17  that you're asking me to see and speculate about
18  have anything to do with what you're -- what you're
19  implying.
20    Q.  You've filed several defamation lawsuits of
21  your own, correct?
22    A.  And what does that have to do with this?
23    Q.  Well, from the 30,000-foot view is you would
24  agree that lying is wrong, right?
25    A.  I do.

Page 151

1    Q.  And you believe that when people publish lies
2  against others, they should be held accountable for
3  those lies, correct?
4    A.  I wish that was the case, but that's not
5  always the case.
6    Q.  That's not my question.  You believe that
7  people should be held accountable when they publish lies
8  about others, right?
9    A.  Yes, I do.  I do believe that.  But that's not
10  always the case.
11    Q.  And that's why you -- that's why you are
12  pursuing defamation claims of your own, right?
13    A.  Yes.
14    Q.  Because in your own personal experience you
15  know that published lies have caused -- or you've
16  alleged at least that those have caused you harm,
17  correct?
18    A.  Yes.
19    Q.  And you think you should be compensated for
20  the harm that you have been caused by lies published by
21  others, right?
22    A.  Not necessarily.
23    Q.  Okay.  Well, then why are you pursuing your
24  own defamation lawsuits if you don't --
25    A.  I wish that people would just, you know,

Page 152

1  just -- would basically just shut their mouths about
2  what -- what they say about something unless they have
3  met them and engage them.  I mean, some of the people
4  that we're talking about in my specific cases, these are
5  people that I have never even met.  You know, if they
6  had met me and I was a jerk to them, then they can call
7  me a jerk.  But most of these people I have never even
8  met.
9    Q.  Do you know if Clay Clark has ever met Eric
10  Coomer?
11    A.  I don't know.
12    Q.  Do you know if Joe Oltmann has ever met Eric
13  Coomer?
14    A.  No idea.
15    Q.  And I think we have established, you haven't
16  read any of the complaints filed by Eric Coomer,
17  correct?
18    A.  I don't recall if I read any of them.
19    Q.  Are you aware that Dr. Coomer has provided
20  sworn testimony that he has received death threats as a
21  result of these claims about him?
22    A.  I'm not.
23    Q.  You would agree that receiving death threats
24  on the basis of a lie is a significant harm, correct?
25    A.  Absolutely.

Page 153

1    Q.   And you would agree that individuals or
2  entities that are responsible for causing that kind of
3  harm should be held accountable for it, right?
4        MS. WEISS:  Object to form.
5        THE WITNESS:  What are you asking me?
6  BY MR. KLOEWER:
7    Q.   I'm just confirming that you would agree that
8  people who are responsible for that kind of harm should
9  be held accountable.
10   A.   I do believe that, yeah.  I think that they --
11  especially that kind of stuff, yeah.
12       MR. KLOEWER:  Okay.  I'm going to shift gears
13       here.  If we could go off the record for like five
14       or 10 minutes, and we will hop back on on a new
15       line of questioning.  Does that work for everybody?
16       Would that be great?
17       MR. GREAVES:  Sure.  Do you have just an ETA
18       of how far you think you are -- are you like
19       halfway done?  Three quarters?
20       MR. KLOEWER:  Closer to three quarters
21       probably.
22       Nate, can you give us a time, a time stamp
23       there?  Or we can go off the record first.
24       THE VIDEOGRAPHER:  Yes.  Let's go off the
25       record.

                                          Page 154

1        The time now is 2:24 p.m.  We are going off
2  the record.  And this is the End of Media Unit 3.
3        (A recess was had at 2:24 p.m. to 2:35 p.m.)
4        THE VIDEOGRAPHER:  The time now is 2:35 p.m.
5  We are on the record.  And this is the beginning of
6  Media Unit No. 4.  You may proceed.
7  BY MR. KLOEWER:
8    Q.   All right.  Mr. Flynn, I want to take a look
9  now, if we could shift gears a bit, to take a look at
10  the subpoena that was issued in this case.
11       Let me pull that up and share my screen, one
12  moment here.  We'll mark this as Exhibit 27.
13       (Exhibit 27, Deposition notice, was marked for
14       identification.)
15  BY MR. KLOEWER:
16   Q.   Okay.  Can you see the document there on my
17  screen, Mr. Flynn?
18   A.   I can see it, yes.
19   Q.   Okay.  Great.  Do you recognize this document?
20   A.   I don't.
21   Q.   Okay.  I'll just represent -- we see the case
22  caption at the top here.  It's a notice of intent to
23  take oral and video deposition.  This is the subpoena
24  that was issued in this case, and it includes --
25       Am I still on screen?  No.

