**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Civil Action No. 21-cv-3440-WJM-KAS

ERIC COOMER, Ph.D.,

      Plaintiff,

v.

MAKE YOUR LIFE EPIC LLC, doing business as ThriveTime Show,
CLAYTON THOMAS CLARK, individually, and
REOPEN AMERICA LLC, doing business as ReAwaken America Tour,

      Defendants.

---

**ORDER GRANTING IN PART AND DENYING IN PART**
**DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

Before the Court is Defendants Make Your Life Epic, doing business as ThriveTime Show, Clayton Thomas Clark, and Reopen America LLC, doing business as ReAwaken America Tour's (collectively, "Defendants"), motion for partial summary judgment ("Motion") (ECF No. 213). Plaintiff Eric Coomer, Ph.D., filed a response, to which Defendants filed a reply. (ECF Nos. 222, 224.) The parties also filed supplemental briefing on the Motion at the Court's direction. (ECF Nos. 234, 236, 237.)

For the following reasons, the Court grants in part and denies in part the Motion.

## I.    BACKGROUND AND PROCEDURAL HISTORY

The parties are familiar with the underlying facts of this case by way of, among other sources, the Court's Order denying Defendants' special motion to dismiss and motion to strike (ECF No. 45 at 2–5), the Tenth Circuit's opinion dismissing Defendants' appeal of that Order (ECF No. 131), and Magistrate Judge Kathryn A. Starnella's civil

contempt recommendation (ECF No. 144). The Court incorporates that general background here and adds the following pertinent procedural history.

In March 2023, the Court denied Defendants' special motion to dismiss, concluding with respect to Coomer's defamation claim that "[t]here can be no real dispute that at least some of the statements attributed to Defendants are defamatory." (ECF No. 45 at 17.) The Court explained that Colorado law recognizes that "a statement is defamatory per se if it imputes a criminal offense," and that, here, "Plaintiff has submitted evidence tending to show Defendants repeatedly endorsed [Non-party Joseph] Oltmann's accusation that Dr. Coomer committed fraud and treason by inviting him on the ThriveTime Show and the Tour." (*Id.* at 17–18.) Observing that "[t]reason is a crime so infamous it is specifically mentioned in the federal Constitution," the Court found that "Plaintiff ha[d] met his burden at step two with respect to the first element" of his defamation claim. (*Id.* at 18.) The Court likewise found that the other defamation elements had been satisfied at the special motion to dismiss stage. (*Id.* at 18–20.) The Court denied the motion to dismiss Coomer's intentional infliction of emotional distress and civil conspiracy claims as well. (*Id.* at 20–24.)

In November 2024, Defendants filed the Motion, seeking summary judgment on "34 discrete [defamatory] statements" they believed Coomer intended to assert as individual causes of action. (ECF No. 213 at 1.) 27 of these statements are listed in Defendants' "Exhibit 10," which they have repeatedly cited throughout this litigation. (*See, e.g.*, ECF No. 213-9; ECF No. 24-10.) The remaining seven statements were allegedly published by Defendants during various months in 2022. (ECF No. 175 ¶¶ 89–102.) Defendants also seek summary judgment on Coomer's civil conspiracy claim.

(ECF No. 213 at 2.)

Earlier this month the Court directed the parties to supplement their briefing on the Motion.  (ECF No. 234.)  The Court observed Defendants' argument that "each allegedly defamatory publication constitutes a separate and independent cause of relief."  (ECF No. 224 at 2 (citing *Lininger v. Knight*, 226 P.2d 809, 812 (Colo. 1951) ("No law is better settled than that each publication of a libel is a separate and independent claim.").)  The Court agreed that this law shall govern this case, notwithstanding Coomer's previous suggestion to the contrary.[1]  (*Id.*)  The Court further agreed that summary judgment was the appropriate stage at which to "rule on whether a statement is defamatory."  (*Id.* at 3.)

Yet the Court had "difficulty discerning whether certain statements listed in Defendants' exhibit (ECF No. 213-9) are actionable because Coomer has repeatedly suggested that some of these statements are not intended to suffice as standalone cause[s] of action but rather merely lend necessary context to other publications the Court has already found to be actionable, such as that he committed fraud and treason by allegedly rigging the 2020 election."  (ECF No. 45 at 18 (internal quotation marks omitted).)  Accordingly, the Court ordered "Coomer to supplement his briefing on Defendants' Motion to clearly explain which of these statements he believes are independent causes of action to be submitted to the jury . . . ."  (*Id.* at 5.)  The Court also ordered Defendants to respond to Coomer's supplement.  (*Id.* at 6.)

---

[1] In his supplement, Coomer dispels any notion that he disputes that this law should govern this case, clarifying that he "cannot and does not dispute that he must propose explicit and discrete jury instructions with respect to each allegedly defamatory statement."  (ECF No. 236 at 2.)

In his supplement, Coomer acknowledges that the original arguments in his
response to the Motion "have understandably given rise to confusion with respect to the
different statements which [he] intends to present to the jury as discrete claims for
defamation."  (ECF No. 236 at 1.)  "In an effort to assuage the confusion," Coomer
attached to the supplement his own exhibit "identifying thirteen published statements
that he asserts are defamatory."  (*Id.* at 2.)  The 13 allegedly defamatory statements are
as follows:

1. Oltmann: "I'll kind of walk through what was said.  Eric starts
   talking.  They identify him as Eric.  Somebody asks who Eric
   is.  Eric responds, or somebody responds, 'Eric's the
   Dominion guy.'  So that's where I heard Eric Dominion guy.  I
   didn't even know what Dominion was.  He continues to talk,
   Eric responds, and then somebody says 'Hey what are we
   going to do when f-ing Trump wins?'  And then he responds,
   'Don't worry, Trump's not going to win, I made sure of that.'
   And then they all sort of laugh.  So Eric continues to fortify
   the group and recruiting."

2. Oltmann: "I've signed an affidavit.  I have been in touch with
   the Trump legal team.  I've testified in certain areas.  I've
   obviously given nearly 200 interviews.  The reason why I
   know we're over the target, that Eric Coomer is the target we
   should concentrate on, is that he holds the patents.  Patents
   that he holds have actually been assigned to Dominion.  He
   has very very deep ties to a radical group, or affiliated with,
   and so you're talking about somebody that frankly has the
   ability to affect elections, and is in a position to affect those
   elections, but is also is kind of a wolf in sheep's clothing.  He
   sits back as a Director of Strategy and Security, but in
   actuality, he calls all the shots in Dominion."

3. Clark: "As we wrap up today's show, I've got a few great
   patriots in the studio here that wanted to ask you questions.
   And the questions that they wanted to ask you, these guys
   are actually former members of the U.S. military.  And
   there's a concern they have, is that the word 'treason' means
   the crime of betraying one's country, especially by
   attempting to kill the sovereign or overthrow the government.
   And you have these people like Eric Coomer that are

attempting to overthrow what appears to be the will of the people.  Overthrowing the will of the people by switching the votes.  Eric Coomer, again the Director of Strategy and Security for Dominion, again is a member of Antifa.  And they had some concerns.  So you just want to be sure to eat the mic, eat that mic likes it's a spiritual event.  Like it's your favorite corndog.  Great.  Sir, I'll have you introduce yourself to our guest."