                                          Page 155

1        Okay.  Sorry.
2        All right.  So I'm going to scroll down here
3  to the document requests.  We don't need to go through
4  all of the definitions and instructions and all that
5  information.  Do you recall that we requested a variety
6  of documents from you?
7    A.   I -- I assume you did, yeah.
8    Q.   I want to just go through these here to ensure
9  that any documents that are responsive have been
10  produced.  So --
11   A.   Uh-huh (Affirmative response).
12   Q.   -- the first item we requested here is all
13  written communications relating to Dr. Coomer between
14  you and Clay Clark, Make Your Life Epic doing business
15  as the Thrivetime Show, or anyone acting on its behalf.
16       Can you tell me, when you're communicating
17  with the Thrivetime Show or the Tour, as you understand
18  the Tour in the broad sense, who do you communicate with
19  or --
20   A.   I communicate --
21   Q.   I'm sorry.  Go ahead.
22   A.   I communicate with Clay.
23   Q.   Okay.  Only Clay?
24   A.   99.9 percent of the time.
25   Q.   Okay.  Is there anyone else with the Tour that

                                          Page 156

1  you have communicated with on tour business?  For
2  example, Vanessa Clark or Aaron Antis or any other folks
3  like that?
4    A.   I know them, and I have spoken to them or
5  communicated with them, but not -- I mean, related to,
6  you know, other things, not necessarily the Tour.
7    Q.   And this request pertains to communications
8  relating to Dr. Coomer.  It sounds like from your
9  testimony before -- and correct me if I'm wrong -- have
10  you ever discussed Dr. Coomer with Clay Clark?
11   A.   I believe I have.  Yeah, I believe I have.
12   Q.   Okay.  And what was the nature of those
13  conversations?
14   A.   We've talked about -- I think on his podcast,
15  Clay's podcast, he's shown the incident on his podcast
16  where Coomer drives his car into a building.
17   Q.   Okay.  Anything other than that?
18   A.   I don't -- I don't think so.  I mean, I don't
19  recall anything else.
20   Q.   Did Mr. Clark ever request that you utilize
21  some of your resources to try to determine whether these
22  claims about Eric Coomer were true?
23       MS. WEISS:  Form.
24  BY MR. KLOEWER:
25   Q.   To clarify, I'm referring to the claims that

                                          Page 157

                                    40 (Pages 154 - 157)

1  he partook on this call, that he claimed that he had
2  rigged the election, and that he did rig the election.
3  Has he ever requested that you investigate this?
4      MS. WEISS:  Object to form.
5      THE WITNESS:  I don't recall if he's ever done
6    that.  I don't believe he's ever done that.  I
7    don't recall if he has.  I don't remember him
8    asking me to do anything of that nature.
9  BY MR. KLOEWER:
10      Q.  Well, do you have resources that would allow
11  you to investigate whether this claim is true or not?
12      A.  Like, a claim about what?  What are you
13  talking about?
14      Q.  Well, you know, we have already established,
15  obviously, you are a top-ranking military intelligence
16  officer --
17      A.  I got -- I got all that, Brad.  Don't
18  patronize me, please.
19      Q.  I'm not --
20      A.  Okay.  I mean, you're asking me what?  Do I
21  have investigative resources to investigate somebody?
22      Q.  Yes.
23      A.  I don't.  I don't have anything that I -- that
24  I, you know, that I own or anything that I -- I don't.
25  I mean, I'm not an investigator.

Page 158

1      Q.  Did you ever discuss your --
2      Well, let's see here.  So the point being, Mr.
3  Clark has never tried to take advantage of your
4  experience or resources to try to determine whether
5  these claims are true or not.  Is that fair?
6      A.  Yeah, that's fair.
7      MS. WEISS:  Object to the form.
8      THE WITNESS:  That's fair.  I mean, I don't
9    recall if he ever did, but that's fair.
10  BY MR. KLOEWER:
11      Q.  And similar questions under document request
12  No. 2 relating to Dominion Voting Systems as opposed to
13  simply Eric Coomer.
14      Has Mr. Clark ever requested information from
15  you regarding Dominion Voting Systems?
16      A.  I don't believe he has.  I don't recall if he
17  has in the past, but I don't -- I just don't recall.
18      Q.  And would you have provided that information
19  to anyone affiliated with the Tour other than Mr. Clark?
20      MR. GREAVES:  Objection to form.
21      THE WITNESS:  Yeah.  I mean, I don't -- and I
22    don't have any knowledge about what you're talking
23    about.
24  BY MR. KLOEWER:
25      Q.  I'm just referring generally to any