Joe Kent: "Hi Joe, my name is Joe Kent."

Clark: "And when did you serve in the military?"

Kent: "1999–2001."

Clark: "Did you serve in the real military?"

Kent: "The real military.  The United States Navy."

Clark: "I just wanted to be sure, sometimes people make stuff up on social media.  And what branch were you in?"

Kent: "The United States Navy."

Clark: "Okay.  And does it bother you, knowing that the head of Security and strategy for Dominion is a member of Antifa who wants to overthrow our country?"

Unnamed Guest: "That's really concerning.  What's most concerning is what's actually going to happen when all of this information comes out?  Joe, I just want to know, is the punishment actually going to fit the crime.  Are we going to get a slap on the wrist, or are they going to bring the boom?"

Oltmann: "I would like to say that we are going to bring the boom and that they're going to find that these people are being held and imprisoned for long prison sentences.  And frankly, if they're found to have suppressed the voice of the American people, if it rises to that level, they can be put to death.  I would like to think that we would as a deterrent have that happen, but I think there's an immense amount of evil in our government structure."

4. Joe Oltmann: Exposing the Treasonous Eric Coomer the ANTIFA Member and the Director of Strategy and Security at DOMINION Voting Systems.  Joe Oltmann is a successful

entrepreneur and the founder of Pin Business Network who
is exposing the Director of Strategy and Security for
DOMINION Voting Systems for being a member of ANTIFA."

5.   a. "What does every American need to know about Eric
     Coomer and DOMINION?"

     b. "When did you first discover the ANTIFA loving nature of
     Eric Coomer?"

     c. "What happened to the VOTING systems in Georgia, and
     what was Eric Coomer's role in this?"

     d. "What action do you want our listeners to take as a result
     of today's show?"

     e. "What do we do with people that commit treason, sedition,
     and subversive activities?"

     f. "Is Eric Coomer going to go to jail for this?"

     g. "Where is Eric Coomer going?"

     h. "Why is it important for people to know that George Soros
     and Dominion actually shared office space?"

6.   Clay Clark: "Vanessa, this is Joe Oltmann."

     Vanessa Clark: "Hi, nice to meet you."

     Clay Clark: "Now, Joe is a guy, he employs 217 employees,
     and he discovered this election fraud.  Now did you talk to
     Eric Coomer?  Because Eric Coomer was the head of
     strategy and security for Dominion Voting Machines, and he
     was also out there putting out very pro-antifa related social
     media posts.  Did you actually talk to him, Joe?"

     Oltmann: "No I didn't.  I sat on the phone very quietly.  You
     know, but I did make sure it was Eric Coomer.  I went back
     and listened to other interviews that he had given.  He made
     himself quite the public figure for Dominion Voting Systems.
     He's also a shareholder and holds the adjudication patents
     for Dominion Voting Systems.  So I made sure it was him.  I
     did an amazing amount of research on his social media
     platforms.  It wasn't just pro-antifa stuff that helped with
     validation, it was all the other things, the anti-Trump, anti-

American sentiment that he had out there. He talks about bias, but the true bias is for a guy that literally can't tell the truth. I know more about Eric Coomer than I think any other person in the country because I've done an amazing amount of research and I've gotten a lot of people to come forward with information about him."

Clay Clark: "Hey where can we go to find all this Eric Coomer information?"

Oltmann: "I'll ship it to you. I'll send it to you. Obviously I got sued by Eric Coomer and I got threatened to get sued by Dominion Voting Systems, so we're right in the middle of it right now."

Clay Clark: "Is there a website?"

Oltmann: "I haven't put a website up yet, but that's actually a really good idea. Maybe I should do that."

7.  Oltmann: "I happened to get on a phone call with a guy named Eric Coomer back in September of last year, and he said, 'Hey don't worry about it, Trump's not going to win, I made sure of that.' I'm in the church of the lord so I'm not going to tell you what he said, but I am going to tell you that I didn't know what I knew at that point. I didn't know. I wrote it down, I thought these guys were nuts, and it wasn't until three days after the election. You know what happened on election night. It wasn't until three days afterwards that I figured out, somebody sent me an article, when his name was in there and he was the spokesperson for Dominion Voting Systems, what I was looking at. I did my research. I do believe things are providential. I do believe that I didn't have to get involved, but for such a time as this, we all should be getting involved."

8.  Oltmann: "Here's what I know. Eric Coomer was on that call. Eric Coomer who is the Director of Strategy and Security for Dominion Voting Systems is a liar. I just sat in a deposition with him where the guy literally lied about everything. Dominion Voting Systems is a system just like others that is designed to steal your voice. That's not hyperbole. That's not me making stuff up. That's truth."

9.  Clay Clark: "Alright ladies and gentlemen, our next speaker, our next presenter, is a very successful entrepreneur who

7

had hundreds of employees and all sorts of reasons to not fight back, but he discovered the corruption, the election fraud, and this little guy who was the head of security for a company called Dominion, by the name of Eric Coomer, who happens to be pro-antifa.  So he decided to put his career on hold and to put his hundred per cent focus on trying to save this nation and to expose the corruption of election fraud.  Ladies and gentlemen, please stand to your feet and greet Joe Oltmann."

10. Oltmann: "I happened to get on this fateful call with Eric Coomer of Dominion Voting Systems and he said I wasn't on that call.  If you guys haven't gotten a chance to watch his deposition, that four hours that Sidney Powell's attorney eviscerated him in that deposition.  He lied, then lied again, then lied again, then admitted at the very end, well, I might support Antifa.  I didn't lie, so I'm going to start this by telling you this, Galatians 4:16 says 'Am I the enemy because I tell you the truth?'"

11. Oltmann: "But I was on that call with Eric Coomer that day.  I wrote down copious notes how Trump's not going to win, I'll make sure of it.  Don't worry about it.  That's not what he said.  He said, I can't say it in a church.  Don't worry about Trump, he's not going to win.  I made [pauses] sure of it.  Now at the time, that was in September, I had no idea what I was in for.  I did my research on that guy.  He had a doctorate.  Now what kind of doctor goes out and supports antifa?  Come to find out that our country has been infected with people that have gone through and been indoctrinated with the education or training system in the universities.  Fast forward to the election.  We all saw what happened on November 3, did we not?  Your eyes do not deceive you.  November 6, I made a decision.  I came forward and said, because somebody sent me something and said, hey check this out, and Eric Coomer was in there.  So I came forward and did research because I'm a tech guy.  I'm a data guy.  I've got data on all of you.  And then I came forward after telling my wife our lives would never be the same.  I found his anti American anti Trump anti police rhetoric.  Kill pigs.  F the USA.  Things that no one who is responsible for over 50% of the vote in this country should ever be putting out there, even if they thought it.  I found a man that was a skinhead, a drug addict, twice arrested for DUI.  And you can say, oh I have friends who are drug addicts.  He was just arrested a month ago, by the way, for a crime.  Again.  This

is the guy that's running 50% of our voting system.  He's the one that holds patents in the adjudication process.  He's the one that built some of the code that's used in other election systems across our country.  And we've been talking about all of the theft that's happened, and I'm a subject matter expert on system architecture.  I'm here to tell you one thing.  The election on November 3, 2020, was stolen.  By a lot, not a little."