Page 159

1  information, any evidence, anything that would suggest
2  that Dominion Voting Systems or related to Dominion
3  Voting Systems at all, if Mr. Clark has ever requested
4  that from you.  Is that correct?
5      A.  I don't recall if he has.  I don't -- I don't
6  remember if he had at all.
7      Q.  And we discussed No. 3 previously a bit.  But
8  just to confirm, we requested all communications with
9  Joseph Oltmann or anyone acting on his behalf.
10      Have you ever been in direct contact with Mr.
11  Oltmann?
12      A.  I don't -- I don't recall if I ever have.
13      Q.  Have you --
14      A.  I mean, I've bumped onto -- I've bumped into
15  him at events, that kind of -- if I remember right.
16      Q.  Have you ever e-mailed, sent e-mails with him?
17      A.  I don't recall if I ever have.
18      Q.  Are you familiar with an entity called FEC
19  United?
20      A.  I don't -- I don't believe I am, no.  What
21  does it stand for?
22      Q.  It's Oltmann's local organization.  The
23  acronym FEC stands for Faith, Education, and Commerce.
24  It's a political organization that Mr. Oltmann has
25  started here in Colorado.  Does that sound familiar?

Page 160

1      A.  It doesn't.
2      Q.  Okay.  Did you ever speak at any of his events
3  that you recall?
4      A.  I -- I don't believe I have.  I mean, I don't
5  know if, you know, if I was invited some place.
6  Sometimes there's organizations that underwrite
7  different things.  But I don't believe I've ever spoken
8  at something like that or with that name.
9      Q.  And have you ever appeared on Mr. Oltmann's
10  podcast, Conservative Daily?
11      A.  I don't recall if I have.
12      Q.  What about an organization called the UADF,
13  the United American Defense Fund?  Does that sound
14  familiar?
15      A.  It doesn't.
16      Q.  Do you know who Tig Tiegen is, or Tiegen?
17      A.  Tig Tiegen?  I don't.  It doesn't ring a bell.
18      Q.  If I told you that the UADF is a paramilitary
19  organization associated with FEC United, that Tig Tiegen
20  is a former -- I believe he's a Marine who served in
21  Benghazi, does that ring a bell with respect to either
22  the UADF or Mr. Tiegen?
23      A.  Well, not with respect to UADF, but now I do
24  recognize Tiegen's name.
25      Q.  Okay.  Do you know him?  Have you met him?

Page 161

41 (Pages 158 - 161)

1    A.  I don't know if I have ever met him.

2    Q.  And just going back briefly with respect to

3  Mr. Clark, what's the most typical means by which you

4  communicate with him?  Is that by text message?  By

5  e-mail?  What's the typical --

6    A.  Normally by text.

7    Q.  Okay.  And is that a normal text app that you

8  have on your phone, or is that more through like a

9  Signal app or --

10    A.  No, normal.  Normal.  Normal text, just

11  regular iPhone text.

12    Q.  Do you ever communicate with Mr. Clark via

13  Signal?

14    A.  I don't believe I ever have.  I don't think I

15  ever have.  Normally it's just regular text and share

16  links, stories, information, stuff like that.

17    Q.  Moving down to No. 4, All documents or

18  communications authored, sent or received by you

19  relating to any appearances by Oltmann on the Tour.

20    We discussed this already when we were looking

21  at the video clips before, but when Oltmann was -- was

22  removed from the Tour, apparently for lack of insurance,

23  I realize you don't have any insight into that, but I

24  just want to confirm, did you have any conversations

25  with Mr. Clark at that time about why he was no longer

Page 162

---

1  on the show or on the Tour?

2    A.  Yeah, I don't -- I don't recall that I did.

3    Q.  And as far as on the other end of the spectrum

4  when Oltmann was brought on to the Tour in the first

5  instance, do you recall conversations you had deciding

6  whether or not he should be granted a spot on the Tour?

7    A.  I don't remember if I was -- if I was in a

8  position to do that.  I just have no knowledge of that.

9    Q.  Do you typically communicate via text or

10  e-mail with Mr. Clark to discuss potential speakers on

11  the Tour and whether they should be allowed on?

12    A.  Yes, texts.  Sometimes we do, yeah.

13    Q.  And did you search your text messages to see

14  if you had communications with Mr. Clark about Mr.

15  Oltmann?

16    A.  I mean, that's -- I think Jason, you guys, you

17  know, did a very -- you know, my lawyers did a very

18  thorough search to address all the questions that you

19  are going through.

20    Q.  Number 5.  We requested documents and

21  communications authored, sent, or received by you

22  concerning any compensation for your employment, time,

23  expertise, including any contracts, pay stubs, text

24  messages, or e-mails.

25    You mentioned earlier that you have an

Page 163

---

1  employment contract with the Tour.  Is that something

2  that you could locate?

3    MR. GREAVES:  Object to the form.

4    MS. WEISS:  Object to the form.  That

5  misstates his testimony.

6    MR. GREAVES:  Yeah.  I was just going to say,

7  I think he talked about a contract but not an

8  employment contract.