12. Clay Clark: "We're not going to be stopped.  So, specifically our next presenter, he has been exposing the corruption of Dominion, of Eric Coomer, of election fraud, and he's here with you today to share the truth about high integrity elections and how we're going to move to a place where election fraud is no longer possible in these great United States.  Ladies and gentlemen, please stand to your feet and greet the successful entrepreneur with hundreds of employees who has decided to devote his entire treasure and time to exposing election fraud.  Ladies and gentlemen, it's Joe Oltmann!"

13. Oltmann: "And so when I stepped out I talked about the fateful call that Eric Coomer was on where he said don't worry about the election, Trump won't win, I made sure of it.  I want to take you back in time for a minute, because I just stepped out and said this is what I know.  Now we all saw what happened on the third of November.  We saw with our own eyes and they tried to tell us, nothing to see here.  You saw it."

(ECF No. 236-2.)  Coomer contends that "[t]hese statements all feature claims published by Defendants that [he] engaged in criminal conduct, confessed to having engaged in criminal conduct, or acted in a manner incompatible with his profession." (ECF No. 236 at 2 (citing *Gordon v. Boyles*, 99 P.3d 75, 79 (Colo. App. 2004).)

Defendants respond that they seek summary judgment on statement numbers 3, 4, 5, 7, 9, 12, and 13, as listed in Coomer's supplemental exhibit.  (ECF No. 237 at 1, 4, 5.)  Defendants also note that, although they "conceded Plaintiffs' Statements Nos. 1, 2, 6, 8, 10, and 11" as listed in their Exhibit 10, that "concession does not extend to the

new statements Plaintiff added in his Supplemental Response." (*Id.* at 2.) Defendants

quibble with certain sentences that Coomer includes in his supplemental exhibit, but

which Defendants did not include in their Exhibit 10.[2] (*Id.*) Finally, Defendants move for

summary judgment on three statements allegedly contained in Defendants' Exhibit 10

but that are not included in Coomer's supplemental exhibit. (*Id.* at 7.)

## II.     ANALYSIS

Defendants move for summary judgment on seven of the 13 statements Coomer

alleges to be defamatory in his supplemental exhibit. (ECF No. 213, 237.) As to

statement numbers 3, 4, 5, 7, and 9, Defendants contend they are not actionable

because they are "rhetorical hyperbole" and "protected statements of opinion," not

defamatory statements of fact. (ECF No. 213 at 8.) As to statement numbers 12 and

13, Defendants contend they are barred by the applicable statute of limitations. (ECF

No. 237 at 5.) Finally, Defendants move for summary judgment on Coomer's civil

conspiracy claim. (*Id.* at 22.)

The Court agrees that statement numbers 12 and 13 were filed outside the

---

[2] This issue is unnecessarily convoluted for a few reasons. First, Coomer did not clearly set forth in his complaint which statements he intended to pursue as independent causes of action. His complaint instead resembles a shotgun pleading. *See Fawley v. Lucero*, 2023 WL 2487323, at * 2 (10th Cir. Mar. 14, 2023) (explaining that a "shotgun pleading" is "the recitation of an extended factual narrative followed by pleading numerous claims without adequately specifying which facts apply to which claims and which parties"). As a result, it appears that Defendants created Exhibit 10 to try to anticipate and organize the statements underlying Coomer's defamation claims. Evidently, Defendants may have missed a few sentences.

But the blame is not all Coomer's. For some reason, Defendants did not move to compel Coomer to issue a more definite statement under Rule 12(e). (ECF No. 222 at 13.)

Nevertheless, as explained below, the added sentences Coomer includes in his exhibit surely do not constitute standalone defamation claims. That is why the Court uses the word "quibble" to describe Defendants' challenge to the inclusion of those added sentences: they are not material to the Court's summary judgment determination.

limitations period and therefore cannot constitute independent defamation claims

against Defendants Make Your Life Epic and Clark, who did not waive this affirmative

defense.  The Court disagrees, however, that statement numbers 3, 4, 5, 7, and 9 are

not actionable; instead, the Court concludes they contain certain statements that are per

se defamatory.  Finally, pursuant to Coomer's agreement, the Court dismisses the civil

conspiracy claim.

### 1.    PERTINENT PRINCIPLES

Summary judgment is warranted "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of

law." *Coomer v. Lindell*, 2024 WL 3989524, at *2 (D. Colo. Aug. 29, 2024) (quoting

Fed. R. Civ. P. 56(a)).  "A dispute is genuine if there is sufficient evidence so that a

rational trier of fact could resolve the issue either way.  A fact is material if under the

substantive law it is essential to the proper disposition of the claim." *Id.* (quoting *Crowe

v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011)) (quotations omitted).  "It

is the movant's burden to demonstrate that no genuine dispute of material fact exists for

trial, whereas the nonmovant must set forth specific facts establishing a genuine issue

for trial." *Id.* (citing *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010)).  "At

all times, the Court will 'view the factual record and draw all reasonable inferences

therefrom most favorably to the nonmovant.'" *Id.* (quoting *Zia Shadows, L.L.C. v. City of

Las Cruces*, 829 F.3d 1232, 1236 (10th Cir. 2016)) (quotation omitted).

Notwithstanding the principle that courts must resolve factual ambiguities against

the moving party, thus favoring the right to a trial, *Houston v. Nat'l Gen. Ins. Co.*, 817

F.2d 83, 85 (10th Cir. 1987), Colorado courts have advised that it is appropriate to

"prompt[ly] resolv[e] . . . defamation actions . . . by summary judgment" because "protracted litigation could have a chilling effect upon constitutionally protected rights of free speech." *SG Interests I, Ltd. v. Kolbenschlag*, 452 P.3d 1, 6 (Colo. App. 2019).

"For centuries, the common law has afforded a cause of action to a person whose reputation has been damaged by the publication of false and defamatory statements." *Mink v. Kinox*, 613 F.3d 995, 1004 (10th Cir. 2010). "Defamation is a communication that holds an individual up to contempt or ridicule thereby causing him to incur injury or damage." *Keohane v. Stewart*, 882 P.2d 1293, 1297 (Colo. 1994). To prevail on a defamation claim, the plaintiff must establish

> (1) a defamatory statement concerning another; (2) published to a third party; (3) with fault amounting to at least negligence on the part of the publisher; and (4) either actionability of the statement irrespective of special damages or the existence of special damages to the plaintiff caused by the publication.

*Lawson v. Stow*, 327 P.3d 340, 342 (Colo. App. 2014) (quoting *Williams v. Dist. Ct.*, 866 P.2d 908, 911 n.4 (Colo. 1993)).