9    THE WITNESS:  Yeah.

10  BY MR. KLOEWER:

11    Q.  Well, I apologize if I misspoke.  I believe

12  you stated that your contract included reference to

13  compensation, correct?

14    A.  I do.

15    Q.  Okay.

16    A.  I did.  I did.  Yeah.

17    Q.  Okay.  And is that contract something that is

18  in your possession today?

19    A.  It's not in my possession today.  If I --

20    Q.  Well, in the general today, not sitting in

21  front of you at this moment.  But you have possession of

22  that contract, correct?

23    A.  I probably could find it, yeah.  If I dig

24  back, if I -- you know, I could probably find it.

25    MR. GREAVES:  It didn't come up in my search.

Page 164

---

1    THE WITNESS:  Yeah, yeah.

2    MR. GREAVES:  If we've got it, we will get it

3  to you.

4    THE WITNESS:  Yeah, yeah.  If we have it,

5  we'll get it to you.  It's not -- but it, you know,

6  it's been so long.

7  BY MR. KLOEWER:

8    Q.  Great.  We will follow up with your counsel on

9  that.

10    And this referred to pay stubs as well for

11  your speaking engagements.  I believe you stated before

12  that any payment you received for your speaking

13  engagements would go through Resilient Patriot; is that

14  correct?

15    A.  Yeah.  We would invoice -- we would invoice

16  Clay.

17    Q.  And do you know, is there -- would you work

18  with Ms. Clark, Vanessa Clark on that compensation, or

19  does that all go through Clay Clark?

20    A.  I mean, however they do it.  I mean, we would

21  invoice Clay and that would get paid.

22    Q.  When you say "invoice Clay," is that an e-mail

23  to who?  Is it to his personal e-mail?

24    A.  I'd have to -- I'd have to go.  I mean, it's

25  a -- no, it would be like Thrivetime or something like

Page 165

42 (Pages 162 - 165)

1   that, if I remember right.
2     Q.  Number 6.  We requested any documents or
3   communications relating to the establishment of the
4   Tour.  That included, you know, discussing the purpose,
5   financing, corporate structure, business plan, things of
6   that nature.
7     We didn't really get into detail too much
8   earlier about how specific your conversations were in
9   the beginning.  Did you -- was it just you and Clay that
10   were sort of kicking around ideas for this, or were
11   other people involved in brainstorming what the Tour
12   might look like?
13     A.  I -- I don't know other conversations that
14   Clay may have had with other people that he knew, but my
15   guess is he probably spoke to a lot of people, and I was
16   one of them.
17     Q.  Were you a party to the conversations with
18   Clay and any additional third parties about the
19   formation of the Tour?
20     A.  We've talked about -- I don't know about the
21   formation of it, but I know we've -- since we have been
22   doing it, we have had different conversations with
23   different people about, you know, how much -- how much
24   fun it is and doing -- doing the various events and
25   talking about the events.  So, I mean, I wouldn't say

Page 166

1   about formation.  It sounds like -- you know, I just
2   don't have any knowledge of that.
3     Q.  But you can't identify anybody other than
4   yourself and Mr. Clark who were -- who founded the Tour?
5     MR. GREAVES:  Objection to form, foundation.
6     THE WITNESS:  I mean, not really.  I mean, I
7   don't really have -- I mean, I can't answer because
8   I really don't have any knowledge about that.
9   BY MR. KLOEWER:
10     Q.  And what about the discussions about financing
11   the Tour on the front end?  What was your understanding
12   of who was going to pay for all this?
13     A.  Honestly, I don't know.  I mean, I think it
14   was, you know, let's see -- let's see if we can sell
15   some tickets, I guess.  I mean, that seems to work.  You
16   know, I know we worked hard to do that.
17     Q.  But as far as before the tickets are sold, who
18   did you understand was going to be paying to, you know,
19   reserve the venue, to advertise, things of that nature?
20     A.  I don't know.  I don't know.  I don't know
21   that level of detail.
22     Q.  Do you know if Clay Clark is paying for this
23   out of pocket from his personal funds, or are there
24   investors that you are aware of?
25     A.  I don't know.