But where, as here, "the alleged defamatory statement concerns a public figure or a matter of public concern," "the plaintiff's burden is heightened." *Hebert v. Ritter*, 2025 WL 869399, at *2 (Colo. App. Mar. 20, 2025). "In these cases, the plaintiff must (1) prove the statement's falsity by clear and convincing evidence; (2) prove by clear and convincing evidence that the defendant made the statement with actual malice; and (3) establish actual damages, even if the statement is defamatory per se." *Id.* "A statement is false if the substance or gist of the statement was inaccurate." *Id.* (citing *Jogan Health, LLC v. Scripps Media, Inc.*, 2025 WL 209353, at *5 (Colo. App. 2025)).

"A statement is defamatory if it 'prejudice[s] the plaintiff in the eyes of a

substantial and respectable minority of the community.'"  *Coomer v. Donald J. Trump for President, Inc.*, 552 P.3d 562, 587 (Colo. App. 2024) (quoting *Arrington v. Palmer*, 971 P.2d 669, 671 (Colo. App. 1998)).  "Defamation can either be written, in which case it is libel, or oral, in which case it is slander." *Mercer Glob. Advisors, Inc. v. ACG Wealth, Inc.*, 2025 WL 786520, at *2 (D. Colo. Mar. 12, 2025).  "A defamatory statement may be defamation per se or defamation per quod." *Id.* (citing *Inter–State Detective Bur., Inc. v. Denver Post, Inc.*, 484 P.2d 131, 133 (Colo. App. 1971)).  "The distinction between libel per se and libel per quod is that to be libel per se the libel must carry its defamatory imputation on its face and is actionable without an allegation or proof of damages; but any libel which does not carry such imputation on its face is libel per quod and is actionable only where special damages are pleaded and proved." *Id.* (citing *Bernstein v. Dun & Bradstreet, Inc.*, 368 P.2d 780, 782 (Colo. App. 1962)).

For a statement to constitute defamation per se, it "must be (1) on its face and without extrinsic proof, unmistakably recognized as injurious (defamatory meaning) and (2) specifically directed at the plaintiff (identity)." *Gordon v. Boyles*, 99 P.3d 75, 78–79 (Colo. App. 2004) (citing *Lininger v. Knight*, 226 P.2d 809, 813 (Colo. 1951)). "Statements that allege criminal activity or serious sexual misconduct, or which impute 'a matter incompatible with the individual's business, trade, profession, or office,' are defamatory per se." *Am. Muckrakers PAC, Inc. v. Boebert*, 2024 WL 3738932, at *10 (D. Colo. June 9, 2024) (quoting *Gordon*, 99 P.3d at 79).  "Whether a statement is defamatory per se is a legal question to be determined as a matter of law by the court." *Mercer Glob. Advisors, Inc.*, 2025 WL 786520, at *2; *see also Am. Muckrakers PAC, Inc.*, 2024 WL 3738932, at *10 ("The meaning of allegedly defamatory statements is a

matter of law left to the Court and is not a factual allegation to which it must defer.");

*Cox v. Hatch*, 761 P.2d 556, 561 (Utah 1988) ("Only if a court first determines that a

publication might be considered defamatory by a reasonable person is there a fact issue

for the trier of fact.").

## 2.    STATEMENT NUMBERS 12 AND 13

Defendants originally sought summary judgment on seven statements they

allegedly published during various months in 2022.  (ECF No. 213 at 4–6.)  Coomer's

supplement clarifies, however, that he intends for only two of those seven statements to

proceed to trial as individual defamation claims: statement numbers 12 and 13, which

feature statements by Clark and Oltmann at the April 1, 2022 Reawaken America Tour

event in Salem, Oregon.  (ECF No. 236-1 at 7.)  Hence, the Court cabins its analysis

accordingly.

"In Colorado, defamation claims must be brought within one year after the cause

of action accrues."  *Hoid v. Denver Post et. al*, 2025 WL 720773, at *3 (Colo. App. Mar.

6, 2025) (citing *Burke v. Greene*, 963 P.2d 1119, 1121 (Colo. App. 1998)); *see also* §

13-80-103(1)(a), C.R.S. 2024.  Such claims accrue "on the date both the injury and its

cause are known or should have been known by the exercise of reasonable diligence."

*Burke*, 963 P.2d at 1121.  When a statement is published and then continuously

circulated, the date on which the statement was first published is the date of accrual for

statute of limitations purposes.  *See Corporon v. Safeway Stores, Inc.*, 708 P.2d 1385,

1390 (Colo. App. 1985); *see also Bloom v. Goodyear Tire & Rubber Co.*, 2006 WL

2331135, at *6–7 (D. Colo. Aug. 10, 2006) (statements posted on the internet are

subject to the single publication rule and, "like the publication of a book, the initial

posting of material on a web site constitutes a discrete act of publication").

Defendants argue that, despite Coomer being "aware of the [April 1, 2022] statements no later than July 31, 2023"—"when Defendant Clark served his responses identifying Oltmann's appearance at the . . . Tour Event in Salem, Oregon"—Coomer "did not seek leave to amend his complaint to include these publications until August, 19, 2024." (ECF No. 237 at 6.) And Coomer did not file his Second Amended Complaint until September 2024. (ECF No. 175.) As a result, Defendants contend the one-year limitations period "had already expired." (*Id.*)

Coomer does not contest that he was aware of the April 1, 2022 statements as early as July 31, 2023. (*See generally* ECF No. 222 at 7–14.) Nor does he dispute that the April 1, 2022 statements were not pleaded until he filed his Second Amended Complaint in September 2024, *i.e.*, over a year after he became aware of the April 1, 2022 statements in July 2023. (*Id.*) Nevertheless, Coomer insists that these two defamation claims are not time-barred because (1) Defendant "Reopen America has waived argument on this issue"; (2) "Defendants are equitably estopped from arguing the statute of limitations"; and (3) "[r]epeated amendment would have been improper." (*Id.*)

The Court agrees that Defendant Reopen American LLC waived its statute of limitations defense. Indeed, this defendant's waiver could not have been clearer when it stipulated to Coomer filing his First Amended Complaint back in October 2023: "Reopen America, LLC waives any defense asserting that liability for any publications at issue in this dispute and made after December 22, 2020 are barred by the statute of limitations." (ECF No. 97 at 1.)

The Court is not persuaded otherwise by Defendants' argument that the waiver applied only to publications that were "at issue in this case" when Reopen America, LLC stipulated to this waiver in October 2023.  (ECF No. 224 at 2.)  By this, the Court understands Defendants to mean that, because Coomer had not moved to amend his complaint to include the April 2022 statements in October 2023, the statements were not "at issue in this dispute" at that time and were therefore not covered by the waiver. (*See id.* ("[The April 1, 2022 statements] did not become 'at issue in this case' until August 19, 2024, when Plaintiff sought leave to file his Second Amended Complaint to add allegations that placed the publications 'at issue.'").)  But Defendants' interpretation of the waiver's plain language is strained.  That plain language unequivocally applies to any "statute of limitations" defense raised against "any publications at issue in this dispute and made after December 22, 2020."  The April 2022 statements are publications at issue in this dispute that were made after December 22, 2020. Defendant Reopen America, LLC therefore may not prevail on their statute of limitations defense.