Page 167

1     Q.  Did you have discussions about the corporate
2   structure of the Tour?  Were you involved, for example,
3   in discussions about starting Reopen America, LLC, and
4   what its purpose would be?
5     A.  I don't recall if I ever had anything like
6   that.  I don't believe I did.
7     Q.  Business plan.  Did you ever see anything like
8   that, you know, the target revenue sales or, you know,
9   any proposals of ways to generate revenue, things of
10   that nature?
11     A.  I don't believe so, but I don't recall.
12     Q.  Let's look at No. 7 here.  And I believe you
13   may have already answered this question already, but
14   just to be certain.  Documents relating to tour's
15   finances, including business plan that we just
16   discussed, profit and loss statements, bank statements,
17   general ledger reports.
18     Are you involved with the Tour on that end of
19   things in any way?
20     A.  No.
21     MS. WEISS:  Brad, I'm going to object to this
22   because of the order we got in December on
23   finances.  The magistrate judge made it pretty
24   clear that the only discovery you can do into the
25   Tour's financing, the finances, is related to

Page 168

1   statements that were specifically about your client
2   and Mr. Oltmann.
3     So I know he's already produced the documents
4   that he has, and I don't think he has any anyway.
5   But the line of questioning about financing I'm
6   going to object to.
7     MR. KLOEWER:  Understood.  I'm just trying to
8   understand what sorts of documents may exist and
9   trying to determine if documents that could be
10   responsive and appropriately disclosed under the
11   Court's order are out there that we should be
12   requesting.
13     So, but I understand Mr. Flynn doesn't play an
14   active role in the financial side of things, so we
15   can -- we can proceed here.
16   BY MR. KLOEWER:
17     Q.  Number 8.  Tour tax returns.  I'm anticipating
18   Ms. Weiss's objection on that as well.
19     So we'll skip to No. 9.  Well, No. 9 falls
20   under the umbrella of that objection as well.
21     Do you have any communication with the Tour's
22   bookkeepers or accountants, Mr. Flynn?
23     A.  I don't.  And I know that, you know, my
24   lawyers did a thorough, thorough review of everything
25   that you're asking me and gave you what everything we --

Page 169

43 (Pages 166 - 169)

1  we, you know, that we were asked to give.  So I'm
2  confident that what exists, you have.
3      Q.  Number 10 pertains to ticket sales.  And I
4  know you are not involved on that side of things, so I
5  just wonder if -- you know, it strikes me that you would
6  have conversations going into an event to know whether
7  it's sold out or not or how many tickets are left.  Do
8  you have those types of conversations as you head into
9  an event?
10     A.  Absolutely.
11     Q.  And how do those conversations typically play
12 out?  Are they in person, on the phone, text messages?
13     A.  On the phone, on a podcast when we are, you
14 know, trying to sell tickets and trying to figure out
15 whether -- you know, what kind of things we --
16         Clay gives away a lot of stuff to get people
17 to buy.  You know we do -- we do back -- backstage
18 passes for -- I mean, he gives tickets away, literally
19 gives tickets away, because, you know, we want to -- he
20 sells them for -- he doesn't even sell tickets
21 sometimes.  Sometimes he just gives them away.
22     Q.  So do you -- are you in, for example, group
23 chats or on Google Documents saying, you know, we've got
24 110 tickets left --
25     A.  No.

Page 170

1      Q.  -- to sell for this event?  Things of that
2  nature?
3      A.  No.  Usually it's just a -- it's on a podcast,
4  where we're selling them on a podcast or, you know, when
5  he and I speak, and, you know, how are we doing.  But,
6  you know, he'll tell me, Hey, it looks like we are sold
7  out again, you know.  Which is nice, you know.  So --
8      Q.  Do you have access to any sort of ticket sale
9  tracking mechanism in realtime?  So like, for example,
10 if you wanted to see how many tickets were left for the
11 next event, can you -- is there a platform you can
12 access to that get that information?
13     A.  For the ReAwaken Tour?
14     Q.  Yeah.
15     A.  No.
16     Q.  Who would have that access?
17         MS. WEISS:  Objection, foundation.
18         THE WITNESS:  You've got me.
19 BY MR. KLOEWER:
20     Q.  Is there anyone affiliated with the Tour that
21 you know, other than Mr. Clark, who sort of administers
22 the ticket sale aspect of operations?
23     A.  I mean, I know a lot of -- a lot of the young
24 people that work with him.  I've gotten to know them.
25 They're great young kids.  But what they specifically

Page 171

1  do, I don't know.
2      Q.  Getting down to these last few requests.
3         We requested all communications with Sidney
4  Powell or anyone acting on her behalf relating to Eric
5  Coomer or Dominion Voting Systems.
6         We have seen many of those communications and
7  discussed them today.  Can you just confirm for me?  We
8  looked at a couple e-mail addresses you used to
9  communicate with Ms. Powell.  We have the zulutym@gmail,
10 the flynn@resilientpatriot.  Are there any other e-mail
11 addresses you have used in your communications with her?
12     A.  I don't believe so.  And I know, you know,
13 we've provided a bunch of stuff related to this.  You
14 know, obviously, she remained my attorney, so there's
15 that privilege for other stuff that, you know, that
16 we're involved in.  But that's -- that's -- those are
17 the primary e-mail addresses.
18     Q.  Do you ever text message with Ms. Powell?
19     A.  Back then?
20     Q.  Then or now.
21     A.  Then, yeah.  Not lately.  Not lately.
22     Q.  Are you still in contact with Ms. Powell?
23     A.  Generally.
24     Q.  How frequently would you say you speak with
25 her these days?