Defendants Make Your Life Epic and Clark, however, undisputedly did not stipulate to this waiver.  The waiver is therefore inapplicable to them.  That leaves Coomer's arguments that equitable tolling applies and that repeated amendment was not necessary.

The Court is unmoved by these arguments.  A court may consider equitably tolling the applicable statute of limitations if the record shows that the plaintiff "did not timely file their claims because of 'extraordinary circumstances' or because [the] defendants' wrongful conduct prevented them from doing so."  *Morrison v. Goff*, 91 P.3d

1050, 1053 (Colo. 2004) (quoting *Dean Witter Reynolds, Inc. v. Hartman*, 911 P.2d

1094, 1096-97 (Colo. 1996)).  "The reasoning underlying these . . . cases is that it is

unfair to penalize the plaintiff for circumstances outside [their] control, so long as the

plaintiff makes good faith efforts to pursue the claims when possible."  *Brodeur v. Am.*

*Home Assurance Co.*, 169 P.3d 139, 149 (Colo. 2007).

Coomer does not aver that Defendants' "wrongful conduct" prevented him from

timely pleading these claims, so that exception cannot save Coomer's 2022 defamation

claims.  Instead, Coomer simply says that equitable tolling is appropriate because

discovery was stayed from March 2022 to May 2023 while the Court's dismissal order

was pending on appeal.  (ECF No. 222 at 11.)  In the Court's view, this procedural

history does not constitute extraordinary circumstances.

Coomer's contention that timely amendment was unnecessary is also unavailing.

In support, he points to the related *Coomer v. Lindell* case, in which another judge in

this District found that repeatedly amending the operative complaint to add new factual

allegations supporting Coomer's defamation claim was "unnecessary."  (ECF No. 222-2

at 11 (quoting *Neal v. Aramark Uniform & Career Apparel, LLC*, 2020 WL 5548809, at

*2 (D. Kan. Sept. 16, 2020).)  In reaching this conclusion, the court reasoned that

Coomer's First Amended Complaint was "not subject to a motion to dismiss that tests its

sufficiency, the post-litigation allegations are solely factual, and the proposed additions

do not encompass new claims or parties . . . ."  (*Id.*)

Here, however, Coomer concedes that the April 1, 2022 statements are intended

to serve as standalone causes of action, *i.e.*, new defamation claims.  (ECF No. 236 at

2.)  In other words, unlike *Coomer v. Lindell*, the inclusion of the April 1, 2022

17

statements to the Second Amended Complaint did not merely "seek to assert factual allegations related to events in 2022 and 2023 that postdate the filing of the First Amended Complaint." (ECF No. 222-2 at 13.) Coomer intends for the April 1, 2022 statements to operate as much more than just supporting factual (or contextual) allegations—according to him, they constitute independent causes of action. *Lininger*, 226 P.2d at 812.

At bottom, the important inquiry is whether enforcing the statute of limitations would unfairly "penalize [Coomer] for circumstances outside [his] control." *Brodeur*, 169 P.3d at 149. For the foregoing reasons, the Court is not convinced that Coomer's belated amendment was outside his control.

Accordingly, the Court grants summary judgment in Defendants Make Your Life Epic, LLC and Clark's favor on Coomer's defamation claims based on statement numbers 12 and 13. The Court denies summary judgment with respect to the same as to Defendant Reopen American LLC.

### 3. STATEMENT NUMBERS 3, 4, 5, 7, AND 9

Defendants contend that statement numbers 3, 4, 5, 7, and 9 are not "defamatory of Plaintiff as a matter of law." (ECF No. 213 at 6.) For the most part, the Court rejects Defendants' contention.

The Court begins by observing an important concession made by Defendants: they do not contest—at the summary judgment stage—that their alleged statements that Coomer "bragged about rigging the 2020 election during an 'Antifa' conference call in September 2020" are defamatory. (*Id.* at 7.) Defendants do not dispute the defamatory nature of such statements because "the Colorado Court of Appeals has already

determined" in a recent, related case that these accusations (and others like it) are defamatory. (*Id.*) Specifically, that court held in a published April 2024 decision "that a statement that Coomer in fact interfered with the election would be defamatory." *See Coomer*, 552 P.3d at 587. Presumably on this basis, Defendants do not dispute that certain portions of statement numbers 1, 2, 6, 8, 10, and 11, as listed in Coomer's supplemental exhibit, may proceed to a jury trial. (*Id.*)

Defendants maintain, however, that statement numbers 3, 4, 5, 7, and 9 "are either not defamatory per se or else not capable of defamatory meaning, and thus not actionable as a matter of law." (*Id.* at 8.) Specifically, Defendants argue that their use of the words "treasonous," "treason," and "fraud," when viewed in context, are "rhetorical hyperbole" and do not constitute defamation per se because they "do not charge the commission of any specific crime." (*Id.* at 8–9.) Defendants further argue that their statements that Coomer "is in fact a member of Antifa," "Antifa loving," and "pro-Antifa" "are not defamatory." (*Id.* at 18.) The Court addresses each argument and statement in turn.

"A statement may be actionable as defamation if it is 'sufficiently factual to be susceptible of being proved true or false.'" *Id.* at 588 (citation omitted). "Statements of pure opinion that do not contain a provably false factual connotation or that cannot reasonably [be] interpreted as stating actual facts about an individual are constitutionally protected and nonactionable." *Id.*; *see also Yeager v. Nat'l Public Radio*, 2018 WL 5884596, at *3 (D. Kan. Nov. 9, 2018) ("Subjective statements and statements of opinion are protected by the First Amendment as long as they do not present or imply the existence of defamatory facts which are capable of being proven true or false.").

19

But there is no "wholesale defamation exemption for anything that might be labeled 'opinion.'" *Milkovich*, 497 U.S. at 18. To the contrary, expressions of opinion "often imply an assertion of objective fact." *Id.* "To distinguish between an actionable assertion of fact and a nonactionable statement of pure opinion, [Colorado courts] apply a two-part test." *Coomer*, 552 P.3d at 587 (citing *Keohane*, 882 P.2d at 1299). "First, [courts] ask whether the statement is 'sufficiently factual to be susceptible of being proved true or false.'" *Id.* (citation omitted). "This step is satisfied if 'the statement contains *or implies* a verifiable fact.'" *Id.* at 588–89 (quoting *NBC Subsidiary (KCNC-TV), Inc. v. Living Will Ctr.*, 879 P.2d 6, 10 (Colo. 1994) (emphasis in original)). "Second, [courts] ask 'whether reasonable people would conclude that the assertion is one of fact.'" *Id.* at 589 (quoting *Keohane*, 882 P.2d at 1299). "In answering this second question, [courts] may consider how the statement is phrased, the context, and the surrounding circumstances, including the medium through which the statement is disseminated and the audience to whom it is directed." *Id.*