Page 172

1      A.  More infrequently these days.  More
2  infrequently.
3      Q.  Is she still representing you on any legal
4  matters?
5      A.  No.
6      Q.  With respect to Patrick Byrne, I don't believe
7  we have seen any communications.  How do you communicate
8  with Mr. Byrne?
9      A.  Generally text, sometimes a phone call,
10 sometimes face-to-face.
11     Q.  And you've discussed Eric Coomer with Patrick
12 Byrne, right?
13     A.  I don't recall if I ever have.  It's -- you
14 know, he's the center of your attention, not the center
15 of my attention.
16     Q.  Well, again, the reason I ask this, you know,
17 it seems like many people in your circle have been sued
18 by Eric Coomer.  Sidney Powell, Patrick Byrne, The
19 America Projects.  And you have never -- you have never
20 communicated with them about him?  Is that your
21 testimony today?
22     A.  I have -- I don't recall if I have.  I mean,
23 I'm aware of, you know, a lot of stuff because of what's
24 reported in the media.  That's for sure.  And all
25 these -- all these lawsuits.

Page 173

1      Q.  Did Mr. Byrne ever ask you if you had any
2  information about Eric Coomer to share with him?
3      A.  I don't remember him asking me any of that.
4      Q.  Did you review your text messages with Mr.
5  Byrne to see if you had anything responsive to this
6  request?
7      A.  I know that my lawyers reviewed, you know, the
8  requests and went through that in very thorough style
9  and provided everything that, you know, we could
10  provide.
11      Q.  Number 13.  We requested similar
12  communications with Eric Trump.
13          Can you tell me, give me a little bit of
14  background on Mr. Trump Jr. -- well, not -- Eric Trump's
15  involvement with the Tour?  How frequently is he a
16  speaker?
17      A.  How frequently is he a speaker?  Probably the
18  last year he has come to almost the last -- the past
19  year's, but not all of them.  But a fair number of them
20  this past year.
21      Q.  Do you know if he's -- if he receives a
22  speaker fee for his appearances on the Tour?
23      A.  No, no idea.
24      Q.  And actually the same question for Patrick
25  Byrne.  Do you know if he receives a fee when he appears

Page 174

1  as well, correct?
2      A.  Well, I don't know that it was -- I can't --
3  I'm not going to sit here and tell you that it was --
4  that I'm aware that it was Coomer, but I know that
5  Dominion has.  That's what I -- that's what I believe.
6      Q.  Okay.  Well, Dr. Coomer has filed a lawsuit
7  against Mike Lindell.  Is this the first that you have
8  heard of that lawsuit as well?
9      A.  No.  I may have read about it.  But yeah, I
10  mean, I know -- I know if you were to ask me, you know,
11  that Mike Lindell has a lawsuit filed against him by --
12  by this election stuff, I would have said yeah, but I
13  think it's by Dominion.  So that's what I -- I didn't
14  realize that Coomer had also filed a lawsuit against
15  him, unless it's the same thing.
16          Did Brad freeze up?
17      MS. WEISS:  Brad, I think you are frozen.
18      THE VIDEOGRAPHER:  I couldn't tell,
19  because when he has --
20      THE WITNESS:  He's dropped out.
21      THE VIDEOGRAPHER:  Yeah.
22      MR. GREAVES:  I couldn't tell either, because
23  his document was still taking up the screen.
24      THE VIDEOGRAPHER:  Right.
25      MR. GREAVES:  Let's go off the record.

Page 176

1  as a speaker on the Tour?
2      A.  No idea.
3      Q.  With respect to Eric Trump, have you ever
4  discussed Eric Coomer with Eric Trump?
5      A.  I don't believe I have.  I don't recall ever
6  having that conversation him.
7      Q.  Are you aware that Eric Trump was Tweeting and
8  sharing articles about Eric Coomer in November and
9  December of 2020?
10      A.  I'm not.
11      Q.  And he's never asked you about Eric Coomer?
12      A.  Eric Trump?
13      Q.  Correct.
14      A.  I don't believe he's ever -- ever asked me
15  about him.  I don't believe we've ever had a
16  conversation about Coomer.
17      Q.  How do you typically communicate with Eric
18  Trump?  Is that by text message, by e-mail?
19      A.  Text.
20      Q.  The last one we have here is Mike Lindell.
21  Have you ever discussed Dr. Coomer with Mike Lindell?
22      A.  I don't recall if we have specifically talked
23  about Coomer.
24      Q.  You are aware that Dr. Coomer has filed a
25  lawsuit against Mike Lindell, My Pillow, and FrankSpeech