"[A]ssertions of fact can be made on an opinion platform," including podcasts and the like. *Id.* To discern whether a defendant has asserted a fact, it is critical to "consider each defendant's statements in context to determine how a reasonable person would have understood them." *See id.* at 582; *see also Hogan v. Winder*, 762 F.3d 1096, 1106 (10th Cir. 2014) ("[D]efamatory meaning is a matter of context."); *Mink v. Knox*, 613 F.3d 995, 1005 (10th Cir. 2010) ("Context is crucial and can turn what, out of context, appears to be a statement of fact into 'rhetorical hyperbole,' which is not actionable."); *Nguyen v. Mai Vu*, 2018 WL 5622634, at *6 (D. Colo. Oct. 30, 2018) ("[T]he law is clear that when a court assesses whether language is defamatory as a

matter of law, it must look at the totality of the circumstances surrounding the statements in question, as well as the entire context in which they were made."); *Burns v. McGraw-Hill Broad Co.*, 659 P.2d 1351, 1360 (Colo. 1983) ("Allegedly defamatory language must be examined in the context in which it was uttered.  It would not be possible for us to establish a hard and fast rule which could govern every situation. Protecting the important and competing interests of free speech and reputation requires a flexible approach anchored in the context of each cause of action."); *O'Connor v. Burningham*, 165 P.3d 1214, 1222 (Utah 2007) ("[A] reviewing court can, and must, conduct a context-driven assessment of the alleged defamatory statement and reach an independent conclusion about the statement's susceptibility to a defamatory interpretation."); *Billauer v. Escobar-Eck*, 305 Cal. Rptr. 3d 273, 286 (Cal. App. 2023) ("[I]t is not the literal truth or falsity of each word or detail used in a statement which determines whether or not it is defamatory," but "whether the 'gist or sting' of the statement is true or false, benign or defamatory, in substance.") (citation omitted).  "In this evaluation of context," the Tenth Circuit has instructed courts to examine "(1) the words themselves and their implications; (2) the entire article or message; (3) the events or disputes that gave rise to the article; and (4) the likely effect on the reasonable reader."  *Hogan*, 762 F.3d at 1106.

At the outset, the Court reiterates and adopts the Colorado Court of Appeals' conclusion "that a statement that Coomer in fact interfered with the election would be defamatory."  *Coomer*, 552 P.3d at 587.  Notably, the division in that case went on to say: "To the extent such a statement imputes a criminal offense, as several defendants' statements did expressly, it is defamatory per se."  *Id*.  With this analytical lens in mind,

the Court concludes that, when viewed in the context in which they were made,
statement numbers 3, 4, 5, 7, and 9 all contain within them specific statements imputing
a criminal offense or "a matter incompatible with the individual's business, trade,
profession, or office." *Am. Muckrakers PAC, Inc.*, 2024 WL 3738932, at *10 (citation
omitted). Consequently, the statements identified below are defamatory per se and
may proceed to trial.

The Court starts with statement numbers 3, 4, and 5, which all feature
statements by Clark and Oltmann on the December 22, 2022 Thrivetime Show podcast
episode. In statement number 3, Clark said, as pertinent here, that "there's a concern
[listeners] have, is that the word 'treason' means the crime of betraying one's country,
especially by attempting to kill the sovereign or overthrow the government." (ECF No.
236-1 at 1.) Clark then immediately directed his listeners' attention to Coomer: "And
you have these people like Eric Coomer that are attempting to overthrow what appears
to be the will of the people. Overthrowing the will of the people by switching the votes.
Eric Coomer, again the Director of Strategy and Security for Dominion." (*Id.* at 1–2.)

The Court sees no meaningful distinction between this statement and those
numerous occasions in which Defendants accused Coomer of rigging the 2020 election
against President Trump. As discussed, the Colorado Court of Appeals recently
concluded—and Defendants do not dispute at this stage of the litigation—that such
accusations are defamatory. *Coomer*, 552 P.3d at 587. What's more, the remarks in
statement number 3 go beyond what some of the statements analyzed by the Colorado
Court of Appeals said, expressly invoking the crime of treason and purporting to set
forth its meaning. As Coomer points out, Clark even "included a link to 18 U.S.C. §

2381, the statutory criminal definition of treason, in the show notes for the interview."
(ECF No. 222 at 18.)  In the Court's view, this was not mere political invective or opinion
statement; rather, Clark unequivocally told his audience that Coomer literally committed
the crime of treason by "attempting to overthrow what appears to be the will of the
people . . . by switching the votes."  *See Keohane*, 882 P.2d at 1304 ("[A]ccusations of
criminal activity, 'even in the form of opinion, are not constitutionally protected.'")
(citation omitted); *but see Letter Carriers v. Austin*, 418 U.S. 264, 285 (1974) (declining
to attach liability after finding it "impossible to believe that any reader . . . would have
understood the newsletter to be charging the appellees with committing the criminal
offense of treason").  (*Id.* at 2.)

Arguing otherwise, Defendants say that, because treason "is defined as levying
war against the United States or giving aid and comfort to its enemies," and Coomer
clearly did not wage war against the United States or give aid and comfort to its
enemies under that federal statute, it necessarily follows that Oltmann and Clark did not
mean that Coomer actually committed treason.  (ECF No. 213 at 14 (citing 18 U.S.C. §
2381).)  Instead, Defendants reason, "[t]his statement expresses a colloquial concept of
treason."  (*Id.*)

Defendants confuse the issue.  The relevant inquiry is "how a reasonable person
would have understood" Defendants' statements *in context*, *Coomer*, 552 P.3d at 587,
irrespective of whether Coomer's alleged election interference actually satisfied the
legal elements of section 2381 (or any other treason statute).[3]  *See Sign Here Petitions*

---

[3] Even if allegedly rigging an election in this way is not a crime under 18 U.S.C. § 2381,
it surely would qualify as a crime under some other statute.  *See Cinquanta v. Burdett*, 388 P.2d
780 (Colo. 1963) (explaining that alleged defamatory "words must impute conduct constituting a
criminal offense chargeable by indictment or by information either at common law or by statute

*LLC v. Chavez*, 402 P.3d 457, 464 (Ariz. App. 2017) (declining to "stop at literalism" and instead "consider[ing] the impression created by the words used as well as the general tenor of the expression, from the point of view of the reasonable person at the time the statement was uttered and under the circumstances it was made") (citation omitted); *see also Yetman v. English*, 811 P.2d 323, 331 (Ariz. 1991) (analyzing context not with the "critical analysis of a mind trained in the law, but by the natural and probable effect upon the mind of the average [listener]") (citation omitted); *Anderson v. Colorado Mountain News Media Co.*, 2019 WL 3321843, at *5 (D. Colo. May 20, 2019) ("The test is whether the challenged statement produces a different effect upon the reader than that which would be produced by the literal truth of the matter.").