Page 175

1      THE VIDEOGRAPHER:  Okay.  Please stand by.
2  The time is 3:03 p.m., and we're going off the
3  record.
4          (A recess was had at 3:03 p.m. to 3:09 p.m.)
5      THE VIDEOGRAPHER:  The time now is 3:09 p.m.,
6  and we are back on the record.  You may proceed.
7  BY MR. KLOEWER:
8      Q.  Okay.  Before the Internet went out over here
9  we were discussing your communications with Mike
10  Lindell.  And I was asking if, in relation to Josh
11  Merritt, who we discussed before, did Mike Lindell or
12  Josh Merritt ever send you an Excel spreadsheet that
13  included various tabs about Eric Coomer's friends,
14  family, their home addresses, contact info, things of
15  that nature?
16      A.  I don't recall if that was ever sent to me,
17  no.  I don't believe it was, but I don't recall if it
18  was sent to me.
19      Q.  Did you ever receive a document like that from
20  Charles Herring?
21      A.  I don't recall that.  I don't know.
22      Q.  Did you ever receive a document from
23  Mr. Lindell that included e-mail addresses and passwords
24  for employees of Smartmatic and Dominion Voting Systems?
25      A.  I don't recall if I ever received anything

Page 177

45 (Pages 174 - 177)

1  like that.
2      Q.  Do you deny ever receiving something like
3  that?
4      A.  I don't deny it.  I just don't remember if I
5  ever received something like that in e-mails.  I just
6  don't remember.
7      Q.  And the same question for Charles Herring.
8  Did he ever send you a spreadsheet with Voting System
9  employee e-mails and passwords?
10     A.  I don't -- I don't recall receiving anything
11 like that.
12     Q.  All right.  Are you aware of any document that
13 meets that description that's in your possession today?
14     A.  I'm not.
15     Q.  Just real quick on the topic of Mike Lindell.
16 Did you -- did you appear at his cyber symposium that he
17 hosted in South Dakota a few years ago in August of
18 2021?  Does that sound familiar?
19     A.  The event I recall, but I don't believe I -- I
20 attended.
21     Q.  Okay.  And why not?
22     A.  Scheduling maybe.  I don't know.  I don't
23 remember.
24     Q.  Do you recall watching that event in realtime?
25     A.  I don't recall.  I mean, I remember -- I

Page 178

1  remember -- I remember there was pieces of it on the
2  Internet, I mean, stuff that I do remember, but that's
3  about it.
4      Q.  And on an unrelated note, have you ever worked
5  with a guy named Dennis Montgomery?
6      A.  I know who it is, but I don't recall ever
7  working with him.  I don't believe I ever worked with
8  him.
9      Q.  Have you ever met him?
10     A.  I have.  I met him once.
11     Q.  What was the context of that meeting?
12     A.  Introduction and just talking about, you know,
13 background and technical stuff.  A lot of things.  But
14 that's -- that's about it.  Nothing dramatic.
15     Q.  Are you aware that Mr. Montgomery claims that
16 there's a super computer called Hammer which has rigged
17 elections all over the world?
18     A.  I am.  I have heard that.
19     Q.  Do you have any reason to believe that
20 computer exists?
21     A.  I don't have any reason to believe that it
22 exists or doesn't exist.
23     Q.  So in your experience, you've never heard of
24 Hammer or a software application called Scorecard being
25 utilized to manipulate election results in the United

Page 179

1  States or abroad?
2      A.  I have heard about it.  I have heard about it,
3  read about it in the news.
4      Q.  Okay.  As you sit here today, do you believe
5  that that has occurred?
6      A.  Believe what has occurred?
7      Q.  That the United States military has utilized a
8  super computer called Hammer to manipulate election
9  results around the world?
10     A.  I'm not sure what you're asking me.  That the
11 U.S. military has the capability to manipulate
12 elections?
13     Q.  Yes.
14     A.  I mean, are you asking me if we have or have
15 ever manipulated elections around the world?
16     Q.  I am asking if a super computer called Hammer
17 has done that, to your knowledge.
18     A.  I -- to my knowledge, I don't know that.  I
19 don't know that.
20     Q.  And did Mr. Montgomery ever provide you any
21 evidence or information related to Hammer or Scorecard?
22     A.  No, not -- if he did, I don't recall.  But I
23 don't remember ever communicating with him other than my
24 first -- when I met him.
25     MR. KLOEWER:  Okay.  I'm sorry to go off the