The context here confirms that Clark and Oltmann's listeners believed they were not just exaggerating. Moments after Clark and Oltmann's initial colloquy concluded, a listener called in and described Clark's accusations as "really concerning" and proceeded to ask Oltmann, "I just want to know, is the punishment actually going to fit *the crime*? Are we going to get a slap on the wrist, or are they going to bring the boom?" (ECF No. 236-1 at 1 (emphasis added).) Oltmann replied that he hoped "that these people are being held and imprisoned for long prison sentences. And frankly, if they're found to have suppressed the voice of the American people, if it rises to that level, they can be put to death." (*Id.* at 2–3.) This context leads the Court to conclude that statement 3 plainly imputes a criminal offense and a matter incompatible with Coomer's profession as the former Director of Product Strategy and Security at

---

and [be] of such kind as to involve infamous punishment or moral turpitude conveying the idea of major social disgrace").

Dominion Voting Systems, Inc.[4]  Therefore, the Court concludes that this portion of

statement 3 constitutes defamation per se.  *Id.*; *but cf. Hogan*, 762 F.3d at 1108

(concluding, based on the surrounding context, that "no reasonable reader would

interpret the articles' statement that Hogan was accused of extortion to mean that

Hogan was being accused of a crime or even especially sharp behavior"); *but cf.*

*Nguyen*, 2018 WL 5622634, at *6 ("It also simply defies logic that Plaintiffs' parents

'properly understood,' much less actually believed, any of the alleged 'name-calling' by

Defendants—*e.g.*, that Plaintiffs literally were thieves, as opposed to bad business

partners who had done their cousins wrong.").

    This analysis applies with equal force to statement numbers 4 and 5.  In

statement number 4, Defendants titled the December 22, 2022 Thrivetime Show

podcast episode as follows: "Exposing the *Treasonous* Eric Coomer the ANTIFA

Member and the Director of Strategy and Security at DOMINION Voting Systems."  (*Id.*

at 3 (emphasis added).)  Contrary to Defendants' assertion, the context of Defendants'

use of the word "treasonous" in the podcast headline, in combination with the rest of the

episode's content, reveals that it was meant literally, not hyperbolically.  *See Hogan*,

762 F.3d at 1109 (suggesting that a headline, on its own, may be considered

defamatory if the surrounding context of the publication supports that conclusion); *see*

---

[4] Coomer argues that Defendants' "singular focus on 'commission of any specific crime'
is another improper framing of the issue."  (ECF No. 222 at 20.)  His theory is that these
statements are defamatory per se because they also impute a matter incompatible with his
business, trade, profession, or office.  (*Id.*)  Inexplicably, Defendants do not address this issue in
their Motion, reply, or response to Coomer's supplement.  (*See generally* EFC Nos. 213, 224,
237.)  Accordingly, the Court concludes Defendants have waived any opposition to this
argument.  *See JME Investments, LLC v. Westfield Ins. Co.*, 2025 WL 345754, at *10 (D. Colo.
Jan. 30, 2025) (a "failure to respond to an argument in a response brief results in waiver")
(citation omitted).

*also Anderson*, 2019 WL 3321843, at *5 ("find[ing] that the headline should be construed in conjunction with the entirety of the article"). The Court concludes that this portion of statement number 4 constitutes defamation per se.

Similarly, statement number 5 contains a series of questions posed by Clark to Oltmann ahead of the December 22, 2022 podcast interview (and later published to Thrivetime's website), including, "What do we do with people that commit treason, sedition, and subversive activities?" (*Id.*) To the Court's mind, this statement by Defendants, while posed as a question, implies a statement of verifiable fact—namely, that Coomer, who was specifically named in the title of the episode,[5] "commit[ed] treason, sedition, and subversive activities" by rigging the 2020 election. *See Coomer*, 552 P.3d at 588 (concluding that the paraphrasing of defamatory statements is still actionable); *see also Milkovich*, 497 U.S. at 18 (noting that a factual assertion may be implied); *Keohane*, 882 P.2d at 1302 (concluding that a question, "though not phrased in the form of a declaration of fact, may imply the existence of a false and defamatory fact"). (*Id.*) The Court concludes that this portion of statement number 5 constitutes defamation per se.

Statements numbers 7 and 9 are likewise problematic. In statement number 7, at the July 18, 2021 Reawaken American Tour event in Anaheim, California, Oltmann

---

[5] To the extent Defendants believe this statement is not defamatory because it is not directed specifically at Coomer, the Court disagrees. (*See* ECF No. 213 at 21 (challenging various statements, no longer at issue as a result of the supplemental briefing, where Oltmann referred to "these people" who "have suppressed the voice of the American people").) True, per se defamatory statements "must be . . . specifically directed at the plaintiff," *Gordon*, 99 P.3d at 78–79, but the context of the statements at issue here clearly shows that Coomer was Defendants' target. Defendants repeatedly invoked his name throughout their podcast and included his name in the episode's title. Coomer need not show that Defendants expressly and specifically uttered his name in each published statement in order to satisfy the identity element of the defamation analysis.

said, among other things, "I happened to get on a phone call with a guy named Eric
Coomer back in September of last year, and he said, 'Hey don't worry about it, Trump's
not going to win, I made sure of that.'" (*Id.* at 5.)  Frankly, in light of their
aforementioned concession, the Court does not understand why Defendants challenge
this statement.  This portion of statement 7 is materially identical to Oltmann's earlier
accusations that Coomer confessed to rigging the 2020 election.  To reiterate,
Defendants do not contest the defamatory nature of this sort of language in other
statements, including statement number 1, in which Oltmann basically said the exact
same thing.  (*See* ECF No. 213 at 22 (not challenging statements that "Plaintiff boasted
about and thereby admitted 'rigging' the 2020 election" and other statements with the
same "gist").)  The Court concludes that this portion of statement number 7 constitutes
defamation per se.

The gist of statement number 9 is the same, although it involves a different
speaker using different words.  Therein, at the November 17, 2021 Reawaken America
Tour event in San Antonio, Texas, Clark introduced Oltmann to the audience by
announcing that Oltmann "discovered the corruption, *the election fraud*, and this little
guy who was the head of security for a company called Dominion, *by the name of Eric
Coomer*, who happens to be pro-antifa."  (*Id.* at 5 (emphases added).)  Later, at that
same event, Oltmann again referred to the alleged "Antifa call" on which Coomer
purportedly confessed to rigging the 2020 election.  (*Id.* at 6 (statement number 10,
which Defendants do not object to, wherein Oltmann refers to "the fateful call with Eric
Coomer of Dominion Voting Systems").)  For the reasons already explained, the Court
concludes that this portion of statement number 9 is clearly defamatory based on its

surrounding context.  *See Coomer*, 552 P.3d at 588 ("Defendants were not discussing
this story in the context of political activism; they were discussing it *in the context of
claims of election fraud.*  In that context, a statement that Coomer had 'made sure'
President Trump was not going to win could mean only that he had taken steps to
subvert the election results.") (emphasis added).