Page 180

1  record again after I just did, but if I could just
2  have like three minutes, I think I'll probably wrap
3  up here pretty quick if we could just have a quick
4  break, and I'll hop back on here in two, three
5  minutes.
6      THE WITNESS:  Sure.  Great.  Thank you.
7      THE VIDEOGRAPHER:  The time now is 3:14 p.m.,
8  and we're going off the record.
9      (A recess was had at 3:14 p.m. to 3:20 p.m.)
10     THE VIDEOGRAPHER:  The time now is 3:20 p.m.,
11 and we are back on the record.  You may proceed.
12     MR. KLOEWER:  Okay.  We continue to have some
13 Internet problems on my end.  But in any case, I
14 have no further questions, so I'll pass the
15 witness.
16     MS. WEISS:  I don't have any questions.  Thank
17 you.
18     MR. GREAVES:  No questions.
19     THE VIDEOGRAPHER:  Okay.  Read or waive?
20     MR. KLOEWER:  Okay.  Sorry.
21     MR. GREAVES:  He'll read.
22     THE VIDEOGRAPHER:  All right.  Are we ready to
23 go off the record then?
24     MR. KLOEWER:  I believe so, yes.
25     THE VIDEOGRAPHER:  Okay.  Please stand by.

Page 181

46 (Pages 178 - 181)

1    The time now is 3:21 p.m.  We are going off
2  the record.  And this concludes today's testimony
3  given by Michael T. Flynn.
4    The total number of media used was four and
5  will be retained by Veritext Legal Solutions.
6    (Concluded at 3:21 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 182

---

1                REPORTER'S CERTIFICATE
2
3  STATE OF FLORIDA
4  COUNTY OF HILLSBOROUGH
5
6    I, Nathan F. Perkins, Registered Diplomate
7  Reporter, certify that I was authorized to and did
8  stenographically report the deposition of Michael T.
9  Flynn; that a review of the transcript was requested;
10  and that the transcript is a true and complete record of
11  my stenographic notes.
12
13    I further certify that I am not a relative,
14  employee, attorney, or counsel of any of the parties,
15  nor am I a relative or employee of any of the parties'
16  attorney or counsel connected with the action, nor am I
17  financially interested in the action.
18
19    Dated this 18th day of April, 2024.
20                          _____
21
22              *Nathan F. Perkins*
23    _____
24            Nathan F. Perkins, RDR
25

Page 184

---

CERTIFICATE OF OATH

1
2
3
4  STATE OF FLORIDA
5  COUNTY OF HILLSBOROUGH
6
7
8    I, Nathan F. Perkins, RDR, Shorthand Reporter and
9  Notary Public, State of Florida, certify that
10  Michael T. Flynn appeared before me by video conference
11  on April 4, 2024, and was duly sworn.
12
13    WITNESS my hand and official seal this 18th day
14  of April, 2024.
15
16
17                          _____
18
          *Nathan F. Perkins*
19
    _____
20        Nathan F. Perkins, RDR
          Notary Public - State of Florida
21        My Commission Expires:  7/18/2025
          Commission No. HH 122841
22
23
24
25

Page 183

---

1        WITNESS' SIGNATURE PAGE
2  PLEASE ATTACH TO THE DEPOSITION OF MICHAEL T. FLYNN,
   TAKEN ON APRIL 4, 2024, IN THE CASE OF ERIC COOMER,
3  Ph.D., VS. MAKE YOUR LIFE EPIC LLC, ETC., ET AL.
4  PAGE  LINE   CORRECTION AND REASON THEREFOR
5
6
7
8
9
10
11
12
13
14
15
16
17
18
    I HAVE READ THE FOREGOING PAGES AND, EXCEPT FOR ANY
19  CORRECTIONS OR AMENDMENTS INDICATED ABOVE, I HEREBY
    SUBSCRIBE TO THE ACCURACY OF THIS TRANSCRIPT.
20
21  _____    _____
22  MICHAEL T. FLYNN                DATE
23
24  _____    _____
25  WITNESS TO SIGNATURE            DATE

Page 185

47 (Pages 182 - 185)

1  Jason Greaves

2  jason@binnell.com

3          April 18, 2024

4  RE: Coomer, Eric, Ph.D. v. Make Your Life Epic

5    4/4/2024, Michael T. Flynn (#6630872)

6    The above-referenced transcript is available for

7  review.

8    Within the applicable timeframe, the witness should

9  read the testimony to verify its accuracy. If there are

10  any changes, the witness should note those with the

11  reason, on the attached Errata Sheet.

12    The witness should sign the Acknowledgment of

13  Deponent and Errata and return to the deposing attorney.

14  Copies should be sent to all counsel, and to Veritext at

15  Errata-tx@veritext.com.

16   Return completed errata within 30 days from

17  receipt of testimony.

18   If the witness fails to do so within the time

19  allotted, the transcript may be used as if signed.

20

21

22          Yours,

23          Veritext Legal Solutions

24

25

                                    Page 186

Veritext Legal Solutions
800-336-4000

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.