The specific context laid out in this analysis is what distinguishes this case from
the litany of cases Defendants cite in their Motion.  Significantly, the Colorado Court of
Appeals had the opportunity to review at least some of the cases on which Defendants
principally rely and concluded that they did not control given their differing contexts.
*See id.* (concluding that *Herring Networks, Inc. v. Maddow*, 8 F.4th 1148 (9th Cir. 2021),
and *McDougal v. Fox News Network, LLC*, 489 F. Supp. 3d 174, 182 (S.D.N.Y. 2020)
did not control).  The Court agrees that those cases are distinguishable.  Unlike
*McDougal*, for example, where the court concluded that "[t]he context in which the
offending statements were made [] make it abundantly clear that Mr. Carlson was not
accusing Ms. McDougal of actually committing a crime," the context of the offending
statements at issue here makes it abundantly clear that Defendants were indeed
accusing Coomer of actually committing treason.  *See id.* at 182 (observing "that
accusations of 'extortion,' 'blackmail,' and related crimes, such as the statements Mr.
Carlson made here, are often construed as merely rhetorical hyperbole *when they are
not accompanied by additional specifics of the actions purportedly constituting the
crime*") (emphasis added).[6]

---

[6] In further contrast to the *McDougal* decision, the December 22, 2020 episode of
Defendants' podcast did not purport to "challeng[e] political correctness and media bias," rather
than state "actual facts," as Tucker Carlson's show purported to do.  F. Supp. 3d at 183.  The
"general tenor" of Defendants' podcast episode—again, titled "Exposing the Treasonous Eric

Finally, the Court addresses Defendants' arguments disputing the defamatory nature of statements that Coomer "is in fact a member of Antifa," "Antifa loving," and "pro-Antifa." (ECF No. 213 at 18.) When confronted with a similar statement— specifically, that "Coomer participated in an Antifa conference call"—the Colorado Court of Appeals "agree[d] that it is a closer call whether merely stating that Coomer had participated in an Antifa call would alone be defamatory under these circumstances." *Coomer*, 552 P.3d at 588. The division abstained from resolving this issue, however, because "the central focus of defendants' statements was not simply that Coomer had been on an Antifa call, but what he had said on that call." *Id.*

The Court similarly perceives Coomer to focus his defamation claims primarily on what Oltmann claims he said on the alleged Antifa call, *i.e.*, that he allegedly rigged the election. While Coomer clearly avers in his response to the Motion that "[r]eferences to 'Antifa' are relevant and actionable," his supplemental exhibit does not explicitly identify whether he intends to pursue such references on a standalone basis, or whether those references merely provide context. (*See* ECF No. 222 at 22 (explaining that "[t]he Antifa call . . . provides necessary cover for the logical leap made by Defendants, namely that Dr. Coomer had the motivation to and actually did rig the presidential

---

Coomer the ANTIFA Member and the Director of Strategy and Security at DOMINION Voting Systems"—was to educate its listeners about actual facts that Oltmann had purportedly uncovered during his research of Coomer. *Id.*

Moreover, unlike *McDougal*, the parties have pointed the Court to no facts suggesting that Defendants included disclaimers, caveats, or other statements informing their listeners that they were merely asserting opinions or theories for the sake of argument. *See Coomer*, 552 P.3d at 589 ("[A]s to the statements in question, defendants did not hedge. They did not even couch the statements with qualifying language like 'I think,' 'I believe,' or 'in my opinion.' Rather, they reported Oltmann's account in declarative terms and then connected it to claimed election irregularities . . . .").

election").).)

In any event, to the extent Coomer does so intend, the Court agrees with Defendants that accusations that Coomer is affiliated with Antifa are not per se defamatory.  While the Court believes that such accusations likely "prejudice the plaintiff in the eyes of a substantial and respectable minority of the community," the Court is not convinced that such an accusation is "sufficiently factual to be susceptible of being proved true or false."  *Id. at* 587 (citations omitted).  In this way, the Court follows the *Harris v. Warner* decision, wherein the Arizona Supreme Court concluded that the defendant's accusation that the plaintiff was "acting like ANTIFA" was not actionable because "it is impossible [to] prove whether [that statement is] true or false, which is necessary for a defamation action."  527 P.3d 314, 319 (Ariz. 2023); *see also United States v. Rundo*, 108 F.4th 792, 798 n.3 (9th Cir. 2024) ("Throughout the record, the parties and the district court refer to 'Antifa' as if it were a formal organization, using language such as 'Antifa member.'  However, Antifa, which stands for 'anti-fascist,' 'is not a well-structured organization, but rather a loosely organized, secretive movement of like-minded far-left activists.  There are no leaders, no hierarchy and no formal membership.'") (citation omitted).  Because "Antifa" is not a well-structured organization, the Court doubts that it is possible for one to reliably prove or disprove the truth of one's membership, at least in the defamation context.

In sum, the Court concludes that those portions identified above of statement numbers 3, 4, 5, 7, and 9 are defamatory per se and may proceed to trial.

### 4.    LOOSE ENDS REGARDING COOMER'S DEFAMATION CLAIM

As this analysis makes clear, the Court does not suggest that every word or

every sentence in statements 1–13 of Coomer's supplemental exhibit is defamatory and therefore actionable.  Clearly, some are not.  As a result, the Court's summary judgment Order is not intended to resolve these issues on such a molecular level, as Defendants seem to ask the Court to do.  This Order simply makes clear that those portions of the statements identified and discussed above are defamatory and therefore may proceed to trial.  Whether the remaining balance of each of those statements may be included in the jury instructions or verdict form for context purposes is an issue best saved for another day.

Thus, the Court rejects Defendants' request that it grant summary judgment on portions of statements Coomer added to statement numbers 1, 2, 6, 8, 10, and 11 in his supplemental exhibit.  It would be absurd for Coomer to argue that statements like "I'll ship it to you," which was added to statement number 6 in the supplemental exhibit, is an independent cause of action.  Again, the relevance of such a sentence is a jury instruction issue, not a summary judgment issue.  *See Coomer*, 2024 WL 3989524, at *5 ("[S]ummary judgment on the actionability of select statements in the Second Amended Complaint is unmerited.").

Lastly, the Court rejects Defendants' request for summary judgment on statement numbers 6, 7, and 21, as listed in their Exhibit 10.  Coomer did not include those statements in his supplemental exhibit, evincing his intent not to pursue them as independent defamation claims.  Accordingly, they are not claims upon which the Court can grant summary judgment.  In the end, the result is the same: the jury will not be instructed on statements Coomer did not include in his supplemental exhibit.

## 5. CIVIL CONSPIRACY CLAIM

Finally, Defendants move for summary judgment on Coomer's civil conspiracy claim. (ECF No. 213 at 22.) Coomer stipulates to the dismissal of this claim. (ECF No. 222 at 25.) Accordingly, Coomer's civil conspiracy claim is dismissed.

## III.    CONCLUSION

For all these reasons, the Court ORDERS:

1. The Motion (ECF No. 213) is GRANTED IN PART AND DENIED IN PART, as set forth above;

2. Coomer's civil conspiracy claim is DISMISSED;

3. The Final Pretrial Preparation Conference remains set for **August 20, 2025 at 10:30 a.m**. in Courtroom A801, and the 10-day jury trial remains set to begin on **September 8, 2025 at 8:30 a.m**.

Dated this 25th day of April, 2025.

BY THE COURT:

William J. Martínez
Senior United States District Judge